## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

In re UPSTREAM ADDICKS AND BARKER
(TEXAS) FLOOD-CONTROL RESERVOIRS

**Sub-Master Docket No. 17-9001L**
**Charles F. Lettow**
**Judge**

THIS DOCUMENT APPLIES TO:

ALL UPSTREAM CASES

### MASTER AMENDED COMPLAINT FOR UPSTREAM PLAINTIFFS

Plaintiffs Christina Micu; Sandra Rodriguez; Erich Schroeder; Catherine Popovici; Elisio Soares; Marina Ageyeva; Lakes on Eldridge Community Association, Inc.; Robert Rheinboldt; Glenn Peters; Mollie Kish; Kulwant Sidhu; Scott Specksgoor; and Scott Holland (each appearing individually and on behalf of all persons similarly situated) (collectively "Plaintiffs"), respectfully submit this Master Amended Complaint for Upstream Plaintiffs against the United States of America ("United States" or "Government") and allege:

### INTRODUCTION

1.      This lawsuit for just compensation centers on the flooding of private property within the Addicks and Barker Reservoirs caused by the Government during and after Tropical Storm Harvey. Between August 25 and 29, 2017, Harvey drenched the Houston area with near-constant rainfall. Much of Harris County and Fort Bend County received more than 30 inches of rain over this five-day period. Over 131,000 homes and businesses flooded in Harris County alone. In the case of over 10,000 flooded private properties that were built within the "Maximum Design Pool" of the Addicks and Barker Reservoirs – two large federal flood control projects in west Houston – this was just as the Government intended.

2.      The Government designed the Addicks and Barker Dams and Reservoirs to

accommodate a specific Maximum Design Pool. The Maximum Design Pool of each reservoir encompasses the area of land located behind and upstream of each dam that the Government designed to be inundated during the maximum design storm. The Maximum Design Pool elevation is the elevation at which the reservoirs are considered to be at full storage capacity. For Addicks, the Maximum Design Pool elevation is 115 feet (NAVD 1988, 2001 adj.). For Barker, it is 108 feet.

3.      Despite intending to inundate the land that forms the Maximum Design Pool for each reservoir, the Government owns only a portion of that land. The remaining land within the Maximum Design Pool is private property. All Plaintiffs, who are members of the putative class (the "Putative Class"), own or lease the private property that is located within the Maximum Design Pool and flooded from Harvey rainfall and the resulting flood pool created behind and upstream of each of these two dams.

4.      During and after Harvey, the Government impounded and intentionally stored more than 380,000 acre-feet of Tropical Storm Harvey's stormwaters inside the two reservoirs. The Government stored this water for over 10 days on private property located within the two reservoirs. As a result, and consistent with the reservoirs' design, the Government flooded Plaintiffs' real property (*i.e.*, their land and immovable property, including their homes, other buildings, in-ground structures, landscaping, and other fixtures erected on or affixed to the land), improvements to Plaintiffs' real property, and/or Plaintiffs' personal property. As a result of this flooding, many Plaintiffs had no ability to access or use their properties for a significant time period during and following Harvey, and many remain displaced from their homes as of the date of this filing.

5.      The Government intentionally stored the stormwaters in the Addicks and Barker Reservoirs for the public purpose of protecting properties downstream along Buffalo Bayou and in downtown Houston. The Government estimates that between 1980 and 2010, the Addicks and

Barker Reservoirs prevented an average of $203 million in damages each year, and in 2009, prevented $964 million damages in that year alone in property damages have been avoided downstream due to the Dams/Reservoirs. Yet at no point did the Government compensate Plaintiffs, or their predecessors-in-interest, for any right to flood their private property.

6.      These actions constitute a taking under the Fifth Amendment of the U.S. Constitution. Plaintiffs, both individually and on behalf of the Putative Class, seek just compensation for the taking of their property by the Government.

## STATEMENT OF JURISDICTION

7.      Plaintiffs seek just compensation in excess of $10,000 from the United States based on claims founded on the Constitution. Jurisdiction and venue in this Court therefore are proper under 28 U.S.C. § 1491.

## PARTIES

### A.      Plaintiffs

8.      In addition to asserting their individual claims, the following Putative Class Representative Plaintiffs assert their claims on behalf of the Putative Class and its members as described below under "Class Allegations."

9.      Plaintiff Christina Micu owns real property at 6411 Canyon Park Drive, Katy, Texas 77450. The property description is Canyon Gate Cinco Ranch Section 7, Block 2, Lot 1, in Fort Bend County, Texas. She and her spouse have owned this property since 2012 and owned it at the time of the Harvey flooding. Her private property lies beneath the elevation of the Maximum Design Pool of the Barker Reservoir. When the United States intentionally impounded water in Barker Reservoir up to an elevation of 101.5 feet due to Harvey rainfall, this resulted in Ms. Micu's private property being flooded, just as the United States intended and designed it to do. Her real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct

result of the Government's intentional storage of water in Barker Reservoir in August/September 2017. She suffered significant damage to the house structure, the contents of her home, and to her property value. She is still displaced from her home and lives in an apartment currently, and has lost the right to use and occupy her private property as intended during and after the time the Government used her property to store Harvey stormwater.

10.      Plaintiff Sandra Rodriguez owns real property at 6215 Pebble Canyon Court, Katy, Texas 77450. The property description is Canyon Gate Cinco Ranch Section 1, Block 1, Lot 58, in Fort Bend County, Texas. She and her spouse have owned this property since 2013 and owned it at the time of the Harvey flood. Her private property lies beneath the elevation of the Maximum Design Pool of the Barker Reservoir. Her real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017. When the United States intentionally impounded water in Barker Reservoir up to an elevation of 101.5 feet due to Harvey rainfall, Ms. Rodriguez's private property was flooded, just as the United States intended and designed it to do. She suffered significant damage to the house structure, the property fair market value, and also lost rental income, because she used this house as rental property. She has lost the right to use and occupy her private property as intended during and after the time the Government used that property to store Harvey stormwater. She also lost the benefits and profits attendant to the continued operation of her commercial venture as she has been unable to rent her house since Harvey, an income on which she depended. She is in the process of selling the flooded home.

11.      Plaintiff Erich Schroeder owns real property at 19914 Sky Hollow Lane, Katy, Texas 77450. The property description is Lot 30, Block 4, Kelliwood Section 5, in Harris County, Texas. He and his spouse have owned this property since February 2015 and owned it at the time of the Harvey flood. His real and personal property was inundated, destroyed, substantially damaged,

and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017. His private property lies beneath the Maximum Design Pool of the Barker Reservoir. When the United States intentionally impounded water in Barker Reservoir up to an elevation of 101.5 feet due to Harvey rainfall, his private property was flooded, just as the United States intended and designed it to do. He suffered significant damage to the house structure, the contents of his home, and to his property value. He has been displaced from his home for months after Harvey, losing the right to use and occupy his private property as intended during and after the time the Government used that property to store Harvey stormwater.

12.     Plaintiff Catherine Popovici owns real property at 19927 Parsons Green Court, Katy, Texas 77450. The property description is Lot 21 and Tract 22A, Block 4, Kelliwood Section 5, in Harris County, Texas. She and her spouse have owned this property since 2003 and owned it at the time of the Harvey flood. Their real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017. When the United States intentionally impounded water in Barker Reservoir up to an elevation of 101.5 feet due to Harvey rainfall, her private property was flooded, just as the United States intended and designed it to do. She has lost the right to use and occupy her private property as intended during and after the time the Government used that property to store Harvey stormwater.

13.     Plaintiff Elisio Soares owns real property at 20526 Indian Grove Lane, Katy, Texas 77450. The property description is Lot 7, Block 1, Cinco Ranch Equestrian Village Section 3, in Harris County, Texas. He has owned this property since 2001 and owned it at the time of the Harvey flood. His private property lies beneath the Maximum Design Pool of the Barker Reservoir. When the United States intentionally impounded water in Barker Reservoir up to an elevation of 101.5 feet during Harvey, his private property was flooded, just as the United States intended and

designed it to do. His real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017. He suffered significant damage to the house structure, the contents of his home, and to his property value. He was displaced from his home for months after Harvey, losing the right to use and occupy his private property as intended during and after the time the Government used that property to store Harvey stormwater.

