**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| IN RE UPSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | ) ) ) ) ) | Sub-Master Docket No. 17-cv-9001L |
| | ) | Judge Charles F. Lettow |
| THIS DOCUMENT RELATES TO: | ) ) | |
| ALL UPSTREAM CASES | ) ) ) | |

**UNITED STATES' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

# TABLES OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 5

LEGAL BACKGROUND .......................................................................................... 9

    I.     Standard of Review ........................................................................................ 9

    II.    Fifth Amendment Takings .......................................................................... 10

ARGUMENT ............................................................................................................ 11

    I.     Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted ...... 11

        A.    Sovereign Actions Undertaken to Minimize or Mitigate an Inevitable Public Harm Do Not Constitute a Taking of Private Property.................................................................................................... 11

        B.    Under Texas Law and the Flood Control Act, Plaintiffs Do Not Possess the Property Interest Purportedly Taken. ................................... 14

            1.    Background Principles of Property Law Limit Cognizable Property Rights. ........................................................................ 15

            2.    Texas Law Recognizes No Property Right in Keeping Property Free From Diversions of Water from a Dam. ................ 16

            3.    Texas Law Recognizes No Property Right Vis-a-Vis a Pre-Existing Flood-Control Structure.................................................. 17

            4.    The Flood Control Act Is A Longstanding Background Principle That Shapes Plaintiffs' Property Rights. ...................... 19

        C.    Plaintiffs' Allegations Relating to Design and Construction of the Dams and the Non-Acquisition of Land Should Be Dismissed............... 21

            1.    Claims About the Corps' Alleged Failure to Acquire Land Are Based on Inaction and Are Therefore Not Cognizable. ......... 22

            2.    Claims About Dam Design and Construction Are Time-Barred........................................................................................... 24

        D.    Plaintiffs' Claim That the United States Has Taken Unidentified "Other Property Interests" Is Legally Deficient ........................................ 25

II.     Plaintiffs' Claims Should Be Dismissed For Lack of Subject Matter
        Jurisdiction Because The Flooding Here Is at Most a Tort; It Is Not a
        Compensable Taking. ........................................................................................... 26

        A.     Plaintiffs Have the Burden To Prove Treatment as a Taking Is
               Appropriate Based on Facts Alleged. ........................................................ 26

        B.     Plaintiffs' Conclusory Allegations Are Not Entitled to a
               Presumption of Correctness. ..................................................................... 28

        C.     Plaintiffs' Allegations Are Insufficient to Establish a Taking, Rather
               Than a Tort. ............................................................................................... 30

CONCLUSION ....................................................................................................................... 32

# TABLES OF AUTHORITIES

**Cases**

*Acadia Tech., Inc. v. United States*,
458 F.3d 1327 (Fed. Cir. 2006) ............................................................. 23

*Acceptance Ins. Cos. v. United States*,
583 F.3d 849 (Fed. Cir. 2009) ........................................... 10, 22, 24, 26

*Air Pegasus, Inc. v. United States*,
424 F.3d 1206 (Fed. Cir. 2005) ............................................................. 20

*Am. Pelagic Fishing Co, L.P v. United States*,
379 F.3d 1346 (Fed. Cir. 2004) ............................................................. 20

*AN Collision Ctr. of Addison, Inc. v. Town of Addison*,
310 S.W.3d 191 (Tex. App. 2010) ......................................................... 18

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ............................................................................... 10

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) ............................................... 18, 23, 28, 30, 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................. 9, 29

*B & G Enterprises, Ltd. v. United States*,
220 F.3d 1318 (Fed. Cir. 2000) ............................................................. 23

*B. Amusement Co. v. United States*,
148 Ct. Cl. 337 (1960) ........................................................................... 20

*Bachmann v. United States*,
134 Fed. Cl. 694 (2017) ................................................................... 12, 13

*Bartz v. United States*,
633 F.2d 571 (Ct. Cl. 1980) ................................................................... 28

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ............................................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................... 25, 29

*Big Oak Farms, Inc. v. United States*,
105 Fed. Cl. 48 (2012) ........................................................................... 26

*Boise Cascade Corp. v. United States*,
296 F.3d 1339 (Fed. Cir. 2002) ............................................................. 14

*Bowditch v. City of Boston,*
    101 U.S. 16 (1879) ..................................................................................... 11

*Brazos River Authority v. City of Graham,*
    354 S.W.2d 99 (Tex. 1961) ........................................................................ 18

*Brinston v. Koppers Indus., Inc.,*
    538 F. Supp. 2d 969 (W.D. Tex. 2008) ..................................................... 19

*Bunch v. Thomas,*
    49 S.W.2d 421 (Tex. 1932) ........................................................................ 18

*California v. United States,*
    271 F.3d 1377 (Fed. Cir. 2001) ................................................................. 20

*Cedars- Sinai Med. Ctr. v. Watkins,*
    11 F.3d 1573 (Fed. Cir. 1993) ............................................................. 10, 29

*Cent. Green v. United States,*
    531 U.S. 425 (2001) ................................................................................... 21

*Chicago & A.R. Co v. Tranbarger,*
    238 U.S. 67 (1915) ..................................................................................... 11

*City of Dallas v. Winans,*
    262 S.W. 2d 256 (Tex. App. 1953) ....................................................... 17, 19

*City of El Paso v. Mazie's L.P.,*
    408 S.W. 3d 13 (Tex. App. 2012) .............................................................. 28

*City of Tyler v. Likes,*
    962 S.W.2d 489 (Tex. 1997) ...................................................................... 18

*City of Whitesboro v. Williams,*
    No. 05-99-01840-CV, 2001 WL 66427 (Tex. App. Jan. 29, 2001) ........... 16

*Columbia Basin Orchard v. United States,*
    132 F. Supp. 707 (Ct. Cl. 1955) ................................................................ 27

*Colvin Cattle Co. v. United States,*
    468 F.3d 803 (Fed. Cir. 2006) ................................................................... 14

*Danforth v. United States,*
    308 U.S. 271 (1939) ................................................................................... 32

*Engage Learning, Inc. v. Salazar,*
    660 F.3d 1346 (Fed. Cir. 2011) ................................................................. 10

*Eyherabide v. United States,*
    345 F.2d 565 (1965) ................................................................................... 31

*Fromme v. United States,*
    412 F.2d 1192 (Ct. Cl. 1969) ..................................................................... 31

*Ga. Power Co. v. United States*,
633 F.2d 554 (Ct. Cl. 1980) ............................................................................ 22

*Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*,
449 S.W.3d 474 (Tex. 2014) ........................................................................... 18

*Hansen v. United States*,
65 Fed. Cl. 76 (2005) ...................................................................................... 17

*Harris Cty. Flood Control Dist. v. Kerr*,
499 S.W.3d 793 (Tex. 2016) ........................................................................... 14

*Hopkins v. State*,
No. 03-03-00499-CV, 2006 WL 1126224 (Tex. App. Apr. 27, 2006) ................... 16

*Horne v. Department of Agriculture*,
569 U.S. 513 (2013) ........................................................................................ 20

*Hughes v. Rowe*,
449 U.S. 5 (1980) ............................................................................................ 10

*Hydro-Electric Co. v. United States*,
151 F. Supp. 322 (Ct. Cl. 1957) ...................................................................... 31

*In re Chicago, Milwaukee, St. Paul, & Pac. R.R.*,
799 F.2d 317 (7th Cir.1986) ............................................................................ 23

*In re Van Michaels*,
846 F.2d 77 (Fed. Cir. 1988) ........................................................................... 23

*John R. Sand & Gravel Co. v. United States*,
552 U.S. 130 (2008) ........................................................................................ 24

*Kahn v. Bauch Leather Co.*,
17 S.W.2d 187 (Tex. Civ. App. 1929) .............................................................. 16

*Katrina Canal Breaches Litig. v. United States*,
696 F.3d 436 (5th Cir. 2012) ............................................................................. 3

*Kraft v. Langford*,
565 S.W.2d 223 (Texas 1978) ........................................................................ 16

*Last Chance Mining Co. v. United States*,
12 Cl. Ct. 551 (1987) ...................................................................................... 23

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ................................................................................. 15, 16

*Maritrans, Inc. v. United States*,
342 F.3d 1344 (Fed. Cir. 2003) ....................................................................... 15

*Meuth v. City of Seguin*,
No. 04–16–00183–CV, 2017 WL 603646 (Tex. App. Feb. 15, 2017) ................... 19

*Miller v. Schoene,*
276 U.S. 272 (1928) ...................................................................... 4, 11, 12

*Moden v. United States,*
404 F.3d 1335 (Fed. Cir. 2006) ........................................................... 29

*Mugler v. Kansas,*
123 U.S. 623 (1887) ........................................................................... 11

*Nat'l Bd. of YMCA v. United States,*
395 U.S. 85 (1969) ............................................................................. 13

*Nat'l Mfg. Co. v. United States,*
210 F.2d 263 (1954) ............................................................................ 20

