# In the United States Court of Federal Claims

No. 17-9001L

(Filed: May 24, 2018)

| | |
|---|---|
| **IN RE UPSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS** <br><br> **THIS OPINION AND ORDER APPLIES TO:** <br><br> **ALL UPSTREAM CASES** | "Upstream" Addicks and Barker Dam flooding cases; motion to dismiss; statute of limitations; 28 U.S.C. § 2501; accrual of claims; action versus inaction; property interests under Texas law; background principles of property law; the tort-takings distinction |

Ian Heath Gershengorn, Jenner & Block, LLP, Washington, D.C., for plaintiff. With him on the briefs and at the hearing were Benjamin M. Eidelson, Jenner & Block, LLP, Washington, D.C.; Larry Vincent and Daniel Charest, Burns & Charest, LLP, Dallas, Texas; Charles Irvine, Irvine & Conner, PLLC, Houston, Texas; Edwin Armistead Easterby, Williams Kherkher Hart Boundas, LLP, Houston, Texas; and Vuk S. Vujasinovic, VB Attorneys, PLLC, Houston, Texas.

Jacqueline C. Brown, Trial Attorney, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Jeffrey H. Wood, Acting Assistant Attorney General, and William J. Shapiro, Laura W. Duncan, Sarah Izfar, Jessica Held, Daniel W. Dooher, and Bradley L. Levine, Trial Attorneys, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

In August 2017, Tropical Storm Harvey drenched the Houston area for five days.[1] Thousands of homes and businesses were flooded. Among those affected by the flooding were

---

[1] When Harvey first made landfall on the Texas mainland on August 26, 2017, it was classified as a category four hurricane. *See* Eric S. Blake & David A. Zelinsky, Nat'l Hurricane Center, *Tropical Cyclone Report: Hurricane Harvey* 3 (May 9, 2018), available at: https://www.nhc.noaa.gov/data/tcr/AL092017_Harvey.pdf (last visited May 22, 2018). But "Harvey rapidly weakened over land to a tropical storm" within the first twelve hours and to a tropical depression by August 30, 2017. *Id.* Because the majority of the five-day downpour that the Houston area experienced coincided with *Tropical Storm* Harvey, the opinion will use this designation.

over 10,000 private properties west of Houston and upstream of the federally designed, built, and maintained Addicks and Barker Dams. These dams were built to limit flooding in Houston, and when Harvey struck, the dams did just that, collecting storm water in their reservoirs to the point that the impounded water flooded private properties upstream. Hundreds of owners of these upstream properties have brought suit against the United States, alleging an uncompensated taking under the Fifth Amendment. Given the large number of similar complaints, procedurally these cases are being handled as a group, using case management methods akin to those employed in multi-district litigation. In that vein, Co-Lead Counsel have been designated, they have filed a Master Amended Complaint for Upstream Plaintiffs ("Master Complaint" or "Mstr. Compl."), ECF No. 18, and defendant ("the government") has filed an Answer to that Master Complaint, ECF No. 80. In its answer, the government denies that it is legally responsible for damage or harm attributed to the upstream flooding, and it has separately moved to dismiss the complaint.

Pending before the court at this juncture is the United States' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim Upon Which Relief Can Be Granted ("Def.'s Mot."), ECF No. 59, filed pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). For the reasons stated, resolution of that motion is deferred until trial.

## BACKGROUND[2]

In 1929 and again in 1935, the Houston area experienced heavy rainfall and flooding. Mstr. Compl. ¶ 26. Floodwaters followed the course of Buffalo Bayou—a river west of Houston, Texas—and its tributaries into the downtown and port areas of the city. Mstr. Compl. ¶¶ 1, 26. These floods engendered congressional action—Congress passed the River and Harbor Act of 1938, ch. 535, § 2, 52 Stat. 802, 804 (codified in relevant part at 33 U.S.C. § 540), authorizing the United States Army Corps of Engineers ("Corps") to study and install flood control measures along Buffalo Bayou as part of the Buffalo Bayou and Tributaries Project. *See* Mstr. Compl. ¶ 27. Two dams, Addicks and Barker, were ultimately approved and built seventeen miles west of Houston along Buffalo Bayou. Mstr. Compl. ¶¶ 29, 32. As flood control measures, these dams were not designed to impede the normally existing waterways. Instead, the water in Buffalo Bayou and its tributaries ordinarily flows through open gates in the dams without encumbrance. Hr'g Tr. 13:3 to 14:1, 25:23 to 26:11 (May 16, 2018).[3] Thus, the impoundment areas behind the dams are usually dry, but they would, however, collect storm water when the gates were closed. That water would be stored in the impoundments until it could be slowly released downstream into Buffalo Bayou through gate-controlled outlets at the base of the dams. *See* Mstr. Compl. ¶¶ 36, 38.

The government completed the construction of the Barker Dam in 1945 and finished acquiring land for an impoundment area behind it by 1951, Mstr. Compl. ¶¶ 33-34, and it

---

[2]Although jurisdictional facts are at issue, the court has held no proceedings to find facts at this stage. Accordingly, the recitations in the background for the pending motion to dismiss are taken from the parties' pleadings, *viz*., the Master Complaint and the Answer.

[3]Further citations to the transcript of the hearing held on May 16, 2018 will omit the date.

2

completed the construction of the Addicks Dam and the acquisition of land for its impoundment area in 1948, Mstr. Compl. ¶¶ 33, 37-38. The government limited its acquisition of land for the impoundment areas. *See* Mstr. Compl. ¶¶ 50-51. The Addicks Dam was designed to hold a pool with an elevation of 108.3 feet above mean sea level, and the Barker Dam was designed to hold a pool with an elevation of 101.7 feet. Mstr. Compl. ¶¶ 39-41. The government acquired 12,460 acres behind Addicks and 12,060 acres behind Barker, or enough acreage to contain pools with elevations of 103.1 feet and 95 feet, respectively. Mstr. Compl. ¶ 50.

