## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| IN RE UPSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | Sub-Master Docket No. 17-9001L |
| THIS DOCUMENT APPLIES TO: ALL UPSTREAM CASES | Hon. Charles F. Lettow |

## UPSTREAM TEST PROPERTY PLAINTIFFS'
## MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to Appendix A, Section 14(a) of the Rules of the Court of Federal Claims, the Upstream Test Property Plaintiffs ("Plaintiffs") submit their Memorandum of Contentions of Fact and Law. This Memorandum deals with the liability issues of the Fifth Amendment claims against Defendant the United States of America (the "United States" or the "Government").

## OVERVIEW

"When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regl. Planning Agency*, 535 U.S. 302, 322 (2002); *see also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) (characterizing physical takings as "paradigmatic taking[s]" which occur by either "a direct U.S. appropriation or [a] physical invasion of private property.").

The present action is a physical takings case relating to the Addicks and Barker Dams, a permanent flood-control project owned and operated by the U.S. Army Corps of Engineers (the "Corps"). As stated in its enabling legislation, the project's sole public purpose is to provide flood-control downstream of the Addicks and Barker Dams' outlet works. The Corps operates and uses the project's embankments and now-gated outlet structures to impound, detain, and store storm water runoff on the land behind the Addicks and Barker Dams, thereby protecting downstream from damaging flood levels.

The Corps owns ~25,000 acres of land ("Government-owned land") behind the Addicks and Barker Dams' embankments. The Government-owned land is usually dry. Over time the Corps has permitted the development of parks, golf courses, and other amenities within it. While the Corps' publicly-available maps refer to the Government-owned land boundaries as a "Project Boundary," there is no physical barrier (or demarcation) between Government-owned land and private land. Because the Corps operates and uses the project to impound, detain, and store more storm water runoff than can be contained on Government-owned land, the "Project Boundary" depicted on the Corps' maps is a fiction. For example, the Corps' use and operation of the dams for a Standard Project Flood (*i.e.,* a hypothetical flood event often used by the Corps for dam design) inflicts the project's impounded storm waters on ~4,500 acres of privately-owned land. Use and operations associated with the maximum flood expected for the project (*i.e.,* the Spillway Design Flood) inflicts the project's impounded storm waters on ~15,000 acres of privately-owned land.

By their very design, the Addicks and Barker Dams have always been destined to use upstream private property to store storm water runoff to carry out the intended public use of the project: mitigating downstream flood levels. During Tropical Storm Harvey,[1] and as a direct result of the Corps' use and operation of the Addicks and Barker Dams, the Corps submerged thousands of acres of private land including private properties owned or leased by the thirteen Test Property Plaintiffs. The Corps physically took these and other private properties for a public purpose without any compensation when it stored storm water runoff on those properties—properties that would otherwise not have such flooding—to carry out the express, stated, and intended purpose of the Addicks and Barker Dams. The damage resulting from the occupation is unquestionably severe, as well as grossly inconsistent with Plaintiffs' constitutionally-recognized and protected property rights.

---

[1] Although a Category 4 hurricane when it made landfall early on August 26, 2017, by the next day Harvey had weakened to become a Tropical Storm and it was during the ensuing days that the flooding which triggered Plaintiffs' claims occurred.

The Addicks and Barker Dams did not "save" the Plaintiffs. They did not "help" the Plaintiffs. And they did not "benefit" the Plaintiffs. To the contrary, Plaintiffs' properties were intended to bear, and during Harvey did bear, the burden required to protect downtown Houston, the Houston Ship Channel, and those other properties downstream of the dams from catastrophic flooding. This case presents the precise scenario that the Takings Clause was designed to address: preventing the Government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012).

At trial, Plaintiffs will prove, whether by fact or stipulation, that: (1) Plaintiffs have ownership interests in the private property that was taken which are protected under the Takings Clause; (2) the Corps' actions in designing, constructing, and/or operating the Addicks and Barker Dams (the federal flood control project) were Government-authorized and for the public purpose of providing flood risk reduction to the City of Houston, the Houston Ship Channel, and other downstream private properties; (3) but for the Government's actions, the reservoir-type flooding of Plaintiffs' properties would not have occurred; (4) it was foreseeable (indeed, actually foreseen and intended) by the Corps that the flooding of Plaintiffs' properties would occur given the design, construction, and operation of the dams; and (5) the extent and/or duration of the flooding substantially and severely interfered with Plaintiffs' rights to use and enjoy their residential or commercial property.

Plaintiffs will also demonstrate why the Government's anticipated defenses must be rejected: (1) the flooding of their properties was plainly caused by the Government's flood control project; (2) the flooding will recur and inundate these properties (3) Plaintiffs do not bear responsibility for the flooding of their properties caused by the federal flood control project; and (4) the decline in property values, the loss of personal property, the damage to the improvements on real property, the inability to live in their homes or operate their businesses, and/or the physical invasion of Government flood waters into the Plaintiffs' private property was sufficiently "severe" to rise to the level of a "taking."

<h1 style="text-align:center">CONTENTIONS OF FACT</h1>

**I.     The evidence at trial will demonstrate a classic Government taking.**

**A.     The Corps designed and constructed the Addicks and Barker Dams to protect downstream properties near Buffalo Bayou from flooding, in part, by storing storm water runoff on private property upstream of the dams.**

The Addicks and Barker Dams, massive federal flood control structures constructed by the Corps seventeen miles west of downtown Houston, are part of the federal flood control project known as the Buffalo Bayou and Tributaries Project. Authorized by Congress by the River and Harbor Act of 1938, ch. 535, § 2, 52 Stat. 802, 804 (codified in relevant part at 33 U.S.C. § 540), the Buffalo Bayou and Tributaries Project was intended to provide flood risk reduction to the City of Houston and the Houston Ship Channel. The Corps designed and constructed the Addicks and Barker Dams in the 1940s, and the Corps remains responsible for their maintenance and operation.

The dams are strategically located upstream of Buffalo Bayou and are designed to capture the flow of several watercourses (creeks and bayous) into that major channel during rain events. Specifically, the Corps built the dams near the confluence of Buffalo Bayou and South Mayde Creek. Below that confluence, Buffalo Bayou continues east to downtown Houston, where it is joined by White Oak Bayou and eventually flows into the Houston Ship Channel and San Jacinto Bay. By detaining the flow of the upstream creeks and bayous that otherwise flow into Buffalo Bayou during rain events, the dams impound water headed downtown in their respective reservoir pools, protecting Houston communities located downstream from the dams from flooding.

