```
 1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3

 4   IN RE:  UPSTREAM ADDICKS AND      ) Master Docket No.

 5   BARKER (TEXAS) FLOOD-CONTROL      ) 17-9001L

 6   RESERVOIRS.                       )

 7   _____)

 8

 9

10                         Courtroom 11B

11              BOB CASEY UNITED STATES COURTHOUSE

12                        515 Rusk Street

13                      Houston, Texas 77002

14                    Wednesday, May 15, 2019

15                          8:29 a.m.

16                       Trial Volume 8

17

18

19         BEFORE:  THE HONORABLE CHARLES F. LETTOW

20

21

22

23

24

25   REPORTED BY:  KRISTY L. CLARK, RPR
```

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS (IN RE UPSTREAMS ADDICKS

 3    AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS:

 4                    BURNS CHAREST, L.L.P., ESQ.

 5                    BY:  DANIEL CHAREST, ESQ.

 6                    900 Jackson Street

 7                    Suite 500

 8                    Dallas, Texas  75202

 9                    (469) 444-5002

10                    dcharest@burnscharest.com

11

12                    IRVINE & CONNER, L.L.C.

13                    BY:  CHARLES W. IRVINE, ESQ.

14                    4709 Austin Street

15                    Houston, Texas 77004

16                    (713) 533-1704

17                    charles@irvineconner.com

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES (CONTINUED):
 2                    WILLIAMS, KHERKHER, HART, BOUNDAS
 3                    BY:  EDWIN A. EASTERBY, ESQ.
 4                    8441 Gulf Freeway
 5                    Suite 600
 6                    Houston, Texas 77017
 7                    (713) 230-2200
 8                    aeasterby@williamskherkher.com
 9
10                    DUNBAR HARDER, P.L.L.C.
11                    BY:  LAWRENCE G. DUNBAR, ESQ., ESQ.
12                    10590 West Office Drive
13                    Suite 2000
14                    Houston, Texas 77042
15                    (713) 782-4646
16
17                    VB ATTORNEYS
18                    BY:  VUK VUJASINOVIC, ESQ.
19                    6363 Woodway Drive
20                    Suite 400
21                    Houston, Texas 77057
22                    (713) 224-7800
23                    vuk@cbattorneys.com
24
25
```

```
 1   APPEARANCES (CONTINUED):
 2                    AHMAD ZAVITSANO, ET AL.
 3                    BY:   KYRIL V. TALANOV, ESQ.
 4                    BY:   HILARY S. GREENE, ESQ.
 5                    1221 McKinney Street
 6                    Suite 2500
 7                    Houston, Texas 77010
 8                    (713) 655-1101
 9                    hgreene@azalaw.com
10
11                    MCGEHEE, CHANG, BARNES, LANDGRAF
12                    BY:   JACK E. MCGEHEE, ESQ.
13                    10370 Richmond Avenue
14                    Suite 1300
15                    Houston, Texas 77042
16                    (713) 864-4000
17                    jmcgehee@lawtx.com
18
19                    SULLINS, JOHNSTON, ROHRBACH & MAGERS
20                    BY:   MICHAEL J. DULANEY, ESQ.
21                    2200 Phoenix Tower
22                    3200 Southwest Freeway
23                    Houston, Texas 77027
24                    (713) 521-0221
25
```

```
 1    APPEARANCES (CONTINUED):

 2    ON BEHALF OF THE DEFENDANT:

 3                      UNITED STATES DEPARTMENT OF JUSTICE

 4                      ENVIRONMENT & NATURAL RESOURCE SECTION

 5                      BY:  WILLIAM SHAPIRO, ESQ.

 6                      501 I Street

 7                      Suite 9-700

 8                      Sacramento, California 95814

 9                      (916) 930-2207

10                      william.shapiro@usdoj.gov

11

12                      UNITED STATES DEPARTMENT OF JUSTICE

13                      ENVIRONMENT & NATURAL RESOURCE SECTION

14                      BY:  KRISTINE S. TARDIFF, ESQ.

15                      53 Pleasant Street

16                      Fourth Floor

17                      Concord, New Hampshire 03301

18                      Kristine.tardiff@usdoj.gov

19

20

21

22

23

24

25
```

APPEARANCES (CONTINUED):

UNITED STATES DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCE SECTION
BY: LAURA DUNCAN, ESQ.
601 D Street, NW
Third Floor
Post Office Box 7611
Washington, DC 20044
(203) 305-0466
laura.duncan@usdoj.gov

UNITED STATES ARMY CORPS OF ENGINEERS
GALVESTON DISTRICT, OFFICE OF COUNSEL
BY: JAMES E. PURCELL, ESQ.
2000 Fort Point Road
Suite 369
Galveston, Texas 77550-1229
(409) 766-3822
james.e.purcell@usace.army.mil

* * * * * * *

```
 1                          I N D E X

 2    Witness:   Direct:   Cross:   Redirect:   Recross:   VDire:

 3    East          2171

 4    Deal       2183/2203  2213      2240        2247    2193/2204

 5                 2209                                      2206

 6    Hansmann    2265      2303      2314

 7    Asche       2316      2326    2342/2348     2344

 8    Nakagaki    2350      2374      2383

 9    Fitzgerald  2384      2448      2469        2470

10    Galloway   2472/2535                                  2498

11                        E X H I B I T S

12    Number:         Marked:        Admitted:

13    Joint:

14    54                             2401

15    60                             2404

16    88                             2407

17    146                            2429

18    266                            2295

19    267                            2295

20    268                            2295

21    269                            2295

22    271                            2298

23    272                            2298

24    273                            2298

25    274                            2298
```

Trial

Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                5/15/2019

```
 1                    E X H I B I T S (Continued)

 2    Number:          Marked:           Admitted:

 3    276                                2296

 4    277                                2296

 5    278                                2296

 6    279                                2296

 7    280                                2301

 8    281                                2301

 9    282                                2301

10    283                                2363

11    284                                2364

12    285                                2365

13    286                                2360

14    287                                2366

15    288                                2367

16    289                                2368

17    Plaintiffs':

18    138                                2175

19    139                                2176

20    2205                               2250

21    Defendant's:

22    42                                 2285

23    194                                2416

24    340                                2433

25    360                                2437
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

```
 1                    E X H I B I T S (Continued)
 2      Number:        Marked:          Admitted:
 3      384                             2439
 4      396                             2442
 5      415                             2443
 6      427                             2445
 7      698                             2282
 8      741                             2271
 9      744                             2271
10      745                             2271
11      747                             2271
12      749                             2290
13      752                             2290
14      753                             2290
15      754                             2290
16      756                             2288
17      757                             2288
18      758                             2288
19      759                             2288
20      806                             2361
21      807                             2362
22      815                             2369
23      816                             2372
24      817                             2371
25      818                             2373
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

```
 1                    P R O C E E D I N G S
 2                     *  *  *  *  *  *  *
 3              (Proceedings called to order, 8:29 a.m.)
 4              THE CLERK:  All rise.  The United States
 5   Court of Federal Claims now in session, Honorable
 6   Charles F. Lettow presiding.
 7              THE COURT:  Please be seated.  Good morning.
 8              IN UNISON:  Good morning.
 9              THE COURT:  Mr. Charest, where do we go from
10   here?
11              MR. CHAREST:  Mr. Easterby is about to call a
12   witness.
13              MR. EASTERBY:  Good morning, Your Honor.
14   Plaintiffs would call Mr. Jeffrey East from the USGS.
15              THE COURT:  Thank you.
16              Good morning.  Mr. East, if you would stand
17   right there to be sworn.
18   Thereupon--
19                    JEFFREY WILLIAM EAST,
20   was called as a witness, and having been first duly
21   sworn, was examined and testified as follows:
22              THE WITNESS:  Yes, I do.
23              THE COURT:  Please be seated in the witness
24   stand.
25              Would you kindly state your full name for the
```

 1    record.

 2              THE WITNESS:  Yes.  My name is Jeffrey

 3    William East.

 4              THE COURT:  Thank you.

 5                    DIRECT EXAMINATION

 6    BY MR. EASTERBY:

 7        Q.   Good morning, Mr. East.  I'm sorry you've had

 8    to come back so many times.  We had some scheduling

 9    issues.

10              Could you please tell the Court what you do

11    for a living.

12        A.   I'm a hydrologist.

13        Q.   Are you the water surface specialist for the

14    Texas Water Science Center?

15        A.   Surface water specialist is what we call it,

16    yes.

17        Q.   And what does that job entail doing?

18        A.   The USGS uses standard methods and procedures

19    and policies for the collection of data.  And so it's

20    my job to understand those policies and then to ensure

21    that staff in the USGS Texas Water Science Center

22    follow those methods and policies.

23        Q.   And surface water, does that include things

24    like the Addicks and Barker reservoirs?

25        A.   Yes, sir.

```
 1        Q.    Does the USGS have two gauges inside the
 2   Addicks and Barker reservoirs?
 3        A.    Yes, sir.
 4        Q.    And do you happen to recall what the numbers
 5   of those are?  If you don't, I can show you exhibit to
 6   refresh your recollection.
 7        A.    Yes, sir, I do know those.
 8        Q.    Okay.  Is it correct that Addicks is USGS
 9   8073000?
10        A.    Yes, sir.
11        Q.    And that Barker is USGS 8072500?
12        A.    Yes, sir.
13        Q.    And could you just explain to the Court
14   briefly, how does the USGS equipment out there
15   determine the elevation of the reservoir pools of water
16   surface?
17        A.    So the gauges, there are a variety of
18   sensors, electronic sensors, that will measure the
19   height of the water.  There are actually multiple
20   sensors, so they use different methods.  And then,
21   additionally, we have physical means of measuring
22   manually that we use when we visit the site and can
23   calibrate the electronic sensors.
24        Q.    And I know the Court heard some about this at
25   the site inspection, but I believe you'll have a radar
```

Trial

1    to determine the elevation?

2         A.    Yes, sir.  That is our primary sensor.

3         Q.    Pressure transducer, which forces the bubbles

4    up so you can get an elevation that way?

5         A.    That's correct, sir.

6         Q.    And then you got the old plumb bob, just a

7    weighted line on -- a weighted apparatus on a line you

8    lower into the water; right?

9         A.    Yes, sir.

10        Q.    Okay.  And does USGS regularly go out and

11   inspect and calibrate that equipment?

12        A.    Yes, we do.

13        Q.    Do you believe that the readings that come

14   from the USGS website for those gauges are reliable?

15        A.    Yes, sir.

16        Q.    Okay.  I'd like to turn your attention now to

17   what's been marked for identification as Plaintiffs'

18   Exhibit 138.  And I have a copy for you, Mr. East, if

19   you would like to read along.

20        A.    Thank you.

21        Q.    And, Mr. East, Plaintiffs' Exhibit 138 is a

22   USGS document; correct?

23        A.    Yes, sir.

24        Q.    And you had your deposition taken in this

25   matter?

1          A.    Yes, I did.

2          Q.    By me and Mr. Irvine; correct?

3          A.    Yes, that's correct.

4          Q.    And you were part of the team that put this

5    report together?

6          A.    No, sir.  I reviewed the report, but I did

7    not compile it.

8          Q.    Thank you for the correction.

9                Its title is "Characterization of Peak

10   Extreme Flows and Flood Inundation of Selected Areas in

11   Southeastern Texas and Southwestern Louisiana from the

12   August and September 2017 Flood Resulting from

13   Hurricane Harvey."  Correct?

14         A.    Yes, sir.

15         Q.    And in the deposition we talked about some

16   USGS gauges that are located on some of the incoming

17   tributaries that come into Addicks and Barker

18   reservoirs.

19               Do you recall that?

20         A.    Yes, sir, I do.

21         Q.    And you're familiar with those gauges?

22         A.    Yes, sir.

23         Q.    And you're familiar with the data from those

24   gauges from the Harvey event?

25         A.    Yes, sir.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

 1         Q.   And is that information contained within

 2    PX138?

 3         A.   Data from those gauges are included.

 4              MR. EASTERBY:  Your Honor, we'd move to admit

 5    Plaintiffs' Exhibit 138 into evidence.

 6              MS. DUNCAN:  No objection.

 7              THE COURT:  Thank you, Ms. Duncan.  Admitted.

 8                   (Whereupon, Plaintiffs' Exhibit 138 was

 9                    admitted into evidence.)

10    BY MR. EASTERBY:

11         Q.   Okay.  Mr. East, I would like to turn your

12    attention to page 5 of this exhibit, which has been

13    Bates-stamped USGS0073459.

14              And if you look at the bottom, do you see a

15    gauge on line 35?

16         A.   Yes, sir.

17         Q.   And that's 8072300?

18         A.   Yes, sir, that's correct.

19         Q.   Buffalo Bayou near Katy, Texas; right?

20         A.   Yes, sir.

21         Q.   Do you happen to know where that gauge is,

22    sir?

23         A.   I believe it's near -- to be honest, I don't

24    remember the name of the road, but I have been there

25    physically, yes.  So I know where it's at.

1        Q.    Greenbusch?

2        A.    Yes.  Thank you.

3              MR. EASTERBY:  All right.  Your Honor, I'd

4   like to put up Plaintiffs' Exhibit 139, if I could,

5   just to maybe assist the Court and the witness with

6   locations.

7   BY MR. EASTERBY:

8        Q.    Do you remember me marking this map at your

9   deposition, Mr. East?

10       A.    Yes, sir I do.

11       Q.    And the gauge we just talked about, Upper

12  Buffalo Bayou, 8072300, is over here; right?

13       A.    That's correct.

14       Q.    And you're familiar with that area?

15       A.    Yes, sir.

16       Q.    Does this little icon accurately depict the

17  location of that gauge?

18       A.    Yes, sir, that looks accurate.

19             MR. EASTERBY:  Okay.  And I can run through

20  all of them, but the sake of time, I'm going to offer

21  to admit Plaintiffs' Exhibit 139 into evidence.

22             MS. DUNCAN:  No objection.

23             THE COURT:  Admitted.

24                  (Whereupon, Plaintiffs' Exhibit 139 was

25                   admitted into evidence.)

```
 1   BY MR. EASTERBY:
 2        Q.   Okay.  Mr. East, you know what?  I have a
 3   copy of the map I'm going to tender to you so you can
 4   follow along with it if you'd like.  I made a larger
 5   copy.
 6             MR. EASTERBY:  Your Honor, would you care for
 7   one?
 8             THE COURT:  No.
 9             MR. EASTERBY:  Okay.
10   BY MR. EASTERBY:
11        Q.   All right.  Mr. East, we're back to
12   Plaintiffs' Exhibit 138.  We talked about line 35.
13   Let's talk about line 36, 8072730.  Correct?
14        A.   That's correct.
15        Q.   Bear Creek near Barker, Texas.
16        A.   Correct.
17             MR. EASTERBY:  And could you put up the map
18   again, please, Matt?  I hate to keep popping back and
19   forth.  It's 139.
20   BY MR. EASTERBY:
21        Q.   Okay.  Let's see.  That's up here; is that
22   correct, Mr. East?
23        A.   That's correct, yes, sir.
24        Q.   And have you been to that gauge as well?
25        A.   Yes, sir, I have.
```

1      Q.   It's a little bit north and a little bit west
2   of the West Houston Airport; is that right?
3      A.   I'm not sure where that airport is, to be
4   honest, but on the map -- well, the map, it doesn't --
5   it shows it on the map.  So, yes, compared to that, it
6   does.
7      Q.   Fair enough.  And getting back to
8   Exhibit 138, on line 37 we see 8072760, Langham Creek
9   at West Little York Road near Addicks, Texas; correct?
10      A.   That's correct.
11      Q.   And last time I do the map, I promise you.
12   Is that up here, Mr. East?
13      A.   Yes, sir, that's it.
14      Q.   Now, those three gauges we just talked about,
15   do they measure the flow of stormwater that's going
16   through them?
17      A.   Not exactly, no, sir.
18      Q.   I think I butchered that in the deposition
19   too.
20           Can you explain what they do measure in terms
21   of cubic feet per second?
22      A.   USGS measures the gauge height at the
23   location, how high the water gets above a given datum.
24   And then we physically make discharge measurements at
25   individual points in time.  We use those discharge

1    measurements to develop a relation between the two.

2    And so we compute discharge using that relation, and

3    those are the data that are provided.

4         Q.    And are those the stage-discharge rating --

5         A.    Rating curve.

6         Q.    Stage-discharge rating curves.

7               And so for those three gauges we've

8    identified, were there stage-discharge rating curves

9    done after Harvey in connection with the Harvey event?

10        A.    Measurements were made at each of those

11   sites, yes, sir.

12        Q.    Okay.  Turn, if you would, to page 9 of

13   Plaintiffs' Exhibit 13.  And I really would just like

14   to focus on page 9, this USGS 73463.

15              Let's see.  Line 37, if you could zoom that

16   in, Matt.

17              That's 8072760; correct?

18        A.    Yes, sir.

19        Q.    And I believe we established that's the

20   Langham Creek gauge up there at West Little York?

21        A.    That's correct.

22        Q.    And so up here on the top column, we can see

23   the peak streamflow in feet cubed per second; right?

24        A.    That's correct.

25        Q.    And what -- what value is indicated for that

1    gauge right there in Langham Creek?

2        A.    It's 9,000 cubic feet per second.

3        Q.    And this is in connection with the Harvey

4    event?

5        A.    Yes, sir.  That's the peak value that we

6    determined during that event.

7        Q.    Okay.  It's got the rank of streamflow along

8    all annual peak streamflows; correct?

9        A.    Yes, sir.

10       Q.    And it says three.

11       A.    That's correct.

12       Q.    What does that tell you?

13       A.    That in the period that the USGS has

14   collected data at that location, this will be the

15   third-highest peak discharge that we recorded.

16       Q.    And then the next column is the number of

17   annual peak streamflows in period of record; right?

18       A.    Yes, sir.

19       Q.    So y'all have done 40?

20       A.    That's correct.

21       Q.    And so Harvey was the third highest of the

22   40?

23       A.    That's correct.

24       Q.    Okay.  Then it's got this AEP for observed

25   August 2017 flood; correct?

1        A.    Yes, sir.

2        Q.    AEP is annual exceedance probability?

3        A.    Yes, sir.

4        Q.    What does that mean?

5        A.    That means in any given year, what is the --

6    you know, what is the probability that this discharge

7    will be equal to or exceed it in any given one year.

8        Q.    So -- and I'm a layperson.  I think about,

9    like, 100-year storms would be 1 percent?

10       A.    Yes, sir.

11       Q.    So what does 6.2 percent equate to, if you

12   know, roughly?

13       A.    1 divided by 6.2 basically.  So I'm not quite

14   sure, off the top of my head.

15       Q.    20-, 30-year?

16       A.    Probably 20-year flood.  20, 25 would be my

17   guess.  I'd have to do the math to know for sure.

18             MR. EASTERBY:  Thank you, Mr. East.

19             That's all the questions I have.  I pass the

20   witness.

21             THE COURT:  Ms. Duncan.

22             MS. DUNCAN:  Your Honor, we have no questions

23   for Mr. East.

24             THE COURT:  May the Court excuse Mr. East as

25   a witness?

```
 1              MS. DUNCAN:  Yes.
 2              THE COURT:  Mr. Easterby, may the Court
 3    excuse Mr. East?
 4              MR. EASTERBY:  Yes, sir, Your Honor.
 5              THE COURT:  Mr. East, thank you very much.
 6    Thank you for adding your testimony to the record.
 7              THE WITNESS:  Yes, sir.
 8              MR. EASTERBY:  Your Honor, we would next call
 9    our last witness, Mr. Matthew Deal, who is an expert
10    witness in this case.
11              THE COURT:  How do you spell his last name?
12              MR. EASTERBY:  D-e-a-l.
13              THE COURT:  Mr. Deal, if you would approach
14    the bench, that would be helpful.
15              Would you raise your right hand to be sworn.
16    Thereupon--
17                    MATTHEW C. DEAL,
18    was called as a witness, and having been first duly
19    sworn, was examined and testified as follows:
20              THE WITNESS:  I do.
21              THE COURT:  Please be seated in the witness
22    stand.
23              THE WITNESS:  Thank you.
24              THE COURT:  Would you state your full name
25    for the record.
```

Trial

Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                          5/15/2019

1            THE WITNESS:  My name is Matthew C. Deal,

2    D-e-a-l.

3            THE COURT:  Thank you.

4                    DIRECT EXAMINATION

5    BY MR. EASTERBY:

6        Q.   Mr. Deal, who do you work for?

7        A.   I have my own firm, Deal Sikes.

8        Q.   What does Deal Sikes do?

9        A.   We're a real estate valuation and counseling

10   firm.

11       Q.   Were you engaged in this matter to provide

12   some expert opinions?

13       A.   I was.

14       Q.   Let me hand you what's been marked for

15   identification as Plaintiffs' Exhibit 2205.

16            And no need to show it yet, Matt.  I have to

17   do some foundation here first.

18            Is that a true and correct copy of your --

19   your expert report dated November 5th, 2018?

20       A.   It appears to be, yes.

21       Q.   Okay.  And you did a rebuttal report as well;

22   correct?

23       A.   I did.

24       Q.   In relation to Mr. Landry's --

25       A.   Yep.

1      Q.    -- work?

2      A.    Yes.

3      Q.    We're going to preserve that for later.  So

4    let's just talk about your main report.

5           Please look at your professional

6    qualifications on page 48 of your report if that will

7    help you with your recollection.  I'm going to ask you

8    about your background.  Sorry about the binder clip.

9      A.    That's all right.

10      Q.    Tell us about your education, if you would,

11    briefly.

12      A.    Sure.  I grew up in Houston.  I've been here

13    all my life.  I graduated high school in 1984 and then

14    went to the University of Texas at Austin and graduated

15    in 1988 with a bachelor of arts degree.

16           Shortly after graduating from college, I

17    came -- came back to Houston and started my career as

18    an appraiser.  So I have been appraising properties

19    since 1989, almost 30 years.

20           Then I continued my education over that

21    period of time.  I'm a state-certified general real

22    estate appraiser in Texas.  I'm a member of the

23    Counselors of Real Estate, hold a CRE designation.

24      Q.    Okay.  And CRE, is that an accreditation for

25    appraisers?

1      A.   It's for appraisers.  It's a broader group of

2   about 1,000 international people with that designation.

3      Q.   Do you have any specialized professional

4   competency in the area of real estate

5   appraisal/valuation?

6      A.   I do.  I have appraised virtually every

7   property type for lots of different reasons throughout

8   my career.  Specifically with regard to -- if I can

9   relate it to this assignment, a couple of things that

10   might be of interest, we do -- we do a lot of damage

11   analysis, a lot of before-and-after analysis caused by

12   detrimental conditions, sort of a two -- two buckets, I

13   would put it.

14           Very large amounts of properties -- I cut my

15   teeth on the polybutylene cases way back in the '90s,

16   working on thousands of homes that were damaged by that

17   situation, as well as, in addition to that and

18   throughout my career, class action lawsuits involving

19   thousands of properties in proximity to petrochemical

20   refineries.  Currently working on cases involving

21   environmental contamination in the ship channel.

22           So it's been a constant throughout my career

23   of large litigation assignments involving thousands of

24   properties.  That's one area.

25           And then I -- I have a particular expertise

1   in the Houston market -- 90-plus percent of our work is

2   in the Harris and surrounding counties -- and a

3   particular expertise in the arena of condemnation.

4          We -- we do condemnation work for -- as much

5   as anybody in this area on behalf of property owners,

6   as well as on behalf of condemning authorities

7   exercising their power of condemnation, typical

8   roadways, railways, power lines and pipelines.  We do

9   it all the time.

10     Q.   Have you ever testified as an expert witness

11  in court before?

12     A.   I have testified hundreds of times.

13     Q.   Have you been accepted as an expert witness

14  in those proceedings?

15     A.   Every time, yes.

16     Q.   Okay.  I think you have the Yellow Book

17  underneath that report you got there.

18     A.   I do.

19     Q.   Can you kindly explain -- I call it the

20  Yellow Book.  It's actually got a proper title.  Can

21  you read it out, please.

22     A.   It's the -- it's the "Interagency Land

23  Acquisition Conference Uniform Appraisal Standards for

24  Federal Land Acquisitions."

25     Q.   And just to be real clear for the Court, did

1    you do any actual appraisals so far in this engagement?

2         A.    No, we have not.

3         Q.    All right.  The Yellow Book, what is that

4    about?  What is it for?

5         A.    These are the -- these are the required

6    standards of the federal case, federal acquisition of

7    property, under eminent domain.  It's slightly

8    different than what we do in Texas.  There's a lot of

9    similarities, but there's also a few differences.  This

10   is -- this is the required analysis that needs to be

11   done to do the proper before-and-after appraisals in a

12   federal acquisition.

13        Q.    Okay.  And you understand we're in the

14   liability phase of the case?

15        A.    That's my understanding, yes.

16        Q.    Let's talk about this market study that's the

17   subject of your report.  If you look at the first page

18   that's got November 5th.

19              And, Matt, again, I don't think we need to

20   see it.

21              But it lists six properties there.

22              Do you see that, Mr. Deal?

23        A.    I do.

24        Q.    And just to get a good record on this, you

25   did some analysis regarding the Banker residence,

1    Burnham residence, Giron residence, Stewart residence,

2    Turney residence, and West Houston Airport?

3          A.    That's correct.

4          Q.    Can you please explain to the Court, what is

5    a market study?

6          A.    A market study is an analysis of supply,

7    demand, and prices for -- of a specific property type

8    in a specific area.  It's an appraisal -- Appraisal

9    Institute term of art that we apply in a lot of these

10   types of cases.

11         Q.    When you're going to do an appraisal, do you

12   typically do a market study first?

13         A.    There are -- there are elements of a market

14   study that -- that are certainly part of the appraisal,

15   yes.

16         Q.    Do you need --

17               THE COURT:  Go ahead.  I'm listening.

18               MR. EASTERBY:  I'm sorry, Judge.

19               THE COURT:  I'm wrestling with binders,

20   but...

21               MR. EASTERBY:  Okay.

22   BY MR. EASTERBY:

23         Q.    All right.  Mr. Deal, what factors did you

24   consider in doing the market study that's the subject

25   of your report?

1          A.    Well, the four forces of value -- those are

2    environmental forces, social forces, governmental

3    forces, and social forces -- are always part of any

4    type of valuation but also part of a market study.

5               And so those are elements such as deed

6    restrictions in a given community; demographics,

7    meaning income levels in a certain area; school

8    districts; proximity to amenities; proximity to

9    employment centers; proximity to public roadway

10   infrastructure; things like that.  Those are things

11   that create value in certain areas, and it's no

12   different for this -- for these neighborhoods that

13   we're talking about.

14         Q.    And, Mr. Deal, I believe on your report,

15   pages 1 and 2, you identify 11 numbered paragraphs that

16   sets forth the research that you did in connection with

17   this market study?

18         A.    Yes.

19         Q.    I really don't think we need to go through

20   all of them, but I did want to ask you just a couple of

21   questions.  You talk about deed restrictions.  Here in

22   the Harris County area, do you think deed restrictions

23   are kind of an important factor?

24         A.    They are a big deal in Harris County and the

25   surrounding counties.  We don't have zoning here.  As

```
 1    many people know, Houston is a city without zoning.
 2    Deed restrictions are a very important part of things
 3    that help value.  They create value and support value.
 4         Q.   Just to give the judge some context, if you
 5    think about a community like the Montrose, are those
 6    all deed-restricted communities?
 7         A.   A lot of those areas are not deed-restricted
 8    in Montrose close to downtown.
 9         Q.   So sometimes you'll see an old one-story
10    house, and next to it you'll see a 60-story townhome?
11         A.   That's typical here in Houston, yes.
12         Q.   If you've got a deed-restricted community
13    that's residential, you would or would not see
14    something like that?
15         A.   You would not see that.  You cannot see that.
16    It's not legally permissible.  In appraisal parlance,
17    in the highest and best use portion of a valuation,
18    it's not legally permissible for that to happen in a
19    deed-restricted community.
20         Q.   Okay.  And, in connection with this
21    engagement, did you actually go out and look at those
22    six test properties?
23         A.   We -- we looked at all -- we inspected them
24    inside and out, with the subject that one residence had
25    sold, as we heard yesterday.  So we were not able to
```

 1  get inside that house; we viewed it from the street.

 2  But, for all the other ones, we went inside.

 3      Q.   And I know your report has got a detailed

 4  discussion of the specifics of each test property in

 5  terms of how long they were out of the house and stuff.

 6  The Court's already heard that testimony, so let's not

 7  replow that ground.

 8           Did you talk to any Realtors in doing your

 9  market study?

10      A.   We did.

11      Q.   Anybody in particular that stands out in your

12  mind?

13      A.   Rachel Clark is one that stands out, yes.

14      Q.   What area does she specialize in?  What

15  neighborhood? I guess.

16      A.   The Villages of Bear Creek.  She specializes

17  in that area.

18      Q.   Now, in doing your market study, did you rely

19  exclusively on MLS transactions?

20      A.   We did not, no.

21      Q.   What is an MLS transaction?

22      A.   MLS stands for multiple listing service.

23  It's the Houston Association of Realtors system of

24  putting sales on a database -- or putting listings on a

25  database and, ultimately, when they trade, putting the

Trial

1    sale price so they can be tracked.  Texas -- as I heard

2    earlier, Texas is a nondisclosure state.  You're not

3    required to -- to report sale prices.  But if you enter

4    yourself into -- have a broker or an agent, then the

5    MLS agent puts the information on the website.

6          Q.    And, in doing your study, did you consider,

7    for each test property, the duration and extent of the

8    submergement?

9          A.    We did, yes.

10          Q.    The amount of damage to the structure?

11          A.    Yes.

12          Q.    And the period in which the plaintiffs were

13    unable to use the property?

14          A.    We did, yes.

15          Q.    Okay.  Are you familiar with the Uniform

16    Standards of Professional Appraisal Practice?

17          A.    Yes, I am.

18          Q.    Okay.  In the exercise of USPAP, did you find

19    that the data and research you and your team conducted

20    was sufficient for you to reach some opinions in this

21    matter?

22          A.    Yes.

23          MR. EASTERBY:  Your Honor, we now would

24    tender Mr. Sikes as an expert in real estate appraisal

25    and real estate valuation.

```
 1                 THE WITNESS:  Mr. Deal.

 2                 MR. EASTERBY:  I'm sorry.  Mr. Deal.

 3                 THE WITNESS:  It's happened before.

 4                 THE COURT:  Ms. Tardiff?

 5                 MS. TARDIFF:  I do have some voir dire.

 6                 THE COURT:  I'm sorry?

 7                 MS. TARDIFF:  I do have some voir dire.

 8                 THE COURT:  You have voir dire?

 9                 MS. TARDIFF:  I do.

10                 THE COURT:  Please.

11                      VOIR DIRE EXAMINATION

12    BY MS. TARDIFF:

13         Q.   Good morning, Mr. Deal.

14         A.   Good morning.

15         Q.   Your professional experience, as described

16    here to us this morning, is as an appraiser; correct?

17         A.   That's correct.

18         Q.   And each of the times you've been qualified

19    to testify in court, it has been as an appraiser; is

20    that correct?

21         A.   I think in my deposition I said there may

22    have been a few times where I've -- it's in the realm

23    of valuation and appraisal.  I would agree with you,

24    yes.

25         Q.   Okay.  Very good.  And you've never been
```

1    qualified to testify as an expert in any other field;

2    is that correct?

3         A.    No, I have not.

4         Q.    And you are not an economist; is that

5    correct?

6         A.    I -- as far as economics with regard to the

7    valuation of real property, I study economics, that

8    piece of it.  I don't consider myself to be an

9    economist.

10        Q.    And you did not use regression analysis as

11   any part of your appraisal practice; is that correct?

12        A.    That's correct.

13        Q.    And you're also not an expert in

14   econometrics?

15        A.    That's correct.

16        Q.    And you're not offering any opinion in this

17   case on the cause of flooding to any of the properties

18   that are identified in your report; correct?

19        A.    I am not.

20        Q.    You're also not purporting to be an expert in

21   hydraulics or hydrology here today?

22        A.    I am not, no.

23        Q.    And you're not a professional engineer; is

24   that correct?

25        A.    Certainly not, no.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    5/15/2019

```
 1          Q.    I do want to ask you a couple questions about
 2    your methodology.  You indicated that you're familiar
 3    with the requirements of the Uniform Standards of
 4    Professional Appraisal Practice, which is also commonly
 5    referred to as USPAP; is that correct?
 6          A.    That's correct.
 7          Q.    And are those professional standards that you
 8    apply in preparing appraisals in your work?
 9          A.    It is, yes.
10          Q.    And is it fair to say that the professional
11    standards set forth in USPAP are the standards you have
12    applied in every other case in which you've testified
13    as an expert in court?
14          A.    If I've done an appraisal, then, yes, I'm
15    required to testify -- or required to do the appraisal
16    pursuant to USPAP.
17                If it's outside of appraisal and I've
18    testified, then it's not necessarily -- all portions of
19    USPAP aren't required.
20          Q.    Very good.
21          A.    Certain portions are but not all of them.
22          Q.    Understood.
23                And you've testified here this morning that
24    you did not conduct an appraisal in this case as to any
25    of the properties identified in your report?
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

 1        A.    That's -- that's a fact.

 2        Q.    And, in the report you've identified for us,

 3   you have not done the analysis required to offer an

 4   opinion of market value; is that correct?

 5        A.    That's correct.  I have not done an appraisal

 6   for market value.  I have not done that.

 7        Q.    Okay.  And so you are not offering an opinion

 8   on market value for any property at issue in your

 9   report before Hurricane Harvey; correct?

10        A.    That's correct.

11        Q.    And that same is true for after Hurricane

12   Harvey?

13        A.    That is correct.

14        Q.    And a market study, which is what you did

15   here, is different than an appraisal; is that right?

16        A.    A market study is on the way to an appraisal,

17   but it falls -- it doesn't take the step -- the next

18   step in order to opine on those values before and

19   after.  So it is different -- it's part of an

20   appraisal, but it's not -- doesn't go to the next step.

21        Q.    Exactly right.  It falls well short of that.

22              And the professional standards set forth in

23   USPAP do not apply to a market study such as the one

24   you've prepared in this case; is that correct?

25        A.    As I said, only certain ones do.  Competency

```
 1    is one.  The ethics rule per USPAP is required.  I'm
 2    required to meet those tests.  But there's no standard
 3    rules.  1, 2, 3, 4 do not apply to the market study.
 4    But portions of USPAP, which I have complied with --
 5    competency, ethics -- I've done that.  But the other
 6    ones, there's no -- there's no space for it in the
 7    other part of USPAP.
 8         Q.   Right.  So, aside from competency and ethics,
 9    which we understand, USPAP doesn't set forth a set of
10    professional standards to guide what you've termed as a
11    market study and define how you do it and what should
12    be included in it?
13         A.   I believe that's correct, yes.
14         Q.   And, likewise, you held up a copy of the
15    Yellow Book, the federal standards.  And those
16    standards likewise do not provide a set of guidelines
17    or methodology for a market study such as what you did
18    here?
19         A.   They do not.  This is -- before and after
20    appraisal that we've talked about, this is what this is
21    about.  And we're not at that phase, I understand, of
22    this case.  And so we haven't done that.
23         Q.   And your market study, as you described here
24    today, involves selecting, for each of the residential
25    properties, at least one set of comparable -- what you
```

1    call comparable transactions pre-Harvey and another set

2    of comparable transactions post-Harvey; is that

3    correct?

4         A.   That's correct.

5         Q.   And your market study does not make any

6    adjustments to those comparable transactions; correct?

7         A.   That's fair.  Yes.

8         Q.   And you cannot say that you would have even

9    used any of these comparable transactions had you

10   actually performed an appraisal; is that correct?

11        A.   I think I told you in my deposition that,

12   very likely, some of them would have been but some of

13   them may not have been.

14        Q.   And you can't say until you actually do that

15   analysis?

16        A.   That's fair.  Yes.

17        Q.   And in your post-Harvey comparable

18   transactions, you had sales prices of homes that are

19   gutted, remediated, and remodeled; is that correct?

20        A.   I think there might be another category.

21        Q.   There might be.

22        A.   But those are three of the categories, yes.

23   I think there's a category for wet, I think we called

24   it, but --

25        Q.   There is, sir --

1            THE COURT:  I'm sorry.  What was the latter
2    category, Mr. Deal?
3            THE WITNESS:  Wet.
4            THE COURT:  Wet.
5            MS. TARDIFF:  Yes.
6    BY MS. TARDIFF:
7        Q.    So, in order, wet, gutted, remediated, and
8    remodeled, four different groupings.
9        A.    Yeah.  Just to be specific, the last one is
10   not remodeled, renovated, but I think it's the same
11   thing.
12       Q.    Thank you for that clarification.
13           And, again, your market study method doesn't
14   make any effort to adjust the sales data for those
15   different conditions; correct?
16       A.    It does not, no.
17       Q.    And you would agree that, in an appraisal
18   analysis, an appraiser would have to adjust for
19   postflood conditions -- be it wet, gutted, remediated,
20   or renovated -- before applying a transaction to a
21   property being appraised and valued?
22       A.    It would require adjustment for those
23   characteristics as well as a multitude of other
24   characteristics, yes.
25       Q.    Exactly right.  So your market study, as I

 1    understand, simply reports a low, high, average, and

 2    medium numbers based on selected raw sales data; is

 3    that right?

 4         A.    That's correct.

 5         Q.    And you have never done a market study like

 6    the one you did here in another case involving

 7    flooding; is that right?

 8         A.    Involving flooding?  No.  Other types of

 9    cases but not flooding.

10         Q.    And your firm, Deal Sikes, has also never

11    done a market study like the one you've done in this

12    case in another case involving flooding; is that right?

13         A.    Involving flooding specifically, no.

14         Q.    And you've never testified in court as an

15    expert witness based solely on a market study like the

16    one you've prepared in this case; is that correct?

17         A.    I'm trying to remember whether I have or not.

18    I don't recall, sitting here.

19         MS. TARDIFF:  And so, Your Honor, based on

20    that, Mr. Deal may certainly be qualified to offer an

21    opinion of market value based on an appraisal.  But, as

22    he's acknowledged, he has not done that in this case.

23         We would oppose plaintiffs' request to

24    qualify Mr. Deal as an expert under Rule 702 for the

25    purpose of -- purposes of offering opinion testimony

1    based on a market study that is not based on any

2    specified principles or methods.

3              THE COURT:  Mr. Easterby, may the Court ask a

4    question of Mr. Deal before we turn back to you?

5              MR. EASTERBY:  Yes, sir.

6              THE COURT:  Mr. Deal, you said you had a

7    special qualification, and it was three initials.  What

8    was that qualification?

9              THE WITNESS:  It's -- I'm a member of the

10   Society of Real Estate Counselors.  CRE is what that

11   is.

12             THE COURT:  What does that qualification

13   entail?

14             THE WITNESS:  That is an invitation-only

15   organization for people -- professionals in the real

16   estate world, a lot of appraisers that provide

17   independent counseling to property owners or to any

18   client, that's not specific to valuation but

19   specific -- but for any type of -- of advice,

20   nonbrokerage-type advice to -- to any client.

21             THE COURT:  Which body or entity gives or

22   authorizes that -- that designation?

23             THE WITNESS:  That is an independent

24   organization, the Society of Real Estate Counselors.

25   They're out of Chicago.  And, like I said, there's

1    about 1,000 of us internationally, mostly in the United

2    States.

3            THE COURT:  But you had indicated also you

4    have given -- I'm not sure you've given advice -- you

5    have prepared studies of damaged properties.  What

6    kinds of damaged properties?

7            THE WITNESS:  On the cases -- the situations

8    I described earlier were primarily residential

9    properties in these events that occurred.

10           As an example, the polybutylene plumbing

11   cases; the Colonial pipeline that exploded many years

12   ago in the San Jacinto River, and then this litigation

13   involving properties being proximate to that.  Those

14   are thousands of residential properties.

15           And we're currently working on similar cases

16   in the ship channel of Houston that have alleged --

17   different cases that have alleged contamination of

18   residential -- large amounts of residential property.

19           THE COURT:  Have you testified as an expert

20   in any of those situations?

21           THE WITNESS:  I have not yet.

22           THE COURT:  Yet.

23           THE WITNESS:  I'm about to, but ...

24           THE COURT:  Mr. Easterby?

25           MR. EASTERBY:  Your Honor, we offer Mr. Deal

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

 1   on the severity element.  And I do believe he has
 2   testified in prior cases about damage to property
 3   specific to condemnation and I think maybe even an
 4   inverse condemnation case.
 5              THE COURT:  You may ask Mr. Deal.
 6              MR. EASTERBY:  Okay.
 7              DIRECT EXAMINATION (Continued)
 8   BY MR. EASTERBY:
 9       Q.   Mr. Deal, in your prior work, have you
10   testified as an expert in condemnation cases?
11       A.   On many occasions, yes.  Hundreds of times.
12       Q.   I believe, in your CV, you have an article --
13   let me find it.
14              "Highest and Best Use in the Role of the
15   Dominant Estate in a Condemnation Case," under
16   "Publications and Presentations."
17              Oh, I'm sorry.  I'm looking at your partner's
18   resumé.  Here we go.  Even better.
19              Let's see.  On yours, "Case Studies in
20   Condemnation Litigation."  Do you see that?
21       A.   Yes.
22       Q.   The next one above that, "Eminent Domain, the
23   Government's Most Awesome Power Over Private Property."
24       A.   Yes.
25       Q.   And so have you done prior expert testimony

1   about the effects of contamination on real property

2   value as an expert?

3       A.   I have, yes.

4            MR. EASTERBY:  Your Honor, we would renew our

5   tender.

6            THE COURT:  Now, specifically, what are you

7   asking the subject matter of the expert testimony to

8   be?

9            MR. EASTERBY:  Specifically, Your Honor --

10           THE COURT:  Real estate appraisal is not

11  going to do it in this particular case.  Real estate

12  valuation might.

13           MR. EASTERBY:  Real estate valuation.  And

14  it's really severity, Your Honor.  So real estate

15  valuation and severity.

16           THE COURT:  We could say real estate market

17  studies and real estate valuation.

18           MR. EASTERBY:   Real estate market studies and

19  real estate valuation, we would tender him on those

20  subjects, Your Honor.

21           MS. TARDIFF:  May I ask one follow-up, Your

22  Honor?

23           THE COURT:  Yes.

24                 VOIR DIRE EXAMINATION

25  BY MS. TARDIFF:

Trial

 1          Q.   So, Mr. Deal, in the instances that

 2   Mr. Easterby just asked you about, where you have

 3   testified, be it in condemnation cases or otherwise,

 4   and provided analysis with respect to -- a damages

 5   analysis.  You mentioned detrimental conditions.

 6          In each of those instances, you did an

 7   analysis that involved a before-and-after opinion --

 8   appraisal that allowed you to reach an opinion as to

 9   value; correct?

10          A.   That's correct.  Yes.

11          MS. TARDIFF:  Your Honor, we stand by our

12   objection with respect to the qualifications, given the

13   testimony regarding the lack of methodology as to a

14   market study and what can be done with that.

15          THE COURT:  Ms. Tardiff, I have a set of

16   further questions.

17          Sorry to take your time for this exercise.

18          But Mr. Deal has just testified he applied

19   USPAP insofar as the steps leading up to an appraisal.

20          Do you -- did you hear that?

21          MS. TARDIFF:  I heard only that he honored

22   USPAP with respect to competency and ethics and -- and

23   not --

24          THE COURT:  That is not what I heard.  So why

25   don't you -- you have the ability to ask Mr. Deal

 1    further questions.

 2                    VOIR DIRE EXAMINATION

 3    BY MS. TARDIFF:

 4        Q.    So, Mr. Deal, with respect to USPAP, you

 5    identified for us that USPAP does have a set of

 6    standards that apply to an appraisal; correct?

 7        A.    That's correct.

 8        Q.    And if you are preparing an appraisal in

 9    accordance with those standards, there is -- there is a

10    lengthy list of requirements that have to go into an

11    appraisal report; correct?

12        A.    There are, yes.

13        Q.    And your market study does not include all of

14    those elements; correct?

15        A.    My market study could be part of the

16    appraisal.  And they would all comply with what's

17    required under Standard Rule 1 of USPAP to reach an

18    opinion of market value.

19              So it would be -- those -- all those elements

20    would be part of an appraisal.  They would be inside

21    the appraisal.  But the piece that hasn't been done is

22    the final opinion of market value that would be reached

23    upon analysis of this market study.  We -- we stopped

24    short of ultimately opining on an opinion of value, as

25    I've said today.  All those steps would be part --

Trial

 1    would be part of an appraisal.

 2         Q.    So you have what is really the very -- maybe

 3    the first step in terms of gathering information; but,

 4    beyond that, your market study goes no further;

 5    correct?

 6              You have not taken even the select sales

 7    you've looked at and done any kind of an adjustment, as

 8    you would be required to do under USPAP, to do a

 9    comparable sales analysis; correct?

10         A.    To -- to reach an opinion of market value, we

11    did not take -- we were not asked to take that final

12    step, and we did not.

13         Q.    Well, it's more than just the final step.

14    There are several interim steps that need to be taken

15    in order for you to be able to offer any opinion of

16    value in compliance with USPAP; correct?

17         A.    Many steps have been taken:  Analysis of the

18    market area in which it's located, researching the deed

19    restrictions, all the forces of value that I've

20    described, proximity to amenities or -- all those

21    things, demographics, all of those things are part

22    of -- would be part of an appraisal.

23              Selection of sales, we've had a lot of sales

24    in here.  It's -- the winnowing of the sales, the

25    adjustment of the sales, and the opinion of value has

 1      not been done, as I've stated.

 2          Q.   So all your market study does is collect some

 3      raw sale prices in before-and-after and present those

 4      in a table with -- with a low, high, medium, and

 5      average with no further analysis as to whether those

 6      listed sales would in fact be comparable sales in

 7      the -- in -- under USPAP for the purpose of coming up

 8      with an opinion of value?

 9          A.   I don't know -- no, that's not right.

10               As we talked about, we researched hundreds of

11      transactions in these markets.  We threw a very wide

12      blanket, hundreds of transactions.

13               And we did cull those down into what we

14      believe were the most comparable sales to each of these

15      test properties before and after.  And so we're not

16      looking at, just willy-nilly, all kinds of data.  We

17      have narrowed it down to what we believe are comparable

18      transactions.

19          Q.   But you have not taken the next step of

20      looking at those transactions that you've listed and

21      determining whether these would, in fact, be sales that

22      you would use if you did a full-blown comparable sales

23      analysis in compliance with USPAP in order to come up

24      with an opinion as to value; correct?

25          A.   There would be an additional step to select

1    those that are the most comparable in order to do

2    appraisals.

3            MS. TARDIFF:  Your Honor, we stand by our

4    objection with respect to qualifications as to what

5    Mr. Deal has actually performed here today and lack of

6    methodology.

7            THE COURT:  Those objections are not well

8    taken.  The Court qualifies Mr. Deal as an expert in

9    real estate market studies and real estate valuation.

10           DIRECT EXAMINATION (Continued)

11   BY MR. EASTERBY:

12       Q.   Okay.  Mr. Deal, this market study we've

13   heard so much about, what was its overall purpose?

14       A.   The purpose of the market study is to opine

15   as to the severity of the interference caused by the

16   inundation of waters on the -- on the test properties.

17       Q.   Yes, sir.

18           And, to reach those opinions, you -- you went

19   out and did detailed reviews and analysis of those test

20   properties?

21       A.   I did, yes, as I described earlier.

22       Q.   So, I mean, I know this sounds like a dumb

23   and obvious question, but do you have any opinions as

24   to whether the submergence and resulting damage to

25   those test properties interfered with the owners' use

1    of their properties?

2         A.    Significantly interfered.  Significant.

3         Q.    Okay.  Do you have any opinions as to whether

4    the test properties suffered any permanent damage from

5    being submerged by those floodwaters?

6         A.    They did suffer permanent damage, damage that

7    wouldn't be healed by itself.  It would require

8    significant amount of investment and risk of capital in

9    order to get them all the way back to be able to be

10   habitable.

11        Q.    And, Mr. Deal, if you look at page 2 of your

12   report --

13        MR. EASTERBY:  And, Your Honor, we would move

14   to admit Plaintiffs' Exhibit 2205 into evidence at this

15   time.  It is his report.

16        THE COURT:  The Court reserves.

17        MR. EASTERBY:  Okay.

18   BY MR. EASTERBY:

19        Q.    If you look at page 2, Mr. Deal, I believe

20   you've got --

21        I don't think you should show it yet, Matt,

22   since the judge has reserved.

23        But can you tell us what your overall opinion

24   was regarding these test properties.

25        A.    That the inundated properties suffered a

1    significant diminution in price levels caused by this

2    inundation.

3         Q.   I mean, just in real simple terms, before

4    Harvey, they are homes and a terminal building; right?

5         A.   Correct.

6         Q.   After Harvey, what are they?

7         A.   They're -- there's chaos.  Flooded

8    properties, significantly damaged properties, unusable

9    properties in a market in disarray.

10        Q.   And do you think that the damage to them had

11   any kind of effect on their value?

12        A.   Yes, I do.  Yes.  Without question.

13        Q.   Okay.  Can you -- without trying to quantify

14   it, since that's not what you're trying to do, but just

15   describe in your own words, what kind of impact did

16   those test properties that were inundated by the

17   impounded floodwaters suffer?

18        A.   Well, before -- before the event -- as an

19   example, in the Banker residence in Kelliwood, you're

20   looking at average home prices of $560,000 in that

21   area, as high as $700,000; and then after, even houses

22   that were renovated, the average price is 425,000

23   roughly dollars.  So we're talking about -- and those

24   that weren't renovated, significant reductions,

25   50 percent and more than what existed before the event.

1          So we're talking about precipitous price

2   drops across the board.

3          Q.   Were you here when Ms. Burnham testified?

4          A.   I was.

5          Q.   And did you hear what she paid for her house?

6          A.   My memory is it's 160 or $165,000.

7          Q.   Second one.  Do you remember what she sold it

8   for?

9          A.   My memory is $80,000.

10         Q.   So as a percentage, that's over 50 percent?

11         A.   Just over half, yes.

12         Q.   Okay.  And just for the Court's benefit, if

13  you flip through your report, it appears you got a

14  detailed analysis and recitation of each of these test

15  properties we described; is that right?

16         A.   That's correct.

17              MR. EASTERBY:  Your Honor, we would move to

18  admit his expert report, which is Plaintiffs'

19  Exhibit 2205, into evidence.

20              THE COURT:  Court reserves.

21              MR. EASTERBY:  Okay, Your Honor.

22              Thank you for your time today.  That's all

23  the questions I have.

24              THE WITNESS:  Thank you.

25              THE COURT:  Ms. Tardiff.

```
 1              MS. TARDIFF:  Thank you.
 2                   CROSS-EXAMINATION
 3  BY MS. TARDIFF:
 4       Q.   All right.  Mr. Deal, I want to start with
 5  one of your statements in response to Mr. Easterby's
 6  question that indicated that you are offering an
 7  opinion that the flooding had an impact on the value.
 8              Did I hear that correct?
 9       A.   You did.
10       Q.   And didn't you tell me earlier in response to
11  my questions that you had not conducted an appraisal
12  here to allow you to reach an opinion in accordance
13  with USPAP, or the Yellow Book for that matter, on
14  value?
15       A.   The specific values of specific properties, I
16  have not.
17       Q.   Okay.  So you have not -- in doing the market
18  study, you have not correlated, with respect to each of
19  the five residential properties discussed in your
20  report, these prices you've selected with the actual
21  test property in order to arrive at an opinion of
22  value?
23       A.   That's correct.
24       Q.   So we've already discussed the fact that your
25  market study is not an appraisal and, as you just
```

1    indicated, is not the basis for offering an opinion of

2    market value, but I do want to discuss a few more

3    aspects of your market study.

4              And, if we can, let's use -- I think you

5    discussed the market value -- excuse me -- the market

6    study for the Banker property just a moment ago.

7              So why don't we pull that up, and that's on

8    page 3 and 4 of your report.

9         A.    Yes.  I'm there.

10        Q.    So if we start with your comparable

11   transactions before the flood, which is on page 3, the

12   tables labeled both "Comparable Transactions Before the

13   Flood" and "Improved Sales Comparison" -- or excuse

14   me -- yes, "Improved Sale comparables."  Correct?

15        A.    That's correct.

16        Q.    Okay.  And just to reemphasize and be clear

17   here, this is not the same thing as a comparable sales

18   analysis that might be included in an appraisal to

19   arrive at an opinion of value; correct?

20        A.    That's correct.

21        Q.    And is it fair to say that, if you were asked

22   to prepare an appraisal of, here, the Banker residence

23   at 4614 Kelliwood Manor Lane in Katy and we were

24   looking for comparable sales prior to the flood, again,

25   these five sales would not necessarily be the same

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1    sales you would select for the purposes of preparing an

2    appraisal and offering an opinion of value; correct?

3        A.    Not necessarily, but they would be on the

4    final list for sure.

5        Q.    Okay.  And even if you used one or more of

6    these listed sales as part of a comparable sales

7    analysis in an appraisal, you would still need to go

8    through the process of determining whether any

9    adjustments needed to be made to the sales; correct?

10       A.    Without question, yes.

11       Q.    Okay.  And those adjustments you -- you'd

12   indicated earlier, there are many of them that have to

13   be considered, but those would include adjustments for

14   factors such as the time of the sale, the size of the

15   lot, the size of the home, condition of the home,

16   quality of the schools, which we heard a lot about over

17   the last week, and location; correct?

18       A.    And other things.

19       Q.    And other things.

20       A.    Beds, baths, other amenities of the home,

21   things of that nature.

22       Q.    And, again, that analysis was not done here?

23       A.    That's correct.  An appraisal analysis was

24   not done.  These sales were selected in this analysis

25   because they did share comparability to the subject

 1    property, but they weren't adjusted, as we've described

 2    many times this morning.

 3         Q.   Okay.  So, for example, if we stick with the

 4    Banker table and look at Sale No. 2 and -- for the

 5    before, which is the home on 4503 Kelliwood Grove.

 6         A.   Yes.

 7         Q.   So that's your highest listed sales price for

 8    this table at $715,000; correct?

 9         A.   It is.

10         Q.   And that home is almost 1,000 square foot --

11    square feet bigger than the Banker home.

12         A.   It is.  I'd have to look at the Banker sheet

13    to confirm that.

14         Q.   And I think I can refer you to page 14 of

15    your report.

16         A.   It is, yes.

17         Q.   Okay.  And -- and --

18              THE COURT:  Ms. Tardiff, sorry.  I am trying

19    to find page 14.

20              MS. TARDIFF:  That's okay.

21              THE COURT:  May the Court ask a really quick

22    question, Ms. Tardiff?

23              MS. TARDIFF:  Yes.

24              THE COURT:  "Gross liveable area" is defined

25    in what way, Mr. Deal?

 1            THE WITNESS:  It's air-conditioned space.  It
 2    does not include the garage.  It's inside the house,
 3    air-conditioned space.
 4            THE COURT:  All right.  In Houston I can
 5    understand why you would want to define it that way.
 6            THE WITNESS:  Yeah.
 7            THE COURT:  Okay.  So it doesn't include, I
 8    guess, work areas or other areas that are -- might be
 9    associated with the garage?
10            THE WITNESS:  Screened-in porches.  We have a
11    lot of screened porches.  We have a lot down here
12    because of mosquitoes.  That would not be in that --
13            THE COURT:  Thank you.  That helps.
14            THE WITNESS:  -- that calculation, yes.
15            THE COURT:  And the Banker property is a
16    little over 4,000 gross.
17            THE WITNESS:  Square feet of air-conditioned
18    interior space.  Yes, yes.
19            THE COURT:  Thank you.
20    BY MS. TARDIFF:
21        Q.   And so for the Banker property on page 14,
22    you've got a list of information that you used.
23        A.   That's correct.
24        Q.   Okay.  And in terms of gross liveable area,
25    that's the same number you're using in your table --

1      A.    Yes.

2      Q.    -- for the other properties?  Okay.

3            And then, if we stick with Sale No. 2 that

4  you used, that lot size -- is also for sale too -- is

5  almost double the lot size of the Banker property;

6  right?

7      A.    It's much larger -- much larger lot, yes.

8      Q.    So you're not suggesting here today that, if

9  you did a comparable sales analysis for the purpose of

10  doing an appraisal, that you would necessarily use

11  Sale 2 in an appraisal given -- given the differential

12  in the gross living area and the lot size?

13      A.    I'm not saying I wouldn't -- I would use it,

14  and I'm not saying I wouldn't use it in an appraisal.

15  It would have to be studied more.

16      Q.    Okay.  But your last listed sale price for

17  the Banker property on page 14 on July 27th, 2007, so

18  the same year as that Sale 2, was $447,284.

19      A.    That's not correct.  You just said the same

20  year.  That was ten years prior.

21      Q.    I'm --

22      A.    That's -- that's a totally -- that sale would

23  not be -- the sale of the Banker residence in 2007

24  would not be considered in any analysis that I would do

25  for date of value of September of '17.

1      Q.   Understood.  Thank you for that

2  clarification.

3           But it stands that still that Sale No. 2 at

4  the price listed, you can't say here today that you

5  would definitely use that sale if you were to do an

6  appraisal of the Banker property before the Harvey

7  flooding?

8      A.   As I stated a moment ago, that's correct.

9      Q.   And, in fact, even if that Sale No. 2 were to

10  be used, it would have to be adjusted downward because

11  of the differential in gross living area and lot size?

12     A.   I haven't done that analysis.  You're asking

13  me a question.  I think the answer is, yes, it would

14  have to be adjusted down.

15     Q.   Let's take a look at -- sticking with Banker

16  and your comparable after the flood.

17     A.   Yes.

18     Q.   And your approach to preparing this

19  comparable transactions after the flood table is -- is

20  the same approach you described for the before.

21     A.   Yes.

22     Q.   And, again, you simply select -- listed some

23  select sales for the time period after the flooding --

24     A.   That's --

25     Q.   -- to show some variation in prices based on

1    these different conditions.  Here we have gutted,

2    remediated, and renovated; correct?

3         A.   That's correct.

4         Q.   Once again, your report does not contain the

5    analysis required to determine if you would use any of

6    these sales if you were to do a comparable sales

7    analysis for the Banker property after the flooding?

8         A.   I think it would include these sales, but

9    maybe not all of them, I think is more fairly stated.

10        Q.   Okay.  And so for your tables of comparable

11   transactions after the flood, you've identified that

12   you -- you used four different categories; there's only

13   three here.  But those four -- four categories were

14   wet, gutted, remediated, and renovated; is that

15   correct?

16        A.   That's correct.

17        Q.   And, Mr. Deal, along that spectrum of

18   different conditions, you used "wet" to mean that a

19   house is sold as is; is that correct?

20        A.   That's correct.

21        Q.   Meaning the floodwaters have receded but

22   there's no remediation of the property?

23        A.   That's correct.

24        Q.   And so flood-damaged floors and walls all

25   remain intact?

1          A.    That's correct.

2          Q.    And on the other end of the spectrum, you

3     used "renovated" to mean that a property has been

4     gutted, remediated, and repaired to its preflood

5     condition; is that correct?

6          A.    Not -- not necessarily, no.

7          Q.    Okay.  What do you mean when you use

8     "renovated" in your report?

9          A.    That the property has been returned to be

10    habitable, that people can actually live there.  But we

11    found oftentimes there was wide ranges of renovation.

12    So sometimes well beyond what existed prior to the

13    flood, there's been renovation done.  So it's a wide

14    variety, not -- not just back to what it was, which was

15    your question.  That's not the case.

16         Q.    Okay.  So there are variations and, in some

17    cases, there are actually improvements beyond what the

18    home was before the flood?

19         A.    That's correct.

20         Q.    And, not surprisingly, I think what you

21    stated here today, if I understood it and what's in

22    your market study, the raw sales data indicate that

23    properties that are sold in the wet or gutted condition

24    after the flooding sell for less than what you've

25    identified as similar properties that have been

1   repaired and renovated; is that correct?

2       A.   Not surprisingly, yes.

3       Q.   So let's turn in that regard to your market

4   study for the Stewart property and look at the "after

5   the flood" table that's on page 10 of your report.

6            And are you at that page, sir?

7       A.   I am.

8       Q.   Okay.  And so, again, this is your comparable

9   transactions after the flood for the Stewart residence

10  at 4719 Eagle Trail Drive; is that correct?

11      A.   That's correct.

12      Q.   And you do list one sale here for a home that

13  you identify as wet at the time of sale; is that

14  correct?

15      A.   It appears so, yes.  And you can see the

16  price, yes.

17      Q.   And that's -- that's No. 9, and that sale

18  price listing on your table is at $70,000.  And that is

19  the lowest sale on this table; correct?

20      A.   It makes sense.  Yes, it is.

21      Q.   And the two highest sale prices on the same

22  table are Sales 1 and 2, which are the two renovated

23  homes; is that correct?

24      A.   That's correct.

25      Q.   And what are sales prices of those two

1    renovated homes as reported in your market study?

2        A.    $195,000 and $170,000.

3        Q.    And if we flip back to page 9, which is your

4    comparable transactions before the flood also for the

5    Stewart property.

6              Are you there?

7        A.    I am.

8        Q.    And you see here that those two postflood

9    homes that were renovated before their sale both sold

10   at prices above your listed preflood median and average

11   price; is that correct?

12       A.    That's correct.

13       Q.    And so the raw sales prices that you have

14   included here, at least in Mr. Stewart's neighborhood,

15   suggest that, once a home is repaired and renovated,

16   those homes are selling at prices that are comparable

17   in some respects to preflood prices; is that correct?

18       A.    I wouldn't phrase it that way.  These --

19   these are homes that have been -- had significant

20   renovation.  And, in fact, I believe No. 1 on Tumbling

21   Rapids, granite countertops throughout the house and

22   bathrooms, major renovations to get it to that price of

23   a hundred and roughly ninety-five thousand dollars,

24   major renovations.

25              And so now you've got an essentially new home

1    competing against homes that were built in 1977.  You

2    would expect it to be at a higher price.  And so it's

3    not a fair comparison to say that everything is okay;

4    it's back to normal.

5         Q.   Well, and your report doesn't give us the

6    details on the level of renovation as to any of the

7    sales listed here; correct?

8         A.   I'm sorry.

9         Q.   Your -- in your report and on your tables, we

10   don't have that detail on the level of renovation in

11   any of these properties?

12        A.   That's correct.  It's -- it's available.

13   It's not -- it's not in this table.

14        Q.   But you would agree with me, would you not,

15   that at least this information indicates that, if flood

16   damage is repaired and a home is renovated, that the

17   sale price is going to be higher than if a home is sold

18   in its wet condition or just a gutted condition?

19        A.   I would absolutely agree with that, yes.  And

20   that's evidenced throughout my report.

21        Q.   And Mr. Easterby asked you about a -- the

22   purchase and post-Harvey sale of Ms. Burnham's property

23   in the Villages of Bear Creek; correct?

24        A.   He did.

25        Q.   And you were here for Ms. Burnham's

1    testimony?

2         A.    For most of it, yes.

3         Q.    For most of it.  And she testified, as

4    Mr. Easterby relayed, that she had purchased the

5    property, I think it was between 160, $165,000,

6    somewhere in that range.

7         A.    That's my memory, in 2014 maybe, I believe,

8    but I don't recall exactly.

9         Q.    And she sold it after the Harvey flooding to

10   Giering Investments for $80,000; correct?

11        A.    Yes, that's correct.

12        Q.    Okay.  And she testified for us here this

13   week that she sold the home in gutted condition;

14   correct?

15        A.    That's what I heard, yes.

16        Q.    So she had removed the wet walls, floors,

17   that kind of thing, but had not done any repairs?

18        A.    That's my understanding, yes.

19        Q.    And, as part of your market study, have you

20   gone back and looked at the subsequent sale of

21   Ms. Burnham's former property after it was repaired and

22   put back on the market?

23        A.    I don't recall whether I have that

24   information.  I just don't know.

25        Q.    Would you expect, though, if the property had

 1    been repaired and then put back on the market, it would

 2    sell for higher than the $80,000 that Ms. Burnham sold

 3    it to Giering Investments?

 4          A.    I would certainly expect that, yes.

 5          Q.    And for the Burnham property, again, you have

 6    not done an appraisal that allows you to offer an

 7    opinion of value as to that property immediately before

 8    Harvey, immediately after Harvey, or at a subsequent

 9    date after it was repaired?

10          A.    As I've stated, I have not done that

11    analysis.

12          Q.    And, sir, your report does not attempt to

13    ascertain the actual flood damage to any of the five

14    residential properties that you were asked to look at;

15    correct?

16          A.    The actual flood damage, it does not, no.

17          Q.    And in this market study, you have not

18    developed and are not offering opinion on whether there

19    is a permanent risk of flooding that has an impact on

20    the market value of these homes; is that correct?

21          A.    I think I'm hearing your question that

22    would -- that would require Uniform Appraisal Standards

23    for Federal Land Acquisitions before and after, taking

24    into consideration project-to-project influence rule,

25    and a lot of other things.  That is an unknowable

1    question right now, or there's -- there's no way to

2    answer that question, and I have not done that

3    analysis.

4          It's -- it's an unknowable -- it's an

5    unknowable answer.  I can't -- you can't get to that

6    right now today.  In this phase, you can't get to that

7    answer.

8      Q.   Well, and as an expert in the Houston area

9    market, having conducted appraisals here for 30 years,

10   you have -- you have seen this market, the housing

11   market in particular, respond to flooding events over

12   time; correct?

13     A.   I have -- I have experienced many flooding

14   events, and I've seen markets.  Yes, I have.

15     Q.   And those markets fluctuate immediately after

16   a flood event, and then that -- there are changes

17   subsequent to that as the market recovers, as homes are

18   repaired and put back on the market in repaired

19   condition; correct?

20     A.   There -- there may be.  It depends.  Every

21   situation is different.  Every property is different.

22   Every event is.

23     Q.   Okay.

24     A.   This one is very different.

25     Q.   And, again, you have not done the analysis

1    that would allow you to offer an opinion on those

2    changes in the market immediately after the flood and

3    in the month subsequent?

4         A.   Again, that would require before-and-after

5    appraisals pursuant to federal guidelines, which can't

6    be done currently.  And we would do that if asked to in

7    the next phase.

8         Q.   I want to ask you a couple of questions about

9    West Houston Airport.  That is identified as one of the

10   properties you looked at at the beginning of your

11   report, but you have not actually done one of these

12   market studies for West Houston Airport; is that

13   correct?

14        A.   We've not done -- one of these sales, before

15   and after, we have not looked at that, that's correct.

16        Q.   And so the conclusions that are stated in the

17   beginning of your report based on market study don't

18   apply to West Houston Airport; is that correct?

19        A.   Well, as it relates to our understanding that

20   there was inundation of that property that interfered

21   with the use -- continued use of the West Houston

22   Airport, that's a fact.

23             That there was some substantial damage,

24   physical damage, permanent damage that wouldn't heal

25   itself, that's a fact.

```
 1              As far as the transactions -- and those are
 2     my opinions as it relates to the West Houston
 3     Airport -- we have not done -- we have not done the
 4     transactions -- before-and-after transaction of
 5     airports specific to your question.
 6         Q.   So those opinions, as you framed them with
 7     respect to West Houston Airport, though, are simply a
 8     reiteration of what the Lesikars -- Ms. Stacy Lesikar
 9     and Woody Lesikar -- testified as to the impact of the
10     floods on their property; correct?
11         A.   That's the first time I've heard them speak
12     on the issue.  I just -- I know what I know about it.
13     I was there and I saw it.  And I think I can provide
14     that opinion about that issue.
15         Q.   But you haven't done -- for each of the
16     residential properties, you did what you described here
17     and we've seen as a market study.  You did not do a
18     market study for West Houston Airport; correct?
19         A.   That's -- that's fair, yes.
20         Q.   I want to turn briefly just to the second
21     section of your report, which begins on page 13.  And
22     we already looked at page 14, which relates to the
23     Banker residence.
24              I'll give you a moment to turn there, sir.
25         A.   I'm there.
```

1      Q.   So the second section of the report,

2  beginning on page 13, includes some information about

3  each of the six properties that are identified in the

4  beginning of your report; is that correct?

5      A.   That's correct.

6      Q.   And we already identified on page 14, for the

7  Banker residence, you have just a summary of basic

8  information about that property; correct?

9      A.   That's correct.

10      Q.   And is that basic information what allowed

11  you to go out and opine what you've identified as

12  comparable sales and sale prices in your market study?

13      A.   I'm sorry.  I'm on page 14.

14           Yes, that -- that provides information

15  about -- we talked about the size of the property, the

16  lot size and things of that nature, beds and baths.

17  This -- this allows you to go into the market and find

18  the property, find the market area which it's located,

19  and analyze comparable market data.

20      Q.   Okay.  And if we turn to page 15, there is

21  a -- a written area of the Banker property and -- with

22  a couple of pictures; is that correct?

23      A.   That's correct.

24      Q.   And that one-page summary with the pictures

25  was provided to you by counsel; correct?

```
 1       A.   I believe the -- the words were.  And the
 2  photographs, we took a bunch of photographs.  These may
 3  or may not be photographs provided to us.  I don't
 4  remember.  But the -- but the written text was provided
 5  to us by counsel.
 6       Q.   Okay.  And that's true for each of the other
 7  properties in this case that -- to the extent that
 8  there is a written narrative?  And let's look at
 9  Ms. Burnham on page 20.
10       A.   Yes.  That's correct.
11       Q.   So that narrative was provided to you by
12  counsel along with those two pictures?
13       A.   I believe those pictures were provided by
14  counsel.  That's correct.
15       Q.   And turning to page 25 and 26 for the Giron
16  property.
17       A.   Yes.
18       Q.   Is that narrative and picture provided to you
19  by counsel?
20       A.   Yes, ma'am.
21       Q.   And pages 31 and 32 for the Stewart property,
22  was that narrative and picture provided to you by
23  counsel?
24       A.   It was.
25       Q.   And then on pages 37 to 38, again, was that
```

Trial

1    narrative and pictures provided to you for the Turney

2    property by counsel?

3         A.   It was, yes.

4         Q.   And one last one here, on pages 40 --

5    actually, just on page 43, was that narrative and those

6    two pictures provided to you for the West Houston

7    Airport property by counsel?

8         A.   Yes.

9         Q.   Mr. Easterby asked you a couple of questions

10   about MLS, or the multiple listing service; is that

11   correct?

12        A.   He did.

13        Q.   Do you recall those?

14        A.   Yes, I do.

15        Q.   And I think he referred to -- it's HAR.  Is

16   that Houston Association of Realtors?

17        A.   It is, yes.

18        Q.   And are they the group that maintains the MLS

19   information for this region?

20        A.   They are, yes.

21        Q.   And you subscribe to that service for the

22   purpose of being able to access that multiple listing

23   information?

24        A.   We do, yes.

25        Q.   And you indicated that you use that in part

1    because Texas is a nondisclosure state?

2        A.   Correct.

3        Q.   And can you explain to us again what that

4    means.

5        A.   I think Texas is one of a handful of states

6    in the country where a property -- when the properties

7    trade, that the buyers and the sellers are not required

8    to disclose the purchase price.  And so I'm not sure

9    why that it is, but it is.  And so we oftentimes,

10   especially for commercial properties, are required to

11   find -- go ask people, interview people, hey, what did

12   you pay for your property?

13          In other states, it's on the deed.  It's

14   literally stamped on the deed what the purchase price

15   was, just not in Texas.

16       Q.   Right.  So you can't -- in Texas, neither

17   Harris County or Fort Bend County, you can't go into

18   the county records, pull a deed, and get that

19   information?

20       A.   Sometimes it's on it.  I've seen it in a deed

21   sometimes, but it's -- it is a rarity that it's in the

22   deed.

23       Q.   Okay.  And there's no tax stamp or anything

24   that would allow you to calculate back a sale price, as

25   some other states allow?

```
 1        A.    Correct.

 2        Q.    And the Houston MLS database that you

 3   referred to, that's generally considered to be a robust

 4   and reliable source of sales information; is that

 5   correct?

 6        A.    For the most part, oftentimes, it is.

 7              I found, in this situation, there was --

 8   there was a lot of data that's not in MLS.  In this

 9   particular instance with post Hurricane Harvey, there's

10   a lot of data that's not in MLS.

11        Q.    And --

12        A.    Which is unusual.

13        Q.    Okay.  And so, in order to go after

14   additional sales data that's not reported in MLS, you

15   would have to go get a copy of the deed out of the

16   county recorder's office; is that right?

17        A.    Not necessarily.

18        Q.    Okay.  But you would have to take a number of

19   steps in order to identify the buyer and seller and

20   then track down the information about that sale,

21   assuming you can find someone who would talk to you?

22        A.    It's what we do.  In Texas, appraisers, every

23   day, we're banging the phones trying to get data of

24   sale transactions.  So you would have to take those

25   steps.
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1          Q.   Sure.  And when you're using the information
2     from the MLS system, that -- the information both about
3     the sales price, buyer, seller, and even the broker,
4     that information is listed in MLS and accessible to you
5     as a subscriber to that service; correct?
6          A.   It is, yes.
7          Q.   So it makes that process much easier?
8          A.   Much easier.  That's correct.
9          Q.   And based on your 30 years of experience as
10    an appraiser in this area, you wouldn't expect non-MLS
11    transactions to be that different from MLS transactions
12    on an average price; correct?
13               MR. EASTERBY:  Objection.  Incomplete
14    hypothetical.
15               Objection.  Incomplete hypothetical.
16               THE COURT:  Overruled.  I think Mr. Deal
17    understands the import of the question.
18               Mr. Deal, you may answer.
19               THE WITNESS:  So the question is I wouldn't
20    expect the MLS transaction -- or the non-MLS to be that
21    much different than the MLS transaction.  Is that
22    right?
23    BY MS. TARDIFF:
24         Q.   On average.
25         A.   As a very general rule, I would agree.

1          In this situation, with the incident that

2    occurred, with the houses that were inundated,

3    there's -- there is a ton of non-MLS transactions that

4    I anticipate are going to be -- show exceedingly

5    low-level sales prices.  So it's different.  This is

6    different than what we typically see in the market.

7    What's happened here is not normal.

8          Q.    And when you say "different," you're

9    referring to the fact that, postflooding, a lot of

10   homes were sold in wet or gutted conditions to

11   companies such as Giering Investments that were buying

12   low, repairing and flipping those homes, or were doing

13   something else with them; correct?

14         A.    And buying to -- to -- to -- individual

15   buyers, not necessarily investors, but anybody, willing

16   and knowledgeable buyers and sellers pursuant to the

17   definitions of market value, there's a lot of sales out

18   there that are not MLS.

19         Q.    And so you made an important point there

20   about willing buyers and willing sellers.  And another

21   concept is arm's-length transactions.

22         So if you are looking at non-MLS

23   transactions, you're also investigating that aspect of

24   whether they are arm's-length transactions or not and

25   the circumstances of the sale to assess whether you

1    could use them in a comparable sales analysis; correct?

2        A.    100 percent agreed, yes.

3        Q.    All right.  Let me ask you just a few more

4    questions tying back to USPAP.

5              So you referred to USPAP standards as -- we

6    were discussing kind of the differences between your

7    market study and an appraisal; correct?

8        A.    Yes.

9        Q.    And USPAP Standard No. 2 sets forth certain

10   reporting requirements for a real property appraisal;

11   is that correct?

12       A.    It does, yes.

13       Q.    And those standards identify what I

14   understand to be two types of written report.  There is

15   an appraisal report; there is a also a restricted

16   appraisal report.  Is that correct?

17       A.    That's correct.

18       Q.    And your market study is neither one of

19   those; correct?

20       A.    It's not an appraisal.

21       Q.    Okay.

22       A.    So it's not -- so it's neither.

23       Q.    Okay.  Thank you.

24             And if -- if a written report offers an

25   opinion of value without setting forth the comparable

 1    sales used to determine that value, that would

 2    necessarily -- that could only be a restricted

 3    appraisal report under USPAP; correct?

 4         A.    That's correct.

 5         Q.    And USPAP Standard 2(b) states clearly that a

 6    restricted appraisal report is for client use only; is

 7    that correct?

 8         A.    I would have to -- I would have to see --

 9    USPAP's about that thick (witness indicating).  I don't

10    remember Standard Rule 2(b) of USPAP specifically.

11         Q.    But are there specifications in USPAP with

12    respect to how a restricted appraisal can be used?

13         A.    There are certain limitations on a restricted

14    appraisal that relate to -- to the needs of a client is

15    my memory of that issue.

16         Q.    And, certainly, if you are asked to do a

17    restricted appraisal, so you're offering an opinion of

18    value, a report without including the details as to

19    your comparable sales, USPAP would require you to

20    expressly identify that as a restricted appraisal?

21         A.    I'm sorry.  I lost the first part of that

22    question.

23         Q.    Okay.  So if you were preparing an appraisal

24    report that offers an opinion of value without

25    including -- that comparable sales analysis does not

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                         5/15/2019

1     include each of the comparable sales transactions that

2     you used and the adjustments that you made, that type

3     of report would be a restricted appraisal report; is

4     that correct?

5          A.   I believe it would, yes.

6          Q.   And USPAP requires that you expressly

7     identify that kind of report as a restricted appraisal?

8          A.   USPAP -- I believe it does, yes.

9               There's a lot of USPAP in the Yellow Book as

10    well.  I'm not sure 100 percent about the ability to

11    use a restricted use -- or restricted appraisal for the

12    federal guidelines.  But what you're describing in

13    Texas, that would be a -- that would be a restricted

14    appraisal, I believe, yes.

15         Q.   And the report would have to be identified as

16    such; correct?

17         A.   I believe so.  Based on my memory, I believe

18    so.

19         Q.   And you would -- certainly, if you were

20    preparing a restricted appraisal report, in your 30

21    years of professional experience, you would identify it

22    as such for the client; correct?

23         A.   I would be required to.  I would -- which we

24    do sometimes, and we do identify it as such at the --

25    it's a client-driven request to do a restricted

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    5/15/2019

1    appraisal.

2              MS. TARDIFF:  Let me just take one moment,

3    Your Honor.

4              THE COURT:  Yes.

5              MS. TARDIFF:  I have no further questions at

6    this time.  Thank you.

7              Thank you, Mr. Deal.

8              THE COURT:  Thank you, Ms. Tardiff.

9              Mr. Easterby, redirect?

10             MR. EASTERBY:  Yes, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MR. EASTERBY:

13        Q.   Mr. Deal, you talked about this being an

14   unusual situation with regard to those non-MLS

15   transactions.  You recall that?

16        A.   Yes.

17        Q.   Could you just expound on that very briefly.

18   What did you mean by that?

19        A.   So we looked at -- in looking at another

20   report that was done, looking at only MLS sales done by

21   a government-hired expert, looked at some

22   transactions -- 150 transactions within a certain area

23   of the test properties.  There was equally as many

24   non-MLS transactions that occurred that were not part

25   of that analysis.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1          And so that's -- that is a lot of data that's
2    out there, but it's -- it's missing.  It's not in the
3    information that was supplied to us.  So it's not MLS
4    data.
5          Q.   And in terms of data, did you and your team
6    do a lot of research on those underlying transactions?
7          A.   We did do a lot of research, yes.
8          Q.   I don't remember the volume of what was
9    produced, but do you have an understanding as to how
10   many pieces of paper it was?
11         A.   I don't know.  Boxes.
12         Q.   Boxes and boxes.  And those were all produced
13   to the government in this case; correct?
14         A.   Yes, they were.
15         Q.   So, after Harvey, in doing all this research
16   and investigation with your team, did you find that a
17   lot of folks were just doing the "for sale by owner"
18   sign in their yard, not MLS?
19         A.   There was quite a bit of that, yes.
20         Q.   And was that particularly prevalent in those
21   communities that didn't have any flood insurance?
22         A.   It was very prevalent, yes.
23         Q.   And so those would not be on MLS?
24         A.   They would not.
25         Q.   And do you believe that, if you were to take

 1     the next step and go to the appraisal, that those

 2     should be considered in selecting comparable

 3     properties?

 4          A.   They would -- they would need to be

 5     considered, looked at, analyzed, and adjusted.

 6          Q.   Okay.  I want to just step through -- oh,

 7     before I ask you that, are you aware -- are you aware

 8     of any legal requirement in Texas that requires that

 9     the seller disclose that a house is in the Addicks or

10     Barker reservoir pool area?

11          A.   I am not aware of any requirement, no.

12          Q.   Let's look at your report again.  Counsel

13     asked you some questions about the Bankers.  Do you

14     recall that?

15          A.   Yes.

16          Q.   Turn with me, if you would, to page 3.

17               And, Matt, if you could put up that table,

18     please, on page 3 of what's been marked for

19     identification as Plaintiffs' Exhibit 2205.

20               So I would like to look at the column that

21     says "GLASF."  What does that stand for?

22          A.   It's gross leasable area and described in

23     square feet.

24          Q.   Okay.  And next to that on the left is

25     "PSFGLA."  What does that stand for?

1      A.    That's the price per square foot of the
2    residence based on the sale price divided by the gross
3    leasable area.
4      Q.    And in your experience is price per square
5    foot kind of the big metric when you're looking at home
6    values in this area?
7      A.    It is certainly one of the metrics, yes.
8      Q.    Right.  So counsel, I think, was trying to
9    say that this one down here -- or up here that's
10   $715,000 was the highest one?
11     A.    That's correct.  It is the highest gross
12   price, yes.
13     Q.    What's its price per square foot?
14     A.    $142.54.
15     Q.    Is there a property on this that's got a
16   higher price per square foot than that?
17     A.    There is.
18     Q.    Which one is that?
19     A.    No. 4.
20     Q.    Okay.  That's 146; correct?
21     A.    Correct.  146.55.
22     Q.    So, you know, bigger house, it makes sense
23   it's going to cost more.  But price per square foot is
24   important?
25     A.    That's why you look at per-square-foot prices

     1   as a metrics, because it normalizes the prices paid.

     2        Q.   So this is the -- before the flood, you guys

     3   have a median price per square foot of -- what's that

     4   number right there, please?

     5        A.   Median at 524,000, or 129, roughly, dollars

     6   per foot.

     7        Q.   129 a foot.

     8             If you turn the page, I think you'll look at

     9   the after.  And I'd like to just look again at the

    10   median down there.

    11             What's the median on the price per square

    12   foot?

    13        A.   $111.77.

    14        Q.   All right.  So before, 140 -- well, it's in

    15   the record.  Let's keep moving.

    16             Let's go to Bear Creek, which I believe is in

    17   the context of the Burnham residence, page 5 of your

    18   report.

    19             Please again look at the median down there

    20   before the flood.  What's the price per square foot on

    21   the median?

    22        A.   $79.71.

    23        Q.   And, in that neighborhood, is it correct that

    24   those are mostly one-story kind of 1960s ranch houses,

    25   as we call them around here?

Trial

1      A.    Well, they're actually considered newer

2   construction, the far right column.  They're -- this

3   particular subdivision, Section 11, is mid '80s, early

4   '90s, the construction.

5      Q.    Understood.

6            Okay.  And then the after, which is the next

7   page, what was your median price per square foot?

8      A.    $46 a foot, $46.07.

9      Q.    So it went from about 80 to about 46?

10     A.    That's correct.

11           And all those homes are in the same section

12  of Bear Creek Village.

13     Q.    And let's look, if you would, at page 9,

14  which is in the context of the Stewarts' home there on

15  Eagle Trail Drive.

16           On the before, what's your median price per

17  square foot?

18     A.    $83.25.

19     Q.    And on the after, what's your median price

20  per square foot?

21     A.    $45.11.

22     Q.    How would you characterize that kind of

23  difference in price per square feet?

24     A.    Severe, a striking difference.

25     Q.    Now, do you believe or have any opinions as

```
 1    to whether you think the market participants that are
 2    buying homes behind the Addicks and Barker reservoirs
 3    understand the risk associated with being submerged by
 4    impounded flood-offs -- floodwater by the federal
 5    government?
 6                 MS. TARDIFF:  Objection.  Beyond the scope of
 7    the cross and outside the scope of his report.
 8                 THE COURT:  Just a moment.  Let me think
 9    about that a minute.
10                 We've had testimony about the abnormal market
11    conditions and the cause.  And the Court had a couple
12    of questions, but I have avoided asking them.
13                 I will allow the question because I think the
14    general topic has been introduced, not just by
15    Mr. Easterby's direct, but by your cross-examination,
16    Ms. Tardiff.
17                 MR. EASTERBY:  If I may, Judge, I'll lay a
18    little more foundation just to be fair to the witness.
19    BY MR. EASTERBY:
20        Q.    Counsel for the government asked you some
21    questions about the houses that had been fully -- did
22    you call them remediated?
23        A.    Renovated.
24        Q.    -- renovated and sold at higher prices.  Do
25    you remember that?
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                              5/15/2019

 1        A.   Yes.

 2        Q.   And so the question again is do you have any

 3   opinions or understanding as to whether the market

 4   participants that are buying homes behind Addicks and

 5   Barker had an understanding of the risks of being

 6   submerged by runoff impounded by the federal

 7   government?

 8        A.   I think there is a significant deficiency in

 9   market knowledge as to what -- what -- on those issues.

10        Q.   All right.  Fair enough.

11             Oh, last question.  You didn't have any

12   comparable transactions for the airport?

13        A.   That's correct.

14        Q.   Are there a lot of airport sales?

15        A.   No, there's not.

16        Q.   Okay.  Thank you.  No further questions.

17             THE COURT:  Ms. Tardiff?

18             MS. TARDIFF:  Just a couple.

19             THE COURT:  Yes.

20                   RECROSS-EXAMINATION

21   BY MS. TARDIFF:

22        Q.   So, Mr. Deal, Mr. Easterby asked you a few

23   follow-up questions about the before-and-after tables

24   in your market study.  Do you recall those?

25        A.   Yes.

1        Q.    And those questions focused on the

2    differential in price per square foot before and after

3    based on the -- that raw sales data; correct?

4        A.    And a couple of questions about gross price,

5    but yes.

6        Q.    And focusing on that, the

7    price-per-square-foot comparison in your after tables,

8    as you described to us, those after tables include raw

9    sales prices for homes that are wet, gutted, remediated

10   only, and renovated.  You have all four categories in

11   that after; correct?

12       A.    That's correct.

13       Q.    And so your report of low, high, average, and

14   median raw sales prices in the after table includes all

15   those variations; correct?

16       A.    They do, yes.

17       Q.    With no adjustments?

18       A.    That's correct.

19       Q.    The last set of questions that Mr. Easterby

20   asked you were with respect to risk and your opinion on

21   whether market participants have an understanding of

22   risks associated with Addicks and Barker; is that

23   correct?

24       A.    That's correct.

25       Q.    Do you recall that?

1          But you have not done any study -- well,
2    first of all, you have not done any survey of market
3    participants to assess their understanding of risks;
4    correct?
5          A.   We have talked to brokers and agents in the
6    marketplace about that issue, which revealed a lack of
7    full understanding of what's in store for the future as
8    it relates to properties that are in proximity to the
9    what we're talking about.
10         Q.   Okay.  But your discussion with some brokers,
11   that's not a survey of all brokers, and it's not a
12   survey of buyers and sellers in this marketplace;
13   correct?
14         A.   It is not a market survey to all -- to all
15   agents.  It is not.  It is the type of information that
16   we utilize in assessing situations like this.  And we
17   talk to a lot.  There's a lot of questions as to what
18   this all means for the future.
19         Q.   But you also -- you have not done a study in
20   connection with this case, whether it's a survey or
21   another type of study, that allows you to opine on the
22   understanding of market participants as to flood risk;
23   correct?
24         A.   I don't agree.  I think part of -- part of
25   what we've done in our research is a study as it

1   relates to that.  As part of our conversations with --

2   with market participants, which is typical for what we

3   do, we have made those inquiries, we've -- we've asked

4   questions about that, and we've gotten answers about

5   it.

6        Q.   And none of that is reported, though, in your

7   expert report here in this case; correct?

8        A.   I agree.  It's not.

9             MS. TARDIFF:  Thank you.

10            THE COURT:  Mr. Easterby.

11            MR. EASTERBY:  Your Honor, I just would like

12   to move to admit Plaintiffs' Exhibit 2205 into

13   evidence.

14            THE COURT:  All right.

15            MS. TARDIFF:  Thank you, Your Honor.  We

16   maintain the same objection as to the lack of a

17   methodology as to the market study.

18            THE COURT:  That objection is not well taken.

19            PX2205 is admitted.

20            (Whereupon, Plaintiffs' Exhibit 2205 was

21             admitted into evidence.)

22            THE COURT:  Now, we have a rebuttal report.

23   What happened with that?

24            MR. EASTERBY:  Your Honor, that addresses

25   Mr. Landry's work.  And, candidly, I think that

1   Mr. Bell already handled that -- or Dr. Bell.  So in

2   the interest of saving time, we'd like to reserve that

3   for the rebuttal phase of the case if necessary.

4              THE COURT:  Okay.  Thank you, Mr. Easterby.

5              May the Court excuse Mr. Deal?

6              MR. EASTERBY:  Yes, sir.

7              THE COURT:  Mr. Deal, thank you for your

8   patience.  You've heard a lot of testimony in this

9   case.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  And the Court appreciates you

12  coming today and testifying.

13             THE WITNESS:  Thank you.

14             THE COURT:  Thank you.

15             MR. CHAREST:  Sir, we're about to rest, but I

16  want to address a few open issues vis-a-vis the record.

17             THE COURT:  Yes.

18             MR. CHAREST:  Before we do that, we still

19  have to do an exchange and submission of the site visit

20  images, which is underway.  We're coordinating with

21  that now.  We're also going to the -- the parties are

22  going to be doing a comparison of admitted exhibit

23  lists to make sure that -- if there's any true-ups that

24  need to be done vis-a-vis the record.

25             THE COURT:  I have a point that I will raise

 1    about that when we discuss the exhibits generally.  I

 2    will say that, ordinarily, the Court would ask the

 3    reporter to take into the reporter's possession the

 4    exhibits that have been admitted and to certify them

 5    along with the transcript as part of record in the

 6    case.  And the Court ordinarily would transmit itself,

 7    collect and transmit, the exhibits that were provided

 8    to the Court and clerk.

 9            But we're not going to do that in this case.

10    And that's what I'm going to ask Ms. Lisa Eddins, who's

11    the scheduler, to address when we come back from our

12    break.

13            MR. CHAREST:  That's completely satisfactory,

14    sir.  Thank you.

15            And the only other issue after that is -- and

16    I think you probably will address it after the break --

17    was we were going to suggest a submission of an agreed

18    volume or something like that.  But I -- we'll hear

19    what the Court has to say after the break.

20            THE COURT:  The submission of what?

21            MR. CHAREST:  An agreed volume of "here are

22    the exhibits" that we're all -- that we're all on the

23    same page with.

24            THE COURT:  Ordinarily, the Court is pretty

25    persnickety -- I'm going to use that word -- about

1    what's in the record and what's not.  That's why we've

2    tried to keep very careful track of admitted exhibits.

3              But, in any event, in this instance, we have

4    so many -- we have thousands -- we're going to have to

5    do something a little different.

6              MR. CHAREST:  Yes, sir.  All right.  Well,

7    subject to those open issues, Your Honor, the

8    plaintiffs rest.  Thank you.

9              THE COURT:  All right.  Thank you.

10             Ms. Tardiff.

11             MS. TARDIFF:  Yes, Your Honor.  Before we

12   call our first witness, we do have a motion to make.

13             THE COURT:  You have what?  A motion to make?

14             MS. TARDIFF:  A motion to make.  And I will

15   turn it over to Mr. Shapiro to make it.

16             MR. SHAPIRO:  Thank you, Your Honor.

17             At this point plaintiffs have rested but for

18   the introduction of a few photographs taken from the

19   site visit.  So we would move for a directed verdict on

20   three grounds.  First, plaintiffs claims fail --

21             THE COURT:  You're invoking 52(c)?

22             MR. SHAPIRO:  Yes, sir.

23             THE COURT:  All right.  Thank you.

24             MR. SHAPIRO:  Plaintiff's claims fail because

25   a one-time temporary flood event resulting from the

```
 1    largest storm to ever hit the United States cannot
 2    establish a taking.
 3           In Ridge Line, the federal circuit stated
 4    that plaintiff must show that "the government's
 5    interference with any property rights was substantial
 6    and frequent enough to rise to the level of taking."
 7           They continue to state that "isolated
 8    invasions, such as one or two floodings, did not make a
 9    taking, but repeated invasions of the same type have
10    been held to result in an involuntary servitude."
11           Under that case law and other cases cited to
12    it, we believe plaintiffs have failed to stake a claim
13    upon which relief can be granted.
14           Secondly, plaintiffs' claims fail because the
15    Corps' actions here were an exercise of governmental
16    power to prevent loss of life and mitigate inevitable
17    damages to private properties.  In cases such as Miller
18    v. Schoene, the government action here was -- and there
19    was taken in an effort to reduce or mitigate inevitable
20    harms to the public and no viable takings claim exists.
21           And then, finally, plaintiffs' claims fail
22    because plaintiffs' lack of defensible property right
23    to be free of floodwaters during storms generated
24    during a massive hurricane, particularly one like
25    occurred in August of 2017.
```

 1              During a four-day stretch, as the Court has

 2      heard, Hurricane Harvey dropped an unprecedented amount

 3      of rainfall on Harris and Fort Bend counties.  No land

 4      owner in a flood-prone region like this has a

 5      compensable property right to be free of such

 6      floodwaters.

 7              Thank you, Your Honor.

 8              THE COURT:  These objections and the motion

 9      under Rule 52© are essentially a reprise of the

10      motion to dismiss that was made earlier in the case.

11      And we denied the motion to dismiss and remitted the

12      case for trial, and the Court adheres to that view.

13              This is admittedly an unusual situation, but

14      on the other hand, we've had a lot of testimony about

15      whether or not this is likely to recur based on recent

16      storms and history of storms in the Houston area and

17      the Gulf generally.

18              So the Court will deny the motion.

19              MR. SHAPIRO:  Thank you, Your Honor.

20              THE COURT:  Thank you.

21              We're a little early, but we might take our

22      morning break at this point.

23              Mr. Shapiro and Ms. Tardiff, is that

24      satisfactory to you?

25              MR. SHAPIRO:  Yes, sir.

1            THE COURT:  It is?

2            Mr. Charest?

3            MR. CHAREST:  Yes, sir.  Thank you.

4            THE COURT:  Thank you.  We are in recess for

5     15 minutes.

6            THE CLERK:  All rise.  Court is in recess.

7                 (Whereupon a short recess was taken.)

8            THE CLERK:  All rise.  United States Court of

9     Federal Claims now is in session, the Honorable Charles

10    F. Lettow presiding.

11           THE COURT:  Please be seated.

12           Court had a quick question to Mr. Charest and

13    Mr. Shapiro.

14           Could Ms. Eddins get an indication of what we

15    have in mind?

16           MR. CHAREST:  Yes, sir.  The understanding is

17    that the parties will submit jointly two clean copies

18    of everything that's been admitted to the Court's

19    chambers and one --

20           THE COURT:  No.  The idea is that you will

21    ship all of the materials that you provided at the

22    outset of trial back to chambers.

23           MR. CHAREST:  Admitted and not admitted; is

24    that correct?

25           THE COURT:  That's correct.  We can sift and

 1    sort.  And so we're going to ask you to do that.  We

 2    have two sample shipping labels, because we'd like them

 3    shipped back to our chambers now.

 4          And did Ms. Eddins cover when this exercise

 5    should occur?

 6          MR. SHAPIRO:  Yes, sir.  I think she -- she

 7    indicated that it should be done within a week and that

 8    we would be able to take care of that still on Friday

 9    afternoon or Saturday, perhaps, if necessary.

10          THE COURT:  Or even Monday --

11          MR. SHAPIRO:  Yes, sir.

12          THE COURT:  -- for the week, because it

13    happens that the chief judge and I will be in the same

14    place Monday and Tuesday, but in Washington.  So the

15    chief judge will not need this courtroom certainly

16    Monday or Tuesday.  I don't think Wednesday either.

17          But then did Ms. Eddins cover with the court

18    reporter what would happen with the certified admitted

19    exhibits?

20          MR. CHAREST:  I'm nervous to say yes because

21    what she told us is different than what you're telling

22    us now.

23          THE COURT:  Let's hear what you think she

24    said.

25          MR. CHAREST:  I thought we were supposed to

```
 1    prepare one agreed list, one submission of a clean set
 2    of exhibits to the -- to the clerk of the federal
 3    circuit -- federal --
 4             THE COURT:  Through the court reporter,
 5    because the court reporter will have to certify.  And
 6    that would be, then, shipped to the clerk of the court.
 7             MR. CHAREST:  We can do that, sir.
 8    Absolutely.  We'll coordinate with the court reporter.
 9             THE COURT:  You will have to work with
10    Ms. Clark to arrange for that.
11             MR. CHAREST:  Can do.  Yes, sir.
12             THE COURT:  You can do that.
13             MR. CHAREST:  Yes, sir.  We'll make it work.
14             THE COURT:  It's just, ordinarily, when we
15    have an out-of-town trial, we do not have the volume of
16    exhibits that we have in this particular case, and it's
17    posing a particular problem for us.
18             MR. CHAREST:  So to clarify, if it's all
19    right with the Court, everything that we've submitted
20    to the Court has -- either the clerk has or the Court
21    has one -- the Court wants boxes sent back as is.
22             THE COURT:  That's exactly right.  Those that
23    you provided, the two sets that you provided, just
24    ship -- don't bother to sift and sort.  We can do that.
25    Because the admission of exhibits is covered by the
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1   transcripts anyway.  We have our lists, obviously, and

2   you have your lists.  And we almost -- I can't remember

3   the last time we had a conflict or had to correct the

4   record.  I just -- we just don't do that.

5            MR. CHAREST:  And so we'll send back the hard

6   copies of -- that the Court has received already, and

7   then we will work on making sure that we have an

8   agreed -- a list that we both concur with, and then

9   we'll supply a clean set of each one of those to the

10  court reporter for certification.

11           THE COURT:  Well, usually, we actually ask

12  that the set -- that the court reporter, essentially,

13  certifies being that that's used by the -- the

14  witnesses, not necessarily a clean set.

15           MR. SHAPIRO:  Yes, sir.

16           THE COURT:  Right.

17           MR. CHAREST:  That may or may not be

18  possible.  There's some times when we just --

19  electronic version was posted, for example.  You see

20  what I mean?

21           THE COURT:  Well, we do -- we do have the

22  thumb drives and some electronic versions, and that can

23  be included.

24           MR. SHAPIRO:  Yes, sir.

25           THE COURT:  Is that helpful?

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                     5/15/2019

1          MR. SHAPIRO:  It is.

2          THE COURT:  We want to sort this out now

3    while we're talking with each other so we all

4    understand what's happening.

5          MR. SHAPIRO:  I think that makes sense, Your

6    Honor, and it will avoid the necessity of having to

7    reprint thousands of exhibits.

8          THE COURT:  Oh, you don't want to do that.

9          MR. SHAPIRO:  Yes, sir.

10          THE COURT:  The Court's paper suppliers would

11    be welcome -- or would welcome that development, but we

12    should not do that.

13          MR. SHAPIRO:  Yes, sir.

14          THE COURT:  That's why you might have a day

15    or so, either -- Saturday's going to be difficult, but

16    Monday or Tuesday of next week to -- to do -- do what

17    you need to do.

18          MR. CHAREST:  We will have Mr. Bynum,

19    probably, sounds like a lawyer, down here on Monday to

20    coordinate that to make sure.

21          THE COURT:  I don't think we've had any

22    situation where a witness has marked on exhibits or

23    anything like that.  But, still, we really do want the

24    copies that the witness has used just to avoid any

25    questions.

1          MR. CHAREST:  I worry that we -- there may be
2     gaps in what the witness was presented and what's still
3     in the binders just over the course of time.
4          THE COURT:  You can work that out.
5          MR. CHAREST:  Thank you, sir.  All right.
6     Fair enough.
7          THE COURT:  I hope.
8          Now, we do have -- as you mentioned,
9     Mr. Charest, and as Mr. Shapiro knows, you have --
10    well, I saw Ms. Tardiff taking photographs -- you have
11    a set of photographs of the test properties that you
12    are agreed will be presented to the Court; right?  And
13    you're going to do that within the next several days.
14         MR. CHAREST:  We -- yes, sir.  We're going
15    to -- we are going to supply to the government the
16    photos that we took from the test properties that
17    they're going to supply us.  My understanding is we'll
18    combine them all and submit to the Court in some form
19    of record.
20         THE COURT:  Yes.
21         Mr. Shapiro?
22         MR. SHAPIRO:  Yes, sir.  And we'll aim to do
23    that at the same time that we -- we send back the other
24    exhibits to the Court.
25         THE COURT:  Okay.  Is there a way to identify

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                        5/15/2019

1      them on the record before we actually close the trial?

2                MR. CHAREST:  I think so.  We can do it any

3      number of ways.  Since they're all electronic, we can

4      just put them -- all the photos on a thumb drive and

5      label that one thing the number.  And we can probably

6      assign individual, you know, identifiers to the file

7      names.  That's probably the easiest.

8                THE COURT:  Can the two of you work that out.

9                MR. CHAREST:  Yes, sir.

10               MR. SHAPIRO:  We can work that out.  One

11     question I had, it seems like we could call it a joint

12     demonstrative exhibit?

13               THE COURT:  Yes.

14               MR. SHAPIRO:  Do you think it would be

15     helpful to the Court to individually identify each page

16     number, or is that not necessary?

17               THE COURT:  I don't think it's necessary.  I

18     think it's -- it would be very, very helpful to

19     identify the particular property involved or the owner

20     of the property.

21               MR. CHAREST:  We can do that, sir.  We can

22     bring it up in terms --

23               THE COURT:  You could do that, that would

24     ease matters considerably.

25               MR. CHAREST:  We can -- we can name them by,

1    like, whatever stop we're at.  Like, the Giron with the

2    home and then number it there.  We can do that.

3            THE COURT:  Just use the home.

4            MR. CHAREST:  Yes, sir.

5            MR. SHAPIRO:  That should not be a problem.

6            MR. CHAREST:  Actually, we do.  I have an

7    idea.  We'll get it done.

8            THE COURT:  All right.  Great.

9            Mr. Easterby.

10            MR. EASTERBY:  I just had a suggestion on

11    that point, Your Honor.  You saw we had the file name,

12    date, time, and GPS embedded in some of those photos.

13    That might be a way to give the Court a good

14    identification as to where the place was.  You can even

15    have a little map embedded in there that shows where it

16    was.

17            THE COURT:  Well, that might be true, but

18    what we have to do, then, is take the GPS coordinates

19    and translate that to the property.  We'd rather not

20    have to take the time to do that.

21            MR. EASTERBY:  Yes, sir.

22            MR. CHAREST:  We'll just -- we'll folder the

23    images on the drive by property location.  That's the

24    easiest way.

25            THE COURT:  All right.

1          Mr. Shapiro?

2          MR. SHAPIRO:  Yes, sir.

3          THE COURT:  Is that okay with you?

4          MR. SHAPIRO:  That is satisfactory.

5          THE COURT:  All right.  Thank you.

6          All right.  Let's proceed.  Mr. Shapiro.

7          MR. SHAPIRO:  There is one sort of

8   housekeeping issue, Your Honor.  After Mr. Long's

9   testimony, he was kept under oath subject to recall.

10  We do not intend to introduce any more of the Facebook

11  video that the Court saw.

12         So with the Court's permission, I think he

13  can be relieved from being recalled.

14         THE COURT:  He's a local person, though, so

15  it's not quite the problem that we have had with some

16  other witnesses.  Let's --

17         Mr. Charest.

18         MR. CHAREST:  We're satisfied.  As long as

19  that video is in the record, which I understand it is,

20  we don't need more or less, and we don't need Mr. Long

21  anymore.

22         THE COURT:  Mr. Long is excused.

23         MR. SHAPIRO:  Thank you, sir.

24         THE COURT:  That will help.

25         Ms. Duncan, are you next?

 1          MS. DUNCAN:  Yes, sir.  United States calls
 2   Mr. Les Hansmann.
 3          THE COURT:  I'm sorry.  You have to say it
 4   again.
 5          MS. DUNCAN:  Mr. Les Hansmann,
 6   H-a-n-s-m-a-n-n.
 7          THE COURT:  Mr. Hansmann, if you would
 8   approach the bench to be sworn as a witness, that would
 9   be helpful.
10   Thereupon--
11                     LESLIE HANSMANN,
12   was called as a witness, and having been first duly
13   sworn, was examined and testified as follows:
14          THE WITNESS:  I do.
15          THE COURT:  If you would be seated in the
16   witness stand, that would be helpful.
17          MS. DUNCAN:  May I proceed?
18          THE COURT:  Yes.
19                     DIRECT EXAMINATION
20   BY MS. DUNCAN:
21      Q.   Please introduce yourself.
22      A.   Yes.  My name is Les Hansmann.
23      Q.   Mr. Hansmann, who do you work for?
24      A.   I currently work for the United States
25   Geologic Survey.

1      Q.    Is that also known as USGS?

2      A.    Yes.

3      Q.    Okay.  And where do you work -- or where are

4   you located?

5      A.    I am located in Rolla, Missouri.

6      Q.    Okay.  And what do you do for USGS?

7      A.    My current job is the section chief for the

8   cartographic products section.

9      Q.    And as section chief for the cartographic

10   product section, what are your primary job

11   responsibilities?

12      A.    So my main job is to oversee the production

13   of the United States geological topographic map.

14      Q.    We're going to ask -- we're going to talk

15   some more about the U.S. geological survey topographic

16   map, but how long have you served in this role as

17   section chief?

18      A.    For the past four years.

19      Q.    Okay.  And how long have you been with USGS

20   in total?

21      A.    31 years.

22      Q.    Okay.  And so before becoming section chief,

23   what work did you do for the USGS?

24      A.    So prior to being a section chief, I was the

25   frontline supervisor for the same section, overseeing

 1    the production of the topographic maps.

 2            And then, prior to that, I was in the

 3    research and development section where we did --

 4    researched and developed a current U.S. topographic

 5    map.

 6        Q.    What is a USGS topographic map?

 7        A.    So a topographic map is a map of 1-to-24,000

 8    scale.  We make these for the whole United States and

 9    its territories.  It covers an area of 7.5 minutes of

10    latitude by 7.5 minutes of longitude.  So ...

11        Q.    Okay.  And how long has USGS been creating

12    topographic maps?

13        A.    140 years.

14            THE COURT:  Ms. Duncan, may I ask a question

15    quick?

16            MS. DUNCAN:  Yes, sir.

17            THE COURT:  Mr. Hansmann, are these the

18    quadrangle maps?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  In ordinary parlance, that's what

21    they're called.  Thank you.

22            MS. DUNCAN:  And we'll be looking at some of

23    those in just a few moments.

24    BY MS. DUNCAN:

25        Q.    Mr. Hansmann, how frequently are the USGS

1    topographic maps updated?

2         A.    So since 2010 they are updated every three

3    years.

4         Q.    Okay.  And how about prior to 2010?

5         A.    Prior to 2010 it was pretty infrequent

6    because of the number of hours that it took to produce

7    one of these, and funding was also a major problem in

8    the past.

9         Q.    Okay.  So let's break that down.  What

10   happened in 2010 that made it such that you updated

11   them every three years?

12        A.    So in 2010 we started making an electronic

13   version of the U.S. topographic map and providing it

14   free for download from the internet.

15        Q.    Okay.  And how are the digital versions of

16   those maps created?

17        A.    Using GIS software and computers.

18        Q.    Okay.  Now, prior to 2010, you mentioned that

19   the maps took a lot of time.

20        A.    Yes.

21        Q.    How were they created?

22        A.    So the way the production process was prior

23   to 2010, it took a lot of hand-scribing.  So normally

24   what would be done is an area would be identified for a

25   project, aerial photography would be acquired over that

1   area, then a field crew would be assigned to go down

2   and identify features and make notes on the aerial

3   photographs.  And then all of that material would be

4   sent back to the -- the mapping centers for production.

5          Q.   Does your office maintain current and

6   historic versions of the USGS topographic maps?

7          A.   Yes, we do.

8          Q.   And are you familiar with USGS topographic

9   maps around the Addicks and Barker reservoirs?

10         A.   Yes, I am.

11         Q.   Okay.  I'd like to turn your attention to

12   four exhibits -- DX744, 745, 741, and 747.

13              Now, to do this efficiently, I have them

14   printed up as what we're going to mark as Defendants'

15   Demonstrative 4.

16              MS. DUNCAN:  And, Your Honor, I have a stack

17   of demonstratives that I'd like to pass out.  These are

18   simply replicas of the actual exhibits.  So, after

19   discussion, I intend to move the substantive exhibits

20   into evidence.

21              THE COURT:  Could you identify the exhibits

22   again?  It's DX744, 745 --

23              MS. DUNCAN:  741 and 747.

24              THE COURT:  Thank you.

25              MS. DUNCAN:  And may I approach?

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1              THE COURT:  Yes.  Certainly.

2              MS. DUNCAN:  And this is a stack of seven

3    different demonstratives.  We'll move through them

4    through the course of the exam.

5    BY MS. DUNCAN:

6         Q.   Mr. Hansmann, looking at the four exhibits in

7    front of you, what are these exhibits?

8         A.   So this is a -- four different versions of

9    the same quadrangle.

10        Q.   And what is the title of this quadrangle?

11        A.   So if we could zoom into the bottom

12   right-hand corner of the very left map.

13        Q.   This is DX744.  Go ahead.

14        A.   So this is the Addicks, Texas, quadrangle.

15   It was published in 1970.

16        Q.   And, on USGS topographic maps, where can the

17   title and the date be found?

18        A.   So on every USGS product, they will always

19   have the map title and the date that it was published

20   in the lower right-hand corner.

21        Q.   Okay.  Let's go through each of these and

22   identify the date.

23             Let's move to the next map, DX745.  What's

24   the date for this map?

25        A.   So this is a 1970 version map, and it was

 1   photorevised in 1980.

 2        Q.   How about the date for DX741?

 3        A.   This is a 1995.

 4        Q.   Okay.  And how about the date for DX747?

 5        A.   It's 2016.

 6        Q.   And who produced these four exhibits sitting

 7   before you?

 8        A.   All of these were produced by the USGS.

 9             MS. DUNCAN:  Your Honor, the United States

10   offers Defendants' Exhibit 744, 745, 741, and 747 into

11   evidence.

12             MR. VUJASINOVIC:  No objection.

13             THE COURT:  Thank you.  Admitted.

14                  (Whereupon, Defendants' Exhibits 744,

15                   745, 741, 747 were admitted into

16                   evidence.)

17   BY MS. DUNCAN:

18        Q.   Mr. Hansmann, you referred to this map as a

19   quad.  And, indeed, that's what the Court asked you

20   about as well.

21             What do you mean when you use the word

22   "quad"?

23        A.   So back -- years ago, the USGS went through

24   and divided up the country and its territories by 7 ½

25   minutes of latitude and 7 ½ minutes of longitude.

 1    Since it's the same measurements on all four sides, we

 2    call it a quadrangle.

 3         Q.   So is there a quad for the entire United

 4    States?

 5         A.   Yes, and its territories.

 6         Q.   Okay.  Now, using these maps before us as an

 7    example, can you give us an overview on how to read

 8    these quads?

 9         A.   Yes.  So USGS used colors and -- and symbols

10    to identify features on the maps.  So, for instance, we

11    would use blue to identify surface water.  We would use

12    the color green to identify vegetation on the maps.

13    And then red would normally be used for transportation

14    features, some cultural features.  And then black as

15    well would be used.

16         Q.   Okay.  I have a few questions about some of

17    the details on these maps.

18              Let's zoom into the far left map, DX744.

19              If you look in the -- at the top left corner,

20    I notice there are some lines going diagonally all the

21    way down the page, and they have numbers in them.

22              Mr. Jackson, can you zoom in.

23              Okay.  Mr. Hansmann, are you familiar with

24    what I'm talking about?

25         A.   Yes, I am.

1          Q.    You know what?  Why don't I give you a

2    pointer.  Just so that we're all talking about the same

3    thing, let's point this out.

4                MS. DUNCAN:  Your Honor, may I approach?

5                THE COURT:  Yes.

6    BY MS. DUNCAN:

7          Q.    Mr. Hansmann, can you point out those lines I

8    was asking you about.

9          A.    So I believe you're talking about these lines

10   that go up and down here and across here.

11         Q.    Well, I wasn't, but what are those?

12         A.    Oh, those are actually the Universal

13   Transverse Mercator grid lines.

14         Q.    And then there are also some brown squiggly

15   lines that are going in a diagonal pattern down the

16   side of the map.

17         A.    Oh, yes.  Those are elevation contours.

18         Q.    And what are the numbers that are included on

19   each of those contours?

20         A.    So those are the elevations at that point.

21         Q.    Okay.

22                How frequently are those contours indicated

23   on the map?

24         A.    It's quite often.  I don't remember the exact

25   distance that we place those numbers.

1     Q.   What is the distance between the elevation
2  contour lines?
3     A.   So, on this map, I'm pretty sure it's a
4  5-feet contour interval.
5     Q.   Now, taking a step back to the --
6          THE COURT:  Ms. Duncan, it depends on whether
7  you're looking at a steep mountain or not.
8          THE WITNESS:  Yes.
9          THE COURT:  I'm sorry.  I have become
10 familiar with the exercise, Mr. Hansmann.
11         THE WITNESS:  Yes.  The contour will change
12 depending upon the slope, or relief, in that area.
13 BY MS. DUNCAN:
14    Q.   Now, are proper -- are individual properties
15 or homes mapped on USGS maps?
16    A.   No.  That's not our job to map property.
17    Q.   Okay.  Are roads shown on these maps?
18    A.   Yes, they are.
19    Q.   Okay.  Now, how could somebody, you know,
20 look at one of these maps and determine the approximate
21 location of a property?
22    A.   So using the rosette that we've listed on
23 here, it's mostly interstates, U.S. highways, state
24 routes, as well as some local road names are printed on
25 here as well.

1           So, following the -- the road network, a
2   person could get pretty close to their property.
3        Q.   Okay.  Does USGS map airports?
4        A.   Yes, we do.
5        Q.   Okay.  Is there an airport located on the
6   quadrangles sitting before you?
7        A.   Yes, there is.
8        Q.   Let's start on DX744 on the far left.
9             Can you tell us where on this map is one
10  located?
11       A.   So there's an airport located about the
12  center of the map.  And it's slightly to the right-hand
13  side.
14            MS. DUNCAN:  Mr. Jackson, can you zoom in for
15  us.
16  BY MS. DUNCAN:
17       Q.   And what's the name of that?
18       A.   That is Lakeside Airport.
19       Q.   Okay.  Is -- is an airport included on the
20  remainder of these quadrangles through time?
21       A.   Yes.  It will be shown on every map.
22       Q.   Okay.  Let's -- then let's turn to DX745, the
23  next map from 1970 but photorevised 1980.  Let me ask
24  you some questions about this one.
25            First, you mentioned that the airport is on

1    every one of these.  Where is the airport on this map?

2         A.   It's located about the center of the map and

3    slightly to the right, just like the previous map.

4         Q.   Okay.  And what are the pink features on this

5    map?

6         A.   So those areas indicate areas that have

7    changed since the map was produced the prior year

8    before -- the prior time before.

9         Q.   Okay.  And if we look down to the bottom

10   right corner, it states this map was photorevised 1980.

11   What does that mean?

12        A.   Yes.  So in approximately -- somewhere around

13   1980, it was determined that this area needed to be

14   updated with new maps.  So a new aerial photography was

15   acquired.  And they would inspect the aerial

16   photography to determine the amount of change on each

17   map.

18             If there was a lot of change, then a new map

19   would be produced.  If there wasn't that much change,

20   then you would see something like this, with the purple

21   areas showing what had changed from the time that the

22   map had been produced before.

23        Q.   Okay.  If you look to the bottom left side of

24   the map, there is some writing in pink.  What's

25   indicated in that note?

1        A.   So that purple text is revisions shown in

2   purple compiled from aerial photographs taken in 1977

3   and other sorts of data.  This information was not

4   field-checked, and the map was edited in 1980.  The

5   purple tint indicates extension of urban areas.

6        Q.   Okay.  Now, if we move through time to the

7   next map in 1995 -- that's Defendants' Exhibit 741 --

8   instead of pink features, there are red features.

9   What's going on with this map?

10        A.   So as -- as previously, new aerial

11   photography was acquired.  And it was examined for the

12   amount of change.

13             This time, there was so much change that a

14   complete update had to be done.  Therefore, there is no

15   purple shown because it's a brand-new map.

16             And the pink areas indicate high-population

17   or urban area, built-up areas.

18        Q.   And is -- is -- can you point out where the

19   airport is on this map?

20        A.   Yes.  It is in the -- about the same

21   location -- well, it is the same location as previous

22   maps.

23        Q.   Okay.  And what's the name on this -- what's

24   the name of the airport on this map?

25        A.   So it's the same airport, but the name has

1    changed.  It's Houston West airport.

2         Q.   Okay.  Now I'd like to move in time up to

3    2016, DX747.  Here, there are no red features.  So what

4    happened with this map?

5         A.   So, in 2016 when we started making -- well,

6    in 2010, we started making an electronic version.

7              The 2016 version, we do not have a national

8    data set for built-up urban areas.  So, therefore, we

9    don't show that anymore.  But what we do is include

10   additional local road names to provide the user more

11   information on the map.

12        Q.   Now, taking a step back and looking at all

13   four of these maps together, are Addicks and Barker

14   dams depicted on these maps?

15        A.   Yes, they are.

16        Q.   For the record, why don't we use the far left

17   map, DX744.  Can you tell us where on the quad the

18   Addicks and Barker dams are located?

19        A.   So if we could zoom in about the center of

20   the map to the right-hand corner -- bottom corner.  I'm

21   sorry.

22             You can see the Interstate 10 going through

23   the center of the map there from east to west.  On the

24   north side of Interstate 10, the Addicks Dam is shown.

25   And on the south side of Interstate 10, the Barker Dam

1    is shown.

2         Q.   Okay.  Now, while we're zoomed in like this,

3    what is the blue coloring shown behind the dam?

4         A.   So the blue tint behind the dam indicates

5    areas that are subject to inundation.

6         Q.   Earlier, you mentioned that USGS uses blue to

7    indicate water features.  Is there a difference between

8    areas subject to inundation and a water feature?

9         A.   Yeah.  So areas that have water year-round

10   would be a solid blue pattern.  And this is a blue

11   dashed pattern that is not solid.

12        Q.   Okay.  And if we zoom in even more closely to

13   the end of the dam where the areas of inundation begin,

14   it appears there's a line with a number.  What is that?

15        A.   So, yes, that blue line is the extent of the

16   area of inundation, with an elevation value printed on

17   that line.

18        Q.   Okay.  Are there areas subject to inundation

19   shown on all four of the maps before you?

20        A.   Yes.

21        Q.   Okay.  If we go over to the 2016 map, DX747,

22   it looks like -- the area behind the map -- or behind

23   the dams looks a little different.  Why is that?

24        A.   So when we started creating the electronic

25   version, we changed some of our symbology.  The area is

1    still identified; it's just a slightly lighter blue.

2    It's not as prominent as the previous maps.

3        Q.   Okay.  If you look to the edge of the Addicks

4    Dam like we did with DX744, but if you do that on

5    DX747, is the same edge of the area depicted with a

6    line and a number?

7        A.   It is shown with a line, but it does not have

8    a number on it.

9        Q.   Okay.  Why not?

10       A.   Mainly because we don't show elevation for

11   the extent of a area subject to inundation anymore

12   because that area can change.  And it really doesn't

13   stand up.

14       Q.   Okay.  Taking a step back, now, you indicated

15   that the blue areas with hashing on these maps are

16   subject to inundation.  So how would a reader looking

17   at these maps be able to learn that?

18       A.   So if we can go back to the first example,

19   Exhibit 744.

20       Q.   Okay.

21       A.   And zoom into the bottom left-hand corner.

22   So at the bottom of that note there, it says "areas

23   covered by light blue pattern are subject to controlled

24   inundation."

25       Q.   Okay.  Now, you directed us to the bottom

```
 1    left-hand corner.  Would similar notes be found on maps

 2    from this time?

 3         A.   Yes.  So any special notes pertaining to

 4    the -- to the map content would be listed in the bottom

 5    left-hand corner on all maps.

 6         Q.   Okay.  And all maps continuing to today?

 7         A.   No.  That is no longer in the credit note on

 8    the electronic version of the maps since 2010.  We

 9    actually provide a symbology file with each quadrangle

10    so that that is accompanied every time somebody

11    downloads a new map.

12         Q.   So, before 2010, the notes would in the

13    bottom left corner?

14         A.   Yes.

15         Q.   And, after 2010, they'd be in a file?

16         A.   Yes.

17         Q.   Okay.  Very quickly, let's turn to, then,

18    DX745, which is photorevised in 1980.

19              And just show us again, where would a reader

20    be able to determine what the blue hashing means?

21         A.   So if we could zoom into that bottom

22    left-hand corner again.

23              And at the very bottom, the areas covered by

24    a light blue pattern are subject to controlled

25    inundation.
```

1          Q.   Let's move to the 1995 map, DX741.

2               How would a reader of this map know what the

3    blue hashed areas are?

4          A.   So, again, if they would zoom into the same

5    area, areas covered by a dashed light blue pattern are

6    subject to controlled inundation occurring as of 1970.

7          Q.   Okay.  Now I'd like to turn your attention to

8    DX698.  And we'll put that up on the screen for you,

9    Mr. Hansmann.

10              Are you familiar with this document?

11         A.   Yes.  That is our current symbology file that

12   we provide with every topographic map.

13         Q.   So the 2016 map that we just looked at, how

14   does the document we're looking at relate to the 2016

15   map?

16         A.   It would be included when it would be

17   downloaded from the internet.

18         Q.   And who produces this document?

19         A.   The USGS.

20              MS. DUNCAN:  Your Honor, the United States

21   offers DX698 into evidence.

22              THE COURT:  Mr. Vujasinovic?

23              MR. VUJASINOVIC:  No objection.

24              THE COURT:  Admitted.

25                   (Whereupon, Defendants' Exhibit 698 was

1                    admitted into evidence.)

2    BY MS. DUNCAN:

3         Q.    Now, Mr. Hansmann, can you show us where in

4    this document the symbol for subject to inundation

5    appears?

6         A.    Yes.  So if we go to the last page in this

7    document.  And on the right-hand side at the top the

8    item "submerged area and bogs," and then the symbology

9    there at the bottom says "land subject to inundation."

10        Q.    Now, taking a step back, have you reviewed

11   anything that helps you understand why the USGS drew

12   the inundation lines as it did behind Addicks and

13   Barker dams?

14        A.    Yes, I have.

15              MR. VUJASINOVIC:  Objection.  That's vague as

16   to what time frame, please.

17   BY MS. DUNCAN:

18        Q.    Mr. Hansmann --

19              THE COURT:  Sustained.

20   BY MS. DUNCAN:

21        Q.    Mr. Hansmann, is a there a difference between

22   the area depicted behind the dams that is subject to

23   inundation for any of the four maps we were looking at?

24        A.    No.  There's nothing that's changed.

25        Q.    So do you -- well, let me -- let me turn your

1    attention to DX42.  And we'll put that up on the

2    screen.

3         A.   Yes.

4         Q.   What is this document?

5         A.   So these are project notes from the Addicks

6    quadrangle.

7         Q.   Okay.  And why -- who keeps these notes?

8         A.   So the -- these notes are created for every

9    map that we create at USGS.  There will be project

10   notes along with field notes.  And this page will be

11   written out.  It will have the name of the quad, which

12   is at the top right-hand corner; the person that

13   reviewed that quadrangle for accuracy; and a date of

14   when that map was reviewed.

15        Q.   Okay.  Is there any -- can you tell us if

16   there's anything on this document that relates to areas

17   subject to inundation on the quads we looked at.

18        A.   Yes.  If we could move down in the document

19   to where it states "Drainage."

20        Q.   Okay.  And, before you go any further, before

21   we read from the document, I want to move this document

22   into evidence, DX42.

23             MR. VUJASINOVIC:  Is it more than just this

24   one page? because I don't have a hard copy.

25             MS. DUNCAN:  No.

```
 1              MR. VUJASINOVIC:  All right.  No objection.
 2              THE COURT:  Admitted.
 3                   (Whereupon, Defendants' Exhibit 42 was
 4                    admitted into evidence.)
 5    BY MS. DUNCAN:
 6         Q.   Now, Mr. Hansmann, you directed us to the
 7    drainage area.
 8         A.   Yes.
 9         Q.   Okay.
10         A.   So under the drainage area, there is a
11    note to areas subject to inundation.  The area subject
12    to inundation controlled by Addicks Dam is elevation of
13    114.  The area controlled by Barker Dam is 107.
14         Q.   Okay.  And how does this relate to the blue
15    dashed areas shown on the four quads we looked at?
16         A.   So that is how we determine where that line
17    would be drawn, at the 114 elevation behind the dam and
18    also the 107 elevation behind the dam.
19         Q.   Okay.  Now, taking a step back -- and we can
20    set that document aside.
21              Are USGS topographic maps publicly available?
22         A.   Yes, they are.
23         Q.   And where are the maps available?
24         A.   Currently, they're available online.
25         Q.   Okay.  Prior to 2010, were the maps publicly
```

1    available?

2         A.    Yes, they were.

3         Q.    And where were they publicly available?

4         A.    You could obtain those at any USGS office,

5    also universities, public libraries.  You could also --

6    any counties would have copies of those maps.  And a

7    person could acquire them from there.

8         Q.    Okay.  Now, are there other USGS topographic

9    map quads that show the areas upstream of the

10   reservoirs?

11        A.    Yes, there is.

12        Q.    Okay.  I'd like to turn your attention to

13   Defendants' Demonstrative 5.  This is the second page

14   in the stack that I've handed you.  And this

15   demonstrative depicts Defendants' Exhibit 756, 757,

16   758, and 759.

17              Mr. Hansmann, are you familiar with these

18   documents?

19        A.    Yes, I am.

20        Q.    And what are these documents?

21        A.    This is four versions of the Hedwig Village

22   quadrangle.

23        Q.    Who created these maps?

24        A.    The USGS.

25        Q.    Okay.  I'd like to quickly determine the date

1   of each of these maps.

2           If we start with DX756, what's the date for

3   this map?

4       A.   So this is 1970.

5       Q.   DX757?

6       A.   This is 1982.

7       Q.   DX758?

8       A.   1995.

9       Q.   And DX759?

10      A.   2016.

11          MS. DUNCAN:  Your Honor, I'd like to move

12   these four exhibits into evidence.

13          MR. VUJASINOVIC:  No objection.

14          THE COURT:  What's the relevance?

15          MS. DUNCAN:  The relevance goes to the

16   character of the land at issue and the awareness or

17   potential awareness of the areas subject to inundation,

18   which also speaks to reasonable investment-backed

19   expectations.

20          We've also had documents that have been

21   entered into the record over the past several days that

22   have referenced USGS quads.

23          THE COURT:  This covers Hedwig Village.

24          MS. DUNCAN:  So, Your Honor --

25          THE COURT:  I take it it's the quadrangle

```
 1    just to the east of the Addicks quadrangle; is that
 2    correct?
 3              MS. DUNCAN:  If you look at the top left
 4    corner, you've got the east side of Addicks, including
 5    the area north --
 6              THE COURT:  I know, but there's a box that
 7    tells you where this quadrangle fits in the scheme of
 8    things.
 9              MS. DUNCAN:  Yes.
10              THE COURT:  All right.
11              MS. DUNCAN:  And in a moment we'll also offer
12    some exhibits that are indeed joint exhibits between
13    both of the parties that are these USGS maps with the
14    test properties overlaid upon them.  So we're simply
15    offering the --
16              THE COURT:  DX756, 757, 758, and 759 are
17    admitted.
18                   (Whereupon, Defendants' Exhibits 756,
19                    757, 758 and 759 were admitted into
20                    evidence.)
21    BY MS. DUNCAN:
22         Q.   Mr. Hansmann, for the record, are Addicks --
23    is Addicks Dam depicted on these maps?
24         A.   Yes, it is.
25         Q.   And where?
```

1      A.    So it's pretty much the left side of the map.

2      Q.    Okay.  Are there any areas subject to

3  inundation depicted on these four maps?

4      A.    Yes, it is.

5      Q.    Okay.  And where?

6      A.    It's behind the dam.

7      Q.    I'd like to now turn your attention to

8  demonstrative -- Defendants' Demonstrative 3 -- excuse

9  me -- Defendants' Demonstrative 6.

10          And this features Defendants' Exhibits 752,

11  753, 749, and 754.

12          Mr. Hansmann, are you familiar with these

13  exhibits?

14      A.    Yes, I am.

15      Q.    And what are these exhibits?

16      A.    So this is four versions of the Clodine,

17  Texas, quadrangle.

18      Q.    And using the legend at the bottom right side

19  of the quad, can you tell -- can you tell the Court

20  where this quad fits in relation to the Addicks quad,

21  the first quad we discussed?

22      A.    So, this one, it is due south of the Addicks,

23  Texas, one.

24      Q.    And who produced these four maps?

25      A.    It's USGS.

1        Q.   Okay.  And let's quickly go through the dates

2   of each of these maps.

3             What is the date of DX752?

4        A.   This is 1970.

5        Q.   DX753?

6        A.   It's 1982.

7        Q.   DX749?

8        A.   1995.

9        Q.   And DX754?

10        A.   That's 2016.

11             MS. DUNCAN:  Your Honor, the United States

12   offers Defendants' Exhibit 752, 753, 749, and 754 into

13   evidence.

14             MR. VUJASINOVIC:  No objection.

15             THE COURT:  Admitted.

16                 (Whereupon, Defendants' Exhibits 752,

17                  753, 749 and 754 were admitted into

18                  evidence.)

19   BY MS. DUNCAN:

20        Q.   Mr. Hansmann, is the Barker Dam depicted on

21   these maps?

22        A.   Yes, it is.

23             THE COURT:  You're going to have to wait just

24   a moment --

25             MS. DUNCAN:  Of course.

```
 1              THE COURT:  -- for the Court to catch up with
 2     its notes.
 3              You may proceed.
 4     BY MS. DUNCAN:
 5         Q.   Mr. Hansmann, now, for the record, can you
 6     describe for us where on these quads the Barker Dam is
 7     depicted.
 8         A.   So it's pretty much the top half of the
 9     quadrangle.
10         Q.   Okay.  And are there any areas subject to
11     inundation depicted on this map?
12         A.   Yes, there is.
13         Q.   Where?
14         A.   It's behind the dam.
15         Q.   Mr. Hansmann, was your office asked to create
16     some maps for this case?
17         A.   Yes, we were.
18         Q.   Okay.  What was your office asked to do?
19         A.   So the Department of Justice contacted us and
20     asked us to take a file that they had collected of
21     property outlines for this area and overlay them on top
22     of our U.S. topographic maps.
23              MR. VUJASINOVIC:  I'm sorry, Judge.  I missed
24     that question.
25              MS. DUNCAN:  I'd be happy to ask again.
```

1          MR. VUJASINOVIC:  Thanks.

2          THE COURT:  We can have it read back, but go

3    ahead, Ms. Duncan.

4    BY MS. DUNCAN:

5      Q.   What were you asked to do?

6      A.   So we were asked to overlay the properties

7    that the Department of Justice had collected on top of

8    our U.S. topographic maps.

9      Q.   Okay.  And so how were these maps created?

10     A.   So using GIS software, we brought in our maps

11   and then overlaid the properties that the Department of

12   Justice provided to us on top of those.

13     Q.   Okay.  I'd now like to turn your attention to

14   Defendants' Demonstrative 7, and this includes four

15   exhibits.

16          MS. DUNCAN:  And, Your Honor, on the

17   demonstrative, we have DX numbers.  But I will read for

18   you the JX numbers, because all of the remainder of the

19   exhibits I will be offering are joint exhibits.  So

20   starting from left to right, we have JX266, JX267,

21   JX268, and JX269.

22   BY MS. DUNCAN:

23     Q.   Mr. Hansmann, are you familiar with the four

24   maps before you?

25     A.   Yes, I am.

1          Q.    And what are these maps?

2          A.    This is the four versions of the Addicks,

3    Texas, quad with the property value -- or property

4    outlines on top of them.

5          Q.    Okay.  And -- and can you tell us, how are

6    the properties depicted on this map -- on these maps?

7          A.    They're shown with a yellow fill with a red

8    outline, and the text is a red and yellow as well.

9          Q.    Is there a legend on this map for the

10   parcels?

11         A.    Yes, there is.

12         Q.    Okay.  Can you describe that for us.

13         A.    So that is in the top right-hand corner.

14         Q.    Okay.  And what is -- what's the language in

15   that legend?

16         A.    It says "parcels," and then it has the symbol

17   that is used and it says "upstream."

18         Q.    Okay.  Now, opposite of that legend is a box

19   with text.

20               What's -- what's that information?

21         A.    So this is a statement that these maps were

22   produced on the request of the Department of Justice

23   with those properties.

24         Q.    Okay.  Now, is this how the test properties

25   are depicted on the USGS maps for all the maps that

```
 1    your office created?

 2        A.   Yes.

 3             MS. DUNCAN:  Your Honor, the United States

 4    offers JX266, 267, 268, and 269 into evidence.

 5             MR. VUJASINOVIC:  Your Honor, we'd object

 6    because these are annotated and the originals would be

 7    the best available evidence.

 8             THE COURT:  Is that -- they are annotated.

 9    But, on the other hand, we have a foundation for -- a

10    basis for the annotations.

11             MS. DUNCAN:  Yes.  Yes, we do.  Mr. Hansmann

12    explained that his office took the parcels, and he

13    explained how the parcels were overlaid onto these

14    maps.

15             Moreover, the underlying maps are already in

16    evidence, and Mr. Hansmann explained what was added to

17    these maps.  This is proper for a trial presentation.

18             THE COURT:  Mr. Vujasinovic.

19             MR. VUJASINOVIC:  Well, I would maintain the

20    objection that the originals are the best available

21    evidence.  The versions they're seeking to admit were

22    never publicly available.

23             MS. DUNCAN:  May --

24             THE COURT:  Overruled.  They're admitted.

25    JX266, 67, 68, and 69 are admitted.
```

```
 1                      (Whereupon, Joint Exhibits 266, 267, 268,

 2                 and 269 were admitted into evidence.)

 3    BY MS. DUNCAN:

 4         Q.   Mr. Hansmann, for the four maps before you,

 5    just for the record, what are the test properties that

 6    are depicted on this map?  And let me just note that

 7    there is a property noted as Mitchell Cummings.  Don't

 8    identify that one.  He has been dismissed from this

 9    case.

10              So other than the Mitchell Cummings property,

11    what are the properties depicted on these maps?

12         A.   If we could zoom in to the top right hand,

13    and we'll work our way down.

14              This is the Burnham at the very top, then

15    Stewart, Sidhu, Turney, West Houston Airport Corp, and

16    Holland.  And then if we could zoom in at the bottom

17    blue-tint area, there's one more, the Popovici.

18         Q.   Thank you.

19              Mr. Hansmann, let's now look to Defendants'

20    Demonstrative 8.

21              MS. DUNCAN:  And, Your Honor, this

22    demonstrative features the DX numbers, but I'm going to

23    read to you the JX numbers moving from the left to

24    right.  And those are JX276, 277 --

25              THE COURT:  Just a moment.
```

 1                    MS. DUNCAN:  Yes.

 2                    THE COURT:   276.

 3                    MS. DUNCAN:  Yes, sir.

 4                    THE COURT:  Just a moment.  Yes.

 5                    MS. DUNCAN:  So 276, 277, 278, and 279.

 6    BY MS. DUNCAN:

 7         Q.   Mr. Hansmann, are you familiar with these

 8    exhibits?

 9         A.   Yes, I am.

10         Q.   And what are these exhibits?

11         A.   This is the Hedwig Village quadrangle with

12    the property parcels laid on top of them.

13                    MS. DUNCAN:  Your Honor, the United States

14    offers JX276, 277, 278, and 279 into evidence.

15                    MR. VUJASINOVIC:  No objection, Judge.

16                    THE COURT:  Admitted.

17                       (Whereupon, Joint Exhibits 276, 277,

18                         278, and 279 were admitted into

19                         evidence.)

20    BY MS. DUNCAN:

21         Q.   Mr. Hansmann, I would like for you to read --

22                    THE COURT:  Ms. Duncan, just give me a

23    moment, Ms. Duncan.

24                    MS. DUNCAN:  Yes.

25                    THE COURT:  I'm amazed the reporter is doing

1    such a good job in keeping up with you.

2             THE COURT REPORTER:  Thank you.

3             THE COURT:  Yes.  Go ahead.

4    BY MS. DUNCAN:

5        Q.   Mr. Hansmann, for the record, I'd like you to

6    tell us what test properties are located on each of

7    these maps.  And why don't we use the far left map

8    shown up here, DX775, which is also JX276, as an

9    example.

10            Mr. Jackson, can you zoom in so that

11   Mr. Hansmann can read these properties.

12       A.   So there are two properties, Lakes on

13   Eldridge and Wind.

14       Q.   Now, Mr. Hansmann, let's move on to

15   Defendants' Demonstrative 9.

16            MS. DUNCAN:  Again, Your Honor, this

17   demonstrative features DX numbers.  I will read in the

18   JX numbers.  Starting from the left to the right, those

19   are JX271, 272, 273, and 274.

20   BY MS. DUNCAN:

21       Q.   Mr. Hansmann, are you familiar with these

22   exhibits?

23       A.   Yes, I am.

24       Q.   What are these?

25       A.   This is the Clodine, Texas, quadrangle with

1    the test properties on top of them.

2              MS. DUNCAN:  Okay.  Your Honor, the United

3    States offers Joint Exhibits 271 through 274 into

4    evidence.

5              MR. VUJASINOVIC:  No objection.

6              THE COURT:  Admitted.

7                   (Whereupon, Joint Exhibits 271 - 274

8                    were admitted into evidence.)

9              THE COURT:  But give me a moment.

10             Thank you.

11   BY MS. DUNCAN:

12       Q.   Mr. Hansmann, I'd like you to tell us for the

13   record which test properties are located on these maps.

14   Why don't we use the far left map, which is DX770, but

15   also JX271.

16             If we can zoom in, Mr. Jackson.

17             Can you tell us for the record what

18   properties are on these maps.

19       A.   So the Soares, Banker, and Micu.

20       Q.   And now I'd like to turn to the last, Defense

21   Demonstrative 10.  This features three maps with

22   DX numbers.

23             MS. DUNCAN:  Your Honor, I will also read in

24   the JX numbers for you.  Starting from the left to the

25   right, those are JX271, 272, 273, and 274.

 1              Oh, excuse me.  I have just read in the wrong

 2    numbers.

 3              Thank you, Charles.

 4              Judge, the maps shown on here are DX779, 780,

 5    and 781, and those are actually JX280, 281, and 282.

 6              THE COURT:  Let's start again with the

 7    JX numbers.

 8              MS. DUNCAN:  Yes, sir.  JX280, 281, and 282.

 9              THE COURT:  Thank you.

10    BY MS. DUNCAN:

11         Q.   Mr. Hansmann, are you familiar with these

12    exhibits?

13         A.   Yes, I am.

14         Q.   And what are they?

15         A.   This is three different versions of the

16    Richmond northeast quadrangle.

17         Q.   And who created these maps?

18         A.   USGS created the original base maps, yes.

19         Q.   Okay.  And you said original base maps.  And

20    so what do you mean by that?

21         A.   So these versions here have the property

22    parcels laid on top of the original --

23         Q.   Okay.

24         A.   -- USGS quadrangle.

25         Q.   So did USGS create both the base maps and the

  1    portion with the overlays?

  2         A.    Yes, we did.

  3         Q.    Okay.   Now, have we discussed this underlying

  4    base map yet?

  5         A.    No, we have not.

  6         Q.    So I'm going to ask you a few more questions

  7    about it just so that our record is clear.

  8              You mentioned this is the Richmond

  9    quadrant -- or quadrangle.   So let's talk about the

 10    dates of those.

 11         A.    Okay.

 12         Q.    Let's go to the left, the Exhibit DX779,

 13    which is also JX280.

 14              What's the date of this map?

 15         A.    So this is 1971.

 16         Q.    Okay.   And if we move to the next map, which

 17    is DX780 and also JX281.

 18              What's the date of this map?

 19         A.    This is 1971 but revised in 1980.

 20         Q.    If we move to the last map on the far right,

 21    which is DX781 and also JX282.

 22              What's the date of this map?

 23         A.    This is 2016.

 24         Q.    Okay.   And, now, can you remind us, what are

 25    the items that USGS overlaid onto this map at the

1    request of --

2         A.    So the items that we placed on top of these

3    maps were the property parcels that were provided to us

4    by Department of Justice.

5         Q.    Okay.  And how about the legend for the

6    parcels?

7         A.    So it's located at the bottom of the -- the

8    map there.

9         Q.    Did you add that too?

10        A.    Yes.  We added that along with the disclaimer

11   on the other side.

12        Q.    Okay.  And so, but for the addition of the

13   property parcels, the legend, and the disclaimer, do

14   these three maps reflect the USGS topographic maps that

15   your office typically maintains?

16        A.    Yes.

17             MS. DUNCAN:  Your Honor, the United States

18   offers JX282, 281, and 280 into evidence.

19             MR. VUJASINOVIC:  No objection.

20             THE COURT:  Admitted.

21                 (Whereupon, Joint Exhibits 281, 282, 280

22                  were admitted into evidence.)

23   BY MS. DUNCAN:

24        Q.    Mr. Hansmann, for the record, which

25   properties are depicted on these maps?  And if it -- if

1    it will help, let's zoom in to the far left map.

2         A.    And let's zoom in to the top left corner.

3         Q.    Top right?

4         A.    Or top right corner.  Excuse me.  And this is

5    the Giron property.

6         Q.    Okay.  And if we -- if we zoom out again,

7    just for the record, are -- is the Barker Dam depicted

8    on this map?

9         A.    Yes, it is.

10        Q.    Okay.  And are there any areas subject to

11   inundation depicted on this map?

12        A.    Yes.

13        Q.    Where are they?

14        A.    Behind the dam.

15        Q.    Say that again.

16        A.    Behind the dam.

17        Q.    Okay.  Now, we've looked at several series of

18   maps that have a 1995 version of a map.

19        A.    Yes.

20        Q.    There's not a 1995 version before us.

21              Why is that?

22        A.    No.  So in 1995, when we were going through

23   and updating these maps, it was determined that there

24   wasn't anything on this map that had changed;

25   therefore, a new map was not needed.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    5/15/2019

1              MS. DUNCAN:  May I have one moment?

2              THE COURT:  Yes.

3              MS. DUNCAN:  No further questions.

4              THE COURT:  Thank you.

5              Mr. Vujasinovic, cross-examination.

6              MR. VUJASINOVIC:  Yes, sir.

7                        CROSS-EXAMINATION

8     BY MR. VUJASINOVIC:

9         Q.   Sir, my name is Vuk Vujasinovic.  I'm with VB

10    Attorneys.  We've never met before.

11        A.   No.

12        Q.   You didn't give a deposition in this case;

13    correct?

14        A.   No, I did not.

15        Q.   And have you ever been to Houston before now?

16        A.   No, I have not.

17        Q.   Okay.  First time in Houston?

18        A.   Yes.

19        Q.   All right.  And these -- the USGS maps you've

20    been talking about, the -- the "subject to controlled

21    inundation" language?

22        A.   Yes, sir.

23        Q.   You said that the only maps that are

24    available online were 2010 or later; is that correct?

25        A.   Yes, sir.

Trial

1      Q.   And so the only maps that are in evidence

2   that are after that date are the handful of 2016 maps;

3   is that correct?

4      A.   No, sir.  These quads have been updated every

5   three years since 2010.

6      Q.   Okay.

7      A.   So that would mean there would be three or

8   four versions of that map.

9      Q.   Okay.  Now, what is the blue -- the blue

10  shading that you've discussed in some of these maps,

11  what is -- what is that based on?

12     A.   I don't understand the question.

13     Q.   Is it based on elevations?  Is it based on

14  storm design? maximum impoundment?  Where did USGS get

15  the data to draw the blue?

16     A.   So that is based off the elevation, and that

17  came from our field notes that were taken in 1970,

18  which was in the map materials box in Denver for this

19  quadrangle.  And, in there, it was determined that the

20  lowest elevation on the dam was used for determining

21  the area of inundation.

22     Q.   Okay.  None of the maps say by whom anyone

23  could be inundated; is that correct?

24     A.   No, it does not.

25     Q.   And none of -- none of the maps say that

1    anybody's home or any geographical area is located in

2    within the government's reservoir, do they?

3         A.    No, it does not.

4         Q.    And none of the maps say that any land or

5    properties or homes are subject to or at risk of being

6    inundated by the government, do they?

7         A.    No, it does not.

8         Q.    None of the -- none of the maps you've

9    discussed tie that blue-shaded area in any way to the

10   actual Addicks and Barker dams, do they?

11        A.    Could you repeat that.

12        Q.    There's no explanation in there tying the

13   blue-shaded area to anything concerning the Addicks and

14   Barker dams, is there?

15        A.    On the map?

16        Q.    Yeah.

17        A.    No.

18        Q.    Okay.  Now, I'm going to show you what's been

19   admitted as Exhibit 2284 in this case.  It's a -- it's

20   a memo from 1989, and someone called in for some

21   information.  It was a potential home buyer, and then

22   the Corps folks contacted Mr. Richard Long.

23              Do you know who that is?

24        A.    No, sir, I do not.

25        Q.    All right.  And, apparently, Mr. Long was the

1    source of some of the information generated in this

2    exhibit.  So I'm going to direct you to page 2 of the

3    exhibit where Mr. Long -- he referenced --

4         Can you read that highlighted right there?

5    A.    "USGS quad maps showing areas of controlled

6    inundation are somewhat misleading."

7    Q.    Okay.  So I have been sitting here listening

8    to you this morning and so was everyone else in the

9    courtroom.

10        Would you agree that those maps are somewhat

11   misleading?

12   A.    No, I would not.

13   Q.    No.  So you've been -- but you have been

14   involved with these maps detailed for, like, over 30

15   years; right?

16   A.    Yes.

17   Q.    Okay.  You think they might be somewhat

18   misleading to the average person that may be buying a

19   home here in Houston?

20   A.    I don't know.

21   Q.    More likely that they probably are misleading

22   to your typical home buyer.

23        Would you admit that, sir?

24   A.    No, I would not.

25   Q.    Now, are you here saying that these USGS maps

1    disclose to potential home buyers that they're inside a

2    reservoir?

3         A.    Could you repeat that, please.

4         Q.    Are you telling the Court that these maps

5    of -- of USGS somehow disclose to a homeowner the house

6    they're about to buy is located inside a reservoir?

7         A.    We don't show property on our maps.  So

8    that -- that would be up to the homeowner to make that

9    determination, not USGS.

10        Q.    So the homeowner would have to start putting

11   together the -- the dots and the pieces of the puzzle

12   you've walked us through here this morning; correct?

13        A.    Yes, they would.

14        Q.    Okay.  And, honestly, do you think the USGS

15   maps alone are an effective way to tell folks that

16   their house they're going to buy is located in a

17   government reservoir?

18        A.    No, I don't know.

19        Q.    You don't know?

20        A.    No.

21        Q.    You're not here to tell the Court it is, are

22   you?

23        A.    I'm not here to give my opinion, no.

24        Q.    The USGS -- the maps you've been talking

25   about, as far as you know, they're not a required

```
 1    disclosure or document in a Texas real estate

 2    transaction, are they?

 3         A.   I wouldn't know.

 4         Q.   Now, are you familiar with the flood

 5    insurance rate maps?

 6         A.   I'm familiar, yes.

 7         Q.   Okay.  And so what do you think a typical

 8    homeowner's going to look at to determine the flood or

 9    possible flood situation of a house they're going to

10    buy, looking at a FEMA flood insurance rate map or

11    going through this process about the USGS maps you've

12    explained this morning?

13              MS. DUNCAN:  Objection.  Calls for

14    speculation.

15              THE COURT:  I'm sorry.  The objection is

16    based on what?

17              MS. DUNCAN:  Objection.  Calls for

18    speculation.

19              THE COURT:  Overruled.

20              THE WITNESS:  I wouldn't know.

21    BY MR. VUJASINOVIC:

22         Q.   When's the last time you bought a house?

23         A.   2010.

24         Q.   Did you look at the flood insurance rate map?

25         A.   No, I did not.
```

```
 1          Q.   Now, you've discussed where some of the
 2   test -- I guess all the test properties are located
 3   within the USGS maps.
 4          Have you looked at where those properties are
 5   located on the flood insurance maps?
 6          A.   No, I haven't.
 7          Q.   I'm going to -- I just want to give you a
 8   couple of examples.  So this is already admitted as
 9   Plaintiffs' Exhibit 461.
10          And do you generally recognize that as a
11   flood insurance map?
12          A.   Yes.
13          Q.   Okay.  I mean, your 30-year history of map
14   knowledge -- I mean, I'll represent to you, first of
15   all, that the -- one of the test properties, the
16   airport, is located in this bottom left-hand corner of
17   this flood insurance map.
18          You follow me?
19          A.   Yes, sir.
20          Q.   Okay.  Now, does anything on this map tell
21   anyone buying a house or a business or a property that
22   there -- that it is located in an area that's at risk
23   of getting flooded by a government project?
24          A.   Not that I can tell.
25          Q.   Let me show you just one other example.  This
```

 1    is already admitted as -- as Plaintiffs' Exhibit 454.

 2    It's kind of near the top of Addicks.  And this is part

 3    of the Bear Creek area.  We got Mr. Burnham in there

 4    and several others.

 5            Same question.  Anything on this flood

 6    insurance map tell a prospective buyer that they're

 7    about to buy a home that's at risk of being inundated

 8    by the government's project?

 9        A.    No.

10        Q.    You told the Court about the -- after 2010,

11    folks could download an electronic version of the maps;

12    right?

13        A.    Yes.

14        Q.    What website -- where do they go to do that?

15        A.    USGS website.

16        Q.    All right.  And then what kind of computer is

17    required to do that?

18        A.    Any computer with access to the internet can

19    access those.

20        Q.    Can you do that off your telephone, cell

21    phone?  Is that going to work?

22        A.    No, that's a mobile application; it's not a

23    computer.

24        Q.    Okay.  So a cell phone won't work?

25        A.    No.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1        Q.    iPads?

2        A.    An iPad would.

3        Q.    An iPad, it's a mobile device.  That works?

4        A.    You can connect to the internet with an

5    iPad.

6        Q.    Okay.  You were talking about Exhibit 744 and

7    this language of "subject to inundation" at the bottom

8    left-hand corner.  Do you remember that?

9        A.    Yes.

10        Q.    Okay.  And so it says the -- basically, the

11    blue shaded area is supposed to -- that language

12    applies to the blue shaded area; correct?

13        A.    Yes.

14        Q.    But then apparently in 2016 -- oops.

15    Sorry -- y'all have completely changed the color

16    pattern of these maps; right?

17        A.    Yes.  We changed the color.

18        Q.    So, as of 2016, on the new maps, all the test

19    properties are high and dry; right?

20        A.    I believe, if you zoom in, that same pattern

21    is still there; it's just a lighter shade of blue.

22        Q.    Okay.

23              Let's zoom in.

24              Okay.  Holland, it looks dry to me.  I mean,

25    where's the blue?  I don't see anything on there.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

 1          A.    I can see it.

 2          Q.    They look different than the prior maps;

 3    right?

 4          A.    Yes.  It's a lighter shade of blue.

 5          Q.    The exhibit -- Defendants' Exhibit 698, which

 6    is the symbols document.  You remember that one?

 7          A.    Yes, sir.

 8          Q.    And it's got the -- that land subject to

 9    inundation language in there?

10          A.    Yes.

11          Q.    And it says "areas shaded in blue are" --

12    that language applies to those; is that right?

13          A.    Yes.

14          Q.    But where is the blue in the 2016 maps?

15          A.    Well, on this version, it is hard to see, but

16    it is there.  I can see it in the green.  I can see the

17    outline on the map.

18          Q.    Okay.  Now, the -- Defendants' Exhibit 42,

19    the -- the handwritten project notes, you remember that

20    one?

21          A.    Yes.

22          Q.    That's never been available to the public;

23    correct?

24          A.    No.  Those notes are not available to the

25    public.

 1        Q.    Thanks for your time, sir.

 2              MR. VUJASINOVIC:  I'll pass the witness.

 3              THE COURT:  Thank you, Mr. Vujasinovic.

 4              The Court has a couple of questions.  May I

 5    ask them?

 6              MS. DUNCAN:  Yes, Your Honor.

 7              THE COURT:  I waited until after the direct

 8    and cross because they might have a substantive import.

 9              Mr. Hansmann, we've had -- have you been in

10    the courtroom during the testimony of others in this

11    case?

12              THE WITNESS:  No, sir, I have not.

13              THE COURT:  Let me just represent to you that

14    we've had testimony about subsidence of land in the

15    Houston area.

16              THE WITNESS:  Yes.

17              THE COURT:  To what extent does the USGS,

18    when it's updating its quadrangle maps, take into

19    account subsidence.

20              THE WITNESS:  So I'm not so sure that we use

21    subsidence, but we do use the vertical datum that has

22    been updated, I think, three times now.  So that is an

23    adjustment to the land elevations for the whole map.

24    So that's how that's accounted for.

25              THE COURT:  What was the last time that

```
 1   adjustment was made?

 2            THE WITNESS:  1988.

 3            THE COURT:  So if there's been subsidence

 4   since 1988, that wouldn't be reflected on the

 5   quadrangle maps?

 6            THE WITNESS:  Correct.

 7            THE COURT:  The Court has no further

 8   questions.

 9            Ms. Duncan?

10            MS. DUNCAN:  I just have a few.  I have a few

11   questions.

12                      REDIRECT EXAMINATION

13   BY MS. DUNCAN:

14       Q.   Mr. Hansmann, you said that you bought a home

15   in 2010; is that right?

16       A.   Yes, I did.

17       Q.   Where do you live?

18       A.   I live in Missouri -- Dixie, Missouri, which

19   is about 30 miles from Rolla, where I work.

20            MS. DUNCAN:  No further questions.

21            THE COURT:  Mr. Vujasinovic?

22            MR. VUJASINOVIC:  Nothing further, Judge.

23            THE COURT:  May the Court excuse

24   Mr. Hansmann?

25            MR. VUJASINOVIC:  Yes.
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

```
 1              THE COURT:  Thank you, Mr. Hansmann.  You are
 2    an expert in your subject.  Thank you indeed for coming
 3    and testifying.
 4              MS. DUNCAN:  Your Honor, the United States
 5    calls Dr. Elizabeth Asche.
 6              THE COURT:  Asche?
 7              MS. DUNCAN:  Yes, sir, A-s-c-h-e.
 8              MR. SHAPIRO:  May I replace this?
 9              I'm going to just replace this, if that's
10    okay.
11              THE COURT:  Dr. Asche, would you come forward
12    and be sworn as a witness, please.
13              Dr. Asche, will you stop about there and
14    raise your right hand to be sworn.
15    Thereupon--
16                   ELIZABETH ASCHE, PHD,
17    was called as a witness, and having been first duly
18    sworn, was examined and testified as follows:
19              THE WITNESS:  I do.
20              THE COURT:  Please be seated in the witness
21    stand.  Thank you.  Make yourself comfortable, if
22    possible -- or as comfortable as possible.
23              THE WITNESS:  Thank you, sir.
24              THE COURT:  And state your full name for the
25    record.
```

```
 1              THE WITNESS:  Dr. Elizabeth Ann Asche.
 2              MS. DUNCAN:  May I proceed?
 3              THE COURT:  Yes.
 4                     DIRECT EXAMINATION
 5   BY MS. DUNCAN:
 6       Q.    Dr. Asche, where do you work?
 7       A.    I work at the Federal Emergency Management
 8   Agency.
 9       Q.    And how long have you been at FEMA?
10       A.    Since 2015.
11       Q.    What do you do for FEMA?
12       A.    I am the chief of the insurance analytics and
13   policy branch within the federal insurance directorate.
14       Q.    Okay.  And, as the branch chief, what are
15   your primary job responsibilities?
16       A.    Essentially, I oversee two different teams:
17   a policy team that has the responsibility to update
18   our standard guidance documents, develop standard
19   operating procedures, and work on congressional reports
20   and other policy products; and an analytics team, which
21   has the primary responsibility, as the data stewards of
22   the National Flood Insurance Program data, to develop
23   products and analyses from that data.
24       Q.    Okay.  You mentioned the National Flood
25   Insurance Program.  I'm going to ask you some questions
```

 1    about that in a moment, but is that program also known
 2    as the NFIP?
 3        A.   Yes.
 4        Q.   And does FEMA maintain information about
 5    policies held under the NFIP?
 6        A.   Yes.
 7        Q.   And does FEMA maintain information about
 8    claims made under the NFIP?
 9        A.   Yes.
10        Q.   Okay.  How long have you served as branch
11    chief?
12        A.   Since 2016.
13        Q.   Okay.  How long has that branch been in
14    place?
15        A.   Since 2016.  I had the opportunity to build
16    the branch from the ground up.
17        Q.   Okay.  And you mentioned that you've been at
18    FEMA since 2015.  What did you do before beginning this
19    branch?
20        A.   I was hired as an expert to do NFIP reform.
21        Q.   Okay.  And what sort of work experience do
22    you have before FEMA?
23        A.   I worked for -- for ten years full-time and
24    part-time at a think tank for a federally funded
25    research and development center for the Department of

1    Homeland Security.

2        Q.   Can you give us an example of some of the

3    work that you did at that think tank?

4        A.   Yeah.  One of the projects that I worked on,

5    I authored a report on the kind of history of federal

6    disaster assistance called "Financing Recovery from

7    Catastrophic Events."

8        Q.   Okay.  And, Dr. Asche, what is your

9    educational background?

10       A.   I have a bachelor's in environmental

11   engineering from the Massachusetts Institute of

12   Technology.  I have a master's in economics and a PhD

13   in economics from the University of California Santa

14   Barbara.

15       Q.   And what did your doctoral research focus on?

16       A.   The economics of the National Flood Insurance

17   Program.

18       Q.   So are you familiar with the history of the

19   National Flood Insurance Program?

20       A.   I am.

21       Q.   Okay.  Now, from a high-level perspective,

22   what is the NFIP?

23       A.   The NFIP is a flood insurance program that is

24   backed by the federal government.

25       Q.   When was it created?

1        A.    The program was created in 1968.

2        Q.    Okay.  And what was going on historically at

3   the time the NFIP was created?

4        A.    In approximately the 30 years prior to the

5   NFIP's creation, there was series of very large floods,

6   where the federal government paid a lot of money to

7   help communities and individuals recover from these

8   flood events.  In addition, insurance was not available

9   at economically feasible rates.

10       Q.    Okay.  And so why was the NFIP created?

11       A.    The NFIP was created to reduce the risks and

12  costs associated with flooding that were borne by

13  taxpayers -- individuals -- and communities.  It was

14  built to do so by initially offering subsidized flood

15  insurance to people and businesses living in

16  communities that participate in the NFIP.

17            Communities that participate in the NFIP need

18  to adopt and enforce minimum floodplain management

19  ordinances, which are developed and intended to reduce

20  those risks and costs of flooding.

21       Q.    Okay.  And what are the mechanics of how a

22  claim on an NFIP insurance policy is paid?

23       A.    Essentially, a policyholder will file a claim

24  on a flood insurance policy.  And this may be with a

25  private insurance company that writes on behalf of the

1    NFIP.

2              The NFIP, the federal government, has a fund

3    called the National Flood Insurance Fund, where they

4    collect and deposit premiums and fees.  They come in

5    from policyholders.  And that fund is used to pay

6    claims.

7              If that fund is exhausted in catastrophic

8    events, the NFIP has the authority to borrow money from

9    the Treasury to pay additional claims.

10        Q.   Okay.  In your job, do you keep track of how

11   many flood insurance policies are sold?

12        A.   Yes.

13        Q.   Why do you track that?

14        A.   One of the reasons that we track how many

15   flood insurance policies are sold and purchased is that

16   a big goal of FEMA, Goal 1 in our strategic plan, is to

17   build a culture of preparedness in the United States.

18   And we recognize that insurance is one of the best

19   lines of defense that an individual can have for their

20   own preparedness.

21             We also recognize that there's an insurance

22   gap.  There aren't as many people that have insurance

23   as we would like to have insurance.  So we want to

24   measure our progress towards closing that insurance gap

25   in order to meet our strategic goals.

1      Q.    Is there a term for the measurement of the
2    number of people that hold flood insurance policies?
3      A.    Yes.  We have developed a measurement of
4    the -- the proportion of people that hold flood
5    insurance policies.  We call that the flood insurance
6    market penetration rate.  We specifically study the
7    residential flood insurance market penetration rate.
8      Q.    How do you calculate the residential market
9    penetration rate?
10     A.    So the market penetration rate is the number
11   of households or residences that have flood insurance
12   in a specific geographic area divided by the number of
13   households in that geographic area.
14           For example, if you had a county where there
15   were ten households and five of those households had
16   flood insurance, your residential market penetration
17   rate would be 50 percent.
18     Q.    Okay.  Now, you used the example of a county.
19   So does FEMA -- does your branch ever determine the
20   penetration rates as to certain geographic areas?
21     A.    Yes.
22     Q.    So are you familiar with the penetration --
23   market -- residential market penetration rates for the
24   nation?
25     A.    I am.

```
 1        Q.   And are you familiar with the residential

 2   market penetration rates for Harris County?

 3        A.   I am.

 4        Q.   And are you familiar with the residential

 5   market penetration rates for Fort Bend County?

 6        A.   I am.

 7        Q.   Are you familiar with those rates as of the

 8   time just before Hurricane Harvey?

 9        A.   I am.

10        Q.   Okay.

11             MS. DUNCAN:  Your Honor, I'd like to ask

12   Dr. Asche to provide us those three numbers.  I think

13   it would be helpful if she could use the flip chart to

14   write those down.  Would you allow her to do so?

15             THE COURT:  She may.  On the other hand, we

16   can actually take notes as we go.  But the use of a

17   flip chart is allowed.

18             THE WITNESS:  All right.

19             THE COURT:  We can hear anyway; barely, but

20   we can hear.

21             Go ahead, Doctor.

22   BY MS. DUNCAN:

23        Q.   You'll need to speak up so that the court

24   reporter can hear you.  And, after you write, be sure

25   to speak in the court reporter's direction.
```

 1          MS. DUNCAN:  Your Honor, may I approach with

 2   the marker?

 3          THE COURT:  Yes.

 4   BY MS. DUNCAN:

 5      Q.   Dr. Asche, what is the residential market

 6   penetration rate for the nation as a whole?

 7      A.   The residential market penetration rate for

 8   the nation as a whole right before Hurricane Harvey was

 9   approximately 3 percent.

10      Q.   And what is the residential market

11   penetration -- or what was the residential market

12   penetration rate for Harris County as a whole just

13   before Hurricane Harvey?

14      A.   The residential market penetration rate for

15   Harris County just before Hurricane Harvey was

16   approximately 21 percent.

17      Q.   And, Dr. Asche, what was the residential

18   market penetration rate for Fort Bend County as a whole

19   just before Hurricane Harvey?

20      A.   The residential market penetration rate for

21   Fort Bend County just before Hurricane Harvey was

22   approximately 19 percent.

23      Q.   And can you provide us a title for this

24   chart?

25      A.   Yes.  I am entitling the chart "Estimated

1    Residential Market Penetration Rate."  And I'm going to

2    put a date on it too.

3              "Estimated NFIP Market Penetration and

4    Residential."  So the date this is as of is

5    August 31st, 2017.

6              And you'll note that that date is the end of

7    August.  And it's a little bit after Hurricane Harvey

8    started.  However, the vast majority of the NFIP

9    policies have a 30-day waiting period.  So this is what

10   we believe best reflects the situation immediately

11   preceding Harvey.

12        Q.   Okay.  You can take a seat.  I'm going to ask

13   you just a few more questions.

14              THE COURT:  Can we identify the flip chart?

15              MS. DUNCAN:  Yes, Your Honor.  And I actually

16   would like to mark it as Defendants' Exhibit 935 and

17   offer it into evidence.

18              THE COURT:  Well, the transcript of the

19   testimony is evidence.  It's a demonstrative.

20              Mr. Easterby?

21              MR. EASTERBY:  Your Honor, I have no

22   objection to it being admitted as a demonstrative.  I

23   suppose I can take a picture of it or something like

24   that, but --

25              THE COURT:  All right.  Let's identify it as

 1    DDX something.

 2                MS. DUNCAN:  DDX11.

 3                And, before I sit down, I'll put a sticker on

 4    it, Your Honor.  And we'll take a picture.  And

 5    tomorrow we will offer it into the record.

 6    BY MS. DUNCAN:

 7         Q.   Dr. Asche, looking at this chart you've just

 8    created, how do the residential market penetration

 9    rates for Harris County compare to those for the

10    nation?

11         A.   They're approximately seven times the

12    residential market penetration rate for the nation as a

13    whole.

14         Q.   Okay.  And how do the rates for Fort Bend

15    County compare to the nationwide rates?

16         A.   They're a little over six times the national

17    average.

18                MS. DUNCAN:  Your Honor, I have no further

19    questions.  I'd like to approach to put a demonstrative

20    exhibit sticker on the chart.

21                THE COURT:  Thank you.

22                Mr. Easterby, cross-examination.

23                I have a couple of questions I'd like to ask,

24    but I'll wait until after the cross-examination is

25    concluded.

```
 1                    CROSS-EXAMINATION

 2   BY MR. EASTERBY:

 3        Q.   Dr. Asche, when did you go to MIT?

 4        A.   Between 2001 and 2005.

 5        Q.   Okay.  My brother went there a little earlier

 6   than you.  Just curious about that.

 7             So chief, insurance analytics, for FEMA or

 8   for NFIP?

 9        A.   For the federal insurance directorate, which

10   is under FEMA and under FIMA, the Federal Insurance and

11   Mitigation Administration.

12        Q.   Okay.  You talked about a culture of

13   preparedness.

14        A.   Yes, sir.

15        Q.   And is that getting at educating the public

16   about their flood risks in the hopes that they'll buy

17   flood insurance?

18        A.   Can you rephrase the question, please.

19        Q.   Sure.

20             Well, I mean, the goal is to get as many

21   folks into NFIP-backed policies as possible; right?

22        A.   The goal is to close the insurance gap,

23   whether it's flood insurance, renters insurance, or

24   homeowners insurance, the specific goal that I was

25   mentioning.
```

1        Q.    But your expertise and involvement is

2   specific to flood insurance?

3        A.    Yes.

4        Q.    NFIP; right?

5              So that gap would be -- ostensibly, some

6   folks may have a flood risk, but they're not insured;

7   right?

8        A.    That is true.

9        Q.    That's the gap; yes?

10        A.    Yes.

11        Q.    And so the best place for those folks to get

12   information about their flood risk would be from a FEMA

13   flood insurance rate map; correct?

14        A.    I don't know.

15        Q.    Really?

16              What is -- what does NFIP use in terms of

17   determining if someone's in a floodplain?

18        A.    Could you be a little bit more specific?

19        Q.    Sure.

20              When you go out and buy an NFIP-backed

21   policy, are there rate differences for folks that are

22   in a 100-year or a 500-year floodplain?

23        A.    Yes.  That is one of the factors that

24   differentiates the difference in price between

25   policies.

 1        Q.    And NFIP won't even write a policy if you're
 2   actually in the floodway; right?  I mean, the floodway
 3   being the actual creek or bayou or whatever?  That's
 4   correct, isn't it?
 5        A.    The regulatory floodway?
 6        Q.    Yes.
 7        A.    Yes.
 8        Q.    And when you say "regulatory," that's from a
 9   FEMA insurance rate map; correct?
10        A.    (No audible response.)
11        Q.    Would it help you to see one?
12        A.    No.
13        Q.    Understandable.
14              Can you answer the question I asked, though,
15   please.
16        A.    A -- a FEMA flood map does show a regulatory
17   floodway, yes.
18        Q.    And you know that federally insured lending
19   institutions require borrowers to have flood insurance
20   if they're in a FEMA-designated 100-year floodplain;
21   yes?
22        A.    Yes.
23        Q.    And those federally insured banks, if the
24   person doesn't, they will put in forced place flood
25   insurance, won't they?

```
 1        A.    Yes.

 2        Q.    That's totally a function of what's depicted

 3   on the FEMA flood insurance rate maps; right?

 4        A.    The mandatory purchase requirement, yes.

 5        Q.    Right.  So just -- I'm sorry if my question

 6   was unclear.

 7              Let's say you got somebody that's about to

 8   buy a house.  And they go to the bank, and they're

 9   told, hey, you're in a 100-year flood zone.

10              You with me so far?

11        A.    I am.

12        Q.    The bank is looking at a FEMA flood insurance

13   rate map to make that assessment; yes?

14        A.    Yes.

15        Q.    That's it.  I mean, that's the map they use;

16   they don't use anything else.  Right?

17        A.    Lenders have the ability to ask people to

18   meet higher than the minimum standards, but the

19   standard is the FEMA designation of in or out.

20        Q.    Right.  They don't use, like -- I don't

21   know -- some kind of topographic map that USGS puts

22   out.  They don't use that, do they?

23        A.    I am not a lender.  I'm sorry.

24        Q.    But you're very well conversant with the NFIP

25   rules that relate to this very subject, aren't you?
```

```
 1         A.    I am.

 2         Q.    And they only use a flood insurance rate

 3    maps.  That's it?

 4         A.    I -- I, again, I'm really sorry.  I'm not a

 5    lender.  I only know what -- what the rules say.  FEMA

 6    is not responsible for enforcing the mandatory purchase

 7    requirement.  I'm sorry.

 8         Q.    Understood.  So have you been to Houston

 9    before this trial?

10         A.    No, sir.

11         Q.    And where are you from?

12         A.    Originally, I am from Washington state.

13         Q.    Washington state.

14               Have you ever been to Rhode Island, by any

15    chance?

16         A.    I have been to Rhode Island.

17         Q.    Did you know that Harris County is

18    70 percent -- 71 percent bigger than the state of Rhode

19    Island?

20         A.    I did not know that.

21         Q.    So the graph that you were kind enough to put

22    together, which is DDX11, when it says 21 percent of

23    Harris County had an NFIP-backed flood insurance policy

24    prior to Harvey, you're talking about an area that is

25    71 percent bigger than the state of Rhode Island;
```

 1    correct?

 2         A.    If -- if your statement that Harris County is

 3    71 percent bigger than Rhode Island, yes, physically,

 4    land area, that is correct.

 5         Q.    And for the record, I googled it.  So it may

 6    not be totally accurate, but I do know it is bigger.

 7               You haven't done any kind of analysis

 8    about -- what did you call it?  The penetration --

 9    penetration rate or something?  Residential market

10    penetration rate; right?  Is that the right term?

11         A.    Yes.

12         Q.    And you hadn't done any kind of analysis of

13    what the residential market penetration rates for the

14    areas that are behind the Addicks Dam that are subject

15    to being submerged by water that's being held back by

16    the government's flood control project; correct?

17         A.    That is correct.

18         Q.    So you don't know if that's 21 percent?

19    3 percent? 1 percent?  No idea?

20         A.    That is correct.

21         Q.    Would it surprise you to learn that it's

22    substantially lower than the rest of Harris County?

23         A.    I don't know how to answer that question.

24         Q.    Well, let me ask you this way.  Like, my

25    house now is in Zone X, which is no flood zone; right?

1       A.    That is not necessarily precisely true.

2       Q.    Okay.

3       A.    That is not in the defined special flood

4   hazard area at this point.

5       Q.    Right.  So there's the AE.  That's 100-year;

6   right?

7       A.    Yes.

8       Q.    Then the 500-year is, like, shaded X, I

9   think?

10       A.    Yes, the 500-year is shaded X.

11       Q.    And then there's just the white area, which

12   is nothing.

13       A.    It is -- it is not necessarily no floodplain,

14   but it is not an area that has been defined as having a

15   specific hazard that you're talking about with AE and

16   shaded X.

17       Q.    Right.  So when you talk about closing the

18   gap, y'all are really focused on the places that have

19   the biggest risk of being flooded; right?

20       A.    I don't think that's true, no.

21       Q.    Just doesn't matter if it's someplace that

22   floods four or five times in a five-year stretch or

23   it's never flooded?

24       A.    When we talk about the closing -- the

25   insurance gap, we reference the national numbers as

 1    being a huge -- huge protection gap, so ...

 2         Q.    I meant to ask you also, you haven't done any

 3    analysis for Fort Bend County specific to the areas

 4    behind the Barker Dam that are at risk of being

 5    submerged by runoff held back by the Barker

 6    embankments.  It's just for Fort Bend County as a

 7    whole?

 8         A.    Correct.

 9         Q.    Okay.  Oh, one last question.  Does a

10    standard NFIP policy cover losses from

11    government-induced flooding?

12         A.    A standard NFIP policy covers losses that

13    meet the definition of a flood.

14         Q.    Well, it's a standard policy; right?  NFIP

15    has a standard prescribed flood insurance policy

16    everywhere across the United States; true?

17         A.    There are three policy forms.

18         Q.    And they all have the same language regarding

19    what is a covered loss?

20         A.    And what is the -- the definition of a

21    general condition of flooding.

22         Q.    Sure.  So -- and you talked about the

23    write-your-own private insurance companies that do

24    flood insurance?  Or maybe you talked a little bit

25    about it, but that's -- that's a thing; right?  It's

1    write-your-own.  You could have a private insurance

2    company that acts as third-party administrator for

3    NFIP, but that private company, it doesn't bear the

4    risk of loss under the policy?

5        A.   Private companies that participate in the

6    write-your-own self-paid do not bear the financial risk

7    of loss under the NFIP; the federal government does.

8        Q.   The federal government bears the risk of loss

9    of every single flood insurance policy out there in the

10   United States?

11       A.   That is incorrect.  There are private flood

12   insurance policies.

13       Q.   You got me.  But residential NFIP backs,

14   that's all --

15       A.   National flood insurance policies are covered

16   by the federal government.

17       Q.   Okay.  So and your familiar with those three

18   versions of the policies.  Yes?

19       A.   Very high level.

20       Q.   Okay.  I just want to know, do you know if a

21   standard residential NFIP policy covers losses from

22   government-induced flooding?

23       A.   If that government-induced flooding meets our

24   definition of a general condition of flooding.  So in

25   the -- in the code of -- or the regulations behind the

1    National Flood Insurance Program, we have a definition

2    for a general condition of flooding.

3        Q.    What is the definition, if you know?

4        A.    I do not know the specific definition off the

5    top of my head.

6        Q.    So -- and I understand it's hard and maybe

7    even a little bit unfair to try to ask you that, but

8    what is your understanding of what the general

9    condition of flooding definition is?

10       A.    So -- okay.  Two or more acres of normally

11   dry land or two or more properties that have

12   experienced that -- that have water on them.  The cause

13   of the flood, whether it's rain, hurricane, tidal

14   surge, overflow of a lake, any other way that water

15   goes somewhere is not specified as the -- the reason

16   for coverage or noncoverage.

17       Q.    So two or more acres of normal dry land or

18   two or more properties are inundated by water or

19   mudflow.  Is that essentially what you just said?

20       A.    Are you reading the definition of a general

21   condition of flooding?  It sounds very similar to my

22   understanding.  I do not know the exact definition off

23   the top of my head.

24       Q.    Okay.  I've read it.  I've actually been a

25   recipient of NFIP money on two occasions so far in my

1    former residence.

2              Does it specifically address

3    government-induced flooding as a covered loss?

4         A.   I don't think so, but I do not know.

5         Q.   I don't think so either.

6              MR. EASTERBY:  Thank you, Doctor, for your

7    time today.

8              I will pass the witness.

9              MS. DUNCAN:  No further questions.

10             THE COURT:  The Court has a set of questions.

11             MS. DUNCAN:  Then I may reserve.

12             THE COURT:  May I ask them?

13             MS. DUNCAN:  Yes, Your Honor.

14             THE COURT:  Dr. Asche, I didn't understand

15   DDX11.  When you listed the percentages of residential

16   market penetration rates for national, Harris County,

17   and Fort Bend County, was that just the rate percentage

18   for those homes or residences that were within the

19   100-year floodplain?

20             THE WITNESS:  No.  Those are for the -- the

21   counties as a whole.

22             THE COURT:  So it's all the properties in the

23   county?

24             THE WITNESS:  It's all the properties in the

25   county.

1            THE COURT:  Flood zone or not?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  All right.  Do you have a market

4  penetration rate for the properties in a 100-year flood

5  zone?

6            THE WITNESS:  Yes.

7            THE COURT:  What is that called?

8            THE WITNESS:  It is the residential market

9  penetration rate, but it's specifically within that

10  SFHA.

11            THE COURT:  Do you know what the percentages

12  are on the particular three types of areas you listed

13  on your chart?

14            THE WITNESS:  Yes.

15            THE COURT:  Could you add them to your chart?

16            THE WITNESS:  I could.

17            THE COURT:  Would you, please.

18            THE WITNESS:  Yes.  Do you mind if I just use

19  one of the pens up here?  It will be a different color.

20            THE COURT:  No.  That's fine.

21            THE WITNESS:  So I'm adding a column, and

22  this is just SFHA penetration rate.  So this is the

23  100-year floodplain that we were talking about.  And

24  these rates for the nation, approximately 30 percent of

25  the nation as a whole in the special flood hazard area

 1   has flood insurance --

 2            THE COURT:  Yes.

 3            THE WITNESS:  -- or had flood insurance as of

 4   October 31, 2017.  In Harris County, it was

 5   approximately 43 percent.  And in Fort Bend County, it

 6   was approximately 26 percent.

 7            THE COURT:  Thank you.  Before you leave your

 8   chart, do you know what the rate is subsequent to

 9   Hurricane Harvey?

10            THE WITNESS:  I know that the rates are much

11   higher.  I have approximate numbers in my brain, but I

12   don't feel as confident in these numbers that I've

13   been -- you know, getting ready for today.

14            Would you like me to -- to put a -- they've

15   gone up.  All of them have gone up.

16            THE COURT:  Why don't -- underneath the word

17   "nation" and "Harris County" and "Fort Bend County,"

18   could you just write an estimate?  Could you just write

19   what you think the numbers approximate?

20            THE WITNESS:  So this is going to be the

21   county as a whole --

22            THE COURT:  All right.

23            THE WITNESS:  -- right now?  Is that what

24   you're --

25            THE COURT:  Yes.

1          THE WITNESS:  Okay.  So Harris is about -- I
2    think it's about up to 48 percent.
3          THE COURT:  That's compared to 21 percent; is
4    that correct?
5          THE WITNESS:  I would -- I would love to be
6    able to get back to you on that, if that is possible.
7          THE COURT:  You can't do that.
8          THE WITNESS:  Okay.  All right.  All right.
9          THE COURT:  I'm sorry.
10          Mr. Easterby?
11          MR. EASTERBY:  And I hope I'm not speaking
12    out of turn.  I just thought maybe we could take a
13    lunch break and give the witness a chance to get
14    reliable information on this subject, which I think is
15    important.
16          THE COURT:  Well, Dr. Asche might be able to
17    do that or might not.
18          Ms. Duncan?
19          MS. DUNCAN:  At your pleasure, Your Honor.
20          THE COURT:  I'm sorry?
21          MS. DUNCAN:  At your pleasure.  Whatever you
22    prefer.
23          THE COURT:  Well, it is a little after noon.
24          Dr. Asche, do you mind?
25          THE WITNESS:  I can get them in 15 seconds if

```
 1    I'm allowed to get them, sir.

 2              THE COURT:  All right.

 3              THE WITNESS:  I have them written down.  They

 4    are not here with me.

 5              THE COURT:  Now, we're talking about the

 6    nation as a whole --

 7              THE WITNESS:  Yep.

 8              THE COURT:  -- after Harvey.

 9              THE WITNESS:  The nation as a whole after

10    Harvey, I can say with confidence is about 4 percent.

11              THE COURT:  And then in the 100-year

12    floodplain, can you give those numbers after Harvey?

13              THE WITNESS:  About 30 percent still.

14              THE COURT:  Let's find out.

15              THE WITNESS:  Okay.

16              THE COURT:  May we take our luncheon recess

17    at this point?

18              MR. EASTERBY:  Yes, Your Honor.

19              MS. DUNCAN:  And, Your Honor, I will have a

20    few redirect questions then.

21              THE COURT:  I guessed as much.  Thank you

22    very much.

23              THE CLERK:  All rise.  Our court is in

24    recess.

25                   (Whereupon a luncheon recess was taken.)
```

1           THE CLERK:  All rise.  United States Court of

2    Federal Claims is now in session, the Honorable Charles

3    F. Lettow presiding.

4           THE COURT:  Please be seated.

5           Dr. Asche, welcome back.

6           THE WITNESS:  Thank you, sir.

7           THE COURT:  Hopefully, you had a decent lunch

8    while you were working.  We'll find out.

9           Ms. Duncan?

10          Let me just find out.  Mr. Easterby, I take

11   it you have -- I'll give you a chance to ask redirect

12   because I asked some questions of Dr. Asche.

13          MR. EASTERBY:  Yes, sir.

14          THE COURT:  Ms. Duncan, you may proceed.

15          MS. DUNCAN:  Your Honor, would you like

16   Dr. Asche to address your questions just before the

17   lunch break?

18          THE COURT:  That's up to you.

19          MS. DUNCAN:  Dr. Asche, are you able to

20   address the judge's questions?

21          THE WITNESS:  I am able to address the

22   judge's questions.

23          THE COURT:  Okay.  Go ahead.

24          MS. DUNCAN:  And, Your Honor, is it okay for

25   the witness to step down?

 1          THE COURT:  Yes.

 2          MS. DUNCAN:  Do you need a marker, Dr. Asche?

 3    Excellent.

 4          THE WITNESS:  Okay.  So the numbers that I'm

 5    going to write are as of February of 2019.  That is the

 6    most recent penetration rate analysis that my team has

 7    done.  Okay?

 8          So the nation as a whole -- and this is going

 9    to be as of 2/28/19 -- is approximately 4 percent,

10    whereas the SFHA is approximately 28 percent for Harris

11    County.  As of 2/28/19, the SF -- or the county as a

12    whole is 28 percent, and the SFHA is 46 percent.  Okay?

13          And then, finally, Fort Bend County, as of

14    2/28/19, is 34 percent at the county level and

15    29 percent in the SFHA.

16          THE COURT:  Thank you, Dr. Asche.

17          THE WITNESS:  You're welcome, sir.

18                    REDIRECT EXAMINATION

19    BY MS. DUNCAN:

20      Q.   Go ahead and take a seat.

21          Dr. Asche, Mr. Easterby asked you some

22    questions about when NFIP claims were actually paid.

23    Do you recall some of those questions?

24      A.   Yes, ma'am.

25      Q.   Okay.  Does your branch maintain information

 1     about NFIP claims that are paid?

 2          A.   Yes, ma'am.

 3          Q.   And have you gathered -- are you familiar

 4     with information about NFIP claims made in Harris

 5     County, Fort Bend County, and Waller County for this

 6     litigation?

 7          A.   Generally, yes.

 8          Q.   Okay.  Now, Dr. Asche, were any of the test

 9     properties in the upstream case that we're dealing with

10     now paid on their NFIP flood insurance policies

11     following Hurricane Harvey?

12               THE COURT:  Mr. Easterby?

13               MR. EASTERBY:  Your Honor, I did make a

14     reference to my own personal situation, but I didn't

15     ask any questions about NFIP claim payments in my cross

16     of the witness.

17               THE COURT:  Overruled.

18               THE WITNESS:  Yes.  My understanding, yes.

19     BY MS. DUNCAN:

20          Q.   Okay.

21               MS. DUNCAN:  No further questions.

22               THE COURT:  All right.  Thank you.

23               Mr. Easterby?

24               MR. EASTERBY:  Thank you, Judge.  I'll be

25     very brief and limit it to the new information.

```
 1                    RECROSS-EXAMINATION
 2   BY MR. EASTERBY:
 3        Q.   So, Dr. Asche, you'd take some statistics
 4   course at MIT in pursuing your doctorate?
 5        A.   I -- I have taken statistics courses in
 6   pursuing my doctorate, yes.
 7        Q.   So the new information, it appears to
 8   indicate that, for Harris County for folks that were in
 9   the 100-year or SFHA, how big of an increase was it
10   between before Harvey and after Harvey?
11        A.   There's a 3 percent difference.
12        Q.   It's not a trick question.  I just wanted to
13   make sure I was understanding what you wrote.
14             And then, in Fort Bend, same question.  It
15   looks like -- what? -- a 3 percent increase?
16        A.   Yes, sir.
17        Q.   And then countywide you're seeing bigger
18   increases, are you not, for Fort Bend?  It's the
19   difference between 34 and 19?
20        A.   Yes, sir.
21        Q.   And for Harris it's a 7 percent increase?
22        A.   Yes, sir.
23        Q.   Are you aware that, in the area behind the
24   Barker Dam in Fort Bend County, there's not any
25   residential land that's in a 100-year FEMA-regulated
```

1    floodplain?

2         A.   I am not aware of that.

3         Q.   Does this information suggest to you that

4    folks that are in the special flood hazard area are

5    more likely to buy flood insurance than those that are

6    not, or can you make a conclusion either way?

7         A.   I don't -- I don't quite understand the

8    question.  I'm sorry.  Can you ask it a different way.

9         Q.   So the goal is to get more market penetration

10   with folks that have flood risk; right?

11        A.   The goal is to have more market penetration

12   with everyone.

13        Q.   With everyone.  Okay.

14             Oh, I wanted to ask you again about that --

15   do you know if the policy -- the standard policy for a

16   dwelling under the NFIP covers flood claims associated

17   with government-induced flooding?  Do you remember

18   that?

19        A.   I do remember that question.

20        Q.   I was able to get my hands on one of those

21   policies during the break.

22             And, with the Court's permission, I'd like to

23   put it up just as a demonstrative so the witness can

24   see the language and if she can answer the question, if

25   that's okay.

1          MS. DUNCAN:  Counsel, do you have a copy of
2     this?
3              THE COURT:  I'm sorry.
4              Ms. Duncan?
5              MS. DUNCAN:  Counsel, do you have a copy of
6     this?
7              MR. EASTERBY:  I actually don't.  I literally
8     just pulled it off the web.  And we can all look at it
9     together or -- I'm asking.
10             MS. DUNCAN:  If the witness has familiarity
11    with this, that's fine.  But I don't know that that's
12    been established yet.
13             THE COURT:  Well, it's not truly recross, but
14    it goes back to your cross.
15             On the other hand, Dr. Asche might be
16    familiar with it.  Let's find out.
17             We ought to identify it as a demonstrative.
18             MR. EASTERBY:  Yes, sir.  So we'll identify
19    this as PEX No. 8.  It appears to be a National Flood
20    Insurance Program dwelling form, standard flood
21    insurance policy, F1 -- strike that --
22    F-1224/October 2015, bearing the seal of the Department
23    of Homeland Security and with the FEMA initials after
24    that.
25    BY MR. EASTERBY:

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1          Q.    You see that, Doctor?

2          A.    I see that.

3                MR. EASTERBY:  Matt, if we could step through

4     the second page.  I believe that there --

5                THE COURT:  Mr. Easterby, we really need to

6     know whether Dr. Asche is familiar with it or not.

7                MR. EASTERBY:  Yes, sir.

8     BY MR. EASTERBY:

9          Q.    Dr. Asche, I know I'm kind of springing this

10    on you.  So, in fairness to you, are you at all

11    familiar with this dwelling form?  If you're not,

12    you're not; if you are, you are.

13                Let us know.

14         A.    I have read the dwelling form, but my branch

15    is not responsible for interpreting the standard flood

16    insurance policy language that is in the dwelling form.

17                MS. DUNCAN:  Objection, Your Honor.  We

18    object to lack of foundation.  Further, this is beyond

19    the scope of my redirect.

20                THE COURT:  Would you state your last part of

21    your statement again.

22                MS. DUNCAN:  Yes, Your Honor.

23                These questions are beyond scope of my

24    redirect.

25                THE COURT:  Mr. Easterby?

 1              MR. EASTERBY:  Your Honor, I would just like

 2    to show her the definition we talked about earlier, if

 3    that refreshes her recollection to be able to answer

 4    the question, and that will be it.

 5              THE COURT:  That's allowed.

 6              MR. EASTERBY:  Thank you, Your Honor.

 7              Second page, Matt.  Please zoom into the

 8    flood definition.  This is page 1 of 26 of PEX88.

 9    BY MR. EASTERBY:

10         Q.   Do you see that definition, Doctor?

11         A.   I do see that definition.

12         Q.   So, based on that definition, do you know

13    whether or not government-induced flooding would be a

14    covered loss under this NFIP dwelling policy?

15         A.   I do not feel like I'm in a position to be

16    able to answer that question for you.

17         Q.   Fair enough.  Thank you for your time today,

18    Doctor.  I appreciate it.

19              MR. EASTERBY:  I'll pass the witness.

20              THE COURT:  Ms. Duncan, are you ready?

21              MS. DUNCAN:  One more question.

22              THE COURT:  Yes.

23                   FURTHER REDIRECT EXAMINATION

24    BY MS. DUNCAN:

25         Q.   Are you familiar with whether any of the test

1   properties in this upstream case have made a claim

2   after Hurricane Harvey and were paid on that claim?

3       A.   Yes.

4       Q.   And what's your familiarity with that?

5       A.   I am familiar with one property that has made

6   a claim and been paid.

7       Q.   And that property is a test property in this

8   case?

9       A.   Yes.

10          MS. DUNCAN:  No further questions.

11          THE COURT:  Thank you.

12          May the Court excuse Dr. Asche?

13          MR. EASTERBY:  Yes, Your Honor.

14          MS. DUNCAN:  Yes, Your Honor.

15          THE COURT:  Thank you, Dr. Asche.  Thank you

16   for coming.  Are you in Washington?  Are you based in

17   Washington?

18          THE WITNESS:  I am based in Washington, D.C.,

19   sir.

20          THE COURT:  All right.  Thank you very much.

21   Thank you for coming and thank you for testifying.

22          Mr. Chellis.

23          MR. CHELLIS:  Your Honor, the United States

24   calls Michael Nakagaki.

25          THE COURT:  Thank you.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                5/15/2019

```
 1              Mr. Nakagaki, stop right there and raise your
 2    right hand to be sworn as a witness.
 3    Thereupon--
 4                       MICHAEL NAKAGAKI,
 5    was called as a witness, and having been first duly
 6    sworn, was examined and testified as follows:
 7              THE WITNESS:  Yes.
 8              THE COURT:  Thank you.  Please be seated in
 9    the witness stand.
10                       DIRECT EXAMINATION
11    BY MR. CHELLIS:
12         Q.   Please introduce yourself.
13         A.   My name is Michael Nakagaki, and I am a
14    program specialist within the mapping section of the
15    NFIP at FEMA.
16         Q.   Mr. Nakagaki, how long have you worked at
17    FEMA?
18         A.   I have worked at FEMA for over four years
19    now.
20         Q.   And what's your job title again?
21         A.   My title is a program specialist.
22         Q.   And what is it that you do as a program
23    specialist?
24         A.   As a program specialist, I use my knowledge
25    of the mapping program to address inquiries that come
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

```
 1    into the section as well as to support the region in
 2    their delivery of flood hazard maps to communities.
 3        Q.    And what's your educational background?
 4        A.    My highest education is a master's in
 5    geoscience from Virginia Tech.
 6        Q.    Where were you working before FEMA?
 7        A.    Before FEMA, I worked at two contractors for
 8    FEMA.  The first was a company called Dewberry.  The
 9    second was a company called Michael Baker Corp.  And,
10    for both of those positions, I was supporting primarily
11    a call center to assist callers to locate flood
12    insurance rate maps through FEMA's map service center
13    website.
14        Q.    And if a caller wanted a flood map, what was
15    the process for that?
16        A.    I would assist them with the map service
17    center website.  It's an online tool for people to type
18    in their address, find a FIRM panel near their
19    property, and then print what's called a FIRMette,
20    which is a way to print a section of the overall FIRM
21    so that way the scale can be maintained, but -- as
22    opposed to printing a 2-foot-by-3-foot map, that a
23    specific section could be printed on a typical
24    11-by-8 ½ sheet.
25        Q.    When did FIRMettes become available to the
```

1    public?

2         A.    Those became available around the mid 2000s.

3         Q.    And what's your understanding of why FEMA

4    made these FIRMettes available to the public?

5         A.    The reason is the FIRM panel itself, again,

6    is -- when printed to scale, is 2 feet by 3 feet.  And

7    there's a lot of details that are included on that,

8    including roads and other features from the local

9    community.

10              If that entire map is shrunk down itself to

11   about the 11 by 8 ½, a lot of those features can be

12   either distorted or too small to read accurately.  So

13   the FIRMette is a way to maintain that scale and that

14   level of detail while still being accurate to be able

15   to measure things from one location to the other and

16   ensure that the scale is maintained.

17              MR. CHELLIS:  Let's pull up DX183.

18              Your Honor, this has already been admitted as

19   Upstream 461.

20              THE COURT:  Upstream 461?

21              MR. CHELLIS:  Correct.

22              THE COURT:  Let's use that number.

23   BY MR. CHELLIS:

24        Q.    Are you familiar with this document?

25        A.    Yes, I am.

1          Q.    And what is it?

2          A.    This is a flood insurance rate map panel for

3    Harris County, Texas.

4          Q.    And what's the date on the map?

5          A.    It says that this became effective in 2007.

6          Q.    Now, if I'm trying to determine what flood

7    zone my home is located in, what am I looking at on

8    this map?

9          A.    You would locate where your property is based

10   on the road names that are available on this map and

11   then determine which of these shaded areas the property

12   falls within.

13         Q.    Can you speak to the flood zones in the area

14   marked "Legend"?

15         A.    Yes.  So these explain the different shading

16   on the flood insurance rate map panel itself.  The

17   darkish shading are the zones that begin with the

18   letters A or B.  And this is the special flood hazard

19   area, so this is the area that is subject to the

20   1 percent annual chance of flood.

21                That means that, given a hypothetical flood

22   event that has a 1 percent chance of occurring any

23   given year, this is the projected area that would be

24   inundated.

25                On this legend, there's also the floodway

```
 1    areas, which would be the SFHA with those

 2    cross-hatchings.

 3            And then there is the medium gray area that's

 4    labeled "Other Flood Areas."  Those are going to be

 5    labeled either X with shading, or, on some of the older

 6    maps, that would be Zone B.  And this is the area

 7    that -- when it's depicting a flooded area, that --

 8    it's the area that's associated with the 0.2 percent

 9    annual chance of flood.  So that is a flood that would

10    have a 0.2 percent chance of occurring any given year.

11            And then the remaining areas outside of that

12    would be X unshaded.  And that is the area that is

13    outside of the .2 percent floodplain.  On the older

14    maps, that may be labeled as a Zone C.

15        Q.   How do you determine which areas warrant a

16    particular flood designation?

17        A.   That's determined through the flood insurance

18    study process.  So, through that process, the FEMA

19    region, working with our mapping partners, gather all

20    of the applicable hydraulic and hydrologic information,

21    as well as past flooding events and topographic

22    information, and use that information and input it into

23    a model to come up with these projections of high -- of

24    how high the flooding is projected to be.  And that is

25    then intersected with the topography of the area to
```

1    determine what area would flood.

2         Q.    You talked about 1 percent, 0.2 percent, and

3    less than 0.2 percent.  Are there more generic ways of

4    describing what those flood hazards zones mean to,

5    like, a homeowner?

6         A.    Yes.  The 1 percent annual chance of flood is

7    sometimes called the 100-year storm.  And the

8    .2 percent floodplain is sometimes called the 500-year

9    storm.

10         Q.    And the less than 0.2 percent chance?

11         A.    And that would be the area that's outside of

12    the .2 percent annual chance floodplain.  So that's the

13    area that would be subject to a flood event that would

14    be more severe but less statistically likely than

15    .2 percent any given year.

16         Q.    Does that mean that that less than

17    0.2 percent area would never flood?

18         A.    No.  That area has a -- a lower probability,

19    but there is a chance that that area would flood.

20         Q.    Can a flood hazard area change over time?

21         A.    Yes, it can, based on the -- again, the

22    inputs that go into the modeling.  So hydraulics and

23    changes in topography or even changes in development

24    can all influence the flooding patterns of the area,

25    which would then change the projected 1 percent annual

 1   chance floodplain.
 2        Q.   On the right-hand side of this map, there are
 3   squiggly -- well, it's squiggly lines that read "103"
 4   and "104."  What do those indicate on the map?
 5        A.   Those indicate the base flood elevations.  So
 6   the 1 percent annual chance flood is also known as the
 7   base flood.  And so what these elevations show is the
 8   projected flooding heights given that hypothetical
 9   flood.
10        Now, the important thing to keep in mind is
11   that these elevations are not elevations above ground.
12   These are above a set datum.  So it's basically above
13   sea level.
14        Q.   Mr. Nakagaki, are you aware of the trial
15   properties in this case?
16        A.   Yes, I am.
17        Q.   And how are you aware of those?
18        A.   I'm aware of those through the support that
19   I've done in creating 13 map books for each property.
20        Q.   Do you see any trial properties on this
21   particular map?
22        A.   Yes.  The West Houston Airport is labeled on
23   this map on the lower left-hand corner.
24        Q.   Now, Mr. Nakagaki, you spoke just now the map
25   books that you created for this case.  Can you describe

 1    more about what you were asked to do.

 2         A.    We were provided with GIS information about

 3    specific property locations as well as the date of

 4    acquisition for each of those properties.  We then used

 5    that information to identify the -- where those

 6    properties fell on the current affected maps as well as

 7    on the map that was in effect at the time of

 8    acquisition, or, in two cases, the map that became in

 9    effect -- into effect as close to that date of

10    acquisition as possible.

11              MR. CHELLIS:  Let's pull up JX286.

12    BY MR. CHELLIS:

13         Q.    Do you recognize this document?

14         A.    Yes, I do.

15         Q.    What is it?

16         A.    This is the map book for the Micu property.

17         Q.    And how did you know the location of the Micu

18    property?

19         A.    That information was provided to us by the

20    DOJ.

21         Q.    And how did you know when this property was

22    acquired?

23         A.    That information was also provided to us by

24    DOJ.

25              MR. CHELLIS:  Your Honor, we move to admit

 1    JX286.

 2              THE COURT:  Mr. Vujasinovic?

 3              MR. VUJASINOVIC:  I haven't seen what's

 4    behind it.  I'm sorry.

 5              MR. CHELLIS:  I'm about to have him go

 6    through a walk-through of the map book if that helps.

 7              THE COURT:  Well, it might, but it would help

 8    to have at least one version of it on the screen or

 9    otherwise available.

10    BY MR. CHELLIS:

11        Q.   This is just the title page.

12              Can we flip to the next page.

13              Mr. Nakagaki, can you give us a high-level

14    walk-through of the map book.

15        A.   Sure.

16              So on the -- the page that's being displayed

17    now, FEMA080999, this page provides a definition and

18    the zones associated with the high-, moderate-, and

19    low-hazard areas.

20              The next page, which is FEMA081000, shows the

21    legend from the following flood insurance rate map

22    images to provide an explanation of what the shading

23    means.

24              The next page, FEMA081001, this shows the map

25    that was in effect when the Micu property was acquired.

 1    On the lower end of the map, it has the property name,

 2    the address, the flood zone that the property is shown

 3    to be in, as well as information about the panel

 4    itself, including when that map became effective and

 5    when it was superseded, meaning when the next version

 6    of a FIRM replaced it.

 7             On the next page, which is FEMA081002, this

 8    is a zoomed-in view of the property to better see where

 9    the property is in relation to the flood zone.

10             The next page, which is FEMA081003, this

11    shows the current effective flood insurance rate map

12    for the property.  And then it also shows the property

13    name, address, flood zone, and the date that that map

14    became effective.

15             The final page, which is FEMA081004, again

16    shows a close-up of the Micu property on the current

17    effective FIRM.

18        Q.   And if we go back to the first map listed,

19    it's on FEMA081001.  What flood zone is the Micu

20    property located in?

21        A.   The Micu property is shown to be within the

22    shaded X zone.

23             MR. CHELLIS:  Your Honor, we'd move to admit

24    JX286.

25             THE COURT:  Thank you, Mr. Challis.

 1              Mr. Vujasinovic?

 2              MR. VUJASINOVIC:  No objection.

 3              THE COURT:  Admitted.

 4                  (Whereupon, Joint Exhibit 286 was

 5                   admitted into evidence.)

 6   BY MR. CHELLIS:

 7         Q.    Now, Mr. Nakagaki, we're going to go through

 8   12 exhibits that are similar and that contain the same

 9   type of information as the Micu property map book.

10         A.    Okay.

11              MR. CHELLIS:  Your Honor, the DX exhibits

12   will be in DX binder 24, and the JX exhibits will be in

13   JX binder 10.

14              Now turning to DX806 --

15              THE COURT:  Is this a JX exhibit?

16              MR. CHELLIS:  This is a DX, Your Honor.

17              THE COURT:  DX?

18              MR. CHELLIS:  DX806.

19              THE COURT:  Thank you.

20              THE WITNESS:  Okay.

21   BY MR. CHELLIS:

22         Q.    What is the property shown on DX806?

23         A.    This is for the Banker property.

24         Q.    And how did the preparation of DX806 compare

25   to the preparation of the Micu map book?

 1      A.   This was created using the same methodology;
 2  however, in this case the date of acquisition was after
 3  the current effective maps, meaning that both the --
 4  the map that showed the current effective map -- flood
 5  insurance rate map as well as the flood insurance rate
 6  map at time of acquisition were the same.  So there's
 7  only one map in this book.
 8      Q.   We're looking at DX806?
 9      A.   Yes.  Wait.  No.  I apologize.  I had the
10  wrong property map.
11      Q.   That's okay, Mr. Nakagaki.
12      A.   Yes.
13      Q.   Have you found the correct DX number?
14      A.   Yes, I have.
15      Q.   And can you turn to that exhibit?
16      A.   Yes.  06.
17           MR. CHELLIS:  Your Honor, we move to admit
18  DX806.
19           MR. VUJASINOVIC:  No objection.
20           THE COURT:  Does this relate to the Banker
21  property?
22           MR. CHELLIS:  Yes.  Yes, Your Honor.
23           THE COURT:  Because at least have that right.
24  Admitted.
25                (Whereupon, Defendants' Exhibit 806 was

 1                    admitted into evidence.)

 2   BY MR. CHELLIS:

 3        Q.   Now, what does DX806 tell us about the flood

 4   hazard at the time that the Banker property was

 5   acquired?

 6        A.   It says that the -- this property was in the

 7   shaded X zone at the date of acquisition.

 8        Q.   And what does DX806 tell us about the more

 9   current flood hazard for the Banker property?

10        A.   For the current effective FIRM, the Banker

11   property is in shaded zone X.

12        Q.   Turning to DX807.  What is the property shown

13   in this map book?

14        A.   This is the Burnham property.

15        Q.   And how did the preparation of DX807 compare

16   to the preparation of the Micu map book?

17        A.   This is the map book that -- where the

18   current effective map and the map at the date of

19   acquisition was the same.  Other than that, the same

20   process was used to create this map book.

21             MR. CHELLIS:  Your Honor, we move to admit

22   DX807.

23             MR. VUJASINOVIC:  No objection.

24             THE COURT:  Admitted.

25                  (Whereupon, Defendants' Exhibit 807 was

 1                    admitted into evidence.)

 2    BY MR. CHELLIS:

 3        Q.    What does DX807 tell us about the flood

 4    hazard at the time the Burnham property was acquired?

 5        A.    This property was in the zone AE at the time

 6    of acquisition.

 7        Q.    And we're moving on to the JXs.

 8              What is the property shown on JX283?  And

 9    I'll give you a moment to find that.

10        A.    283.  This is for the Giron property.

11        Q.    And how did the preparation of JX283 compare

12    to the preparation of the Micu property map book?

13        A.    This map book was made with the same

14    methodology as the Micu property; however, the flood

15    hazard information is specific to this property.

16              MR. CHELLIS:  Your Honor, we move to admit

17    JX283.

18              MR. VUJASINOVIC:  No objection.

19              THE COURT:  Admitted.

20              (Whereupon, Joint Exhibit 283 was

21                 admitted into evidence.)

22    BY MR. CHELLIS:

23        Q.    And what does JX283 tell us about the flood

24    hazard at the time that the Giron property was

25    acquired?

1        A.    At the time of acquisition, the Giron

2    property was in zone X shaded.

3        Q.    And what does JX283 tell us about the more

4    current flood hazard for the Giron property?

5        A.    On the current effective map, the Giron

6    property is shown within the X shade -- the shaded X

7    zone.

8        Q.    Turning to JX284.  What is the property shown

9    on JX284?

10       A.    This is the Holland property.

11       Q.    And how did the preparation of JX284 compare

12   to the preparation for the Micu map book?

13       A.    This map book was made with the same process

14   as the Micu property.

15            MR. CHELLIS:  Your Honor, we move to admit

16   JX284.

17            MR. VUJASINOVIC:  No objection.

18            THE COURT:  Admitted.

19               (Whereupon, Joint Exhibit 284 was

20                admitted into evidence.)

21   BY MR. CHELLIS:

22       Q.    And what does JX284 tell us about the flood

23   hazard at the time the Holland property was acquired?

24       A.    At the time of acquisition for the Holland

25   property, it is shown to be within the X unshaded zone.

1        Q.    And what does JX284 tell us about the more

2   current flood hazard for the Holland property?

3        A.    On the current effective map, the map -- the

4   property is shown to be within the X shaded zone.

5        Q.    Turning to JX285.  What is the property shown

6   on JX285?

7        A.    This is the Lakes on Eldridge Community

8   Association property.

9        Q.    And how did the preparation of JX285 compare

10  to the preparation of the Micu property map book?

11       A.    This was made with the same process as the

12  Micu property except that the flood hazard information

13  is specific to this property.

14             MR. CHELLIS:  Your Honor, we move to admit

15  JX285.

16             MR. VUJASINOVIC:  No objection.

17             THE COURT:  Admitted.

18             (Whereupon, Joint Exhibit 285 was

19              admitted into evidence.)

20  BY MR. CHELLIS:

21       Q.    What does JX285 tell us about the flood

22  hazard at the time the Lakes on Eldridge property was

23  acquired?

24       A.    This shows that, at the time of acquisition,

25  the Lakes on Eldridge Community Association property

```
 1     was in the X unshaded zone.
 2          Q.   And what does JX285 tell us about the more
 3     current flood hazard for the Lakes on Eldridge
 4     property?
 5          A.   It shows that the Lakes on Eldridge property
 6     on the current effective maps is in the X unshaded
 7     zone.
 8          Q.   Turning to JX287.  What is the property shown
 9     on JX287?
10          A.   That is the Popovici property.
11          Q.   And how did the preparation of JX287 compare
12     to the preparation for the Micu map book?
13          A.   This was made with the same process as the
14     Micu property, however, the flood hazard information
15     specific to this property.
16               MR. CHELLIS:  Your Honor, we move to admit
17     JX287.
18               MR. VUJASINOVIC:  No objection.
19               THE COURT:  Admitted.
20                    (Whereupon, Joint Exhibit 287 was
21                      admitted into evidence.)
22     BY MR. CHELLIS:
23          Q.   And what does JX287 tell us about the flood
24     hazard at the time the Popovici property was acquired?
25          A.   At the time of acquisition, the Popovici
```

 1    property is shown to be in the X unshaded zone.

 2         Q.    And what does JX287 tell us about the more

 3    current flood hazard for the Popovici property?

 4         A.    On the current effective FIRM, Popovici

 5    property is shown to be within the X unshaded zone.

 6         Q.    Turning to JX288.  What is the property shown

 7    on JX288?

 8         A.    This is the Sidhu property.

 9         Q.    And how did the preparation of JX288 compare

10    to the preparation of the Micu map book?

11         A.    This was made with the same process, but the

12    flood hazard information is specific to this property.

13              MR. CHELLIS:  Your Honor, we move to admit

14    JX288.

15              MR. VUJASINOVIC:  No objection.

16              THE COURT:  Admitted.

17                 (Whereupon, Joint Exhibit 288 was

18                  admitted into evidence.)

19    BY MR. CHELLIS:

20         Q.    What does JX288 tell us about the flood

21    hazard at the time the Sidhu property was acquired?

22         A.    The date of acquisition, the Sidhu property

23    is shown to be within the X unshaded zone.

24         Q.    And what does JX288 tell us about the more

25    current flood hazard for the Sidhu property?

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1          A.     On the current effective FIRM, Sidhu property

2     is shown to be within the X unshaded zone.

3          Q.     What is the property shown on JX289?

4          A.     This is the Soares property.

5          Q.     And how did the preparation of JX289 compare

6     to the preparation of the Micu map book?

7          A.     This was made with the same methodology;

8     however, the flood hazard information is specific to

9     this property.

10               MR. CHELLIS:   Your Honor, we move to admit

11    JX289.

12               MR. VUJASINOVIC:   No objection.

13               THE COURT:   Admitted.

14                    (Whereupon, Joint Exhibit 289 was

15                     admitted into evidence.)

16    BY MR. CHELLIS:

17         Q.     And what does JX289 tell us about the flood

18    hazard at the time the Soares property was acquired?

19         A.     At the time of acquisition, the Soares

20    property is shown to be within the X unshaded zone.

21         Q.     And what does JX289 tell us about the more

22    current flood hazard for the Soares property?

23         A.     On the current effective map, the Soares

24    property is shown to be within the X unshaded zone.

25         Q.     Turning to the DXs again.   We're going to

1    turn to DX815.  I'll give you some time to find that,

2    Mr. Nakagaki.

3         A.    Okay.

4         Q.    And what is the property shown on DX815?

5         A.    This is the Stewart property.

6         Q.    And how did the preparation of DX815 compare

7    to the preparation for the Micu map book?

8         A.    This was made with the same methodology, but

9    the flood hazard information is specific to this

10   property.

11             MR. CHELLIS:  Your Honor, we move to admit

12   DX815.

13             MR. VUJASINOVIC:  No objection.

14             THE COURT:  Admitted.

15                  (Whereupon, Defendants' Exhibit 815 was

16                   admitted into evidence.)

17   BY MR. CHELLIS:

18        Q.    What does DX815 tell us about the flood

19   hazard at the time the Stewart property was acquired?

20        A.    This map shows that, at the time of

21   acquisition, the Stewart property was in the C zone.

22        Q.    And what does DX815 tell us about the more

23   current flood hazard for the Stewart property?

24        A.    On the current effective FIRM, the Stewart

25   property is shown be to be within the X unshaded zone.

```
 1          Q.    Turning to DX817.  What is the property shown
 2    on DX817?
 3          A.    This is for the West Houston Airport
 4    Corporation property.
 5          Q.    And how did the preparation of DX817 compare
 6    to the preparation of the Micu map book?
 7          A.    It was prepared with the same process;
 8    however in this case, the date of acquisition predated
 9    any effective FIRM for this area.  And so, for the
10    first map in this book, we used the first FIRM to be
11    published in the area.  So that's the FIRM that was
12    closest in date to the date of acquisition.
13               MR. CHELLIS:  Your Honor, we move to admit
14    DX817.
15               MR. VUJASINOVIC:  Could we just know what the
16    date was?
17               MR. CHELLIS:  For the map?
18               THE COURT:  Mr. Chellis, can we tell what the
19    map date is?
20               THE WITNESS:  Yes, the map date --
21    BY MR. CHELLIS:
22          Q.    Mr. Nakagaki, turning to FEMA081078, can you
23    tell the map date?
24          A.    The map date is from 1976.
25               MR. VUJASINOVIC:  Okay.  No objection.
```

```
 1              THE COURT:  Admitted.
 2                      (Whereupon, Defendants' Exhibit 817 was
 3                       admitted into evidence.)
 4    BY MR. CHELLIS:
 5         Q.   And what does the map dated 1976 show for the
 6    West Houston Airport?
 7         A.   It shows that the property was in the C zone.
 8         Q.   And what does DX817 tell us about the more
 9    current flood hazard for the West Houston Airport
10    property?
11         A.   On the current effective map, the West
12    Houston Airport is shown to be within the X unshaded
13    zone.
14         Q.   And turning back to DX816.  Can you tell us
15    what property is shown on DX816?
16         A.   This is for the Turney property.
17         Q.   And how did the preparation of DX816 compare
18    to the preparation of the Micu map book?
19         A.   This was made using the same process;
20    however, in this case the date of acquisition also
21    predated the first FIRM for this community.  So we used
22    the FIRM that was in effect closest to the date of
23    acquisition.
24              MR. CHELLIS:  Your Honor, we move to admit
25    DX816.
```

```
 1              MR. VUJASINOVIC:  Could we know what the date
 2     was on the map?
 3              THE COURT:  I'm sorry.
 4              Mr. Chellis, if we could have the date.
 5     BY MR. CHELLIS:
 6         Q.   Mr. Nakagaki, could you identify the map date
 7     for the Turney property?
 8         A.   Yes.  The first FIRM for this area became
 9     effective in 1981.
10              MR. CHELLIS:  Your Honor, we move to admit
11     DX816.
12              MR. VUJASINOVIC:  No objection.
13              THE COURT:  Admitted.
14              (Whereupon, Defendants' Exhibit 816 was
15                 admitted into evidence.)
16     BY MR. CHELLIS:
17         Q.   Based on the earliest available flood map,
18     what does DX816 tell about the flood hazard nearest to
19     the time the Turney property was acquired?
20         A.   That when this FIRM became effective, the
21     Turney property was shown to be within the C zone.
22         Q.   And what does DX816 tell us about the more
23     current flood hazard for the Turney property?
24         A.   On the current effective FIRM, the property
25     is shown to be within the X unshaded zone.
```

1      Q.    And turning to DX818, what is the property

2   shown on DX8818?

3      A.    This is the Wind property.

4      Q.    And how did the preparation of DX818 compare

5   to the preparation of the Micu map book?

6      A.    This was made with the same process as the

7   Micu map book; however, this information is specific to

8   this property.

9            MR. CHELLIS:  Your Honor, we move to admit

10  DX818.

11           MR. VUJASINOVIC:  No objection.

12           THE COURT:  Admitted.

13               (Whereupon, Defendants' Exhibit 818 was

14                admitted into evidence.)

15  BY MR. CHELLIS:

16     Q.    And what does DX818 tell us about the flood

17  hazard at the time the Wind property was acquired?

18     A.    At the date of acquisition, the flood

19  insurance rate map shows the Wind property in the X

20  unshaded zone.

21     Q.    And what does DX818 tell us about the more

22  current flood hazard for the Wind property?

23     A.    The current effective FIRM, the Wind property

24  is shown in the X unshaded zone.

25           MR. CHELLIS:  Your Honor, if I could have a

```
 1   moment to speak with co-counsel?
 2              THE COURT:  Yes.
 3              MR. CHELLIS:  No further questions.  We pass
 4   the witness.
 5              THE COURT:  Thank you, Mr. Chellis.
 6              Mr. Vujasinovic.
 7              MR. VUJASINOVIC:  Yes, Your Honor.
 8                        CROSS-EXAMINATION
 9   BY MR. VUJASINOVIC:
10        Q.    Hello, Mr. Nakagaki.  I'm Vuk Vujasinovic.
11        A.    Hi.
12        Q.    You were not deposed in this case; is that
13   correct?
14        A.    That's correct.
15        Q.    All right.  And FEMA only analyzes and
16   provides risk data for natural hazards in connection
17   with these flood maps; is that correct?
18        A.    I don't understand.
19        Q.    You are the program specialist in the
20   engineering resources branch in FEMA's engineering and
21   modeling division; is that correct?
22        A.    That's correct.
23        Q.    And that division is responsible for
24   providing risk data and risk modeling of natural
25   hazards throughout the United States; is that correct?
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1          A.    That's correct.

2          Q.    Okay.  And so back to my question was FEMA

3    only analyzes and provides risk data for natural

4    hazards; is that correct?

5          A.    Can you define "natural hazards"?

6          Q.    Not man-made.

7          A.    So that is something that's going to depend

8    because of the -- the information that goes into the

9    flood insurance studies is based on the available

10   information, which in some cases may be beyond only the

11   non-man-made disasters.

12         Q.    Are you aware of any man-made disasters in

13   the -- our country that FEMA has provided and mapped

14   risk data for?

15         A.    I'm sorry.  Can you repeat the question.

16         Q.    Sure thing.

17               Are you available of any man-made disasters

18   for which your division has ever provided risk data in

19   connection with making the maps?

20         A.    Yes.

21         Q.    Which one?

22         A.    FEMA does have what are called flood risk

23   products, which is additional information that's

24   provided on a voluntary basis based on dam or levy

25   failure information that's gathered as part of a flood

 1    insurance study.

 2            However, that information of the flood risk

 3    product may not be on the flood insurance rate map

 4    itself.  It's additional information that's provided.

 5        Q.   So the maps don't reflect risk from man-made

 6    disasters?

 7        A.   That's something that's going to depend.

 8        Q.   Okay.  All I want to know is if any of these

 9    FEMA flood insurance maps ever depict risk associated

10    with a man-made hazard.

11        A.   I don't have a full knowledge of the

12    information that went into every study that FEMA has

13    done.

14        Q.   What it sounds like, you think sometimes the

15    maps do reflect risks from a man-made hazard.  Is that

16    correct?

17        A.   In reference to the products I was speaking

18    to, those are not the flood insurance rate maps; those

19    are additional maps that FEMA may provide.

20        Q.   Where do we get those, like Joe -- you know,

21    me, somebody, anyone?

22        A.   That information is provided from FEMA and

23    our mapping partners to the community.  So in the case

24    of an individual, they can speak with their local

25    building department, or in some cases that may be

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

```
 1     available through our map service center website.
 2          Q.   So you would -- you would say the public
 3     should be aware that FEMA -- the FEMA division that
 4     makes these flood insurance maps do know about man-made
 5     hazards; correct?
 6          A.   Can you repeat the question.
 7               MR. VUJASINOVIC:  Can you please repeat it
 8     for me, ma'am.
 9               (Record read by the reporter.)
10               THE WITNESS:  FEMA has -- I don't know if I
11     can speak to all of the information that FEMA has
12     available.
13     BY MR. VUJASINOVIC:
14          Q.   I'm talking about your division -- your
15     division makes the maps; right?
16          A.   That's correct.
17          Q.   And you're here as the representative for the
18     division; right?
19          A.   That's correct.
20          Q.   And it's -- I'm just asking.  It sounds like
21     your division know -- believes that the public ought
22     to -- well, your division knows about man-made hazards.
23          A.   Yes.
24          Q.   And you have that information somewhere but
25     not on the actual flood insurance maps; correct?
```

1          A.    When that information is available to us,

2    yes.

3          Q.    Are you aware of any man-made hazards about

4    20 miles east of us?

5          A.    No.

6          Q.    You ever been to Houston?

7          A.    This is my first time.

8          Q.    Okay.  And so do any of the maps ever -- that

9    have ever been put out by your division disclose any

10   risk of getting inundated by the Addicks or Barker

11   reservoir?

12         A.    I don't know that.

13         Q.    Remember you testified earlier about you

14   worked, I guess, in your division, and part of your job

15   involved taking inquiries?

16         A.    That's correct.

17         Q.    Is that like a national hotline?

18         A.    The work that I do from headquarters is

19   typically helping inquiries that come in from either

20   media sources or Congress or the White House.

21         Q.    All right.  So sophisticated sources?

22         A.    Correct.

23         Q.    That's a partially inside joke.  Sorry.

24               So now, was that, like, a call center?  It's

25   not, like, just you answering the phone, is it?

1      A.    The work that I do today is typically written

2    correspondence that's directed to our office.

3      Q.    Okay.  So lots of emails these days, letters

4    maybe in the past; is that correct?

5      A.    Correct.

6      Q.    And I suspect most of those questions

7    relate -- relate to how do you read the flood insurance

8    maps?

9      A.    Many of them do, yes.

10      Q.    So what if somebody from Houston called y'all

11    and said, "Do I live in a government reservoir?"  What

12    would you tell them?

13      A.    Before responding, I would coordinate with

14    the FEMA Region 6 office to understand what information

15    is available for a particular property.

16      Q.    So you'd call Region 6 and say, "Hey, does

17    this person live in a government reservoir"?

18      A.    Well, in addition to that, it would be to ask

19    about the location of the property on the current flood

20    insurance rate maps and to ask for additional details

21    about what went into those maps.

22      Q.    Now, if any of y'all look at the map, would

23    the map be able to answer that question?

24      A.    On its own, no, the map does not speak to

25    that.

1      Q.    So we're calling other government offices and

2   got to go down that road; is that correct?

3      A.    Correct.

4      Q.    Has anybody ever called your division and

5   asked about whether they live in a government reservoir

6   in Houston, to your knowledge?

7      A.    Not to my knowledge.

8      Q.    You said the flood zone maps are -- are a

9   product of a flood insurance study process; is that

10  correct?

11     A.    That's correct.

12     Q.    And your division works with what you said

13  are mapping partners; is that correct?

14     A.    That's correct.

15     Q.    Who are those mapping partners?

16     A.    The mapping partners are either contractors

17  that are directly hired by the agency or, in other

18  cases, they can be communities or states that do the

19  engineering themselves and then work with the regional

20  office to make sure that they comply with the set of

21  regulations to issue those -- information.

22     Q.    Are any other branches of the federal

23  government ever one of y'all's partners?

24     A.    We can work with other agencies, such as the

25  Army Corps of Engineers; but, typically, as far as a

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                 5/15/2019

1   mapping partner, somebody that's engaged to create the

2   FIRMs as they are, typically, that's something that is

3   done -- that is not done by other agencies.

4          Q.   Any area that's in what you've termed the

5   unshaded zone X is outside of the 500-year floodplain;

6   correct?

7          A.   That's correct.

8          Q.   And, therefore, the area is not in any

9   identifiable floodplain; correct?

10         A.   The floodplain -- the X shaded zone is a

11  floodplain.

12         Q.   I'm -- I am referring to unshaded X.

13         A.   The -- the unshaded X is -- I apologize.

14         Q.   It's okay.

15         A.   So, yes, the -- while there's not one

16  specific floodplain that the X shaded is -- the X

17  unshaded zone is associated with, it is -- can also be

18  seen as encompassing all floodplains that have a

19  greater impact but a lower probability than the

20  .2 percent floodplain or the 500-year flood.

21         Q.   But unshaded X is -- is outside the 500-year

22  floodplain?

23         A.   The -- the .2 percent floodplain is the

24  500-year floodplain.

25         Q.   Yes.  The methodology behind creating maps,

    1     is that -- is it pretty reliable?

    2          A.   Yes.

    3          Q.   Will you just briefly elaborate on how

    4     reliable it is.

    5          A.   Certainly.  So the mapping process itself is

    6     governed by what we call mapping standards and

    7     guidance.  So that is current mapping and standards for

    8     creating this flood hazard information.  It's based on

    9     the latest technology and has been reviewed by outside

   10     groups from FEMA, such as the Technical Mapping

   11     Advisory Council, and has been shown to be technically

   12     credible.

   13          Q.   And the methodology behind creating those

   14     maps does not consider or include any risk associated

   15     with potentially getting inundated by the Addicks or

   16     Barker flood pool; is that correct?

   17          A.   I do not know that.

   18          Q.   Okay.

   19               Oh, last thing, West Houston Airport.  This

   20     is Plaintiffs' Exhibit 2188 and 461.  And what did

   21     you -- what did you testify about the -- well, isn't it

   22     true that the West Houston Airport terminal building

   23     parcel is not in the shaded X floodplain?

   24          A.   That's correct.

   25          Q.   Okay.  Thanks for your time, sir.

1            MR. VUJASINOVIC:  Pass the witness.

2            THE COURT:  Mr. Chellis, redirect?

3            MR. CHELLIS:  Just one question.

4            THE COURT:  Yes.

5                    REDIRECT EXAMINATION

6    BY MR. CHELLIS:

7        Q.    Mr. Nakagaki, opposing counsel asked you

8    about the various floodplains and about your experience

9    with the call center in FEMA generally.

10            Does FEMA have a general practice concerning

11   what it tells all homeowners about flood insurance no

12   matter what floodplain they live in?

13       A.    Yeah.  As part of our -- when we get those

14   kind of inquiries, we do always recommend that

15   properties carry flood insurance, no matter what flood

16   hazards zone they're in, because there's always a

17   possibility of flooding.

18            MR. CHELLIS:  No further questions.

19            THE COURT:  All right.  Thank you.

20            May the Court excuse Mr. Nakagaki?

21            MR. VUJASINOVIC:  Yes, Your Honor.

22            MR. CHELLIS:  Yes.

23            THE COURT:  Thank you, Mr. Nakagaki.  Thank

24   you very much for coming and for attending and for

25   giving testimony today.

1            THE WITNESS:  Yes.

2            THE COURT:  Ms. Tardiff?

3            MS. TARDIFF:  Thanks.  Good afternoon, Your

4    Honor.  The United States calls Steven Fitzgerald.

5            THE COURT:  Thank you.

6            Mr. Fitzgerald, if you'll stop about right

7    there and raise your right hand to be sworn as a

8    witness.

9    Thereupon--

10                STEVEN D. FITZGERALD,

11    was called as a witness, and having been first duly

12    sworn, was examined and testified as follows:

13            THE WITNESS:  Yes.

14            THE COURT:  Thank you.  Please be seated in

15    the witness stand.  Would you kindly state your full

16    name for the record.

17            THE WITNESS:  Yes.  My full name is Steven D.

18    Fitzgerald.

19            MS. TARDIFF:  Thank you, Your Honor.

20                DIRECT EXAMINATION

21    BY MS. TARDIFF:

22      Q.   Good afternoon, Mr. Fitzgerald.

23           Sir, you were identified last week by

24    Mr. Jeff Lindner as his former supervisor at Harris

25    County Flood Control District.  And, sir, did you

1    recently retire from the flood control district?

2         A.    Yes, I did, about six and a half months ago.

3         Q.    Congratulations.

4               How long were you employed at Harris County

5    Flood Control District?

6         A.    It was right around 37 years.

7         Q.    And what was your position at the flood

8    control district at the time of your retirement?

9         A.    It was chief engineer.

10        Q.    And how long did you serve as chief engineer?

11        A.    Right at 20 years.

12        Q.    And, sir, are you also a registered

13   professional engineer?

14        A.    Yes.

15        Q.    Have your responsibilities at Harris County

16   Flood Control District included working with the Corps

17   of Engineers?

18        A.    Yes.

19        Q.    And can you describe those responsibilities

20   for us?

21        A.    Yes.  It probably began in 1989, 1990, when I

22   became the manager of the capital improvements

23   department.  And so we had projects with the Corps of

24   Engineers to implement, as well as other Harris County

25   Flood Control District projects.  And that's when it

1    started.

2            And there was project managers that worked

3    for me that managed the day-to-day aspects of each of

4    the projects, but I was involved at a little higher

5    level to keep the projects moving.

6        Q.    Okay.  And, with a specific focus on the

7    Addicks and Barker reservoirs, can you describe what

8    your roles or responsibilities are -- or were with

9    respect to the Corps of Engineers?

10        A.    That was primarily because the Corps owns,

11    operates, and maintains those facilities.  Those are

12    not Harris County Flood Control District facilities.

13    More of coordination and communication about the

14    reservoirs, what's happening physically, you know, what

15    kind of work they were doing with them, and then also,

16    before, during, and after events, potential rainfall

17    and flood events.

18            And I was one of the people that coordinated

19    with them and eventually became the primary person that

20    coordinated with them.

21        Q.    And can you give us an estimate of how

22    many -- how many years during your tenure at the flood

23    control district that you served in a coordination role

24    with the Corps related to Addicks and Barker?

25        A.    I don't remember specifically because I think

1    it evolved over time.

2         Q.   Sure.

3         A.   But I would say probably sometime in the

4    early 1990s, it began.

5         Q.   Okay.  We heard last week that Harris County

6    Flood Control District was created around 1937; is that

7    correct?

8         A.   Yes.

9         Q.   Okay.  And can you -- let me step back.

10             I'm going to circle back and actually use a

11   document that's already been admitted.  We're going to

12   turn to Defendants' Exhibit 737.  And we'll get a copy

13   of that in front of you, sir.

14             And, Mr. Fitzgerald, are you familiar with

15   this document?

16        A.   Yes.

17        Q.   And is this a document that you worked on

18   preparing?

19        A.   Yes.

20        Q.   And how many years has Harris County Flood

21   Control District been preparing federal briefings such

22   as the one in front of you?

23        A.   This was our 20th year.  The books -- the

24   information evolved over time.  So, in the beginning,

25   they were shorter than this.

 1        Q.    And is this a public report?

 2        A.    Yes.

 3        Q.    And was the Addicks and Barker project the

 4   first project that Harris County Flood Control District

 5   was involved with the Corps on?

 6        A.    Yes.  When the district was created in 1937,

 7   one of the main reasons was to be a local interest over

 8   the Addicks and Barker reservoirs.

 9        Q.    And, today, does the flood control district

10   still serve as a local interest -- or is -- if there's

11   another word for it, you can tell us that -- on Corps

12   projects?

13        A.    For Corps projects in general, we're the

14   nonfederal sponsor -- sometimes you'll hear the term

15   "local sponsor" -- for other projects in Harris County.

16              But, for Addicks and Barker, that was very

17   early on in the 1930s and '40s.  Laws were different

18   then.  More laws have passed since then that got more

19   into what a local sponsor does.  So, on the other

20   projects, we are the local sponsor.  This one, I never

21   really considered us as a local sponsor as today -- in

22   today's terms.

23        Q.    And, in today's terms, what does it mean to

24   be a local sponsor or nonfederal sponsor for a project

25   with the Corps?

1       A.    Before the Corps can work on a project in a

2    community, there has to be a local sponsor that agrees

3    to cost-share in the project, a minimum amount of money

4    and then a maximum amount.  And they have to agree to

5    do certain aspects of the project, like buying the

6    right-of-way, altering bridges.  And then also, when

7    the project is finished, to do the operation and

8    maintenance on that particular project.

9       Q.    Okay.  And we'll circle back to some other

10   projects that the flood control district is involved

11   in, but first I'm going to have you turn in Defendants'

12   Exhibit 737, the federal briefing paper from -- or

13   report from 2018, to the page that is Bates-stamped

14   FEMA78351.

15            And do you have that in front of you,

16   Mr. Fitzgerald?

17      A.    Yes.

18      Q.    The caption of this page is "Vision, Mission,

19   Value, and Goals."

20            And, sir, did you have -- were you involved

21   in crafting these statements?

22      A.    Yes.

23      Q.    And there are several statements here that

24   speak in terms of flood risk and flood -- or excuse

25   me -- that speak in terms of reducing flood risk and

     1    flood damages.  Is that a fair characterization?

     2         A.   Yes.

     3         Q.   Okay.  And, sir, is it possible to eliminate

     4    flood risks and flood damages in Harris County?

     5         A.   No, not completely, because the terrain is

     6    relatively flat and our rainfall, particularly along

     7    the Gulf Coast, is very intense and can overwhelm the

     8    drainage systems pretty easily.

     9         Q.   And focusing on the goals on this page -- and

    10    I'll paraphrase here -- but one of the listed goals is

    11    "to reduce flood impacts by planning and implementing

    12    flood risk reduction programs such as flood

    13    preparedness education."

    14              There's also a reference here to flood

    15    warning.  And so my question, Mr. Fitzgerald, is what

    16    are the general messages about flood risk and flood

    17    preparedness that Harris County Flood Control District

    18    seeks to communicate to the public?

    19         A.   Off the top of my head -- there's several of

    20    them.  I won't remember all of them.

    21              But it's primarily for the public to be --

    22    pay attention to the weather and -- especially when the

    23    forecast -- or forecasting heavy rains and possible

    24    flooding.  Have a plan, family plan when that happens.

    25    In case the families get separated or something happens

 1   at their home, school, or business, know what you would

 2   do.

 3            Also to monitor or have -- look at the flood

 4   warning system that the Harris County Flood Control

 5   District has on their website.  Pay attention to that.

 6            And also, many, many years ago, we advised

 7   all citizens and all publications we did to buy flood

 8   insurance because we believe every home is susceptible

 9   to flooding in Harris County.  And you need to get

10   flood insurance as well.

11        Q.    And so are -- those public messages that the

12   flood control district has tried to put out, are those

13   limited to areas that have experienced flooding before?

14        A.    No.  Those are for the general public.

15        Q.    And, sir, based on your several decades at

16   Harris County Flood Control District, do you consider

17   flood risk reduction to be a shared responsibility?

18        A.    Yes.  That's a term I learned going to

19   different conferences around the country.  In the last

20   two decades, I think, it became a term.

21            And it means that there's no one entity or

22   person or organization that can do a lot by themselves

23   to help reduce flood risk.  It's shared between the

24   citizens, what they can do at their house, you know,

25   school, business, family before, during, and after a

```
 1    flood.  Then, at the local county, state, and federal

 2    level, we each have different roles.  And if we work

 3    together, we can do more to reduce flood risk in the

 4    communities across Harris County and in the United

 5    States.

 6         Q.   Very good.  We're going to stick with

 7    Defendants' Exhibit 737, the federal briefing report

 8    for 2018.  And I'm going to ask you to turn to the next

 9    page, which is FEMA78352.

10              There's some background information here.

11    And, Mr. Fitzgerald, I'm going to direct your attention

12    to the third bullet point there.  The first sentence

13    reads "The district's income is derived primarily from

14    a dedicated ad valorem property tax."

15              And, sir, can you explain what that means?

16         A.   I'm not a financial expert or person on this,

17    but I am a taxpayer in Harris County.  So it means that

18    our -- we pay a tax rate -- it says here 2.831 cents

19    last year -- per hundred valuation of our property as a

20    tax annually.

21         Q.   And does every property owner in Harris

22    County have that responsibility?

23         A.   As far as I know, they do.

24         Q.   And when you receive your annual property tax

25    bill from Harris County, is there a line item for the
```

1    tax assessed specifically for Harris County Flood
2    Control District?
3        A.   Yes.  It's under the Harris County tax.
4    There's several sources of that tax.  It's rolled up.
5    So taxpayers write a check to Harris County, and it
6    tells you the source of each one of those taxes.
7        Q.   Okay.  I'm going to have you turn to the next
8    page, which is a fact sheet.  And it's FEMA78353.
9             And, Mr. Fitzgerald, I want to start by
10   asking you about the drainage infrastructure in -- or
11   the Harris County Flood Control District manages within
12   the county.
13            And can you begin by describing the channels
14   that Harris County Flood Control District is
15   responsible for?
16       A.   Yes.  The channels -- we say there are open
17   channels in Harris County because we do not have
18   jurisdiction over the roadside ditches, storm sewers,
19   those local drainage systems, but they outfall into the
20   Harris County Flood Control District channels -- open
21   channels.
22       Q.   And how many open channels is Harris County
23   responsible for -- or the flood control district?
24   Excuse me.
25       A.   By the way flood control district's numbering

    1    system is, there's 1500 channels.  And there's about

    2    2500 miles in length if we add them all together.

    3        Q.   So we've heard -- and I'll try to make sure I

    4    get the ones in Harris County correct.  But, for

    5    example, above Addicks, we've heard about Langham Creek

    6    this week.  Is that considered an open channel?

    7        A.   Yes.

    8        Q.   Okay.  And Buffalo Bayou?

    9        A.   Yes.

   10        Q.   And then would any tributaries that flow into

   11    those larger creeks or channels also be part of that

   12    network?

   13        A.   Yes.

   14        Q.   Is Harris County Flood Control District also

   15    responsible for detention basins?

   16        A.   Yes.  The ones that Harris County Flood

   17    Control District builds as part of a flood control

   18    project or a federally partnered project and then also

   19    ones that land developers build to drain public roads

   20    that they build.  As long they meet flood control

   21    district criteria, then we would maintain those as

   22    well.

   23        Q.   Okay.  And I should probably --

   24        A.   I said "we."

   25             My heart is still with Harris County Flood

1   Control District, Judge, so I may say "we" every once
2   in a while.
3       Q.   And let me step back there and ask you, what
4   is a detention basin?
5       A.   It's a place where the stormwater runoff
6   could be stored temporarily until the water starts
7   going down in the receiving channel downstream.  But
8   the ones in Harris County that Harris County Flood
9   Control maintains are all gravity; they all drain by
10  gravity.  So ...
11      Q.   And is there a distinction between detention
12  basins that Harris County Flood Control District
13  maintains and those that they do not?
14           So let me ask you a follow-up question there.
15           About how many detention basins does the
16  flood control district maintain and have responsibility
17  for?
18      A.   It's about 200, probably a little more than a
19  year ago because more have been constructed.
20      Q.   And do those vary in size?
21      A.   Yes.  There's small ones, probably 1 or
22  2 acres, and then all the way up -- what did we say? --
23  oh, 14 acres.
24      Q.   And is the 14-acre one, is that a regional
25  detention basin?

1          A.    Yes, that is.

2          Q.    And what does that mean?

3          A.    Regional means it's on a main channel, and it

4     works in coordination with other regional detention

5     basins on that channel system.  And usually some

6     channel improvement -- channel contains improvement

7     projects on that channel.

8          Q.    Okay.  And you mentioned that there are other

9     detention basins within the county that you don't have

10    responsibility for -- that Harris County Flood Control

11    District does not have responsibility for.

12          Do you have a sense as to how many of those

13    type of detention basins there are in the county?

14          A.    I don't know.  I usually just say about --

15    probably at least a thousand or so.  Because there's a

16    lot of private detention basins, you know, at Walmarts.

17    And there may be a subdivision or a large development

18    that wants to maintain one themselves that they decide

19    to do.

20          Q.    And, sir, are Addicks and Barker reservoirs

21    large detention basins?

22          A.    Yes.  They were the first detention basins in

23    Harris County.

24          Q.    Are they the largest in the county?

25          A.    And the largest.  Yes, still the largest.

```
 1        Q.    Okay.  Mr. Fitzgerald, I want to switch gears
 2   a little bit and walk through some rainfall events and
 3   a few documents.  And I'll try to do it in
 4   chronological order to make it easier for all of us.
 5              And I want to start by bringing you back to
 6   late 1991, early 1992, that time period.
 7              Do you recall the rainfall or rainfall events
 8   during that period of time?
 9        A.    In general, I do.
10        Q.    Can you describe to us what you recall.
11        A.    Sure.
12              Somewhere around Thanksgiving 1991, that time
13   period where we had pretty good rainfall, not to cause
14   any house flooding in Harris County, but then it
15   continued to rain off and on through March.  There
16   wasn't hardly a week that went by where it didn't rain.
17   And then, in March -- I believe it was Palm Sunday in
18   March -- we had a pretty good rainfall that was greater
19   than 4 to 6 inches, which usually causes -- can cause
20   house flooding in certain watersheds.
21        Q.    And focusing on the Addicks and Barker
22   reservoirs in particular, do you have a recollection as
23   to how those storms affected the reservoirs and the
24   reservoir pools at that time?
25        A.    Yes, because the operation --
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

    1              THE COURT:  Sorry?

    2              MR. DUNBAR:  Larry Dunbar for the plaintiffs.

    3              THE COURT:  Yes, Mr. Dunbar.

    4              MR. DUNBAR:  I just wanted to make it clear,

    5    Your Honor, that this is a fact witness and not an

    6    expert witness, because we know Mr. Fitzgerald in the

    7    past has been retained by the DOJ as an expert witness.

    8              So I just wanted to make sure that it's clear

    9    that this witness is being presented as a fact witness.

   10              MS. TARDIFF:  He is here as a fact witness

   11    under subpoena.  He was subpoenaed by both parties,

   12    Your Honor.

   13              THE COURT:  Thank you.

   14              MR. DUNBAR:  Thank you, Your Honor.

   15    BY MS. TARDIFF:

   16         Q.   So let me step back because I'm not sure we

   17    got past the question.

   18              But what is your recollection as to how the

   19    storms you described over the winter of '91 into early

   20    1992 -- March of 1992, I think you said -- how those

   21    affected the Addicks and Barker reservoirs and the

   22    reservoir pools?

   23         A.   You know, when that happened, the operation

   24    plan the Corps has is that, if there's a threat of

   25    rain, the gates are closed and -- so that, you know,

1   the local runoff from downstream on Buffalo would not

2   be combined with what's coming out of the reservoirs.

3           And, during that time period, they had a

4   difficult time opening -- having chances to open

5   that -- those gates because of all the rain and

6   forecasted rain during that time period.  Then, in

7   March of '92, there was that large rain.  I don't

8   remember how large it was, but it was enough to really

9   start running -- or water to run off into the

10  reservoirs and the levels starting to rise.

11          And so that's what happened.  And that was --

12  at that time, March of '92 flood created a record level

13  in Addicks and Barker reservoirs.

14      Q.   And did those record pool levels affect roads

15  in the area?

16      A.   The one that I recall is State Highway 6 that

17  runs through Addicks Reservoir.  It was closed for some

18  time.  I don't remember how long.  But that western

19  part of -- northwestern part of Harris County uses

20  State highway 6 a lot.  So it really disrupted traffic

21  in that area.

22      Q.   And that's a heavily traveled road, then?

23      A.   It's very heavily traveled.  And so it was --

24  it was a pretty good wake-up call at that time.

25      Q.   And so you say it was a pretty good wake-up

1    call.  Can you -- can you describe what those storms
2    and then the record pool levels, the closure of that
3    road for a period of time, what that told you in your
4    position at Harris County Flood Control District at the
5    time about flood risks related to Addicks and Barker
6    reservoirs for properties upstream of those reservoirs?
7         A.   I think -- because, you know, it was a record
8    level, Highway 6 was closed, had a lot of attention in
9    the community.  So the community became aware that they
10   were there, because most people didn't pay attention to
11   them.  And so it was a good wake-up call.
12             And then, also, for the Corps and Harris
13   County Flood Control and others in the area to realize
14   that the reservoirs could fill not just from a single
15   large event but from a series of smaller events over
16   time.
17             So that was what we learned during that
18   event.
19        Q.   Let's turn to some documents in the reports
20   moving past March of 1992.  I'm going to have you turn
21   first to Joint Exhibit 54.
22             And, Mr. Fitzgerald, are you familiar with
23   this document?
24        A.   Yes.
25        Q.   Can you identify it for us?

```
 1        A.    Yes.  It's the Katy Freeway Corridor Flood
 2   Control Study dated May 1996.
 3        Q.    And was this prepared by Harris County Flood
 4   Control District's planning department?
 5        A.    Yes.
 6              MS. TARDIFF:  Your Honor, we move to admit
 7   Joint Exhibit 54.
 8              MR. DUNBAR:  No objection, Your Honor.
 9              THE COURT:  Mr. Dunbar.
10              What is the date of the document?
11              THE WITNESS:  May 1996.
12              THE COURT:  Is that when it was prepared?
13              THE WITNESS:  Yes.  That's when it was
14   published -- not published, but that's when it was
15   finalized.  Probably took a few months to prepare it.
16              THE COURT:  All right.  Admitted.
17              (Whereupon, Joint Exhibit 54 was
18              admitted into evidence.)
19   BY MS. TARDIFF:
20        Q.    And, Mr. Fitzgerald, just generally, do you
21   recall generally what this particular study was about?
22        A.    Yes.  The Texas Department of Transportation
23   was beginning the planning or maybe the preliminary
24   engineering for the Katy Freeway expansion, and so they
25   had consultants and their own staff look into drainage
```

1    along the Katy Freeway corridor.  And they were coming
2    to the flood control office to coordinate that with us.
3            THE COURT:  Ms. Tardiff, may I ask a quick
4    question?
5            MS. TARDIFF:  Yes, sir.
6            THE COURT:  What the Katy Freeway?
7            THE WITNESS:  Okay.  It's Interstate 10.
8            MS. TARDIFF:  Would you like us to pull up a
9    map, sir, just to orient it?
10           THE COURT:  No, no.  We don't need that.  I
11   just had to smile.  Katy comes from a
12   Missouri-Kansas-Texas Railway, eventually, and there's
13   an interesting Blues Brothers song about "I caught the
14   Katy," but we don't need to go there.
15           MS. TARDIFF:  I promise I won't start
16   singing.
17           THE WITNESS:  Yeah.  Each community has their
18   own names for their freeways.  So hard to keep up.
19   BY MS. TARDIFF:
20       Q.   Okay.  I'm going to have you turn, then, to
21   page 2 of this report.  And looking at about the middle
22   of the page under the heading "Problem Statement," can
23   you read that first statement in the record for us,
24   Mr. Fitzgerald.
25       A.   "The primary flood threat facing the citizens

1    of West Harris County and West Houston comes from the

2    inability to drain the Addicks and Barker reservoirs in

3    an efficient manner.   The maximum flood pool levels of

4    the Addicks and Barker reservoirs extend far beyond the

5    limits of the government-owned land.   There are

6    currently 6,000 structures and more than 8,000 acres

7    within the reservoir fringe areas between the limits of

8    the government-owned land and the extent of the Addicks

9    and Barker maximum flood pools.   While 6,000 is a large

10   number, projected growth rates for West Harris County

11   could easily increase the number of structures in the

12   fringe to 25,000 or more.   Delineations of the Addicks

13   Reservoir and Barker Reservoir fringe areas are shown

14   in Appendix A."

15        Q.   And, Mr. Fitzgerald, does that statement

16   accurately reflect Harris County Flood Control

17   District's understanding at this time of the flood risk

18   for properties and homes located in what is described

19   in this report as the fringe area upstream of the

20   government-owned land?

21        A.   Yes.

22        Q.   All right.   Let's take a look at one more

23   report.   I'm going to have you turn to Joint

24   Exhibit 60.

25             Do you have that in front of you?

1          A.    Yes.

2          Q.    Okay.  Is this a report that was prepared

3     by -- or for, at least, Harris County Flood Control

4     District?

5          A.    Yes.

6          Q.    And who prepared this report?

7          A.    Costello Incorporated.

8          Q.    Can you identify what the report is and the

9     date for us.

10         A.    It's a feasibility study for improvements to

11    Addicks and Barker reservoirs, dated March of 2000.

12         Q.    And is Costello a professional engineering

13    firm here in the area?

14         A.    Yes, civil engineering firm.

15               MS. TARDIFF:  We move to admit Joint

16    Exhibit 60.

17               MR. DUNBAR:  No objection, Your Honor.

18               THE COURT:  Admitted.

19               (Whereupon, Joint Exhibit 60 was

20                admitted into evidence.)

21    BY MS. TARDIFF:

22         Q.    I'm going to have you turn to the first page

23    of the report, following the table of contents.  It is

24    page 1 of the report.

25               And are you there, Mr. Fitzgerald?

1          A.    Yes.

2          Q.    I'm going to direct your attention to the

3    bottom of that page under Section C, which is "Problem

4    Statement."

5                And can you -- I'm going to again ask you to

6    read that paragraph for us, sir.

7          A.    "The potential of flooding upstream of the

8    dams and within the fringe areas has been a growing

9    concern due to the continuing development within these

10   areas.  During the winter of 1991 and spring of 1992,

11   the reservoirs reached the highest recorded flood

12   elevations.  Disruptions to the transportation systems

13   within the reservoirs occurred and lasted for several

14   weeks, with the reservoirs taking several months to

15   drain to nonthreatening levels.  These occurrences have

16   prompted the concerns of the residents, business

17   owners, and government representatives to be expressed

18   regarding the level of protection that the reservoirs

19   provide to the property upstream of the dams."

20         Q.    And, Mr. Fitzgerald, is that description of

21   the problem in this report consistent with your

22   recollection that the storms during the winter of 1991

23   extending into the spring of 1992 brought renewed

24   attention to the flood risk for properties upstream of

25   the reservoirs in what is referred to here again in

      1    this report as the fringe area?

      2        A.   Yes.

      3        Q.   All right.  I want to switch gears one more

      4    time and turn next to the Addicks and Barker Emergency

      5    Coordination Team, which has also been referred to here

      6    over the last week or so by the acronym ABECT,

      7    A-B-E-C-T.

      8             And, Mr. Fitzgerald, are you familiar with

      9    the ABECT group?

     10        A.   Yes.

     11        Q.   And how are you familiar with that group?

     12        A.   I've been on it since its inception in about

     13    2007.

     14        Q.   And is Harris County Flood Control District a

     15    member of the ABECT group?

     16        A.   Yes.

     17        Q.   And can you remind us who some of the other

     18    participants in that group are?

     19        A.   I'll probably leave someone out, but I'll

     20    try.

     21             Harris County Flood Control District, Corps

     22    of Engineers, Harris County, Fort Bend County, City of

     23    Houston, the Texas Department of Emergency Management,

     24    USGS, National Weather Service.  That's all I can

     25    remember right now.  I think that's about it.

1      Q.   And, as a participant in the ABECT group, how

2  would you describe the purpose of that group?

3      A.   The purpose is to prepare for an event that

4  may happen related to Addicks and Barker reservoirs

5  together as a team and to improve our communications,

6  our coordination, decision-making so that we can

7  ultimately get information to the public and

8  decision-makers during -- before, during, and after an

9  event to help reduce the consequences of the flood.

10     Q.   Very good.  I'm going to have us turn next to

11 Joint Exhibit 88.

12     A.   I'm learning the system here.

13     Q.   And, Mr. Fitzgerald, are you a recipient of

14 this email?

15     A.   Yes.

16     Q.   And can you tell us the -- the date and

17 subject of that email?

18     A.   The date is February 1, 2008.  Subject is

19 "Addicks and Barker Emergency Response Plan, next

20 exercise planning meeting."

21          MS. TARDIFF:  Your Honor, we move to admit

22 Joint Exhibit 88.

23          MR. DUNBAR:  No objection, Your Honor.

24          THE COURT:  Admitted.

25               (Whereupon, Joint Exhibit 88 was

1            admitted into evidence.)

2     BY MS. TARDIFF:

3        Q.   Mr. Fitzgerald, I'm going to try and work

4     with the attachments that are on this exhibit since

5     this was used at your deposition.  I'm going to have

6     you turn to the third page of the attachment.  The

7     Bates number at the bottom is DEPO50780.

8            Are you on that page, sir?

9        A.   Yes.

10       Q.   And you might be able to bring it up as well.

11           And, Mr. Fitzgerald, based on your

12    deposition, my recollection is this is a part of -- a

13    portion of a spreadsheet that was attached to this, but

14    can you identify for us what -- what this is?

15       A.   Yes.  This was a very early versions of our

16    response plan that we developed as a group, action

17    response plan.  Because during an event, we wanted to

18    have an understanding before the event what each one of

19    the jurisdiction's response or responsibility or action

20    may be so that we could coordinate more efficiently.

21       Q.   And so can you describe for us, based on the

22    page that you're on, what the columns are in this

23    portion of this sheet and what information was shared

24    with any ABECT group.  And let me back up.

25           The portion of this spreadsheet we're looking

1    at relates to Addicks Reservoir on 5780; is that
2    correct?
3         A.   Yes.
4         Q.   Okay.  Can you walk us through kind of the
5    pool elevation consequence and explain what the third
6    column here is.
7         A.   Okay.  Now, the concept came up with those of
8    us who worked floods before, because it's all done on
9    elevation and rising and falling levels in a community
10   from detention basin or a channel.  So the elevations
11   changes are important to knowing what's happening in
12   the community.
13        And so we decided to prepare this based on
14   elevations as the water rose to know what the
15   consequence would be as it reached some key elevations,
16   physical -- physical locations in and around the
17   reservoirs.  And then -- so we had to describe the
18   consequence there and then the name and condition.
19        Name is -- the Corps of Engineers has certain
20   names for certain levels.  Like "extended watch" is one
21   and some other names.  So we put those in there and
22   then a little more detail about the condition of the
23   consequence.  Some of them needed a little more
24   information.  So we put in a column.
25        Q.   And --

1        A.   Then that's another column that's not on this

2   page.  It should be.  It's the next one.  I'm not sure

3   where it is, but ...

4        Q.   Is the fourth column -- what is the

5   additional column that you recall was on the

6   spreadsheet that was prepared?

7        A.   Well, this early one had the entities' action

8   and response at that level, what they normally do at

9   that level or what would they plan to do at that level.

10             Like I said, this is an early one.  It

11   evolved into something -- the same type of columns, but

12   there were some refinements made.

13        Q.   Okay.  And sticking with the portion of the

14   spreadsheet we see here for Addicks, did this early

15   spreadsheet provide members of the ABECT group a pool

16   elevation for the approximate first street flooded from

17   a rising pool for Bear Creek Village?

18        A.   Yes.

19        Q.   And what was that elevation?

20        A.   On this early one, which is at a different

21   datum than the current one we use, it says 104.2.

22        Q.   And in this early spreadsheet, did -- was

23   ABECT also given an approximate pool elevation when the

24   first home floods from the pool and again at Addicks?

25        A.   It's 106.6.

```
 1          Q.   And is there a similar spreadsheet for Barker
 2     Reservoir attached to this email?
 3          A.   Yes.
 4               THE COURT:  Ms. Tardiff, before we leave
 5     this, may I ask a really quick question about the same
 6     page?
 7               MS. TARDIFF:  Yes, of course.
 8               THE COURT:  Mr. Fitzgerald, do you see 99.7
 9     elevation of the pool, and it says, "Pool covers all
10     lanes of State Highway 6"?
11               THE WITNESS:  Yes, sir.
12               THE COURT:  Has that actually happened?
13               THE WITNESS:  Yes.  A few times.
14               THE COURT:  Sorry?
15               THE WITNESS:  Just a few times.  Even --
16     above it says 98.9 pool on the shoulder.  TxDOT will
17     close the highway when it's on the shoulder because
18     it's unsafe.  So that's the -- that's the point when
19     TxDOT will close the highway.
20               THE COURT:  So, really, the first evident
21     thing that happens is Highway 6 gets closed; is that
22     right?
23               THE WITNESS:  Yes.  And there's -- later
24     versions of this, there's some other roads internal to
25     Addicks that are public that we added on here, but
```

1    they're less traveled.  But this was the most important

2    one.

3             THE COURT:  Thank you.

4    BY MS. TARDIFF:

5        Q.   So, and on that point, in a situation where

6    here the Addicks Reservoir pool is -- is rising to the

7    extent that it starts to impact State Highway 6, how

8    does that impact landowners upstream of Addicks

9    Reservoir?

10       A.   Their ability to get to work and school is

11   impacted.

12       Q.   So they're having to seek alternate routes

13   that don't allow them to drive through the reservoir at

14   that point?

15       A.   That's correct.

16       Q.   And if State Highway 6 is impacted by a

17   rising pool, is that well publicized in the area?

18       A.   Yes.  And I think the community probably

19   knows as quick as anyone else because someone can't --

20   highway's closed.  Usually we know about it but not

21   always in the past.  Since ABECT, it got better, you

22   know, with better communication.  But the community

23   member could find out.  They couldn't drive down the

24   street.

25       Q.   I'm going to have you turn now to Defendants'

1    Exhibit 194.

2            And, Mr. Fitzgerald, I'll give you a chance

3    to take a look at this, but my first question is are

4    you familiar with this document?  Or have you seen it

5    before?

6        A.    Yes, probably.  I've probably seen it before.

7        Q.    Can you tell us what it is?

8        A.    It's the Addicks and Barker Multiagency

9    Emergency Coordination Team meeting.  Looks like an

10   agenda.  And then there's an attachment, which was that

11   action response --

12       Q.    And --

13       A.    -- spreadsheet that we talked about

14   previously.

15       Q.    What's the date?

16       A.    This is a newer version of it.

17       Q.    Very good.  What is the date on this

18   document?

19       A.    Friday, March the 13th.

20       Q.    And is --

21       A.    2009.

22       Q.    Okay.  Thank you.  And is the Addicks and

23   Barker Multiagency Emergency Coordination Team, is that

24   the same thing as the ABECT?

25       A.    Yes.

```
 1        Q.    Okay.

 2        A.    Took us a while to figure out a good federal

 3   acronym to use for this.

 4              MS. TARDIFF:  Your Honor, we would move to

 5   admit Defendants' 194?

 6              MR. DUNBAR:  Your Honor, we object.  I don't

 7   think this -- I don't believe this witness has

 8   identified that he actually did recognize this

 9   document.  So we're going to object to.

10              THE COURT:  That objection stands at the

11   moment.

12              Ms. Tardiff, we need a little more

13   foundation.

14              MS. TARDIFF:  Okay.

15   BY MS. TARDIFF:

16        Q.    Mr. Fitzgerald, did you routinely participate

17   in ABECT team meetings?

18        A.    Yes.

19        Q.    And is it common to have an agenda such as

20   you see here on the first page?

21        A.    Most of the time.

22        Q.    And is the attachment to that agenda a

23   spreadsheet that is familiar to you?

24        A.    Yes.

25              MS. TARDIFF:  Your Honor, we still move to
```

 1    admit DX194.

 2              THE COURT:  You ought to find out when

 3    Mr. Fitzgerald became familiar with it and whether he

 4    actually attended the meeting.

 5    BY MS. TARDIFF:

 6         Q.   Do you recall whether you attended this

 7    meeting back in March of 2009?

 8         A.   We had a meeting -- many meetings, and we had

 9    lots of versions of this spreadsheet as it was

10    developing.  So I probably -- not -- I'm 99 percent

11    sure I saw every version because I was very much

12    involved in developing these.

13         Q.   And so you were -- you were involved in the

14    development of the spreadsheet --

15         A.   Very much.

16         Q.   -- one version of which is attached to this?

17         A.   That's the way I would look at it.

18              THE COURT:  Mr. Dunbar.

19              MR. DUNBAR:  First, Your Honor, he can't say

20    he actually attended this meeting, so he doesn't know

21    if this actually -- agenda actually was for a meeting

22    he attended.  I don't have a problem with introducing

23    the spreadsheet if he can state that he actually saw

24    this particular version of the spreadsheet.  I'm fine

25    with that.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                                      5/15/2019

```
 1              THE COURT:  Ms. Tardiff, I am tempted to
 2    admit it, but let's have a little more foundation.
 3              MS. TARDIFF:  We'll try, Your Honor.
 4    BY MS. TARDIFF:
 5         Q.   Again, Mr. Fitzgerald, you said there were a
 6    number of iterations of this spreadsheet over time?
 7         A.   Yes, ma'am.
 8         Q.   And was that part of ABECT's efforts to put
 9    together a spreadsheet that would be useful to those
10    team members in the event of a situation where you had
11    a rising pool?
12         A.   Yes.
13         Q.   And do you recognize this spreadsheet as one
14    of those iterations over time?
15         A.   Yes.
16              MR. DUNBAR:  No problem, Your Honor.
17              THE COURT:  All right.  Admitted.
18              (Whereupon, Defendants' Exhibit 194 was
19                 admitted into evidence.)
20    BY MS. TARDIFF:
21         Q.   So, Mr. Fitzgerald, this version of the
22    spreadsheet might be a little easier for us to read.
23    I'm going to have you turn to the first page after the
24    cover sheet, and we'll look at the table at the top,
25    which is identified as "Addicks Reservoir."
```

1          And can we blow up just that first part of

2     the table?  Actually, the full top part.  Sorry.

3          Mr. Fitzgerald, when we were -- when we were

4     looking at the last exhibit where the spreadsheet was

5     kind of broken up, you were talking about an additional

6     column.

7          Does this version of the spreadsheet have

8     that additional column?

9     A.    Yes.

10    Q.    And can you describe what that column is and

11    what the purpose of it -- of that column was in

12    connection with the ABECT group?

13    A.    Yes.  That was the column for the agencies to

14    include what action and response that they would take

15    each one of those corresponding pool elevations.

16    Q.    And did each of the members of the -- of the

17    ABECT group kind of go through the process of

18    identifying what their response would be to one of

19    your -- one of the key pool levels that was identified

20    here?

21    A.    Yes.

22    Q.    Okay.  The page we are on, the action

23    response column is captioned "USACE."  Is that right?

24    A.    Yes.

25    Q.    And let's look down at the one at the pool

1    level 104.2 feet on this version of the spreadsheet.

2          The consequence is approximate first street

3    flooded from pool, Bear Creek Village.

4          What is the -- the stated action at this

5    point for the Corps of Engineers in response to that

6    key pool level?

7    A.    To notify HCFCD; HC, which is Harris County;

8    HOUU, which is City of Houston there could be possible

9    street flooding off GOL, which is government-owned

10   land, from reservoir pool, provide reservoir pool

11   projections.

12   Q.    Let's move forward a little further in this

13   document.  We'll stay with Addicks.  We're going to

14   move forward to the page which is Bates-stamped

15   USACE727392.

16         THE COURT:  Ms. Tardiff, may I ask a quick

17   question?

18         MS. TARDIFF:  Yes, sir.

19         THE COURT:  It has to do with the pool level

20   111, flow around north end of dam.

21         Do you know what that means Mr. Fitzgerald?

22         THE WITNESS:  Okay.  Yeah.  That's on -- back

23   on Addicks.  Okay.

24         Yes.  That means that the water level's gone

25   to the point high enough to start flowing around the

1    end of Addicks Reservoir dam onto the north side.

2             THE COURT:  Let's take the next entry.  Pool

3    level 116, flow over spillways.  What does that mean?

4             THE WITNESS:  That's the Corps' elevation

5    where they say flow is going over the spillways.

6             THE COURT:  Where are these spillways

7    located, to your knowledge?

8             THE WITNESS:  There's two on Addicks

9    Reservoir, one on the north end at the end of the dam

10   and then one along the south side of the dam from the

11   end of the dam, you know, toward the middle of the dam.

12            THE COURT:  So you're saying there's a flow

13   around the north end of the dam well before the flow

14   over the spillway?

15            THE WITNESS:  Yes.

16            THE COURT:  Why?

17            THE WITNESS:  Because the spillway -- the dam

18   itself ends at the dam or a little higher than the

19   natural ground on the ends.

20            THE COURT:  Are you aware of subsidence in

21   that area?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  Are these elevations accurate?

24            THE WITNESS:  This is an early version.  So

25   these elevations, I recommend not using based upon more

1    recent information.  So this is 2009.

2           THE COURT:   Thank you.

3    BY MS. TARDIFF:

4       Q.   So this -- this table dated back to 2009, is

5    that based on elevation datum at that time?

6       A.   Yes.  The Corps used 1973, but we later used

7    the -- the current elevation that we use in Harris

8    County.  I don't know exactly when that was, but this

9    was during the development stage.

10      Q.   Sure.  And --

11      A.   Early development stage.

12      Q.   So, over time, this spreadsheet was updated

13   and -- and new -- as new information was available,

14   that was encompassed in -- or included in updated

15   spreadsheets?

16      A.   Yes.  And the ABECT team decided to break

17   things down a little more for Addicks and get a little

18   more granular.  So it evolved over time.  And even

19   after we got it to a point to start working with it,

20   like any good piece of information that you need, if

21   you found ways to improve it any more, refinements,

22   then those could have been done to it as well.

23      Q.   And does -- do the members of the ABECT group

24   still use an updated form of this general spreadsheet

25   to assist during emergency events where you have flood

1    pool that may exceed government-owned lands?

2        A.    Yes.

3        Q.    Let's jump ahead now, then, to the page I had

4    referenced.  It's Bates USACE727392.  And let's stay

5    with an Addicks chart for now.

6              Are you on that page, Mr. Fitzgerald?

7        A.    Yes.

8        Q.    And is this particular page in the 2009

9    version of the spreadsheet related to Harris County

10   Flood Control District's action and response to the

11   stated pool levels?

12       A.    Yes.

13       Q.    And, looking down the pool elevations, I'm

14   going to direct your attention to 104.2 feet.  And on

15   this table, at least, this version of the table, that

16   there are two consequences associated with that

17   elevation on this chart; is that correct?

18       A.    Yes.

19       Q.    And what are those two consequences?

20       A.    The first one listed is "first street

21   flooded, Bear Creek Village, Hickory Grove Drive."  And

22   the second one is "pool reaches 80 percent of

23   government-owned land."

24       Q.    And, at that elevation, what is the listed

25   Harris County Flood Control District action and

1    response?

2         A.    For the pool reaches 80 percent of

3    government-owned land, it's "issue major flood warning

4    house -- for houses for Bear Creek Village."

5         Q.    And, in issuing flood warnings, does the

6    flood control district make a distinction between

7    street flooding and house or structure flooding?

8         A.    Yes, in general.  But the flood warnings go

9    out through the National Weather Service.  And they

10   have pretty strict definitions of major flooding and

11   minor flooding.  And they have different terms like

12   that.  And I'm not familiar with all those terms.

13        Q.    Okay.  Very good.

14              If you bump up to the 106.6 elevation -- flow

15   elevation on this particular page, what is the Harris

16   County Flood Control District's listed action and

17   response?

18        A.    At elevation 109, "expand major flood warning

19   for potential impact areas."

20        Q.    And your understanding is the flood control

21   district would coordinate those warnings with, you

22   said, the National Weather Service?

23        A.    Yes, and others on the ABECT team.

24        Q.    And does Harris County Flood Control District

25   also communicate with local news channels and other

1    outlets for getting information out in the event of a

2    rising pool?

3         A.    It's -- Harris County Flood Control District

4    works through the Harris County Office of Emergency

5    Management, who has -- who most of that communication

6    goes through.  But staff there -- like Jeff, Jeff was

7    here last week.  Jeff is usually there at Harris County

8    Office of Emergency Management, and sometimes others.

9    So all that's coordinated among all the different

10   agencies.

11        Q.    And when you say "Jeff," you're referring to

12   Jeff Lindner?

13        A.    Yes.  Sorry.

14        Q.    All right.  Mr. Fitzgerald, I want to turn

15   next to Hurricane Harvey and talk about that particular

16   event.

17             First of all, did you -- did you work

18   Hurricane Harvey -- the Hurricane Harvey event in your

19   capacity with Harris County Flood Control District?

20        A.    Yes.

21        Q.    And can you describe what your role and

22   responsibilities were during that event?

23        A.    I was -- I had been the flood watch leader

24   for Harris County Flood Control for I don't know how

25   long, a long time, many years.  And -- but, in 2017 --

1    starting in 2016, I was trying to transition to other
2    people to do more what I used to do because I knew I
3    was going to be retiring in one to three years.
4          So when Harvey came up, I was trying -- I did
5    that.  I let others step up.  But I was the incident
6    commander during the evening times on the first three
7    nights, I believe it was.  So I was in charge of the --
8    of the -- what we do at the Harris County Flood Control
9    District during an event, not Harris County Office of
10   Emergency Management.  We're -- we're in very close
11   contact with them.
12       Q.    And you mentioned your role over time as a
13   flood watch leader.  Related to that, have you worked
14   every flood event in Harris County since you started at
15   the flood control district back in the mid '80s?
16       A.    Probably since 1983, I worked 95 percent of
17   every flood and near-flood event.
18       Q.    Did Hurricane Harvey -- some folks have
19   referred to as Tropical Storm Harvey here.  Did that
20   storm create an emergency situation for Harris and Fort
21   Bend Counties?
22       A.    Yes.
23       Q.    And why?  Can you explain that?
24       A.    Well, anytime there's a tropical system in
25   the Gulf, we get worried because it could -- it could

1    head this way.  And so we don't know when an emergency

2    would start, it would begin, but we take it very

3    seriously.  We start coordinating with others in the

4    community at other agencies and the ABECT team.

5            And so -- but with the forecast of the

6    potential rainfall, as it got higher and higher, as it

7    got closer to the coast, we took it more and more

8    seriously, as well as everyone else in Harris County.

9        Q.    Sure.  And as someone who's worked on maybe

10   95 percent of the floods that have happened in Harris

11   County since about 1983, how -- how would you compare

12   the, you know, emergency situation created by Hurricane

13   Harvey in Harris County with the other flood events

14   that you've worked on over that period of time?

15       A.    It started out like almost any other tropical

16   system, but it quickly escalated once it got closer to

17   the coast and made landfall on Friday in Rockport or

18   near Rockport.  But the rainfall forecasters all rated

19   it high.  And I was thankful that Judge Bennett, you

20   know, closed the county down on Friday.  And most of

21   the schools closed on Friday to prepare for this event.

22   So I was very happy for that.

23           At the time, we didn't know what the impact

24   was going to be, but the forecast of the rainfalls was

25   astronomical.  So we were glad.  But as it went on, it

```
 1   got -- it got worse and worse.  So ...
 2        Q.   Was the ABECT group activated in anticipation
 3   of Harvey making landfall?
 4        A.   Yes.  I believe our first call was on
 5   Wednesday.  I don't know -- I didn't keep up with the
 6   calendar days.  I know the week -- days of the week, so
 7   I don't want to confuse -- I don't know what day that
 8   is of the month.
 9             MS. TARDIFF:  May I approach, Your Honor?
10             THE COURT:  Yes.
11             MS. TARDIFF:  For counsel, I'm going to hand
12   Mr. Fitzgerald what's been marked as Joint Exhibit 293.
13   It's just a blank calendar.
14   BY MS. TARDIFF:
15        Q.   So you mentioned Wednesday before Harvey
16   arrived.  Looking at Joint Exhibit 293, can you tell us
17   what date that was?
18        A.   That was August 23rd.
19        Q.   And, stepping back to make sure I heard you
20   correctly, was that the first time that the ABECT group
21   met?
22        A.   I think it was.  So we could have been -- you
23   know, the ABECT group is everyone, all the different
24   organizations.  But, in my role as coordinating with
25   the Corps and other -- sometimes other agencies, we may
```

Trial

Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1    start phone calls one on one.  But ABECT was my primary

2    contact.  So that could have happened before.  I just

3    don't keep records of all of those.

4         Q.   And in connection with Harvey, do you have a

5    recollection as to whether you started having

6    one-on-one calls with your contacts at the Corps even

7    before the ABECT group started meeting or having

8    regular calls?

9         A.   I'm pretty sure I did, but it's kind of fuzzy

10   now in my head.

11        Q.   And, generally speaking, can you describe for

12   us how the ABECT team was communicating as a group

13   during Hurricane Harvey?

14        A.   We had conference calls -- regularly

15   scheduled conference calls twice a day.  The first one

16   started on the 23rd in the morning.  We had one in the

17   morning, one in the afternoon.  And that was the

18   primary communications.

19        Q.   Were there also email communications during

20   that time?

21        A.   There was email information that was

22   exchanged during that time.  We didn't usually do too

23   much discussion on emails, mostly information exchange.

24        Q.   Okay.  And what kind of information was the

25   Corps transmitting to the ABECT group via email?

1       A.    The primary -- what they sent to us was their

2    latest model results of projections for Addicks and

3    Barker.

4       Q.    And does -- do those modeling results also go

5    by an acronym?

6       A.    Yes.  It's called CWMS.  S-W-M-S [sic], I

7    think it is.  I can't remember what it stands for.

8    It's another one of those acronyms.  But it's hydrology

9    and hydraulic models.  But it's a suite of models that

10   the Corps uses across the United States to manage their

11   training systems across the United States.

12      Q.    And is it -- is the CWMS information that was

13   being transmitted, is that a forecast?

14      A.    It includes what's -- at the time that the

15   models run, it includes what the situation is up to

16   that point and then a forecast projection beyond that.

17      Q.    Okay.  Let's take a look at that and make it

18   easier.  I'm going to have you turn to Joint

19   Exhibit 146.

20            And, Mr. Fitzgerald, do you have Joint

21   Exhibit 146 in front of you?

22      A.    Yes.

23      Q.    And are you one of the listed recipients on

24   this email?

25      A.    Yes.

```
 1        Q.    Along with many others.

 2              And what is the date of this email and time?

 3        A.    It is Friday, August 25th, 2017, at 2:26 p.m.

 4        Q.    And what is the subject of this email?

 5        A.    "SWMS forecast for August 25th, 2017, to

 6   September 24th, 2017."

 7              MS. TARDIFF:  Your Honor, we'd move to admit

 8   Joint Exhibit 146.

 9              THE COURT:  It's already in evidence.

10              MS. TARDIFF:  Oh, I apologize.

11   BY MS. TARDIFF:

12        Q.    So we'll go ahead and -- and let me ask you a

13   few questions about this.  First of all --

14              THE COURT:  Now, just a moment.  I have a

15   note that it came in through Mr. Vogler.

16              Well -- all right.  If it didn't come in

17   through Mr. Vogler, it does come in now.  One or

18   another, it's admitted. (Joint 146 admitted.)

19              MS. TARDIFF:  Thank you, Your Honor.

20              THE COURT:  I think it came in through

21   Mr. Vogler.

22   BY MS. TARDIFF:

23        Q.    Mr. Fitzgerald, looking at the list of

24   recipients at the top of this email, does that listing

25   include participants in the ABECT group?
```

```
 1        A.    Yes.

 2        Q.    Are there more than just your regular group

 3   participants in the ABECT group listed here?

 4        A.    Yes, a lot more.

 5        Q.    And you described for us what a CWMS forecast

 6   is here, but let me ask you about this -- the sender of

 7   this email is Michael Kauffman.  Do you know

 8   Mr. Kauffman?

 9        A.    Yes.

10        Q.    And who is he?

11        A.    He's in the hydrology and hydraulics

12   department at the Corps of Engineers in Galveston.

13        Q.    And is Mr. Kauffman one of the individuals

14   that the Corps involved in preparing and transmitting

15   these CWMS forecasts to the ABECT group and others

16   listed here?

17        A.    Yes.  He does the modeling.  He's very good

18   at it.

19        Q.    So let's actually turn to the CWMS forecast

20   which is attached here.  And what's the date of this

21   particular CWMS forecast?

22        A.    August 25th, 2017, which is Friday.

23        Q.    And I'm looking at the second paragraph on

24   the page that is COH-DOJ8154.  Are you on that same

25   page?
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

 1        A.   Yes.

 2        Q.   You had mentioned earlier that the forecast

 3   uses rainfall forecast as one of its inputs.  Here, it

 4   states -- it makes a reference to the seven-day QPF is

 5   showing accumulation of approximately 23 inches.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   And, based on that forecasted rainfall of

 9   23 inches, what did this CWMS forecast tell you about

10   pool elevations in Addicks and Barker reservoir?

11        A.   Well, Michael has this table in front to

12   summarize it.  He has a peak forecasted reservoir level

13   for Addicks at 105 plus and Barker at approximately

14   100.

15        Q.   And, Mr. Fitzgerald, there are also some

16   tables at the back.  And, as an engineer, are those

17   tables that you would have looked at for additional

18   information about this forecast?

19             THE COURT:  Ms. Tardiff, what is the page

20   we've been looking at?

21             MS. TARDIFF:  The page we were just looking

22   at is -- there's two Bates numbers.  I was referring to

23   the one that is COH-DOJ8154.  And then I am turning and

24   directing Mr. Fitzgerald to the same Bates numbering

25   ending in 8156 and 8157.

1    BY MS. TARDIFF:

2        Q.    And, Mr. Fitzgerald, are the graphs that are

3    shown on those two pages familiar to you?

4        A.    Yes.

5        Q.    And, as an engineer involved in the ABECT

6    group, would you have looked at these graphs for

7    additional information?

8        A.    Yes.

9        Q.    And you mentioned that they -- the CWMS

10   forecast tells you both what's already occurred and

11   what's forecast.  Can you just explain that generally

12   in terms of the graphs before you.

13       A.    Yes.  On the graphs on the first page, the

14   Addicks Reservoir forecast -- and there's a vertical

15   dashed line that's heavy, bold.  And that is the time

16   that Michael ran this simulation.  So it's the current

17   time.  So anything to the left of that is what was

18   observed and to the right of that is projected.

19       Q.    All right.  Mr. Fitzgerald, I'm going to have

20   you turn next to Defendants' Exhibit 340.

21             And, Mr. Fitzgerald, are you a recipient of

22   this email?

23       A.    Yes.

24       Q.    And can you tell us the date and time of this

25   email?

```
 1        A.    It is August 26th, 2017, at 12:31 p.m.
 2        Q.    And is this the transmittal of another CWMS
 3   forecast from Mr. Kauffman?
 4        A.    Yes.
 5              MS. TARDIFF:  We move to admit
 6   Defendants' 340.
 7              THE COURT:  Mr. Dunbar?
 8              MR. DUNBAR:  No objection, Your Honor.
 9              THE COURT:  Admitted.
10                   (Whereupon, Defendants' Exhibit 340 was
11                    admitted into evidence.)
12   BY MS. TARDIFF:
13        Q.    Mr. Fitzgerald, I'm going to have you turn to
14   the first page of the attached CWMS forecast again.
15   The Bates number at the bottom is COH-DOJ8241.
16              And looking at the CWMS forecast, what did
17   this particular forecast, which is now dated
18   8/26/2017 -- what was the forecast with respect to when
19   the Addicks and Barker pools would reach
20   government-owned land?
21        A.    Again, reading from the table -- summary
22   table on the first page, it says 103 for Addicks and 95
23   on Barker.
24        Q.    And does that table -- did that also give you
25   a date and time when that was forecasted to occur?
```

 1      A.   Yes.  Looks like it did include that just to

 2   the right of those numbers on that table.

 3      Q.   And just below that, did this CWMS forecast

 4   on August 26th, 2017, also include a line item for

 5   first home flooded at each of those reservoirs?

 6      A.   Yes.

 7      Q.   Along with a time -- date and time?

 8      A.   Yes.  It does include that on the table as

 9   well.

10      Q.   And did this forecast also include a forecast

11   for the peak elevations of each reservoir based on

12   actual rainfall and then what was forecasted still to

13   come?

14      A.   Yes, it does.

15      Q.   And that's at the bottom of that table?

16      A.   Yes.

17      Q.   If we look up at the second paragraph of this

18   forecast -- and I'm reading the second sentence -- it

19   says "At this time, we are not expected to make

20   mandatory releases for surcharge operations."

21           Do you see that sentence?

22      A.   Yes.  I do now.

23      Q.   And was the issue of releases from the

24   reservoir during the storm also a subject of calls with

25   the ABECT group?

```
 1          A.    Yes.

 2          Q.    I'm going to have you turn next to

 3    Defendants' Exhibit 3.

 4                THE COURT:  Ms. Tardiff?

 5                MS. TARDIFF:  Yes, sir.

 6                THE COURT:  You're on a roll, but it's about

 7    time for our afternoon recess.

 8                MS. TARDIFF:  I --

 9                THE COURT:  Can we take it?

10                MS. TARDIFF:  Absolutely.

11                THE COURT:  Mr. Fitzgerald, do you mind?

12                THE WITNESS:  I'm ready.

13                THE COURT:  You're ready.

14                Mr. Dunbar?

15                MR. DUNBAR:  No problem, Your Honor.

16                THE COURT:  All right.  We're in recess.

17                THE CLERK:  All rise.  Court is in recess.

18                     (Whereupon a short recess was taken.)

19                THE CLERK:  All rise.  United States Court of

20    Federal Claims is now in session, the Honorable Charles

21    F. Lettow presiding.

22                THE COURT:  Please be seated.

23                Mr. Fitzgerald, welcome back.

24                Ms. Tardiff, you may proceed.

25                MS. TARDIFF:  Thank you, Your Honor.
```

```
 1   BY MS. TARDIFF:
 2        Q.   Mr. Fitzgerald, I'm going to return back to
 3   some of the CWMS forecasts that we've been looking at.
 4   The next one I'm going to ask you to take a look at is
 5   Defendants' Exhibit 360.  And that should be in that
 6   same notebook.
 7             Do you have that in front of you, sir?
 8        A.   Yes.
 9        Q.   Okay.  Once again, Mr. Fitzgerald, are you a
10   listed recipient on this email?
11        A.   Yes.
12        Q.   And can you --
13             THE COURT:  I'm sorry.  Let's stop just a
14   minute.  You said this is DX which number?
15             MS. TARDIFF:  360.
16             THE COURT:  Oh, I thought you said 350.  I'm
17   sorry.
18             Yes.  Go ahead.
19             MS. TARDIFF:  Thank you.
20   BY MS. TARDIFF:
21        Q.   And what is the date and time of this email,
22   Mr. Fitzgerald?
23        A.   This one is 8/27/2017 at 2:02 p.m.
24        Q.   And is this another transmittal of an updated
25   CWMS forecast from Mr. Kauffman at the Corps?
```

```
 1        A.    Yes.
 2              MS. TARDIFF:  We'd move to admit
 3   Defendants' 360.
 4              MR. DUNBAR:  No objection.
 5              THE COURT:  Admitted.
 6                   (Whereupon, Defendants' Exhibit 360 was
 7                    admitted into evidence.)
 8   BY MS. TARDIFF:
 9        Q.    Let's turn again briefly to the attached CWMS
10   forecast which is dated 8/27/2017.
11              Before the break, we talked about the
12   forecast in Defendants' Exhibit 340, which was the day
13   before.  And there was a reference to mandatory
14   releases.
15              If you'd take a look at the second paragraph
16   here, Mr. Fitzgerald, it states "At this time,
17   mandatory releases are expected to be necessary for
18   surcharge operations at Addicks later tonight and at
19   Barker on Wednesday."
20              And, once again, my question is was the
21   subject of releases from the reservoir during the event
22   a subject of the phone calls with the Addicks group
23   during the event?
24        A.    Yes.
25        Q.    And did the Corps subsequently initiate those
```

1    releases from the reservoir during the event?

2        A.   Yes.

3        Q.   If we look down on the table here on this

4    page, which is COH-DOJ8575, we've already discussed a

5    couple of the listings here.  But the first two refer

6    to -- it says "EW Stage 1 RES level," and then, below

7    that, "EW Stage 2 RES level."

8             And, Mr. Fitzgerald, do you understand what

9    those references are to?

10       A.   I don't usually pay attention to those

11   because those are within the reservoirs and those mean

12   more to the Corps than to the rest of us.

13       Q.   Okay.  Do you know if those are connected

14   with the emergency action plan?

15       A.   They're a list of the emergency action plan.

16       Q.   We're going to turn next to Defendants' 384.

17            And, Mr. Fitzgerald, are you again a listed

18   recipient of this email?

19       A.   Yes.

20       Q.   And what is the date and time of this email?

21       A.   August 28th, 2017 --

22       Q.   And --

23       A.   -- at 4:16, I think.  Zero -- 4:16 a.m.

24       Q.   A.m.  Thank you.

25            And is this another transmittal of an updated

1    CWMS forecast from Mr. Kauffman at the Corps to the

2    ABECT group and anybody else listed here?

3        A.    Yes.

4              MS. TARDIFF:  We move to admit

5    Defendants' 384.

6              MR. DUNBAR:  No objection.

7              THE COURT:  Admitted.

8                   (Whereupon, Defendants' Exhibit 384 was

9                    admitted into evidence.)

10             THE WITNESS:  That's on -- it's on Monday.

11   BY MS. TARDIFF:

12       Q.    Thank you.

13             And looking back at your experience with

14   Harvey, what's your recollection of -- of what the

15   rainfall was like from the time it began through -- you

16   know, we're now at Monday.  What was that rainfall like

17   over the weekend?

18       A.    Are you referring to the Addicks and Barker

19   watershed or just in general?

20       Q.    Well, let's start with in general.

21       A.    My recollection is we had a little bit of

22   rain on Thursday or Friday, I think, small amount of

23   rain as the system was coming closer to the coast.  And

24   Saturday, during the day, early part of the day, wasn't

25   too bad.  But then it really picked up in the afternoon

```
 1    and evening at night.  And that's when the heaviest
 2    rain started impacting Harris County, was Saturday
 3    evening, Saturday night down in the southeast part of
 4    the county, which ended up with the record rainfall
 5    levels.
 6         Q.   And did that heavy rain continue after
 7    Saturday night?
 8         A.   Yes.  And it depended on where you were in
 9    the county and what watershed you were in as to how it
10    ebbed and flow, like any storm event.  But it continued
11    Sunday.  And Sunday afternoon and evening, even got
12    heavier.  And then Monday it continued, not quite as
13    heavy as on Sunday, but on Monday it continued.  And
14    didn't really leave Harris County probably until
15    Tuesday afternoon on eastern side of the county.
16         Q.   Okay.  And then let's -- let's pull back to
17    the Addicks and Barker watersheds and referring to the
18    CWMS forecast, here we have for August 28th at -- and
19    referring to the first paragraph, what was the CWMS
20    forecast reporting to you in terms of rainfall that had
21    already occurred and then the rainfall that was
22    forecasted yet to come at that time?
23         A.   Could you repeat the question.
24         Q.   Sure.  I'm looking at the CWMS forecast
25    that's attached to the email that is Defendants'
```

1   Exhibit 384.  I'm on the first page of the forecast,

2   which is COH-DOJ8867.

3          And looking at that first paragraph, what did

4   this CWMS forecast that was transmitted to the ABECT

5   group tell you about the amount of rainfall that had

6   already fallen in the Addicks and Barker watershed and

7   the amount of rain that was still forecasted to come in

8   that area?

9      A.   In the first paragraph, Michael said that the

10  watersheds -- Addicks and Barker watersheds had

11  received 25 to 28 inches since the beginning of the

12  event and forecasted rainfall amounts are in flux.

13  Then he says the seven-day accumulation assumed for

14  this forecast is 25 inches, as received from the river

15  forecast center, which would be the next seven days

16  beyond that time before -- before August 28th -- or

17  after August 28.

18     Q.   And looking down at the table on the same

19  page, did this CWMS forecast add a page as to a

20  forecast for flows around the end of the dam or end of

21  either dam?  And I'm looking at the row below

22  "Mandatory releases begin."

23     A.   Oh, yes.  It's in the same paragraph.  I was

24  looking down at the table.

25          It says, "Releases had begun at Addicks and

1    Barker tonight due to the speed at which the pools have

2    been rising.  We're expected to have water around the

3    north end of Addicks later tonight with peak flows of

4    about 22,000 cfs on Friday morning."

5        Q.   And at that point, that was -- that was the

6    forecast based on conditions that had occurred and what

7    was forecasted to come; is that accurate?

8        A.   Yes.

9        Q.   Let's turn next to Defendants' 396.

10            And, Mr. Fitzgerald, once again, are you a

11    recipient of this email?

12       A.   Yes.

13       Q.   And what is the date and time?

14       A.   It is Tuesday, August 29th, at 4:51 a.m.

15       Q.   And is this the transmittal from Mr. Kauffman

16    of another updated CWMS forecast?

17       A.   Yes.

18            MS. TARDIFF:  We move to admit

19    Defendants' 396.

20            MR. DUNBAR:  No objection.

21            THE COURT:  Thank you, Mr. Dunbar.  Admitted.

22                (Whereupon, Defendants' Exhibit 396 was

23                 admitted into evidence.)

24    BY MS. TARDIFF:

25       Q.   And as with the last CWMS forecast we've seen

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1    again, did this CWMS forecast provide an update on both

2    existing conditions and then forecasted conditions

3    after the date of the report?

4        A.   Yes.

5        Q.   Let's turn to Defendants' 415.

6             And, Mr. Fitzgerald, are you a recipient of

7    this email?

8        A.   Yes.

9        Q.   Can you tell me the date and time?

10       A.   It would be August 30th at 6:02 a.m.

11       Q.   And by this --

12       A.   Excuse me.  It's on Wednesday.

13       Q.   Thank you, sir.

14            And does this email from Mr. Kauffman

15   transmit another updated copy of the CWMS forecast?

16       A.   Yes.

17            MS. TARDIFF:  We move to admit

18   Defendants' 415.

19            MR. DUNBAR:  No objection.

20            THE COURT:  Admitted.

21                 (Whereupon, Defendants' Exhibit 415 was

22                  admitted into evidence.)

23   BY MS. TARDIFF:

24       Q.   Mr. Fitzgerald, one quick question on this

25   one.  If you turn to the forecast itself on the page

1    beginning COH-DOJ9758.

2              Do you see that?

3      A.    Yes.

4      Q.    And looking at the second paragraph, what did

5    this CWMS forecast tell the recipient of the forecast

6    regarding the peak of -- for the Addicks Reservoir?

7      A.    You said look at the second paragraph?

8      Q.    Yes, sir.

9      A.    About the peak?  Okay.

10             What you ask about, it says "Addicks is

11   expected to peak today before the emergency spillway is

12   activated.  The Barker Reservoir pool is not expected

13   to flank the ends of the dam."

14     Q.    Let's do one more.  I'm going to have you

15   turn to Defendants' Exhibit 427.

16             And, again, Mr. Fitzgerald, are you one of

17   the listed recipients on this email?

18     A.    Yes.

19     Q.    And can you give us the date and time of this

20   email?

21     A.    It's Thursday, August 31st, at 3:38 a.m.

22     Q.    And by this email, did Mr. Kauffman again

23   transmit an updated CWMS forecast to all of the

24   recipients on this list?

25     A.    Yes.

```
 1              MS. TARDIFF:  We move to admit
 2   Defendants' 427.
 3              MR. DUNBAR:  No objection.
 4              THE COURT:  Admitted.
 5                   (Whereupon, Defendants' Exhibit 427 was
 6                   admitted into evidence.)
 7   BY MS. TARDIFF:
 8        Q.   I'm going to turn back to the 2018 federal
 9   briefing, which is Defendants' 737.
10              And, Mr. Fitzgerald, my first question is is
11   the Addicks and Barker project we've been discussing,
12   is that the only federal flood control or flood risk
13   reduction project in Harris County?
14        A.   No.
15        Q.   No.  And are you generally familiar with the
16   other active federal flood control or flood risk
17   reduction projects in Harris County?
18        A.   Yes.
19        Q.   And is Harris County Flood Control District a
20   local sponsor for those other projects?
21        A.   Yes, for the other projects, they are the
22   local sponsor.
23        Q.   I'm going to have you turn in the report to
24   FEMA page 78373.  And, Mr. Fitzgerald, there is a table
25   on this page.  The title is "Active Federal Project
```

```
 1    Status Summary."
 2            Can you describe for us the information
 3    that's contained in this table in the flood control
 4    district's 2018 federal briefing report?
 5       A.   Yes.  These are the federal projects where
 6    there's some action going on on them in 2018 and just a
 7    brief one-page summary of information about each one.
 8       Q.   And these are listed as active projects.
 9            What does that mean?
10       A.   That means they are not completed.
11       Q.   And are all of the projects that are listed
12    here projects that Harris County Flood Control District
13    is partnering with the Corps of Engineers on in Harris
14    County?
15       A.   Yes.  In some way or another.  The last two
16    are on hold as a federal project, Halls Bayou and
17    Buffalo Bayou main stem.  Those are on hold.  The ones
18    above that are active.
19       Q.   Let's turn to the next page, which is FEMA
20    78375.
21            And, Mr. Fitzgerald, what is the information
22    that's summarized in this table at 78375?
23       A.   These are milestone date summary of all the
24    federal projects, Corps of Engineers federal projects
25    in Harris County in three categories:  those that are
```

1    completed, those under construction, and those that are

2    authorized but no work has been done past

3    authorization.

4        Q.   And if we turn to the next page, which is

5    78376, what does this map show us?

6        A.   This is a schematic layout of the active and

7    completed Corps of Engineers federal projects in Harris

8    County.

9        Q.   And are some of those active and completed --

10   or do some of those active and completed projects,

11   other than Addicks and Barker, include detention

12   basins?

13       A.   Yes.  The regional detention basins are along

14   most all of them.

15       Q.   With respect to other detention basins for

16   which Harris County Flood Control District was

17   responsible for, were those detention basins

18   overwhelmed by the rainfall during Harvey?

19       A.   Yes.  During Harvey every watershed was

20   impacted by the heavy rainfall, which was the first

21   time probably in modern history.  And they were all

22   overwhelmed, you know, after the first 12 to 14 inches

23   of rain, maybe a little more on some of them.

24       Q.   And did Harris County see structure or house

25   flooding around some of those detention basins in

1    Harris County during Harvey?

2        A.    I don't know about -- specifically about

3    locations around the detention basins, but there was

4    extensive house flooding across Harris County due to

5    Hurricane Harvey.

6        Q.    In every watershed?

7        A.    In every watershed -- every major watershed.

8              MS. TARDIFF:    Thank you, sir.  I don't have

9    any further questions.

10             THE COURT:    Thank you, Ms. Tardiff.

11             Mr. Dunbar, cross-examination.

12                     CROSS-EXAMINATION

13   BY MR. DUNBAR:

14       Q.    Good afternoon, Mr. Fitzgerald.  My name's

15   Larry Dunbar.  We've met before?

16       A.    Yes.

17       Q.    We know each other quite well?

18       A.    Yes.

19       Q.    Did you meet with the government lawyers

20   before you testified today?

21       A.    Yes.

22       Q.    For how long?

23       A.    Probably an hour or so.

24       Q.    And on what day?

25       A.    What day?  I don't remember what day.  Couple

1    of weeks ago, probably.

2        Q.    Okay.  Did you meet with any of the

3    plaintiffs' counsel in this case before today?

4        A.    Yes.

5        Q.    Who?

6        A.    It was during the deposition.

7        Q.    Oh, but ...

8        A.    There was a lot of attorneys there.  I didn't

9    know who everybody was.

10       Q.    But within the last few months.

11       A.    Not after the deposition, no.

12       Q.    Okay.  You aware that Mr. Easterby, with our

13   group, asked to meet with you but that that request was

14   declined?

15       A.    Yes.

16       Q.    Are you being paid by the federal government

17   for your testimony?

18       A.    No.

19       Q.    So you're doing it voluntarily?

20       A.    Yes.

21       Q.    And is that to help out the federal

22   government?

23       A.    No.  It's to provide as accurate information

24   as I can so that the people making decisions can make

25   more -- make a better decision with the information.

 1        Q.   Okay.  And you had been -- worked as an

 2   expert witness on behalf of the federal government in

 3   the St. Bernard Parish case?

 4        A.   Yes.

 5        Q.   And did you use a HEC-RAS model for that

 6   case?

 7        A.   Yes.

 8        Q.   In your testimony, you had sometimes referred

 9   to Addicks and Barker reservoirs; correct?

10        A.   I'll take your word for it.

11        Q.   Have you ever referred to the Addicks

12   Reservoir?

13        A.   Yes.

14        Q.   Have you ever referred to the Barker

15   Reservoir?

16        A.   Yes.

17        Q.   When you use that term, Addicks Reservoir,

18   what are you exactly referring to?  What area of the

19   land are you referring to?

20        A.   To me, it's just the names of the facilities

21   that are built by the Corps in western Harris County.

22        Q.   So you're really talking about Addicks Dam?

23        A.   I think of them as just, you know, the whole

24   unit -- the dam, the land, everything.

25        Q.   The land being the government-owned land?

 1       A.    I don't usually think about that.  I just

 2   think of them as detention basins and that's their

 3   name.

 4       Q.    Okay.  Because you -- you had mentioned the

 5   Corps owns, operates, and maintains Addicks and Barker

 6   reservoirs.

 7             So does the Corps of Engineer own the land

 8   behind Addicks Dam that encompasses the entire

 9   reservoir pool?

10       A.    Based on what I know, including some reports

11   we went over earlier, we -- the pool goes off the

12   government-owned land.

13       Q.    Okay.

14       A.    Can go off the government-owned land.

15       Q.    Okay.  You had talked about the Harvey

16   rainfall that occurred over Harris County and then at

17   flood levels; correct?

18       A.    Yes.

19       Q.    Do you know how many homes there are in

20   Harris County, approximately?  A million?

21       A.    Yeah, because the estimate that we did --

22   rough -- not rough.  Got information from different

23   jurisdictions in an estimate.  Just in Harris County

24   was like 154,000 homes that flooded.  And that was

25   about 10 or 12 percent of the number of structures

 1    on -- on the HCAD list, Harris County Appraisal

 2    District list, just a rough estimate.

 3         Q.    Okay.  So for rainfall Harvey, that dumped 30

 4    to 50 inches of rain in Harris County and about 10 or

 5    so percent of the homes flooded, you still think that

 6    every house in Harris County has a risk of flooding?

 7         A.    Yes.

 8         Q.    From what kind of event?

 9         A.    It would be different depending on the

10    location of the watershed.

11         Q.    How much rain is needed to flood every house

12    in Harris County?

13         A.    I -- I think your expert should be better at

14    answering that question than me.

15         Q.    Did you work for flood control for over 30

16    years?

17         A.    Yes.

18         Q.    You've been the chief engineer for over 20

19    years?

20         A.    Yes.

21         Q.    You've been studying rainfall in Harris

22    County over that time?

23         A.    Yes.

24         Q.    Okay.  And 50 inches of rain over Harris

25    County flooded 10 percent of the homes.

1      A.    The rainfall was not the same in every

2  watershed during Hurricane Harvey.

3      Q.    At least 30 inches of rain fell over all of

4  Harris County; correct?

5      A.    I think it was -- I think the most -- I think

6  there was some areas that were less than that still.

7      Q.    Okay.

8      A.    Just from my memory.  I don't have that

9  information in front of me right now.

10      Q.    Okay.  Well, could 100 inches of rain flood

11  every house in Harris County?

12      A.    Possibly.

13      Q.    You know how high 100 inches of rain would

14  produce in terms of water levels throughout the county?

15      A.    I don't know.

16      Q.    You have no idea, do you?  You have no idea,

17  do you?

18      A.    It would be high.

19      Q.    You had talked about the '92 flood setting

20  record pool levels at Addicks and Barker reservoirs;

21  correct?

22      A.    Yes.

23      Q.    And isn't it true that the character of the

24  flooding associated with the reservoir pool was

25  different than the character flooding associated with

 1    the river -- like riverine bayou flood?

 2        A.    Could you repeat the question.

 3        Q.    Sure.  You remember I took your deposition in

 4    this case?

 5        A.    Yes.

 6        Q.    Okay.  And do you remember we talked about

 7    the nature of the flooding associated with the

 8    reservoir pool causing a more prolonged period of

 9    flooding than typical for a bayou flooding?  Remember

10    that?

11        A.    Yes.

12        Q.    Okay.  And do you remember you talking about

13    how the character of the flooding associated with the

14    reservoir pool is different in part because of the

15    extended length of time that that inundation or

16    flooding would occur?

17        A.    Yes.

18        Q.    Okay.  And it's also true that, you

19    indicated, that the flooding in a reservoir pool was

20    different, especially in Addicks and Barker, because

21    that water level causing the flooding can start to go

22    down but then, from a subsequent storm, come back up

23    again because these reservoirs can't release enough

24    water fast enough; correct?

25        A.    Yes.  The elevations can go up and down as

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                          5/15/2019

1    related to how much rainfall and runoff is coming in

2    and how much is being released out of the outlets.

3          Q.   And this is kind of what you saw in the '92

4    flood, right, that you had rain for months.  It wasn't

5    associated with just one storm; right?

6          A.   Correct.

7          Q.   Wasn't even associated with two or three

8    storms over a two- or three-week period; correct?

9          A.   Some number.  I don't remember how many.

10         Q.   Well, it was months, because you said in late

11   '91 it started to rain and continued to rain through

12   March of 1992; correct?

13         A.   Off and on, yes.

14         Q.   Okay.

15         A.   I don't remember the exact number of storms,

16   though.

17         Q.   Okay.  And that's something that could make

18   flooding, even in a reservoir, different than the

19   flooding you would see on a stream where it's going to

20   go up -- it's going to come down fairly quickly, a day

21   or two, compared to a month; correct?

22         A.   Yes, that could happen.

23         Q.   Now, there was discussion about the fringe

24   area in a reservoir.

25              Do you recall that?

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                              5/15/2019

1          A.    Yes.  It was reports that we read from.

2          Q.    Right.  And what is a fringe area in that

3     reservoir?

4          A.    In that context, I believe it means the area

5     between the government-owned land and wherever the

6     boundary of the pool is.

7          Q.    Okay.  Do you know what that boundary of the

8     pool was defined as?

9          A.    No.

10         Q.    Okay.  And is that fringe area area that

11    development is in?

12         A.    There's -- there's development in fringe --

13    in the fringe area.

14         Q.    And was there development approved by Harris

15    County for that fringe area?

16         A.    I can only assume it was.

17         Q.    Because it's in Harris County?

18         A.    Because it's in Harris County.  It's there.

19         Q.    All right.

20         A.    I don't know if they got permits or not for

21    it, but I assume they did.

22         Q.    Because doesn't Harris County regulate and

23    permit all development in Harris County?

24         A.    Unincorporated Harris County.

25         Q.    Yes.  And this was unincorporated Harris

1    County?

2        A.   Yes, unincorporated Harris County.

3        Q.   Okay.  If you could turn to Joint Exhibit 88.

4    This was the -- these were the -- remember the water

5    impact tables?

6        A.   Action response plan?

7        Q.   Action response plan, where you had these

8    different water levels for different conditions

9    occurring in the reservoir, whether it was the first

10   street flooding, first home flooding, flow around the

11   north end of the dam, et cetera.

12            Do you remember that?

13       A.   Yes, I remember that.

14       Q.   And the judge asked you some questions about

15   that.  And one of the questions was he was noticing

16   that the natural ground elevation is less than the

17   spillway elevation.

18            Do you recall that?

19       A.   Yes.

20       Q.   And you, I believe, had indicated you maybe

21   thought that was due to subsidence?

22       A.   No, I did not say that.

23       Q.   Okay.  Good.

24            Does that make sense to you that a spillway

25   elevation would be higher than a natural ground it ties

```
 1    into?

 2         A.   Doesn't have to make sense to me.  It's just

 3    the way it is.

 4         Q.   Okay.  Do you know any detention ponds in

 5    Harris County that were built to have the spillway

 6    elevation higher than the ground it ties into?

 7              No, do you?

 8         A.   Not that I'm aware of.

 9         Q.   That's right.

10              And isn't the purpose of a spillway is to

11    allow the water to flow out of the detention basin

12    before it starts to spill over natural ground or an

13    earth embankment?

14         A.   I think for most facilities, that's correct.

15         Q.   And it kind of makes sense, doesn't it?

16         A.   Yes.

17         Q.   Yeah.  Okay.  So do you know when Addicks and

18    Barker were built, based upon your review of documents,

19    whether they had spillways at that time back in the

20    '40s?

21         A.   I don't recall.

22         Q.   Okay.  Do you recall when -- in the '80s when

23    Addicks and Barker dams were -- the embankments were

24    raised?

25         A.   I know the Corps did work in the early '80s
```

```
 1    because I had just arrived at flood control and that
 2    work was ongoing, and I know there was work done on the
 3    dam.
 4         Q.   Okay.  And you've read documents that
 5    indicated that they raised the embankments; correct?
 6         A.   I don't remember that specifically.  I just
 7    know there was work done.
 8         Q.   And you know that they concreted the spillway
 9    areas on each ends of each dam?
10         A.   Yes.
11         Q.   Okay.
12         A.   I know that was done in that time period.
13         Q.   Right.  And do you know if those concreted
14    sections of the spillway were raised above the natural
15    ground level they tied into?
16         A.   I don't know that.
17         Q.   Okay.  Would it have made sense to you that
18    those spillways should have been set at or below the
19    natural ground that they tie into?
20         A.   I think that's something you need to ask your
21    experts about.
22         Q.   Okay.  Have you asked the Corps that
23    question?
24         A.   No.
25         Q.   Okay.  I think the judge also asked a
```

1    question about Highway 6 being flooded in Addicks

2    Reservoir when the water level gets high enough.  Do

3    you recall that?

4        A.   Yes.

5        Q.   Okay.  And is -- that part of Highway 6 that

6    gets flooded when the water level in Addicks Reservoir

7    gets high enough, is that part of the highway inside

8    the reservoir itself?

9        A.   Yes.

10       Q.   Is it also within government-owned land?

11       A.   Yes.

12       Q.   Okay.

13            And then Highway 6, as it runs south of

14   Interstate 10 and along or adjacent to Barker

15   Reservoir, it's outside of the Barker Reservoir;

16   correct?

17       A.   Yes.

18       Q.   On the east side; correct?

19       A.   Yes, the east side.

20       Q.   And, in fact, you can get on Highway 6 and

21   look at the Barker Dam; correct?

22       A.   Yes.

23       Q.   Whereas Addicks, you're on Highway 6, you're

24   in the Addicks Reservoir?

25       A.   Yes.  Once you go over the dam, yes.

1       Q.    So these elevations that we see in Joint

2   Exhibit 88, I think you had indicated that those may

3   have been on older datum compared to the water levels

4   that we may see in the emergency action plan of 2014.

5       A.    Yes.  And the elevations may have been

6   refined based on more recent datum, surveys, all kinds

7   of reasons.  This was an early version.

8       Q.    Okay.  And so, if we really look into the

9   2014 emergency action plan, that gives the most updated

10  information; correct?

11      A.    For 2014, yes.

12      Q.    Right.

13      A.    I know it's been updated since then.  I don't

14  know --

15      Q.    And if you make the appropriate datum

16  adjustments, you can go back in time and see, for

17  different datums, what those elevations would correlate

18  to back in those earlier points in time?

19      A.    Yes.

20      Q.    Okay.  And you can see, at those elevations,

21  the match and tie-in with the elevations shown in Joint

22  Exhibit 88?

23      A.    That could be done, yes.

24      Q.    The emails that the government lawyer went

25  through that showed the CWMS forecasts, do you recall

```
 1    those?
 2        A.   Yes.
 3        Q.   Aren't those CWMS forecasts marked for
 4    internal use only?
 5             You know they are, don't you?
 6        A.   I don't know.  They may be.  I didn't look
 7    and see.
 8        Q.   Were they distributed to the public?
 9        A.   No.
10        Q.   Okay.  And, as you indicated, these CWMS
11    forecasts, I think the first one was on the 23rd of
12    August, if I recall Joint Exhibit 146.
13        A.   I'll take your word for it.
14        Q.   Okay.  And then you basically were getting
15    CWMS forecasts pretty much every day; correct?
16        A.   Yes.
17        Q.   Okay.  And when did the public get warned
18    that there was going to be flooding outside of the
19    government-owned land in Addicks and Barker reservoirs
20    by -- by the county?
21        A.   I don't know.
22        Q.   You don't know?
23             Would it surprise you to hear that it was
24    late Sunday night, early Monday morning?
25        A.   I don't know when it happened.
```

```
 1        Q.    You don't know?  Okay.

 2              And what kind of warning did you -- did

 3   Harris County give the public on those two dates?

 4        A.    I don't know.

 5        Q.    Okay.  Did you know if Harris County warned

 6   those people to evacuate?

 7        A.    I don't know.

 8        Q.    You hadn't heard that they were asked to

 9   evacuate?

10        A.    I heard discussions about it, but I don't

11   know what -- what was ultimately decided.

12        Q.    Okay.  And why would you even discuss having

13   people evacuate?

14        A.    In my experience working floods for so long,

15   when people think they might -- their house might be

16   flooded or their car, they want to evacuate.  They want

17   to leave.  They want to flee from the -- to get away

18   from the water.  So that's a natural reaction for most

19   people.

20        Q.    Right.  And Harris County takes the position

21   not to evacuate but stay in place; right?

22        A.    We learned that in Tropical Storm Allison.

23   Because 22 people died, but no one drowned in their

24   homes.  And so we learned that kind of as a nation

25   during that -- during that time.  For -- for rising
```

1    water from rivers and other things, people should go up

2    rather than -- rather than fleeing because it's more

3    dangerous to them when they're trying to flee.

4         Q.   Yeah.  And what about people who live in a

5    one-story house or apartment, where do they go up?

6         A.   They go up as high as they can.

7         Q.   What's up beyond your first floor?

8         A.   Up to the roof.

9         Q.   Oh, okay.

10        A.   In Allison, we had quite a few people on

11   their roofs, and Harvey as well.

12        Q.   Yeah.  So the people behind the dams that may

13   have 4 or 5 feet of water in their home, you would want

14   them to stay in their home but go up on the roof?

15        A.   And others.  We heard lots of stories of

16   neighbors helping neighbors, people with two-story

17   homes are helping elderly.  And that happened in

18   Allison when there was 73, 74,000 homes flooded.  The

19   stories were actually incredible of neighbors helping

20   neighbors and the infirm.  And that's one reason no one

21   drowned in their homes in Tropical Storm Allison.

22        Q.   Would you agree that, along the coast,

23   especially here in the Houston-Galveston area, that we

24   not only get large amounts of rain but also high,

25   intense amounts of rain?

```
 1        A.    Yes.

 2        Q.    And that that's a major factor contributing

 3   to flooding in Harris County?

 4        A.    Yes.

 5        Q.    It's the intensity that really kind of gets

 6   us, doesn't it?

 7        A.    Intensity and distribution across the

 8   watershed or across the county and the duration.  It's

 9   several factors more than just intensity.

10        Q.    Right.  And what storm caused the most

11   intense rainfall in Harris County -- anywhere in Harris

12   County -- for the 6-, 12-, and 24-hour storm event?

13        A.    Could you repeat the last part of your

14   question.

15        Q.    Sure.  For the 6-, 12-, and 24-hour duration

16   maximum rainfall, what historic storm has the highest

17   amount for those durations in Harris County?

18        A.    That's Tropical Storm Allison, June of 2001.

19        Q.    Not Harvey?

20        A.    Not for those intensities.

21        Q.    Okay.  But probably Harvey has the maximum

22   amount of rainfall for longer durations?

23        A.    That's what the data shows.

24        Q.    Okay.  Now, Harris County Flood Control

25   District, after it was created, was created in part
```

1    as -- to be a local sponsor for the Addicks and Barker

2    dams; correct?

3         A.    Or whatever they called it back then.

4         Q.    The Buffalo Bayou project?

5         A.    Whatever they called it back then, not the

6    name, but the -- a local sponsor today is different

7    than what a local sponsor would have been back in the

8    '40s.

9         Q.    And is it the only thing Harris County was --

10   Harris County Flood Control District was created for?

11   Is that its only purpose?

12        A.    No.  I don't know the exact wording of the

13   creation.  I haven't read that document.

14        Q.    Okay.  But it's also created really to

15   reclaim lands so that they could be drained and

16   ultimately developed; correct?

17        A.    I don't think it says that.

18        Q.    Okay.  Do you know that Harris County Flood

19   Control District in the '50s and '60s went out and

20   created and improved channels throughout the county?

21        A.    Yes.  I know that Harris County Flood Control

22   District has done quite a bit of work to -- to channels

23   to improve conveyance and lower flood levels.

24        Q.    Okay.  And for what purpose?

25        A.    To reduce flood damages.

1      Q.   Well, what about for land that hasn't been

2   developed yet?

3      A.   There's undeveloped land all across Harris

4   County.

5      Q.   And Harris County --

6      A.   There's probably a watershed that doesn't

7   have developed land in it.

8      Q.   But Harris County Flood Control District went

9   out and improved channels to allow for development to

10   occur to create depth in those channels; correct?

11      A.   I'm not aware of that.

12      Q.   You are not aware of that?

13      A.   No.

14      Q.   Okay.  Do you know if developers go in and

15   build channels so that they can create depth to put

16   their storm sewers in?

17      A.   Could you repeat that question.

18      Q.   Sure.  Do you know that developers and their

19   engineers build channels to create depth so that their

20   storm sewers can be constructed and gravity-drained

21   into them?

22      A.   Yes.

23      Q.   And you know that those channels that are

24   built by the developers then drain into Harris County

25   Flood Control District channels?

```
 1          A.    Yes.

 2          Q.    Okay.  And you know that, in the past, many

 3     of the drainage -- flood control district channels were

 4     originally natural bayous and creeks?

 5          A.    Some were, yes.

 6          Q.    And that some of those did not have

 7     sufficient depth to allow for development unless they

 8     were improved and deepened?

 9          A.    Yes, that did happen.

10          Q.    Okay.  And so isn't it true that the Harris

11     County Flood Control District improved some of those

12     channels that drain into Addicks and Barker reservoir?

13                And they exist on government-owned land.

14          A.    Okay.  Yes.

15          Q.    Okay.  And the flood control district

16     obtained permission from the federal government to do

17     that; correct?

18          A.    Yes.

19          Q.    But it was done and paid for by the flood

20     control district?

21          A.    I don't know all of them, but I know some of

22     them.  Some of them were paid for by the flood control

23     district.

24          Q.    Were they ever paid for by the Corps of

25     Engineers or the federal government?
```

```
 1          A.    I don't believe so.

 2          Q.    Okay.

 3                MR. DUNBAR:  One moment, Your Honor.

 4                THE COURT:  Yes.

 5                MR. DUNBAR:  That's all I have, Your Honor.

 6                THE COURT:  All right.  Thank you very much,

 7    Mr. Dunbar.

 8                Ms. Tardiff, redirect?

 9                      REDIRECT EXAMINATION

10    BY MS. TARDIFF:

11          Q.    Just very briefly, Mr. Fitzgerald.

12                How many subpoenas did you receive in this

13    case?

14          A.    I received two for the -- for this trial.

15          Q.    One of those was from the plaintiffs?

16          A.    Yes.

17          Q.    And was the other one from the United States?

18          A.    Yes.

19          Q.    And you were not called last week by the

20    plaintiffs pursuant to the subpoena that they issued to

21    you; is that correct?

22          A.    That's correct.

23          Q.    And you stated earlier that you're not being

24    paid for your testimony here today; correct?

25          A.    That's correct.
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    5/15/2019

```
 1        Q.   You're appearing as a fact witness?

 2        A.   Yes.

 3        Q.   And you took an oath here to tell the truth;

 4   correct?

 5        A.   Yes.

 6        Q.   And you have told the truth in response to

 7   all of the questions that have been asked to you,

 8   whether it's by me or Mr. Dunbar here today; correct?

 9        A.   Yes.

10        Q.   And did the fact that -- we had a meeting at

11   Harris County Flood Control District offices with the

12   flood control district's attorney a few weeks ago.

13             Did that impact in any way any of the answers

14   that you gave here today?

15        A.   No.

16        Q.   To your knowledge, was -- were the

17   plaintiffs' counsel also given an opportunity to meet

18   with you at that time by Harris County Flood Control

19   District's counsel?

20        A.   That's what she told me, yes.

21        Q.   Okay.  Thank you, sir.

22             THE COURT:  Mr. Dunbar?

23             MR. DUNBAR:  One quick question, Your Honor.

24             THE COURT:  Yes.

25                      RECROSS-EXAMINATION
```

1    BY MR. DUNBAR:

2        Q.    When you met with defense counsel and the

3    attorney from the Harris County Flood Control District,

4    were you an employee of the district?

5        A.    No.

6        Q.    So that the lawyer for the flood control

7    district was not your lawyer?

8        A.    Not my personal lawyer, no.

9        Q.    Not even representing you 'cause you were

10   already retired?

11       A.    Yes.

12             MR. DUNBAR:  That's all I have, Your Honor.

13             THE COURT:  May the Court excuse

14   Mr. Fitzgerald?

15             MS. TARDIFF:  Yes, Your Honor.

16             MR. DUNBAR:  Yes, Your Honor.

17             THE COURT:  Mr. Fitzgerald, thank you.  And I

18   take it you've been waiting a little bit to testify.

19   Thank you for your patience.

20             THE WITNESS:  No problem.  Thank you.

21             THE COURT:  Mr. Shapiro -- all right.

22   Mr. Levine?

23             MR. LEVINE:  Yes, Your Honor.

24             THE COURT:  You have the next witness?

25             MR. LEVINE:  Yes, Your Honor.

```
1              THE COURT:  And it is?
2              MR. LEVINE:  Dr. Gerald Galloway.
3              THE COURT:  Thank you.
4              Dr. Galloway, if you will stop about right
5    there and raise your right hand to be sworn.
6    Thereupon--
7                   GERALD E. GALLOWAY JR.,
8    was called as a witness, and having been first duly
9    sworn, was examined and testified as follows:
10             THE WITNESS:  I do.
11             THE COURT:  Thank you.  And once you've
12   seated yourself in the witness stand, would you state
13   your full name for the record.
14             THE WITNESS:  Gerald E. Galloway, Jr.
15             THE COURT:  Thank you.
16             Mr. Levine?
17             MR. LEVINE:  Thank you.  Just a moment with a
18   few.
19             May I approach with the pointer and binder?
20             THE COURT:  Yes.
21             Somebody's water?  Just looking what's going
22   on behind you, Mr. Galloway.
23             Mr. Levine?
24                   DIRECT EXAMINATION
25   BY MR. LEVINE:
```

1      Q.    Thank you, Your Honor.  Dr. Galloway, please
2   state your full name for the record.
3      A.    Gerald E. Galloway, Jr.
4      Q.    Okay.  Where do you presently work?
5      A.    I presently work at the University of
6   Maryland in College Park, Maryland, at Texas A&M in
7   both College Park and Galveston.
8      Q.    Okay.  And do you also have a consulting
9   firm, Water Resources Professionals?
10      A.    Yes.  I have a limited liability corporation,
11   Water Resources Professionals.
12      Q.    Okay.  And what does your work with Water
13   Resources Professionals involve?
14      A.    It involves advice, participation in studies
15   for groups, nongovernmental organizations, and
16   occasionally small firms that need assistance in
17   dealing with water resource management.
18      Q.    And what are your present employment duties
19   with Maryland and Texas A&M?
20      A.    I am a professor of engineering at the
21   University of Maryland.  And I'm under a three-year
22   fellowship at Texas A&M University that allows me to
23   work in both locations, where I'm a researcher and a
24   teacher.
25            Over the last two years, I have concentrated

1    on the research in conducting a study of urban flooding

2    in the United States in conjunction with Texas A&M and

3    just teaching on a part-time basis and advising

4    students.

5         Q.   And do you have a particular research focus?

6         A.   My research focus is in water resources

7    management, flood control, flood-proneness definition,

8    and disaster resilience as it applies to primarily the

9    flood world.

10        Q.   Does water resources management include flood

11   risk management?

12        A.   It certainly does.  Water resource management

13   is a broad category.  Flood risk management is a major

14   part of that today.

15        Q.   Okay.  And is flood-proneness a part of flood

16   risk management?

17        A.   Flood-proneness is a part of that.

18        Q.   Okay.  And when you say "flood-proneness,"

19   what do you mean?

20        A.   By flood-proneness, I mean, Your Honor, are

21   you susceptible to being flooded.  It's an interesting

22   term because it appears in many locations, never really

23   defined other than that term.  It's the probability

24   that a flood could occur or the susceptibility,

25   vulnerability to flooding.

1      Q.   And what types of courses have you taught

2    that are relevant to your work in this case?

3      A.    Over the last -- primarily, my focus has been

4    on teaching a course, 30 years, of water resources

5    management in the broad sense.

6            I have also taught engineering design.   I

7    have taught environmental engineering.   I have taught

8    disaster management, courses focused in water

9    resources, but in the application in flood control --

10   flood management.

11     Q.   Dr. Galloway, let's talk about your

12   educational background.   What degrees do you hold?

13     A.   I have a bachelor of science in the United

14   States Military Academy, a master's of science in

15   engineering from Princeton University, a master of

16   public administration from Penn State at their Capital

17   campus in Harrisburg, a master of military art and

18   science from the United States -- and a PhD in water

19   resources from Chapel Hill -- the University of North

20   Carolina at Chapel Hill in water resources.

21           THE COURT:   Let's just make sure the reporter

22   has caught up.

23           (Clarification by the reporter.)

24           THE WITNESS:   I have a master of public

25   administration from Penn State in Harrisburg, Capital

```
 1   campus, followed by a master of military art and

 2   science, which is history and management, from the U.S.

 3   Army Management Staff College.

 4   BY MR. LEVINE:

 5       Q.   Dr. Galloway, can you tell us about your past

 6   employment prior to your work at Maryland and Texas

 7   A&M, please.

 8       A.   Well, I have been in this business, Your

 9   Honor, for over 60 years.  I graduated in 1957 into the

10   Army in the Corps of Engineers and went to Europe for

11   an initial assignment as a combat engineer, which

12   lasted three years.  I then --

13            THE COURT:  Which unit?

14            THE WITNESS:  Third Armored Division, sir.

15            THE COURT:  Thank you.

16            THE WITNESS:  And I went to Europe.  I came

17   back and I had several troop assignments since -- or I

18   had several troop assignments, both in Germany and two

19   tours in Vietnam.  I have worked in the Corps of

20   Engineers in the New York district and in the

21   Pittsburgh district as the district commander.

22            I have worked in the Pentagon.  I've worked

23   in other locations.  After my district assignment, I

24   went to the military academy as a professor, became a

25   professor of engineering, the head of department, and
```

1    eventually the dean of the academic board -- the chief

2    academic officer at West Point, a position from which I

3    retired.  I then went to be the dean at the Industrial

4    College of the Armed Forces, one of the colleges of the

5    National Defense University.

6            From there, I was asked to join the

7    International Joint Commission as a senior civilian.

8    The International Joint Commission is a U.S.-Canadian

9    commission that deals with the boundary waters we share

10   with Canada.  And did that through the -- following the

11   great flood on the Red River of the North and assisted

12   in our report that went to the two governments on that

13   particular project.

14           After that, I joined a commercial firm

15   working in the business of IT and flood risk

16   management.  We were competitors for contracts, as

17   you've heard from -- this morning or this afternoon,

18   from FEMA for mapmaking and flood risk management

19   support of FEMA.

20           In 2004, I went to work at the University of

21   North Carolina -- excuse me -- at the University of

22   Maryland and then continued with the small corporation

23   that I've got doing some other work.

24   BY MR. LEVINE:

25       Q.   Dr. Galloway, when you retired from the U.S.

1    Army, what was your rank?

2         A.    Brigadier general.

3         Q.    Thank you.

4               Dr. Galloway, have you ever been tasked to

5    work for the President of the United States?

6         A.    Yes, sir, three times.

7               I was asked to become a member of the

8    Mississippi River Commission in 1987 and was on the

9    commission for eight years.

10              In 1993, in the midst of the great

11   Mississippi River flood of that year, it was -- the

12   largest, really, flood we had in the 20th century in

13   the U.S. -- the president asked me to pick up and form

14   a team to find out why the flood happened, what we

15   should do about it, and what were the challenges to

16   what we were already doing.

17              I then did that study.  And then later, in

18   1997, I was appointed by the President to the American

19   Heritage Rivers Commission, looking at how we ought to

20   treat rivers across the country.

21        Q.    Are you a member of any relevant academies?

22        A.    Yes.  I am an elected member of the National

23   Academy of Engineering, National Academy of Public

24   Administration, and the National Academy of

25   Construction.

```
 1        Q.    And what types of activities have you
 2   participated in with those organizations?
 3        A.    The primary activity for members of those
 4   organizations is to participate in study groups that
 5   they form at the request of the government.  I worked
 6   on 14 study groups, committees, at the National Academy
 7   of Engineering.  I worked on five at the National
 8   Academy of Public Administration, many of which dealt
 9   with important issues dealing with water resources
10   including, recently, one on the National Flood
11   Insurance Program and levies, levies and how they
12   affect the National Flood Insurance Program; one on --
13   we completed a couple of months ago -- on disaster
14   resilience, measuring community resilience to
15   disasters.
16        Q.    And have you chaired any of those committees?
17        A.    I have chaired several of the committees.
18   And I have also done the committees with National
19   Academy of Public Administration dealing with flood
20   mapping and, again, the issue of dealing with military
21   installations and how they work with communities in
22   cooperation in these very difficult disaster events.
23        Q.    Have you done any work outside of these
24   organizations?
25        A.    Yes.  Both as a college professor and in my
```

1    independent role, I have worked with groups like the

2    Nature Conservancy, the World Wildlife Fund.  I have

3    worked for United States Government in going to places

4    like Mexico to investigate flood control there and

5    flood risk management.

6             And I have worked on major projects with the

7    World Wildlife Fund and the government of China, which

8    created a book on flooding in China and flooding across

9    the world.  It's called "Strategies for Flood Risk

10   Management."

11            I've worked for the government of Singapore

12   as an adviser on their sea level rise.  Worked for the

13   USAID as a member of an NGO, working on Mekong River

14   climate change issues with dams and the associated

15   issues with what happens when you have that taking

16   place.

17            Most recently I worked in Italy, with the

18   government of Tuscany, the City for Florence, the

19   government of Italy on preventing flooding in the city

20   of Florence.

21   Q.    Have you been recognized by your peers?

22   A.    I've received several awards.  Perhaps most

23   important to me is the election to the three academies.

24   But I have received the -- the award -- the OPAL award,

25   outstanding leadership over your period of service,

1    from the American Society of Civil Engineers.  I have
2    been elected as a distinguished member.
3              I have also been elected to the Golden Eagle
4    Award in the Society of American Military Engineers.
5    AWRA, another organization, has given me their highest
6    award.
7              I am most proud of the Goddard-White Award.
8    Those are two gentlemen who pioneered in flood risk
9    management and floodplain management by the Association
10   of State Floodplain Managers.
11        Q.   Have you been published?
12        A.   Yes.  I have written a couple of books -- a
13   few books, more than that, many articles for journals.
14   But my -- my real issue has been on working on reports
15   and items that will go to serve the public purpose.  So
16   I have a great number of those that I can claim
17   authorship or coauthorship on.
18        Q.   Can you give us some examples of work which
19   has been published that's relevant to your work in this
20   matter?
21        A.   I mentioned, Your Honor, the work with China,
22   the Ministry of Water Resources -- the Ministry of
23   Water Resources, the World Wildlife Fund, sponsored by
24   the international organization.  They also -- we also
25   had on this particular team members from other parts of

1    the world.  We published a document, "Strategies for
2    Flood Risk Management," that is universally distributed
3    by UNESCO as one of their documents and also in the
4    Pacific by the Asian Development Bank, at which that is
5    one of their principal ones.
6            Recently, in the last year, we've published a
7    book on the issues of flood risk management in
8    Florence.  It's a report on what we said was wrong in
9    Florence, what they needed to do to deal with the
10   problems.  And that accompanies some work by the UN in
11   trying to improve resilience of cultural organizations
12   to disasters.
13       Q.    Have you testified at trial before,
14   Dr. Galloway?
15       A.    I have not.
16       Q.    Okay.  Have you been retained as an expert
17   before in litigation?
18       A.    I have.
19       Q.    How many times?
20       A.    Once.
21       Q.    But they didn't need you to testify at trial?
22       A.    They didn't need me to testify.
23       Q.    Have you ever been disqualified as an expert
24   in litigation?
25       A.    I have not.

1       Q.   Dr. Galloway, were you retained by the United

2   States in this matter?

3       A.   I was.

4       Q.   Okay.  Without getting into any of your

5   conclusions, what was your assignment in this case?

6       A.   My assignment was to investigate, Your Honor,

7   the proneness of this area, the test properties, to

8   flooding and to examine the test properties in that

9   light.

10          I was given two particular challenges in

11  there.  The first was to define the characteristics of

12  flood-proneness, what it is, and then to apply those to

13  the test properties under -- at the -- at the time of

14  the acquisition of those properties and over time.

15          I was also asked to look at the indicators

16  which would be information available to people who

17  would be acquiring property at the time of their

18  acquisition that would give them any indications of

19  flood-proneness.

20      Q.   And was that flood-proneness in the context

21  of a Hurricane Harvey-like event?

22      A.   Yes.  It was at the time of acquisition for a

23  Hurricane Harvey-like event.

24      Q.   Okay.  And when you say Hurricane Harvey-like

25  event, what do you mean?

          1          A.    I mean, a hurricane identical to Hurricane

          2    Harvey but at the time of acquisition.  Obviously,

          3    there's some minor changes that might take place, but

          4    essentially the Hurricane Harvey.

          5          Q.    What type of information did you consider?

          6          A.    I was fortunate to have all of the

          7    information that's been gathered since Hurricane

          8    Harvey.  I was also fortunate to have been working here

          9    in this region over this period of time since before

         10    Hurricane Harvey, a year, and to have information that

         11    I gathered in the course of the studies we were doing

         12    at Texas A&M.

         13                I've had access to the -- the government

         14    information, the files they have, the literature that

         15    goes with this business of flood risk management that's

         16    in the general area and in business and commercial

         17    sense.

         18                I have also been able to visit the locations

         19    of the test properties.  And I've also been able to

         20    participate in professional organizations dealing with

         21    the issues connected with Harvey.

         22          Q.    Did you have access to a database of

         23    materials that had been produced in this litigation?

         24          A.    Yes, I have had access to that.

         25          Q.    Okay.  Did that include Army Corps of

 1     Engineers reports and information from Harris and Fort

 2     Bend County?

 3          A.    Yes, it does.

 4          Q.    And information from USGS and FEMA?

 5          A.    Yes.  All of those are part of that.

 6          Q.    Is this the type of information that people

 7     in your field would consider for this type of

 8     assignment?

 9          A.    Yes.

10               MR. CHAREST:  Objection, Your Honor.

11               THE COURT:  Mr. Charest.

12               MR. CHAREST:  Foundation.  We've not actually

13     established what field we're actually talking about

14     here, and that's part of the issue we have with --

15               THE COURT:  We'll sort it out in due course.

16               Mr. Levine.

17               MR. LEVINE:  Thank you, Your Honor.

18     BY MR. LEVINE:

19          Q.    I'm sorry.  I don't know if we got an answer

20     to that last question.

21          A.    Would you repeat the question.

22          Q.    Yes.  Is this the type of information people

23     in your field would consider for this type of

24     assignment?

25          A.    Yes.  It is the stuff of which reports on

 1    flood programs, flood risk management are made.

 2         Q.    Were you assisted by anyone in your work on

 3    this case?

 4         A.    I was.  I was assisted by an organization

 5    called Analysis Group of Washington, D.C., and their

 6    staff in putting parts of my reporting together,

 7    gathering the information, cataloging it, geographic

 8    information services.

 9              I also was assisted by a colleague of mine,

10    Professor Jeff Brideau, who is a new PhD in history of

11    infrastructure at the University of Maryland.

12         Q.    And did you supervise their work in

13    accordance with the standards of your profession?

14         A.    I certainly did.

15         Q.    Okay.  And have you done similar work in your

16    career to the assignment in this matter?

17         A.    Yes, a number of times.  The very -- clearly

18    the work for the President and subsequent one on the

19    Red River of the north that we reviewed and submitted

20    to the two governments, other -- the report that just

21    was completed in Italy is very similar to this, dealing

22    with flood risk management, water resource management,

23    combination, and looking at the causes in the futures.

24         Q.    I'm sorry.  The causes of flooding?

25         A.    Yes.  The causes of -- all of these contain

1    issues that dealt with a flood having occurred, what

2    could you do about it, what are the causes of that

3    flood, what are the issues that must be addressed in

4    dealing with this.

5          Q.    Okay.  Did you use a methodology to help

6    answer the question in your assignment?

7          A.    I certainly did.

8          Q.    Is that methodology provided in your report?

9          A.    It is.

10         Q.    Can you explain that methodology for us.

11         A.    Your Honor, it started with defining

12   flood-proneness and identifying two features,

13   characteristics -- those things that are natural items,

14   factors that would be considered as you look at this,

15   such things as topography; and then indicators, which

16   are information that would be available about the

17   source of the flood, the location, information about

18   who is damaged, how, all of those sorts of features.

19              We then -- I then took those and examined

20   each in the context of the test properties and then

21   made conclusions as to the relative flood-proneness of

22   the test properties and, in general, the Houston area

23   and the watersheds here to flooding.

24         Q.    And did you also consider if those indicators

25   were available to property owners at the time they

```
 1    purchased their property in the context of a Hurricane

 2    Harvey-like event?

 3         A.   Yes.  Were the indicators available?  How did

 4    they appear?  Where would they have found them?  And

 5    how would they be put to use?

 6         Q.   Why is the context of a Hurricane Harvey-like

 7    event important?

 8         A.   I'm sorry.  I didn't --

 9         Q.   Why is the context of a Hurricane Harvey-like

10    event important?

11         A.   I'm not sure I understand the context.

12         Q.   Sorry.  The context of a Harvey-like storm.

13         A.   Oh, why is -- well, the context of a

14    Harvey-like storm is it is one that has occurred.  We

15    know that that is a significant event of a magnitude

16    previously cited as being unequaled.

17              And, therefore, the challenge of looking at

18    the proneness to flooding is dependent on the hazard

19    that you're facing.  In this particular case, a

20    Hurricane Harvey-like event is that hazard.

21         Q.   Did you develop the characteristics and

22    indicators that are part of your methodology?

23         A.   I did.  But I did in the sense that they're

24    common ones in the world in which I operate and have

25    operated for 60 years.
```

1      Q.   Sorry.  Did you develop them, or did you use
2  the ones that are typically in in practice?
3      A.   I developed them in the sense that I pulled
4  them out of the shelf of characteristics and indicators
5  that have been used over the -- this time period by
6  professionals in my field and that I have used
7  personally in many reports and other activities --
8  professional activities.
9      Q.   So did you derive these from somewhere?
10          MR. CHAREST:  Objection.
11          THE COURT:  Mr. Charest.
12          MR. CHAREST:  It's consistently leading.  So
13  I'm going to have to raise an objection and ask the
14  witness testify, not the lawyer.
15          THE COURT:  We'll take that.
16          You're allowed the question.
17  BY MR. LEVINE:
18      Q.   I'm sorry.  The question was did you derive
19  these from somewhere, this information.
20      A.   The characteristics and indicators are
21  derived from my professional experience.  They're
22  derived from the literature that is common in the
23  field.  They're derived from reports similar to this
24  that are being produced all around the world.
25      Q.   Is this information that's typically

1    considered in your field of work?

2         A.   Yes.

3         Q.   Dr. Galloway, as we addressed your assignment

4    and your expert conclusions, would it be helpful for

5    you to refer to the expert report you prepared for this

6    case?

7         A.   It would.

8              MR. LEVINE:   Okay.  Your Honor, I'd just like

9    to take care of a little bit of housekeeping here.

10             THE COURT:   Yes.

11             MR. LEVINE:   Okay.  The exhibit number is

12   DX609.  The exhibit that's been provided in the binders

13   is 609R because there were some redactions due to

14   privacy information.  We're not going to have to clear

15   the courtroom today.  We're just not going to publish

16   any information on the screen that would be considered

17   privacy act and subject to the protective order in this

18   matter.

19             THE COURT:   What is the nature of the

20   information that has been redacted?

21             MR. LEVINE:   It relates to NFIP data,

22   national flood insurance data.

23             THE COURT:   Why is that subject to the

24   privacy act?

25             MR. LEVINE:   If -- if it -- if it shows,

 1    like, particular addresses and things like that.  We

 2    have -- we have some graphics, Your Honor.  I'll just

 3    proffer what this is.  We have some graphics that plot

 4    the locations of where people have policies.  So we

 5    just don't want to put that on the screen.  But what I

 6    do have is separate copies of the report for you, your

 7    clerk, opposing counsel that have the unredacted

 8    information so that you can view it.  When he testifies

 9    to it, it won't get into the specifics of the

10    information that's private that should not be published

11    on the screen.

12            THE COURT:  There's nothing about the

13    information subject to the privacy act that, I take it,

14    would be pertinent to a decision in this case; is that

15    correct?

16            MR. LEVINE:  No, Your Honor.  I think that's

17    correct, yes.

18            THE COURT:  All right.  Mr. Charest, are you

19    familiar with this exercise?

20            MR. CHAREST:  Not at all, to be honest with

21    you.  It sounds -- I'm happy to use the redacted

22    version.  That's fine with me.

23            THE COURT:  Let's do that.

24            MR. LEVINE:  If it's okay, Your Honor --

25            THE COURT:  Yes.

1           MR. LEVINE:  -- we've prepared unredacted
2    versions, and we also have tabs that are several
3    appendices.  The versions that are in the binders don't
4    have the tabs.  This will make it a little bit easier
5    to go through the material.
6           THE COURT:  All right.
7           MR. LEVINE:  May I approach?
8           THE COURT:  Yes.
9           MR. LEVINE:  Thank you.
10           THE COURT:  Just make sure that Mr. Charest
11    and his colleagues have the same thing.
12           MR. LEVINE:  Yes, sir, Your Honor.  And the
13    witness has a binder with the same thing.
14           THE COURT:  Thank you.
15           MR. LEVINE:  Additionally, Your Honor, when
16    Dr. Galloway did his report, he did it in both the
17    upstream and downstream subdockets.  The report
18    contains appendices for several -- for all of the test
19    properties in both upstream and the downstream dockets
20    when that's okay.  I'm going to address that.  The
21    report -- the appendices for the downstream properties
22    have been taken out of the copy I have just provided to
23    you and to counsel.
24           THE COURT:  Thank goodness.
25           MR. LEVINE:  Yes.  Yes, Your Honor.  We did

1    not intend to offer that.  When the documents were

2    exchanged prior to trial, the downstream test

3    properties were still in there, and we do not intend to

4    put that on.

5            THE COURT:  Is there anything in the text of

6    Dr. Galloway's report that refers to the downstream

7    investigation or analysis that he made?

8            MR. LEVINE:  As Dr. Galloway indicated when

9    he was walking us through his methodology, he did look

10   at the Houston region in general.  So he does talk

11   about the Houston region in general in portions of the

12   report.  But the information related to the downstream

13   properties is in the appendices which we have taken

14   out.

15           THE COURT:  Mr. Charest.

16           MR. CHAREST:  It's a single report for both

17   cases.  By the caption, you can see it.  So it's not

18   aimed at the upstream or the downstream.  The

19   appendices are test properties-specific, but the

20   analysis and the methodology says it is.  It's the same

21   both ways.

22           THE COURT:  Thank you, Mr. Charest.

23           Mr. Levine, we'll try to sort it out.

24           MR. LEVINE:  I think, as we go through it,

25   Your Honor, you'll find that we're not putting on

1    evidence regarding the downstream test properties.

2              THE COURT:  Thank you.

3              MR. LEVINE:  Thank you, Your Honor.

4    BY MR. LEVINE:

5         Q.   So, Dr. Galloway, I've placed --

6              THE COURT:  Let me just comment.  I think the

7    legal issues associated with upstream are very

8    different than those associated with the downstream.

9    Let's just leave it at that.  Now, I might think that;

10   others may not.  And I fully understand that.

11             Let's -- let's proceed.

12             MR. LEVINE:  Thank you, Your Honor.

13   BY MR. LEVINE:

14        Q.   Dr. Galloway, on the screen I'm placing a

15   document.

16             What is this document?

17        A.   That's my expert report.

18        Q.   And did you prepare it?

19        A.   I prepared it.

20             MR. LEVINE:  Okay.  Your Honor, additionally

21   I'd like to introduce JX290, which is also at the back

22   of the package of materials.  And JX290 are ten

23   replacement pages.  Some of the figures in the upstream

24   appendices.  Just we had the wrong figures.  So at the

25   time of Dr. Galloway's deposition, we produced these

 1    ten replacement pages to plaintiffs' counsel.

 2              So I just wanted you to know that that was

 3    included in -- in the overall discussion.

 4              THE COURT:  Just a moment.

 5              MR. CHAREST:  Those are the packet you gave

 6    me, Brad?

 7              MR. LEVINE:  They should be.

 8              THE COURT:  What was that?

 9              MR. CHAREST:  I'm trying to get oriented as

10    well, sir, with what's going on.

11              MR. LEVINE:  Sorry.  So in the packet that I

12    provided to both you and counsel should be DX609, which

13    is Dr. Galloway's report.  Additionally, at the back of

14    the packet JX290, which are just ten figures which are

15    replacements to the report.

16              THE COURT:  Thank you.

17              MR. LEVINE:  Thank you, Your Honor.

18              THE COURT:  Let me just --

19              MR. LEVINE:  Take your time, Your Honor.

20              THE COURT:  I'm sensitive to time in this

21    case.

22              MR. LEVINE:  Certainly, Your Honor.

23              MR. CHAREST:  Were these given during the

24    deposition?  Is that what you're saying?

25              MR. LEVINE:  No.  They were produced at the

1    time of the deposition.  Y'all have had those since --

2    I believe it was around Christmastime.

3              MR. CHAREST:  Thank you.

4              THE COURT:  All right.  Thank you.

5              MR. LEVINE:  Thank you, Your Honor.

6    BY MR. LEVINE:

7         Q.    Okay.  Dr. Galloway, does this report fairly

8    and accurately describe your work in this case?

9         A.    It does.

10        Q.    Okay.  And does your report include your CV

11   in Appendix A, and is it representative of the

12   education, experience, and qualifications that you

13   described for us?

14        A.    It does.

15        Q.    Does your report identify the materials that

16   you relied upon in footnotes as well as in Appendix B?

17        A.    It does.

18        Q.    Okay.  Does it include a discussion of your

19   methodology?

20        A.    It does.

21        Q.    Okay.  Does it include a summary of your

22   opinions?

23             MR. CHAREST:  Objection.  Leading.  I mean --

24             THE COURT:  Sustained.

25   BY MR. LEVINE:

```
 1          Q.    Are your opinions stated in the report?
 2          A.    They are.
 3                MR. CHAREST:  Leading, sir, still.
 4                THE COURT:  I'll not comment.
 5                Mr. Levine, let's just go forward.
 6   BY MR. LEVINE:
 7          Q.    Are your opinions stated in the report?
 8          A.    Yes.
 9          Q.    And do you hold the opinions expressed in the
10   report to a reasonable degree of professional
11   certainty?
12                THE COURT:  Mr. Charest.
13                MR. CHAREST:  It's still leading.  I don't
14   know how better to say the objection.  He's leading and
15   has been and hasn't asked a nonleading question in,
16   like, 20 questions.
17                THE COURT:  All right.  Let's just put it
18   this way.  The Court tries to make sure that Rule 702,
19   especially, is applied.  And we'll deal with Rule 703
20   as well, but I don't think these questions -- well,
21   I'll not comment.
22                Go ahead, Mr. Levine.
23   BY MR. LEVINE:
24          Q.    Do you hold your opinions to a reasonable
25   degree of professional certainty?
```

```
 1        A.   Yes.

 2             MR. LEVINE:  Your Honor, pursuant to

 3   Rule 702, I'm offering Dr. Galloway as a qualified

 4   expert witness in the fields of water resource

 5   management --

 6             THE COURT:  Just --

 7             MR. LEVINE:  -- and flood risk management.

 8             THE COURT:  Just a moment.

 9             MR. LEVINE:  Yes, Your Honor.

10             THE COURT:  Flood risk.

11             MR. LEVINE:  Water resource management and

12   flood risk management.

13             THE COURT:  Thank you.

14             MR. LEVINE:  And I also offer DX609 and JX290

15   into evidence.  I understand you'll --

16             THE COURT:  Reserve.

17             MR. LEVINE:  -- reserve.

18             THE COURT:  Not even close.  We're still at

19   voir dire here.

20             Mr. Charest, do you have voir dire?

21             MR. CHAREST:  Yes, sir.  Thank you.

22                  VOIR DIRE EXAMINATION

23   BY MR. CHAREST:

24        Q.   General, first thank you for your service,

25   and that's an impressive résumé.
```

1          You have been in the field of flood risk for

2    60 years; correct?

3          A.    Correct.

4          Q.    And have you ever been accepted by a court as

5    an expert to testify before today on the subject

6    matters that you're offering today?

7          A.    I am not sure if my previous litigation had

8    me accepted as an expert.

9          Q.    Right.  Well, you -- Mr. Levine asked you

10   about the prior experience, and you told us, the Court

11   and everybody, that they didn't need you; right?

12         A.    They didn't need me.

13         Q.    Right.  Did they tell you they didn't need

14   you because you got stricken, sir?

15         A.    No.

16         Q.    Were you, in fact, stricken, sir, as an

17   expert in that case?

18         A.    Stricken?

19         Q.    Yes, sir.

20         A.    No.

21         Q.    What case was it, sir?

22         A.    I'll have to get the exact title.

23         Q.    Was it federal, Mobil Corporation?

24         A.    Yes.

25         Q.    In the Eastern District of Michigan?

1        A.    Right.

2        Q.    And is your testimony here under oath that

3   your opinions were not stricken?

4        A.    Not to my knowledge.

5              MR. CHAREST:  Matt, put up the case, please.

6   Yeah, zoom into the top right-hand paragraph, please.

7   Up there.  Yep.  Above the facts, above the facts.

8   BY MR. CHAREST:

9        Q.    "The motion to exclude the reports and

10  testimony of Gerald Galloway are granted."

11             Did I read that correctly, sir?

12       A.    I have never seen this.

13       Q.    Okay.

14             Can you first show me the caption, Matt, just

15  to make sure we're on the same page as to what case

16  we're talking about.

17             Is that the case that you were offered as an

18  expert, sir, and were stricken?

19       A.    If that's what stricken is, yes.

20       Q.    Thank you.  And that's your only other time

21  to be offered as an expert in a court case; correct?

22       A.    Right.

23       Q.    You were asked by the government to determine

24  what indicators --

25             THE COURT:  Mr. Charest, may I ask several

1    questions --

2                MR. CHAREST:  Please.

3                THE COURT:  -- of Dr. Galloway?

4                Did you actually testify in court in that

5    case?

6                THE WITNESS:  I did not.

7                THE COURT:  Was this an in limine -- do you

8    know what an in limine motion is, Dr. Galloway?

9                THE WITNESS:  No, I don't, Your Honor.

10               THE COURT:  Mr. Charest, was this on in

11   limine motions?

12               MR. CHAREST:  I don't honestly know, Your

13   Honor.  I just found out recently.  I think it was -- I

14   thought it was a Daubert challenge.

15               THE COURT:  You think it was what?

16               MR. CHAREST:  I thought it was a Daubert

17   challenge because the discussion talks about fit, but

18   that's all I can tell you, sir.

19               THE COURT:  Well, a Daubert challenge can

20   arise with in limines.

21               MR. CHAREST:  Yes, sir.

22               THE COURT:  Did you appear at a hearing in

23   that case, Dr. Galloway?

24               THE WITNESS:  Your Honor, I appeared at -- I

25   gave a deposition.  The deposition went to the court.

```
 1   And I don't know what --
 2              THE COURT:  You don't know what happened?
 3              THE WITNESS:  I did not.
 4              THE COURT:  All right.  Thank you.
 5              Mr. Charest, sorry to interrupt.  Go ahead.
 6              MR. CHAREST:  No worries at all, sir.
 7   BY MR. CHAREST:
 8       Q.   I understand, sir, that you've been offered
 9   as an expert in water resource management; correct?
10       A.   Yes.
11       Q.   And flood risk management; correct?
12       A.   Correct.
13       Q.   Are, within those two management-level
14   subject matters, whatever they actually are, found the
15   skill set of determining flood-proneness?
16       A.   Yes.
17       Q.   Which one?  Which of those two areas of work
18   involve the determination of whether something is
19   flood-prone or not?
20       A.   In water resource management.
21       Q.   Okay.
22       A.   And it's an integral -- flood-proneness is an
23   integral part of flood risk management.
24       Q.   So -- so both, then, sir?
25       A.   They're both.
```

1        Q.   All right.  And both of them involve

2   determining flood-proneness of a particular location;

3   is that right?

4        A.   Yes.

5        Q.   All right.  I'm curious about the methodology

6   that you employed here.  And I'm going to try and

7   understand it the best I can, and you can tell me if

8   I'm wrong.

9             You look at facts and data around the

10  neighborhood and learn and identify -- you call them

11  indicators; right?

12       A.   Indicators normally don't apply to the

13  neighborhood; they apply to a broader area.

14       Q.   Okay.  Leave aside the neighborhood.  You go

15  to a geographical area and identify, with your 60 years

16  of experience, indicators that, to you, indicate that

17  the area is flood-prone; right?

18       A.   As -- yes, if it's in a FEMA special flood

19  hazard area, that's an indicator.

20       Q.   That's not my question.  I'm trying to

21  understand how you do your job, because one of the

22  things we have to do here is make sure that what you're

23  doing is scientifically sufficient and reliable for the

24  judge to allow into the record.

25            You understand?

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

 1        A.    I certainly understand.

 2        Q.    All right.  So the first step is to identify

 3   indicators through your eyes and in the application of

 4   your 60 years of experience in flood risk management;

 5   correct?

 6        A.    I am giving -- offering indicators in my

 7   methodology that have been in use over the years by

 8   myself and other professionals in the conduct of such

 9   similar studies.

10        Q.    All right.  I'm not asking you where you

11   found your list of indicators.

12        A.    Right.

13        Q.    I'm asking you the methodology by which you

14   applied that list.  What do you do with that list?  Do

15   you go into the street and look for culverts?  What --

16   how do you apply that information?

17        A.    You can obtain -- since -- if you see --

18   you'd have seen the list of indicators.  If you take

19   that list of indicators, some of them -- when I am

20   saying one indicator is media, availability of

21   information about flooding, the logical place to find

22   that is in the newspapers, in documents, in reports,

23   public meetings, those sorts of things.

24              And where do I look for them?  I look for

25   them in the reports of agencies, as I've cited.  I look

1    for them in the entire issue of dealing with the

2    subject of the project that's being evaluated or

3    discussed.  And I could go through each of the

4    indicators -- that's really what the methodology

5    explains -- and tell you where you'd get that

6    information.

7        Q.    But that's -- that's -- I'm sure we'll be

8    hearing about that if this -- if it happens, from your

9    counsel.

10            But more importantly to my question is you

11   take a list as developed by experts of what will

12   indicate flood-proneness, and you, with your 60 years

13   of experience, go out and look to find these data and

14   these information and compile them -- right? -- as to

15   each location; correct?

16       A.    That's correct.

17       Q.    All right.  And you, with your 60 years of

18   experience, evaluate these different data points and

19   determine, in my view, this area is flood-prone;

20   correct?

21       A.    With a reason for that.

22       Q.    Sorry?

23       A.    With a reason -- giving a reason for that.

24   I -- it's not a yes or no; it's a yes or no based on

25   the evidence that I see and comment on.

1      Q.    Right.  But, fundamentally, it's your
2    interpretation of facts and data and your value
3    judgment that, yes, it's flood-prone or, no, it's not
4    flood-prone; correct?
5      A.    It's -- would you state that again.
6      Q.    Okay.  You go, take your list, you do your
7    search, then you -- Professor Galloway, Dr. Galloway,
8    General Galloway -- say, "I believe this area is
9    flood-prone or I believe it's not flood-prone; right?
10      A.    That's correct.
11      Q.    Okay.  So it's all your analysis in your
12    head; correct?
13      A.    It's on paper.  It's -- it's what you do when
14    you prepare any kind of a report.  You lay out the
15    facts, you lay out the reasons for the facts, and then
16    you make a judgment.  And that's what I have done in --
17    in my career.  In signing environmental impact
18    statements, all of it comes down to eventually having
19    to make a judgment.  It's not necessarily binding.
20      Q.    It's either flood-prone or not flood-prone;
21    right?  It's always binary; right?
22      A.    Well, it ultimately is, in this case, binary.
23    You'd make an end judgment on each, yes.
24      Q.    And that judgment -- it's you making that
25    judgment; correct?

1        A.    Well, I would argue that it is -- the

2   information that I am providing leads to that

3   presentation.

4        Q.    But you're the one that signs up and down,

5   not anybody else?

6        A.    I'm the ultimate decider, yes.

7        Q.    Not an analysis group who did all the work?

8        A.    Right.

9        Q.    It's you?

10       A.    Excuse me?

11       Q.    It's not an analysis group who did all the

12  gathering; it's you that makes the decision.  Right?

13       A.    I'm not sure that I -- I'm not sure an

14  analysis group did all the work.

15       Q.    Okay.  It's you that makes the decision, not

16  an analysis group; right?

17       A.    I make the decision.

18       Q.    How can I know, as an objective observer of

19  your work, that you've got it right?  How can I test

20  your application of these data to your reason to get a

21  conclusion?

22       A.    Well, you could compare them to the similar

23  projects that are going on.  You could compare it to

24  similar works that are taking place where analyses are

25  made, where -- the world is full of environmental

1    impact statements that are based on the judgment of

2    maybe one person or two person -- two people that have

3    made them, others that are putting them together.  That

4    all is an accumulation and presentation of facts and

5    information and a decision made on the basis of that

6    with a reason therefor.

7         Q.   So I'm supposed to look at -- I'm supposed to

8    take this same information and find other works, maybe

9    by the Corps or FEMA or NFIP, where they determined

10   flood-proneness and apply it like that; is that right?

11        A.   No.  I think that each report that is done on

12   an engineering project or an engineering analysis or a

13   general analysis of a flood kind of an event is

14   independent of all the others.  But the methodology --

15   the consideration of basic characteristics and the

16   consideration of these particular indicators is common.

17            And you will see those put together in a form

18   similar to this that says, given this amount of

19   information, you can make a judgment as to the flood

20   vulnerability of an area and the flood-proneness of an

21   area and make those kinds of decisions.

22        Q.   Flood-proneness is not a term that's used by

23   the Corps of Engineers, is it?

24        A.   It certainly is used by the Corps of

25   Engineers.  It's -- and it's used by other federal

```
 1    agencies.  It's not defined.  It's accepted that that's

 2    what it means.

 3         Q.   So maybe -- maybe we talked past each other.

 4              Flood-proneness is not defined by the Corps

 5    of Engineers, is it, sir?

 6         A.   You're correct.

 7         Q.   And flood-proneness is not a term used by

 8    FEMA, is it, sir?

 9         A.   It's a term used by both the Corps of

10    Engineers and FEMA.  Neither defines the term; both use

11    it extensively.

12         Q.   So how can I look at either one of those

13    sources and know what it means if neither is defining

14    it?

15         A.   Well, in this particular case, both of those

16    organizations -- the Bureau of Reclamation and

17    others -- use the term "flood-proneness" as a term

18    that's accepted as the propensity, the vulnerability of

19    flooding.  They use it and say it's something that's

20    flood-prone.  They use it in other cases like that.

21    There is not a federal regulation definition of

22    flood-proneness.

23         Q.   Right.  And it's not a term that's used or

24    defined in the NFIP program right?

25         A.   I'm sorry?
```

1       Q.    It's not a term that's defined or used in the
2   NFIP?
3       A.    It is used in almost all of the NFIP
4   documents.
5       Q.    Does the NFIP define flood-proneness?
6       A.    It does not.
7             I said both -- neither the Corps nor FEMA has
8   a CFR definition.
9       Q.    And then the term as you use it is adapted
10  from multiple sources, which I think we're hearing here
11  today, but has no antecedent source; correct?
12      A.    The antecedent source is the literature of
13  flood activity over the last 60 years.
14      Q.    So it does have an antecedent source or does
15  is not, sir?
16      A.    The antecedent source is the burden of its
17  use.
18      Q.    Sir, do you remember giving a deposition in
19  this case?
20      A.    Yes, I do.
21      Q.    Do you remember saying that there was no
22  antecedent source to this term?
23      A.    I'm saying now that there is no -- I've
24  already said there's no CFR definition to this.
25      Q.    I just asked you whether there was an

 1    antecedent source for this term, and you said yes;

 2    whereas, in your deposition, you said no.  Right, sir?

 3        A.    I'd have to look at my deposition.

 4        Q.    Okay.  Let's do that.

 5              Matt, I want to look at lines 25 -- sorry.

 6    Page 25, lines 20 to 26.

 7              THE COURT:  Mr. Levine?

 8              MR. LEVINE:  Objection.  Improper

 9    impeachment.

10              THE COURT:  That's true.  Have you asked

11    exactly or almost exactly the same question,

12    Mr. Charest?

13              MR. CHAREST:  I will do it that way exactly.

14    BY MR. CHAREST:

15        Q.    Sir, did you create --

16              MR. LEVINE:  I'm sorry.  Can I get a page and

17    line, please.

18              MR. CHAREST:  25/20 to 26/01.

19              THE COURT:  I didn't hear, Mr. Charest.

20              MR. CHAREST:  He wanted a page, sir, for the

21    impeachment.

22              MR. LEVINE:  I'm sorry, Your Honor.  Can I

23    get a page and line, please.

24              THE COURT:  Yes.  Why don't you look at it

25    before we put it up on the screen, please.

 1            MR. CHAREST:  25/20 to 26/01.

 2            THE COURT:  Let's not put it up on the

 3    screen.

 4    BY MR. CHAREST:

 5        Q.   Sir, did you create that definition, or did

 6    you take it from some other source?

 7        A.   What definition?

 8        Q.   The definition of flood-proneness, sir.

 9        A.   No.  I -- I have said flood-proneness is a

10    general term in use in the profession.

11        Q.   Is there an antecedent source to that term,

12    sir?

13        A.   What do you mean by an antecedent source?

14        Q.   I'm quoting you from the deposition when you

15    said there's no antecedent source.  So I guess I have

16    to ask you what you mean by antecedent source, sir.

17        A.   Well, antecedent source means I would go to

18    the CFR and find it.

19        Q.   And there is none; right?

20        A.   What?

21        Q.   And there is no definition like that, is

22    there, sir?

23        A.   I said that.

24        Q.   The methodology that you articulate in Roman

25    numeral III of your report, which you described briefly

1    with Mr. Levine, is a methodology that you have never

2    used before to evaluate the test property location;

3    correct?

4         A.   Are you saying I've never used it to -- to --

5    on these test properties?

6         Q.   No, on a test property-like situation.

7         A.   I've used this methodology and been part of

8    it in the preparation of numerous reports, evaluating

9    the results of major flood events, looking at the

10   issues in the Arno River in Florence, defining and

11   looking at how people are dealing with these very same

12   issues.

13        I am using the same methodologies that are

14   used there and in numerous other reports, where you

15   have to deal with the physical attributes of a flood

16   situation and the social and cultural aspects of that.

17        Q.   Sir, this methodology that you articulate in

18   Roman numeral III of your report, is this

19   methodology -- is this a methodology that you have ever

20   used before on a test property-like situation?

21        A.   Define a test property-like situation.

22        Q.   Like what we're doing right here in this

23   case, sir.

24        A.   Well, I define this case -- I would say used

25   in a case of evaluating properties for their proneness

```
 1    to flooding, the possibility that they would flood --
 2    flood.  And, in my particular case, the use of the
 3    analysis that leads to a definition of whether there is
 4    a necessity for or a federal interest, for example, in
 5    the federal government supporting a project.
 6              I have done numerous projects, reviewed
 7    numerous projects, that have followed this same general
 8    outline and dealt with these kinds of situations.
 9         Q.   I don't think you answered my question,
10    because I asked you about using it in a test
11    property-like situation, like in this case.
12              What's the answer to that question, sir?
13              THE COURT:  Mr. Levine?
14              MR. LEVINE:  Objection, Your Honor.  Asked
15    and answered.
16              MR. CHAREST:  Not answered.
17              THE COURT:  It's about the second time.
18    Maybe it's the third, but I don't know if it's been
19    answered yet.
20              MR. CHAREST:  That's exactly right, sir.  He
21    has not answered it.
22              THE WITNESS:  Well, you're giving your
23    definition of a test property situation, looking for my
24    answer to that.
25              I am saying that my definition -- or my
```

1    acceptance of your test property definition is the
2    evaluation of properties that are in a flood --
3    potential flood hazard zone and what are the
4    characteristics and indicators that allow people to
5    determine whether or not that's the case.
6    BY MR. CHAREST:
7        Q.   Sir, I'm quoting you from your own deposition
8    when you use the term "test property situation."  Okay?
9             So let me -- I'm going to ask it the best I
10   can one more time.  And if I don't get an answer, I
11   have to put the impeachment up.  So here we go.
12            So this methodology that you articulated --
13            THE COURT:  Slow down.
14            MR. LEVINE:  I'm sorry, Your Honor.  Can I
15   get a page and line.
16            MR. CHAREST:  81/17 to 81/20.
17            We -- Your Honor --
18   BY MR. CHAREST:
19       Q.   Do you remember giving a deposition in this
20   case, sir?
21       A.   I'd like to see it.
22       Q.   Okay.  Great.
23            Put it up, please, Matt.
24            THE COURT:  No.  We're not going to do that.
25            MR. CHAREST:  Your Honor -- okay.  All right.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                                5/15/2019

1               THE COURT:  I'm sorry.

2               MR. CHAREST:  Yes, sir.

3               THE COURT:  I am not going to raise my voice,

4     but I am going to say no.

5               MR. CHAREST:  Yes, sir, Your Honor.

6     Understood.

7               THE COURT:  Thank you.

8     BY MR. CHAREST:

9         Q.    This methodology that you articulate in Roman

10    numeral No. III of your report, sir, is a methodology

11    that you have never used before in a test property

12    situation; correct?

13        A.    I -- I'm -- either asking me if I'm using a

14    test property situation, I've never been in a position

15    where I have looked at 13 specific test properties in

16    Houston, Texas.

17              Have I looked at properties that are -- have

18    been flooded to analyze whether or not there is action

19    that should be taken?  Yes.

20        Q.    So you've never done this -- let's start

21    within Houston, I guess; right?

22        A.    Right.

23        Q.    And does it change because we're in Houston,

24    or does it change because it's a test property

25    situation and you're dealing with specific properties

1    and trying to opine on that?

2         A.    I'm trying to understand, I guess, what you

3    mean by a test property situation.  Do you mean an

4    evaluation of the proneness of flooding of property?

5         Q.    I'm using your own words, so I don't know how

6    better to define it other than in this case --

7         A.    Well, I want to see my own words.

8         Q.    I'd love to.

9         A.    Okay.

10               THE COURT:  Mr. Levine, may we show parts of

11   the deposition transcript?

12               MR. LEVINE:  Sorry?

13               THE COURT:  I'm asking the question.

14               MR. LEVINE:  Yes, Your Honor, I understand.

15               That -- the question that counsel asked was

16   not the exact same wording.

17               THE COURT:  Well, it might not be the same

18   words, but I want to make sure it's the same question

19   as asked.  Whether it uses precisely the same words or

20   not is not a issue.

21               MR. CHAREST:  May we show it?  I think I have

22   established a foundation.

23               MR. LEVINE:  It was a similar question.

24               THE COURT:  I'm sorry?

25               MR. LEVINE:  It was a similar question.

1          THE COURT:  It was a similar question?

2          MR. LEVINE:  Yes, Your Honor.

3          THE COURT:  All right.  I think we've gone

4   far enough we can show the question.

5          MR. CHAREST:  Thank you, sir.

6   BY MR. CHAREST:

7      Q.   So this methodology that you articulate in

8   Roman numeral III of your report, sir, is this a

9   methodology that you have ever used before?

10         "ANSWER:  On a test property-like

11         situation, your words, the answer is no."

12         Was that true then?

13     A.   Well, in the context of what we were talking

14   about, the test property-like situation is where you

15   are evaluating 13 --

16     Q.   Can you answer my question.

17         Was that true or not when you said it?

18     A.   It depends on how I define test property-like

19   situation.  My answer is no.  That's correct.

20     Q.   So it was true then and it's true now that

21   you've never used this methodology in the circumstances

22   we find ourselves today; right?

23     A.   I -- I have never used this methodology to

24   evaluate 13 properties with a view towards making this

25   particular judgment under these circumstances.

1      Q.   Thank you, sir.

2           Your flood-proneness evaluation is not a

3   peer-reviewed methodology, is it, sir?

4      A.   I'm not sure that -- I would not agree.  I

5   think that the approach shown in the methodology, the

6   steps taken and the indicators and characteristics

7   mentioned, are in fact common and are the ones used in

8   carrying out analyses of flood projects.

9      Q.   Yeah, that's a different answer.  Common and

10  used in the industry is one thing.  Have they been

11  peer-reviewed, sir, your methodology that you're

12  talking about?

13          Sir?

14     A.   I have not, nor did I feel it necessary to

15  take what is called a common approach to dealing with

16  this situation and have it peer-reviewed.  I don't know

17  why or how I would do that.

18     Q.   Has your approach and your methodology been

19  tested in any manner?

20     A.   The methodology is -- the general methodology

21  that I've applied in many studies, and it has been

22  tested in the results of those studies.

23     Q.   But not the methodology here because you've

24  never done it before; right?

25     A.   I've never done it in Houston before.

```
 1        Q.    Not just here in Houston, but in testing of
 2   test property circumstance, you've never done it
 3   before?
 4        A.    I'm afraid that you are limiting the
 5   methodology to test properties, whereas this is a
 6   methodology that is applied in this case to test
 7   properties but is common in the use of analyzing
 8   flood-proneness and -- and flood-related activities in
 9   analyzing the future actions in dealing with the flood
10   situation.
11        Q.    How, if at all, can a neutral body determine
12   the error rate of your analysis in your work here?
13        A.    You'd have to explain to me what you mean by
14   the error rate.
15        Q.    So there are 13 test properties in this case
16   for the upstream, anyway; right?  Correct?
17        A.    Yes.
18        Q.    And for 13 out of 13 you said you think
19   they're flood-prone; right?
20        A.    Correct.
21        Q.    How do we know that all 13 were correct?  Is
22   there another way to check other than just asking you?
23        A.    Other than ask me?
24        Q.    Yes, sir.
25        A.    Have another body look at these and make the
```

1    same judgments that I did.

2         Q.   Then is there a way to measure the quality of

3    that work that you've done at all?  Or do we just have

4    to believe you?

5         A.   Well, I think that you have to take, in this

6    sort of a situation -- and I am going back to my

7    Florence situation.  The prime minister of Italy takes

8    a report and reads it.  He doesn't send it out for

9    other people to comment on.  He looks at it and makes

10   his judgment based on the people who prepare it and the

11   approach taken.

12        I believe the approach taken here is a common

13   methodology and that how do you judge that is up to the

14   person that's looking at that.

15        Q.   A common methodology except for as applied in

16   test property situation; right?

17        A.   No.  It's a common methodology applied to

18   flood issues that have occurred in the case of previous

19   flooding of the location and what is behind that.

20        Q.   For each one of the test properties, you fill

21   out a form that make up the appendices; correct?

22        A.   Yes.

23        Q.   And you created that form for this case?

24        A.   I did.

25        Q.   And you've never used that form in any of

```
 1    your other methodologies or the application of this
 2    methodology before this case; correct?
 3         A.   That's correct.
 4         Q.   And that was how you set out your -- your
 5    reasoning for each one of the test properties, was
 6    identifying these different factors and running through
 7    the checklist; is that right?
 8         A.   That's correct.  And that's what I have done
 9    in studies.  It's a different format but simply here to
10    make ease in comparison.
11         Q.   Your flood-proneness evaluation did not
12    attempt to assess any quantitative aspects of
13    flood-proneness; right?  It's binary flood-prone or
14    not; right?
15         A.   Explain what you mean by "quantitative."
16         Q.   Well, all right.  I'll make up an example.
17    When I was first having a baby, I learned about an
18    Apgar score.  Are you familiar with that?
19              So you look, like, the color of the baby, how
20    active they are, and there's more.  Each one gets one
21    or two or three points, and then you add them together.
22    And after a certain number, they go the baby is healthy
23    or she's not healthy or however it falls in that
24    spectrum.
25              So the notion of grading things with a
```

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1    numerical value and adding them together and then

2    seeing how they fit.

3            Are you with me?

4    A.    I am with you.

5    Q.    Did you do anything like that here, sir?

6    A.    I did not.  And I have been teaching in that

7    field of multiattribute decision modeling and have

8    learned that there are times when that may be useful

9    and times when that is a dodge or a cover, gives you no

10   certainty any more than the binary.

11   Q.    So you could have done it in a manner that

12   allowed gradation but did not; is that right?

13   A.    I am not sure.  In this case I determined,

14   after looking at it, that it would be more appropriate

15   to go to the binary for each of the indicators.

16   Q.    So you're saying here under oath that you

17   evaluated whether or not to do a gradated approach and

18   determined not to do it and instead use a binary

19   approach; is that right?

20   A.    Yes.

21   Q.    That's your testimony that that happened?

22   A.    Did what happen?

23   Q.    Did you really evaluate whether to do a

24   gradated approach and then convert to a binary

25   approach?

1        A.    The conversion is lost on me.  What do you

2   mean by conversion?

3        Q.    I'm reacting to your testimony, sir.

4              Did you at one point in time say, "I'm going

5   to grade these, give them numbers and rank them," and

6   then determined, "No, it's not appropriate here.  I'm

7   going to do something else."

8              Did that really happen?

9              MR. LEVINE:  Objection, Your Honor.

10             THE WITNESS:  No, that's not what happened.

11             THE COURT:  Mr. Levine.

12             MR. LEVINE:  Vague.

13             MR. CHAREST:  So did or did not happen --

14             THE COURT:  Just a moment.  I think that

15   question is allowable given the context that was

16   provided by the prior questions and answers.  So the

17   objection is overruled.

18             MR. CHAREST:  Thank you, sir.

19   BY MR. CHAREST:

20       Q.    So I'm confused because about three questions

21   ago you said that's exactly what you did and now you're

22   saying you didn't do it.

23       A.    It's exactly what I did?  I'm missing my

24   terms to what I conveyed to you.

25       Q.    Okay.  One of us is misunderstanding each

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                              5/15/2019

     1    other or --

     2        A.    But -- but my answer is, as a practitioner of

     3    multiattribute decision modeling and working with this

     4    and writing about it, when -- you don't start off with

     5    a decision.  You evaluate the information that's there.

     6    Then you make a decision on the appropriateness of the

     7    methodology you're going to use for your decision

     8    modeling.  And in this case the decision modeling was

     9    binary.

    10        Q.    And you did or did not evaluate doing a

    11    gradated ranking system first and then abandon that in

    12    favor of a binary view?

    13        A.    Well --

    14        Q.    Which one was it?

    15        A.    Well, when you say "abandoned," means I

    16    accepted.  What I said is I evaluated how I would do

    17    that, and I determined that the appropriate one for

    18    this was binary.

    19        Q.    That's your final answer?

    20        A.    Is that my final answer?

    21        Q.    Yes, sir.

    22        A.    Yes.

    23        Q.    We'll stick with that, then.

    24              So you made no evaluation of relative

    25    flood-proneness as to any of the test properties;

```
 1   right?
 2        A.    Comparing test property A to B?
 3        Q.    Yes, sir.
 4        A.    No, I did not.
 5        Q.    So you have no view as to one -- if one is
 6   just barely flood-prone and one is very, very
 7   flood-prone; they're all just going to be called
 8   flood-prone under your analysis; right?
 9        A.    Certainly.  If you're making a decision --
10   and I said that the flood-prone is an independent
11   analysis of each one, in this case, with a binary
12   decision.
13        Q.    Can you have a property being just barely
14   flood-prone and still qualify?
15        A.    Still qualify for what?
16        Q.    As flood-prone.
17        A.    Yes.
18        Q.    So what -- what's the standard that you're
19   measuring to determine whether that particular property
20   got over the hump to be flood-prone?  What's the thing
21   that you're comparing to?
22        A.    As Mr. Fitzgerald indicated today, you're
23   either -- if you're advising somebody, giving an
24   opinion on something, and you are dealing with the
25   issue of flood-proneness, being a little flood-prone or
```

1    a lot flood-prone doesn't make any difference.  If

2    there's a possibility, there's a probability that

3    you're going to flood, that information needs to be

4    portrayed in that line -- you are flood-prone or you're

5    not.

6         Q.    So you can't be a little flood-prone?

7    Because that's not what you just said three questions

8    ago now.

9         A.    You can't be a little flood-prone?  No.

10        Q.    Let's focus on that question I have asked you

11   and still don't have an answer yet.

12              What are you measuring that against to

13   determine that this qualifies as flood-prone?

14        A.    This -- if there is a possibility or

15   probability that that property or that location will be

16   receiving floodwaters.

17        Q.    That's -- that's it?  And that's not any kind

18   of --

19        A.    Will be flooded.

20        Q.    But you don't do any math to support that, do

21   you?  I mean, you do this probability analysis that

22   you're talking about?

23        A.    I defined flood-proneness as the

24   vulnerability to, or some people use the probability

25   of, but the vulnerability to flooding.  And when I say

1   something is flood-prone, I say in the opinion or based

2   on my analysis there is a vulnerability to flooding

3   when it's labeled "flood-prone," whether it's a little

4   or a lot, whether it has many indicators or a few.

5       Q.   Well, labeling something flood-prone doesn't

6   make it flood-prone.  I would think that, first, you

7   would determine, is it flood-prone?  And then you would

8   label it flood-prone; correct?

9       A.   What do you mean by something is flood-prone,

10  you have to decide whether it is flood-prone?

11      Q.   I'm completely flummoxed here.

12           When you first looked at the first test

13  property, did you think "I don't know" or did you think

14  "I know"?  Before you went to any data at all, just the

15  address.

16      A.   You go in with an assumption that you're

17  looking at property and you know nothing.

18      Q.   Okay.  And then you learn what you learn;

19  right?

20      A.   That's correct.

21      Q.   And then you compare it to some standard to

22  determine, yes, it's flood-prone or, no, it's not

23  flood-prone; right?

24      A.   Yes.

25      Q.   What is that standard, sir?

```
 1      A.    Well, there are several characteristics and
 2 several indicators.  And you can judge on there.  Is
 3 there a -- what you'd call sufficient number of
 4 indicators to indicate that that is a factor that must
 5 be considered.
 6      Q.    How many are sufficient?
 7      A.    Depends on which one you're talking about.
 8      Q.    What does it depend on?
 9      A.    If we -- let's take the case of an indicator
10 that says information available concerning the previous
11 flooding.  Is there one? two? three?  It does not
12 matter.  It indicates that you've got one that said
13 previously flooding.  In that particular case, that
14 would be a strong indicator.
15      Q.    And what about places that never had flooding
16 before, sir?
17            I mean, I'm still trying to find out what is
18 the thing you're measuring against?  Because the
19 purpose of going through this process is to understand
20 whether or not what you're doing is repeatable, whether
21 it's testable by somebody else.  Or is it just you
22 saying "I think it is."  And I am just trying to
23 understand how you can show me it's not just you saying
24 "I think it is."
25      A.    It's -- it's, in my opinion, very repeatable.
```

```
 1    And it's using terms and items that are in common use
 2    in this profession.  Is the area located in something
 3    that's been defined by the federal government as a
 4    hazard area?  That's very simple to look at.  And
 5    that's relatively straightforward.  Others are not as
 6    straightforward as that.
 7         Q.   Did each of the test properties have variable
 8    in terms of they're not all identical indicators of
 9    flood-proneness?
10         A.   Each of them was looked at with the complete
11    list of characteristics and indicators that I had.
12         Q.   And did each of them have identical or
13    different indicators?
14         A.   They had the same indicators.  I examined the
15    same indicators and the same characteristics for all
16    properties.
17         Q.   Not every one of them flooded before, have
18    they, sir?
19         A.   No.
20         Q.   So not all of them had the same indicators;
21    right?
22         A.   Well, you're saying the same result.  As I --
23    the methodology specifies indicators and
24    characteristics, characteristics being natural physical
25    things that you can see and indicators being things
```

1    that are available for you to learn.  And each of them

2    has their own specific answers to each of the questions

3    that deals with that.

4        Q.   And as to each of them, you had the same

5    exact conclusion; right?  Literally, the same words?

6        A.   I'm sorry.  I'm missing something in -- if

7    you are taking the sum, the conclusion overall, yes.

8    If you're taking the individual assessments, each

9    assessment differed.

10       Q.   Is it true -- I want to talk about a slightly

11   different thing.  I'm just going to bookmark it so

12   everybody knows what we're talking about.  I want to

13   talk about fit, how these opinions you're trying to

14   offer fit in this case.

15            So here's my question to you.  In connection

16   with your work on this engagement, did you consider

17   whether or not the Corps of Engineers' use and

18   operation of Addicks and Barker dams to impound a

19   runoff was a potential source of a flood hazard in the

20   upstream area?

21       A.   Go through the first part of that question.

22       Q.   In connection with your work on this

23   engagement, did you consider whether or not the Corps

24   of Engineers' use and operations of the Addicks and

25   Barker dams to impound a runoff was a potential source

1    of the flood hazard in the upstream areas?

2         A.   That was not an indicator that was on my

3    list.

4         Q.   So the indicators you're talking about are

5    things other than the Addicks and Barker dams; right?

6         A.   The indicators did not include the Addicks

7    and Barker dam.  It included the hazard, the source of

8    the waters.

9         Q.   But -- so the test property owners' awareness

10   of the Addicks and Barker dams was not something that

11   you thought they should have been aware of vis-a-vis an

12   indicator for what was available to them at the time

13   they purchased the property; correct?

14        A.   I most certainly did.

15        Q.   Do you agree with me that you did not

16   consider whether or not the Addicks and Barker dams --

17   you did not consider them as a source of the flood

18   hazard in the upstream areas; right?

19        A.   I did not specifically consider -- well,

20   you're defining a condition that I am not familiar with

21   or at least I -- you haven't given me enough

22   information to deal with, and that's not in my area of

23   expertise for this particular issue.

24             I have said that waters that come on the

25   property are coming from rainfall or coming from the

 1     streams that -- that flow by and they can -- they can

 2     come by from the pool of Addicks and Barker.

 3         Q.    But you did not look to see whether the

 4     existence of the Addicks and Barker dam embankments

 5     increased the risk of flood-proneness in the upstream

 6     areas, did you, sir?

 7         A.    I did not have to do that.  That was not one

 8     of the -- that's a hydrologic analysis.  I did not do a

 9     hydrologic analysis.

10         Q.    So to be clear, your analysis did not include

11     the risk of flood -- the increased risk of

12     flood-proneness as a result of the Addicks and Barker

13     dams?

14         A.    My analysis did not include risk of anything.

15     Risk -- risk gets involved into defining of

16     consequences.  And we're talking about something --

17     we're talking about proneness and not risk.  And that's

18     a fundamental.

19         Q.    Proneness is different than risk, you say?

20         A.    It is.

21         Q.    How?

22         A.    In the literature, in the profession, risk is

23     the taking of the physical problems with flooding, the

24     flood source, the flooding that is occurring, and

25     applying to it, with it, the product of the economic,

 1    social, and cultural consequences, environmental

 2    consequences, to create the risk.

 3              That's the definition that's in use in the

 4    profession, in the community, in the government.  And I

 5    did not become involved in looking at impacts of any

 6    properties, any of the 13 properties.  And so I did not

 7    do any risk analysis.

 8         Q.   Are the places that you looked at, the test

 9    properties, more or less flood-prone as a result of

10    being near the Addicks and Barker dams?

11         A.   They are flood-prone in the sense that they

12    are in the designated pool, indicated on the U.S.

13    geologic survey maps.

14         Q.   Aren't they flood-prone because of the dams

15    themselves, not because of being on a map?

16         A.   I -- again, you're looking at what is the

17    circumstances in a Harvey-like event that creates this.

18    And I was not in the position of trying to evaluate

19    what was the cause of the particular flooding of a

20    particular property amongst the many that are

21    available.

22         Q.   That's not what I asked you, sir.

23         A.   Ask again, then.

24         Q.   Aren't the homes more flood-prone because of

25    the Addicks and Barker?

 1      A.    Under what conditions?

 2      Q.    Conditions like Harvey you said is what you

 3  studied.

 4      A.    A Harvey-like event?  I don't know the answer

 5  to that, and I haven't seen the answer portrayed.

 6           MR. CHAREST:  Your Honor, that's the last

 7  question I have.  I think that the expert -- the

 8  purported expert both -- well, he's never been

 9  qualified.  He's been stricken without telling us.

10  He -- it's pure ipse dixit.  There is no fit.  He

11  should not be qualified as an expert under 702, sir.

12           THE COURT:  Mr. Levine, the Court has a set

13  of questions, but why don't you carry forward with more

14  voir dire.

15           MR. LEVINE:  Thank you, Your Honor.

16           THE COURT:  The Court would be interested in

17  learning what these indicia actually are if no

18  hydraulic analysis was performed.

19           MR. LEVINE:  Thank you, Your Honor.  I'd be

20  happy to go through that.

21           THE COURT:  Let's do that.

22           DIRECT EXAMINATION (Continued)

23  BY MR. LEVINE:

24      Q.    So, Dr. Galloway, I want to look at Figure 1

25  from your report.  And we're going to put up on the

     1    poster board --

     2                MR. LEVINE:  That's just a replication of

     3    Figure 1 from the report, Your Honor, and that's found

     4    on -- on page 16 of Dr. Galloway's report.

     5                THE COURT:  Yeah.

     6                MR. CHAREST:  Are we doing more

     7    qualifications, or are we into opinion now?

     8                THE COURT:  This is still voir dire.

     9                MR. CHAREST:  Thank you, sir.

    10    BY MR. LEVINE:

    11        Q.   So, Dr. Galloway, you explained that you

    12    considered characteristics and indicators, Figure 1.

    13             What is Figure 1?

    14        A.   Figure 1 is how characteristics fit into the

    15    definition of flood-proneness.

    16        Q.   Okay.

    17        A.   On the right side, Your Honor, you see a --

    18    an approach found in the current European and in the

    19    textbook that I mentioned that was done for UNESCO on

    20    dealing with flood-risk strategies.

    21             Flood hazard is at the top of that.  That's

    22    where you get the water that creates the flood.  The

    23    pathway is how it goes from that source, whether the

    24    air or river, to the exposed property, the receptor.

    25    And each -- in each of those, flood hazard and pathway

1    and exposure, there are characteristics that can be

2    ascertained and that give an indication of the relative

3    flood-proneness.

4         All those together help define

5    flood-proneness.  When you add the consequences, the

6    impacts, in the profession, it then becomes the risk.

7         Q.   And, Dr. Galloway, I see under the dashed

8    line "Consequences and Risk."

9         Did you do an analysis of consequences and

10   risk here?

11        A.   I did not.

12        Q.   Okay.  So what characteristics are included

13   in flood hazard?

14        A.   Flood hazard is the source, the primary

15   source of the flooding.  In this particular region,

16   that is rainfall events, it's river rises, it's

17   surge -- sea level rise would not be appropriate -- and

18   changes in weather that might occur that would have an

19   impact on the volume and intensity.

20        Q.   Okay.  And, Dr. Galloway, what

21   characteristics are included in pathway?

22        A.   The pathway, Your Honor, is the land over

23   which it travels and the items that are there.  Clear

24   on topography is the shape of the land.  Is it flat or

25   is it one that's going to have very fast runoff, as you

1    would have in an Alpine or a hilly area?

2              It would also include drainage features which

3    are a supplement to the natural drainage of the system,

4    both natural and constructed types of features; the

5    land cover, what's on the land that causes the runoff

6    to be slight or heavy; protection, which is what

7    structures have been put in place to prevent flooding

8    from taking place.

9         Q.   Okay.  And what's exposure?

10        A.   Exposure is how high you are, what's the

11   chance that you're -- if you're low, obviously, in an

12   area near a stream, you have a greater probability of

13   hitting flooding than if you're up several feet in the

14   air.

15             You can also be in a location where you're at

16   the junction of multiple streams.  That's a position

17   that is -- puts you at exposure.  Clearly, if you're

18   moved out of the area or you're very high, your

19   exposure is reduced and your -- the probability of

20   flooding is less.

21             So these three -- flood hazard, pathway,

22   exposure -- define the probability of you being

23   flooded.  What happens with that is the consequences

24   and the risk.

25        Q.   Okay.  And, most recently, where did you

1    derive this figure from?  Like, what was your most

2    recent work where you derived this work?

3         A.    Well, we used the -- this came out of the

4    UNESCO report out of previous reports that came from

5    the European community in dealing with their entire

6    water resources challenges with flooding, and it was

7    also similar to the approach we took in analyzing the

8    flooding on the Arno River as it went through Florence,

9    Italy.

10        Q.    So you've used this type of analysis many

11   times?

12        A.    I've used it many times.  This is the -- what

13   you need to do is to understand the situation and to

14   evaluate what the changes are, the possibilities for

15   change, and the influencers on each of those boxes to

16   the left.

17        Q.    Okay.  And in conducting your analysis here,

18   did you consider the types of information that you just

19   described for us with hazards, pathway, and exposure?

20        A.    I did.

21        Q.    Okay.  Now I want to introduce Figure 3,

22   which is the indicators.

23              Do we have a set -- yeah, the second easel.

24   Thank you.

25              And this is a reproduction of Figure 3 from

 1    Dr. Galloway's report, which is found on page 24, and
 2    the indicators portion of his methodology is on
 3    pages 23 through 40 of the report.
 4              Dr. Galloway, what is Figure 3?
 5        A.   It is a list of indicators that would lead
 6    you -- assist you in determining whether or not you are
 7    possibly subject to flooding.  There are items that are
 8    available to the person -- the layperson and do not
 9    have a scientific or a -- a necessity for scientific
10    knowledge but are more commonly available to the person
11    that would be moving or looking at an area.
12        Q.   Okay.  And did you create Figure 3 for this
13    report?
14        A.   I created Figure 3 by using the commonly used
15    approaches that I have used in the past.  And they're
16    part of the methodologies used in studies that are
17    performed for and by the federal government.
18        Q.   Was it adapted from anywhere?
19        A.   Yes.  I chose the ones for this particular
20    study.
21        Q.   Right.  When it comes to assessing
22    flood-proneness, are these the indicators that you and
23    your colleagues would consider?
24        A.   Yes.
25        Q.   Okay.  Are there other indicators that you

1    could have chosen for this analysis?

2         A.   Yes.  But they were not applicable, in my

3    opinion, to this particular case.

4         Q.   Okay.  So why did you choose the particular

5    indicators you did?

6         A.   Because in this -- because they were the ones

7    that were most pertinent among many.  And I have

8    learned that an excess number just confuses it.  These

9    are the ones that drive to the central point.

10        Q.   So let's look at the indicators of

11   flood-proneness listed on Figure 3 from your report and

12   walk through those briefly.

13             Why are physical characteristics an indicator

14   of flood-proneness?

15             MR. CHAREST:  Your Honor, I think we're

16   getting into -- I mean, I've kind of let it go, but

17   we're talking about his opinion now, literally --

18             MR. LEVINE:  No, we're still on the --

19             THE COURT:  I see them -- I see on

20   Figure 3 -- I have a couple of really basic questions

21   about this exercise --

22             MR. LEVINE:  Please, Your Honor.

23             THE COURT:  -- because we've had a lot of

24   testimony about -- I don't want to charge your time to

25   you, Mr. Levine, but we've had a lot of testimony about

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                          5/15/2019

```
 1    the relative -- relative propensity to flooding; that
 2    is, the susceptibility to flooding based on, for
 3    example, the 100-year flood zone, the 500-year, and so
 4    on and so forth.
 5             And you can actually calculate those things
 6    by reference to hydrogeologic -- I think of it as
 7    hydrogeologic -- hydrologic data on past events.  To
 8    me, it's all relative.  As we've had testimony from
 9    Dr. Bedient and Mr. Nakagaki, Ms. -- Dr. Asche, you can
10    have something past the 500-year flood line that would
11    be susceptible to flooding in an extraordinary event
12    that might occur once every 5,000 years.
13             I just don't see a basis for a binary
14    approach in this particular set of circumstances.  It
15    just doesn't make any sense.
16             MR. LEVINE:  So I -- if -- if I understand
17    your question, you're asking --
18             THE COURT:  It's not a question.  I'm asking
19    you to address the concern I have, which is that a
20    binary approach just doesn't seem to fit anything in
21    this particular case.
22             MR. LEVINE:  So if I may, Your Honor.
23             THE COURT:  Yes.
24             MR. LEVINE:  Dr. Galloway's opinion goes to
25    both character-of-the-land issues and reasonable
```

1    investment-backed expectations.  So, to the extent

2    there's a question about fit within the factors that

3    are in play in this case, his work goes to those areas.

4              THE COURT:  Well, it might -- you might think

5    it does, but let's just take -- for example, it seems

6    to me that what we're really talking about is hydrology

7    and hydraulics.  And I just don't see anything like

8    hydrology and hydraulics in this particular analysis or

9    report by Dr. Galloway.

10             MR. LEVINE:  That's correct, Your Honor.

11   Dr. Galloway is -- we're not seeking to enter him as an

12   expert in hydrology and hydraulics.  The United States

13   has experts in that area.

14             THE COURT:  Well, let's hear from them in due

15   course.  I just don't see how you can address

16   flood-proneness without addressing hydrology and

17   hydraulics.  It's just not possible.

18             MR. LEVINE:  Your Honor, I think the -- the

19   work that Dr. Galloway did does address flood-proneness

20   as he's explained it.

21             Again, there's a difference between proneness

22   and risk.  And Dr. Galloway explained that difference.

23   Perhaps the way the term "risk" is used commonly is

24   causing some confusion here versus, you know --

25             THE COURT:  It's not confusion.

 1          MR. LEVINE:  Sir, if I may?

 2          THE COURT:  Yes.

 3          MR. LEVINE:  Reasonable investment-backed

 4  expectations is an objective standard.

 5          THE COURT:  That's correct.

 6          MR. LEVINE:  Okay.  Thank you.

 7          The analysis that Dr. Galloway did

 8  considering these indicators that are on the screen --

 9          THE COURT:  Right.

10          MR. LEVINE:  -- these are indicators that are

11  available to laypeople that they could consider when

12  making a decision such as purchasing property.

13          THE COURT:  We've had a fair amount of

14  testimony on that particular subject.  In fact, all of

15  the test property owners basically testified about

16  that.  And we had testimony from officials at Fort Bend

17  County and Harris County on those particular subjects,

18  and the Corps.

19          MR. LEVINE:  Yes, Your Honor.  We have had

20  testimony on that.  What Dr. Galloway's testimony

21  provides is opinions related to whether or not there

22  were indicators -- first, whether or not a property was

23  flood-prone; and, secondly, whether or not indicators

24  were available to a person at the time they purchased

25  their property to be aware that they could flood in a

1    Hurricane Harvey-like event.

2              THE COURT:  Let me just say that the Court's

3    inclination -- and I'd like to sleep on it overnight.

4    But the Court's inclination is not to allow

5    Dr. Galloway to testify as an expert because I don't

6    think there's a scientific basis for his testimony.

7              On the other hand, I am willing to allow the

8    government to make a proffer of Dr. Galloway's

9    testimony.  You understand what I'm saying?

10             MR. LEVINE:  I do understand what you're

11   saying, Your Honor.  And, if I may, could -- could we

12   finish, in the morning, presenting the indicators?

13             THE COURT:  Yes.  Well, I thought we had.  I

14   mean, we looked at them.

15             MR. LEVINE:  We looked at the headings.

16   Dr. Galloway didn't have a chance to explain to you

17   what they are and why they're important.

18             THE COURT:  That -- that is definitely

19   allowable.  And, in fact, that could be part of your

20   proffer, but -- and I will allow you -- you can take

21   your time to make your proffer.

22             And the Court will definitely allow it

23   because this is the kind of case where a proffer is

24   fully appropriate given the set of circumstances all

25   the parties are in.

Trial
Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

```
 1                MR. LEVINE:  I'm sorry, Your Honor.  Are you
 2     asking me a question, Your Honor?
 3                THE COURT:  No, I -- I'm just saying, are you
 4     willing to take the time to make that proffer?  I'm
 5     willing to allow it.
 6                MR. LEVINE:  Is Your Honor ruling at this
 7     time?  I thought you said you wanted to sleep on it and
 8     reserve --
 9                THE COURT:  I do.
10                MR. LEVINE:  -- and rule in the morning.
11                THE COURT:  I would like to revisit it
12     tomorrow morning, but you've basically -- you've heard
13     at least my tentative decision.
14                MR. LEVINE:  I -- I understand, Your Honor.
15     And I think we'll be happy to address what you're
16     thinking in the morning.
17                THE COURT:  And the reason I did that is to
18     allow everyone to not only sleep on it overnight, but
19     to prepare for what you're going to do one way or the
20     other.
21                MR. LEVINE:  I understand, Your Honor.  Thank
22     you.
23                THE COURT:  I guess, you know, we do have
24     limited time.
25                Mr. Charest, do you have comments?
```

1          MR. CHAREST:  I'm standing by, sir.  I was

2    going to suggest, if the Court was done, we could be

3    done.  If the Court wants to start the proffer now, we

4    could do that too.  Whatever you like.

5          THE COURT:  Well, I'm a little reluctant to

6    do that because there really hasn't been thought given

7    to a preparation as to how the proffer would be

8    accomplished.

9          MR. CHAREST:  Fair enough.

10          THE COURT:  It might be accomplished through

11    Dr. Galloway's testimony.  And the Court is willing to

12    go so far as to allow that.

13          You understand, Mr. Levine?

14          MR. LEVINE:  As I understood it, Your Honor.

15          THE COURT:  The Court can allow a proffer

16    through testimony.

17          MR. LEVINE:  Yes, Your Honor.  I -- I do

18    understand procedurally what you're describing.

19          As -- as Your Honor indicated, if we could

20    sleep on it and I'll come back in the morning and

21    address this, I think that would be appropriate.

22          THE COURT:  That would be a good idea all the

23    way around.

24          MR. LEVINE:  Thank you, Your Honor.

25          THE COURT:  All right.  Let's just have the

Trial

Upstream Addicks and Barker (Texas) Flood-Control Reservoirs                    5/15/2019

1   time -- given all the circumstances, let's just have

2   the time for the record.

3          THE CLERK:  Yeah.  The plaintiffs are at

4   2618, and the government is at 2116.

5          THE COURT:  All right.  Government -- I'm

6   sorry -- defense is at what?

7          THE CLERK:  2116.

8          THE COURT:  2618 for plaintiffs, and 2116 for

9   the defense.

10          Dr. Galloway, I look forward to seeing you

11   tomorrow morning.

12          And, Mr. Levine and Mr. Charest and everyone,

13   we will entertain these -- these fascinating subjects

14   tomorrow morning.  Thank you.

15          MR. LEVINE:  Thank you, Your Honor.

16          THE CLERK:  All rise.  Court is in recess.

17               (Thereupon, the proceedings

18                concluded at 5:30 p.m.)

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3          I, Kristy L. Clark, court-approved transcriber,

 4    certify that the foregoing is a correct transcript from

 5    the official electronic sound recording of the

 6    proceedings in the above-titled matter.

 7

 8

 9

10    DATE: 5/16/19

11                         KRISTY L. CLARK, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          ADMITTED EXHIBITS
 2
 3   JX        PAGE       DESCRIPTION
 4   54        2401       5/1/1996 Harris County Flood Control
 5                        District, Katy Freeway Corridor Flood
 6                        Control Study
 7   60        2404       3/1/2000 Feasibility Study for
 8                        Improvements to Addicks and Barker,
 9                        March 2000
10   88        2407       2/1/2008 ABECT Planning/Exercise
11                        related to rising reservoir pool
12                        Levels
13   146       2429       Email from Michael Kauffman regarding
14                        CWMS Forecast for 08/25/2017-
15                        09/24/2017
16   266       2295       USGS Maps of Plaintiffs' properties
17                        (showing location of Burnham,
18                        Stewart, Sidhu, Turney, West Houston
19                        Airport, Holland, and Popovici
20                        properties)
21   267       2295       USGS Maps of Plaintiffs' properties
22                        (showing location of Burnham,
23                        Stewart, Sidhu, Turney, West Houston
24                        Airport, Holland, and Popovici
25                        properties)
```

```
 1   268    2295     USGS Maps of Plaintiffs' properties
 2                    (showing location of Burnham,Stewart,
 3                    Sidhu, Turney, West Houston Airport,
 4                    Holland, and Popovici properties)
 5   269    2295     USGS Map of Plaintiffs' properties,
 6                    Addicks, TX, 2016 (showing location
 7                    of Burnham, Stewart, Sidhu, Turney,
 8                    West Houston Airport, Holland, and
 9                    Popovici properties)
10   271    2298     USGS Map of Plaintiffs' properties,
11                    Clodine, TX, 1970 (showing location
12                    of Soares, Banker, and Micu
13                    properties)
14   272    2298     USGS Map of Plaintiffs' properties,
15                    Clodine, TX, 1982 (showing location
16                    of Soares, Banker, and Micu
17                    properties)
18   273    2298     USGS Map of Plaintiffs' properties,
19                    Clodine, TX, 1995 (showing location
20                    of Soares, Banker, and Micu
21                    properties)
22   274    2298     USGS Map of Plaintiffs' properties,
23                    Clodine, TX, 2016 (showing location
24                    of Soares, Banker, and Micu
25                    properties)
```

| 1 | 276 | 2296 | USGS Map of Hedwig Village, TX, |
| 2 | | | Harris County, 1970 (showing location |
| 3 | | | of Lakes on Eldridge and Wind |
| 4 | | | properties) |
| 5 | 277 | 2296 | USGS Map of Hedwig Village TX, Harris |
| 6 | | | County, 1982 (showing location of |
| 7 | | | Lakes on Eldridge and Wind |
| 8 | | | properties) |
| 9 | 278 | 2296 | USGS Map of Hedwig Village, TX, |
| 10 | | | Harris County, 1995 (showing location |
| 11 | | | of Lakes on Eldridge and Wind |
| 12 | | | properties) |
| 13 | 279 | 2296 | USGS Map of Hedwig Village, TX, |
| 14 | | | Harris County, 2016 (showing location |
| 15 | | | of Lakes on Eldridge and Wind |
| 16 | | | properties) |
| 17 | 280 | 2301 | USGS Map of Richmond NE Quadrangle, |
| 18 | | | TX, 1971 (showing location of Giron |
| 19 | | | property) |
| 20 | 281 | 2301 | USGS Map of Richmond, NE Quadrangle, |
| 21 | | | TX, 1971 (Photorevised 1980) (showing |
| 22 | | | location of Giron property) |
| 23 | 282 | 2301 | USGS Map of Richmond, NE Quadrangle, |
| 24 | | | TX, 2016 (showing location of Giron |
| 25 | | | property) |

2553

```
 1    283     2363      FEMA Flood Insurance Rate Maps
 2                      (FIRMs) - Giron Property
 3    284     2364      FEMA Flood Insurance Rate Maps
 4                      (FIRMs) - Holland Property
 5    285     2365      FEMA Flood Insurance Rate Maps
 6                      (FIRMs) - Lakes on Eldridge Property
 7    286     2360      FEMA Flood Insurance Rate Maps
 8                      (FIRMs) - Micu Property
 9    287     2366      FEMA Flood Insurance Rate Maps
10                      (FIRMs) - Popovici Property
11    288     2367      FEMA Flood Insurance Rate Maps
12                      (FIRMs) - Sidhu Property
13    289     2368      FEMA Flood Insurance Rate Maps
14                      (FIRMs) - Soares Property
15
16    PX      PAGE      DESCRIPTION
17    138     2175      USGS Characterization of Peak
18                      Streamflows
19    139     2176      Map with Gage Locations
20    2205    2250      11/5/2018 Deal Sikes Expert Report
21
22    DX      PAGE      DESCRIPTION
23    42      2285      3/16/1971 USGS Field notes, Addicks
24                      Reservoir
25
```

| | | | |
|---|---|---|---|
| 1 | 194 | 2416 | 03/13/2009 Addicks and Barker |
| 2 | | | Emergency Coordination Team (ABECT) |
| 3 | | | Meeting agenda and related documents |
| 4 | 340 | 2433 | 08/26/2017 Email from M. Kauffman |
| 5 | | | regarding CWMS Forecast for 08/26 - |
| 6 | | | 09/24, 2017 |
| 7 | 360 | 2437 | 08/27/2017 Email from M. Kauffman |
| 8 | | | regarding CWMS Forecast for 08/27 - |
| 9 | | | 09/24/2017 |
| 10 | 384 | 2439 | 08/28/2017 Email from M. Kauffman |
| 11 | | | regarding CWMS Forecast for 08/27 - |
| 12 | | | 09/24/2017 |
| 13 | 396 | 2442 | 08/29/2017 Email from Justice |
| 14 | | | regarding CWMS Forecast for 08/29 - |
| 15 | | | 09/24/2017 |
| 16 | 415 | 2443 | 08/30/2017 Email from M. Kauffman |
| 17 | | | regarding CWMS Forecast for 08/30 - |
| 18 | | | 09/24/2017 |
| 19 | 427 | 2445 | 08/31/2017 Email from M. Kauffman |
| 20 | | | regarding CWMS Forecast for 08/31 - |
| 21 | | | 09/24/2017 |
| 22 | 698 | 2282 | USGS Topographic Map Symbols |
| 23 | 741 | 2271 | USGS Addicks and Barker map |
| 24 | 744 | 2271 | USGS Addicks Quadrangle map 1970 |
| 25 | 745 | 2271 | USGS Addicks Quadrangle map 1980 |

```
 1    747    2271    USGS Addicks Quadrangle map 2016
 2    749    2290    USGS Clodine Quadrangle map 1995
 3    752    2290    USGS Clodine Quadrangle map 1970
 4    753    2290    USGS Clodine Quadrangle map 1982
 5    754    2290    MAP - USGS Topographical Map: Clodine
 6                   Quadrangle, TX, 7.5-Minute Series;
 7                   2016; (NGA REF NO. USGSX24K9246)
 8    756    2288    MAP - USGS Topographical Map: Hedwig
 9                   Village Quadrangle, TX - Harris Co.,
10                   7.5-Minute Series; 1970;
11                   (N2945-W9530)
12    757    2288    MAP - USGS Topographical Map: Hedwig
13                   Village Quadrangle - Harris Co., TX,
14                   7.5-Minute Series; 1982;
15                   (N2945-W9530/7.5)
16    758    2288    MAP - USGS Topographical Map: Hedwig
17                   Village Quadrangle - Harris Co., TX,
18                   7.5-Minute Series; 1995
19    759    2288    MAP - USGS Topographical Map: Hedwig
20                   Village Quadrangle - Harris Co., TX,
21                   7.5-Minute Series; 2016; (NGA REF NO.
22                   USGSX24K19987)
23    806    2361    FEMA Flood Insurance Rate Maps
24                   (FIRMs) - Banker Property
25
```

| | | | |
|---|---|---|---|
| 1 | 807 | 2362 | FEMA Flood Insurance Rate Maps |
| 2 | | | (FIRMs) - Burnham Property |
| 3 | 815 | 2369 | FEMA Flood Insurance Rate Maps |
| 4 | | | (FIRMs) - Stewart Property |
| 5 | 816 | 2372 | FEMA Flood Insurance Rate Maps |
| 6 | | | (FIRMs) - Turney Property |
| 7 | 817 | 2371 | FEMA Flood Insurance Rate Maps |
| 8 | | | (FIRMs) - West Houston Airport Corp. |
| 9 | | | Property |
| 10 | 818 | 2373 | FEMA Flood Insurance Rate Maps |
| 11 | | | (FIRMs) - Wind Property |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |