# In the United States Court of Federal Claims
Sub-Master Docket No. 17-9001L

(Filed: April 30, 2020)

| | |
|---|---|
| ************************************* ) | |
| **IN RE UPSTREAM ADDICKS AND** ) | |
| **BARKER (TEXAS) FLOOD-** ) | |
| **CONTROL RESERVOIRS** ) | |
| ) | Date of taking of a permanent flowage |
| ************************************* ) | easement; scope of that easement |
| **THIS DOCUMENT APPLIES TO:** ) | |
| ) | |
| **ALL UPSTREAM CASES** ) | |
| ) | |
| ************************************* ) | |

Daniel H. Charest and E. Lawrence Vincent, Burns Charest LLP, Dallas, Texas, Charles Irvine, Irvine & Conner PLLC, Houston, Texas, and Edwin Armistead Easterby, Williams Hart Boundas Easterby, LLP, Houston, Texas, Co-Lead Counsel for Upstream Plaintiffs. Of Counsel was Vuk. S. Vujasinovic, VB Attorneys, PLLC, Houston Texas.

Kristine S. Tardiff, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Concord, New Hampshire, for defendant. With her on briefs were Jean E. Williams, Deputy Assistant Attorney General, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., and William J. Shapiro, Laura W. Duncan, and Sarah Izfar, Trial Attorneys, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

On December 17, 2019, the court found the United States liable to thirteen bellwether property owners under the Fifth Amendment of the United States Constitution for the taking of a non-categorical, permanent flowage easement on their properties as a result of government-induced flooding during Tropical Storm Harvey, produced by the government's construction, maintenance, and operation of the Addicks and Barker Dams. *See generally In re Upstream Addicks & Barker*, 146 Fed. Cl. 219 (2019). Pending before the court are the parties' competing proposals concerning the date when the taking at issue occurred and the scope of the easement taken.

Having bifurcated liability and damages, the court subsequently selected six of the original thirteen bellwether properties to serve as test properties in the compensation phase of the case. *See* ECF No. 268 (Order Selecting Bellwether Properties for Compensation Phase).

Anticipating a need for clarity in advance of expert discovery during the compensation phase of this litigation, the court instructed the parties to submit briefing as to the date when the taking occurred and the scope of the flowage easement taken. *See* Scheduling Order, ECF No. 273. That briefing is now complete, *see* Def.'s Mot. to Clarify ("Def.'s Mot."), ECF No. 276; Pls.' Cross-Mot. and Resp. ("Pls.' Cross-Mot."), ECF No. 279; Def.'s Resp. to Pls.' Cross-Mot. ("Def.'s Resp.") ECF No. 280; Pls.' Reply to Def.'s Resp. ("Pls.' Reply"), ECF No. 281, and the court held a hearing to address these issues on April 28, 2020. The questions of when the taking occurred and the extent of its scope are now ready for resolution.

## ANALYSIS

### *A. The Date of Taking*

The court's opinion addressing liability did not expressly identify the date when the taking of the flowage easement occurred, as it was unnecessary to do so to reach a determination on liability. That date is significant, however, for assessing the measure of just compensation due. *See Whitney Benefits, Inc. v. United States*, 18 Cl. Ct. 394, 406 (1989), *modified*, 20 Cl. Ct. 324 (1990), *aff'd*, 926 F.2d 1169 (Fed. Cir. 1991) ("Having determined that a taking has occurred, the court must find the value for which plaintiff is to be compensated. The first inquiry necessarily involves establishing the date on which the taking took place."). The appropriate measure of just compensation when the government takes private property is the fair market value of the land taken. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984) (citing *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511-13 (1979)) (noting that just compensation "means in most cases the fair market value of the property on the date it is appropriated"). Because property values invariably shift over time, the parties' expert witnesses will need to rely on the value of the underlying property at a particular point in time to accurately determine the value of the flowage easement taken. *See United States v. Clarke*, 445 U.S. 253, 258 (1980) ("The value of property taken by a governmental body is to be ascertained as of the date of taking.") (citing *United States v. Miller*, 317 U.S. 369, 374 (1943)).