14.     Plaintiff Marina Ageyeva owns real property at 12619 Wilbury Park, Houston, Texas 77041. The property description is Lot 1, Block 3, Lakes on Eldridge, Section 2 Amend., in Harris County, Texas. Ms. Ageyeva has owned this property since 2012 and owned it at the time of the Harvey flood. Her real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017. Her private property lies beneath the Maximum Design Pool of Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to an elevation of 109.1 feet due to Harvey rainfall, Ms. Ageyeva's private property was flooded, just as the United States intended and designed it to do. She suffered significant damage to the house structure, the contents of her home, and to her property's fair market value. She has been living on the second story of her house while repairs are conducted to the lower floor, losing the right to use and occupy her private property as intended during and after the time the Government used that property to store Harvey stormwater.

15.     Plaintiff Lakes on Eldridge Community Association, Inc. is the owner of multiple real properties in the Lakes on Eldridge gated community. The property descriptions are:

Res A Blk 2 (Club House & Recreation) Lakes On Eldridge North Sec 4 (HCAD #1203410020001); Res F Blk 1 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980010006); Res A Blk 3 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980030005); Res B Blk 3 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980030006); Res K Blk 3 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD

#1218980030007); Res G Blk 5 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980050007); Res H Blk 5 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980050008); Row-Private Streets Lakes On Eldridge North Sec 7 (HCAD #1218980050009); Res I Blk 4 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980040005); Res J Blk 4 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980040006); Res L Blk 4 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980040007); Res C Blk 2 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980020010); Res D Blk 2 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 7 (HCAD #1218980020011); Res A Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 6 (HCAD #1217610010042); Res C Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 6 (HCAD #1217610010043); Res B Blk 2 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 6 (HCAD #1217610020006); Row-Private Streets Lakes On Eldridge North Sec 6 (HCAD #1217610020007); Res A Blk 1 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 8 (HCAD #1217620010053); Res B Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 8 (HCAD #1217620010054); Row-Private Streets Lakes On Eldridge North Sec 8 (HCAD #1217620030010); Res A Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 9 (HCAD #1217630010037); Res B Blk 3 (Open Space Landscape Drainage & Utility) Lakes On Eldridge North Sec 9 (HCAD #1217630030013); Row-Private Streets Lakes On Eldridge North Sec 9 (HCAD #1217630030014); Row-Private Streets Lakes On Eldridge North Sec 5 (HCAD #1211510030011); Res A Blk 1 (Common Open Space/Utility & Landscape) Lakes On Eldridge North Sec 5 (HCAD #1211510010013); Res A Blk 3 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 11 (HCAD #1226480030024); Res D Blk 3 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 11 (HCAD #1226480030025); Row-Private Streets Lakes On Eldridge North Sec 11 (HCAD #1226480030026); Row-Private Streets Lakes On Eldridge North Sec 10 (HCAD #1226470020011); Res B Blk 1 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 11 (HCAD #1226480010015); Res C Blk 1 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 11 (HCAD #1226480010016); Res A Blk 1 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 10 (HCAD #1226470010053); Row-Private Streets Lakes On Eldridge North Sec 13 (HCAD #1230300020016); Res A Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 13 (HCAD #1230300010046); Res B Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 13 (HCAD #1230300010047); Res C Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 13 (HCAD #1230300010048); Res D Blk 1 (Open Space/Landscape/Utility) Lakes On Eldridge North Sec 13 (HCAD #1230300010049); Res E Blk 1 (Open Space/Landscape/Drainage & Utility) Lakes On Eldridge North Sec 13 (HCAD #1230300010050); Tr 2b Abst 1322 Wcrr Co Sec 2 Blk 1 (HCAD #0470960000020); Res D Blk 3 (Drainage/Recreation & Landscape) Lakes On Eldridge North Sec 4 (HCAD #1203410030001); Res G Blk 3 (Landscape/Open Space & Utility) Lakes On Eldridge North Sec 4 (HCAD #1203410030004); Res H Blk 3 (Landscape/Open Space & Utility) Lakes On Eldridge North Sec 4 (HCAD #1203410030005); Row-Private Streets Lakes On Eldridge North Sec 4 (HCAD #1203410030006); Res C Blk 3 (Landscape/Open Space/Pipeline Esmt/Drainage & Utility) Lakes On Eldridge North Sec 3 (HCAD #1203400030021); Res C Blk 3 (Landscape/Open

Space/Pipeline Esmt/Drainage & Utility) Lakes On Eldridge North Sec 3 (HCAD #1203400030021); Res B Blk 2 (Landscape/Open Space) Lakes On Eldridge North Sec 3 (HCAD #1203400020006); Res A Blk 1 (Landscape/Open Space) Lakes On Eldridge North Sec 3 (HCAD #1203400010043); Res A Blk 3 (Landscape/Open Space & Utility Purposes) Lakes On Eldridge North Sec 2 (HCAD #1203390030014); Res A Blk 3 (Landscape/Open Space & Utility Purposes) Lakes On Eldridge North Sec 1 (HCAD #1203380030011); Res A Blk 1 Villages At Lakepointe Sec 5 (HCAD #1208280010001); Res D Blk 4 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 17 (HCAD #1251200040020); Row-Private Streets Lakes On Eldridge North Sec 17 (HCAD #1251200040021); Res A Blk 2 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 17 (HCAD #1251200020012); Row-Private Streets Lakes On Eldridge North Sec 14 (HCAD #1251000020012); Row-Private Streets Lakes On Eldridge North Sec 14(HCAD #1251000020012); Res A Blk 1 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 15 (HCAD #1250970010027); Res B Blk 1 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 15 (HCAD #1250970010028); Res C Blk 1 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 15 (HCAD #1250970010029); Row-Private Streets Lakes On Eldridge North Sec 15 (HCAD #1250970010030); Res A Blk 1 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 14 (HCAD #1251000010033); Res B Blk 1 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 14 (HCAD #1251000010034); Res C Blk 1 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 14 (HCAD #1251000010035); Row-Private Streets Lakes On Eldridge North Sec 16 (HCAD #1249340030024); Res A Blk 1 (Open Space/Landscape/Utility/Drainage) Lakes On Eldridge North Sec 16 (HCAD #1249340010072); Row-Private Streets Lakes On Eldridge North Sec 12 (HCAD #1248560030002); Row-Private Streets Lakes On Eldridge North Sec 18 (HCAD #1237170030019); Res A Blk 1 (Open Space/Landscape/Utility & Drainage) Lakes On Eldridge North Sec 18 (HCAD #1237170010050); Res B Blk 1 (Open Space/Landscape/Utility & Drainage) Lakes On Eldridge North Sec 18 (HCAD #1237170010051); Res A Blk 2 (Open Space/Landscape/Utility & Drainage) Lakes On Eldridge North Sec 20 (HCAD #1237190020006); Res B Blk 3 (Open Space/Landscape/Utility & Drainage) Lakes On Eldridge North Sec 20 (HCAD #1237190030006); Res D Blk 1 (Open Space/Landscape/Utility & Drainage) Lakes On Eldridge North Sec 20 (HCAD #1237190010006); Row-Private Street Lakes On Eldridge North Sec 19 (HCAD #1237180010023); Res F Blk 4 (Open Space/Landscape/Utility & Drainage) Lakes On Eldridge North Sec 20 (HCAD #1237190040028); Res G Blk 4 (Open Space/Landscape/Utility & Drainage) Lakes On Eldridge North Sec 20 (HCAD #1237190040029); Row-Private Streets, Lakes On Eldridge North Sec 20 (HCAD #1237190040030)

These properties occupy land beneath the elevation of the Maximum Design Pool of the Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to 109.1 feet during Harvey, the private properties of the Lakes on Eldridge Community Association were flooded, just as the United States intended and designed the reservoir to do. The real property and

improvements of Lakes on Eldridge Community Association was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017.

16.     Plaintiff Robert Rheinboldt owns real property at 5522 Fragrant Cloud, Houston, Texas, 77041. The property description is Lt 12, Blk 2, Twin Lakes Sec 1, in Harris County, Texas. He and his spouse have owned this property since 1992 and owned it at the time of the Harvey flood. Their real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017. His private property lies beneath the Maximum Design Pool of Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to an elevation of 109.1 feet due to Harvey rainfall, his private property was flooded, just as the United States intended and designed it to do. He suffered significant damage to the house structure, the contents of his home, and to his property's fair market value. He also lost the right to use and occupy his private property as intended during and after the time the Government used that property to store Harvey stormwater.

17.     Plaintiff Glenn Peters owns real property at 13639 Harpers Bridge Drive, Houston, Texas 77041. The property description is Lot 41, Block 4, Concord Bridge, Section 4, in Harris County, Texas. He and his spouse have owned this property since 1989 and owned it at the time of the Harvey flood. Their real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017. His private property lies beneath the Maximum Design Pool of Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to an elevation of 109.1 feet due to Harvey rainfall, his private property was flooded, just as the United States intended and designed it to do. He suffered significant damage to the house structure,

the contents of his home, and to his property's fair market value. He also lost the right to use and occupy his private property as intended during and after the time the Government used that property to store Harvey stormwater.