*Nicholson v. United States,*
77 Fed. Cl. 605 (2007) ............................... 4, 11, 23, 24, 26, 27, 32

*Park Apartments v. United States,*
465 F.3d 1308 (Fed. Cir. 2006) ........................................................... 26

*Pendleton v. United States,*
47 Fed. Cl. 480 (2000) ....................................................................... 23

*Portsmouth Harbor Land & Hotel Co. v. United States,*
260 U.S. 327 (1922) .......................................................................... 4, 31

*Renne v. Geary,*
501 U.S. 312 (1991) .......................................................................... 9, 29

*Reynolds v. Army & Air Force Exch. Serv.,*
846 F.2d 746 (Fed. Cir. 1988) ........................................................... 10

*Ridge Line, Inc. v. United States,*
346 F.3d 1346 (Fed. Cir. 2003) ............... 4, 10, 11, 15, 26, 27, 28, 30, 31

*Rio Grande Silvery Minnow v. Bureau of Reclamation,*
601 F.3d 1096 (10th Cir. 2002) ........................................................ 5, 8

*Rio Grande Silvery Minnow v. Keys,*
469 F. Supp. 2d 973 (D.N.M. 2002) .................................................... 5

*Sommers Oil Co. v. United States,*
241 F.3d 1375 (Fed. Cir. 2001) ........................................................... 9

*Stueve Bros. Farms, LLC v. United States,*
105 Fed. Cl. 760 (2012) ....................................................................... 32

*Stueve Bros. Farms, LLS v. United States,*
737 F.3d 750 (Fed. Cir. 2013) ............................................................. 32

*Tarrant Reg'l Water Dist. v. Gragg,*
151 S.W. 3d 546 (Tex. 2004) ............................................................... 28

*The George Family Trust ex rel. George v. United States,*
91 Fed. Cl. 177 (2009) ................................................ 28, 29

*Thomas v. Bunch,*
41 S.W.2d 359 (Tex. App. 1931) ................................................ 18

*United States v. James,*
478 U.S. 597 (1986) ................................................ 19

*United States v. Sponenbarger,*
308 U.S. 256 (1939) ................................................ 5, 32

*United States v. Twin City Power Co.,*
350 U.S. 222 (1956) ................................................ 20

## FEDERAL STATUTES

28 U.S.C. § 1491(a)(1) ................................................ 27

28 U.S.C. § 2501 ................................................ 4, 24

33 U.S.C. § 540 (2017) ................................................ 5

33 U.S.C. § 601 ................................................ 20

33 U.S.C. § 702c ................................................ 4, 15, 19

Pub. L. No. 115-123 ................................................ 2

Pub. L. No. 115-56 ................................................ 2

Pub. L. No. 115-63 ................................................ 2

Pub. L. No. 115-64 ................................................ 2

Pub. L. No. 115-72 ................................................ 2, 8

Pub. L. No. 75-685 ................................................ 5

## STATE STATUTE

Tex. Water Code Ann. § 11.086(a), (b) (West 2017) ................................................ 16

## RULES

RCFC 12(b)(1) ................................................ 5, 10, 29, 32

RCFC 12(b)(6) ................................................ 5, 28, 32

RCFC 56 ................................................ 28

RCFC 8(a) ................................................ 21, 25

RCFC 9(i) ................................................ 25, 26

## REGULATIONS

33 C.F.R. § 222.5 ................................................ 21

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 1 | National Weather Service National Hurricane Center Tropical Cyclone Report, Hurricane Harvey (2018) |
| 2 | Press Release, Corps releases at Addicks and Barker Dams to begin (Aug, 28, 2017) |
| 3 | House of Representatives Doc. No. 75-456, Houston Ship Channel and Buffalo Bayou, Texas, Letter from The Secretary of War (1937) |
| 4 | Addicks and Barker Reservoirs Buffalo Bayou and Tributaries San Jacinto River Basin, Texas Water Control Manual, excerpt (Nov. 2012) |
| 5 | General Laws of the State of Texas, S.B. No. 16 (1915) |

## <u>INTRODUCTION</u>

Hurricane Harvey was the greatest single rainfall event in United States history. The National Weather Service has concluded that the storm was a 1000-year event. Ex. 1, National Weather Service National Hurricane Center Tropical Cyclone Report, Hurricane Harvey at NOAA0000007. The storm made landfall as a Category 4 hurricane on August 25, 2017, and over the next several days dumped an estimated one trillion gallons of water in the Greater Houston area. Harris County estimates that the storm produced enough rain to cover a 1,800 square-mile area with thirty-three inches of water.[1] According to Plaintiffs, more than 131,000 structures flooded in Harris County alone; and more flooding occurred in Fort Bend and other Texas counties. *See* Master Am. Complaint for Upstream Plaintiffs ("Compl.") ¶¶ 1, 9, ECF No. 18. The people of Houston suffered substantial losses in this storm.

The Greater Houston area has long been subject to devastating floods. After severe flooding in the early twentieth century, the United States constructed flood-control projects in and around the City of Houston, including two flood-control dams: the Addicks and Barker dams. These dams were constructed in the 1940s, are located about seventeen miles west of downtown Houston, and have substantially reduced flooding risks for the past 70 years. Indeed, their presence has facilitated the growth and development of modern-day Houston, now the fourth largest city in the United States.

Before, during and after Hurricane Harvey, the United States sought to prevent loss of life and ameliorate the damage to private property that is inevitable when such an extraordinary Act of God strikes. After the storm made landfall, but while it still raged, military and civilian personnel in the United States Army Corps of Engineers ("Corps") monitored water levels at the

---

[1] See generally https://www.hcfcd.org/hurricane-harvey

Addicks and Barker dams and observed unprecedented inflows.  Rain continued to fall hour after

hour; and at the Addicks and Barker dams, flood waters continued to rise higher and higher.  The

District Commander in charge of the dams announced on August 28, 2017:  "If we don't begin

releasing now, the volume of uncontrolled water *around the dams* will be higher and have a

greater impact on the surrounding communities."  Ex. 2, Corps Press Release (Aug. 28, 2017)

(emphasis added, internal quotation marks omitted).  The Corps took action in order to deal with

the emergency.

As soon as storm waters began to recede, countless Americans mobilized to provide

essential support to those impacted by Harvey.  For its part, the United States, through the Corps,

the Federal Emergency Management Agency ("FEMA"), the Small Business Administration

("SBA"), the Department of Housing and Urban Development ("HUD"), and other government

agencies, brought aid to the hurricane's victims and began facilitating recovery efforts.  Those

efforts are ongoing; the United States has thus far allocated billions of dollars for those affected

by Hurricane Harvey.  *See* Additional Supplemental Appropriations for Disaster Relief

Requirements Act, Pub. L. No. 115-72, 131 Stat. 1224 (2017); Reinforcing Education

Accountability in Development Act, Pub. L. No. 115-56, 131 Stat. 1129 (2017); Hurricanes

Harvey, Irma & Maria Education Relief Act of 2017, Pub. L. No. 115-64, 131 Stat. 1187;

Disaster Tax Relief & Airport & Airway Extension Act of 2017, Pub. L. No. 115-63, 131 Stat.

1168 (collectively providing tax relief, education relief, and other assistance to disaster victims).

Additionally, last week, Congress appropriated another $90 billion to further promote recovery

efforts in areas throughout the United States affected by major disasters in 2017.  Bipartisan

Budget Act of 2018, Pub. L. No. 115-123, 132 Stat. 64.  A significant portion of these funds is

intended for individuals and businesses harmed by Hurricane Harvey.  Specifically, each

qualifying property owner affected by Hurricane Harvey can seek individual assistance from FEMA in an amount up to $33,300 to cover home repairs, serious needs, or expenses associated with the hurricane.[2] In addition to this aid, each qualifying property owner may be eligible to receive low-interest SBA loans (up to $200,000 for residential property and up to $2 million for business property, including rental properties).[3] That aid has been flowing and continues to flow to property owners, such as Plaintiffs, who are residents of the hurricane-ravaged counties.

The United States has been sued by more than 1,500 plaintiffs, who contend that the Corps' emergency response to Hurricane Harvey constitutes a Fifth Amendment taking because their properties were damaged by flooding and floodwaters that flood control improvements could not prevent. These constitutional claims are unprecedented. Never in the history of the Republic has the Supreme Court or an appellate court found the Fifth Amendment to require the United States to pay compensation to persons damaged by catastrophic flooding caused by a major hurricane. Couched as statutory tort suits, such claims would clearly fail. *See, e.g., Katrina Canal Breaches Litig. v. United States*, 696 F.3d 436, 452-53 (5th Cir. 2012). Plaintiffs should fare no differently under a constitutional taking theory.

<u>First</u>, Plaintiffs fail to identify in their complaint a way that the Corps could have operated the Addicks and Barker dams that would have protected privately-owned property both above and below the dams. Plaintiffs do not even contend that such protection was possible. Instead, Plaintiffs implicitly maintain that the Corps should have directed floodwaters

---

[2] Temporary housing or permanent housing construction repair, whereby FEMA performs direct repairs to fix homes – instead of giving money – may also be available to eligible property owners.