The Corps periodically reevaluated the functionality of the dams, and, relevant here, it did so in the 1980s. Mstr. Compl. ¶ 42. In light of new data on rainfall in the area, the Corps decided that the Addicks and Barker Dams needed to be redesigned for more adequate flood protection. Mstr. Compl. ¶ 42. The tops of both dams were raised and spillways were strengthened. Mstr. Compl. ¶ 43; Hr'g Tr. 12:17-22. After this redesign, the new maximum pool elevations were 118.14 feet for Addicks and 110.26 feet for Barker. Mstr. Compl. ¶ 47. The government did not acquire any additional land or pursue flowage easements for the newly expanded potential impoundment areas. Thus, the new maximum pool elevations meant that the dams could impound water to flood thousands of additional acres of private property. *See* Mstr. Compl. ¶¶ 54-55.

Over the years, the Corps prepared and used Water Control Manuals to govern the operation of the dams. The Corps' updated 2012 Water Control Manual describes the primary objective of the Addicks and Barker Dams as the prevention of downstream flooding. *See* Mstr. Compl. ¶¶ 56, 64. When rain falls, the Corps' normal operating procedure is to close the outlet gates, preventing any additional storm water from flowing downstream to Houston until the rain has passed. Mstr. Compl. ¶ 65. This is true even when the impounded water exceeds the government-owned land and floods private property. Mstr. Compl. ¶ 65. If the impounded water level rises to the point at which it threatens the integrity of the dams, the Corps will open the outlet gates to release water downstream. Mstr. Compl. ¶ 66. Nothing in the 2012 Water Control Manual indicates that the Corps will open the outlet gates to prevent or reduce upstream flooding. Mstr. Compl. ¶ 66.

The Corps appears to have been long aware that its management plans could result in the flooding of private property. *See* Mstr. Compl. ¶¶ 56-63. In 1986, the Corps noted that "[t]he maximum pool elevation for both reservoirs extends beyond each project boundary" and conceded that "[a]s the surrounding areas are developed, this may mean that homes in adjacent subdivisions may be flooded. This could result in lawsuits against the Corps of Engineers for flooding private lands." Mstr. Compl. ¶¶ 56-57 (emphasis omitted). The Corps again acknowledged this problem in 1995 and suggested nine possible approaches to address it; the government opted for a tenth approach: "No Action." *See* Mstr. Compl. ¶ 60. In 2009, the Corps stated that despite numerous flood events in the Houston area throughout the history of the dams, neither of the reservoirs "ha[d] . . . exceeded the limits of government owned land in any flood event." But this good news came with a qualification: "[H]ad some of these events centered over Addicks and Barker . . . the combined rainfall and runoff could have resulted in flood pools exceeding the limits of government[-]owned land and possibly exceeding the capacity of [the d]ams." Mstr. Compl. ¶ 61 (emphasis omitted).

3

The Addicks and Barker Reservoirs first exceeded the limits of the government-owned impoundment areas in April 2016. *See* Mstr. Compl. ¶ 78. The so-called Tax Day Flood resulted in inundated streets and grassy areas in subdivisions adjacent to the dams. *See* Mstr. Compl. ¶ 78; Pls.' Opp'n to [Def.'s] Mot. to Dismiss ("Pls.' Opp'n") at 40, ECF No. 99; Hr'g Tr. 35:24 to 36:11, 69:1 to 70:6. A year later, when Tropical Storm Harvey hit Houston in August 2017, the reservoirs spilled over onto private land much more extensively than in the prior year. Mstr. Compl. ¶¶ 1, 70. Over the course of five days, Harvey dropped more than 30 inches of rain on the Houston area. *See* Mstr. Compl. ¶ 1. At first, consistent with the Corps' procedure, the gates of both dams were closed to forestall downstream flooding. Mstr. Compl. ¶ 67. But as the reservoirs filled, the gates were opened despite already serious flooding downstream in Houston. *See* Mstr. Compl. ¶ 67. Due to Harvey, the Addicks and Barker Reservoirs reached a maximum elevation of 109.1 feet and 101.5 feet, respectively, each approximately six feet higher than could be held on federal land. *See* Mstr. Compl. ¶¶ 70-71. Put another way, during the event, the Addicks and Barker Reservoirs flooded 3,973 acres and 3,081 acres of private property, respectively. Mstr. Compl. ¶ 76. Those properties allegedly remained flooded for at least a week. Mstr. Compl. ¶¶ 70-71.

**PROCEDURAL HISTORY**

On September 5, 2017, the first complaint relating to Tropical Storm Harvey and the Addicks and Barker Dams was filed. *See Y and J Properties, Ltd. v. United States*, No. 17-1189L. Hundreds of such cases have since been filed and are currently pending in this court. On October 31, 2017, the Chief Judge of the court issued Management Order No. 1, consolidating extant and any later-filed related cases within a master docket, *In re Addicks and Barker (Texas) Flood Control Reservoirs, Case No. 17-3000L*. *See Y & J Props., Ltd. v. United States*, 134 Fed. Cl. 534 (2017). In December of the same year, the Chief Judge of the court split the Master Docket into two sub-master dockets, one for upstream cases, *In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, Sub-Master Docket No. 17-9001L, and the other for downstream cases, *In re Downstream Addicks and Barker (Texas) Flood-Control Reservoirs*, Sub-Master Docket No. 17-9002L. *See In re Addicks and Barker (Texas) Flood-Control Reservoirs v. United States*, No. 17-3000L (Fed. Cl. Dec. 5, 2017), ECF No. 102, 2017 WL 6334791. This division put the two sub-master dockets on separate tracks, each following its own timeline and structuring its own proceedings.