In the 1940s, the Corps originally designed the Addicks and Barker Dams to ensure that, in the event of an anticipated "design storm," the dams would hold back enough water to help protect downstream properties from unmanageable flooding. For the "design storm," the Corps used an actual, historical rain event, referred to as the 1899 Hearne Storm, which deposited over 34.5 inches of rain in 72 hours. (This Hearne storm, which the Corps used to design the Addicks and Barker Dams, turned out to be similar in size and duration as the rain deposited over the Addicks and Barker

watersheds during Harvey.) The Corps concluded that each dam would need to store water up to specific pool elevations in its respective reservoir—about 108 feet above sea level behind Addicks and about 102 feet above sea level behind Barker. The Addicks and Barker Dams were built several feet higher than those elevations to ensure they would not be overtopped.

The Corps also began acquiring land for the dams and the lower portions of their reservoirs. Government regulations specify the amount and extent of land that is to be acquired within a flood control reservoir, known as a "takings line." The Corps originally assigned Barker Dam a takings line of 98.3 feet, even though it could detain runoff for a flood of 101.7 feet. Likewise, Addicks Dam originally had a takings line of 104.4 feet and could detain runoff for a flood of 108.3 feet. Because dams are designed to store water in their reservoirs, the Corps customarily acquires either the fee or a flowage easement in the land behind its dams upon which it intends to store that water.[2] Here, however, the Corps acquired property interests in far less land than it designed its dams to inundate.

**B.      The Corps redesigned Addicks and Barker, increased the storage capacity of each reservoir, but chose not to acquire any additional land inside the reservoirs upstream of the Government-owned land.**

In the 1980s, the Corps reevaluated and redesigned the dams in anticipation of more severe storms and in light of updated dam-safety criteria. The Corps based its new design on an updated storm calculation for its Spillway Design Storm, called the Probable Maximum Precipitation ("PMP") and estimated that the PMP facing the area was in fact significantly greater than the +30 inches the Corps had originally predicted. In fact, the Corps projected that the Spillway Design Storm, using the

---

[2] As the United States recently advised the Federal Circuit, "[t]he Corps' property-acquisition policy has long required acquisition-in-fee of backwater land lying below the level that will be permanently inundated," and the same policy provides for the acquisition of easements "in more remote upstream areas where backwaters may form in connection with operations that raise the reservoir level." Principal Brief of the United States, Case Nos. 16-2301, 16-2373, *St. Bernard Parish Gov't v. United States*, at 44-45 (Fed. Cir. filed Dec. 9, 2016) (citing 43 C.F.R. §§ 8.1(b), 8.3(b); 32 C.F.R. § 644.4(b)(2)(iii) and (v)); *see also Narramore v. United States*, 960 F.2d 1048, 1049 (Fed. Cir. 1992) (describing the Corps' acquisition of flowage easements for upstream land that would flood only when the reservoir "would reach full capacity" and, therefore, "only occasionally").

PMP, would generate over 40 inches of rain within each of the Addicks and Barker watersheds, with additional runoff in Addicks due to overflows from Cypress Creek.

In light of these new projections, the Corps configured and modified both Addicks and Barker Dams to store the full amount of expected water. For Addicks, the Corps computed a new maximum design pool level of 118.14 feet (NGVD 1929 with '73 adj., or about 115 feet using the current datum of NAVD 1988, 2001 adj.) giving a new maximum storage capacity in the reservoir of 330,000 acre-feet. The Corps set the new maximum design pool elevation of Barker at 110.26 feet (or about 108 feet NAVD 1988, 2001 adj.), with a maximum storage capacity of 280,000 acre-feet. To meet these new specifications, the Corps raised the tops of both dams by several feet and made other structural changes. These recalculations of expected water inputs and the corresponding increase of dams' storage capacity meant a new takings line for each reservoir would need to be calculated to show what additional property would be inundated and, therefore, would need to be added to the existing Government-owned land.

To accommodate the additional storm water runoff that would be stored behind the dams after these modifications, the Corps estimated that it needed to acquire an additional 5,000 acres of private property within Addicks reservoir and an additional 4,000 acres of private property within Barker reservoir. However, the Corps decided, based on a cost-benefit analysis, that it would not acquire additional lands within either reservoir. As a result, the new maximum design water levels for both Addicks and Barker grew even higher than the elevation of the Government-owned land within each reservoir. Indeed, in a 1981 document, the Corps acknowledged the inadequacy of Government-owned land upstream of the reservoir embankments to contain the floodwaters generated by the design flood, noting that this inadequacy was "recognized in the original design of the reservoirs." And, as discussed in more detail below, with each modification and study, the Corps repeatedly noted the inadequacy of Government-owned land and further projected that, eventually, water would exceed the extent of Government-owned land to inundate private property.

The Government-owned land behind Addicks and Barker Dams remains at its 1940s levels, pegged to flood water elevations of 103 feet for Addicks and 95 feet for Barker. That land is sufficient to hold only about <u>half</u> of the water runoff associated with their Spillway Design Flood pool footprint—the actual maximum designed storage capacity for which these two reservoirs were designed. In fact, the Corps designed the Addicks and Barker Dams to retain a <u>greater amount of water in their reservoirs</u>: up to 115 feet for Addicks and 108 feet for Barker.[3] Both dams were designed and constructed to store massive amounts of water that would cover a significantly greater area within their reservoirs than the area covered by the Government-owned land.

As reflected in Corps documents, the Corps calculated the takings line in light of then-modern regulations and modifications to the Addicks and Barker Dams. For example, in May 1980, the Corps describes the need to acquire land as necessary to comply with then-existing regulations.

---

[3] Lest the Government try to twist Plaintiffs' argument, the issue raised here is <u>not</u> a claim that the Government's "inaction" or failure to acquire sufficient land serves as the basis of Plaintiffs' takings claims. The undisputed record shows that the Government <u>designed, built, and operated the Addicks and Barker Dams</u> **with the intention** that the dams would impound runoff waters in an amount that would **flood private property located within the footprint of the reservoirs**.



SWGED-DP

Buffalo Bayou and Tributaries –
Spillways for Addicks and Barker Dams

Chief, Real Est Div       SWGED       2 May 80
                                          Mr. Masters/mew/327

1. In order that Addicks and Barker Reservoirs be in strict compliance with SWD ETL 1110-2-22, we determined that it would be necessary to acquire real estate interests in the area encompassed by a line representing the elevation of the SPF plus appropriate freeboard for the selected plan. By coincidence, the SPF plus freeboard elevation for all plans is approximately the same as that indicated by the SDF line for Plan IIa. The SDF line for Plan IIa was previously plotted and furnished to you.

2. As you are aware, the value of the upstream real estate for Plan IIa, shown on the inclosed table, was prorated from the appraised values for Plan IV, extension of the dams to contain the SDF. You are requested to review this value to determine if it is adequate for preliminary real estate costs for evaluation of alternatives.

3. Assuming the value of upstream real estate for Plan IIa is adequate, you are requested to furnish a breakdown of the estimated costs for improvements and unimproved land for each reservoir.