The parties dispute the date of the taking. The government contends that the date of taking aligns with the time construction of the dams reached completion in the 1940s, *see* Def.'s Mot. at 5, a date which, given the rural and undeveloped nature of the properties in question at that time, would yield a fair market value much less than that for the properties in their improved state as residences at the time of flooding during Tropical Storm Harvey. In the government's view, the court "expressly premised" its liability finding "on the creation of a condition that has existed since the dams were designed and constructed in the 1940s." *Id.* at 4. In other words, the government contends that because the conditions making eventual flooding probable had long existed, rendering the taking foreseeable dating back to the time of construction, the taking must have occurred well before Harvey's floodwaters physically invaded plaintiffs' properties. On that understanding, the government looks to when the dams' construction concluded, identifying the date of taking as February 1945 for properties upstream of the Barker Dam and December 1948 for the properties upstream of the Addicks Dam. *Id.* at 6. Plaintiffs counter, however, that "binding authority dictates that the date of the government's physical invasion determines the date of the tak[ing]." Pls.' Cross-Mot. at 3. That reasoning leads plaintiffs to conclude that the date of taking should be established as August 30, 2017—the day on which the impounded flood waters reached their highest elevation as a result of Tropical Storm Harvey, or, in other words, the government's "maximum physical possession." *Id.* at 3-4.

The court finds the authority cited by plaintiffs convincing and the reasoning put forward by defendant flawed.  "When a taking occurs by physical invasion . . . the usual rule is that the time of the invasion constitutes the act of taking, and 'it is that event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued.'"  *Clarke*, 445 U.S. at 258 (quoting *United States v. Dow*, 357 U.S. 17, 22 (1958)); *see also National Food & Beverage Co. v. United States*, 105 Fed. Cl. 679, 695 (2012) ("A physical taking begins when the government's action interferes with or substantially disturbs the owner's use and enjoyment of the property.  Typically this is the date when the government actually takes possession of the land or other property."); *King v. United States*, 205 Ct. Cl. 512, 518 (1974) ("The time of taking is the date the United States enters into possession.").  While it may be possible for the government to take property prior to any physical invasion or, in a context like this one, before the flooding occurs, to rise to the level of a taking such pre-invasion "interference must be so complete as to deprive the owner of all or most of his interest in the subject matter."  *National Food & Beverage*, 105 Fed. Cl. at 695 (citation and internal quotations omitted).

Water in the Addicks and Barker Reservoirs had never exceeded government-owned land until April 2016, and impounded water did not inundate any structures even at that time.  *See In re Upstream Addicks & Barker*, 146 Fed. Cl. at 240.  Thus, no physical invasion of the property existed until at least that time.  Furthermore, the rapid and extensive development of land within the reservoirs from the time they were built until the occurrence of Tropical Storm Harvey plainly suggests that the mere construction of the dams did not constitute interference "so complete as to deprive the owner of all or most of his interest in the subject matter."  *National Food & Beverage*, 105 Fed. Cl. at 695 (citation and internal quotations omitted).  Consequently, the taking could not have occurred earlier than 2016, and the level of inundation at that time was insufficiently severe, *i.e.*, only streets and parts of lawns, to establish a successful taking claim.  As the court determined in its liability opinion, however, the "significant harm" caused by the government-induced flooding during and after Tropical Storm Harvey, "almost entirely prevent[ed] [] normal use and enjoyment [of the properties]" and was sufficiently severe to constitute a taking.  *In re Upstream Addicks & Barker*, 146 Fed. Cl. at 251.  That physical invasion of plaintiffs' properties began on August 28, 2017 and "crested at a record pool elevation of 101.6 feet in Barker and 109.1 feet in Addicks on August 30, 2017."  *Id.* at 241.  The appropriate date of taking for assessing just compensation is therefore the date on which the government's physical possession of the property during the Harvey event reached its highest level—August 30, 2017.