18.     Plaintiff Mollie Kish owns real property at 5022 Pine Cliff Drive, Houston, Texas 77084. The property description is Lt 68, Blk 9, Bear Creek Village Sec. 7, in Harris County, Texas. Ms. Kish has owned this property since March 2017 and owned it at the time of the Harvey flood. Her private property lies beneath the Maximum Design Pool of Addicks Reservoir. Her real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017. When the United States intentionally impounded water in Addicks Reservoir up to an elevation of 109.1 feet due to Harvey rainfall, Ms. Kish's private property was flooded, just as the United States intended and designed it to do. She suffered significant damage to the house structure, the contents of her home, and to her property's fair market value, and was displaced from her property. She also lost the right to use and occupy her private property as intended during and after the time the Government used that property to store Harvey stormwater.

19.     Plaintiff Scott Holland leased property at 1923 Wingleaf Drive, Houston, Texas 77084. The property description is Lot 48, Block 3, Mayde Creek Farms, Section 1, in Harris County, Texas. Mr. Holland and his spouse leased the property since 2001, and leased it at the time of the flood. A lessee has a recognized real property interest to possess and occupy real property, including a house, under Texas law. He and his spouse lost the right to use and occupy his leasehold property as intended during and after the time the Government used that property to store Harvey stormwater. In addition, much of their personal property that was located on the leased property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017.

20.     Plaintiff Kulwant Sidhu is the owner of multiple real properties at 16111 Aspenglenn Drive, Houston, Texas 77084. The property descriptions are:

Unit 708 Bldg G, 1.113 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100070013); Unit 706 Bldg G, 1.13 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100070011); Unit 1010 Bldg J, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100019); Unit 1009 Bldg J, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100018); Unit 1008 Bldg J, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100017); Unit 701 Bldg G, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100070001); Unit 612 Bldg F, .90 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100060020); Unit 1006 Bldg J, 1.22 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100015); Unit 611 Bldg F, .90 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100060019); Unit 1005 Bldg J, 1.22 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100014); Unit 609 Bldg F, .90 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100060018); Unit 1004 Bldg J, 1.22 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100013); Unit 608 Bldg F, .89 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100060017); Unit 1002 Bldg J, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100011); Unit 1001 Bldg J, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100100001); Unit 604 Bldg F, .89 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100060014); Unit 910 Bldg I, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100090017); Unit 603 Bldg F, .90 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100060013); Unit 908 Bldg I, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100090016); Unit 907 Bldg I, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100090015); Unit 906 Bldg I, 1.13 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100090014); Unit 904 Bldg I, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100090012); Unit 903 Bldg I, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100090011); Unit 901 Bldg I, 1.14 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100090001); Unit 808 Bldg H, 1.23 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100080011); Unit 806 Bldg H, 1.23 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100080010); Unit 805 Bldg H, 1.23 Int Common Land & Ele, Aspen Club Condo Ph 2 (HCAD #1150100080009).

Mr. Sidhu has owned these properties since 2005 and owned them at the time of the flood. These properties occupy land beneath the elevation of the Maximum Design Pool of the Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to 109.1 feet during Harvey, thirteen of Mr. Sidhu's private properties were flooded, just as the United States intended and designed it to do. The remaining second floor properties did not flood, but Mr. Sidhu's tenants terminated their leases after the flood. Mr. Sidhu's real property was inundated,

destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017. Mr. Sidhu lost rental income as a result of the Government's acts. He also suffered significant damage to the apartments, to personal property located therein, and a significant loss of property value.

21.     Plaintiff Scott Specksgoor owns real property at 3422 Longhorn, Houston Texas, 77084. The property description is Tr 3C, Abst 634 J Page, in Harris County, Texas. He has owned the property since 2002, and he runs his business at this property. His property occupies land beneath the elevation of the Maximum Design Pool of the Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to 109.1 feet during Harvey, Mr. Specksgoor's real and personal property was flooded, just as the United States intended and designed the reservoir to do. Mr. Specksgoor's real property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017. He suffered damage to the improvements, personal property, business inventory, and loss of property value.

22.     A map of the geographic locations of these Plaintiffs is depicted here:



**B.     Defendant**

23.     Defendant is the United States of America, a sovereign entity and body politic. Defendant answers for one or more of its agencies, including but not limited to the U.S. Army Corps of Engineers ("Corps of Engineers" or "Corps"). Counsel for the United States has appeared in this case.

**FACTS**

24.     This case seeks just compensation under the Fifth Amendment for thousands of property owners and property lessees whose real and/or personal property were taken as a result of

the Government's design and use of two federal flood control projects known as Addicks and Barker Dams/Reservoirs.

25.     As further described below, thousands of homes, businesses, and other improvements lie on non-federal, private property that falls within the two Government reservoirs. During and after Tropical Storm Harvey, just as the Government internally predicted and intended for years, stormwaters accumulated inside the Government's reservoirs, were stored behind their dams, and inundated Plaintiffs' private property.

**A.    To Protect Downtown Houston, Congress Authorizes Construction of the Addicks and Barker Dams/Reservoirs in the 1940s.**

26.     Heavy rains in 1929 produced floodwaters that rushed down Buffalo Bayou and its tributaries into the City of Houston, devastating the downtown area. In 1935, even heavier rains fell and produced even greater flooding in the city and port of Houston.

27.     In response to these major floods, the United States Congress approved the Rivers and Harbors Act on June 30, 1938, authorizing the design and construction of the Addicks and Barker Dams/Reservoirs for the purpose of flood control, as part of the Buffalo Bayou and Tributaries Project ("BBTP"). The BBTP was later modified by the Flood Control Acts of August 11, 1939, and September 3, 1954.

28.     The BBTP was intended to provide for flood control improvements to Buffalo Bayou and its principal tributaries, White Oak Bayou and Brays Bayou. The purpose of the BBTP was to provide flood protection to properties, including residences and businesses extending to downtown Houston, that are located in the downstream floodplains of Buffalo Bayou and its principal tributaries.

29.     As originally contemplated, the BBTP was to include a single large dam/reservoir across Buffalo Bayou. However, due to the high cost associated with a single dam/reservoir

bisected by Interstate Highway 10, two smaller dams/reservoirs were proposed instead—Addicks to the north of I-10 and Barker to the south of I-10.

30.     The flood control plan authorized by the Government through the BBTP eventually contemplated three detention reservoirs: Addicks, Barker, and a third, called White Oak Reservoir. A canal system was to convey releases from White Oak Reservoir to the north of Houston into the San Jacinto River, while another canal system would convey releases from Addicks and Barker Dams/Reservoirs to the south of Houston into Galveston Bay. Further, a levee was to be constructed along the Cypress Creek watershed divide to prevent overflow from the Cypress Creek watershed into the Addicks Reservoir watershed.

31.     However, the proposed White Oak Reservoir, the Cypress Creek levee, and the two north and south canals were never built. Instead, the Government only constructed the Addicks and Barker Dams/Reservoirs, along with some limited channel improvements immediately downstream of these two dams.

32.     As ultimately built, Addicks and Barker Dams/Reservoirs are strategically located 17 miles west of downtown Houston in the vicinity of the confluence of Buffalo Bayou and South Mayde Creek. Below this confluence, Buffalo Bayou continues east to downtown Houston where it is joined by White Oak Bayou. Buffalo Bayou continues further east to eventually include the Houston Ship Channel, and ultimately flows into San Jacinto Bay. The Government built these two dams/reservoirs to prevent catastrophic flooding and damage to downstream properties along Buffalo Bayou during and after large storm events.

33.     The Government began acquiring land for the Addicks and Barker Dams/Reservoirs in the early 1940s. Acquisition of land was complete by 1948 for Addicks, and by 1951 for Barker.

34.     Barker Dam/Reservoir was built in both Harris County and Fort Bend County, on the south side of present-day Interstate Highway 10, west of Texas State Highway 6. The construction of Barker Dam began in February 1942 and was completed in February 1945.

35.     As constructed, Barker Dam consists of an earthen embankment that measures 71,900 feet long. The Barker Dam runs along the south, east, and north sides of the reservoir. There is no levee, dam or embankment on the west side of Barker Dam/Reservoir because the ground elevation is higher on that side; that is where stormwaters from upstream portions of the watershed enter the reservoir area and are impounded and stored behind the dam.