[3] *See* https://disasterloan.sba.gov/ela/Declarations/DeclarationDetails?declNumber=1008079&members=false

elsewhere—elsewhere being on to some other person's private property—in order to protect Plaintiffs' own property. But the Fifth Amendment is not a constitutional flood insurance policy. No taking arises where, as here, the government is merely acting to mitigate or minimize an inevitable harm to the public. *See, e.g., Miller v. Schoene*, 276 U.S. 272, 279-80 (1928).

<u>Second</u>, under both Texas and long-standing federal law, Plaintiffs lack a protected interest in the property purportedly taken. Texas law does not recognize a property right to keep land free from waters backing up from a flood-control dam where the dam was neither built nor modified after the property was acquired. And the Flood Control Act of 1928, which was in place long before Plaintiffs purchased their property, establishes as a background principle that protection from floodwaters such as those produced by Harvey is not a stick in the bundle of property rights possessed by Plaintiffs. *See* 33 U.S.C. § 702c.

<u>Third</u>, claims concerning the dams' design and construction over 70 years ago, even if once viable, are now barred by the statute of limitations; moreover, claims concerning subsequent governmental <u>inaction</u> do not state a taking claim under the Fifth Amendment. *See* 28 U.S.C. § 2501; *Nicholson v. United States*, 77 Fed. Cl. 605, 616 (2007).

<u>Fourth,</u> Plaintiffs' claims should be dismissed for lack of jurisdiction. Plaintiffs do not allege facts that, if proven, would establish a pattern of severe and recurrent flooding that was intended and effected by the United States. Consequently, their allegations do not rise to the level of a compensable taking, but constitute, at most, a tort claim for which this Court lacks jurisdiction. *See, e.g., Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329-330 (1922); *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003). Both the government actions alleged and the flooding claimed resulted from a Category 4 hurricane – not an intentional act by the United States.

4

Fundamentally, Plaintiffs ask this Court to transform the United States into an "insurer that the evil of floods be stamped out universally[,]" in contravention of longstanding Fifth Amendment jurisprudence. *United States v. Sponenbarger*, 308 U.S. 256, 266 (1939). Accordingly, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), the United States moves to dismiss the Upstream Plaintiffs' Amended Master Complaint (ECF No. 18) for lack of subject matter jurisdiction or in the alternative for failure to state a claim upon which relief can be granted.

## FACTUAL BACKGROUND [4]

The City of Houston has long been subject to severe flooding because of its flat terrain and clay-like soils. *See generally* Jim Blackburn & Larry Dunbar, *Houston's High Water Problems*, 46-DEC Hous. Law. 18, at *19 (2008) (noting that "flooding and drainage have always been problems in Houston."); Ex. 3, H. R. Doc. No. 75-456, at 2 (1937) (describing how floods in the area "result from the rapid run-off of heavy precipitation . . ." that inundate areas in and above Houston). Following a severe flood in 1935, Congress directed the Chief of Engineers to study flood protection along Buffalo Bayou, a waterway flowing through Houston to the Houston Ship Channel and ultimately the Gulf of Mexico. Compl. ¶ 32; Rivers and Harbors Act of June 20, 1938, Pub. L. No. 75-685, 52 Stat. 802, 804 (codified at 33 U.S.C. § 540 (2017)). That investigation showed that hurricanes had caused flooding of up to 40 feet at Main

---

[4] The United States has cited throughout this motion background facts concerning Hurricane Harvey and the Houston area. The Court has discretion to take judicial notice of these facts. *E.g. Rio Grande Silvery Minnow v. Keys*, 469 F. Supp. 2d 973, 988 n.12 (D.N.M. 2002) (taking judicial notice of weather conditions readily determinable), *vacated on other grounds by* 601 F.3d 1096 (10th Cir. 2002). But, judicial notice is not necessary in this circumstance because the background facts do not control the outcome of any of the legal arguments supporting dismissal of Plaintiffs' claims.

Street in Houston, Texas and that flood control structures were necessary to protect life and property.

> The loss of life, heavy property damage, and disruption to the commerce of the city and port of Houston occasioned by the flood of 1935 have demonstrated the urgent need for the prosecution of comprehensive and effective measures for the control of future floods in Buffalo Bayou.

Ex. 3 at USACE000004.[5]  The Corps subsequently proposed the Buffalo Bayou and Tributaries Project, a flood-control project including, among other things, the construction of the Addicks and Barker flood-control reservoirs upstream of Buffalo Bayou.  Compl. ¶¶ 36, 56.  Congress and Harris County approved the plan and construction of the Addicks and Barker dams was completed in 1948 and 1945, respectively.  Compl. ¶¶ 34, 38; 52 Stat. 802, 804.  The dams were designed exclusively for flood control; their reservoirs are typically dry, detaining water only during significant storms.  When built, the two dams were outside the Houston city limits and surrounded by agricultural land and grassland.

In the decades following dam construction, development in and near Houston rose dramatically, with Harris and Fort Bend Counties permitting development that increasingly encroached on Buffalo Bayou and drew nearer to government-owned land upstream of the reservoirs.  *See* Ex. 4, 2012 Water Control Manual at USACE002208-10.[6]  In the 1930s, Houston was home to fewer than 300,000 people.  Ex. 3 at USACE000007.  Eighty years later, Houston has grown to a city of more than 2.3 million residents.[7]

---

[5] The 1935 flood resulted from a 3-day rainfall averaging between twelve and fifteen inches.  Ex. 3 at USACE000003.

[6]  Plaintiffs reference the 2012 Water Control Manual in the Complaint.  Compl. ¶¶ 62, 63, 64, 66, 74, 75, and 76.

[7]  *See* https://www.census.gov/quickfacts/fact/table/houstoncitytexas,harriscountytexas/ PST045216

The Addicks and Barker reservoirs were built to "prevent catastrophic flooding and damage to properties along Buffalo Bayou," including downtown Houston and the Houston Ship Channel, and had been in place for decades before Plaintiffs acquired their properties between 1989 and 2017.[8] *See* Compl. ¶¶ 17, 18, 32. The projects were successful and indeed, the flood protection provided by the projects contributed to the exponential growth of the region. During Hurricane Harvey, the dams withstood tremendous inflows and remained intact.

Hurricane Harvey was the first Category 4 hurricane to make landfall on the continental United States since 2004. From August 25 to 29, 2017, Hurricane Harvey dumped "near-constant" rains that shattered local records and caused widespread flooding in the Houston metropolitan area. Compl. ¶ 1. The hurricane's flooding led Texas's Governor to declare emergencies in sixty counties.[9] The President of the United States, likewise, declared the hurricane a major disaster.[10]

During Hurricane Harvey, consistent with the flood-control purposes for which the dams were constructed, the Corps operated the dams to attempt to prevent loss of life and ameliorate harm to the general public.[11] As in any heavy rain event, the Corps initially closed the floodgates to detain water in the reservoirs and protect downstream communities from flooding. *See* Compl. ¶¶ 65, 67. But as water levels in the Addicks and Barker reservoirs rose from the

---

[8] Some Plaintiffs alleged in their original complaints that they acquired their properties before 1989, but none are named in the master complaint. None alleged they acquired their properties before the dams were constructed.

[9] *See* https://gov.texas.gov/news/post/diaster-proc

[10] *See* https://www.fema.gov/disaster/4332

[11] *See* http://www.swg.usace.army.mil/Media/News-Releases/Article/1346048/addicks-and-barker-reservoirs-floodwaters-discharged-ready-for-next-rain-event/

unprecedented rains and water began to flow around the end of one dam, the Corps was forced to

begin releasing water in the early morning of August 28, 2017. Ex. 2. Even with the releases,

because of the storm's record-setting rains, inflows into both reservoirs greatly exceeded

outflows and water levels in the reservoirs continued to rise. Water levels peaked on the

morning of August 30, 2017.

As floodwaters from Hurricane Harvey receded, the Corps deployed hundreds of

employees from its Texas and other offices to work with local governments to protect the life,

health, and safety of those affected by the hurricane.[12] The Corps helped FEMA provide

temporary power and housing, and otherwise worked to make sure critical public facilities were

operational. *Id.* FEMA deployed more than 21,000 personnel in support of Hurricane Harvey

response, including search and rescue teams to help those stranded, and transporting medical

supplies and equipment including meals and water. The United States expects to expend billions

of dollars to provide aid and facilitate the recovery of persons affected by the storm. Thus far,

for Harvey-related damage, FEMA has received more than 370,000 requests for assistance and

has approved $1.55 billion pursuant to the Individual and Households Program.[13] The October

26, 2017 Additional Supplemental Appropriations for Disaster Relief Requirements Act, Pub. L.

No. 115-72, appropriated $18.67 billion to FEMA, including funding that can be issued as direct

loans to local governments providing essential services as a result of Hurricane Harvey and other

---

[12] *See* http://www.usace.army.mil/Hurricane-Harvey-Response/. Countless private citizens, too, bravely came to the heroic rescue and aid of thousands of Texans harmed by Harvey.