The proceedings in both of these sub-master dockets have followed the pattern used for multi-district litigation. In the upstream cases, Co-Lead Counsel was designated for jurisdictional discovery (Mr. Ian Gershengorn and Mr. Larry Vincent) and for pretrial discovery and dispositive motions (Mr. Daniel Charest, Mr. Charles Irvine, Mr. Larry Vincent, and Mr. E. Armistead Easterby). *See In re Addicks and Barker (Texas) Flood-Control Reservoirs v. United States*, No. 17-3000L (Fed. Cl. Dec. 5, 2017), ECF No. 103. Then, in January 2018, Co-Lead Counsel filed both the Master Complaint and an Amended Individual Master Complaint. *See In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, Sub-Master Docket No. 17-9001L (Jan. 16, 2018), ECF Nos. 17, 18. The court subsequently stayed all complaints, extant or not-yet-filed, other than the Master Complaint, which alleged both temporary and permanent takings. *See* Case Management Order (Feb. 1, 2018) at 1-2, Sub-Master Docket No. 17-9001L, ECF No. 37; *see also* Mstr. Comp. ¶¶ 105-140. The court also permitted "present- and

4

subsequently-filed cases [to] adopt" the Master Complaint by filing a short-form complaint. *See* Case Management Order at 3.

Concurrently, the court ordered the parties to come to an agreement on ten test properties. Case Management Order at 2-3. That number was later increased to fourteen, *see* Hr'g Tr. at 14:19 to 15:1 (March 9, 2018), and, after addressing various proposals, the court subsequently approved the parties' agreed test properties on March 13, 2018, *see* Order Approving Test Property Selection (Mar. 13, 2018), ECF No. 91. Meanwhile, a schedule for discovery and further motions was entered, with discovery opening March 1, 2018 and closing May 31, 2018, *see* Order Reaffirming Schedule (Feb. 21, 2018), ECF No. 69, later revised to June 13, 2018, *see* Order of March 13, 2018.[4]

The government's motion to dismiss the Master Complaint, both for lack of jurisdiction and for failure to state a claim, has been fully briefed and was argued at the hearing held in Houston on May 16, 2018.

**STANDARDS FOR DECISION**

*A. Motion to Dismiss – RCFC 12(b)(1) and 12(b)(6)*

When ruling on a motion to dismiss for lack of jurisdiction, the court "accept[s] as true all undisputed facts asserted in the plaintiff's complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Through the Tucker Act, Congress waived the sovereign immunity of the United States and provided this court with jurisdiction over a plaintiff's claims "founded . . . upon the Constitution . . . for liquidated or unliquidated damages." 28 U.S.C. § 1491(a)(1); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983). But the Tucker Act does not provide a plaintiff with substantive rights. *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, a plaintiff establishes jurisdiction by "identify[ing] a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part) (citing *Mitchell*, 463 U.S. at 216; *Testan*, 424 U.S. at 398). The Takings Clause of the Fifth Amendment is one such source of substantive law. *Starr Int'l Co. v. United States*, 856 F.3d 953, 977 (Fed. Cir. 2017) ("The Takings Clause of the Fifth Amendment inherently is money-mandating.") (citing *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008)).

A complaint will not survive a motion to dismiss for failure to state a claim if it does not "contain . . . sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual matter alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citation omitted).

---

[4]Subsequently, the parties requested, and the court agreed, that the period for discovery be extended, and that extension will run at least to a date in December 2018. *See* Hr'g Tr. 114:13-21.

5

### B. Elements of a Takings Claim

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "The Takings Clause is 'designed to bar [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) ("*Arkansas Game I*") (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). "And 'when the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.'" *Id.* (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regl. Planning Agency*, 535 U.S. 302, 322 (2002)) (alterations omitted).

"[M]ost takings claims turn on situation-specific factual inquiries." *Arkansas Game I*, 568 U.S. at 31 (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)). "[D]ue to the fact-intensive nature of takings cases," *Moden v. United States*, 404 F.3d 1335, 1342 (2005), trial courts tend to be slow to dismiss them, *see Moden*, 404 F.3d at 1342 (noting that "summary judgment should not be granted precipitously" in takings cases due to their fact-intensive natures, even when, as there, the parties have engaged in discovery), and to create a record with "detailed findings of fact," *Arkansas Game I*, 568 U.S. at 29. More specifically, "[f]looding cases, like other takings cases, should be assessed with reference to the 'particular circumstances of each case,' and not by resorting to blanket exclusionary rules." *Arkansas Game I*, 568 U.S. at 37 (quoting *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958)). And, concerns about the fact-intensive nature of takings claims are heightened when a plaintiff pleads a takings claim based on a temporary physical invasion because, "[u]nlike permanent physical takings, . . . temporary invasions 'are subject to a more complex balancing process to determine whether they are a taking.'" *Arkansas Game & Fish Com'n v. United States* ("*Arkansas Game II*"), 736 F.3d 1364, 1369 (Fed. Cir. 2013) (quoting *Arkansas Game I*, 568 U.S. at 36).

To establish a viable takings claim, a plaintiff must prove two things. First, he or she must show that he or she has "a property interest for purposes of the Fifth Amendment." *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing *Conti v. United States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002)); *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("[O]nly persons with a valid property interest at the time of the taking are entitled to compensation.") (internal citations omitted). Second, he or she must establish that the government's actions "amounted to a compensable taking of that property interest." *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). For flooding cases, the Supreme Court has identified at least five factors relevant to, but not necessarily dispositive of, this latter inquiry. *See Arkansas Game I*, 568 U.S. at 38-39. They include (1) time—the duration of the physical invasion; (2) causation; (3) intent or foreseeability, that is, "the degree to which the invasion is intended or is the foreseeable result of authorized government action;" (4) "the owner's reasonable investment-backed expectations regarding the land's use," including "the character of the land;" and (5) the "[s]everity of the interference." *Id.* (internal quotations omitted); *see also Arkansas Game II*, 736 F.3d at 1369-75 (considering each of these factors).