4. If you have any questions, contact Mr. Greg Masters, ext. 327.

1 Incl                                   JOSEPH C. TRAHAN
Table                                   Chief, Engineering Division

In June 1980, the Corps calculated the cost to comply with its then-existing regulation (ETL 1110-2-22) which it described as calling for Standard Project Flood plus freeboard.

18 Jun 80
GBM
SWGED-DP

ADDICKS AND BARKER
SUMMARY OF ESTIMATED
COSTS FOR ALTERNATIVE
PLANS

| Plans & Proposed Work | Work on Dams | Acquisition Hazardous Areas Downstream | Acquisition Upstream Comply w/ETL 1110-2-22 (SPF + Freeboard) |
|---|---|---|---|
| | | ESTIMATED COST IN MILLIONS OF DOLLARS | |
| I  Degrade ends of embankments | 3 | 9,318 | 353(2) |

In the same document, the Corps set out that calculated "upstream takings line" (shown below graphically) for both reservoirs associated with Addicks and Barker Dams.

> (2) Addicks:  improvements $180 + undeveloped $92 = $272
> Barker :  improvements $  3 + undeveloped $78 = $ 81
> Since the SPF elevation for all plans only vary from 109.5 to 110.6 at Addicks and 100.3 to 100.5 at Barker, an upstream taking line elevation of 113.4 at Addicks and 104.5 at Barker was selected as representative for current estimating purposes.

The Corps determined that acquisition of additional lands needed to be in compliance would cost an estimated $353 million. The Brigadier General responsible for the report urged action because the extent of Government-owned land within the reservoirs, "are now 4.5 and 3.1 feet below the current Standard Project Flood levels for Addicks and Barker," and that "[s]hould additional lands (primarily the undeveloped ones) not be purchased now, the opportunity will probably be lost forever."

> 6.  The acquisition of upstream lands to comply with ETL 1110-2-22 has been estimated to cost $353 million.  The areas on the upstream side of the reservoirs are developing quickly.  Should additional lands (primarily the undeveloped ones) not be purchased now, the opportunity will probably be lost forever.  The possibility exists of reducing costs by protecting some of the existing development with levees in lieu of land acquisition.  Costs could be further reduced by purchasing lands only to the SPF spillway level with no freeboard.  Since the magnitude of this real estate problem has a potential funds requirement much larger than the spillway problem and since there will be considerable public interest in any changes in this area, we believe this issue should be kept separate from the spillway problem.  In any event more detailed studies will have to be performed before the scope of the problem can be narrowed.  The original real estate lines are now 4.5 and 3.1 feet below the current Standard Project Flood levels for Addicks and Barker, respectively.  This is based on revised Standard Project Storm data, ultimate urban conditions, and the existing Addicks and Barker projects.  Any policy decisions, funding delays, or public involvement programs for this separate, existing, and noncritical problem must not hinder the immediate fix of the unsafe structures.
>
> 7.  Since we believe these problems are priority items, we seek your attention and approval of these recommendations at the earliest date.  The estimates of construction costs for Plans I and IIa were made in January 1978 and will be updated prior to FY 82 budget submittals.  Changes in these estimates will not affect the recommendations made.
>
> 9 Incl (quad)                              HUGH G. ROBINSON
> 3 cy incl wd                               Brigadier General, USA
>                                            Division Engineer
>
>                         2 of 2                        USACE530471

The figures below illustrate the Government-owned land within each reservoir, as well as the updated takings line, the Spillway Design Flood, and the pool of Harvey flooding.





Notably and plainly, compliance with the Corps' then-existing regulations would have included virtually all of the upstream properties flooded during Harvey.

**C.    The Corps knew, foresaw, and intended that private property beyond Government-owned land in the reservoirs would flood from storm water runoff stored by the Addicks and Barker Dams.**

The Corps has long been aware of this misalignment between the design pools of the dams and the extent of Government-owned land. The fact that the Addicks and Barker Dams were designed and intended such that they would impound storm water runoff on private property has been identified by Corps' employees many times over the years.

For instance, the Corps' 1962 Reservoir Regulation Manual projects that more than 4,600 acres of private property behind each dam would be inundated by the capture and storage of floodwaters. The Chief of the Corps' Engineering Division warned in a May 1973 memo that the maximum impoundment behind Addicks and Barker Dams would cause the flooding of substantial amounts of private lands adjoining the Government-owned lands.

```
                          Addicks and Barker Reservoirs - Encroachment
                          on Private Lands
SWGED
Chief, Des Br             Chief, Engr Div            3 May 73

1.  The fact that maximum impoundment in subject reservoirs will
cause flooding of substantial amounts of private lands adjoining
the fee-owned Government lands is expected to soon become a public
issue, primarily with respect to Addicks.  We have already had
one inquiry from an investor interested in land at the upper end
of Addicks.
```

In a 1986 design memorandum, the Corps specifically observed that, given the design pools, "homes in adjacent subdivisions may be flooded," which "could result in lawsuits against the Corps of Engineers for flooding private lands." Still, the Corps never acquired fee or flowage easements across all the land its dams were designed to flood.

In 1995, the Corps again predicted the flooding of upstream properties and, again, did nothing. In the Corps' Reconnaissance Report, Section 216 Study Addicks and Barker Reservoirs, Houston, Texas (October 1995), the Government recognized it had only acquired land up to "5.9 feet <u>below</u> the maximum flood control pool elevation at Addicks Reservoir and 8.7 feet <u>below</u> the maximum

pool at Barker Reservoir" (emphasis added.) The Report acknowledged the extant threat of flooding in upstream private property:

> There is also a potential threat of property damage upstream of the reservoir lands. The dams and reservoir lands acquired for upstream temporary reservoir storage are now surrounded by residential and commercial urban developments. Densely populated housing developments essentially fill the fringe areas between the government owned lands (GOL) and the maximum pool elevation adjacent to Addicks Reservoir. Much of the fringe areas of Barker Reservoir are bordered by similar developments and the rest are rapidly developing. Urban development extending for miles upstream from the reservoirs has resulted in increased rainfall runoff into the detention facilities. Recent flood events have clearly identified the need for modification of the reservoir or operational changes. Rainstorms in the spring of 1992 tested the capacity of the reservoirs within the GOL, as shown in Table 1. The impoundments were the highest levels recorded and the rainfall was roughly estimated to have a recurrence frequency of about once in 30 to 40 years. The recent events indicate a potential for future flooding problems.

The Corps evaluated as many as ten potential solutions to address this problem, it chose to implement the tenth alternative: "Accept existing conditions and risk [i.e., extant upstream flood risk] through **No Action**." On October 16, 1995, the Corps' District Engineer, Col. Robert B. Gatlin, signed the Section 216 Study, adopting the tenth "No Action" alternative.