The government rejects this conclusion solely by reference to analysis in the court's liability opinion, insisting that the court's reasoning reaches back to the 1940s.  Def.'s Mot. at 4-5.  The language that the government cites in the liability opinion related to the court's analysis under the multi-factor test set forth in *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 38-39 (2012).  That analysis provides a mechanism for determining whether the government's actions amounted to a compensable taking, and under that legal framework the foreseeability of government-induced flooding supports the finding of a taking.  *See In re Upstream Addicks & Barker*, 146 Fed. Cl. at 254-56.  Foreseeability alone, however, has little bearing on the date of the taking itself.  The liability opinion's discussion of the construction, maintenance, and operation of the dams largely served to define the government's action as a taking rather than a tort, specifically whether the eventual government-induced flooding was foreseeable—*i.e.*, "the predictable result" or "natural or probable consequence" of the government's actions.  *Id*. at 254 (citations and internal quotations omitted).  That reasoning is

not particularly pertinent to the specific date the taking occurred. Moreover, the government's physical changes to the dams since the 1940s, as well as their subsequent maintenance and operation, created the conditions under which a taking claim could arise, but no such claim existed until the impoundment of water took place. As the court previously explained, "[c]laims accrue when . . . plaintiffs can file suit and obtain relief," but plaintiffs cannot sue and obtain relief for a taking—and thus their claims have not accrued—until they "actually experience" a taking. *In re Upstream Addicks & Barker*, 138 Fed. Cl. 658, 666-67 (2018) (citations and internal quotations omitted) (deferring ruling on government's motion to dismiss ); s*ee also Stueve Bros. Farms, LLC v. United States*, 105 Fed. Cl. 760, 764 (2012), *aff'd*, 737 F.3d 750 (Fed. Cir. 2013) (noting that "the apprehension of future flooding created by flood control legislation and the beginning of construction does not impose a flowage easement on a property that may be burdened by future flooding" if no flooding is actually experienced). Moreover, in finding these claims within the six-year statute of limitations set forth in 28 U.S.C. § 2501, the court already determined that "plaintiffs' claims [began to accrue] no earlier than 2016 and more likely in 2017." *In Upstream Addicks & Barker*, 138 Fed. Cl. at 666. In sum, a taking simply could not have occurred nearly three quarters of a century before plaintiffs' claims began to accrue.

### B. Scope of the Taking

The parties also contest the scope of the permanent flowage easement taken by the government's actions. The government asserts that the court's liability opinion premised its conclusion "on a belief that the design and construction of the dams imposed a condition on the subject upstream properties under which flooding from reservoir pools m[ight] occur," such that "occasional flooding from the reservoir flood pools m[ight] exceed the government-owned land elevation and reach up to the maximum design spillway elevations of each dam." Def.'s Resp. at 3 (citations omitted). Relying on the court's finding that these elevations were 114.6 feet for Addicks Reservoir and 106.4 feet for Barker Reservoir, the government contends that these maximum design spillway elevations "necessarily delineate the geographic and physical extent of the easements that the [c]ourt concluded the United States [took]." *Id.* Plaintiffs, however, maintain that the geographic scope of the easement taken "should be no more than the maximum area, defined in terms of elevation, that the United States took physical possession of through its government-induced flooding on August 30, 2017." Pls.' Cross-Mot. at 9. On that date, plaintiffs note, "the reservoir pools behind the Addicks and Barker [D]ams reached their maximum levels at 109.1 feet and 101.6 feet, respectively, for the Addicks and Barker [R]eservoirs." *Id.* (citation omitted). The government's proposed limits, plaintiffs observe, are "substantially higher than the . . . reservoir pool[s] on August 30, 2017." *Id.* In sum, the parties dispute whether the geographic scope of the easement should encompass the entire maximum design spillway elevation (as the government asserts) or merely the maximum elevation of the pools actually impounded during the Harvey event (as plaintiffs contend). Ultimately then, the parties disagree about whether the easement's scope is broader than the extent of the water's physical invasion.