36.     The Government constructed five outlets at the bottom of the dam to allow for the slow release of stored waters into the downstream Buffalo Bayou. Originally designed to be uncontrolled, these outlets have now been provided with gates to control the release of stored waters.

37.     Addicks Dam/Reservoir was built entirely within Harris County on the north side of present-day Interstate Highway 10. Texas State Highway 6 bisects the reservoir north to south.

38.     The construction of Addicks Dam began in May 1946 and was completed in December 1948. As constructed, Addicks Dam consists of an earthen embankment that measures 61,166 feet long. The Addicks Dam runs along the south and east sides of the reservoir. There is no levee, dam, or embankment on the west or north sides of Addicks Reservoir because the ground elevation is higher on those sides, which is where stormwaters from upstream portions of the watershed enter the reservoir area and are captured and stored behind the dam. Additionally, five outlets at the bottom of the dam were constructed to allow for the slow release of these stored waters downstream into Buffalo Bayou. These outlets were originally designed to be uncontrolled, but have since been provided with gates to control the release of stored waters.

39.     According to Corps' documents, the Government designed the two dams/reservoirs in the 1940s to capture and store stormwaters associated with an anticipated "Design Storm." The Design Storm was calculated based on the probable maximum rain that could reasonably be expected to occur in the area. For Addicks and Barker Dams/Reservoirs, the 1899 storm that dumped over 30 inches of rain in 72 hours over Hearne, Texas was selected as the probable maximum rain for calculating the Design Storm volumes. For the Design Storm for each dam/reservoir, the Government assumed that 90% of the rain over the respective watershed would become runoff and enter each reservoir area.

40.     The Government calculated that releases from the combined Addicks and Barker Dams/Reservoirs into Buffalo Bayou could reach approximately 15,000 cubic feet per second without damaging private property. The Government used the Design Storm <u>runoff</u> to determine how much water would need to be stored behind the dams and within the reservoirs while non-damaging releases of up to approximately 15,000 cubic feet per second occurred. The Government also used this Design Storm information to determine how high the dams needed to be built to be safe and not fail during such a storm.

41.     The Government likewise calculated the resulting maximum Design Storm <u>pool level</u> for each reservoir. For Addicks, the Government calculated this pool elevation to be 108.3 feet above mean sea level (NGVD 1929); for Barker, 101.7 feet above mean sea level (NGVD 1929). The top of the two dams were set several feet higher than these maximum design pool levels to ensure their safety and prevent them from being overtopped.

**B.     The Government Redesigns the Addicks and Barker Dams/Reservoirs, Establishing a New Maximum Design Pool for Each Reservoir.**

42.     In the 1980s, the Corps undertook a reevaluation of the Addicks and Barker Dams/Reservoirs. This reevaluation resulted in the Government's establishing the Maximum Design Pool elevations relevant to this lawsuit. Since the original construction of the dams, the

Corps had developed new dam safety design criteria, which also took into account updated design rainfall information for the area. The Corps then reevaluated how the Addicks and Barker Dams/Reservoirs would function under the new criteria and ultimately decided that the Addicks and Barker Dams/Reservoirs needed to be redesigned and reconstructed to satisfy the new criteria.

43.     As part of the redesign and reconstruction, the top of both Addicks and Barker Dams were raised several feet. Additionally, at both ends of each of the two dams, the Corps added emergency spillways that were concrete-lined to provide erosion protection against floodwaters flowing over them.

44.     According to a 2013 Corps document, the height of the Addicks Dam varies from 117.4 feet to 121 feet (NAVD 1988, 2001 adj.) along the length of the main dam embankment. This is approximately 48 feet above the streambed up to the highest point. In addition, the Addicks Dam has a spillway on either end of the dam that is armored with a concrete apron. The spillway's crest elevation at the northern end of the dam is reported to be 112.5 feet, and, at the southern end of the dam, the other spillway's crest elevation is reported as 115.5 feet. The elevation of the natural ground at the end of each spillway is reported as 108 feet at the northern end and 111 feet at the southern end.

45.     According to a 2013 Corps document, the height of the Barker Dam varies from 110 feet to 113.1 feet (NAVD 1988, 2001 adj.) along the entire length of the main dam embankment. This is approximately 36 feet above the stream bed up to its highest point. In addition, Barker Dam also has a spillway on either end that is armored with a concrete apron. The spillway's crest elevation at the northern end of the dam is reported to be 105.5 feet, and, at the southern end of the dam, the other spillway's crest elevation is 106.7 feet. The elevation of the natural ground at the ends of both spillways is reported to be 104 feet.

46.     The Government based its new design for Addicks and Barker Dams on a new Design Storm calculation, known as the Spillway Design Storm. The Spillway Design Storm incorporated an updated probable maximum rain event, known as the Probable Maximum Precipitation. The Probable Maximum Precipitation is an updated maximum rain event and amounts to over 40 inches in 72 hours, an increase over the 30 inches in 72 hours contemplated by the Reservoirs/Dams' original design. Given storms having occurred after the construction of the Reservoirs/Dams that exceeded the original design rainfall amount (such as Tropical Storm Claudette which in 1979 dumped 43 inches of rain over just 24 hours in Alvin, Texas), the Government decided to update its design storm rainfall and account for the Spillway Design Storm in its Dams/Reservoirs' redesign.

47.     Using this Spillway Design Storm, the Corps assumed approximately 40 inches of runoff would be generated within each of the Addicks and Barker watersheds, along with additional runoff entering Addicks due to overflows from Cypress Creek because the Cypress Creek levee project was never constructed. Based on this Spillway Design Storm, and in accordance with standard design criteria, the Corps computed a new Maximum Design Pool level for Addicks with an elevation of 118.14 feet (NGVD 1929 with '73 adj., or about 115 feet NAVD 1988, 2001 adj.) and with a Maximum Storage Capacity in the reservoir of 330,000 acre-feet. For Barker, the Corps computed the Maximum Design Pool elevation at 110.26 feet (or about 108 feet NAVD 1988, 2001 adj.) with a Maximum Storage Capacity of 280,000 acre-feet.

48.     The Maximum Design Pool elevation of Addicks and Barker Dams/Reservoirs is a few feet higher than the lowest level of these dams' emergency spillways. Uncontrolled releases over the concrete-lined spillways are within the design operation of the Addicks and Barker Dams/Reservoirs to ensure dam safety; however, the maximum pool levels that occurred in Addicks and Barker during Harvey did not reach the levels of these spillways of either dam.

19

49.     The Corps' use of these terms—Design Storm, Probable Maximum Precipitation, Maximum Design Pool—and the calculations contained in the Corps' own studies and documentation demonstrate that an event like Harvey, in terms of the amount of rain and resulting stormwater that the Reservoirs/Dams would be expected and designed to handle, was not only foreseeable, but actually foreseen, and that the Reservoirs/Dams were in fact designed and intended to handle the quantity of stormwater generated during Harvey, and even more.

**C.     The Government Acquires Far Less Land Than Needed for the "Maximum Design Pools" it Designed for Each of the Addicks and Barker Reservoirs/Dams.**

50.     When acquiring title to land to store water behind the dams, the Government acquired fee simple title to approximately 12,460 acres for Addicks Dam/Reservoir, associated with lands having an approximate elevation of up to only 103.1 feet (NAVD 1988, 2001 adj.). The Government acquired 12,060 acres for Barker Dam/Reservoir, up to an approximate elevation of only 95 feet (NAVD 1988, 2001 adj).

51.     Crucially, the amount of land the Government acquired for each of the two reservoirs represented far less than the total expanse of property certain to be inundated within the Maximum Design Pool for each reservoir associated with the Spillway Design Storm of over 40 inches of rain in 72 hours. Rather than acquire the entire property to be flooded within the Maximum Design Pool, the Government obtained title to land inside Addicks and Barker Reservoirs sufficient to hold about only _half_ the amount of rain associated with the Spillway Design Storm. Stated another way, the Government obtained title to land at an elevation similar to the 100-year flood pool, that is, property expected to have a 1% chance of being flooded during any given year. The 100-year rainfall in this area for 72 hours is about 14 inches.

52.     Within Addicks Reservoir, the elevation of the 100-year flood pool is reported to be 100.5 feet (NAVD 1988, 2001 adj.). The Government acquired land in Addicks up to approximately 103.1 feet of elevation (NAVD 1988, 2001 adj.). This is many feet of elevation short of the

Maximum Design Pool of approximately 115 feet, meaning the Government does not own, or have any legal right to utilize for any public purpose without compensation, the land between approximately 103.1 feet to approximately 115 feet elevation.