[13] *See* note 10. The Individual and Households Program provides aid to those affected by a disaster who have uninsured or underinsured expenses and serious needs, and can include rental assistance for temporary housing or home repair or replacement assistance. *See https://www.fema.gov/media-library-data/1502371943459-711a17671708a7ded53f0b22315f2597/FACTSHEETIndividualsandHouseholdIHP.pdf*

natural disasters.  The SBA has already awarded $3.2 billion in Hurricane Harvey-related aid, of

which approximately $762 million has been disbursed.  The Department of Housing and Urban

Development also expects to issue additional hurricane aid to those eligible.[14]

Plaintiffs can apply for many of the various types of federal aid available to them and to

the tens of thousands of other property owners whose properties flooded during the Hurricane.

This is the traditional Congressionally-approved method by which landowners harmed by an

extraordinary natural disaster like Hurricane Harvey receive federal assistance.

## LEGAL BACKGROUND

### I.      Standard of Review

With respect to a motion to dismiss for failure to state a claim upon which relief may be

granted, a court must accept as true all the factual allegations in the complaint, but not the legal

allegations.  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations

omitted).  In opposing such a motion, the plaintiff must demonstrate that the complaint contains

sufficient facts to "state a claim to relief that is plausible on its face," and that the court may

"draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft

v. Iqbal*, 556 U.S. 662, 663 (2009) (quotations and citations omitted).  Moreover, the allegations

must set forth facts that demonstrate the plaintiff is plausibly entitled to the relief sought, rather

than mere legal conclusions absent supporting facts.  *Id.*

Federal courts are courts of limited jurisdiction and they are presumed to lack jurisdiction

in a particular case unless jurisdiction is established by the plaintiff.  *See Renne v. Geary*, 501

---

[14] In addition to the agencies listed here, the Corporation for National and Community Service, Department of Health and Human Services, Department of Homeland Security National Protection and Programs Directorate, U.S. Coast Guard, Defense Logistics Agency, U.S. Department of Agriculture, National Guard Bureau and other agencies have provided extensive additional assistance and aid.

U.S. 312, 316 (1991). On a motion to dismiss, the plaintiff bears the burden of proving that subject matter jurisdiction is appropriate by a preponderance of evidence. *See Reynolds v. Army & Air Force Exch. Serv*., 846 F.2d 746, 748 (Fed. Cir. 1988) (citations omitted). Under RCFC 12(b)(1), a defendant can seek dismissal for lack of subject matter jurisdiction by making a facial attack, in which the allegations of the complaint are taken as true. *Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (citation omitted); *Cedars- Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993). However, with respect to subject matter jurisdiction, a court does not need to presume the truthfulness of the plaintiff's allegations. *Reynolds*, 846 F.2d at 747; *Cedars-Sinai*, 11 F.3d at 1583. Rather, the court may consider matters outside of the plaintiff's complaint in assessing its jurisdiction, without converting the motion into one for summary judgment. *See Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011) (citing *Arbaugh v. Y&H Corp*., 546 U.S. 500, 514 (2006)).

## II.    Fifth Amendment Takings

The plaintiff in an inverse condemnation action bears the burden of pleading the facts that ultimately bear on whether a taking has occurred. *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (citation omitted). First, Plaintiffs must identify the precise government action that is the basis of the claim. *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 855 (Fed. Cir. 2009) (an alleged taking "consisting of several distinct [government] actions viewed in concert" is too broad of a characterization because it does not pinpoint what step in the order of events constituted conduct that would be a taking). Once Plaintiffs identify the precise government action, they "must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances." *Ridge Line,* 346 F.3d at 1355 (citation omitted). *See also Acceptance*, 583 F.3d at 855. That is because "not every 'invasion' of private property

resulting from government activity amounts to an appropriation," and "[o]nly under limited circumstances may the property-owner be compensated for a taking." *Ridge Line*, 346 F.3d at 1355; *Nicholson v. United States*, 77 Fed. Cl. 605, 616 (2007).

## **ARGUMENT**

### I.      **Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted.**

#### A.      Sovereign Actions Undertaken to Minimize or Mitigate an Inevitable Public Harm Do Not Constitute a Taking of Private Property.

Plaintiffs do not present a cognizable taking claim because the Corps' actions were an exercise of governmental power to prevent loss of life and mitigate inevitable damages to private property as part of the emergency response to Hurricane Harvey, an extraordinary natural disaster.  The Supreme Court has long maintained a distinction between the exercise of police power and the taking of private property for public use.  All property rights are held subject to "a fair exercise" of the police power.  *Chi. & Alton R.R.v. Tranbarger*, 238 U.S. 67, 77 (1915). Consequently, even the destruction or seizure of property is not generally viewed as a compensable taking so long as the government is acting to protect public health or safety.  *See, e.g., Mugler v. Kansas,* 123 U.S. 623 (1887).  And where, as here, the Government action is part of an effort to reduce or mitigate inevitable harms to the public, no viable taking claim exists. *See, e.g., Miller*, 276 U.S. at 279-80.  *See also Bowditch v. City of Boston,* 101 U.S. 16, 18-19 (1879) (government not liable for a taking where firefighters destroyed a home to arrest the spread of fire in the protection of other private properties).  The application of that well-established principle of takings law is particularly appropriate where, as here, the government is confronted with an extraordinary natural event like Hurricane Harvey.

A long line of cases holds that no taking occurs when the government's action incidentally results in damage to private property as the government seeks to protect the public

from harm.  The seminal case in this line of authority is *Miller*, where the Supreme Court affirmed a Virginia Supreme Court decision upholding the destruction of a large number of ornamental red cedar trees, without compensation, in accordance with a state law designed to protect neighboring apple orchards.  276 U.S. at 277-80.

In *Miller*, legislation gave the Virginia State Entomologist the authority and discretion to order the destruction of red cedars found growing within a two-mile radius of any apple orchards because of the destructive nature of a fungus that spreads between red cedars and apple trees.  *Id.* This order necessitated damage to private property where red cedar trees were growing.  But failure to issue such an order would result in damage to apple orchards.  The state had to decide how to address an inevitable harm to private property—the loss of red cedars or damages to the local apple industry.  In finding no compensable taking, the Supreme Court recognized the unenviable dilemma governments face when they must choose between the preservation of two types of property in dangerous proximity, stating:

> It would have been none the less a choice if, instead of enacting the present statute, the state, by doing nothing, had permitted serious injury to the apple orchards within its borders to go on unchecked.  When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public.

*Miller*, 276 U.S. at 279.

In a recent case involving "the most traditional function of the police power: entering property to arrest" a criminal suspect, this Court held that there was no taking of real property. *Bachmann v. United States*, 134 Fed. Cl. 694, 697 (2017).  "When private property is damaged incident to the exercise of the police power, such damage is not a taking for the public use, because the property has not been altered or turned over for public benefit.  Instead, both the owner of the property and the public can be said to be benefited by the enforcement of criminal

12

laws and cessation of the criminal activity." *Id.* at 696 (citing *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 92–93 (1969) ("temporary, unplanned occupation" of building by troops under exigent circumstances is not a taking)). *Bachmann* confirms the continuing vitality of the principle that the Fifth Amendment does not invariably require compensation for government-caused damage to private property.

The *Miller* doctrine plainly applies here. Plaintiffs allege that their property rights were taken as the result of the Corps' operation of the Addicks and Barker dams before, during, and after Hurricane Harvey. Compl. ¶¶ 65-67. Hurricane Harvey was a record-setting storm—unprecedented not only for Houston, but in the entire history of the United States—in which severe flooding was inevitable. Plaintiffs fail to identify in their complaint an approach that the Corps could have adopted to protect all privately-owned property—above and below the dams—from flooding. Nor do Plaintiffs allege that such widespread protection was possible. Instead, Plaintiffs necessarily maintain that the Corps should have directed floodwaters elsewhere—elsewhere being downstream from the reservoirs on to private property owned by others.[15] At the same time, downstream landowners are asserting a version of the same claim in the opposite direction; they argue that the government should have prevented water from flowing downstream by detaining more of it in the reservoirs. *In re Downstream Addicks and Barker (Texas) Flood-Control Reservoirs v. United States*, No. 17-cv9002-SGB, Consolidated and Am. Downstream Master Complaint. ECF No. 23. Those conflicting claims vividly illustrate that Hurricane Harvey created a no-win situation for the Corps akin to the one confronting the State of Virginia in *Miller*. Like Virginia, the Corps was faced with a dilemma—to close the floodgates or not—

---

[15] Plaintiffs also suggest the United States should have earlier condemned more land. Compl. ¶¶ 51, 54, 55. This allegation based on inaction is not cognizable. *See* discussion *infra* Section II.C.1.

where both action and inaction would inevitably result in some harm to some property owners. Caught between a rock and a hard place, the Corps followed procedures aimed at preserving the dams, protecting human life, and mitigating inevitable flood damages. That is not a taking. The Fifth Amendment has not created a constitutional flood insurance policy. No taking arises where, as here, the Government is simply acting to mitigate or minimize the inevitable harm to the public caused by an extraordinary Act of God.