6

Plaintiffs who bring inverse-condemnation takings claims based on government-induced flooding must meet an additional requirement particular to this court. *See Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003). They must establish that "treatment under takings law, as opposed to tort law, is appropriate under the circumstances." *Id*. Although the Tucker Act precludes claims "sounding in tort" from this court's jurisdiction, "to the extent [a plaintiff raises] a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper." *Moden*, 404 F.3d at 1341; *see also id.* at 1339, 1341-42 (treating as improper a dismissal for lack of jurisdiction on grounds of the tort-takings distinction, but considering the trial court's disposition in that case as a grant of summary judgment because the trial court considered facts outside the pleadings).[5]

## ANALYSIS

In seeking dismissal of plaintiffs' upstream Master Complaint, the government raises five distinct arguments. The government contends first, that the statute of limitations has run; second, that the plaintiffs allege a taking arising out of government inaction instead of government action; third, that plaintiffs lack the necessary underlying property interest under either state or federal law to bring a viable takings claim; fourth, that plaintiffs have no reasonable investment-backed expectations because they acquired the properties at issue after the construction of the dams; and, fifth, that plaintiffs have only plausibly alleged a tort, not a taking. Plaintiffs counter that the Corps took actions first to build and then to modify the dams in the 1940s and 1980s, respectively, that the dams were designed and built to impound water behind them in a way that foreseeably exceeded the land required and acquired for the impoundment pools, and that the resulting flooding effectuated a taking of their property.

### *I. STATUTE OF LIMITATIONS*

The Addicks and Barker Dams were originally built 70 years ago and were modified in the 1980s. *See* Mstr. Compl. ¶¶ 33-42. The government relies on 28 U.S.C. § 2501 to argue that this court lacks jurisdiction because the six-year limitations period specified by that statute has long since run. *See* Def.'s Mot. at 4, 24; [Def.'s] Reply in Support of its Mot. to Dismiss for Lack of Jurisdiction and for Failure to State a Claim upon Which Relief can be Granted ("Def.'s Reply") at 4, 23-24, ECF No. 105. Although the government is correct that Section 2501 imposes a six-year limitation period on takings claims and that "the design of the reservoirs, the acquisition of land, [and] the calculation of design pools . . . [did not] occur[] within the last six years," it is incorrect that these are the "key actions identified in the [c]omplaint" for purposes of evaluating the limitations period. *See* Def.'s Mot. at 24. The point at hand is when plaintiffs'

---

[5]The extent of the nonfrivolous pleading requirement for jurisdiction has been debated. *Compare Jan's Helicopter Serv.*, 525 F.3d at 1309 ("[A]ll that is required [for jurisdiction] is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within class of plaintiffs entitled to recover under the money-mandating source. There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits."), *with id.* at 1310, 1312 (Prost, J., dissenting in part) ("[*Moden*] does not confine the nonfrivolous claim requirement to a 'class of plaintiffs' analysis.").

claims actually accrued. 28 U.S.C. § 2501. Claims accrue "when . . . plaintiff[s] can file suit and obtain relief." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013) (internal quotations omitted). Plaintiffs can sue and obtain relief for a taking once they "actually experience[]" that taking. *Stueve Bros. Farms, LLC, v. United States*, 737 F.3d 750, 753-54 (Fed. Cir. 2013). Thus, accepting the facts as alleged, plaintiffs' claims accrued no earlier than 2016, *see* Mstr. Compl. ¶ 78, and more likely in 2017, rendering the filing of these suits well within the six-year limitation period of Section 2501.

The government's implied argument that Section 2501 should be treated differently in this case because it is "a limitation on the waiver of sovereign immunity" is unavailing. *See* Def.'s Mot. at 24. The Supreme Court has declined to hold that Section 2501 merits a "special accrual rule," calling its text "unexceptional." *Franconia Assocs. v. United States*, 536 U.S. 129, 145 (2002). The Court has since reasserted this view, describing *Franconia* as "rejecting [the] argument by the [g]overnment that [Section 2501] embodies a special, earlier-than-normal, rule as to when a claim first accrues." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 138 (2008).

Statutes of limitation must also be distinguished from statutes of repose. Unlike statutes of limitation that begin to run when a claim accrues, statutes of repose are "measured . . . from the date of the last culpable act or omission of the defendant." *CTS Corp. v. Waldburger*, __U.S.__, ___, 134 S. Ct. 2175, 2182 (2014). Thus, "the injury [to the plaintiff] need not have occurred, much less have been discovered" before the repose period begins to run. *Id.* (internal quotations omitted). A statute of repose would perfectly suit the government's arguments, but unfortunately for the government, Section 2501 is not that kind of limitation.

## *II. GOVERNMENT ACTION OR INACTION*

The government contends that plaintiffs have failed to state a claim because they base their takings claims on government *inaction* as opposed to government action. *See* Def.'s Mot. at 22 ("It is well-settled law that the government's failure to act or to perform its duties, or the government's delay in acting, cannot constitute a taking.") (citing *Georgia Power Co. v. United States*, 633 F.2d 554, 557 (Ct. Cl. 1980); *Nicholson v. United States*, 77 Fed. Cl. 605, 620 (2007)). Specifically, the government asserts that "[p]laintiffs cannot state a [viable] taking[s] claim merely by alleging that the United States should have bought some unspecified amount of land decades ago to contain" the storm water from Tropical Storm Harvey. Def.'s Reply at 1. This assertion misconstrues the plaintiffs' allegations, which are focused on government action. *See* Mstr. Compl. ¶¶ 69-77; *see also* Pls.' Opp'n at 17-19. The government acted when it built and then modified the dams in such a way that they could and did impound storm water behind the dams on both government and private property. That the government's action bore fruit or had consequences only some years later does not obviate the reality that *action*, not inaction, is at issue. *See St. Bernard Par. Gov't v. United States*, 887 F.3d 1359, 1362 (Fed. Cir. 2018) ("In order to establish causation, a plaintiff must show that in the ordinary course of events, absent

8

government action, plaintiffs would not have suffered the injury."). The accrual analysis set out *supra* signifies as much.[6]

Moreover, plaintiffs' allegations that the government was aware of the risk the dams' designs posed to private property and could have mitigated those risks by procuring flowage easements on, or purchasing additional land within, the designed and redesigned impoundment areas are inapposite to the action-inaction inquiry. Those allegations speak to the government's intent and the foreseeability of the alleged takings. Plaintiffs therefore adequately allege government action as the basis for their taking claims.