In its 2009 "Master Plan," the Corps identified that the elevation of Government-owned land would be exceeded by the "maximum possible pool before water spills around the end of the dam." The Corps also conceded, based on its review of historical storm data, "had some of these events been centered over Addicks and Barker Reservoirs or the Upper Buffalo Bayou Watershed, the combined rainfall and runoff could have resulted in flood pools exceeding the limits of government owned land and possibly exceeding the capacity of Addicks and Barker Dams." In its 2012 Water Control Manual, the Corps again recognized that heavy rain events would flood upstream properties: "acquisition of real estate was based on the original design. Presently, [flood] pool levels in excess of Government-owned land will damage residential developments adjacent to Government-owned lands."

Fundamentally, the Government knew that the design and operation of the Addicks and Barker Dams would result in the detention of storm water runoff within their reservoirs but beyond Government-owned Land and onto private upstream property. Indeed, the Government has gone so far as to calculate the extent of inundation of private property upstream of Addicks and Barker Dams in the event of storms of varying magnitudes. The Corps has identified the elevation of thousands of upstream homes that would flood when water upstream of Addicks or Barker exceeds the elevation of the Government-owned land—going so far as to identify the elevation of the first upstream street that would flood in that inevitable scenario. As the evidence shows, not only was flooding of upstream properties foreseeable, the Government actually predicted that private property behind Addicks and Barker Dams would be flooded because of the design and operation of those structures.

D.   **During Tropical Storm Harvey, the Addicks and Barker Dams functioned exactly as intended by capturing and storing floodwater within the footprints of the SDF and the Corps' calculated takings line**.

During Harvey, the Addicks and Barker Dams, including the embankments, outlet structures, and emergency spillways, performed precisely as the Corps intended. The Corps operated the Addicks and Barker Dams by opening and closing their floodgates consistent with its 2012 Water Control Manual and, when inflows into the reservoirs caused the pool elevations to rise at a rate which triggered the Water Control Manual's induced surcharge regulation schedule, the Corps followed its pre-set release schedules to ensure the structural integrity of the dams. Everything went as planned—including flooding private property upstream of the Addicks and Barker Dams.

Heavy rainfall during Harvey raised the water levels behind the Addicks and Barker Dams to about 109.1 and 101.6 feet, respectively. While those levels fall well below the Government's maximum design pools of 115 feet for Addicks and 108 feet for Barker, they far exceeded the limits of Government-owned land for storage of water behind each dam (again, approximately 103 feet and 95 feet, respectively). Ultimately, the maximum reservoir pool levels from Tropical Storm Harvey were about six (6) feet higher than the Government-owned land, about one (1) foot lower than the Corps'

updated takings line, and about six (6) feet lower than the Spillway Design Flood levels in both Addicks and Barker reservoirs.

**Addicks Reservoir and Dam**



During Tropical Storm Harvey, the Addicks and Barker Dams operated exactly as designed and intended by temporarily detaining storm water runoff within the reservoir behind each of the dams. And, when the anticipated storm of Harvey's magnitude hit the greater Houston area, the Addicks and Barker Dams, as intended and in keeping with the project's express purpose, impounded and stored large quantities of water on private property as to which the Government held no right to inundate—property owned by Upstream Plaintiffs—in order to save downstream properties, including downtown Houston and the Houston Ship Channel, from disaster. No credible argument to the contrary exists.

**E.   Harvey flooding was catastrophic for Upstream Test Property Plaintiffs.**

In total, the Addicks and Barker Dams inundated at least 7,000 acres of private upstream property with more than 177,000 acre-feet of storm water. This flooding was catastrophic for the property owners, including Plaintiffs. More than 10,000 private properties were flooded. And, for

many, the inundation lasted for more than 10 days. Homes, cars, appliances, furniture, and countless personal effects were destroyed. Families were displaced for months. For many, the taking of their private property continues as they still have not been able to resume full use of their homes. Flooding of Plaintiffs' properties also prevented ingress or egress to their homes and businesses, thereby depriving them of the full use and enjoyment of their private property rights.

Each of Test Property Plaintiffs suffered losses to their real and personal property as a result of Harvey.[4] The figure below shows the estimated depth of flooding within each of the Upstream Test Properties from Harvey. Each of the Plaintiffs suffered severe loss, including displacement, the loss of the use of their property for a significant period of time, a sharp decrease in the fair market value of their properties, and physical damage (except for Popovici) ranging from destroyed landscaping to the destruction of virtually every worldly possession. Significantly, each of the Plaintiffs lost the ability to enjoy their respective private property rights as a result of the flooding.

---

[4] The flood waters rose higher than the finished floor level of the Test Properties located at 6411 Canyon Park Drive, Katy Texas (Micu); 20526 Indian Grove Lane, Katy Texas (Soares); 4719 Eagle Trail Drive, Houston, Texas (Stewart); 4614 Kelliwood Manor Lane, Katy, Texas (Todd and Christine Banker); 4310 Cassidy Park Lane, Katy, Texas (Giron); 15626 Four Seasons Drive, Houston, Texas (Burnham); 15910 Red Willow Drive, Houston, Texas (Turney); 5306 Sunbright Court, Houston, Texas (Kurt and Jean Wind); and 1923 Wingleaf Drive, Houston, Texas (Holland). The flooding reached higher than the first-floor level of several apartment units at 16111 Aspenglenn Drive, Houston, Texas (Sidhu); higher than the first floor level of the community clubhouse at 0 Lake Center Run, Houston, Texas (Lakes on Eldridge Community Association); and higher than the first floor level of the terminal building at 18000 Groschke Road, Houston, Texas (West Houston Airport Corp.). Finally, pool flood waters reached onto the private property at 19927 Parsons Green Court, Katy, Texas (Popovici) encircling the home for an extended time without reaching a level above the first floor.

| | No. | Name | House / building Slab Elevation | Depth of Flooding (feet) |
|---|---|---|---|---|
| **Barker** | 1 | Micu | 99.5' | 2.0' |
| | 2 | Giron | 101.2' | 0.3' |
| | 3 | Banker | 100.4' | 1.1' |
| | 4 | Soares | 100.8' | 0.7' |
| | 5 | Popovici | 101.9' | -0.4' |
| **Addicks** | 6 | Holland | 107.6' | 1.5' |
| | 7 | WHA | 108.3' | 0.8' |
| | 8 | Sidhu | 106.7' | 2.4' |
| | 9 | Turney | 104.2' | 4.9' |
| | 10 | Stewart | 108.6' | 0.5' |
| | 11 | Burnham | 105.1' | 4.0' |
| | 12 | Wind | 109.0' | 0.1' |
| | 13 | Lakes on Eldridge | 108.6' | 0.5' |

(Note: surveyed elevations are in feet above NAVD '88, 2001 adjustment; further adjusted to be compatible with USGS pool readings: Barker -0.3'; Addicks -0.3')

The Government does not own any property interest, such as a flowage easement, on any of the Test Properties to allow it to store water on these properties without compensating Plaintiffs.