The question of how far the taking reached is to some extent answered by determining when the taking occurred. As noted previously, the date of the taking in this context generally cannot precede the physical invasion itself because usually no taking could occur until that time. Likewise, the scope of the taking must also be determined by reference to the extent of the

4

physical invasion. If, as the Supreme Court has held, "the time of the invasion constitutes the act of taking," *Clarke*, 445 U.S. at 258, and "[t]he time of taking is the date the United States enters into possession," *King*, 205 Ct. Cl. at 518 (citation omitted), then it reasonably follows that the extent of the taking cannot stretch beyond the reach of the corresponding physical invasion. The natural implication is that no taking occurs until water enters the property, and the scope of the easement must be defined accordingly; it may not extend beyond areas of actual inundation. Applying that reasoning here indicates that the scope of the easement taken by the impoundment of flood pools beyond government-owned land must be determined by the actual elevation of the maximum water levels—not, as the government contends, by reference to the amount of water the dams were designed and subsequently modified to impound. While it may have been conceptually possible for the taking to extend all the way to the maximum design spillway elevation, the water did not spread that far and thus the maximum design spillway elevation is not salient to defining the scope of the easement taken. Instead, the easement should be defined by reference to the elevation of the pools at their highest level on August 30, 2017, *viz.*, 101.6 feet in Barker and 109.1 feet in Addicks. *See In re Upstream Addicks & Barker*, 146 Fed. Cl. at 241. Within the parameters of those elevation specifications, the government took a permanent flowage easement, leaving plaintiffs a fee simple interest in their properties which allows them to continue their lawful use subject to the risk of occasional flooding caused by the operation of the Addicks and Barker Dams. Finally, for clarification, the court notes that the taking also encompassed—as a consequential result of the flowage easement taken—plaintiffs' personal property, fixtures, and improvements damaged or destroyed by the flood event that climaxed on August 30, 2017. *See In re Upstream Addicks & Barker*, 146 Fed. Cl. at 247 n.17.

The parties dispute several matters concerning the scope of rights reserved by landowners and the scope of rights obtained by the easement holder. *See, e.g.*, Pls.' Cross-Mot. at 10-13; Def.'s Resp. at 4-7. Most of these contested points involve the rights and obligations of the parties in the event of potential future flood events—such as whether plaintiffs may recover for future flood damage to personal property within the easement, *see* Pls.' Cross-Mot. at 4—and need not be addressed here. *See, e.g.*, *United States v. Cress*, 243 U.S. 316, 329 (1917) (noting that "when less than the whole has been taken" the scope of the taking should be defined in terms of what "is necessary fairly to effectuate the purpose of the taking"). The purpose of the court's opinion is to guide the parties' expert witnesses in evaluating the measure of just compensation due for the non-categorical taking of a permanent flowage easement on the six bellwether properties, and, as such, the court need not address each of these hypothetical disagreements to provide sufficient guidance to inform a reasoned valuation assessment in preparation for a trial on damages.[1]

---

[1]The court recognizes the possibility that future government-induced flood pools may extend beyond the highest elevation generated by Tropical Storm Harvey, and, as the court now defines the easement taken by reference to the water level that occurred during that storm, it is conceivable that the government could take additional property above that elevation in the future, thereby giving rise to a potential second taking claim. *See, e.g.*, *LaBruzzo v. United States*, 144 Fed. Cl. 456, 471-73 (Fed. Cl. 2019).

## CONCLUSION

For the reasons stated, the government's motion to clarify is DENIED and plaintiffs' cross-motion is GRANTED IN PART AND DENIED IN PART. Expert discovery shall proceed in accordance with the conclusions regarding the date of the taking and the scope thereof set forth in this opinion.

It is so **ORDERED**.

                                              s/ Charles F. Lettow
                                              Charles F. Lettow
                                              Senior Judge