53.     Within Barker Reservoir, the elevation of the 100-year flood pool is reported to be 97 feet (NAVD 1988, 2001 adj.). The Government acquired land in Barker up to approximately 95 feet of elevation. Again, this is many feet of elevation short of the Maximum Design Pool of approximately 108 feet. The Government thus does not own, or have any legal right to utilize for any public purpose without compensation, the land from approximately 95 feet to approximately 108 feet elevation.

54.     Even in its 1962 Reservoir Regulation Manual, the Corps' data showed inadequate land acquisition for these two reservoirs. For Addicks Reservoir, the Corps lists the area of Government-owned land as 12,795 acres and the land area associated with the Design Storm as 17,080 acres. The Manual shows that the Government knew that the Maximum Design Pool would inundate up to 4,285 acres of private land within the Addicks Reservoir. For Barker Reservoir, the Corps lists the area of Government-owned land as 12,110 acres and the land area associated with the Design Storm as 16,705 acres. The Manual shows that the Government knew that the Maximum Design Pool would inundate up to 4,595 acres of private land within the Barker Reservoir.

55.     Yet the Corps did not acquire, and never has acquired, the full acreage necessary to contain the impounded waters on Government-owned land for a storm event that it *knew* would fill the two reservoirs to their Maximum Design Pool; nor did the Corps acquire flowage, drainage, or flood easements for this remaining private land within the Maximum Design Pool. According to the Corps, the Government only acquired land within the pool level similar to the 100-year flood pool level. However, according to the Government's own computations, the Spillway Design Storm

would produce a pool level greatly exceeding the 100-year flood event; thus, flooding of private property outside the federally acquired land was inevitable, intended, and foreseeable.

**D.  Not Only the Design, but also the Planned Operation of the Federal Reservoirs, has Always Been Intended by the Government to Flood Private Property Behind the Dams.**

56.    In the Corps' 1986 Master Plan Update (Design Memorandum No. 3), the Government made clear statements that recognized the impact on the <u>private</u> property located within the Addicks and Barker reservoirs from anticipated use of those reservoirs. For example, the Corps stated: "Addicks and Barker Reservoirs were constructed for the single purpose of flood control. All lands within the project boundaries are required for impoundment of water to maximum design water surface elevations. Any development or facilities located within the project boundaries are subject to inundation." 1986 Master Plan Update, at 16.

57.    Critically, the Corps has conceded that its Maximum Design Pool extends beyond federal property and that this design feature of its dams/reservoirs would eventually result in lawsuits against the Government. In a section entitled 'Special problems: Flooding of Non-Federal Lands,' the Corps admitted:

> The maximum pool elevation for both reservoirs extends beyond each project boundary. As the surrounding areas are developed, this may mean that **homes in adjacent subdivisions may be flooded. This could result in lawsuits against the Corps of Engineers for flooding private lands**.

*Id.*, at 116.

58.    Further, in clear awareness of the problem at hand, the Corps identified two possible solutions to avoid the planned flooding of Plaintiffs' private property:

> One solution to this problem would be to **acquire all lands** to the maximum pool elevation at each project. Other solutions would be to **acquire flowage easements** and to work with local governments to establish zoning laws which would limit development in these areas.

*Id.*, at 116–17.

59.     But the Government did nothing. Instead, private land within the Corps' Maximum Design Pools remained open to development, and thousands of homes and businesses have been built in these two reservoirs.

60.     In 1995, the Government again recognized the problem, proposed solutions, and again did nothing.  Specifically, in the Corps' Reconnaissance Report, Section 216 Study Addicks and Barker Reservoirs, Houston, Texas (October 1995), the Government recognized that it had only acquired land up to "5.9 feet below the maximum flood control pool elevation at Addicks Reservoir and 8.7 feet below the maximum pool at Barker Reservoir." Section 216 Study, at 5.  The Corps then presented and evaluated ten potentially feasible alternatives to address this problem. Three alternatives would have increased reservoir storage capacities, one alternative would have reduced reservoir inflows, four alternatives would have increased reservoir flood releases, and one alternative was to "[a]dopt a flood warning system and evacuation plan." *Id.* at 7–8. The Corps did not adopt or implement any of these nine alternatives. **The tenth alternative was to "[a]ccept existing conditions and risk through No Action."** *Id.* at 8. On October 16, 1995, the Corps' District Engineer, Col. Robert B. Gatlin, signed the Section 216 Study, adopting the tenth "No Action" alternative. *Id.* at 19.

61.     Nor was this the last time the Government ignored the coming flood disaster caused by its design and operation of the Addicks and Barker Dams/Reservoirs. In a 2009 "Master Plan," the Corps identified that the elevation of Government-owned land would be exceeded by the "maximum possible pool before water spills around the end of the dam." 2009 Master Plan, at B-3 and B-4. The Government acknowledged that it only owned land sufficient to impound floodwaters up to an elevation of about 103 feet in Addicks and 95.5 feet in Barker, and that when the reservoirs impound and store floodwaters at higher elevations, the impounded water would exceed the footprint of the Government-owned land and be stored on private property.

> Despite numerous major flood events in the Metropolitan Houston area since 1963 when the remaining two conduits at each dam were gated, Addicks and Barker Reservoirs have not exceeded the limits of government-owned land in any flood event . . . . However, **had some of these events been centered over Addicks and Barker Reservoirs or the Upper Buffalo Bayou Watershed, the combined rainfall and runoff could have resulted in flood pools exceeding the limits of government owned land and possibly exceeding the capacity of Addicks and Barker Dams.**

*Id.*

62.     In its 2012 updated Water Control Manual, the Corps identified the surface area of Government-owned land as 13,016 acres for Addicks, with a storage capacity on Government-owned land being 127,591 acre-feet. *See* 2012 Water Control Manual, at A-2. The storage capacity within the Addicks Reservoir below its concrete-lined spillways is in excess of 200,000 acre-feet, much more than is available on Government-owned land. For Barker, the 2012 Water Control Manual identified the surface area of Government-owned land as 12,036 acres with a storage capacity on Government-owned land being 82,921 acre-feet. *See id.*. Again, the storage capacity within the Barker Reservoir below its concrete-lined spillways is in excess of 200,000 acre-feet, much more than is available on Government-owned land.

63.     Once again, the 2012 Water Control Manual, the Corps predicted that rain events would flood residential developments outside the federal property:

> Presently, [flood] **pool levels in excess of Government-owned land <u>will damage</u> residential developments adjacent to Government-owned lands.**

*Id.*, at 7-1 (emphasis added).

64.     Indeed, the 2012 Water Control Manual repeats the long-understood "primary objective" for the Addicks and Barker Reservoirs as to use them to maximize their available storage to prevent damaging flooding <u>downstream</u>.

65.     When rain falls in the Buffalo Bayou watershed below the dams, such as during Harvey, the standard operating procedure of the Corps is to close all of the gates of Addicks and Barker to prevent any release of stored waters flowing downstream until after the rainfall event. The operational directives for the dams are designed and intended to impound all stormwater from their upstream watersheds during such events. It is also normal procedure to keep the gates closed even when the flood pool exceeds Government-owned land and floods private property. The Corps monitors pool elevations and rates of rise in pool elevations.

66.     If the flood pool behind these dams reaches a certain elevation and is anticipated to continue to rise, then normal procedure is to open the gates and release water downstream, to both optimize reservoir storage capacity and to protect the integrity of the dams. This technique—known as "induced surcharge"—is common to many Corps reservoirs. The 2012 Water Control Manual for Addicks and Barker establishes the calculated "induced surcharge" release schedule for both Reservoirs. The 2012 Water Control Manual for Addicks and Barker does not include any "induced surcharge" release procedures to avoid the intended inundation of non-federal property of the upstream Plaintiffs.

67.     During Harvey, the Corps first closed the gates according to normal procedure. The Corps later opened the gates and released water downstream because that was the normal procedure. The Corps did not open the gates and release water downstream to protect upstream Plaintiffs during Harvey.

68.     Thus, the United States not only knowingly and intentionally designed the Maximum Design Pools of Addicks and Barker Dams/Reservoirs to extend beyond federal property and to store water on private property (without obtaining and paying for the right to do so), the Government also foresaw widespread flooding and inundation of such private property from the intended operations of the dams/reservoirs. Indeed, the Government predicted that it

would be sued when a major storm (which it reasonably anticipated would occur), in fact, occurred, and inundated private property located within these reservoirs. And here we are.