The Texas Supreme Court, addressing what it likewise perceived to be a no-win scenario in a taking case that involved flooding in Harris County, cautioned against reducing "flood control decisions . . . to picking your plaintiff rather than responsible flood control management." *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 810 (Tex. 2016) (quotation marks omitted). Like the Texas Supreme Court in *Kerr*, this Court should "decline to extend takings liability vastly beyond the extant jurisprudence, in a manner that makes the government an insurer for all manner of natural disaster." *Id.* (footnote omitted)

Flooding from Hurricane Harvey was inevitable given the amount, duration and location of rainfall. Plaintiffs' claim of a taking must fail in this circumstance where the Corps acted to protect the general public during the emergency of a hurricane.

      B.      <u>Under Texas Law and the Flood Control Act, Plaintiffs Do Not Possess the Property Interest Purportedly Taken</u>.

The plaintiff in any Fifth Amendment taking action must establish, as a threshold matter, that they possess the property right purportedly taken. *See, e.g., Colvin Cattle Co. v. United States,* 468 F.3d 803, 806 (Fed. Cir. 2006). As the Federal Circuit has explained, the first step is for the Court to determine "whether the plaintiff possesses a valid interest in the property affected by the governmental action, *i.e.*, whether the plaintiff possessed [the pertinent] 'stick in the bundle of property rights.'" *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343

(Fed. Cir. 2002) (citation omitted).  Plaintiffs here do not possess the "stick" that was purportedly taken from their bundle of real property rights.

Plaintiffs allege the taking of temporary and permanent flowage easements that purportedly burden their real property, and the temporary and permanent taking of other mostly-unspecified property rights.  Compl. ¶¶ 107, 109, 117, 123, 124, 137, 139.  As a prerequisite to their taking claims, Plaintiffs must therefore establish that they have a right to property free of floodwaters resulting from a catastrophic hurricane like Harvey.  Plaintiffs cannot make the requisite showing because Texas law excepts flood-control structures from the state's general prohibitions against diversions of water, and the dams are pre-existing structures constructed and operated long before Plaintiffs acquired their properties.  Simply put, Plaintiffs cannot show they have a protected property right under Texas law to avoid diversions of water from existing dams.

The Flood Control Act, which Congress enacted both before the dams were constructed and before Plaintiffs acquired their real property, is likewise fatal to their claim.  Plaintiffs do not possess a protected property right at odds with this unambiguous background principle, which provides that no liability "of any kind" shall be imposed "upon the United States for any damage from or by floods or flood waters at any place."  33 U.S.C. § 702c.  For these reasons, Plaintiffs fail to state a claim for relief under the Fifth Amendment.

## 1. *Background Principles of Property Law Limit Cognizable Property Rights.*

The Constitution itself does not create or define property rights.  Consequently, courts look to "background principles" derived from "an independent source such as state, federal, or common law" to determine whether a plaintiff has a cognizable property interest.  *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)); *Bd. of Regents v. Roth*, 408 U.S. 564, 578 (1972); *see also Ridge*

*Line*, 346 F.3d at 1357 (assessing existence vel non of property interest according to West Virginia reasonable use law).  Indeed, there is no taking if common law nuisance and property principles prohibit the desired land use or place an existing restriction on the property right claimed.  *Lucas*, 505 U.S. at 1029.

## 2. *Texas Law Recognizes No Property Right in Keeping Property Free From Diversions of Water from a Dam.*

Section 11.086 of the Texas Water Code generally prohibits private landowners from diverting the natural flows of water onto private property, and it entitles property owners to recover damages from "an overflow of water caused by unlawful diversion or impounding." Tex. Water Code Ann. § 11.086(a), (b) (West 2017).  But crucially, the statute expressly exempts diversions of water caused by the "construction and maintenance of levees and other improvements to control floods." *Id.* § 11.086(c).[16]  *Kahn v. Bauch Leather Co.*, 17 S.W.2d 187, 189 (Tex. Civ. App. 1929) (referring to Article 7589a of the Texas Civil Statutes, a predecessor of Section 11.086, which exempted the "construction and maintenance of levees and other improvements for the purpose of controlling floods.").  The statute has been interpreted to bar claims under Section 11.086 where water was diverted by a flood-control project.  *See, e.g.*, *Hopkins v. State*, No. 03-03-00499-CV, 2006 WL 1126224, at *11 (Tex. App. Apr. 27, 2006) (considering a nuisance claim);  *City of Whitesboro v. Williams*, No. 05-99-01840-CV, 2001 WL 66427, at *2 (Tex. App. Jan. 29, 2001) (recognizing that section (c) exempts the construction of flood-control improvements) (not designated for publication).  Other Texas authorities preceding the enactment of this Texas Water Code provision similarly disallow a cause of action based on

---

[16] Subtitle B, including Chapter 11, of the Texas Water Code generally sets forth water rights recognized under Texas law.  *See Kraft v. Langford*, 565 S.W.2d 223, 229 (Texas 1978) (describing the predecessor statute to Section 11.086 as a "rule of property that defines and limits the rights of property owners," and "creates easements and limits their use . . . .").

the diversion of waters caused by a public improvement that "had already occurred when [the claimant] acquired the property."[17] *City of Dallas v. Winans*, 262 S.W. 2d 256, 259 (Tex. App. 1953). Plaintiffs only vaguely allege that "Plaintiffs' rights in [their] property were impaired," and do so without alleging or demonstrating that they enjoy a protected right to keep surface waters off their property under circumstances like those present here. Compl. ¶ 109. They further claim "rights in these properties" under Texas law, but fail to address the fact that Texas law has exempted diversions of water from flood-control structures from its general prohibitions disallowing diversions of water. *Id.* Plaintiffs cannot show they have a cognizable property right in keeping their properties free of diversions of water from the Addicks and Barker reservoirs, and therefore fail to state a viable claim.

### 3. *Texas Law Recognizes No Property Right Vis-a-Vis a Pre-Existing Flood-Control Structure.*

Even if Plaintiffs were able to demonstrate a property right in keeping their properties free from diversions of floodwaters resulting from a catastrophic hurricane, they cannot show that such right exists for any landowner who acquired their property after the construction of the dams in the 1940s. Plaintiffs have identified no such claimant and indeed allege acquisitions of properties upstream of the dams as recently as 2017—nearly 70 years after the last dam was completed. Compl. ¶ 18.

Background principles of state law limit an owner's rights to claims involving new construction or a new pattern of government operations. *See, e.g. Hansen v. United States*, 65 Fed. Cl. 76, 123-24 (2005) (analyzing what water rights had vested under South Dakota law). In

---

[17] The law prohibiting diversions of surface water, including an exemption from liability for flood control projects, was first enacted in 1915 because of a public necessity. *See* Ex. 5, Texas H.B. No. 26 (May 29, 1915).

*City of Tyler v. Likes*, the Texas Supreme Court rejected a taking and nuisance claim finding that there was no governmental activity that had increased the amount of water in the watershed *after* the culvert system was installed, more than ten years before the plaintiffs had acquired their home.[18] 962 S.W.2d 489, 505 (Tex. 1997). By contrast, in *Brazos River Authority v. City of Graham*, the Court found a taking where the property at issue was constructed *before* the dam at issue. 354 S.W.2d 99, 104 (Tex. 1961) (describing how the water disposal plan was constructed before the dam and lake came into existence), *holding modified by Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*, 449 S.W.3d 474, 780 (Tex. 2014) (finding no taking where there was no recurrent flooding). These authorities demonstrate that Plaintiffs cannot claim a taking based on the design or construction of the dams, which predate by decades the acquisition of their property.

Plaintiffs also cannot state a claim based on continued operation of the dams. A public entity's continued operation of a public program, or its alleged failure to implement corrective measures, does not encroach upon a protected property interest. *AN Collision Ctr.*, 310 S.W.3d at 195-96. Plaintiffs possess no right to be free from invasions from the operation of projects whose construction and operations pre-dated the acquisition of their properties.[19] *See Thomas v. Bunch*, 41 S.W.2d 359, 363 (Tex. App. 1931), *aff'd*, 49 S.W.2d 421 (Tex. 1932) (holding that a

---

[18] Nuisance jurisprudence is instructive to inform what property rights are recognized by law because Texas recognizes that nuisances that rise to the level of a constitutional taking may be compensable against the state. *See AN Collision Ctr. of Addison, Inc. v. Town of Addison*, 310 S.W.3d 191, 194 (Tex. App. 2010).