### III.    PROPERTY INTERESTS

Plaintiffs allege they own real and personal property that was destroyed or severely impaired by the flooding caused by the Addicks and Barker Dams. *See* Mstr. Compl. ¶¶ 8-21. The government does not now—in its motion to dismiss—contest ownership. Rather, it asserts (1) that plaintiffs do not have a *relevant* property interest under state or federal law; (2) that the existence of the dams before plaintiffs acquired their property undermines their reasonable investment-backed expectations; (3) that any property interest that plaintiffs do have is inherently limited by the government's police power; and (4) that they have failed to plead their personal property interests with sufficient particularity. *See* Def.'s Mot. at 11-21, 25-26.

---

[6]As the government's counsel advised, "a causation question . . . is not at play in our motion to dismiss." Hr'g Tr. 28:3-4. Counsel for the government elaborated:

> [Counsel]: [Y]our question is whether the flooding would have taken place without the dams.
>
> The Court: Y[es].
>
> [Counsel]: No.
>
> The Court: Well, I take it everybody concedes that it would not have taken place in the way it did without the dams.
>
> [Counsel]: In the way it did, yes. Where exactly the water is, yes, but as to specific properties and where they are and whether flooding would not have taken place, that is not a question we concede.

Hr'g Tr. 28:10-21; *see also* Hr'g Tr. 30:14-19 ("[W]e are accepting as true[] all of the allegations in [p]laintiffs' complaint, which includes causation for the purposes of this motion. . . . [W]e are agreeing that the flooding would not have happened but for the dams.").

9

### A. Texas Property Law and Federal Annotations on that Law

The government makes three broad arguments in an attempt to undermine plaintiffs' alleged property interests under state and federal law: (1) Texas law recognizes no property right in keeping property free from diversions of water from dams, (2) Texas law recognizes no property right *vis-à-vis* a preexisting flood control structure, and (3) the federal Flood Control Act is a longstanding background principle that limits plaintiffs' property rights. *See* Def.'s Mot. at 16-21. The government buttresses these arguments with citations to the Texas Water Code, Texas Civil Statutes, and selective citations to Texas case law. *See* Def.'s Mot. at 16-19. As to Texas statutory law, the government relies on Section 11.086 of the Texas Water Code, which generally prohibits private landowners from diverting the natural flows of water onto private property, and which entitles property owners to recover damages from "an overflow of water caused by unlawful diversion or impounding." Tex. Water Code Ann. § 11.086(a), (b). The government emphasizes that the statute expressly exempts diversions of water caused by the "construction and maintenance of levees and other impoundments to control floods." *Id*. § 11.086(c). As to Texas judicial precedents, the government cites *City of Tyler v. Likes*, 962 S.W.2d 489, 505 (Tex. 1997), where the Texas Supreme Court rejected takings and nuisance claims upon a finding that there was no governmental activity that had *increased* the amount of water in a watershed after a system was installed more than ten years before the plaintiffs had acquired their home.

The government has misstated Texas property law, particularly as it relates to flood-control measures. Almost as if he were addressing this case directly, then-Justice Willett, writing for the Texas Supreme Court, explained: "[W]here the government made a conscious decision to subject particular properties to inundation so that other properties would be spared, as happens when a government builds a flood-control dam knowing that certain properties will be flooded by the resulting reservoir[,] . . . *of course* the government must compensate the owners who lose their land to the reservoir." *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 807 (Tex. 2016) (emphasis added); *see also Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex. 2004). Although the court's statement in *Harris County* is dicta—the Texas Supreme Court held that no compensable taking had occurred in that case—the deficiency in the plaintiffs' claim was that "the [c]ounty never intended, as part of a flood-control plan, to use the [plaintiffs'] particular properties for detention ponds, drainage easements, or the like," and the plaintiffs had offered no proof that the county was "substantially certain its approval of development would result in the flooding of the [plaintiffs'] particular lots." *Kerr*, 499 S.W.2d at 807. Neither of these shortcomings are present in facts alleged in this case. *See* Mstr. Compl. ¶¶ 50-77.

Notably also, the Texas Water Code provisions cited by the government are inapposite to the facts alleged here. Texas Water Code Ann. § 11.086 relates to unlawful diversions of diffuse surface water, *i.e.*, sheet flows which have not yet "reache[d] some bed or channel in which water is accustomed to flow." *Dietrich v. Goodman*, 123 S.W.3d 413, 419 (Tex. App. 2003) (internal quotations omitted). The dams at issue here function to control the flow of natural water courses on their way to Buffalo Bayou. *See Bass v. Taylor*, 90 S.W.2d 811, 815 (Tex.

10

1936) (explaining that "the flood waters of a river cannot be likened to [diffuse] surface water").[7] Plaintiffs have more than plausibly alleged a valid property interest under state law.

The government further argues that the federal Flood Control Act of 1928, ch. 569, § 3, 45 Stat. 534 (codified as amended in relevant part at 33 U.S.C. § 702c), is a background principle that "[s]hapes [p]laintiffs' [p]roperty [r]ights," in a way that forecloses their takings claims. Def.'s Mot. at 19-20 (section heading). Plaintiffs counter that no act of Congress can "eliminate[] liability for takings claims." *See* Pls.' Opp'n at 28 (citing, *inter alia*, *Scranton v. Wheeler*, 179 U.S. 141, 153 (1900) ("Congress may not override the provision that just compensation must be made when private property is taken for public use.")). The government responds, "Congress can retract the waiver of sovereign immunity from takings claims[] without extinguishing substantive liability, as an aggrieved party could still seek a private bill from Congress." Def.'s Reply at 20 & n.14. In sum, the parties' briefs speak past each other. Perhaps Congress might withdraw its waiver of sovereign immunity in takings cases, remitting claimants to the pursuit of a private bill in Congress, but neither contends that such a withdrawal has occurred here. *Compare* Def.'s Mot at 19-20 & n.20, *with* Pls.' Opp'n at 27.