As if those losses were not enough, Plaintiffs' property values have dropped sharply—thanks in no small part to recognition of the ongoing threat of flooding associated with the Addicks and Barker Dams. Indeed, the rainfall recorded during Harvey in the upper Buffalo Bayou watershed was not unprecedented for the Houston area; rainfalls of similar magnitude or greater have been recorded in the past and will occur in the future. When the next Harvey comes, the property owners upstream of the Addicks and Barker Dams, whomever they are at that time, will bear the brunt for providing protection for millions of Houstonians yet again. Recent pricing trends confirm that buyers in those neighborhoods now understand that risk.

**F.  The Test Property Plaintiffs flooded due to the federal project—not localized drainage sources or overbank riverine flooding.**

Each of the Test Properties flooded due to the impounding of rainfall runoff waters by the Corps behind the Addicks and Barker Dams that reached maximum water levels of 109.1 feet and

101.5 feet, respectively. The elevation of each Test Property is lower than the maximum pool elevations achieved during Harvey. Aerial footage shows that the inundation on August 30 (and thereafter) within the reservoirs of the Addicks and Barker Dams was not caused by anything other than the Addicks and Barker Dams. The observed conditions of local tributaries and other eyewitness accounts all confirm that the pool, not other sources, caused Plaintiffs' maximum flooding. Even the Government's hydrologist confirms this critical point.

The Government tries to imply otherwise—suggesting that Plaintiffs suffered an "extraordinary Act of God," and that their properties were "damaged by flooding and floodwaters that flood control improvements could not prevent." But the Government's story ignores that Plaintiffs here are upstream of the Addicks and Barker Dams—the flooding they suffered resulted from the pools impounded by the Addicks and Barker Dams. If the Addicks and Barker Dams did not exist, Plaintiffs would not have flooded as much, if at all, and not from the prolonged, reservoir-type flooding experienced in Harvey. Plaintiffs suffered a man-made disaster, directly and solely caused by the Corps' project during a storm which the Government correctly anticipated would come. The maximum flooding was not the result of any other source, including localized drainage sources or overbank riverine flooding.

1. **Localized drainage issues did not cause maximum flooding of Plaintiffs' properties.**

With the exception of the West Houston Airport, Plaintiffs are located in platted subdivisions. These subdivisions have local drainage systems to handle certain amounts of rainfall both within their underground storm sewers and their above-ground drainageways, such as their streets and/or ditches. The standard design storm for such drainage systems is the two-year rain event for the underground systems and the 100-year rain event for the above-ground systems, such as ditches and roadways. The design of such systems generally looks at one hour as the critical duration of rainfall.

The rainfall during Harvey that fell in the area over the Test Properties' subdivisions was insufficient to indicate that their local drainage systems could not handle such a rain. During Harvey, local rainfall over the Test Properties was on the order of a five-year to 25-year frequency for the maximum one-hour duration. This exceeds the two-year frequency used for designing the underground storm sewer systems but is far less than the 100-year frequency typically used to design the above-ground drainage systems. By design, storm water would be in the streets during Harvey, but not much beyond the curbs in the Plaintiffs' subdivisions prior to the reservoir pool exceeding Government-owned land. The local drainage systems in the Test Properties' subdivisions would have been capable of handling the Harvey rain event. And nothing in the record suggests otherwise.

### 2. Riverine flooding issues did not cause maximum flooding of Plaintiffs' properties.

Some of the Test Properties are located in the vicinity of a creek or bayou. Such creeks and bayous typically have 100-year and 500-year floodplains mapped as part of the FEMA floodplain mapping program. Homes and businesses are typically built outside of or higher than the 100-year floodplain of the nearest creek or bayou. The critical duration of rainfall that is applicable to these creeks and bayous is normally six to twelve hours.

Harris County Flood Control District ("HCFCD") rain gauge data shows that the rainfall during Harvey was not of sufficient intensity to overtop the banks of these creeks and bayous in an amount that exceeded the subsequent pool flooding from Addicks and Barker Dams. Indeed, many key tributaries remained in bank throughout the Harvey event. Instead, the rainfall during Harvey that fell over the Addicks and Barker watersheds approached the 100-year frequency event for the 6-hour duration and exceeded the 100-year event for the 12-hour duration. These creeks and bayous would have been producing flood levels generally consistent with their respective floodplains associated with these rainfall frequency amounts, or somewhat higher given the amount of rainfall that preceded these peak rainfall amounts. Further, the Plaintiffs have collected visual evidence that will show the absence

of overbanking at critical locations of key tributaries. These real-world observations combined with the Harvey flood levels shown for each of the main creeks entering into the Addicks and Barker Reservoirs, as reported by the HCFCD, demonstrate that the riverine flooding that occurred during Harvey did not cause and would not have caused the Test Properties to flood, if at all, to the extent of flooding due to pool flooding from Addicks and Barker Dams.

G.     **Flooding of upstream properties will inevitably re-occur.**

The design, construction, and operation of the Addicks and Barker Dams renders flooding of private property behind the dams inevitable to re-occur. The dams are permanent and immovable structures. They are operated to capture and impound rainfall runoff from the Addicks and Barker watersheds when heavy rains come to the greater Houston area.

Heavy rain storms are a feature of the Texas Gulf Coast. For example, Tropical Storm Claudette in 1979 dropped more than 40 inches of rain in 24 hours in Alvin, Texas, which is just 50 miles southeast of Addicks and Barker. Tropical Storm Allison in 2001 dropped about 35 inches of rain in five days over portions of northeast Harris County. Additionally, on April 18, 2016 (the so-called Tax Day flood), the Addicks and Barker watersheds received 10 to 17 inches of rain during a 24-hour period. This rainfall resulted in new record pool elevations in both Addicks and Barker and caused streets in the neighborhoods upstream of Addicks to be inundated by the reservoir flood pool for the first time. Future heavy storms are inevitable. And, as long as they stand, the Addicks and Barker Dams will function to capture the storm waters to protect downtown Houston, the Houston Ship Channel, and the private properties downstream of the Addicks and Barker Dams.

## CONTENTIONS OF LAW

II.     **Applicable Legal Principles Confirm that the Government Actions in Designing, Constructing, and Operating its Federal Flood Control Project Took Plaintiffs' Properties.**

To establish a viable takings claim, Plaintiffs must prove two things: (1) a property interest for purposes of the Fifth Amendment and (2) that the Government's actions constituted a compensable

taking of that property interest which, in the context of this inverse-condemnation takings case based on Government-induced flooding, requires a showing that "treatment under takings law, as opposed to tort law, is appropriate under the circumstances." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003); *see also Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). Takings law requires an examination of what the Government knew, intended, or should have foreseen concerning the impact of its public projects and whether the harm visited upon a plaintiff's property was the "predictable result of the government's action, and whether the government's actions were sufficiently substantial to justify a takings remedy." *Ridge Line*, 346 F.3d at 1355.