**E.      The Addicks and Barker Reservoirs/Dams Functioned Precisely As Intended During Tropical Storm Harvey.**

69.      Three decades after the United States predicted its two dams/reservoirs would flood private properties located within their design pools, Tropical Storm Harvey brought several days of rain, which did just that. Just as the Government intended, the property within these design pools, including thousands of homes and businesses, flooded. The invasion on, and impact of Harvey floodwaters on, Plaintiffs' real and personal property was both the intent and the direct, natural, or probable result of the Corps' authorized activity—namely, the design, construction, and use of Addicks and Barker Dams/Reservoirs to store stormwater.

70.      During Tropical Storm Harvey, the water level in Addicks Reservoir reached a maximum elevation of 109.1 feet (NAVD 1988, 2001 adj.), well above the approximate 103.1-foot elevation associated with federally owned lands, but still *less* than the Government's Maximum Design Pool of 115 feet and the spillway crest elevations at Addicks—meaning the impact of the Government's intentional actions could have been even worse still. Consistent with Addicks Dam/Reservoir's design, the Government intentionally stored floodwaters on all private properties above the approximate 103.1 feet of elevation but below 109.1 feet of elevation without having any right to do so. The floodwaters did not fully recede from many of these private properties for more than a week, and many affected property owners, including Plaintiffs, have yet to recover the functional, let alone the full, use and possession of their property.

71.      During Tropical Storm Harvey, the water level in Barker Reservoir reached a maximum elevation of 101.5 feet (NAVD 1988, 2001 adj.), well above the approximate 95 feet elevation associated with federally owned lands, but *less* than the Government's Maximum Design Pool of about 108 feet. Consistent with Barker Dam/Reservoir's design, the Government

intentionally stored floodwaters on all private properties above the approximate 95 feet elevation but below 101.5 feet without having any right to do so. Many of these private properties remained flooded for more than a week, and many affected property owners, including Plaintiffs, have yet to recover the functional, let alone the full, use and possession of their property.

72.    The following diagrams illustrate the relevant pool level elevations for Addicks and Barker:





73.    The Government's authorized action was its design, construction, and use of its two flood control projects, Addicks and Barker Dams/Reservoirs, in a manner that it intended, and which it knew would flood private lands located within its reservoirs' Maximum Design Pools during anticipated storm events.

74.    Consistent with the Reservoir's design and using data from the Corps' 2012 Water Control Manual, the flood pool elevation in Addicks due to Harvey occupied at least 16,989 acres.

The amount of water impounded was at least 217,896 acre-feet. *See* 2012 Water Control Manual, at Table 7-01, page 22.

75.     Consistent with the Reservoir's design and using data from the Corps' 2012 Water Control Manual, the flood pool elevation in Barker due to Harvey occupied at least 15,117 acres. The amount of water impounded was at least 170,034 acre-feet. *See* 2012 Water Control Manual, at Table 7-01, page 22.

76.     Thus, according to the Corps' 2012 Water Control Manual, the Government impounded 90,305 acre-feet of stormwater on at least 3,973 acres of private land in Addicks Dam/Reservoir during Harvey; and 87,113 acre-feet of stormwater on at least 3,081 acres of private land in Barker Dam/Reservoir during Harvey. 2012 Water Control Manual, at Table 7-01, page 22. In total, the Government impounded an additional 177,418 acre-feet of stormwater beyond Government-owned land behind and upstream of Addicks and Barker Dams and within their reservoirs, inundating and damaging at least 7,054 acres of private property.

77.     The amount of rainfall during Harvey was less than the amount the Dams/Reservoirs were designed to handle. Therefore, the Harvey rain amount was anticipated and foreseeable and cannot be defended as an 'act of God.'

**F.     This Saga is Not Over: Due to the Reservoirs' Design, Harvey Will Not be the Last Flood Event for Those Behind the Addicks and Barker Dams.**

78.     Harvey was not a "one off" flood event for the upstream property owners who flooded during Harvey. Stormwater first exceeded Government-owned land during the so-called Tax Day Flood of 2016. Flooding will happen again during future heavy storm systems, just as the Corps foresaw when it designed, constructed, and mandated the procedures for use of these dam/reservoir projects.

79.     The flooding of the "upstream" property owners is not the product of a one-time decision by the Corps to implement an emergency procedure that it did not foresee or anticipate.

Rather, it is the product of the Corps' design and construction of these projects and knowledge that during foreseeable and anticipated storm events, these dams would capture and store floodwaters within their respective reservoirs beyond Government-owned lands and up to their respective Maximum Design Pool levels.

80.    The Addicks and Barker Dams/Reservoirs are permanent structures that subject Plaintiffs and Putative Class members to inevitably recurring flooding and the risk thereof. Not only did the Government previously intend, it *still* intends to store its floodwaters on the private property that is located within the Maximum Design Pools of these two reservoirs. To this extent, future flooding of such property is equally foreseeable and expected to recur.

81.    Plaintiffs had reasonable expectations that they would be safe and secure in their homes and/or businesses. Plaintiffs reasonably expected that they would be able to occupy and use their homes and businesses for the purposes and in the manner for which they were purchased. All Plaintiffs' investment-backed expectations in their properties were centered on the safety and security of their residential subdivisions, or safety of the commercial developments, with no expectation of Government-induced flooding. The Government's intentional storage of Harvey stormwater on Plaintiffs' property significantly and severely interfered with each Plaintiff's reasonable investment-backed expectations regarding the use and occupancy of their property.

82.    Certain neighbors of Plaintiffs have sold their homes, and real estate sales confirm significant property losses and permanent damage. In many cases, these post-storm sales already show approximately 50% devaluation in property values.

83.    In addition to the diminution of property value, portions of Plaintiffs' homes have been destroyed—necessitating tearing out soiled walls, removing mold-prone insulation, replacing ruined floors, replacing garage doors and other exterior features, and requiring the repair of other structural issues.

84.     In addition to the real property destroyed, Plaintiffs whose homes flooded suffered permanent damage, destruction, and tragic loss of personal property including appliances, furniture, air conditioning units, and numerous personal effects. For those in one-story houses, this loss of property amounts to most of their possessions.

85.     Those Plaintiffs using their property for commercial purposes have been deprived of use of, and access to, their property, losing the benefits and profits attendant to the continued operation of any of their commercial ventures—all as both the intentional and the direct, natural, or probable consequence of these federal projects. Plaintiffs seek full economic damages to which they are entitled.

86.     Plaintiffs had no ability to access or use their properties for a significant time period following Tropical Storm Harvey. Most Plaintiffs were displaced from their homes and had to stay in hotels or alternative accommodations for months following the storm. As of the date of this filing, most Plaintiffs are still deprived of the full use and occupancy of their homes.

87.     The Government does not own any right to store water on these Plaintiffs' private property. The Government has never made an offer to Plaintiffs to purchase an easement or other property interest for the storage of water. The Government has never attempted to use its power of eminent domain to acquire an easement or other property interest from Plaintiffs for the purpose of storing water. The Government has never compensated or offered to compensate Plaintiffs to use their property to store water.

88.     The Government's intentional design, construction, and use of the Addicks and Barker Dams/Reservoirs for their acknowledged public purpose—namely to prevent flooding downstream along Buffalo Bayou and in downtown Houston—at the expense of flooding Plaintiffs' properties located in the reservoirs, is precisely the type of taking which is compensable.

89.     As of the date of this Complaint, the Government is continuing to use the Addicks and Barker Dams/Reservoirs in a manner that will store impounded water on private property as a result of major storm events without obtaining and paying for the right to do so.

## CLASS ALLEGATIONS

90.     In addition to asserting claims on their own behalf, the Plaintiffs (who are the Putative Class Representative Plaintiffs) specified above bring this action as a class action under Rule 23 of the U.S. Court of Federal Claims (RCFC 23), seeking to represent the following Putative Class:

> All persons or entities leasing or owning non-federal and/or private real property and personal property, located within the Government's Maximum Design Pools of Addicks Reservoir (115 feet) or Barker Reservoir (108 feet) and that flooded during Hurricane/Tropical Storm Harvey in August/September, 2017 due to the flood pools created behind the Addicks and Barker dams.

91.     Excluded from the Putative Class are the Government and its personnel, the Court, and Court personnel.

92.     The six elements of RCFC 23(a) and (b) can be summarized as: (i) numerosity—a class so large that joinder is impracticable; (ii) commonality—the presence of common questions of law or fact; (iii) typicality—the claims presented are typical of the class; (iv) adequacy—the Plaintiffs and counsel will fairly and adequately represent the interests of the class; (v) proof that the United States acted or refused to act on grounds generally applicable to the class; and (vi) superiority—the requested class action is the fairest and most efficient way to resolve a given set of controversies.