[19] The concept of a subsequent purchaser having no property right to be free from diversions from an existing structure is reflected also within the requirement that Plaintiffs demonstrate that their reasonable investment-backed expectations have been frustrated by the government activity. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38-39 (2012). Here, Plaintiffs do not allege any facts showing they expected the dams would be operated in any manner other than "precisely as intended," since as early as at least 1962. Compl. at 26 and ¶ 54.

landowner erecting a dam to protect land acquired a vested right to maintain dam as originally constructed); *see also City of Dallas*, 262 S.W.2d at 258 (finding no liability where municipality's operation had not changed, and noting that "if a cause of action ever existed, it was in favor of some remote predecessor in title, not appellee."); *Meuth v. City of Seguin*, No. 04–16–00183–CV, 2017 WL 603646, *4 (Tex. App. Feb. 15, 2017) (finding no liability where municipality continued to operate drainage culvert that was built prior to plaintiff's acquisition of property). Because Plaintiffs allege no new or changed operation of the dams after their acquisition, they possess no cognizable property right that could be taken under Texas law, and their claims should therefore be dismissed. *Cf. Brinston v. Koppers Indus., Inc*., 538 F. Supp. 2d 969, 977 (W.D. Tex. 2008) (rejecting permanent nuisance claim because the plaintiffs did not own the property when the alleged nuisance originally commenced),

### 4. *The Flood Control Act Is A Longstanding Background Principle That Shapes Plaintiffs' Property Rights.*

Even apart from these principles of Texas law, which are independently sufficient to foreclose Plaintiffs' claims, Plaintiffs' property rights are further shaped by background principles established in the Flood Control Act. The Act addresses rights and expectations with respect to floods and floodwaters, and which predates both the dams and Plaintiffs' ownership of their property. The Flood Control Act is clear and unequivocal: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." [20]  33 U.S.C. § 702c. The plain language and longstanding existence of Section 702c

---

[20]  The broad and seemingly unequivocal language of Section 702c raises the question whether the statute has withdrawn, in relevant respects, the waiver of sovereign immunity that underlies this Court's subject matter jurisdiction. *See United States v. James*, 478 U.S. 597, 606-07 (1986) (opining that Section 702c "clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from 'any' liability associated with flood control."). The Federal Circuit has found no "unambiguous evidence in the text or legislative history of § 702c that

defeat Plaintiffs' claims.  *Cf. B. Amusement Co. v. United States*, 148 Ct. Cl. 337, 342 (1960) (finding that even if the policy of non-liability in Section 702c is based on public policy and not sovereign immunity, it is at any rate a withdrawal of consent to be sued).

In circumstances where the federal government has long exercised dominant control in an industry, private property rights are frequently limited by government action or regulation.  *See Air Pegasus, Inc. v. United States*, 424 F.3d 1206, 1217-18 (Fed. Cir. 2005) (discussing public transit regulations and finding no property right in navigable airspace); *United States v. Twin City Power Co.*, 350 U.S. 222, 225-28 (1956) (holding that riparian landowners took their interest in a stream subject to the government's dominant navigational servitude).  Furthermore, where the federal government's regulatory authority can change or restrict the scope of a claimed property right, no private property right exists.  *E.g.*, *Am. Pelagic Fishing Co., L.P v. United States*, 379 F.3d 1346, 1374 (Fed. Cir. 2004).  The federal government has exercised authority in the area of flood risk reduction since the nineteenth century.  *See* Rivers and Harbor Act of 1888, codified at 33 U.S.C. § 601.  This long-standing exercise of federal authority shapes what property rights are cognizable.

The Flood Control Act was enacted in 1928.  *Nat'l Mfg. Co. v. United States*, 210 F.2d 263, 270 (1954).  It had been in place nearly 20 years before the Addicks and Barker dams were complete.  The dams were constructed pursuant to Flood Control Act authority and against the

---

Congress had withdrawn the Tucker Act grant of jurisdiction."  *California v. United States*, 271 F.3d 1377, 1383 (Fed. Cir. 2001) (finding the legislative history discussed in *James* to be "an insufficient basis . . . upon which to presume an implied partial repeal of the Tucker Act").  *But see Horne v. Department of Agriculture*, 569 U.S. 513, 527 (2013) (enunciating a different approach for "determin[ing] whether a statutory scheme displaces Tucker Act jurisdiction").  The United States does not seek dismissal of Plaintiffs' claims on this ground at this time.  We identify the issue because it goes to this Court's subject matter jurisdiction.

backdrop of Section 702c.[21]  It was another 40 years (or more) before, according to the

Complaint, Plaintiffs acquired their property.  *See* Compl. ¶¶ 17, 18.  They did so against the

backdrop of public facilities that had at that time been operated for generations, providing both

benefits and burdens to the local community, and against the backdrop of an unequivocal

provision that barred the recovery of damages relating to floods and floodwaters.[22]  In other

words, Section 702c constitutes an established background principle that has been in place for

nearly 100 years.

Plaintiffs do not allege that the Addicks and Barker dams were constructed after they

acquired their properties.  Nor do they allege that after acquisition of their property the Corps has

altered its operations to their detriment.  Instead, Plaintiffs seek compensation for damages

resulting from the floods or floodwaters of Hurricane Harvey.  *See* Compl. ¶¶ 70, 71.  The

character of the waters that allegedly caused the claimed damage and the purposes behind their

release are determinative.  *Cent. Green v. United States,* 531 U.S. 425, 436 (2001).  Waters

captured by a flood-control reservoir  for flood control purposes, or waters that such projects

cannot control during a catastrophic storm are without question floodwaters within the meaning

of the Flood Control Act.  *See id.*  And because Section 702c constitutes a background principle,

it also acts as a bar to liability.  Plaintiffs' claims should therefore be dismissed.

C.    Plaintiffs' Allegations Relating to Design and Construction of the Dams and the
       Non-Acquisition of Land Should Be Dismissed**.**

---

[21] The Addicks and Barker dams were authorized under the Rivers and Harbors Act of 1938,
which resulted from the 1936 Flood Control Act, and which retained the immunity provision of
the 1928 Flood Control Act.  Pub. L. No. 75-685, 52 Stat. 802 (1938)

[22] The Corps alone is responsible for the operation of over 500 dam projects authorized by
various Flood Control Acts and other statutes, including more than 300 of which that have flood-
control as one of the authorized purposes.  33 C.F.R. § 222.5 App. E.  Other government
agencies operate additional federal projects, some of which have flood-control purposes as well.

Plaintiffs have not clearly identified what government action they believe effected a taking, and their existing allegations do not allege a concrete government action within six years of the filing of the Complaint that caused flooding that would otherwise not have occurred. Plaintiffs variously claim the government action consisted of: (1) the construction of the dams; (2) a failure to acquire sufficient land, at some unspecified point in time, to contain all floodwaters the dams can store according to its design; and (3) the vaguely-described "impoundment" of water. Compl. ¶¶ 51, 54, 55, 68, 73, 76, 79. The first two claims are founded either on government inaction or on actions taken long ago. Accordingly, those claims must be dismissed for failure to state a claim or, alternatively, if barred by the statute of limitations, for lack of subject matter jurisdiction. The third claim describes a result that might or might not have been caused by a government action, which is in any event so vague and uncertain to be insufficient as a matter of law. *See Acceptance Ins.*, 583 F.3d at 855 (requiring plaintiff to "pinpoint" the asserted government action).

1. ***Claims About the Corps' Alleged Failure to Acquire Land Are Based on Inaction and Are Therefore Not Cognizable.***

Plaintiffs allege that the Corps did not acquire enough land or did not fix perceived problems with the dams. Plaintiffs do not indicate how much land should have hypothetically been acquired or when. They also do not even allege that the Corps should have acquired their own land in the hypothetical acquisition. Plaintiffs' claims are not cognizable as a Fifth Amendment taking because they rest on government inaction.

In the Complaint, Plaintiffs assert in multiple places that "the Government did nothing," apparently acknowledging the absence of an affirmative act. Compl. ¶¶ 59, 60. It is well-settled law that the government's failure to act or to perform its duties, or the government's delay in acting, cannot constitute a taking. *See Ga. Power Co. v. United States*, 633 F.2d 554, 557 (Ct.

Cl. 1980); *Nicholson*, 77 Fed. Cl. at 620. The Court of Federal Claims "has consistently required that an affirmative action on the part of the Government form the basis of the alleged taking." *Id*. (citing *Last Chance Mining Co. v. United States*¸ 12 Cl. Ct. 551, 556-57 (1987), *aff'd*, 846 F.2d 77 (Fed. Cir. 1988) (per curiam), *B & G Enters., Ltd. v. United States*, 43 Fed. Cl. 523, 526-27 (1999), *aff'd*, 220 F.3d 1318 (Fed. Cir. 2000), and *Pendleton v. United States*, 47 Fed. Cl. 480, 485 (2000)). *See also Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1334 (Fed. Cir. 2006) (finding that government's unreasonable delay did not constitute the basis of a takings claim). This is unsurprising. The discretionary function exception to federal liability under the Federal Tort Claims Act is a critical, longstanding feature of our legal system on which much of our Nation's current civil works infrastructure was based. As Judge Easterbrook has emphasized, the Supreme Court has "never treated [such] limitations on liability in tort as mere pleading obstacles, to be surmounted by shifting ground to the Tucker Act." *In re Chicago, Milwaukee, St. Paul, & Pac. R.R.*, 799 F.2d 317, 326 (7th Cir.1986), *cited with approval in Ark. Game & Fish Comm'n*, 568 U.S. at 39). Consequently, the claim that the United States has elected not to explicitly condemn enough land or acquire easements, *see* Compl. ¶ 59, does not state a claim upon which relief can be granted. Plaintiffs' non-specific and deficient pleading illustrates that a claim of inaction, here resting on allegations of a hypothetical course of action of unknown scope and consequence, is not cognizable.