The disagreement between the parties on this point is, accordingly, a hypothetical one, centered on the question of whether a statute, if passed prior to the government action that gave rise to the taking, could become a background principle of property law that extinguishes a property owner's judicial remedy to compensation for a taking without violating the principle the Supreme Court expressed in *Scranton*. The court agrees with plaintiffs that it cannot. *See* Pls.' Opp'n at 28. The Flood Control Act does not supersede or bar this court's jurisdiction over takings claims for flooding, and it does not extinguish plaintiffs' substantive right to just compensation.

### B. Preexistence of the Dams and Investment-Backed Expectations

The government also claims that plaintiffs' acquisition of their property after the construction of the dams is fatal to their takings claim under federal law. *See* Def.'s Reply at 18-19. In context, the government's arguments appear to relate to plaintiffs' reasonable investment-backed expectations. *See* Def.'s Mot. at 18 & n.19. The government asserts that plaintiffs have no such reasonable expectations because they have "not allege[d] any facts showing [that] they expected [that] the dams would operate in any manner other than 'precisely as intended[]' since . . . 1962." *Id.*

Plaintiffs respond by citing two decisions by the Supreme Court: *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), and *Dickinson v. United States*, 331 U.S. 745 (1947). Pls.' Opp'n at 22-25. They argue that these cases "make[] clear that . . . a title transfer postdating a government action . . . is no bar to a takings claim." *See* Pls.' Opp'n at 22-23. The government attempts to distinguish both cases, asserting that *Palazzolo* "should apply only in the context of a regulation that applies to all citizens," Def.'s Reply at 19, and that *Dickinson* is "a case

---

[7]*Dietrich* stated in pithy terms that "a landowner might divert the entire Brazos River across his neighbor's property without subjecting himself to liability under Section 11.086." 123 S.W.3d at 419.

11

concerning [only] when a cause of action for flooding accrues," *id*. at 18 ("In *Dickinson*, the sole question before the Court was when a suit must be brought on a claim in respect to land taken by the United States.") (citation and internal quotation marks omitted).

The government's argument based on preexistence fails. *Palazzolo* explicitly rejects the "sweeping[] rule" that "[a] purchaser or a successive title holder . . . is deemed to have notice of an earlier-enacted restriction and is barred from claiming that it effects a taking." *Palazzolo*, 533 U.S. at 626. The Court explained that "[t]he State may not put so potent a Hobbesian stick into the Lockean bundle," thereby "put[ting] an expiration date on the Takings Clause," "strip[ping] landowners] of the ability to transfer the interest which [they] possessed prior to the regulation," and "secur[ing] a windfall [to the State]." *Id.* at 627. There is nothing in this broad language that counsels lower courts to read *Palazzolo* narrowly, applying only to regulatory takings. As to *Dickinson*, the government is correct that the question before the Court was one of the timing of accrual. *See* 331 U.S. at 750. But *Dickinson* is also an example of a takings claim that was upheld despite land being transferred after the flooding that culminated in the taking had already begun. *See id.* at 747-49; *see also Cooper v. United States*, 827 F.2d 762, 764-65 (Fed. Cir. 1987). *Dickinson* and *Cooper* are examples of courts awarding compensation to plaintiffs who acquired their land while on notice that a taking was occurring or had the potential to occur. As such, they erase any doubt of the plausibility of plaintiffs' reasonable investment-backed expectations in the face of the takings threat posed by the proximity of the Addicks and Barker Dams.

### C. Property Rights Limited by Police Power

The government claims that its police power to "protect[] . . . life or property . . . during an emergency" limits any rights in property plaintiffs may have had and that Tropical Storm Harvey posed such an emergency. *See* Def.'s Reply at 5, 7-11 (citing, *inter alia*, *Miller v. Schoene*, 276 U.S. 272 (1928); *Bowditch v. City of Boston*, 101 U.S. 16 (1879)). But the actions available to the government for dealing with the relevant emergency were constrained by the design of the dams and impoundments, the Corps' 2012 Water Control Manual, and the Corps' normal operating procedures. *See* Mstr. Compl. ¶¶ 64-66. Key to those constraints was the design of the dams that contemplated flooding land outside government ownership or control. The design pools extended well beyond land owned or controlled by the government, to include thousands of homes and businesses. Mstr. Compl. ¶¶ 47, 54-55. Thus, it was not that the government had to respond to Tropical Storm Harvey as an emergency that necessitated the flooding of private land, but rather it was the design of the dams and the government's procedures for operating them, all put in place well before Harvey arrived. The government cannot, therefore, invoke its police power to limit plaintiffs' property rights and obtain dismissal of their complaint.

### D. Sufficiency of Plaintiffs' Claims Regarding Personal Property

The government contends that the Master Complaint should be dismissed as insufficient because, for inverse-condemnation claims, plaintiffs must plead with particularity the "specific property interest" allegedly taken. Def.'s Mot. at 25 (quoting RCFC 9(i)). The government claims that plaintiffs have neither sufficiently identified the personal property allegedly

12

destroyed, as required by RCFC 9(i), nor plausibly alleged its destruction to the satisfaction of *Twombly*. Def.'s Mot. at 25-26 (citing *Twombly*, 550 U.S. at 570). The court previously rejected this argument in acting on the several proffered versions of the master complaint. *See* Hr'g Tr. at 25: 6-12 (Feb. 14, 2018) ("It is necessary to identify and differentiate between real and personal property, . . . [but] I just don't think that [a more] detailed listing [of personal property] is going to help at this point."); *see also* Order of Feb. 1, 2018, ECF No. 36 (denying the government's motion for a more definite statement). At the pleadings stage of these cases, there is no need for a plaintiff to separately identify each type or item of personal property destroyed or severely harmed by flood water. The listing of chairs, couches, rugs, books, air conditioners, and computers, etc., is all implied by referring to household furnishings.