### A.      Plaintiffs possess property rights protected by the Fifth Amendment.

"[E]very sort of [real property] interest [a] citizen may possess" counts as a protectable property interest under the Fifth Amendment. *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945). The term "property" refers to the rights inhering in the person's relationship to the property in question, whether real or personal, and not the property or "thing" itself. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984). And, "[i]n the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession – the right to <u>exclude</u> strangers, or for that matter friends, but especially the Government." *Hendler v. United States*, 952 F.2d 1364, 1371 (Fed. Cir. 1991). Because the Fifth Amendment itself does not create property interests subject to protection under the Takings Clause, the existence of a protectable property interest "is determined by reference to existing rules or understandings that stem from independent sources such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998).

Under Texas law, the term property "does not only mean the real estate, but every right which accompanies its ownership." *State v. Moore Outdoor Properties, L.P.*, 416 S.W.3d 237, 242-43 (Tex. App.—El Paso 2013, pet. denied) (citing *DuPuy v. City of Waco*, 396 S.W.2d 103, 108 (Tex. 1965)). Texas court have recognized that property interests which will support a taking claim include

ownership in fee simple, *State v. Schmidt*, 805 S.W.2d 25, 29 (Tex. App.—Austin 1991), *rev'd on other grounds*, 867 S.W.2d 769 (Tex. 1993); leasehold interests, *Urban Renewal Agency v. Trammel*, 407 S.W.2d 773 (Tex. 1966); fixtures and improvements located on a plaintiff's realty, *State v. Carpenter*, 89 S.W.2d 979, 980 (Tex. 1936); a future reversionary interest, *El Dorado Land Co., L.P. v. City of McKinney,* 395 S.W.3d 798 (Tex. 2013); a possible future right of reentry to the property, *id.*; and even an owner's right of <u>access</u> to their property, *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex. 1992).

Texas courts, including the Texas Supreme Court, have long recognized that the physical invasion of property by floodwaters from a public project supports an inverse condemnation claim:

> We hold that the evidence in this case supports the trial court's findings that the extensive damage the Gragg Ranch experienced was the inevitable result of the reservoir's construction and of its operation as intended. … [A]s we noted more than forty years ago,
>
> > [g]overnmental agencies and authorities are necessities. They are capable of rendering great and beneficent public services. But any appeal to the tradition of our laws which omits a decent regard for private property rights is both inaccurate and distorted. It is because of this regard that our governmental agencies and authorities in acquiring properties for their public purposes are generally required to proceed under the power of eminent domain rather than under the police power. Such a policy has not resulted in a destruction of flood control and improvement agencies in the past and there is no reason to apprehend that the continuation of such policy will prove overly costly or inimical to the American way of life in the future.

*Tarrant Regional Water Dist. v. Gragg*, 151 S.W.3d 546, 555-56 (Tex. 2004) (quoting *Brazos River Auth. v. City of Graham*, 354 S.W.2d 99, 105 (Tex. 1961)); *see also Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 807 (Tex. 2016) ("[W]here government made a conscious decision to subject particular properties to inundation so that other properties would be spared, as happens when a government builds a flood-control dam knowing that certain properties will be flooded by the resulting reservoir . . . of course the government must compensate the owners who lose their land to the reservoir."); *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532 (Tex. 2013) ("[W]e need not look to evidence of the frequency of flooding to deduce the government's intent: the City knew the project would inundate part of

Kopplow's property before it ever began construction, prompting the City to seek a drainage easement from Kopplow. . . . Based on these facts, there is little dispute that the City intended to take Kopplow's property for the project, and *Gragg* does not bar the inverse condemnation claim."); *Ansley v. Tarrant County Water Control and Imp. Dist., No. One*, 498 S.W.2d 469 (Tex. App.—Tyler 1973, writ ref'd n.r.e.) (injury to land caused by backup from reservoir supported inverse condemnation action). There can be no question that the Plaintiffs have property rights protected by the Fifth Amendment.

> **B.    The principles applicable to the factual circumstances here prove the Government's actions constituted a taking of Plaintiffs' property.**

The second *Ridge Line* inquiry is whether the Government's actions constituted a compensable taking which, in flooding cases asks whether the effects Plaintiffs experienced were the "predictable result of the government's action, and whether the government's actions were sufficiently substantial to justify a takings remedy." *Ridge Line*, 346 F.3d at 1355. Controlling case law directs that the analytical test used to determine whether there has been a taking depends on the conceptual framework applicable to the claim.

> Generally, the government can take property by two means: physically or by regulation. Both types of takings can be further divided into two categories: categorical and non-categorical. Categorical takings deprive the owners of <u>all</u> economically viable use of their property. Non-categorical takings, on the other hand, deprive the owner of *some* amount of the economic use of their land, either through physical invasion or onerous regulation. Takings can be either permanent or temporary in duration.

*Caquelin v. United States*, No. 14-37L, 2018 WL 5813009, at *5 (Fed. Cl. Nov. 6, 2018).[5]

Here, Plaintiffs' properties were physically invaded by storm water runoff the Government stored on their land, in their homes, and/or in their businesses. Plaintiffs have therefore alleged (1) a temporary categorical physical taking for the period the Government utilized Plaintiffs' properties for

---

[5] Counsel for Plaintiffs are certainly aware of the circumstances surrounding the appeal and remand in the *Caquelin* matter and therefore will set forth not only the "categorical" analysis which, counsel believes, demonstrates that the *Arkansas Game* factors do not apply to their claims, but will also discuss and demonstrate why Plaintiffs' claims satisfy the *Arkansas Game* factors as well.

its public use; and (2) a permanent non-categorical physical taking for the flowage easement that exists across their properties and for which a taking claim has now accrued.

### 1. The temporary categorical physical taking.

"A temporary categorical physical taking occurs when the government physically seizes the entirety of a landowner's property for public use but returns it to the original owner after a period of time." *Caquelin*, 2018 WL 5813009, at *6. In such cases, "courts look to the temporal element to determine the measure of just compensation under the Fifth Amendment, not whether a claim arose at all." *Id.* (citing *Ladd v. United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010) and *Yuba Nat. Res., Inc. v. United States*, 821 F.2d 638, 641-42 (Fed. Cir. 1987)). Because the Government physically seized the entirety of each Plaintiffs' real property and completely destroyed much of Plaintiffs' personal property, the total preclusion by the Government of Plaintiffs' use and enjoyment of that property constitutes a categorical taking. And the fact that the Government only exercised such complete control for a limited period of time is only relevant for the calculation of compensation, "not whether a taking occurred." *Id.* (citing *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945) ("Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest . . . , to amount to a [T]aking.")).