93.     Under RCFC 23(a)(1), the "numerosity" requirement, the proposed class is so numerous that joinder is impracticable. The Putative Class comprises thousands of properties located in Harris and Fort Bend Counties and contains at least 10,000 members.

94.     Under RCFC 23(a)(2), the "commonality" requirement, there are questions of law and/or fact common to the class that support certification. The claims of potential class members

depend on common legal and factual contentions that are capable of class-wide resolution. Legally, liability is uniform across the class: whether the Government violated the Fifth Amendment by intentionally impounding stormwaters on the Putative Class' private property due to Harvey rainfall. The determination of liability also turns on common facts: the action of the United States in designing, constructing, and using the Addicks and Barker Dams/Reservoirs, with both the intentional and the direct, natural, and probable consequence of these federal projects being the taking of the Putative Class' property without just compensation.

95.     Additionally, the questions of law and fact common to the proposed Putative Class plainly predominate over any questions affecting only individual members of the Putative Class. As stated, liability is clearly a common issue. More generally, the common legal and factual questions, which do not vary from member to member of the Putative Class, and which may be determined without reference to the individual circumstances of any Putative Class member potentially include:

a.     Whether the inundation, destruction, damage, and/or devaluation of the Putative Class members' real and/or personal property caused by the Government's intentional storage of stormwaters within the Maximum Design Pool of the Addicks and Barker Reservoirs during August/September 2017 constitutes an unconstitutional taking of Putative Class members' property by the Government without just compensation;

b.     Whether by intentionally storing flood water within the Maximum Design Pools of the Addicks and Barker Reservoirs during August/September 2017 and inundating, destroying, damaging, and/or devaluing Putative Class members' property and businesses, the Government caused a taking of Putative Class members' constitutionally protected property interests without just compensation;

c.     Whether the inundation, destruction, damage, and/or devaluation of Putative Class members' real and/or personal property was the intentional, direct, natural, probable, and reasonably foreseeable consequence of the Government's intentional storage of stormwaters within the Maximum Design Pool of the Addicks and Barker Reservoirs during August/September 2017;

d.     Whether the inundation of Putative Class members' real and/or personal property resulted in the destruction of, substantial damage to and/or devaluation of their real and/or personal property;

e.     The proper measure (as opposed to quantum) of the just compensation or other appropriate relief for the Putative Class members for which the Government is liable.

The proper measure of damages includes but is not limited to: the diminution of the real property fair market value; the cost to restore, repair or replace real property improvements; loss and permanent damage to personal property, lost rental value, all plus interest.

96.     Under the RCFC 23(a)(3), the claims of the class representative parties and parcels are typical of the claims of the proposed class. Plaintiffs and members of the Putative Class were inundated by the stormwater intentionally stored by the Government on and over their real and/or personal property in August/September 2017 in the same manner. The relief Plaintiffs seek is common to the relief sought by Putative Class members.

97.     Further, under RCFC 23(a)(4), the "adequacy" requirement, Plaintiffs, as the Putative Class' representatives, will fairly and adequately protect the interests of the class. Plaintiffs' interests are consistent with and not antagonistic to those of the Putative Class it seeks to represent. Plaintiffs and members of the Putative Class all own property interests within the design pools of Addicks or Barker Reservoirs, have had their property interest taken, sustained actual pecuniary losses, and seek just compensation under the Fifth Amendment.

98.     Plaintiffs have no interests that are adverse to, or which conflict with, the interests of members of the Putative Class, and Plaintiffs are ready and able to fairly and adequately protect the interests of the Putative Class. Plaintiffs strongly believe the United States must provide just compensation for taking private property located within the Maximum Design Pools in Addicks and Barker Reservoirs and which flooded during Harvey, and have asserted viable claims for takings under the Fifth Amendment. Plaintiffs will diligently pursue those claims. If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent the Putative Class or additional claims as may be appropriate.

99.     Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action. Counsel is knowledgeable about, and experienced in, conducting class action litigation, complex multi-plaintiff litigation, takings litigation, and flooding

litigation. Counsel has and will continue to devote the appropriate resources necessary to prosecute these claims.

100.     Satisfaction of RCFC 23(b)(2) is shown by the fact that by designing, constructing, and using the Addicks and Barker Dams/Reservoirs, the United States intentionally stored stormwater on the Putative Class' property without just compensation. At the very least, the storing of stormwater on the Putative Class' property without just compensation caused by the design, construction, and use of the Addicks and Barker Dams/Reservoirs was a direct, natural, and probable consequence of these federal projects. The Government acted or refused to act on grounds generally applicable to the class by designing, constructing, and using the Addicks and Barker Dams/Reservoirs so as to flood and destroy the Putative Class members' real and personal property to an extent as to constitute a taking of that property without just compensation.

101.     Finally, for the RCFC 23(b)(3) "superiority" requirement, a class action is the superior and most efficient vehicle for resolving the takings claims, for both the Court and for the litigants and would promote judicial economy while still maintaining fairness to Putative Class members.

102.     A class action will result in the most fair and efficient adjudication of this controversy. Given the number of affected individuals, individual litigation of the claims of all Class Members is highly impractical. Even if every member of the Putative Class could afford to pursue individual litigation, the Court system could not. It would be impossible for this Court to hear thousands of individual cases. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

103.     By contrast, maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the

parties and of the court system, and protects the rights of each Putative Class member. Plaintiffs anticipate no difficulty in managing this action as a class action. For these reasons, maintaining this action as a class action pursuant to RCFC 23 is appropriate.

## CAUSES OF ACTION

104.    Plaintiffs allege the following causes of action together and in the alternative.

### Count I: The Temporary Taking of a Flowage Easement Without Just Compensation in Violation of the Fifth Amendment of the United States Constitution

105.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Master Amended Complaint.

106.    For the public's benefit and the benefit of certain areas, including downstream properties along Buffalo Bayou and downtown Houston, the Government constructed Addicks and Barker Dams/Reservoirs with the intent to store stormwaters up to the Maximum Design Pools of the two reservoirs during heavy rains.

107.    By storing stormwaters on private property within the Maximum Design Pools of Addicks and Barker Reservoirs during (and after) Harvey, the Government violated the Takings Clause of the Fifth Amendment because it temporarily took the right to flood that property with Harvey's stormwaters (*i.e.*, a flowage easement) without paying just compensation. The Government's taking of that specific interest in this instance and for a certain period was temporary because the flooding in connection with Harvey is itself temporary and because some of Plaintiffs' immovable property can be restored, remediated, and/or repaired over a period of time, allowing Plaintiffs to eventually fully use, enjoy, and occupy their land and immovable property.  As alleged below, however, the Government has also and/or alternatively taken a permanent flowage easement through its commitment to flooding Plaintiffs' property on a recurrent and ongoing basis; and as alleged below, the Government has permanently taken the property interests that it permanently damaged and destroyed by storing Harvey stormwaters on Plaintiffs' property.

108.    Plaintiffs allege that the Government's taking of a temporary flowage easement for Harvey in particular occurred from the time that the flood pool from Harvey inundated their property, until the time each of the Plaintiffs and Putative Class Members are able to fully use, enjoy, and occupy their land and property.  In the alternative, and at a minimum, Plaintiffs allege that the temporary flowage easement for Harvey in particular lasted until the flood pool due to Harvey's stormwaters fully receded from Plaintiffs' property.

109.    The Government's actions in connection with storing Harvey stormwaters violated Plaintiffs' protectable property rights. Specifically, Plaintiffs own or lease real property and own personal property, and Plaintiffs' rights in that property were impaired by the Government's taking of a temporary flowage easement over their residential and commercial properties. Their rights in these properties are recognized and protected under Texas law.

110.    Further, the Government's actions ran counter to, and severely interfered with, Plaintiffs' reasonable investment-backed expectations in the safety and security of the residential and commercial properties that they rented or owned.

111.    As detailed above, the damage done by the Government's storage of Harvey stormwaters on Plaintiffs' property is unquestionably substantial.

112.    The Government's action was the cause-in-fact and proximate cause of the taking. The storage and invasion of Harvey stormwaters onto Plaintiffs' real property was both the intended and the direct, natural, and probable result of the Corps' authorized activity.

113.    As a result of the foregoing, and in addition to, or in the alternative to, the other causes of action asserted herein, the Government has temporarily taken a flowage easement over Plaintiffs' property for a public use, without payment of just compensation.