The same defect infects Plaintiffs' vague assertion that the Corps "intentionally stored floodwaters" on their property. Compl. ¶¶ 70, 71; *see also id.* ¶ 73 (referring to some unspecified "use" of the Addicks and Barker dams). The storage of floodwaters on Plaintiffs' property might (or might not) be *the result* of an affirmative act by the United States, but the term "storage" does not itself sufficiently identify such an act. In the absence of an allegation

that pinpoints the government action that allegedly caused water to be stored on each Plaintiff's property, no cognizable claim is stated. Because Plaintiffs fail to pinpoint an affirmative action by the Corps occurring during the past six years that caused flooding during Hurricane Harvey that would not otherwise have occurred, their claims are legally deficient and should be dismissed for failure to state a claim. See *Acceptance Ins.*, 583 F.3d at 855; *Nicholson*, 77 Fed. Cl. at 620.

### 2. *Claims About Dam Design and Construction Are Time-Barred.*

Plaintiffs describe the "authorized action" on which their claims are based as the "design" and "construction" of the Addicks and Barker dams. Compl. ¶ 73. This purportedly effected the taking of permanent and/or temporary flowage easements, but Plaintiffs fail to clarify how this occurred. Plaintiffs do clearly allege that the Corps designed the Addicks and Barker reservoirs in the 1940s, acquired land upstream of the reservoirs through the 1950s, and calculated alternate design pools in the 1980s. Compl. ¶¶ 33, 42, 73, 132, 134, 135. Plaintiffs also cite documents from the 1980s and 1990s as support for the contention that the United States constructed the dams with the intent to store water in what they call the "maximum design pool." Compl. ¶ 106. These activities all occurred approximately 30 or more years ago.

Taking claims under the Tucker Act are subject to a six-year statute of limitations. 28 U.S.C. § 2501. The statute of limitations is a limitation on the waiver of sovereign immunity and is therefore strictly construed. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132-35 (2008). None of the key actions identified in the Complaint – the design of the reservoirs, the acquisition of land, or the calculation of design pools—occurred within the last six years. Therefore, to the extent Plaintiffs contend a flowage easement or other property was taken by dam design, dam construction, or is based on the Corps' supposed failure to acquire sufficient land for such construction, Plaintiffs' claims are time-barred.

<u>Plaintiffs' Claim That the United States Has Taken Unidentified "Other Property Interests" Is Legally Deficient.</u>

For a complaint to state a valid claim under this Court's Rules, a plaintiff must include "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a). Moreover, for a Fifth Amendment takings claim, a plaintiff must plead with particularity the "specific property interest" allegedly taken by the United States. *See* RCFC 9(i). This pleading requirement applies equally to alleged takings of real, personal, intangible, or other property. The failure to meet these pleading requirements is grounds for dismissal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544,570 (holding that plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action. . . .").

Here, Plaintiffs offer general allegations about the purported taking of unspecified "other" property, without identifying the specific property purportedly taken. Paragraph 84 of the Master Amended Complaint states generally that:

> In addition to the real property destroyed, Plaintiffs whose homes flooded suffered permanent damage, destruction and tragic loss of personal property including appliances, furniture, air conditioning units, and numerous personal effects. For those in one-story houses, this loss of property amounts to most of their possessions.

However, paragraphs 9 through 21, which set forth the claims of each individual Plaintiff, identify no specific personal or other property that the Plaintiff alleges to have been taken by the United States. Compl. ¶¶ 9-21. Rule 9(i) does not allow a plaintiff to seek compensation for a taking without specifically identifying the property and property interest allegedly taken. The identification of particular property is essential because each property interest purportedly taken—real, personal or otherwise—must be analyzed independently and just compensation is available only for the fair market value of a taking of property that is pled and proved, not for

consequential damages. *Indep. Park Apartments v. United States*, 465 F.3d 1308, 1311 (Fed. Cir. 2006).

Plaintiffs seek in their complaint such non-compensable consequential damages. The Court should rule that consequential damages such as claimed lost rental income and "benefits and profits attendant to" the business, Compl. ¶¶ 10, 20, are not compensable as a matter of law. *See, e.g., Big Oak Farms, Inc. v. United States*, 105 Fed. Cl. 48, 58 (2012).

Plaintiffs had the opportunity to cure these deficiencies after the United States explicitly identified them in its Motion for More Definite Statement, but Plaintiffs chose to reassert vague and legally insufficient allegations. Plaintiffs' failure to identify the specific personal property of each Plaintiff violates RCFC 9(i) and prevents the United States from reasonably preparing a response and developing its defenses. The Court should dismiss Plaintiffs' claims for the taking of unidentified "personal property" for failure to state a claim upon which relief can be granted.

## II. Plaintiffs' Claims Should Be Dismissed For Lack of Subject Matter Jurisdiction Because The Flooding Here Is at Most a Tort; It Is Not a Compensable Taking.

### A. Plaintiffs Have the Burden To Prove Treatment as a Taking Is Appropriate Based on Facts Alleged.

The plaintiff in an inverse condemnation action bears the burden of pleading and proving facts that ultimately bear on jurisdiction. *Ridge Line*, 346 F.3d at 1355. This means that, among other things, the plaintiff "must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances." *Id.*; *Acceptance*, 583 F.3d at 855. It is well-established that "not every 'invasion' of private property resulting from government activity amounts to an appropriation," and "[o]nly under limited circumstances may the property-owner be compensated for a taking." *Ridge Line*, 346 F.3d at 1355; *Nicholson*, 77 Fed. Cl. at 616. Whether a claim is a tort or a taking "requires consideration" of the government's action and whether that action was "sufficiently substantial to justify a takings remedy." *Ridge Line*, 346

F.3d at 1355.  The plaintiff must show either that the government intended to take its property or that such an intent can fairly be deemed to exist because a taking is the "direct, natural, or probable result" of the government action.  *Id.* (quoting *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 709 (Ct. Cl. 1955)).  The interference must also be "substantial and frequent enough to rise to the level of a taking."  *Id.* at 1357.  This tort-taking distinction is a threshold question because tort claims are not within the Court's jurisdiction.  *Id.* at 1355; 28 U.S.C. § 1491(a)(1).

Relatedly, long-standing precedent requires that the plaintiff establish that the government act that allegedly caused the taking was lawful and authorized, and either "appropriate[d] a benefit to the government at the expense of the property owner, or at least preempt[ed] the owners['] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value."  *Ridge Line*, 346 F.3d at 1356.

Plaintiffs' claims should be dismissed because they have neither pled sufficient facts, nor can they prove, that their claims should be treated as takings, rather than torts.  Plaintiffs offer only cursory and speculative allegations about the supposed permanence of the alleged taking. Plaintiffs acknowledge that Hurricane Harvey was an extraordinary storm.  Floodwaters receded soon after the hurricane ended.  Plaintiffs do not allege that the Corps' operation of the Addicks and Barker dams flooded their properties before or since the hurricane.  Put simply, according to their own allegations, flooding has not been permanent, frequent, recurrent, or even likely to recur in the future.  Plaintiffs have not even adequately pled facts to show the government—as opposed to the hurricane—either caused the flooding in question, or that an identified government action set in motion a chain of events of which the flooding was a natural consequence.  *Cf. Nicholson*, 77 Fed. Cl. at 618 (finding that Hurricane Katrina, not the

installation of floodwalls, caused flooding); *Bartz v. United States*, 633 F.2d 571, 593 (Ct. Cl. 1980) (finding that "excessive precipitation," not dam releases caused flooding).  Moreover, a one-time hurricane-induced flood stemming from a 1000-year storm—rather than "government-induced" flooding from routine operations—is not "substantial and frequent enough to rise to the level of a taking."  *Ridge Line*, 346 F.3d at 1357.  Numerous cases establish that even infrequently-recurring floods, let alone one-time floods, do not constitute a taking.[23]  This case is fundamentally distinguishable, even at the pleadings stage, from *Arkansas Game & Fish*.  In that case, the flooding resulted from the routine operation of a government dam under "normal" circumstances—not during an emergency resulting from a hurricane and an historic rain event.  And the flooding, while temporary, recurred each year for several years.  568 U.S. 23.  Here, Plaintiffs fail to plead facts plausibly establishing the severe and frequent invasion of a protected property right necessary to state a taking claim under controlling legal authority, including *Arkansas Game & Fish*.  Plaintiffs' claims arise, if at all, in tort.  Consequently, their claims should be dismissed.