### *IV.* *THE TORT-TAKINGS DISTINCTION*

The tort-takings distinction, like most of takings law, "turns on situation-specific factual inquiries." *See Arkansas Game I*, 568 U.S. at 32. As explained previously, when plaintiffs have alleged a "nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper." *Moden*, 404 F.3d at 1341. The remaining question, then, is whether plaintiffs' complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The government argues that plaintiffs have failed to plausibly allege a temporary taking instead of a tort based on the "two-part inquiry" expressed in *Ridge Line*. *See* Def.'s Reply at 26-28 (citing *Ridge Line*, 346 F.3d at 1355-57 (requiring plaintiffs to show that "the government intend[ed] to invade a protected property interest or the asserted invasion [was] the . . . probable result of an authorized activity" and that "the government's interference with any property rights of [the plaintiffs] was substantial and frequent" to establish a taking claim based on inverse condemnation)). The government asserts that plaintiffs' takings claims cannot plausibly satisfy the *Ridge Line* inquiry because "[n]othing in [p]laintiffs' [c]omplaint suggests that flooding has been . . . frequent," Def.'s Reply at 28, as "one or two floods are unlikely to meet th[at] standard." Def.'s Mot. at 31 (internal quotation marks omitted).

But the government is mistaken. In *Stockton v. United States*, 214 Ct. Cl. 506, 518-19 (1977), the court stated that "only one actual flooding is enough when the property is upstream of the dam and below the contour line to which the dam is designed to impound water." The government attempts to distinguish *Stockton*. First, the government notes that *Stockton* is a pre-*Ridge Line* case. Def.'s Reply at 27. Although the relative timing of the decisions is worth noting, there is nothing in *Ridge Line* that requires the abrogation of *Stockton*. The Federal Circuit's disclaimer in *Ridge Line* of "isolated invasions, such as one or two floodings" cited to a pre-*Stockton* decision by the Court of Claims, *Eyherabide v. United States*, 170 Ct. Cl. 598, 604, 345 F.2d 565, 569 (1965), but made no reference to *Stockton* itself. *See Ridge Line*, 346 F.3d at 1357 (brackets omitted).[8]

---

[8]In *Eyherabide*, the Court of Claims held that the Navy had effectuated a temporary taking by periodically using the plaintiff's ranch as part of its "gunnery range." 345 F.2d at 568-70. There, the court distinguished "[i]solated invasions" from the Navy's "repeated invasions of the same type." *Id.* at 569.

13

Further, the government's argument about "frequency" is similar to the contention that the Supreme Court rejected in *Arkansas Game I*. The thrust of the Supreme Court's opinion, indeed, its explicit language, foreclosed "resorting to blanket exclusionary rules . . . [in f]looding cases, [as in] other takings cases." 568 U.S. at 37. Rather, courts are to assess flooding claims "with reference to the particular circumstances of each case." *Id.* (citations and internal quotation marks omitted). The government is correct that *Arkansas Game I* did not explicitly overrule *Ridge Line*, *see* Def.'s Reply at 26-27, but the *Ridge Line* test must now accommodate the Supreme Court's ruling in *Arkansas Game I*. The frequency inquiry that the government would have this court apply is, in essence, a blanket exclusionary rule for all single or isolated instances of flooding. *See* Def.'s Reply at 27-28 (implying that all takings claims based on two or fewer flooding events are categorically deficient under *Ridge Line*). The government seeks to buttress this problematic argument by noting that the Supreme Court cited *Ridge Line* approvingly in *Arkansas Game I* and also stated that "while a single act [of flooding] *may* not be enough, a continuance of them in sufficient number and for a sufficient time may prove a taking." *Arkansas Game I*, 568 U.S. at 39 (quoting *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329-30 (1922)) (internal alterations omitted) (emphasis added). But the Supreme Court did not quote this language with reference to *Ridge Line's* hard-and-fast rule—it did not cite *Ridge Line* in that context. Rather, the Court used the quoted language to highlight that the "[s]everity of the interference figures in the calculus" as one factor among many. *Id.* at 39. The Court's commitment to an open, fact-driven, case-specific inquiry is supported by the quotation of qualified and not categorical language: a single act of flooding "*may*" not be enough. Consistent with the overall thrust of the opinion, the Court left open the possibility that although a single flooding may not be enough, it also might be.

Next, the government argues that *Stockton* is distinct from those cases because in *Stockton*, "flooding occurred . . . at least twice." Def.'s Reply at 27. The facts recounted in *Stockton*, however, do not support that reading. The court in *Stockton* had noted that previously, "[f]luctuating levels of the reservoir at times temporarily submerged grass and trees on the slope, but with no ill effects," 214 Ct. Cl. at 511. Those "fluctuating levels" were not flooding and certainly were not like the flooding upon which plaintiffs based their takings claim. *See id.* at 513-14 ("Heavy rains in April 1973 consistently brought reservoir elevations to over 592 feet throughout the month, peaking at 596.91 feet. These *unprecedented levels*, coupled with strong northerly winds, sent 3 to 4-foot waves against plaintiffs' shoreline, eroded the soil[,] . . . and toppled trees into the lake.") (emphasis added).

Moreover, the plaintiffs here have alleged two flooding events: the Tax Day Flood of 2016, when the impoundments allegedly filled to the point that streets and some grassy areas of adjacent subdivisions were covered with water, and the Harvey event in 2017. *See* Mstr. Compl. ¶¶ 1, 78.