### 2. The permanent non-categorical physical taking.

"A non-categorical physical taking occurs when the government occupies part of an owner's property in some manner." *Caquelin*, 2018 WL 5813009, at *6. Moreover, "any permanent physical invasion of property, no matter how negligible, constitutes a taking." *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, (1982)); *see also United States v. Causby*, 328 U.S. 256 (1946) (repeated flights by government planes through plaintiffs' airspace was a permanent non-categorical physical taking despite the fact that the enjoyment and use of the land was not completely destroyed).

To the extent the Government has taken a permanent flowage easement across Plaintiffs' properties, a takings claim has accrued. *See Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979)

("[E]ven if the government physically invades only an easement in property, it must nonetheless pay just compensation"); *see also Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) (Scalia, J.) ("To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather . . . 'a mere restriction on its use,' . . . is to use words in a manner that deprives them of all their ordinary meaning. The right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'"). Of course, "the concept of permanent physical occupation does not require that in every instance the occupation be exclusive, or continuous and uninterrupted. Rather, indefiniteness means permanency. *Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991).

**C.    The factors set forth by the Supreme Court in *Arkansas Game* prove the Government's actions constituted a taking of Plaintiffs' property.**

Based on this Court's analysis of controlling case law as set forth in *Caquelin*, Plaintiffs believe that the *Ridge Line* inquiry of whether the flooding Plaintiffs experienced was the "predictable result of the government's action, and whether the government's actions were sufficiently substantial to justify a takings remedy" are demonstrated on a *per se* basis without the necessity of demonstrating a taking based on the factors set forth in *Arkansas Game*. However, given the uncertainty in current law, Plaintiffs can and will demonstrate that even under the *Arkansas Game* analysis, a compensable taking of Plaintiffs' property has occurred.

Nevertheless, application of the factors identified by the Supreme Court in *Arkansas Game* to this case proves that the Government's actions here rise to the level of a taking. In *Caquelin*, this Court analyzed six factors it gleaned from the Supreme Court's opinion in *Arkansas Game*: (a) time and duration of the taking; (b) the degree to which the invasion was intended; (c) the foreseeable result of authorized Government action; (d) the character of the land at issue; (e) the property owner's reasonable investment-backed expectations regarding the land's use; and (f) the "severity of the interference." *Caquelin*, 2018 WL 5813009, at *11-16. Each factor supports finding a taking here.

1. **The time and duration of the taking.**

Temporary takings, which deny a landowner all rights to the use of private property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318 (1987). The Fifth Amendment mandates compensation to private property owners when the Government occupies the property for its own purposes, even though that use is temporary. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

The Government's actions completely deprived Plaintiffs the use of their property for an extended period of time (both during the inundation and the months thereafter when the properties could not be used for their intended purposes), so the first factor supports a taking.

2. **The degree to which the invasion was intended.**

Demonstrating that Plaintiffs' injuries were "the direct, natural, or probable result of the authorized government action," rather than merely an incidental or consequential injury, establishes the Government's intent to take private property. *Cary v. United States*, 552 F.3d 1373, 1377 (Fed. Cir. 2009) (citing *Ridge Line*, 346 F.3d at1356). The plaintiffs' injury need only be the likely result of the Government's act. *See Moden v. United States*, 404 F.3d 1335, 1343 (Fed. Cir. 2005). Here, Plaintiffs' proof far exceeds this "likely result" standard. The Addicks and Barker dams were designed, constructed, and operated with the full intent and purpose to impound water behind them, inundating a known geographic area—two defined reservoirs which, by definition, include private property. Plaintiffs' injuries were the "direct, natural, or probable result" of the Buffalo Bayou and Tributaries Project. Indeed, flooding caused by a dam impounding reservoir waters is an archetypal example of the government intending property to flood. *Stockton v. United States*, 214 Ct. Cl. 506, 518-19 (1977) ("We further believe that only one actual flooding is enough when the property is upstream of the dam and below the contour line to which the dam is designed to impound water. Then, even if there has been but one flooding, the result is only that which the engineers intended the dam to achieve.").

With abundant proof that the Government's actions in designing, constructing, and operating Addicks and Barker Dams with the full intent and purpose to impound water behind them in a known geographic area which includes Plaintiffs' properties, the second factor supports a taking.

### 3.     The foreseeable result of the authorized Government action.

Noting it is a "related vein," the *Caquelin* opinion next examines whether the effects the plaintiffs experienced were "the predictable result of authorized government action." *Caquelin*, 2018 WL 5813009, at *12 (quoting *Ridge Line*, 346 F.3d at 1355-56). The question presented by this factor is whether the invasion of Plaintiffs' property was the foreseeable result of Government action. *Banks v. United States*, 138 Fed. Cl. 141, 150 (2018). A taking is "foreseeable" if it is the direct, natural or probable result of the alleged Government authorized actions for a public purpose and not a mere eventual or consequential injury inflicted by those actions. *Cary*, 552 F.3d at 1377; *Moden*, 404 F.3d at 1342; *see also Hansen v U.S.*, 65 Fed. Cl. 76, 97 (2005) ("the *Ridge Line* court adopted the traditional objective tort-causation approach to takings as an alternative means for establishing a takings claim," which "is largely based on causation-in-fact and allows a takings claim to lie so long as the harm is proximately related to the causative action").

Here the evidence will show that the flooding of Plaintiffs' properties by the storm water detained by the Addicks and Barker Dams and held in their associated reservoirs was clearly foreseeable; indeed, it was an eventuality the Government recognized over the course of several decades, yet continually chose to accept. To borrow again from *Caquelin*, no "preternatural clairvoyance is needed" to predict that the Government's construction of a dam will be the flooding of property in the reservoir the dam created. The third factor supports finding a taking.

### 4.     The character of the land at issue.

In the fourth factor, the *Caquelin* opinion discusses a "key difference" between the test for non-categorical <u>regulatory</u> takings (as in the seminal case of *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978)), and the *Arkansas Game* inquiry.

In *Penn Central*, the focus is on the character of the <u>governmental action</u>. But in *Arkansas Game*, the Supreme Court reverses the inquiry and directs courts to look to the "character of the *land* at issue." When viewed in the government flooding context, and in conjunction with the other *Arkansas Game* factors, this change in the focus of the inquiry is cogent and instructive. The *Penn Central* factors are designed to determine if a non-categorical regulatory taking occurred, or, in the words of Mr. Justice Holmes, whether a governmental regulation "goes too far." *Arkansas Game*, by contrast, points courts to determine whether a taking (as opposed to a tort) occurred by looking at the nature of the underlying land, *i.e.*, was it prone to repeated flooding or especially susceptible to flooding. This factor, much like factors 2 and 3, seems specifically identified to be deployed in a governmental flooding context.