**Count II: The Temporary Taking of Other Property Interests Without Just Compensation in Violation of the Fifth Amendment**

114.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Master Amended Complaint.

115.    Plaintiffs are entitled to the full and exclusive use and occupancy of their land, immovable property, and personal property for personal and commercial purposes.

116.    As both an intended and a direct, natural, and probable consequence of the Addicks and Barker Dam/Reservoir projects, including the Government's use of these projects, Plaintiffs' properties were subjected to actual flooding in connection with Harvey.

117.    By storing stormwaters on private property within the Maximum Design Pools of Addicks and Barker Reservoirs during Harvey, the Government temporarily took the Plaintiffs' interest in the use, enjoyment, and occupation of their land and immovable and other personal property, used for personal and/or commercial purposes, without paying just compensation.

118.    The Government's actions ran counter to Plaintiffs' reasonable investment-backed expectations in the safety and security of the residential and commercial properties that they owned or rented.

119.    The damage to Plaintiffs' protected property interests is severe. Many Plaintiffs were displaced from their homes, and some are still displaced to this day. Many Plaintiffs have been forced to reside in hotels or other alternative accommodations for extended periods. Plaintiffs cannot use, enjoy, or occupy their residential or business properties as intended. The Government's action was the cause-in-fact and proximate cause of the taking. The storage and invasion of stormwaters onto Plaintiffs' real and/or personal property was both the intentional and the direct, natural, and probable result of the Corps' authorized activity.

120.    Plaintiffs allege that the Government's temporary taking of their interests in the full use, enjoyment, and occupancy of their property occurred from the time the flood pool from

Harvey began to inundate their property, until the time each of the Plaintiffs and Putative Class Members are able to fully use, enjoy, and occupy their land and property.

121.    As a result of the foregoing, and in addition to, or in the alternative to, the other causes of action asserted herein, Plaintiffs have been deprived of the full and exclusive use, occupancy, and enjoyment of their property (including the land, immovable improvements, and personal property), resulting in a temporary taking of their property for a public use, without payment of just compensation.

**Count III: The Permanent Taking of Damaged and Destroyed Property Without Just Compensation in Violation of the Fifth Amendment**

122.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Master Amended Complaint.

123.    By storing stormwaters on private property within the Maximum Design Pools of Addicks and Barker Reservoirs during Harvey, the Government violated the Takings Clause of the Fifth Amendment because it permanently took the Plaintiffs' property interests in their homes, their improvements, their personal property, and the value of their land without paying just compensation.

124.    The Government's actions during and after Harvey violated Plaintiffs' protectable property rights. Specifically, Plaintiffs own or lease real property and own personal property which was damaged or destroyed by the Government. Their rights to this property are recognized and protected under Texas law.

125.    The Government's actions run counter to Plaintiffs' reasonable investment-backed expectations that they were safe and secure in their residential and commercial properties and would not have their homes, improvements, personal property, and the value of their land permanently damaged or destroyed.

126.     As discussed extensively in this complaint, the Government foresaw, intended, and predicted the taking of Plaintiffs' real and personal property.

127.     The Government designed, constructed, and used the Addicks and Barker Dams/Reservoirs in a manner that it knew would, and intended to, result in the flooding of private property located within its reservoirs' Maximum Design Pools during foreseeable and anticipated storm events. The consequences to Plaintiffs' properties were both the intended and the direct, natural, and probable result of authorized activities by the Government.

128.     The permanent damage to and destruction of real and personal property brought about by the Government's storage of Harvey stormwaters on Plaintiffs' property is severe.  Among other losses, some homes and businesses and personal items were permanently destroyed. The permanent taking occurred when the Government used, damaged, and/or destroyed the Plaintiffs' property.

129.     The Government's authorized action was the cause-in-fact and proximate cause of the taking. The storage and invasion of stormwaters onto Plaintiffs' real and personal property was both the intended and the direct, natural, and probable result of the Corps' authorized activity.

130.     As a result of the foregoing, and in addition to, or in the alternative to, the other causes of action asserted herein, Plaintiffs have been permanently deprived of their interests in the property that was damaged or destroyed in connection with Harvey, resulting in a permanent taking of their property for a public use, without payment of just compensation.

## Count IV: The Permanent Taking of a Flowage Easement Without Just Compensation in Violation of the Fifth Amendment of the United States Constitution

131.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Master Amended Complaint. This cause of action is pled in the alternative.

132.     For the public's benefit and the benefit of certain areas, including downstream properties along Buffalo Bayou and downtown Houston, the Government constructed Addicks and

Barker Dams/Reservoirs and intended to store stormwaters up to the Maximum Design Pools of the two reservoirs during heavy rains.

133.    The Addicks and Barker Dams/Reservoirs are permanent structures with indefinite and/or very long lifespans.

134.    The flooding of Plaintiffs' property is inevitably recurring and is necessarily incident to and an intended consequence of, the continued use of the permanent Addicks and Barker Dam/Reservoir projects as designed, constructed, and used by the Government.

135.    The Government's design of the Maximum Design Pools of Addicks and Barker Reservoirs at elevations that encompass significant private property demonstrates and confirms the Government's permanent commitment to the intermittent, but recurring, flooding of Plaintiffs' real and personal property and businesses, when heavy rain events occur again.

136.    Further, the Government's actions run counter to, and severely interfere with, Plaintiffs reasonable investment-backed expectations in the safety and security of the residential and commercial properties that they rented or owned.

137.    The Government's actions violate Plaintiffs' protectable property rights. Specifically, Plaintiffs own or lease real property and own personal property, and the Government has subjected that property to a permanent liability to flooding through its actions in connection with the design, construction, and use of the Addicks and Barker Dams/Reservoirs. Plaintiffs' rights in this property are recognized and protected under Texas law.

138.    As a direct, natural, and intended consequence of the design and construction of the Addicks and Barker Dam/Reservoir projects, Plaintiffs' properties have been subjected to both actual flooding and the continued risk of inevitably recurring flooding. The Government's action is the cause-in-fact and proximate cause of the taking.

139.    By subjecting Plaintiffs' property to a permanent liability to flooding, including storing stormwaters on their property during August/September 2017, the Government has taken a permanent flowage and drainage easement on Plaintiffs' properties.

140.    As a result of the foregoing, and in addition to, or in the alternative to, the other causes of action asserted herein, the United States has taken permanent easements or servitudes of flowage over Plaintiffs' property, which it has permanently taken for a public purpose, without just compensation.

## PRAYER

Plaintiffs pray that the Court:

A.    Determine that this action may be maintained as a class action under RCFC 23 and direct that reasonable notice be given to members of the class;

B.    Enter judgment in Plaintiffs' favor, individually and/or on behalf of all persons similarly situated, and against the United States of America, finding that Plaintiffs are entitled to recover just compensation for the takings alleged above and such other appropriate relief as the Court deems just and proper in an amount to be determined by the trier of fact.

C.    Award Plaintiffs their reasonable and necessary attorney's fees, litigation expenses, and court costs, including appraisal, expert witness, and engineering fees, pursuant to 42 U.S.C. § 4654(c), plus appropriate interest, compounded (per USCFC jurisprudence), legal interest pursuant to 28 U.S.C. § 1961, 28 U.S.C. § 1920, and/or CFC Rule 23(h); and,

D.    Award Plaintiffs all other general, legal, and equitable relief which this Court is empowered to provide, and to which Plaintiffs are entitled.

Respectfully submitted,

IRVINE & CONNER PLLC

by: /s/ Daniel H. Charest

    Charles Irvine
    Irvine & Conner, PLLC
    4709 Austin Street
    Houston, Texas 77004
    713-533-1704
    713-524-5165 (fax)
    charles@irvineconner.com
        *Co-Lead Counsel, Upstream Pre-Trial*
        *Discovery and Dispositive Motions*


    Daniel H. Charest
    Larry Vincent
    BURNS CHAREST LLP
    900 Jackson Street, Suite 500
    Dallas, Texas 75202
    469-904-4550
    dcharest@burnscharest.com
    lvincent@burnscharest.com
        *Co-Lead Counsel, Upstream Pre-Trial*
        *Discovery and Dispositive Motions*

        *Co-Lead Counsel for Upstream Plaintiffs*
        *as to Jurisdictional Discovery, the*
        *Government's Motion to Dismiss, and*
        *Scheduling*

**Certificate of Service**

I, Daniel H. Charest, certify that on January 16, 2018, I filed and served this document on all counsel of

record through the Court's electronic filing system.

        /s/ Daniel H. Charest
        Daniel H. Charest