> B.     <u>Plaintiffs' Conclusory Allegations Are Not Entitled to a Presumption of Correctness.</u>

Plaintiffs' conclusory allegations do not enjoy a presumption of correctness.

Even at the motion to dismiss stage, Plaintiffs bear the burden of "alleg[ing] facts sufficient to establish the court's subject matter jurisdiction."[24]  *The George Family Trust ex rel. George v.*

---

[23] Texas cases establish that, although recurrence is not an absolute requirement to prove a taking, "recurrence is a probative factor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore substantially certain to occur." *City of El Paso v. Mazie's L.P.*, 408 S.W. 3d 13, 25 (Tex. App. 2012) (quoting *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W. 3d 546, 555 (Tex. 2004)).

[24] The Federal Circuit has treated a motion to dismiss a flooding-related takings case based on the tort-taking distinction as a motion for failure to state a claim under RCFC 12(b)(6), converted to a motion for summary judgment under RCFC 56, rather than a dismissal for lack of subject

*United States*, 91 Fed. Cl. 177, 189 (2009) (citing *Rene v. Geary*, 501 U.S. 312, 316 (1991))

(granting motion to dismiss in part and denying it in part, in government-induced flooding case).

"Once the court's subject matter jurisdiction is called into question, . . . [the plaintiff] bears the

burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Id.*

(additional citations omitted). When a motion to dismiss "controverts the plaintiff's

jurisdictional allegations and challenges the factual basis of the court's jurisdiction, the plaintiff

must demonstrate facts sufficient to support jurisdiction," and the Court is not limited to

considering the allegations of the complaint. *George Family Trust*, 91 Fed. Cl. at 190 (citing

*Cedars-Sinai Med. Ctr.*, 11 F.3d at 1583-84).

Plaintiffs' master complaint fails to allege facts that, if proven, would demonstrate that

the government caused flooding other than during Hurricane Harvey itself, and their bare

recitation of various legal conclusions is insufficient to meet their burden to establish

jurisdiction. "The tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing

*Twombly*, 550 U.S. at 555). "In keeping with these principles a court considering a motion to

dismiss can choose to begin by identifying pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth." *Id.* at 679.

Here, Plaintiffs' bare allegations that the Government has a "commitment to flooding

Plaintiffs' property on a recurrent and ongoing basis" or that "flooding will happen again," *see*

---

matter jurisdiction under RCFC 12(b)(1). *See Moden v. United States*, 404 F.3d 1335, 1339-42
(Fed. Cir. 2006). However described, the *Ridge Line* elements clearly are subject to the pleading
requirements of *Iqbal* and *Twombly*. *See George Family Trust*, 91 Fed. Cl. at 201 (citing *Iqbal*,
556 U.S. 662 and *Twombly*, 550 U.S. 544).

Compl. ¶¶ 78, 107, are not entitled to a presumption of truth and are legally insufficient. And Plaintiffs do not allege, much less plead facts that plausibly establish, the supposed frequency of hypothetical future flooding. Plaintiffs offer no more than the allegation that floods occurred when Texas was struck by an extraordinary 1000-year storm.

C. Plaintiffs' Allegations Are Insufficient to Establish a Taking, Rather Than a Tort.

Although *Arkansas Game & Fish* addressed the legal standards applicable where a plaintiff alleges a temporary, but recurring, physical taking, it did not disrupt the general *Ridge Line* test, and cited the decision approvingly. *Ark. Game & Fish*, 568 U.S. at 38. As the Supreme Court explained, it ruled, "simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." *Id.* The Court thus rejected a *per se* rule that a flood must be permanent or inevitably recurring for it to constitute a taking, and made clear that a taking could potentially be shown when "government-induced flood invasions, although repetitive, are temporary."[25] *Id.* at 26.

The tort-taking test in *Ridge Line* has two parts, both of which must be satisfied to demonstrate the Court has jurisdiction over a taking claim, and that the allegations do not instead sound in tort. A taking cannot occur through negligence or inadvertence. Consequently, under *Ridge Line*'s first part, a plaintiff must establish that the government's action intended to invade and take a property interest or that the taking of property was so certain in the ordinary course that such intent should be deemed to exist. 346 F.3d at 1355-56. Additionally, under *Ridge Line*'s second part, a plaintiff must allege facts plausibly establishing that "the government's

---

[25] Significantly, the "government-induced flood invasions" in *Arkansas Game & Fish* resulted from purposeful releases from the dam where the Corps deviated from the existing operations manual, made recurrent and repeated over many years, and where the releases were scheduled and intentional. 568 U.S. at 26. The one-time flooding here was none of these things; the government acted in an emergency created by a hurricane, and Plaintiffs do not allege facts plausibly establishing when, if ever, flooding of their property will occur again.

actions were sufficiently substantial to justify a takings remedy." *Id.* Both the "nature and magnitude of government action must be considered." *Id. at* 1356. Importantly, the "government's interference with any property rights . . ." must be "substantial and frequent enough to rise to the level of a taking." *Id.* at 1357. A single storm-induced flood is an "isolated invasion," and even "one or two floods" are unlikely to meet the standard of "substantial and frequent." *Id.* Isolated invasions contrast with "repeated invasions of the same type [that] have often been held to result in an involuntary servitude." *Id.* (quoting *Eyherabide v. United States*, 345 F.2d 565, 569 (1965)). *See also Fromme v. United States*, 412 F.2d 1192, 1197 (Ct. Cl. 1969) (holding that a taking could not be found where flooding of land could "reasonably be expected to recur… once in every 15 years, on the average"); *N. Ctys. Hydro-Electric Co. v. United States*, 151 F. Supp. 322, 323 (Ct. Cl. 1957) ("[t]wo floodings, one ten years after the pool behind the dam was completely full, and the other nineteen years after, do not constitute a taking.") (citations omitted); *accord Arkansas Game*, 568 U.S. at 39 ("[W]hile a single act may not be enough, a continuance of them, in sufficient number and for a sufficient time may prove [a taking].") (quoting *Portsmouth Harbor*, 260 U.S. at 329-330 (finding that government acts occurring periodically over a period of decades may not be a taking, but instead "occasional torts" and remanding the case for consideration of that question)).

Plaintiffs fail to plead facts sufficient to meet either part of the *Ridge Line* tort-taking inquiry. Plaintiffs' allegations regarding intent are wholly conclusory and not connected to a particular government action. Plaintiffs likewise fail to plead facts sufficient to establish that any flooding has been recurrent or repeated. Plaintiffs' only reference to any other flooding concerns an extreme rain event in 2016; but, notably, Plaintiffs do *not* allege in the master complaint that any of their properties were flooded in 2016, or that any previous flooding was similar in

severity and duration to that alleged from Hurricane Harvey.[26] *See* Compl. ¶ 78. Plaintiffs'
unsupported and speculative allegation that flooding "will happen" in the future is refuted by
their own allegations, which identify no other instance in roughly 70 years of dam operation – a
period during which other tropical storms and hurricanes hit the area – when flooding of their
property could be attributable to the government. *Id.* The mere "apprehension of future
flooding" or the concern that some future government action may make flooding more likely
does not support a taking claim. *Sponenbarger*, 308 U.S. at 267; *Danforth v. United States*, 308
U.S. 271, 286 (1939); *Stueve Bros. Farms, LLC v. United States*, 105 Fed. Cl. 760, 767–68
(2012) (finding that mere "apprehension of future flooding" does not impose a taking in the form
of a flowage easement), *aff'd*, 737 F.3d 750 (Fed. Cir. 2013). Plaintiffs are unable to show that
flooding is likely to recur because it was caused by an unpredictable and unforeseeable natural
disaster, rather than as a result of purposeful government activity. The one-time flooding here
resulting from an unprecedented hurricane is insufficient to state a taking claim under *Ridge
Line*. *See, e.g. Nicholson*, 77 Fed. Cl. at 618 (rejecting taking claim based on Hurricane Katrina
after rejecting the notion that the flooding "w[as] [a] condition initially set in motion by the"
government action as opposed to the hurricane).

## **CONCLUSION**

For these reasons, pursuant to RCFC 12(b)(1) and 12(b)(6), the United States respectfully
requests that the Court dismiss the actions in the upstream sub-master docket.

---

[26] The United States is aware of allegations in Plaintiffs' original complaints of a few plaintiffs
who claimed there was some water on some portion of their property. Plaintiffs do not specify
which or how many Plaintiffs allegedly flooded in 2016.

February 16, 2018

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

By _/s/ Jacqueline Brown_
JACQUELINE C. BROWN
WILLIAM J. SHAPIRO
LAURA W. DUNCAN
SARAH IZFAR
JESSICA HELD
DANIEL W. DOOHER
BRADLEY L. LEVINE
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Post Office Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0481
Fax: (202) 305-0506
E-mail: jacqueline.c.brown@usdoj.gov

Counsel for the United States