Finally, the government represents that "in *Stockton*, the Corps had explicitly attempted to acquire a flowage easement for [the] land . . . , but the Court of Claims found that that easement had been improperly acquired[;]" "a factual scenario not at issue here." Def.'s Reply at 27. The government is correct that the cases are factually distinct, but the government makes no attempt to explain the materiality of the divergence. *See id.* (noting only that the *Stockton's* factual context was "unusual"). Takings cases often turn on factual questions, but the differing

14

facts must bear on the relevant inquiry: here, frequency. It is not apparent how an improperly acquired flowage easement bears on the frequency of the flooding. But insofar as the acquisition of easements goes to intent, *see id.* (describing the *Stockton* court's statement as a "finding about the government's intent"), it appears that such a distinction cuts against the government. In *Stockton*, the Corps attempted to acquire a flowage easement but bungled it by making "misrepresentations to an unsophisticated plaintiff." *Id.* (citing *Stockton*, 214 Ct. Cl. at 515-16). That seems a sight better than here, where the Corps appeared indifferent to the risk to nearby private property owners, taking no action to reduce that risk or to obtain authorization from those owners to impound water on their land. *See* Mstr. Compl. ¶¶ 56-60. In sum, the two alleged floods in successive years and the teachings of *Stockton* coupled with of the Supreme Court's opinion in *Arkansas Game I*, suffice to render the plaintiffs' takings claims plausible.

Plaintiffs have also alleged a permanent taking of both "damaged or destroyed" personal property and a "flowage and drainage easement." *See* Mstr. Compl. at ¶¶ 122-140. A permanent takings claim based on flooding allegations need not result from a "permanent condition of continual overflow;" the flooding can be "intermittent" if it is "inevitably recurring." *United States v. Cress*, 243 U.S. 316, 328 (1917). The flooding of plaintiffs land is inevitably recurring, plaintiffs argue, because "storms of similar size have happened over the years and [have narrowly] missed Houston," and the "permanent structure[s]" that caused the upstream flooding here and would cause any future flooding "remain in place." Hr'g Tr. 70:6-16. The government responds by endeavoring to distinguish *Cress*: "[T]he intermittent and inevitably recurring flooding had already taken place in [*Cress*,] . . . so the Court had facts to rely on there about when [flooding] was likely to occur in the future." Hr'g Tr. 74:6-15.

This court has previously rejected arguments like those made by the government here. In *Quebedeaux v. United States*, 112 Fed. Cl. 317, 319-20 (2013), the government opened a dam's spillway on two occasions; the second resulted in flooding downstream. The government's motion to dismiss argued that a single flooding event could not give rise to a taking; the court denied that motion, noting that the plaintiffs' claims of inevitable recurrence were plausible: "[I]t is conceivable that a takings [claim] might lie where defendant, using a permanent structure, purposely floods a property once and expressly reserves the right to do so in the future. In this instance, it is conceivable that defendant's actions may be viewed not as an "isolated invasion," but rather as reserving a flowage easement over the affected property." *Id.* at 323 (internal citations omitted). As explained *supra*, the facts alleged include multiple flood events since the dams were built (the Tax Day Flood and Harvey); a history of heavy rainfall in the area, consistent with similar flooding (the 1929 and 1935 storms that led to the construction of the dams and storms that, if they had been "centered over Addicks and Barker," would have resulted in the flooding of private property); and two permanent structures that were designed and are operated in a way that will guarantee future flooding in the absence of change. Again, at this pleadings stage, plaintiffs need not prove that the intermittent flooding of their land is inevitably recurring, but only need allege facts that show that such inevitable recurrence is plausible. They have alleged facts that have more than done so.

But, due to the "fact-intensive nature of takings cases," *Moden*, 404 F.3d at 1342, and because "temporary invasion[ cases] 'are subject to a more complex balancing process,'" *Arkansas Game II*, 736 F.3d at 1369 (quoting *Arkansas Game I*, 568 U.S. at 36), the court will

not resolve these issues on a motion to dismiss. Instead, the court elects to exercise its discretion under RCFC 12(i) and defer the resolution of this motion until trial, where it can make more "detailed findings of fact." *Arkansas Game I*, 568 U.S. at 29.[9]

## CONCLUSION

For the reasons stated, resolution of the government's motion to dismiss is DEFERRED until trial pursuant to RCFC 12(i).

It is so **ORDERED**.

                                                 s/ Charles F. Lettow
                                                 Charles F. Lettow
                                                 Judge

---

[9] RCFC 12(i) provides in pertinent part that "any defense listed in RCFC 12(b)(1)-(7)—whether made in a pleading or by motion— . . . must be heard and decided before trial *unless the court orders a deferral until trial*." RCFC 12(i) (emphasis added).

When "the defenses in Rule 12(b) . . . can[not] be addressed by a preliminary hearing" because "ruling on th[ose] defense[s] entails substantial consideration of the merits," such defenses "can most effectively be addressed during trial." James Wm. Moore, *Moore's Federal Practice* § 12.50 (3d ed. 2012) (discussing Fed. R. Civ. P. 12(i)). "Deferring matters until trial" in this way "allows a court to give [due] consideration to matters with such grave consequences as motions for dismissal under Rule 12(b)(1)–(7)." *Id.*; *see also* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1350 (3d ed. 2004) ("[T]he court may postpone a decision until evidence is submitted at trial if the jurisdictional issue is intertwined with the merits of the case."). In reviewing a trial court's decision to defer a ruling, a federal appellate court "observed that the method and timetable for deciding a Rule 12(b) motion is left to the *sole* discretion of the trial judge," including the discretion to defer any ruling on the motion until after the trial. *See In re School Asbestos Litigation*, 921 F.2d 1310, 1316 (3d Cir. 1990) (internal quotation marks omitted) (emphasis in original) (citing *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1195 (6th Cir. 1988) (interpreting Fed. R. Civ. P. 12(d), the predecessor of Rule 12(i)).

The intensely factual nature of takings cases in flooding situations necessarily intertwines questions of jurisdiction and the merits. Thus the court has decided to exercise its discretion under RCFC 12(i) to defer ruling on the government's motion to dismiss until trial.