*Caquelin*, 2018 WL 5813009, at *13 (citation omitted).

As in *Arkansas Game* and *Caquelin*, the inundated areas at issue here have never been exposed to flooding comparable to the accumulations from Harvey "in any other time span either prior to or after the construction" of the Addicks and Barker Dams. *Caquelin*, 2018 WL 5813009, at *13. These are residential subdivision or places of commercial business. These are not farm fields. As home and places of business, they are exceptionally vulnerable if a federal project puts them at risk of reservoir pool flooding. Given the character of the land, the fourth factor supports a taking here.

5. **Reasonable investment-backed expectations regarding land use.**

Typically, the concept of "reasonable investment-backed expectations is applied in a regulatory takings case and "is designed to account for property owners' expectation that the regulatory regime in existence at the time of their acquisition will remain in place, and that new, more restrictive legislation or regulations will not be adopted." *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018). Strictly speaking, the factor should not be applied here because this action involves physical and categorical takings. *See Palm Beach Isles Assoc. v. United States*, 231 F.3d 1354, 1364 (Fed. Cir. 2000) (noting that when a categorical taking is found to have occurred, "the property owner is entitled to a recovery without regard to consideration of investment-backed expectations [because, i]n such a case, 'reasonable investment-backed expectations' are not a proper part of the analysis, just as they are not in physical takings cases"); *see also Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) ("[D]ifferent situations call for quite different analyses. The Government's attempt to read the

concept of 'reasonable expectations' as used in regulatory takings law into the analysis of a physical occupation case would undermine, if not eviscerate, long-recognized understandings regarding protection of property rights; it is rejected categorically. The trial court erred in accepting the Government's effort to inject into the analysis of this physical taking case the question of the owner's 'reasonable expectations.'").

Nevertheless, should the factor be deemed applicable, the Government's complete physical occupation of Plaintiffs' properties through the inundation and storage of storm water runoff for days on end, literally destroying hundreds of thousands of dollars in real and personal property and leaving the sites in conditions that precluded their residential and commercial use for up to months thereafter, certainly had a significant economic impact on each Plaintiff's reasonable investment-backed expectations regarding the use of their property, either as a residence or as a business. Moreover, the reality remains that most of the Plaintiffs invested their life savings into the Test Properties without knowledge or expectation of flood risk. The fifth factor supports of a taking.

### 6. The severity of the interference.

As far back as 1871, the Supreme Court recognized that when the Government overflows private property with water and causes substantial damage thereby, it has taken that property for purposes of the Fifth Amendment and just compensation must be paid. *See Pumpelly v. Green Bay & M. Canal Co.*, 80 U.S. (13 Wall.) 166, 177-78 (1871). "[I]t is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking." *United States v. Cress*, 243 U.S. 316, 328 (1917); *see also United States v. Lynah*, 188 U. S. 445, 470 (1903) ("It is clear from these authorities that where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value, there is a taking within the scope of the 5th Amendment."); *Cress*, 243 U.S. 328 ("There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on

principle, the right to compensation must arise in the one case as in the other.").

As in *Caquelin*, the severity of the interference with Plaintiffs' property rights in this case is complete. The temporary taking of Plaintiffs' properties was categorical, and the non-categorical taking of the flowage easement—the right to flood Plaintiffs' properties for as long as the dams stand—would be permanent. *Ridge Line*, 346 F.3d at 1352 (noting that a permanent occupation "need not exclude the property owner to be compensable as a taking"); *see also United States v. Dickinson*, 331 U.S. 745, 748 (1947) ("Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time.").

As noted at the outset, the flooding caused by the Buffalo Bayou and Tributaries Project inflicted severe injury on thousands of homes and thousands of acres of private property in each of the Addicks and Barker reservoirs. The Upstream Test Property Plaintiffs completely lost the use of their properties for several days and were displaced from, and unable to regain access to or full use of, their properties for up to many months thereafter. Physical improvements were destroyed or damaged, along with cars, appliances, furniture, and countless personal possessions from the Government-caused flooding. The severity of the impact on Plaintiffs' properties is clear from whatever aspect it is viewed: the costs of repair of the physical damage from the flooding; the inability of Plaintiffs to enjoy the use of their property for several days or months, along with the displacement they suffered; and the loss in market value of their homes or businesses due to the fact that they flooded from a reservoir pool. The sixth factor supports the finding of a taking.

## CONCLUSION

At trial, Plaintiffs will prove that the United States took their private property without just compensation in violation of the Fifth Amendment to the United States Constitution. In designing, constructing, and/or operating the Addicks and Barker Dams (a federal flood control project) for the public purpose of providing flood risk reduction to the City of Houston, the Houston Ship Channel,

and all other downstream private property, the United States foresaw and intended to flood Plaintiffs' private property upstream of the Addicks and Barker Dams. Plaintiffs bore the burden of protecting their fellow citizens—a classic example of a constitutional taking. On this record, and as will be proven at trial, Plaintiffs, "in all fairness and justice," deserve to be justly compensated for their losses. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012).

Dated: December 24, 2018

Respectfully submitted,

/s/ Daniel H. Charest

Daniel Charest
Larry Vincent
Burns & Charest LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
469-904-4550
dcharest@burnscharest.com
lvincent@burnscharest.com
*Co-Lead Counsel, Upstream Pre-Trial*
*Discovery and Dispositive Motions*
*Co-Lead Counsel for Upstream Plaintiffs*
*as to Jurisdictional Discovery, Motion to*
*Dismiss, and Scheduling*

/s/ Charles Irvine

Charles Irvine
Irvine & Conner PLLC
4709 Austin Street
Houston, Texas 77004
713-533-1704
charles@irvineconner.com
*Co-Lead Counsel, Upstream Pre-Trial*
*Discovery and Dispositive Motions*

/s/ Edwin Armistead Easterby

Edwin Armistead "Armi" Easterby
Williams Kherkher Hart Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
713-230-2200
aeasterby@williamskherkher.com
*Co-Lead Counsel, Upstream Pre-Trial*
*Discovery and Dispositive Motions*

/s/ Vuk S. Vujasinovic

Vuk S. Vujasinovic
VB Attorneys, PLLC
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713-224-7800
*Of Counsel for Individual Upstream Plaintiffs as to Jurisdictional Discovery, the Government's Motion to Dismiss, and Scheduling*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certified that a true and correct copy of the foregoing instrument, together with all exhibits, was served on all counsel of record in this Sub-Master Cause by filing it via the Court's ECF system on December 24, 2018.

/s/Daniel H. Charest