## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

In re UPSTREAM ADDICKS AND BARKER
(TEXAS) FLOOD-CONTROL RESERVOIRS

Sub-Master Docket No. 17-9001L

THIS DOCUMENT APPLIES TO:

Judge Charles F. Lettow

ALL UPSTREAM CASES

## PLAINTIFFS' JUST COMPENSATION POST-TRIAL REPLY BRIEF

Daniel H. Charest
E. Lawrence Vincent
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
469-904-4550
dcharest@burnscharest.com
lvincent@burnscharest.com
   *Co-Lead Counsel, Upstream Pre-Trial
   Discovery and Dispositive Motions*

   *Co-Lead Counsel for Upstream Plaintiffs as to
   Jurisdictional Discovery, Motion to Dismiss,
   and Scheduling*

Charles Irvine
IRVINE & CONNER PLLC
4709 Austin Street
Houston, Texas 77004
713-533-1704
charles@irvineconner.com
   *Co-Lead Counsel, Upstream Pre-Trial
   Discovery and Dispositive Motions*

Edwin Armistead "Armi" Easterby
THE EASTERBY LAW FIRM, P.C.
1502 Glourie Dr.
Houston, Texas 77055
713-230-2200
armi@easterbylaw.com
   *Co-Lead Counsel, Upstream Pre-Trial
   Discovery and Dispositive Motions*

Vuk S. Vujasinovic
VB ATTORNEYS, PLLC
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713-224-7800
vuk@vbattorneys.com
   *Of Counsel for Upstream Plaintiffs as to
   Jurisdictional Discovery, Motion to Dismiss, and
   Scheduling*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STANDARD FOR DECISION .....................................................................................2

ARGUMENT ...............................................................................................................4

I.      The Archetype of the Government's Perfidy: Frank Lucco. ...........................5

        A.      Lucco's work failed to produce the fundamental requirement for opining to just compensation: a credible before-and-after valuation. .........................6

        B.      The government's fallback position that "market knowledge" is a valid proxy for the existence of a flowage easement on a property sold without the burden of a flowage easement must be rejected. ........................................9

        C.      The government's tertiary stance—that "market knowledge" of the "conditions of the easement" results in a "pricing in" of the property rights lost by the taking of a flowage easement—likewise fails. ...................13

        D.      The government's Maginot Line—that statements in the press and on the internet should be accepted as proof of sufficient "market awareness" of the "conditions of the easement," – i.e., that specific properties flooded during Harvey because of the Addicks and Barker Dams, to overcome the lack of evidence of After Scenario sales which transferred the property interest to be valued in this case—fails. ...................15

        E.      The government must be held accountable for the Lucco debacle and its attempts to completely evade its consequences rejected. ..........................16

II.     The Attempts by Government Witnesses to Dodge the Facts. .....................21

        A.      The attempt to minimize the impact of the permanent flowage easement. ...............................................................................................21

                1.      Paula Johnson-Muic. ...............................................................21

                2.      Timothy Nelson. ......................................................................24

                3.      Colonel Timothy Vail. ............................................................25

        B.      The government's attempt to minimize the future induced flood risk of Plaintiffs' properties within the Addicks and Barker Reservoirs. ............26

III.    The Government's Illegitimate "Offsets" to Just Compensation. ................30

IV.     The Government's Disregard for the Court's Liability Decision and Previous Rulings. ..............................................................................................34

V.    The Government's Ineffectual Challenges to Plaintiffs' Proof. ................................38

    A.    The Compensation Due for the Rights Taken in Acquiring the Permanent Flowage Easement. ..................................................39

    B.    None of the government's attacks even touch Plaintiffs' evidence. ...........41

        1.    The testimony and opinions of Mr. Robert Philo. ........................41

        2.    The testimony and opinions of Dr. Randall Bell. ..........................44

        3.    The testimony and opinions of Matt Deal. ....................................48

        4.    The testimony and opinions of Tim Archibald. ............................53

        5.    The testimony and opinions of Dr. Philip Bedient. ......................57

    C.    The Compensation Due for the Temporary Loss of Use Each Plaintiff Suffered. ........................................................................60

    D.    The Compensation Due for the Personal Property Taken. ...........................61

        1.    Kulwant Sidhu has made no claim for lost profits or any other "consequential damages." ..............................................63

        2.    Scott Holland lost personal property and a leasehold—real property that the government perversely argues is not compensable. ........................................................64

        3.    The government's opposition to the amounts sought by Catherine Popovici are without merit. ................................66

        4.    The government's objections to the personal property recovery sought by Christina Micu are unsupported and, frankly, offensive. ........................................................68

        5.    Conclusion re personal property lost: The government's disingenuous ploys to evade responsibility must be rejected. ..........................70

    E.    There is no such thing as an incremental taking. ........................................72

    F.    The compensation due for the time value of the unpaid compensation. ..................................................................73

CONCLUSION ......................................................................................75

CERTIFICATE OF SERVICE .............................................................78

# TABLE OF AUTHORITIES

**Cases**

*2,953.15 Acres of Land, More or Less, in Russell Cnty., State of Ala. v. United States,*
  350 F.2d 356 (5th Cir. 1965) ................................................................................................40

*Almota Farmers Elevator & Warehouse Co. v. United States,*
  409 U.S. 470 (1973) ............................................................................................... 34, 69

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
  303 F.3d 256 (2d Cir. 2002) ................................................................................................18

*Arkansas Game & Fish Comm'n v. United States,*
  736 F.3d 1364 (Fed. Cir. 2013) ..........................................................................................71

*Baker v. City of McKinney,*
  No. 4:21-CV-00176, 2022 WL 2298974 (E.D. Tex. June 21, 2022) ....................................65

*Bauman v. Ross,*
  167 U.S. 548 (1897) ............................................................................................... 30, 33

*Brown v. Frontier Theatres, Inc.,*
  369 S.W.2d 299 (Tex. 1963) ..............................................................................................61

*Capreal, Inc. v. United States,*
  99 Fed. Cl. 133 (2011) .......................................................................................................39

*Cedar Point Nursery v. Hassid,*
  141 S. Ct. 2063 (2021) .........................................................................................................2

*Cienega Gardens v. United States,*
  33 Fed. Cl. 196 (1995) .......................................................................................................35

*Coconut Grove Ent., Inc. v. United States,*
  46 Fed. Cl. 249 (2000) .......................................................................................................64

*Columbia Basin Orchard v. United States,*
  132 F. Supp. 707 (Ct. Cl. 1955) ...........................................................................................5

*Complete Logistical Servs., LLC v. Rulh,*
  394 F. Supp. 3d 625 (E.D. La. 2019) ..................................................................................17

*Eaton v. Courtaulds of N. Am., Inc.,*
  578 F.2d 87 (5th Cir. 1978) ................................................................................................39

*Eyheraide v. United States,*
  170 Fed. Cl. 598 (1965) .....................................................................................................60

*Guillory v. Domtar Industries, Inc.,*
  95 F.3d 1320 (5th Cir. 1996) ..............................................................................................18

*Hardy v. United States,*
  141 Fed. Cl. 1 (2018) ..............................................................................................47, 54, 73

*Hendler v. United States,*
  175 F.3d 1374 (Fed. Cir. 1999) ..............................................................................5, 30, 33

*Horne v. Dep't of Ag.*,
  576 U.S. 350 (2015) ............................................................................................. 38, 60

*Horton v. Mills Cty.*,
  468 S.W.2d 876 (Tex. Civ. App. 1971) .................................................................. 40

*In re City of Cent. Falls, R.I.*,
  468 B.R. 36 (Bankr. D.R.I. 2012) .......................................................................... 12

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*,
  146 Fed. Cl. 219 (2019) ................................................................................... passim

*In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*,
  148 Fed. Cl. 274 (2020) .......................................................................................... 38

*Innovair Aviation, Ltd. v. United States*,
  72 Fed. Cl. 415 (2006) ............................................................................................ 61

*Jackson v. United States*,
  155 Fed. Cl. 689 (2021) .................................................................................. passim

*Johnson v. United States*,
  2 Ct. Cl. 391 (1866) ................................................................................................ 37

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979) .................................................................................................. 2

*Karuk Tribe of Cal. v. Ammon*,
  209 F.3d 1366 (Fed. Cir. 2000) .......................................................................... 38, 60

*Kestenbaum v. Falstaff Brewing Corp.*,
  514 F.2d 690 (5th Cir. 1975) .................................................................................. 62

*Leigh v. Village of Los Lunas*,
  108 P.3d 525 (NM Ct. App. 2005) ............................................................................ 8

*Lost Tree Vill. Corp. v. United States*,
  115 Fed. Cl. 219 (2014) .......................................................................................... 19

*Mathis-Kay v. McNeilus Truck & Mfg., Inc.*,
  No. 06-CV-815S, 2011 WL 4498386 (W.D.N.Y. Sept. 27, 2011) .......................... 18

*McCann Holdings, Ltd. v. United States*,
  111 Fed. Cl. 608 (2013) .......................................................................................... 51

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) .................................................................................. 17

*Nat'l Food & Bev. Co. v. United States*,
  103 Fed. Cl. 63 (2012) ............................................................................................ 20

*Nat'l Food & Beverage Co. v. United States*,
  105 Fed. Cl. 679 (2012) .......................................................................................... 20

*Olson v. United States*,
  292 U.S. 246 (1934) .................................................................................................. 2

*Pop v. Yarborough,*
  354 F. Supp. 2d 1132 (C.D. Cal. 2005) ................................................................. 18

*Rasmuson v. United States,*
  807 F.3d 1343 (Fed. Cir. 2015) .......................................................................... 6

*Rogers v. United States,*
  96 Fed. Cl. 472 (2011) ...................................................................................... 51

*Seaboard Air Line Ry. Co. v. United States,*
  261 U.S. 299 (1923) ............................................................................ 65, 72, 73

*Sears v. United States,*
  132 Fed. Cl. 6 (2017) ......................................................................................... 9

Severance v. Patterson,
  370 S.W.3d 705 (Tex. 2012) ............................................................................ 39

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.,*
  289 U.S. 689 (1933) ......................................................................................... 61

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
  282 U.S. 555 (1931) .................................................................................. 62, 64

*Tattoli v. United States,*
  2018 WL 3689546 (M.D. Fla. Aug. 3, 2018) ................................................... 12

*Taylor Foundry Co. v. Wichita Falls Grain Co.,*
  51 S.W.3d 766 (Tex. App.—Fort Worth 2001, no pet.) .................................... 39

*Textainer Equip. Mgmt. Ltd. v. United States,*
  99 Fed. Cl. 211 (2011) ...................................................................................... 73

*Tolan v. City of Bellaire,*
  No. CV H-09-1324, 2015 WL 12765413 (S.D. Tex. Aug. 28, 2015) ................ 18

*Twin Lakes Reg'l Sewer Dist. v. Teumer,*
  992 N.E.2d 744 (Ind. Ct. App. 2013) ................................................................. 8

*U.S. ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.,*
  40 F. Supp. 811 (E.D. Tenn. 1941) ............................................................ 49, 50

*United States v. 2,847.58 Acres of Land,*
  529 F.2d 682 (6th Cir. 1976) ............................................................................ 50

*United States v. 46,672.96 Acres of Land,*
  521 F.2d 13 (10th Cir. 1975) .............................................................................. 6

*United States v. 564.54 Acres of Land,*
  441 U.S. 506 (1979) ........................................................................................... 3

*United States v. Chicago, B. & Q.R. Co,*
  90 F.2d 161 (7th Cir. 1936) ............................................................................. 40

*United States v. Chicago, B. & Q.R. Co.,*
  82 F.2d 131 (8th Cir. 1936) ............................................................................. 40

*United States v. Clarke,*
   445 U.S. 253 (1980) ................................................................................................. 59

*United States v. Dickinson,*
   331 U.S. 745 (1947) ................................................................................... 2, 37, 40

*United States v. Gen. Motors Corp.,*
   323 U.S. 373 (1945) ................................................................................................... 6

*United States v. Miller,*
   317 U.S. 369 (1943) ................................................................................................. 38

*United States v. North American Transportation & Trading Co.,*
   253 U. S. 330 (1920) ............................................................................................... 72

*United States v. River Rouge Improvement Co.,*
   269 U.S. 411 (1926) ................................................................................................... 5

United States v. Todd,
   627 F.3d 329 (9th Cir. 2010) ................................................................................. 12

*United States v. Va. Elec. & Power Co.,*
   365 U.S. 624 (1961) ................................................................................................. 38

*United States v. Virginia Electric & Power Co.,*
   365 U.S. 624 (1961) ................................................................................................. 46

*Vaizburd v. United States,*
   384 F.3d 1278 (Fed. Cir. 2004) ............................................................................. 19

*Waverley View Investors, LLC v. United States,*
   136 Fed. Cl. 593 (2018) .......................................................................................... 73

*Yuba Nat. Resources, Inc. v. United States,*
   904 F.2d 1577 (Fed. Cir. 1990) ............................................................................. 59

**Other Authorities**

Uniform Appraisal Standards for Federal Land Acquisitions § 4.4.2.4 (Interagency
   Land Acquisition Conference 2016) .............................................................. passim

## INTRODUCTION
### The Government's Chicanery

The sole issue before this Court is the determination of just compensation owed to Plaintiffs for the losses they suffered due to the United States taking a permanent flowage easement over their properties by inundating them with contaminated Category 3 black water, "*i.e.*, water with 'a greater potential to harbor pathogens, including sewage, chemicals, fertilizer, and organic material.'" *In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 252 (2019). But only Plaintiffs offered reliable, useful evidence on the actual subject. And that evidence showed ranges in diminished values between 80% and 100% for Plaintiffs property rights.

By contrast, the government retreated to an alternative reality in which the U.S. Army Corps of Engineers' top real estate professionals <u>cannot</u> explain, without further consultation with its attorneys years <u>after</u> the Court issued not one but three rulings on the scope and nature of the easement, what effects the easement will have on Plaintiffs' rights. But—at the same time according to the government—market participants who transacted <u>before</u> any of those same rulings <u>divined</u> their rights and the effect of the easement such that their transactions reflect valid market prices for the easement's impact on value. And the government maintains this assertion despite the admitted fact that each market participant expressly disclaimed the existence of an easement on the transacted property.

The government's sole appraiser testified that <u>he</u> needed to review the Court's three orders to understand the easement's terms to value it properly—but nevertheless he used market sales data that <u>predated each of those orders by months and years</u>. Then, when faced with the reality that the "market data" which underlies its appraiser's analysis all predates the declaration of an easement, the government pivoted to assert that the "conditions that led to the easement" (whatever that means) were sufficient for market participants to know <u>both</u> the existence and terms of the easement—never

mind the fact that the government had argued for years (and still maintains) that these identical conditions do not constitute a taking at all.

Beyond the government's appraisal fiasco, the hydrology/frequency experts for the United States repeatedly had their ends-driven work undermined, corrected, and shown to support Plaintiffs' position. The trial record exposes not only the foundational flaws in the government's positions but also the duplicitous nature of its witnesses, necessitating that the government resort to terminally flawed appraisals, demonstrably bad science, and obviously inconsistent factual assertions because, absent obfuscation, the government cannot avoid the obvious: the government's taking constitutes a huge percentage of the overall value of the affected properties.

Plaintiffs seek an award of just compensation for the permanent flowage easement taken by the government measured by the severe diminution in value of their real property caused by the loss of the right to exclude government entry onto that property by flooding it, the lost right to use that property for a significant period of time, and the lost right to use (and alienate) their personal property destroyed during the government's taking of its permanent flowage easement. They want, deserve, and are entitled to be made whole.

**STANDARD FOR DECISION**
**The Constitutional Mandate: "for all that the Government takes it must pay."**
***United States v. Dickinson*, 331 U.S. 745 (1947).**

The government owes a categorical duty to pay sufficient just compensation for this physical taking to put each Plaintiff "in as good a position pecuniarily as if his property had not been taken." *Olson v. United States*, 292 U.S. 246, 255 (1934). "When the government physically acquires private property for a public use, the Takings Clause obligates the government to provide the owner with just compensation. The Court assesses such physical takings using a *per se* rule: The government must pay for what it takes." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

Determination of just compensation entails an "ad hoc, factual inquiry" which "derives as much content from the basic equitable principles of fairness as it does from technical concepts of property law." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979). The inquiry is designed to determine the market value of the property rights taken at the time of the taking. *Jackson v. United States*, 155 Fed. Cl. 689, 702 (2021). In practical terms, just compensation is that amount which "a willing buyer would pay in cash to a willing seller at the time of the taking." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (emphasis added).

As this Court has recognized, "at the time the government took its permanent flowage easement" means that a hypothetical willing buyer would be purchasing a property still full of Category 3 black water, that would need months of expensive repair during which it could not be used, and which came with significant amounts of ruined personal property having no salvage value. At trial, Dr. Randall Bell, provided a more sober description:

> Well, in this case, the date of value is August 30th, 2017. . .. I'm basically and hypothetically standing in the living room with the water up to my knees or soggy carpet with the destroyed drywall and cabinetry and so on and so forth. It's as if you're putting a for-sale sign on that property in that destructive condition.
>
> . . .
>
> In this particular case, hypothetically, you would also know that there's a flowage easement as of that date placed on the property which allows the government to inundate the property not on a permanent basis in terms of a lake, but on a periodic basis, which basically is something – means something less than permanent.
>
> . . .
>
> Well, as of that date of value, if there's a future and when there's a future occurrence, it's – you've given that right away. You've basically – it severs the bundle of rights. The bundle of rights is the right to enjoy and the right to occupy. And so an easement goes onto title reports, and it is the right to occupy – instead of saying I can – I and my family and whoever we choose to have in the house can occupy our house, and choose who occupies it, you've now – I don't want to use the word "invited," but you now share occupancy with the government, who can also occupy the interior of that house, meaning literally living rooms, kids' bedrooms, kitchens, dining rooms, with water on a periodic basis when they choose to do it.
>
> . . .

> And you are informed that at any time, the government can park water inside your property, that goes in perpetuity. It's forever. So the compensation paid is to cover it for the fee simple – or for the – the rest of the – the life of the property. [1]

That is the "After Scenario" confronting each "willing buyer." That is the scenario which must serve as a reality check on the arguments and positions put forward by the government. And only Plaintiffs valued the property interest in question (a permanent flowage easement described by the Court) in the proper condition (after the property in question had suffered flooding). The government wholly failed.

## ARGUMENT

By not only ignoring the point of the exercise but also rewriting reality, the government tries to escape (or significantly reduce) its obligation to pay just compensation. Entwined with attempts to minimize the force of this Court's liability finding are pages of irrelevant, illegitimate, and untenable arguments which should, at each turn, be ignored, rejected, and exposed for their disingenuity. Much of the government's post-trial brief (ECF 570) urges the Court to accept contentions that are either legally irrelevant to the valuation of the property rights taken or constitute outright error.

- The government's brief touts the history and benefits of the Buffalo Bayou and Tributaries Project when it knows the Plaintiffs received <u>none</u> of those benefits and, instead, shouldered the risk and burden of providing those benefits to the citizens of Houston.[2]

- The government admits that the determination of just compensation "must be based on the Court's liability rulings," but then edits its articulation of those rulings with incomplete quotations that discard the portions it finds burdensome.[3]

---

[1] Tr. 1829:12-20, 1829:24-1830:5, 1830:9-22, 1831:5-10 (Bell).

[2] ECF 570, at 12-14; *In re Upstream*, 146 Fed. Cl. at 253-54 ("In the case of Addicks and Barker, the government received a notable benefit at the expense of the upstream private property owners. That the dams protected downstream Houston is not the point. It suffices to say that, consistent with the purpose for the construction of the Addicks and Barker flood-control projects, the government protected downstream properties from an estimated $7 billion in losses during Harvey, while concurrently causing upstream properties to suffer from severe flooding. . .. Notably, here the same actions which benefitted the downstream properties are those which caused harm to plaintiffs." (cleaned up)).

[3] ECF 570, at 22 (omitting Court's finding that compensation is owed for Plaintiffs' personal property and fixtures which were damaged or destroyed by the government's flooding).

- The government asks the Court to deny compensation due Plaintiffs based on amounts they received which cannot, as a matter of law, be applied to offset the compensation due.[4]

- Indeed, the government proclaims that "no plaintiffs have alleged and proven that the Corps was negligent on the operation of [the] dams during Harvey."[5] That is certainly correct. But it is also irrelevant. Plaintiffs have not plead a legal theory under which they cannot recover.[6]

The Court should reject the government's denigration of the devastating losses suffered by each Plaintiff and the tactics it employs to do so.

## I.     The Archetype of the Government's Perfidy: Frank Lucco.

There is no way to sugar coat the government's cheek in promoting its position regarding valuation of the permanent flowage easement taken in this case, the prime exemplar being the testimony of its appraisal expert, Frank Lucco. In countenancing Lucco's choice to use a sales comparison approach without having any legitimately comparable sales that transferred the property interest to be valued, the government—by design—avoided looking at the core issue in the case. These missteps drive After values that similarly avoid valuing the easement. And, by presenting Lucco's work as valid (after having instructed him to violate the mandatory UNIFORM APPRAISAL STANDARDS FOR FEDERAL LAND ACQUISITIONS § 4.4.2.4, at 123 (Interagency Land Acquisition Conference 2016) (hereafter the "YELLOW BOOK"), the government invites reversible error. The Court should reject the government's invitation.

---

[4] ECF 570, at 93 (arguing government benefits that "inured specifically to the Plaintiffs who received the benefits" should be offset against the compensation due but providing no legal authority or support for the twisting of the actual legal standard which permits offset only for benefits "which arise directly and proximately to the remaining land as a result of the public work on the part taken," *see Hendler v. United States*, 175 F.3d 1374, 1380 (Fed. Cir. 1999) (citing *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 415-16 (1926)).

[5] ECF 570, at 61 n.80.

[6] *See Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 710 (Ct. Cl. 1955) (recognizing that "in no case has the Supreme Court ever indicated that an accidental or negligent impairment of the value of property constitutes a taking").

**A.      Lucco's work failed to produce the fundamental requirement for opining to just compensation: a credible before-and-after valuation.**

The government identifies the correct methodology as "the before-and-after method, i.e., the difference between the value of the property before and after the Government's easement was imposed."[7] As the government notes, "determining the market value of the subject properties both before the taking (without the easement) and after the taking (with or subject to the easement) is the correct methodology."[8] But the government did no such thing.

The government's sole witness on the critical issue before the Court—the valuation of Plaintiffs' properties both before the taking (without the easement) and after the taking (with the easement)—did not execute that methodology. For both the Before and the After Scenarios, Lucco claimed to have used a sales comparison approach to assess the values of Plaintiffs' properties.[9] Plaintiffs do not dispute that Lucco used a sales comparison approach in the Before Scenario.[10] But Lucco's attempt to use the comparable sales approach to formulate opinions of value in the After Scenario must be rejected altogether for many independent reasons.[11] Whatever Lucco did for the After Scenario, he did not measure the value of a flowage easement imposed on a just-flooded home.

The After Scenario in this case involves a property burdened with a permanent flowage easement—and it is that property interest which must be valued. *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379 (1945) ("the compensation to be paid is the value of the interest taken"); *see also* YELLOW BOOK § 4.4.2.4, at 123 (government appraiser cannot rely on a sale "involving a different property

---

[7] *See* ECF 570, at 13 (quoting *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015)).

[8] ECF 570, at 13.

[9] Tr. 2114:7-13 (Lucco).

[10] For reasons described in trial, Plaintiffs' experts did the Before appraisals better. But at least Lucco used correct methods in the Before Scenario.

[11] *See* DX 1002 (Banker), DX1003 (Burnham), DX 1004 (Micu), DX1005 (Popovici), and DX1006 & DX 1007 (Sidhu).

interest than the property under appraisal" (citing *United States v. 46,672.96 Acres of Land*, 521 F.2d 13, 17 (10th Cir. 1975). The Court defined the easement in a series of three orders: on December 17, 2019, the Court declared the existence of an easement by finding the government liable for a taking (ECF 260); on April 30, 2020, the Court issued an order on the scope of the easement in which it described the date of taking, its physical extent, and the permanent nature of the easement, but confirmed that residual fee owners could continue lawful use of properties subject to the risk of occasional flooding caused by operation of the Addicks and Barker dams (ECF 283); and, on June 11, 2021, the Court provided further clarification on the easement (ECF 381). And Lucco testified that he, an appraiser with over 40 years of experience, needed to review these orders to understand the easement's terms.[12]

The sales data used by Lucco to render his opinion of value for the After Scenario consists of 35 transactions spread over his six reports.[13] None of the sales Lucco used for his After Scenario valuations involved the transfer of a property actually burdened by a flowage easement. Every sales transaction Lucco used for every report he furnished—and every opinion he—valued the transfer of fee simple ownership of a property without an easement:

> Q. Are you aware of the yellow book rule that requires that market transactions involve the property interest, the conveyance of the property interest that is being measured?
>
> A. Yes.
>
> Q. All right. And the point there is that when you do a paired sales analysis, the concept, the best thing you could get is two properties that are alike in every

---

[12] Tr. 2128:10-2131:6 (Lucco) ("Q. All right. So at least as of that – the time of your instruction, you required references to documents dated December 17, 2019, April 3rd, 2020, and June 11, 2021, in order to understand the terms of this easement, correct? A. Yes."); *see also* DX 1011 (referring to ECF 260, ECF 283, and ECF 381 and telling Lucco that the Court orders "collectively define the nature and scope of the flowage easement").

[13] *See* DX 1002, at UPEXPERTREPORT_11238-42 (Banker); DX 1003, at UPEXPERTREPORT_ 11355-66 (Burnham); DX 1004, at UPEXPERTREPORT_11471-78 (Micu); DX 1005, at UPEXPERTREPORT_11577-81 (Popovici); DX 1062, at UPEXPERTREPORT_11655-59 (Sidhu Unit 603); DX 1007, at UPEXPERTREPORT_11740-44 (Sidhu Unit 604).

respect except for the one characteristic, and then the difference in price reflects that characteristic, right?

A. That's ideal, yes.

Q. Right. And that -- in order to measure an easement, the thing that should be measured is a transaction involving a knowledgeable seller and a knowledgeable buyer and the conveyance of a property subject to an easement, right?

A. Yes.[14]

Q. Is it true, sir, that as to every one of the transactions that you looked at for your after market sales, the estate that was conveyed is fee simple?

A. Yes.[15]

Q. The easement's not recorded, right?

A. That's my understanding.

Q. Right. So whatever those transactions were, they did not involve a recorded easement on a residential property, correct?

A. That's correct.[16]

Full stop. <u>None of the sales in Lucco's After Scenario analysis involved a property burdened by a flowage easement</u>—the property interest taken by the government in this case. Therefore, Lucco's claim to have followed the Before and After methodology as set forth in the Yellow Book, and that he could use the sales comparison approach for his After Scenario values, are simply false. And any reliance on the "valuation" evidence Lucco proffered would be *per se* reversible error. *See Twin Lakes Reg'l Sewer Dist. v. Teumer*, 992 N.E.2d 744, 749 (Ind. Ct. App. 2013) (admission of appraisal report in condemnation action that valued interest other than that taken was reversible error); *Leigh v. Village of*

---

[14] Tr. 2150:21-2152:7 (Lucco).

[15] Tr. 2176:23-2177:1 (Lucco). Lucco's admission is easily confirmed by a review of the appraisal reports he produced which <u>all</u> show that <u>every</u> comparable sale he used transferred fee Simple rights to the subject property. DX 1002, at UPEXPERTREPORT_11238-42 (Banker); DX 1003, at UPEXPERTREPORT_ 11355-66 (Burnham); DX 1004, at UPEXPERTREPORT_11471-78 (Micu); DX 1005, at UPEXPERTREPORT_11577-81 (Popovici); DX 1062, at UPEXPERTREPORT_11655-59 (Sidhu Unit 603); DX 1007, at UPEXPERTREPORT_11740-44 (Sidhu Unit 604)

[16] Tr. 2156:20-2157:1 (Lucco).

*Los Lunas*, 108 P.3d 525, 534 (NM Ct. App. 2005)) ("Neither the Leighs' testimony nor their appraiser's testimony provided sufficient evidence of the before and after fair market values of the property. We therefore find the erroneous admission of the appraiser's report to be reversible error.").

**B.    The government's fallback position that "market knowledge" is a valid proxy for the existence of a flowage easement on a property sold without the burden of a flowage easement must be rejected.**

Knowing that Lucco's appraisal work must be rendered in compliance with the YELLOW BOOK,[17] and that, as Lucco acknowledged, the YELLOW BOOK requires the comparable sales used be ones that transfers the property interest being valued,[18] Lucco's failure to meet the requisite standard meant that the government needed some way to justify presenting invalid evidence to this Court.

The answer came in the government's artifice that—in lieu of using sales which transferred the property interest at issue—Lucco could use comparable sales transactions <u>hypothesized</u> to have taken place between parties who had knowledge of the existence and terms of the yet-to-be-declared easement, and that would suffice to ensure each participant "priced in" the impacts of the nonexistent easement when negotiating the transaction.  According to the government, "the market" was "aware" of the easement (and its terms!) before the Court or the parties to this litigation. And, from that flawed, impossible hypothesis, the government says Lucco "analyzed the impact of the changed disclosure form and the Court's liability ruling on sales and concluded that they did not result in measurable

---

[17] Tr. 2084:16-20 (Lucco); *see also* DX (1011 letter of instruction from government to Lucco); *Hardy v. United States*, 141 Fed. Cl. 1, 10 (2018) ("The approach that government appraisers <u>are to follow</u> in opining on the value of land taken by the federal government is found in the Yellow Book." emphasis added); *Sears v. United States*, 132 Fed. Cl. 6, 12 n.8 (2017), *aff'd*, 726 F. App'x 823 (Fed. Cir. 2018) ("The Yellow Book sets forth the standards and methods to be applied in appraisals of land acquired by the federal government. In conducting such appraisals, professional appraisers must follow the terms of the Yellow Book as well as the general appraisal standards set forth by the Uniform Standards of Professional Appraisal Practices.").

[18] Tr. 2051:14-18 (Lucco).

changes in sale prices."[19] Pure fiction.

First, Lucco's testimony proves the government's fallback is false. Lucco repeatedly admitted that <u>none</u> of the actual market participants in the actual sales he used in his After Scenario were aware that <u>any</u> unrecorded flowage easement exists on the properties being transferred.[20]

Second, the record shows that the government's informational foundation for its premise is bogus. The "changed disclosure form and the Court's liability ruling on sales" touted by the government could not have provided the requisite "market awareness" to justify Lucco's use of the After Scenario sales he chose for his sales comparison approach. That form came out for use in Texas on September 1, 2019.[21] The Court's liability ruling was rendered December 17, 2019.[22] The record shows that 34 of the 35 sales Lucco used for his After Scenario valuation closed <u>before</u> the revised Texas Seller's Disclosure Form became effective—precluding it from having had <u>any</u> effect on <u>any</u> sale in Lucco's market transactions. Moreover, <u>all</u> of the sales Lucco used in his After Scenario closed <u>before any</u> of this Court's Orders were entered.[23] These are the same orders that Lucco said he had to review to know about existence and terms of the easement.

> Q. Isn't it true that all of your after damaged condition sales happened before December of 2019?
>
> A. I think that's true for the sales I used in the individual appraisal reports.
>
> Q. Yeah. <u>The ones that support your damage calculations, correct</u>?

---

[19] ECF 570, at 40 n.53.

[20] Tr. 2145:16-20 (Lucco); 2146:25-2147:3 (Lucco).

[21] Tr. 2792:12-14 (Bell).

[22] Tr. 2128:14-17 (Lucco).

[23] DX 1002, at UPEXPERTREPORT_11232-33 (Banker); DX 1003, at UPEXPERTREPORT_11346-49 (Burnham); DX 1004, at UPEXPERTREPORT_11463-65 (Micu); DX 1005, at UPEXPERTREPORT_11572-73 (Popovici); DX 1062, at UPEXPERTREPORT_11650-51 (Sidhu Unit 603); DX 1007, at UPEXPERTREPORT_11735-36 (Sidhu Unit 604). After Scenario Sale 2 in Lucco's Popovici report closed October 31, 2019. DX 1005, at UPEXPERTREPORT_11572.

A.   <u>Correct</u>.

Q.   All right. <u>And since all of your transactions that inform your analysis happened before December 2019, they of necessity happened before the Court issued its ruling on scope in April of 2020 and the Court issued its clarification ruling in June of 2021, correct</u>?

A.   <u>The sales in my individual appraisal reports did</u>.

Q.   Right. <u>And I don't -- the sales in your individual appraisal reports are the bases for your before and after comparisons, correct</u>?

A.   <u>They are</u>.[24]

Neither the new disclosure form nor the Court's liability decision (or orders describing the easement terms) existed at the time the sales transactions on which Lucco bases his After Scenario valuation opinions. And Lucco admitted that the actual market participants <u>did not know</u> about the easement:

Q.   You, your testimony today, is that none of the market participants who transacted and led to the data on which you used your after condition knew about the Court-ordered easement at the time of that transaction, correct?

A.   I think that's fair for the sales that I used in my individual appraisal reports.

Q.   Okay. So then every single sale that you used for your individual appraisal reports were by people, market participants who were not aware of the existence of this Court-ordered easement, correct?

A.   They specifically wouldn't have heard about the easement.

Q.   I'll accept that. And their not having heard about it, you believe that they were not aware of the existence of the easement, correct?

A.   I think that's fair.[25]

To dispel any confusion about the knowledge of market participants, Lucco admitted, as he must, that every disclosure from his study referenced "no easement" by the seller.[26]

---

[24] Tr. 2142:20-2143:15 (Lucco).

[25] Tr. 2150:21-2151:13 (Lucco).

[26] Tr. 2363:13-2364:01 (Lucco) ("Q. And not a single seller disclosed an unrecorded easement in the very properties, the very transactions that you used to measure the value of this easement, correct? A. Correct."). And when Lucco realized the fatal flaw in his data, he quickly added: "But I did look at sales after that time period." However, Lucco <u>then</u> had to admit that he did not change a single number

Even looking beyond the actual market participants' knowledge, no reason exists to believe the market writ large was (or even has yet been) made aware of an unrecorded easement during the time of Lucco's study. The government put forth no evidence that members of the public—including those who own property in the Harvey pool—know they are subject to any unrecorded easement. All of the government's focus on market knowledge went to the fact of flooding. But flooding does not mean—*vel non*—an easement exists. In fact, all the evidence presented at trial on this subject as presented by Plaintiffs and confirmed that <u>no publicly available maps showing the area encompassed by the Addicks and Barker pools exist</u>.[27] Indeed, the testimony at trial showed that the release of this information lacks only the blessing of FEMA, and there is no good reason the government should keep withholding it from the public.[28] Likewise, the U.S. Army Corps of Engineers, at the direction of its office counsel, has refused to provide its determination of the extent of the Harvey flood pools.[29]

Plaintiffs ask this Court to reject the government's argument that "market knowledge" based on a non-existent disclosure form and three then-unknown court rulings was somehow a proxy for the presence of a permanent flowage easement in the transactions Lucco used in his After Scenario. *See United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010) (recognizing that it is impossible to know future events with certainty); *Tattoli v. United States*, 2018 WL 3689546, at *4 (M.D. Fla. Aug. 3, 2018) ("it is impossible to see into the future"); *In re City of Cent. Falls, R.I.*, 468 B.R. 36, 65 n.73 (Bankr. D.R.I. 2012) (noting "the unremarkable caveat that it is impossible to know the future"). The Court

---

in any of his reports based on his "look at" any sale after December of 2019. See Tr. 2143:15-22 (Lucco).

[27] Tr. 727:7-11 (Wanhahnen).

[28] Tr. 738:18-22, 739:9-15, 745:7-22 (Wanhahnen); Tr. 562:23-563:3, 563:14-19, 564:13-19 (Ward).

[29] Tr. 595:13-20, 596:20-25 (Ward).

should reject Lucco's explanation that the buyers and sellers in the "comparable" sales transactions he used were somehow—inexplicably—informationally "ahead of the curve."[30]

### C. The government's tertiary stance—that "market knowledge" of the "conditions of the easement" results in a "pricing in" of the property rights lost by the taking of a flowage easement—likewise fails.

The government next claims that, in lieu of using sales which transferred the property interest at issue, and despite the disclosure of "no easement" by the actual market participants, Lucco could use comparable sales transactions that are hypothesized to have taken place between parties who he assumes were "aware of the conditions of the easement," and that this assumed knowledge sufficed to ensure each participant "priced in" the nonexistent easement when negotiating their sale. According to Lucco the three "conditions of the easement" that act as a proxy for the lack of the property right which is supposed to be measured are: (1) an awareness of Tropical Storm Harvey, (2) an awareness that the flooding was caused by the Addicks and Barker dams, and (3) an awareness that the property could possibly flood again.[31] But the government's "conditions of the easement" then, is a further step from reality. And another invitation to error. The government's attempt to morph the knowledge that a parcel of property flooded during Harvey because of water retained by the Addicks and Barker dams into a proxy for awareness of a <u>future</u> finding that a permanent flowage easement was thereby taken <u>and</u> the terms of that yet-to-be-declared easement so that the effect of <u>both</u> are somehow mystically priced into the sales transaction must be rejected.

First and foremost, Lucco himself admitted that <u>knowledge of the purported "conditions of an easement" does not equate to knowledge of an easement</u>.[32] Indeed, Lucco admitted that he did not

---

[30] Tr. 2147:13-21 (Lucco).

[31] Tr. 2146:08-2148:03 (Lucco); 2153:23-2154:11 (Lucco).

[32] Tr. 2154:12-14; 2405:1-4 ("Q. Why are they asking those questions if previous flooding is the same as an easement?" A. Previous flooding is not necessarily the same as an easement.").

interview any of the participants in the sales transactions he used for his After Scenario valuations, and that he did no study or other investigation to support the assumption that any market participant knew of either the easement or the orders issued by the Court, much less "priced them" into the sale.[33]

If the government's failure to prove the connection were not enough, the record confirms that "market knowledge" that a given parcel flooded, or of the "conditions of the easement," does <u>not</u> translate into knowledge of an unrecorded easement for <u>any</u> of the sellers or buyers in the actual transactions Lucco used for his After Scenario valuation. <u>None</u> of the available Sellers Disclosure forms for any of Lucco's After Scenario sales showed <u>any</u> seller prescient enough to disclose the presence of an unrecorded easement.[34]

Nor did knowledge of the "conditions of the easement" translate into some general market knowledge of the presence of the easement.[35] Mr. Lucco never did anything to actually test his foundational hypothesis that the market was knowledgeable about (and had "priced in") the existence of an unrecorded easement in the sales transactions he relied on. But Dr. Bell did.

Dr. Bell analyzed data on this issue provided for <u>all</u> sales of properties within the Harvey pool that closed between August 30, 2017, and December 19, 2019, and provided a written report demonstrating that on only <u>three</u> (3) of the 1,288 Seller Disclosure forms (i.e. 0.23% of sales) available and reviewed was there a notation that the seller disclosed the presence of an unrecorded easement

---

[33] Tr. 2158:15-24 (Lucco).

[34] PX-JC 1174-1201 (Sellers Disclosure Forms for Lucco's After Scenario sales); Tr. 2363:13-2364:01 (Lucco) ("Q. And not a single seller disclosed an unrecorded easement in the very properties, the very transactions that you used to measure the value of this easement, correct? A. Correct.").

[35] To be extremely clear, general market knowledge—which serves as a proxy for transacting parties' knowledge—matters not at all when the transacting parties' knowledge is known. Lucco's "bullseye" confirms this reality renders the government's entire "market awareness" irrelevant. *See* Tr. 2788:02-2789:23 (Bell) ("Q. Okay. In particular, these transacting parties are not aware, correct? A. Exactly."). *See also* Tr. 2865:24 - 2866:10 (Bell) ("Mr. Lucco clearly was not holistic. It was, in fact, that he -- he -- whether you use the -- he stepped away from the data rather than go into the data.")

on the property.[36] Thus, in contrast to the amorphous "market awareness" that Lucco contends (but never proves) exists, the hard data (which Lucco ignored) <u>affirmatively disproves Lucco's critical assumption</u> upon which <u>all</u> of his After Scenario valuations depend: that the sales transaction he relied on to value a permanent flowage easement had the presence of such a property interest "priced into" the transaction.

> **D.** **The government's Maginot Line—that statements in the press and on the internet should be accepted as proof of sufficient "market awareness" of the "conditions of the easement," – i.e., that specific properties flooded during Harvey because of the Addicks and Barker Dams, to overcome the lack of evidence of After Scenario sales which transferred the property interest to be valued in this case—fails.**

The government next claims that the Court should ignore the fact that <u>none</u> of the buyers and sellers in the transactions upon which its expert relies knew about the easement, ignore the study by Dr. Bell that showed less than 1% of upstream sales disclosed an unrecorded easement (and the fact that those sellers had advice of counsel to understand the issue), ignore Mr. Philo's testimony that the Title-Insurance-Mortgage industry is unaware of the easement, and ignore the fact that it has no actual evidence that the market holds any particular knowledge and, instead, the Court should simply look at the many sales that have taken place after Tropical Storm Harvey and intuit a pervasive "market knowledge" that somehow translates into market disregard for the property rights taken by the government.

---

[36] Tr. 2790:15-2791:04; 2792:18-2794:18; PX-JC 1025, at 22. The government's argument that "sales trends" for properties in the Addicks and Barker reservoirs did not change following issuance of the Court's opinion on liability confirms the <u>lack</u> of any knowledge on the part of market participants, rather than the presence of knowledge but apathy toward it. It is certainly true that Lucco did nothing to confirm his speculation that the market became instantly aware of the Court's order, but that such knowledge did not change any market participant's purchase decision. *See generally* Tr. 462:13 - 463:04 (Philo) (noting the title insurance industry is unaware of the easement and will change practices when it becomes aware); 473:11-18 (same); 491:20-492:25 (same); 499:01-11 (noting that notice of flooding not "adequate to give notice of the existence of an easement which is unknown to the buyer or to the title company"); 506:14-508:04 (discussing the inadequacy of notice both as to market participants and title insurance industry).

The only record evidence refutes the government's premise. Nor do viable tools exist for market participants to understand the easement. Even the Corps representative Robert Thomas admitted that as of <u>today</u> there is <u>no</u> USACE website that someone could access to find out if their property is within the statutorily defined "flood pool."[37] Bypassing the courtroom demonstrations that revealed just how <u>inaccessible</u> the Corps' web-based information is,[38] the fact remains that its website information is subject to change that often results in "bad information."[39] Significantly, Mr. Thomas admitted that even the Army Corps of Engineers could not answer an inquiry from a member of the public of whether their particular piece of property was, or was not, in the Harvey pool.[40] And the government bears responsibility for this lack of awareness, at least in part. The government failed to follow its own policy and seek clarity about the easement—preferring confusion in the populace while claiming "the market" is aware.[41]

### E.   The government must be held accountable for the Lucco debacle and its attempts to completely evade its consequences rejected.

The government's final gambit is to try and sidestep the fact that it has not provided any valid proof on the central issue to be decided at trial by (1) minimizing the importance of the proxy (proof of "market knowledge") that was the <u>focal point</u> of its trial strategy, (2) asserting that it should be deemed Plaintiffs' burden to <u>disprove</u> the argument which the government put forward and relies on, and (3) twisting the law and this Court's comments concerning the recordation and contents of the

---

[37] Tr.1196:15-20. (Thomas).

[38] *See, e.g.,* Tr.1143:20-1146:20 (multiple, unsuccessful, attempts for government counsel to access the website for the Corps' Buffalo Bayou and Tributaries Resiliency Study website and interim report).

[39] Tr.1158:24-1159:2 (Thomas).

[40] Tr.1213:3-10 (Thomas).

[41] *See generally* (Real Estate Handbook (JX 1007)) at Section 5-24 on DEPO_0080971 (calling for the Department of Justice to "attempt to have…a precise description of the interests taken."); *see also* Tr. 256:08-258:01 (Johnson-Muic).

forthcoming easement document. But there can be no doubt or equivocation on this point. It is an absolute necessity that this Court accept the government's "market knowledge" chimera as a proxy for the absence of essential sales data for Lucco's comparable sales analysis—i.e., After Scenario sale which <u>transfer and value</u> the property rights to be assessed; and it does not fall to Plaintiffs to "disprove" the unfounded conjecture upon which the government's expert bases his entire testimony and all his opinions of value.

Recognizing the ruined state of its expert's analysis, on page 31 of its brief the government floats the notion that none of the extensive efforts to prove "market knowledge" to which it has gone are even needed, angling that it need not prove the validity of its market knowledge proxy to plug the hole in Lucco's data at all. The government's last-ditch ploy to lay the burden of "disproving" Lucco's patently invalid assumptions and irrelevant underlying data at Plaintiffs' feet—asserting that "the Court need not entertain Plaintiffs' unsupported theory about a lack of market awareness"—is ridiculous.[42] Without an explicit finding by this Court that the buyers and sellers in Lucco's study were aware of—and "priced into"—the transfer of property rights which included the lack of those rights taken by the government by an as-yet-to-be-decreed-or-described permanent flowage easement, no basis exists to accept Lucco's After Scenario sales as being reflective of or in any way having measured the value of those taken property rights. Period.

And there is no question but that the government bears the burden to demonstrate the admissibility (and reliability) of its expert's testimony and opinions. *Complete Logistical Servs., LLC v. Rulh*, 394 F. Supp. 3d 625, 636 (E.D. La. 2019) ("the proponent of the evidence bears the burden of proving that the testimony is reliable and relevant") (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). "In considering an expert's reliability a court must determine 'whether the

---

[42] *See, e.g.*, ECF 570, at 31; Tr. 2173:02-06 (Lucco confirming that, if market participants in are not reasonably knowledgeable, then Lucco's After appraisals are not accurate).

proffered testimony has a sufficiently reliable foundation to permit it to be considered' by the trier of fact." *Mathis-Kay v. McNeilus Truck & Mfg., Inc.*, No. 06-CV-815S, 2011 WL 4498386, at *3 (W.D.N.Y. Sept. 27, 2011) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002)). In any event, though it is <u>not</u> Plaintiffs' burden, Dr. Bell's rebuttal testimony and study <u>confirms the market's lack of awareness</u>. Plaintiffs did, in fact, disprove the government's untested hypothesis.

At the end of the day, the government provides no competent, admissible evidence on the key issue at trial: the just compensation owed Plaintiffs <u>for the rights taken</u> by the permanent flowage easement. Lucco's failure to value the property interest taken was exposed at trial. None of Lucco's After Scenario sales transferred (or valued) a flowage easement (or property burdened by one). Based on flawed assumptions, ("conditions of the easement") suffering fatal factual underpinnings (no easement disclosed; admitted lack of knowledge), and proven wrong by market data (less than 1%— each represented by counsel—disclosing an easement), the validity of the "sales comparison approach" Lucco claims to have used craters. *See Tolan v. City of Bellaire*, No. CV H-09-1324, 2015 WL 12765413, at *4 (S.D. Tex. Aug. 28, 2015) ("When, however, there are no facts in the record to support an expert's opinion, or the facts relied upon are indisputably wrong, an expert's opinion simply has no relevance, cannot assist the trier of fact, and should be excluded.") (citing *Guillory v. Domtar Industries*, Inc., 95 F.3d 1320, 1331 (5th Cir. 1996)); *see also Pop v. Yarborough*, 354 F. Supp. 2d 1132, 1141-42 (C.D. Cal. 2005) ("[W]here the facts underlying the expert's opinion are proved to be false or nonexistent, not only is the expert's opinion destroyed but the falsity permeates his entire testimony; it tends to prove his untruthfulness as a witness.").[43]

---

[43] And as shown *infra*, each of the government's assertions relied on by the Court in permitting Lucco to testify in the first place (*In re Upstream*, 159 Fed. Cl. at 523-24) were proved at trial to be false. The record confirms that Lucco (a) <u>did not</u> conduct "an independent study to evaluate market awareness," but instead Lucco admitted he did not confirm <u>any</u> "market awareness" of the easement or its terms with <u>any</u> of the buyers and sellers for the sales he used in his valuation (the only ones that matter); (b) <u>did not</u> "provide an opinion on the value of the flowage easement <u>as described by the</u> court in its

The government's final gambit is an attempt to divert attention from the issue by contending that the validity of Plaintiffs' criticism of Lucco somehow tied up with a determination whether the easement must be recorded, or its language available, before comparable sales to measure the property rights taken can be used. That is simply false.

The government poses their argument in the guise of an assertion that Plaintiffs have "Reject[ed] the Use of Actual Sales Data from the Market," and that the argument that an easement must be recorded is foreclosed by precedent and this Court's prior ruling.[44] The governments' point appears to be unremarkably that sometimes courts decide liability and compensation at the same time, sometime not. But even assuming the government's contention about these Plaintiffs is correct— which it is not—the government badly misreads *Vaizburd* and the other authorities it cites. In *Vaizburd*, the only dispute, other than value, was the date of the taking. *Vaizburd*, 384 F.3d at 1281. Recordation, scope of easement terms, or pre-liability comparable sales data are <u>nowhere</u> discussed. The lower Court faulted the valuation by pro-se *Vaizburd's* landowner—not appraiser; and after ruling on the date of take for the slowly developing <u>sand accretion</u> (an open and obvious condition), also faulted the government's appraiser's comparables, which it was then allowed to correct. *See Vaizburd v. United States*, 57 Fed. Cl. 221, 230-32 (2003). The only issue the Federal Circuit remanded was for the lower court to determine the cost to cure compensation. *Vaizburd*, 384 F.3d at 1286.

---

rulings," as it was <u>impossible</u> for any of the participants in the sales he used to have <u>any</u> such knowledge since <u>none</u> of those rulings <u>existed</u> at the time Lucco's "comparable sales" transactions closed; (c) <u>did not</u> "testify to the effect of the flooding risk and awareness of it on the market value of the bellwether properties" since <u>none</u> of the buyers and seller in any of the After Scenario sales were interviewed so that these factors were confirmed to have been material in their sales transactions; and (d) <u>did not</u> utilize "comparable sales [with] some form of specific disclosure of property flooding due to the Harvey event," since <u>none</u> of the sales Lucco relied on had <u>any</u> "form of specific disclosure" of the existence or terms of the easement "priced in" to the sales transaction he used in his valuation.

[44] ECF 570, at 41 (citing ECF 514, at 9 n.9, and *Vaizburd v. United States*, 384 F.3d 1278 (Fed. Cir. 2004)).

The Government's other authorities concerning pre-liability market data are similarly inapt. *Lost Tree Vill. Corp. v. United States*, 115 Fed. Cl. 219, 224 (2014) was a regulatory takings case by this Court involving the denial of a Corps of Engineers Clean Water Act Section 404 permit; there was no dispute about the scope of the taking on the one parcel at issue and very little dispute about the value.[45] Similarly, the only easements at issue in *Nat'l Food & Beverage Co. v. United States*, 105 Fed. Cl. 679, 694, 700–01 (2012), were a few temporary road easements that were not contested; the actual decision involved the Corps' removal of clay from a private property with the final value being based upon the cubic-yards of clay removed. *Nat'l Food & Bev. Co.*, 105 Fed. Cl. at 703. This Court had already decided the scope of the take when it granted the plaintiff's motion for partial summary judgment on the government's liability, as well as the proper method of determining damages. See *Nat'l Food & Bev. Co. v. United States*, 103 Fed. Cl. 63, 69-70 (2012). None of these authorities lend support to the government's argument that *only* pre-liability market data is allowed for the After Scenario valuation— the Lucco approach. And certainly, none of them lend any support to the idea that without recordation, or the availability of the specific easement terms to the parties involved in the transaction, the "value" of the rights taken by the flowage easement at issue <u>cannot</u> be reflected in the sale of a property that is admittedly <u>not burdened</u> by any such easement—Plaintiffs" approach.

Neither Lucco's testimony nor the figures provided in his reports may be weighed against the opinions provided by Plaintiffs' experts. His opinions all failed the moment he selected his data. And no subterfuge can repair that fundamental flaw.

---

[45] "The parties agree that without the permit, Plat 57 has a nominal value, not reflective of any economic use, but with the permit, Plat 57 is worth a substantial amount. Lost Tree's appraisal expert, Mr. Peter Armfield, testified that it would be worth $25,000 without the permit and $4,285,000 with the permit. The government's appraiser, Mr. John Underwood, testified that it would be worth $30,000 without the permit, and $3,910,000 with the permit." *Lost Tree*, 115 Fed. Cl. at 224 (internal citations omitted).

## II.    The Attempts by Government Witnesses to Dodge the Facts.

The trial witnesses employed by the United States—usually reluctantly and only after documentary proof forced them to—provided testimony which annihilate the arguments presented in the government's post-trial brief. Impeached by internal records and prior admissions, even the government's witnesses ultimately supported Plaintiffs' position.

### A.    The attempt to minimize the impact of the permanent flowage easement.

Three government witnesses—Paula Johnson-Muic, Timothy Nelson, and Colonel Timothy Vail—each provided the Court with important testimony regarding the factual basis for Plaintiffs' just compensation requests. Unwilling, recalcitrant, and obdurate, these witnesses—when forced—confirmed the impact (and value) of the easement.

### 1.    Paula Johnson-Muic.

Paula Johnson-Muic is the most senior civilian employee at the Corps of Engineers in the entire United States. She testified to the Corps policies regarding the enforcement of <u>all</u> the easements it holds—policies that will apply to the enforcement of the easement rights set forth in this Court's final judgment.[46] Significantly, Ms. Johnson-Muic provided little to no testimony regarding the interpretation of the easement because the language has not yet been finalized.[47] Johnson-Muic addressed standard policies directing how the rights granted-whatever they turn out to be-will be enforced, which she admitted do not change vis-à-vis encroachments whether the rights held by the United States were taken in condemnation or acquired in an inverse condemnation action—"the policies of the Corps apply to <u>all</u> its easements" even if the rights specified in the grant document

---

[46] Tr. 136:10-25 (Johnson-Muic).

[47] Tr. 172:20-173:19, 210:25-211:20, 214:02-12, 218:10-24, 246:22-247:08 (Johnson-Muic).

vary.[48] And she confirmed the Corps' does protect the authorized purposes of its flood control projects through its enforcement of the United States' property rights including litigation against citizens if the government deems it necessary..[49]

Ms. Johnson-Muic was clear that, whatever the government's litigation position might be, the written instrument reflecting the taking of a permanent flowage easement <u>will be recorded</u> in the real property records of Harris and Fort Bend counties.[50] As Ms. Johnson-Muic admitted, the Corps will record the property interest it obtains in this case whether that be through obtaining a grant from a Plaintiff[51] or a judgment from the Court.[52] And if the final judgment "does not contain language which clearly vests title in the United States of the interest in land for which the compensation was paid, requests should be made of the United States Attorney to move the Court to amend the judgment to show that such title has vested."[53]

However reduced to written instrument, it is the policy of the United States to obtain and record <u>any</u> conveyance that reflects the transfer of rights from a condemnee in an inverse condemnation case to the government:[54]

> Q. And that's the policy of the United States Army Corps of Engineers as pertains to inverse condemnations, correct?
>
> A. Yes.

---

[48] Tr. 215:6-17 (Johnson-Muic). "An encroachment is unauthorized placement of improvements on corps property by a non-Army party." Tr. 279:4-5 (Johnson-Muic).

[49] Tr. 188:20-23 (Johnson-Muic).

[50] Tr. 142:21-145:24, 153:21-154:2, 158:10-24 (Johnson-Muic).

[51] Tr. 143:8-24, 155:13-156:19 (Johnson-Muic).

[52] Tr. 144:7-14 (Johnson-Muic).

[53] Tr. 261:13-20 (Johnson-Muic); *see also* Tr. 263:16-23 (Johnson-Muic) ("If the corps believes that the judgment is insufficiently clear, it is the policy of the corps to ask justice to ask the Court to amend the judgment.").

[54] Tr. 145:19-24, 256:17-25 (Johnson-Muic).

Q. Great. And "An attempt will also be made to provide in the judgment that payment by the United States will not be required until the plaintiff has delivered a deed or other acceptable conveyance of the interest taken." Did I read that correctly?

A. Yes.

Q. And that's an articulation of the policy of the United States vis-à-vis inverse condemnation for Army Corps properties, correct?

A. Yes.

Q. All right. Now, on to (b), the division or the district engineer will obtain proper execution of the deed, record the same, procure a final certificate of title of a commercial title company or a staff attorney, and obtain a final title opinion, correct?

A. That's what it says, yes.

Q. That's what it says and that is the policy of the United States vis-à-vis condemnation – inverse condemnation cases for corps properties, correct?

A. Yes.[55]

. . . .

Q. Whether it's a deed, a judgment, or the – or judgment or whatever documents were perceived to be required to reflect the easement, the point is the corps will absolutely file of record whatever documents it sees fit to reflect the conveyance of the easement, in particular this easement, from these property owners to the corps.

A. Yes.[56]

. . . .

Q. The corps policy calls for the recordation, correct?

A. Yes.[57]

Johnson-Muic confirmed that, "as the dominant estate, the easement owner [i.e. the United States] has the right to enforce rights against the residual fee owner if the residual fee owner is acting in any way that is interfering with the rights conveyed in the easement."[58] And she confirmed the right to flood intermittently, as described by the Court, means that i the Corps can and will flood Plaintiffs'

---

[55] Tr. 257:1-258:1 (Johnson-Muic).

[56] Tr. 147:24-148:6 (Johnson-Muic).

[57] Tr. 264:12-14 (Johnson-Muic).

[58] Tr. 164:23-165:3 (Johnson-Muic).

property for as long and as often as the weather requires, just so long as their property is not underlined permanently under water.[59] Whenever it rains heavily enough over the Addicks and Barker watershed, the Court-ordered easement will give the United States the right to flood Plaintiffs' property as project operations, which are within the discretion of the Corps, require.[60] In other words, whenever the Corps desires to inundate upstream properties to protect downstream properties, the City of Houston, and the Houston Ship Channel, it can and will do so.[61]

### 2. Timothy Nelson.

Timothy Nelson is the chief of the real estate division for the Galveston District of the Corps, the top civilian authority with respect to real estate issues in the district that will administer the government's flowage easement.[62] He echoed the testimony of Ms. Johnson-Muic that, with respect to the relationship between the easement owner and the fee owner, the dominant estate is the easement owner.[63] He confirmed that, as owner of the flowage easement it has taken, the United States can exercise all the rights given to it in that easement, without any restriction on those rights by the fee owner.[64] Plaintiffs will have lost the right to exclude the water the government wants to store on their properties—forever.[65] Mr. Nelson confirmed the Corps' right to survey and mark its easement, and, unless existing regulations change, the Court ordered easement.[66] And, no matter how often the

---

[59] Tr. 166:18-22 (Johnson-Muic).

[60] Tr. 174:23-175:2 (Johnson-Muic).

[61] Tr. 181:4-184:25, 189:10-190:5 (Johnson-Muic).

[62] Tr. 308:24-309:14 (Nelson).

[63] Tr. 341:2-5 (Nelson).

[64] Tr. 343:23-344:7 (Nelson).

[65] Tr. 346:2-6, 346:24-347:7 (Nelson). *See also* Tr. 361:14-25 (Nelson) (acknowledging that the exclusion of floodwaters from the upstream permanent flowage easement in inconsistent with the purpose of the Buffalo Bayou and Tributaries project).

[66] Tr. 349:19-350:15, 352:03-15 (Nelson).

government must (or chooses to) use the easement and flood Plaintiffs' properties, <u>the amount the government uses it (and predictions about future use) does nothing to diminish the rights it has taken</u>.[67]

The most damaging testimony to the government's litigation position from Mr. Nelson related to the work done for him by the Corps' appraiser, Thomas Seymour, for Mr. Nelson. Mr. Seymour is the <u>only</u> USACE-sponsored, non-litigation attempt to value an upstream flowage easement for property within the Addicks and Barker reservoirs.[68] Mr. Nelson testified that the "summary of Easement Cost Estimates" provided in Mr. Seymour's work reflected values the easement taken (as opposed to a fee acquisition which Mr. Seymour also assessed), at <u>over 99% of the fee simple value</u> of the property.[69] For his part, Mr. Seymour calculated the easement <u>at 93.5% of the fee simple value</u>.[70]

### 3.     Colonel Timothy Vail.

Colonel Timothy Vail is the commander and district engineer for the Galveston District of the U.S. Army Corps of Engineers.[71] Col. Vail confirmed that the Corps has reported to the public that, based on government scientists at the National Oceanic and Atmospheric Administration ("NOAA"), local precipitation patterns have changed and that both the frequency and intensity of

---

[67] Tr. 349:19-21 (Nelson) ("Q. Predictions on the amount of use <u>do not</u> diminish the rights taken, correct? A. Yes.") (emphasis added).

[68] Tr. 314:12-319:19 (Nelson).

[69] Tr. 323:15-334:17 (mathematically, the $8,300,000,000 value of the remainder property from the $2,200,000,000 fee simple value after the taking). And while the government challenges Mr. Seymour's "gross appraisal" numbers as "a glorified cost estimate" of only one option being considered in the BBTRS, and not valuing the specific easement to be crafted by the Court, Tr. 412:4-420:13, the point is that the government <u>knows</u> the order of magnitude as to the property rights taken by a flowage easement <u>despite</u> its every effort to deny that knowledge.

[70] Tr. 2653:19-2655:07 (Seymour) ("Q. . . So the difference between the fee and the flowage easement from your experience -- or from your calculations is 93ish percent, and that's based on the summary tables that you presented as the conclusions of your study, correct? A. Yes.").

[71] Tr. 1292:10-17 (Vail).

rainfall has increased.[72] These changes, along with increased upstream urbanization will combine to increase inflows to Addicks and Barker reservoirs if rain falls in the relevant watersheds.[73] And while Col. Vail refused to agree with the statement—indeed became "obdurate on the subject"—the Buffalo Bayou & Tributaries Resiliency Study confirmed that these changed conditions have led to a transference of risk to upstream properties in order to protect downstream properties.[74] He acknowledged the findings of the interim BBTRS report that relatively recent evidence, climate models, and studies imply the climate is changing;[75] that climate change and greenhouse gas emissions are expected to alter future weather patterns, including precipitation;[76] and that the Corps expects future economic damages from flooding to individual Upstream private property owners are likely.[77]

> **B.   The government's attempt to minimize the future induced flood risk of Plaintiffs' properties within the Addicks and Barker Reservoirs.**

The government made an effort to paint a picture of the future induced flood risk, particularly as to the Plaintiffs, as being so rare and remote (i.e., somewhere between once every 500 to 1,000 years, or greater), that the permanent flowage easement's imposition wouldn't be of consequence to future homebuyers and therefore to property values.[78] When the government's witnesses were pressed on cross examination, however, the truth—and the data manipulation underlying the government's thesis—became clear.

---

[72] Tr. 1302:15-1304:5, 1364:25-1365:3 (Vail).

[73] Tr. 1308:03-09, 1311:08-12 (Vail).

[74] Tr. 1312:19-1315:06 (Vail); see also JX 1013 (BBTRS Interim Report) at USACEII01926646.

[75] Tr. 1363:6-25 (Vail).

[76] Tr. 1364:8-12 (Vail).

[77] Tr. 1370:18-21, 1371:20-1372:9 (Vail).

[78] The effort (which failed factually) found no purchase in any valuation effort, i.e. no appraiser relied on any government witness (expert or otherwise) statement about a lack of flood risk.

Soon after Tropical Storm Harvey, NOAA presented to the public a map depicting the frequency of the Harvey 4-day rainfall across the Houston region showing a vast area with a rainfall frequency in excess of 1,000 years.[79] But these rainfall frequencies issued by NOAA were decidedly outdated, having been issued in the 1960s.[80] NOAA updated its rainfall frequencies in 2018 for Texas, a tabulation referred to as NOAA Atlas 14.[81] This update took into account the rainfall data available both before the 1960s as well as since—including Harvey.[82] While the government presented at trial Mark Glaudemans with the National Weather Service who had been in charge of the work in creating NOAA Atlas 14 for Texas, his testimony on cross-examination made it abundantly clear that the updated rainfall frequency information had significant flaws.

For example, Mr. Glaudemans admitted that this updated analysis contained no adjustments for climate change.[83] Mr. Glaudemans stated that no such adjustment had been made because NOAA's analysis only looked at the 1-hour and 1-day duration storm events.[84] As such, the analysis

---

[79] Tr. 2072:4-8 (Glaudemans); DX 1343.

[80] Tr. 2501:8-2502:20 (England).

[81] Tr. 2030:6-2031:5 (Glaudemans).

[82] Tr. 2031:6-9 (Glaudemans).

[83] Tr. 2049:19-2050:2 (Glaudemans). As the Court noted at trial, its use of the term "occasionally" when describing the government's invocation of its easement rights was "to describe events that might be more frequent in the future depending on meteorological conditions." Tr. 167:23-168:1. Rather than a talisman of infrequent use (as if the Court's description could control future precipitation), the fact is that Plaintiffs' properties will be flooded as the operations of the Addicks and Barker dams— and mother nature—dictate. *See* Tr. 172:6-10 (rights under permanent flowage easement to flood Plaintiffs' properties will be exercised "whenever the meteorological conditions happen that cause sufficient water to fall in the Addicks and Barker watersheds"); *see also In re Upstream*, 146 Fed. Cl. at 251 ("[T]he sheer frequency of significant storms in the region both before and since construction of the dams—the Hearne storm, the Taylor storm, the 1929 and 1935 storms, Tropical Storm Claudette in 1979, the 1992 series of storms, Tropical Storm Allison in 2001, and the Tax Day Storm—suggests that this was more than an isolated event, and that it is likely to recur."); *see also, supra*, Col. Vail's testimony about climate change. It is that increasing frequency of severe storms the region has experienced over the past 30-40 years, brought about in part by climate change, that Dr. Bedient's analysis addressed—and which the government witnesses ignored.

[84] Tr. 2051:9-14, Tr. 2052:1 (Glaudemans).

bypassed any effect from the ever-increasing storms events lasting <u>more than a day (i.e. any major storm likely to impact upstream properties)</u>.[85] Mr. Glaudemans had no explanation why NOAA failed to conduct any trend analysis for longer duration storms, especially since bigger storms last more than one day.[86] Furthermore, Mr. Glaudemans admitted that the data used for NOAA Atlas 14 did <u>not</u> account for the widely accepted national record 24-hour rainfall estimate for Tropical Storm Claudette (43 inches); but instead NOAA used only about 25 inches in the analysis since NOAA knew, had it used the higher amount, the rainfall frequencies for the 100-year events would have been <u>higher</u> than it reported in Atlas 14.[87] And, of course, Atlas 14 does not include the rainfall data from Tropical Storm Imelda, another "greater than a thousand-year event" that struck the Houston area a mere two years after Harvey:

> Q. If Imelda dumped about 45 inches of rain over a three-day period between the Houston and Beaumont area, wouldn't that according to your statistics mean that was greater than a thousand-year event?
>
> A. Yes.
>
> Q. And that those folks now got two greater-than-thousand-year events within a two-year period, correct?
>
> A. Yes.[88]

Inclusion of the Imelda data would have likewise increased the rainfall frequencies for the 100-year events, as well as others.[89] Mr. Glaudemans' testimony revealed the significant flaws in the Houston region rainfall frequencies reported in NOAA Atlas 14; frequencies the government touts to this Court as justification for claiming it will never (or, at most, very rarely) use its flowage easement to flood Plaintiffs' properties.

---

[85] Tr. 2051:15-24 (Glaudemans).

[86] Tr. 2051:25-2052:1 (Glaudemans).

[87] Tr. 2054:12-2055:14, 2067:25-2068:13 (Glaudemans).

[88] Tr. 2052:14-19 (Glaudemans).

[89] Tr. 2061:9-2062:19 (Glaudemans).

The testimony of Dr. John England, a government expert witnesses employed by the Risk Management Center of the U.S. Army Corps of Engineers, fared no better. Dr. England testified that the Corps had developed a "new approach" to assessing flood pool frequency curves in connection with its dam safety program; one which has been used by the Corps in the ongoing BBTRS study as well as for the 2019 Water Control Manual for Addicks and Barker dams.[90] Dr. England explained that, while this new approach uses a number of computer models for its analysis, it relied on the Atlas 14 rainfall frequency values for these analyses (which he used in his critique of Dr. Bedient's work).[91] Dr. England not only essentially admitted that these analyses were based on the under-valued rainfall estimates from Atlas 14, but Dr. England also could not explain the incorrect pool elevation data that he presented in his resulting flood pool frequency curves.[92]

Dr. England further admitted that his new approach for conducting pool frequency analyses do not directly use any of the observed pool level data, but only use this observed data for comparison purposes to the modeled results.[93]

In addition, since the 2019 Water Control Manual for Addicks and Barker dams contains pool frequency curves for these two reservoirs based on computer modeling using NOAA Atlas 14 rainfall frequency estimates, the resulting frequency curves were lower than and did not follow the observed pool elevation data.[94] In fact, Mr. Beddingfield admitted that in the 2019 Water Control Manual pool frequency analyses, the Corps had not used the observed pool elevation data for its Barker analysis,

---

[90] Tr. 2539:14-20, 2560:10-2562:12, 2568:11-25 (England).

[91] Tr. 2522:9-20, 2528:6-9 (England).

[92] Tr. 2548:4-24 (England).

[93] Tr. 2550:4-9 (England); 1054:1-15 (Beddingfield). Interestingly, the results following the upper confidence limit curves of Dr. England's work quite closely match those Dr. Bedient opined to as the correct pool frequency results for Addicks and Barker reservoirs. Tr. 2563:6-2565:16.

[94] *See* JX 1021 (2019 Water Control Manual) at Plates 8-07, 8-08.

but rather much <u>lower</u> pool levels than those which actually occurred.[95]  Not surprisingly, when the true values are utilized the resulting flood pool frequency curve for Barker is much closer to the one seen in Dr. Bedient's analysis.

Finally, Dr. Barry Keim testified regarding rainfall frequency estimates using NOAA Atlas 14 and point rainfall data recorded at various rainfall gages for several different storms.[96] The point Dr. Keim made from the stand was that when each storm was examined, "all the heaviest rainfall on each of those storms was outside of Addicks and Barker."[97] But, as Dr. Keim admitted, the fact that these storms fell outside the Addicks and Barker watershed was only a matter of luck; no meteorological conditions that prevent any of those storms from falling over the Addicks and Barker watersheds.[98] What Dr. Keim's analysis did <u>not</u> provide is the answer to what <u>would</u> have happened if each (or any) of those storm <u>had</u> dumped their rainfall over the Addick or Barker watersheds—which is the question Dr. Bedient addressed.[99] If anything, Dr. Keim confirmed Dr. Bedient's work. And, to the extent Dr. Keim was hired to criticize Dr. Bedient, he wholly missed the mark by focusing only on rain fall (which Dr. Bedient did not do) rather than stage frequency analysis (which Dr. Bedient did).

## III.    The Government's Illegitimate "Offsets" to Just Compensation.

The Court's previous skepticism regarding the "offsets" to the just compensation pressed by the government proved justified at trial. In a partial takings case such as this, as a matter of law the

---

[95] Tr. 976:20-979:10 (Beddingfield); JX 1021-A and JX 1021-B.

[96] Tr. 2593:13-2605:18 (Keim).

[97] Tr. 2602:7-9 (Keim).

[98] Tr. 2623:19-2625:8 (Keim).

[99] Tr. 2619:14-2623:9 (Keim). Col. Vail also addressed prior Corps documents confirming that "only chance has prevented storms bigger than the 1935 storm" from falling over the Addicks and Barker watersheds, showing that major storms over Addicks and Barker watersheds would cause extensive flooding (for weeks), and revealing that the Corps "kn[e]w that [upstream flooding] can happen" in 2009. Tr. 1340:13-1342:16 (discussing JX 0005); 1349:12-1352:11 (discussing Upstream 1597, admitted during the Liability Trial); 1354:10-1356:01 (same).

only offset to a just compensation are amounts by which <u>the remainder property is "specially and directly increased" by the taking</u>. *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *see also Hendler v. United States*, 175 F.3d 1374, 1380 (Fed. Cir. 1999) ("direct and special benefits" to the remainder property are only those "which arise directly and proximately to the remaining land <u>as a result of the public work on the part taken</u>, due to the peculiar relation of the land in question to the public work") (emphasis added). Despite this Court's rulings advising that "common general benefits available to everyone will not be offset from a just compensation award" and that "casualty loss deductions are a general benefit that cannot be deducted from a just compensation award," *In re Upstream*, 159 Fed. Cl. at 527-28, the government continued its futile quest.

Pamela Glasschroeder testified that the Federal Emergency Management Agency paid disaster benefits to Plaintiffs Burnham, Micu, Holland, and the Bankers.[100] Those amount included payments under various FEMA programs, <u>none of which have any connection whatsoever</u> to the value of any Plaintiff's remainder property after it was flooded.[101] According to Ms. Glasschroeder, <u>none</u> of the eligibility criteria for any of the FEMA payments made involve the ownership of property taken by the government for a public purpose at all.[102] John Hintermeister gave similar testimony with regard to the eligibility criteria for obtaining insurance under the National Flood Insurance Program ("NFIP").[103] Anyone who meets the criteria for coverage under the NFIP can obtain flood insurance; it is not a program that provides benefits <u>to the property itself</u> which arise directly and proximately as a result of the public work on the part taken.

---

[100] Tr. 2690:20-24 (Glasschroeder).

[101] Tr. 2693:18-2699:12 (Glasschroeder) (discussing payments for "rental assistance," "sheltering," housing assistance," and $600 of Ms. Burnham's NFIP premiums).

[102] Tr. 2704:12-2705:19 (Glasschroeder).

[103] Tr. 2631:25-2632:11 (Hintermeister).

Ms. Glasschroeder was followed on the stand by Dan Leistra-Jones, who testified about his analysis of whether any Plaintiff received payments—from any source—that somehow "relate to" the Harvey flooding.[104] Leistra-Jones admitted that he had never performed an "offsetting benefits analysis" for a just compensation case before, that he could not provide testimony as to any Plaintiff should or should not recover any specific amount of compensation, that he could not testify as to any category of loss for which any Plaintiff should receive compensation, nor he could he testify as to any standard pursuant to which any Plaintiff should receive compensation for the government's taking of its permanent flowage easement.[105] Leistra-Jones admitted that he did not even understand what is meant by "a special or direct benefit relating to the reminder property"—the actual standard for assessing offsets to just compensation due in a takings case.[106] Whatever he did, Leistra-Jones did not evaluate (and, therefore, could not categorize) whether any perceived benefits specially or directly benefitted the value of the remainder.[107] In fact, Leistra-Jones did not know what a remainder property is at all.[108] And he made no effort to identify any relationship between an identified "benefit" and the remainder property:

> Q. Because your instruction was to get all benefits, right?
>
> A. I was to look at benefits that they received from the federal government and, to a lesser extent, non-federal benefits as well that relate specifically to the claimed losses they're alleging from Hurricane Harvey.
>
> Q. Again, it was all benefits from Harvey, correct?
>
> A. It was all benefits received that relate directly to the losses they are claiming from the Hurricane Harvey flooding.

---

[104] Tr. 2718:25-2719:5 (Leistra-Jones); see also Tr. 2770:18-2771:06 (Leistra-Jones confirming benefits available without regard to taking); Tr. 2771:12-2773:02 (Leistra-Jones saying his approach would be the same for people not involved in a taking).

[105] Tr. 2732:2-2733:7 (Leistra-Jones).

[106] Tr. 2735:18-2736:15 (Leistra-Jones).

[107] TR. 2739:10-16 (Leistra-Jones).

[108] Tr. 2737:17-19 (Leistra-Jones).

Q. Okay. That's fine. But not any relationship that you've identified to the remainder property, correct?

MS. TARDIFF: Asked and answered.

THE COURT: This one is overruled in context.

THE WITNESS: That's correct.[109]

The government paid Leistra-Jones to tally the amounts received by any Plaintiff which he opined would be "economically inappropriate" as a "double recovery," <u>regardless of the legal standard of relevant offsets</u>.[110] Having been instructed to proceed beyond the proper legal framework, he did just that: Leistra-Jones' analysis included amounts for private insurance obtained and paid for by a Plaintiff, as well as the FEMA assistance available to <u>anyone</u> who suffered from a declared disaster <u>regardless of any connection to any taking or benefit (or lack thereof) to the remainder property</u>.[111]

There is simply no link between the proof of offsets offered by the government and the recognized, narrow, circumstance in which constitutional just compensation may be reduced. And, absent that key connection, no offset is proper:

> When making a just compensation award, the Supreme Court has held that certain offsets may be deducted. Specifically, the amount which "specially and directly increased" the value of the remainder property after a partial taking can be offset against the just compensation award. *Bauman v. Ross*, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270 (1897). The Court of Appeals for the Federal Circuit has defined such direct and special benefits to be those "which arise directly and proximately to the remaining land as a result of the public work on the part taken, due to the peculiar relation of the land in question to the public work." *Hendler v. United States*, 175 F.3d 1374, 1380 (Fed. Cir. 1999). General benefits (or those benefits "that are more or less common to all lands in the vicinity of the land taken," *id.*) on the other hand will not be offset. *Hendler v. United States*, 38 Fed. Cl. 611, 617 (1997) ("Special benefits are deducted from any compensation due, and general benefits are not."), *aff'd*, 175 F.3d at 1386.

---

[109] Tr. 2740:16 - 2741:08 (Leistra-Jones).

[110] Tr. 2765:0-2766:13 (Leistra-Jones).

[111] Tr. 2766:15-2771:6 (Leistra-Jones). Indeed, leaving aside the fact that these benefits were available to everyone (not just takings victims), the record confirms the complete disconnect between the funds Plaintiffs received and enhancement of remainder value. Tr. 2744:24-2776:13 (Leistra-Jones).

*In re Upstream*, 159 Fed. Cl. at 526. None of the government witnesses even pretended that any of the "offsetting benefits" they testified about met the standard previously articulated by this Court. They tallied "any benefit from the government related to Harvey" and did no more.[112]

The government seeks to "offset" each award of just compensation paid for the rights it has taken through the inundation of Plaintiffs' properties with amounts recovered by Plaintiffs for what it would—in any other case—characterize as unrecoverable "damages" the flooding caused. The government's just compensation shell game has no place in a determination of just compensation. "The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, as it does from technical concepts of property law. It is, of course, true that Almota should be in no better position than if it had sold its leasehold to a private buyer. But its position should surely be no worse." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 478 (1973).

## IV.    The Government's Disregard for the Court's Liability Decision and Previous Rulings.

In 2019 this Court found the United States liable for the taking of a permanent flowage easement. Yet the government continues to re-litigate rejected (and now irrelevant) positions advanced in that 2019 trial in an effort to lessen the just compensation due for that taking.

For instance, the government discusses the history and function of the Addicks and Barker reservoirs and extolls the benefits achieved by the project since its inception.[113] But the government omits from its argument that none of the benefits that accrued to the government were enjoyed by Plaintiffs. Indeed, "here the same actions which benefitted the downstream properties are those which caused harm to plaintiffs." *In re Upstream*, 146 Fed. Cl. at 254. In fact, in its opinion, the Court rejected

---

[112] Tr. 2733:15-2734:05 (Leistra-Jones).

[113] ECF 570, at 2-3.

the government's argument, advanced here for the first time,[114] that Plaintiffs' losses were "consequential damages" which may not be recovered:

> Another consideration in the takings analysis is whether the invasion "appropriate[s] a benefit to the government at the expense of the property owner," as opposed to inflicting a mere "consequential" injury. . .. [W]hen the direct result of the government's actions is the destruction of property for its own, and thus the public's, benefit, the affected property owners are entitled to just compensation for a taking. In the case of Addicks and Barker, the government received a notable benefit at the expense of the upstream private property owners. That the dams protected downstream Houston is not the point. It suffices to say that, consistent with the purpose for the construction of the Addicks and Barker flood-control projects, the government protected downstream properties from an estimated $7 billion in losses during Harvey, while concurrently causing upstream properties to suffer from severe flooding.
>
> …
>
> The flooding suffered by plaintiffs and the associated "damages were not merely consequential. They were the product of a direct invasion of the plaintiffs' domain.

*In re Upstream*, 146 Fed. Cl. at 253-54. Any succor the government might have provided in the construction and operation of the Addicks and Barker dams was delivered at the expense and loss of Plaintiffs. On these facts, no "balancing" of the rights taken versus the benefits conferred is appropriate whatsoever.[115] *Cienega Gardens v. United States*, 33 Fed. Cl. 196, 214 (1995) (noting that in a physical takings case "there is no need to balance the public benefit of the government action against the private burden borne by the plaintiff since a *per se* taking interferes with the owner's fundamental possessory rights with respect to the property"), *vacated on other grounds*, 194 F.3d 1231 (1998).

The government also emphasizes the "extreme nature of the Harvey rainfall" and asserts that "the rarity of this storm was not contested during the 2019 trial."[116] What the government fails to say,

---

[114] ECF 570, at 85.

[115] The lack of homage de the government is reinforced by the fact that even at the just compensation trial – three years after this Court's liability opinion detailing the basis upon which it found a physical taking by inundation by the project, the Corps representative, Robert Thomas, <u>still</u> refused to admit the Corps' actions caused the flooding of Plaintiffs' properties. Tr. 1188:3-1189:13.

[116] ECF 570, at 4.

however, is that the "rarity" of the Harvey event <u>was not at issue in the 2019 trial</u>. The nearest question examined was that concerning the foreseeability of Harvey, which the Court noted was evident from the day the dams were built. *In re Upstream*, 146 Fed. Cl. at 255-56. And, contrary to the government's bizarre assertion that weather was not "disputed" in the liability trial, Plaintiffs proved floods like Harvey inevitably would happen again. *id.* at 251 (noting that "the sheer frequency of significant storms in the region both before and since construction of the dams—the Hearne storm, the Taylor storm, the 1929 and 1935 storms, Tropical Storm Claudette in 1979, the 1992 series of storms, Tropical Storm Allison in 2001, and the Tax Day Storm—suggests that [Harvey] was more than an isolated event, and that it is likely to recur.").

The government intentionally used Plaintiffs' properties as a detention facility to protect downstream homes, businesses, and the City of Houston itself. *See In re Upstream*, 146 Fed. Cl. at 234 (discussing a 1973 Corp's memorandum discussing the Corps' "operating concept of imposing flooding on private lands without benefit of flowage easement or other legal right" and a 1974 Corps inspection report that acknowledged the government would soon be "in the position of having to flood the area within the reservoir with the accompanying damages in order to protect downstream improvements in the event of a severe future storm"). The government made the decision to "build now, pay later." *See In re Upstream*, 146 Fed. Cl. at 234-36. It's later.

The government persists in refusing to accept accountability for its decisions, resorting to disingenuous positions of well-established rulings. For instance, in its post-trial brief, the United States argues against loss of use compensation by asserting that, "[i]n the pretrial rulings, the Court stated that it 'did not find a temporary taking of property by the government had occurred.'"[117] But that is

---

[117] ECF 570, at 101.

misleading. And the full quote from this Court wholly refutes any contention that Plaintiffs cannot recover for loss of use:

> The government is correct that the court did not find a temporary taking of property by the government had occurred. But,[118] the court did recognize that certain property losses by plaintiffs were the "consequential result" of the government's taking of a flowage easement. Evidence regarding the "temporary dispossession of [plaintiffs'] property rights measured by the fair rental value of the property for the reasonable period [plaintiffs] w[ere] deprived of its use," Pls.' Mem. at 26, is included in the consequential results of the government's taking of a permanent flowage easement. Just as plaintiffs' personal property would not have been damaged or destroyed but for the government's taking, it is also true that but for the government's taking, plaintiffs would not have been displaced from their properties—temporarily or otherwise. "[F]or all that the [g]overnment takes it must pay." *United States v. Dickinson*, 331 U.S. 745, 750, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). This edict remains true, regardless of the fact that the flooding was a temporary aspect of a permanent taking.

*In re Upstream*, 159 Fed. Cl. at 531-32 (emphasis added). The government doubles down on its diversion from the truth and asserts the compensation Plaintiffs seek for the temporary loss of use of their properties constitutes a claim for "consequential damages that are not recoverable" because "[t]he Court did not hold the United States liable for a temporary taking."[119] Advocacy is one thing. But this is beyond. And the Court should reject the government's effort to rewrite the record. A consequential result does not automatically translate into "consequential damages." The government's wordplay should be rejected and compensation awarded for Plaintiffs' temporary loss of the use and enjoyment of their properties, as this court has long recognized. *See Johnson v. United States*, 2 Ct. Cl. 391, 416 (1866) (holding that when the government takes land on a temporary basis, "the measure of the damages must be limited to the value of this temporary occupancy, as though the claimant had leased and the government had rented the premises").

The government tries a similar ploy with respect to personal property: "Plaintiffs have not proven a taking of personal property" and, that recovery for the property destroyed when the United

---

[118] "Nothing someone says before the word 'but' really counts." –George R.R. Martin.

[119] ECF 570, at 101.

States used Plaintiffs' properties as part of its flood control project (again) constitute unrecoverable consequential damages.[120] But this Court has already rejected both arguments: "When it found the government liable for a permanent flowage easement, the court concluded that 'the taking also encompassed—as a consequential result of the flowage easement taken—plaintiffs' personal property, fixtures, and improvements damaged or destroyed by the flood event.'" *In re Upstream*, 159 Fed. Cl. at 529 (quoting *In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, 148 Fed. Cl. 274, 278 (2020)). but the government's assertions notwithstanding, there can be no doubt that the government holds the same "categorical duty" to pay just compensation for the taking of Plaintiffs' personal property. *Horne v. Dep't of Ag.*, 576 U.S. 350, 135 S. Ct. 2419, 2426 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."); *Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374 (Fed. Cir. 2000) ("the term property as used in the Taking Clause includes all rights inhering in ownership, including the right to possess, use, and dispose of the property").

## V.      The Government's Ineffectual Challenges to Plaintiffs' Proof.

Nothing in the government's brief (or the case it presented at trial) discredits the evidence presented assessing the compensation owed each Plaintiff for the devastation the United States caused to protect the City of Houston and the Houston Ship Channel at Plaintiffs' expense. The Court should enter the following amounts as just compensation awarded to each Test Property Plaintiff:

| Banker | $655,592.34 | Micu | $319,484.85 |
|--------|-------------|---------|-------------|
| Burnham | $209,088.63 | Popovici | $392,283.69 |
| Holland | $95,137.52 | Sidhu | $91,905.31 |

---

[120] ECF 570, at 77-78.

**A.    The Compensation Due for the Rights Taken in Acquiring the Permanent Flowage Easement.**

Both sides agree that the taking of the permanent flowage easement requires the government to pay the property owner the market value of the property rights taken at the time of the taking assessed using the "before-and-after" method (i.e., the difference between the value of the property before and after the Government's easement was imposed), measured by what a willing buyer would pay in cash to a willing seller at the time of the taking. *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961); *United States v. Miller*, 317 U.S. 369, 374 (1943).

"The scope of an easement is a matter of state law." *Capreal, Inc. v. United States*, 99 Fed. Cl. 133, 143 (2011) (citations omitted). The government challenges this legal precept by pointing out that the cases Plaintiffs cite were Trails Act cases.[121] That is an irrelevant distinction. The interpretation of the document that ultimately transfers the rights taken—whether it be an agreed-to conveyance document between the government and the property owner, or a judgment of the Court – will be interpreted according to state law using well-known classic rules of construction for the interpretation of written documents. *See generally Eaton v. Courtaulds of N. Am., Inc.*, 578 F.2d 87, 90 (5th Cir. 1978) (interpreting consent decree from prior action "as a matter of contractual interpretation").

And Texas law protects the rights of the easement, as the dominant estate, over those of the owner of the fee. "Because the easement holder is the dominant estate owner and the land burdened by the easement is the servient estate, the property owner may not interfere with the easement holder's right to use the servient estate for the purposes of the easement." *Severance v. Patterson*, 370 S.W.3d 705, 721 (Tex. 2012); see also *Taylor Foundry Co. v. Wichita Falls Grain Co.*, 51 S.W.3d 766, 770 (Tex. App.— Fort Worth 2001, no pet.) ("Any use by the servient estate holder that interferes with the exercise of the dominant estate holder's rights <u>must yield</u>." (emphasis added)). "By physically, and permanently,

---

[121] ECF 570, at 44 n.56.

taking a part of property, the government [did] not simply take a single strand from the bundle of property rights: it chopped through the bundle, taking a slice of every strand, effectively destroying each of these rights." *Caquelin v. United States*, 140 Fed. Cl. 564, 574 (2018). As the government's own witnesses acknowledged, that is the way the Corps will interpret and apply whatever document it is to enforce in the future.

Compensation for the taking of the easement must be calculated based on an assumption that, in the future, the government will put its rights to the full physical use permitted. *See 2,953.15 Acres of Land, More or Less, in Russell Cnty., State of Ala. v. United States,* 350 F.2d 356, 360 (5th Cir. 1965) ("The Government concedes, as it must, that the landowners are entitled to assume in the condemnation suit that the Government will make the full use physically possible of any easement described in the complaint."). Plaintiffs are due compensation for all losses which can be reasonably anticipated from the maximum use of the easement. *2,953.15 Acres of Land*, 350 F.2d at 360 ("Damages reasonably to be anticipated from the use of the property for the purpose for which the condemnation is made are relevant in determining the compensation to be awarded for the taking.") (citing *United States v. Dickinson*, 331 U.S. 745 (1947); *United States v. Chicago, B. & Q.R. Co.*, 82 F.2d 131 (8th Cir. 1936); *United States v. Chicago, B. & Q.R. Co*, 90 F.2d 161 (7th Cir. 1936)); *see also Horton v. Mills Cty.*, 468 S.W.2d 876, 878 (Tex. Civ. App.—Austin 1971, no writ) ("It is settled law in this state that the probability that the condemnor will not exercise, or has no present intention of exercising, the full rights acquired under condemnation may not be considered in reduction of damages, where, as in this case, there is nothing to prevent the condemnor from using to the full extent its rights. The law presumes the condemnor will exercise its rights and will use and enjoy the property taken to the extent of its acquisition.").

**B.      None of the government's attacks even touch Plaintiffs' evidence.**

The proof presented by Plaintiffs' experts at trial left no doubt as to the devastating effect the government's flowage easement will have when it infiltrates market sales.

**1.      The testimony and opinions of Mr. Robert Philo.**

The key testimony from Mr. Robert Philo is that it went <u>completely unrebutted</u> by any other evidence or testimony at trial. That is, the Court has no evidence before it on the operation of Title, Insurance, and Mortgage (coined "TIM" by Dr. Bell) behind the scenes of the real estate market. And the evidence is stark: the TIM industry will not transact on properties subject to the easement.

Mr. Philo is an attorney with over 40 years of experience practicing real estate law and working in the title insurance industry.[122] He has closed real estate transactions of every stripe, supervised closings and the issuance of title commitments and policies, acted as underwriting counsel for several national and regional title insurance companies and in that capacity, answered questions from title insurance agents involving documents which they found of record and how they affect title.[123] From 1981 through 1984, Philo worked for the Texas Department of Insurance and supervised the title insurance industry in this state.[124] For years Mr. Philo was a teacher for both the Texas state bar and for the Texas Land Title Association—a 5,000 member industry organization of title insurers and title agents and escrow officers that gathers and shares information about title insurance and interacts frequently with the Texas Department of Insurance.[125] Mr. Philo testified that he "served as chairman

---

[122] Tr. 434:21-435:9 (Philo).

[123] Tr. 435:14-25 (Philo).

[124] Tr. 436:1-5 (Philo).

[125] Tr. 439:11-24 (Philo).

of just about every committee that they have," and "served as the president of the organization [in] 1995, 1996." [126]

Mr. Philo provided testimony concerning what "actually does occur in the title insurance industry, the processes, the procedures, and how that affects real estate transactions," as well as "what happens when there is a flowage easement that has either been recorded or unrecorded," and "how does what the title industry do affect the market generally." [127] He has been accepted as an expert "multiple times" in previous cases. [128]

In the course of describing the workings of the title insurance industry in Texas, Mr. Philo explained how title searches are performed and why title insurers "except" non-standard easements from coverage in the policies they issue. [129] He then discussed the ripple effect such an exception to title has on the overall purchase transaction: because "clean" title cannot be provided, the buyer has to accept the title risk, and even if they do, the lender for the purchase will put it under additional scrutiny. [130] The exception to title can also adversely impact the ability of the lender to get lender's insurance for the deal, as well as their decision to fund the transaction at all. [131] This is especially true for residential home mortgages which must meet a series of "checks" required by purchasers of that debt paper in the huge secondary mortgage market. [132] As Mr. Philo went on to discuss, the presence

---

[126] Tr. 440:15-18 (Philo).

[127] Tr. 437:6-22 (Philo).

[128] Tr. 437:24-438:1 (Philo).

[129] Tr. 464:13-466:24 (Philo).

[130] Tr. 467:2-470:14 (Philo).

[131] Tr. 481:9-482:11 (Philo).

[132] Tr. 483:2-484:20 (Philo).

of a flowage easement on a parcel of property precludes the issuance of "clean" title to the property and is a matter that <u>cannot</u> be cured so that clean title may be obtained.[133]

The only comments the government makes about Mr. Philo are contained in footnote 64 of its brief and amount to an acerbic attack on his testimony that the TIM industry is as-yet unaware of the yet-to-be-written and recorded flowage easement at issue in this case, and that when it becomes aware "it will cause a turmoil for period of time while the title insurance industry tries to figure out what to do about it, and what properties are affected by it."[134] According to Mr. Philo, the title insurance "industry" in Texas is actually comprised of three or four major groups of lenders that form a "very close-knit family" such that if one of the insurers were aware of this issue, they all would soon be aware.[135] He is also certain the industry actors remain unaware of the import of this Court's liability finding because it has not been the subject of any bulletin issued by the Texas Land Title Association.[136] And he noted that while industry actors routinely examine the dockets of state and federal courts in Texas, that is not true of this Court's docket.[137] Of course, the government offered no evidence to the contrary.

Once the industry gains the knowledge that a permanent flowage easement is to be recorded over properties in the Addicks and Barker reservoirs, Mr. Philo testified that title insurers will simply not do any business in the area until they can put an exception to it "in every policy in Harris and Fort Bend County."[138] Mr. Philo's uncontroverted testimony serves (again) to demonstrate the baseless

---

[133] Tr. 489:6-16 (Philo).

[134] Tr. 462:13-463:4 (Philo).

[135] Tr. 491:23-493:15 (Philo).

[136] Tr. 492:2-25 (Philo).

[137] Tr. 493:17-24 (Philo).

[138] Tr. 463:25-464:10 (Philo).

assumptions concerning "market awareness" upon which Lucco's opinions rely, while supporting the significant impact to the market value of Plaintiffs' properties attested to by their valuation experts.

### 2. The testimony and opinions of Dr. Randall Bell.

Dr. Bell provided testimony based on his decades of experience at the forefront of valuation problems involving unique circumstances. Indeed, Dr. Bell literally wrote the book on the application of his Detrimental Condition Matrix, model adopted and used by the Appraisal Institute in such circumstances.[139] And he has been involved in top-level disaster appraisals across the country and the world. In his book, Dr. Bell demonstrates application of the Matrix to valuation problems at properties ranging from those destroyed in the attacks of September 11, 2001; the massacre at Sandy Hook Elementary School in Newtown, Connecticut; the nuclear accident at Three Mile Island; the apartment building inhabited by mass murderer Jeffrey Dahmer; and the environmental and ecological spoliation from the Exxon Valdez oil spill.

For this case, Dr. Bell approached the appraisal problem with a five-step analysis: (1) a literature review going back several decades of materials relevant to the problem; (2) a search for relevant case studies from around the country; (3) an assessment of interviews of local market participants; (4) an examination of documents prepared by the Army Corps of Engineers outside of this litigation regarding the diminution in value caused by a permanent flowage easement; and (5) an analysis of the applicability and significance of an easement valuation matrix prepared by Mr. Donnie Sherwood and published by the International Right-of-Way Association ("IRWA").[140]

According to Dr. Bell, there is a vast difference between the diminution in value to a property caused by it having previously flooded versus the diminution in value to a property caused by the imposition of a flowage easement. First and foremost, the flooding of a property "doesn't sever the

---

[139] See DX 1705, at 20; Tr. 1822:9-1823:1 (Bell).

[140] Tr. 1833:14-1834:9 (Bell).

bundle of rights."[141] Dr, Bell then echoed and confirmed the testimony of Mr. Philo regarding the impact of a flowage easement on the TIM industry participants.[142] As Dr. Bell explained, "with a flowage easement, it's a game changer" with regard to the TIM industry:[143]

> [P]articularly the mortgage company who batches the sales and then sells [mortgages] . . . there's a certain criteria and check marks. And a flowage easement that encompasses a -- the living area of a house is a big deal. And I would think it would -- well, the data shows that that's reflected in the effects that it would have on the price.[144]

Dr. Bell discussed the case studies he reviewed of residential properties with flowage easements on them, all of which were on the banks of rivers or lakes.[145]

> [T]hey basically go from the boat dock area up maybe ten feet up the -- up the lawn, and rarely do you see flowage easements entering into living area because they are so incompatible. Allowing water deliberately and engineered to flow through someone's living area, that's just very unusual. So I would say, yes, indeed the lease -- or, excuse me, the flowage easement is indeed atypical because typically they exclude living areas.[146]

As Dr. Bell went on to explain, the flowage easement here is certainly atypical as it will allow habitable structure to remain, "But I wouldn't say that's a good thing. I would say that's not a good thing."[147] Indeed, in one of the case studies underlying Dr. Bell's opinion, when creating a new reservoir in Ohio, the condemnor wanted a flowage easement over exiting residences that would now be adjacent to the waterline and the property owners were given a choice to stay and live in their homes with the flowage easement or the condemnor would buy out the property owners in fee simple—and the

---

[141] Tr. 1838:14-16 (Bell).

[142] Tr. 1838:16-1839:12 (Bell).

[143] Tr. 1838:21-25 (Bell).

[144] Tr. 1839:6-12 (Bell).

[145] Tr. 1840:15-18 (Bell).

[146] Tr. 1840:18-1841:1 (Bell).

[147] Tr. 1856:14-19 (Bell).

owners chose to be bought out.[148] Indeed, Dr. Bell happened to be at the site the day the homes were being bulldozed.[149]

And nothing the government tried could shake Dr. Bell's opinion that the problems regarding the TIM industry and the principle of substitution (whereby people can simply go to a different area nearby and purchase a home <u>without</u> a flowage easement on it) combine to diminish the value of properties covered by the flowage easement somewhere in the range of 85-100% of Before value.[150]

In its briefing the government challenges Dr. Bell's testimony by asserting his opinions "are based on what he believes will happen in the future, when the easement is issued and recorded, not that the diminution has occurred today or on the date of taking."[151] Not at all. Dr. Bell's opinions, properly, are assessed <u>as of the date of take</u> as if the government's flowage easement existed on the property. That is precisely the correct methodology to use. And yes Dr. Bell rejected use of the post-Harvey sales in the flood pool but not for "irrelevant, unsupported reasons."[152] Dr. Bell rejected using those sales <u>because, as Lucco admitted but did not understand the error, none of those sales transferred the property interest sought to be valued in this case.</u> *See United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 633 (1961) ("The guiding principle of just compensation is reimbursement to the owner for the property interest taken."). Because <u>none</u> of the post-Harvey sales in the flood pool involved a transfer of a property subject to flowage easement, <u>none</u> can be used to in a "paired sales analysis" to value the permanent flowage easement taken here:

> In a paired sales analysis, an appraiser compares two properties that are alike except for one characteristic. Any difference in the price is attributed to the characteristic that differs, which allows the appraiser to isolate the effect of that variable.

---

[148] Tr. 1841:23-1842:8 (Bell).

[149] Tr. 1841:23-1842:11 (Bell).

[150] Tr. 1842:17-1843:1843:2, 1847:9-11 (Bell).

[151] ECF 570, at 54.

[152] ECF 570, at 55.

*Childers v. United States*, 116 Fed. Cl. 486, 509 (2013). The variable at issue here is the presence of a permanent flowage easement; the loss of the property rights taken by the government—that is what must be measured. That goal cannot be achieved, that property interest cannot be measured, using transaction that did not involve its purchase and sale. Nor does Lucco's "conditions of the easement" notion serve as a proxy for the actual transfer of the actual interest for all the reasons set out above.

Next the government criticizes Dr. Bell's reference to the IRWA article by Donnie Sherwood a part of his investigation and analysis, but that criticism too is without merit. Dr. Bell testified that he did take into account the information and analysis in Mr. Sherwood's matrix regarding the impact of various easements on property values and has done so for well over 10 years.[153] Dr. Bell said that he initially learned of the IRWA article in 2006 when it was first published because it was recommended to him by a government agency for guidance on an easement condemnation matter that Dr. Bell was working on for the government.[154] Dr. Bell stated that the article is used and accepted across the appraisal profession, and that he used it for what it is—one piece of information you use to "triangulate" all available data to "end up at a similar point that reconciles."[155]

Moreover, the government's attack on the validity of using the "Sherwood matrix" at all provides yet another example of the misrepresentations it has shown itself willing to make to this Court. Contrary to what the government states in footnote 60 of its brief,[156] <u>neither</u> of the courts in *Jackson v. United States*, 155 Fed. Cl. 689, 701-702 (2021), *appeal dismissed,* No. 2022-1276, 2022 WL 2163785 (Fed. Cir. Jan. 25, 2022), or in *Hardy v. United States*, 141 Fed. Cl. 1, 15 (2018), "found the Sherwood matrix is not a reliable basis to value properties." That is simply not true. And the

---

[153] Tr. 1834:4-9 (Bell).

[154] Tr. 1834:19-1835:5 (Bell).

[155] Tr. 1835:8-13 (Bell).

[156] ECF 570, at 57.

government (misleading citations aside) had offered no fact, opinion, or legal position that undermines the Sherwood matrix.[157]

The government did not, and could not, undermine the testimony and opinions provided by Dr. Randall Bell. Literally, the man wrote the book on appraising uniquely impacted properties. And has testified in the most high-profile cases in the world. Compared to the government's expert, Dr. Bell's testimony, understanding, and application towers above Lucco's offering:

> Q. . . . Tell us now, having watched all of Mr. Lucco's testimony and all of the testimony pertaining -- either read or watched all of the testimony pertaining to the claims, how comfortable do you remain or feel about the opinions you rendered as compared to the opinions of Mr. Lucco?
>
> A. I feel as or more confident as I did the day I arrived here to testify. Everything I've seen, I feel very comfortable in terms of the validity of my opinions and the invalidity or, actually, missing the mark of Mr. Lucco's testimony.[158]

### 3. The testimony and opinions of Matt Deal.

The government made no challenges to Mr. Deal's qualifications to testify as an expert on the topics of real estate appraisal, real estate valuation, and real estate market studies and his appraisal reports were all admitted.[159] Mr. Deal testified extensively regarding the objective of the "after" appraisal, which is to reliably determine the market value of the property rights remaining to the fee

---

[157] In *Jackson*, the court rejected use of the Sherwood matrix by the government's appraiser because the government's appraiser misapplied the matrix to the easement at issue. *See* 155 Fed. Cl. at 700-01 ("At the outset, Defendant failed to establish that the Sherwood matrix is a persuasive indicator of the owners' property rights in land encumbered by a Rails-To-Trails easement. . .. Recreational trail easements do not even appear on the matrix."). And, in *Hardy*, while the court rejected application of the matrix again in a Rails-to-Trails case, and again when relied on by the government's expert, it did not make any finding that the matrix *per se* was "not a reliable basis for valuing properties." Instead, the *Hardy* court actually said, "Second, even assuming, for the sake of argument, that the Sherwood Matrix constitutes reliable authority, Mr. Sheppard's reliance on it is inapposite." 141 Fed. Cl. at 145. For the government to take the failure by its own experts to properly apply the Sherwood matrix to cases involving very different easement rights as a basis to tell this Court that the matrix has been rejected and found "not a reliable basis for valuing properties" is beyond the pale.

[158] Tr. 2803:25-2804:12 (Bell).

[159] Tr. 1421:01-13 (Deal); Tr. 1706:1-24 (admitting PX-JC 886, 887, 888, 889, 890, & 891).

simple owner after the taking.[160] The property rights remaining that Mr. Deal considered were taken directly from the Court's rulings.[161] Mr. Deal conducted extensive research regarding the negative externalities resulting from the Corps' operation and use of the Addicks and Barker Dams (e.g. loss of use during and after periods of induced flooding, inability to exclude flood waters, extreme destruction caused by flooding inside a family residence, etc.) influence market value.[162] Mr. Deal explained that his overall methodology was to undertake significant market research and analysis to extract market comparisons to isolate and quantify compensable damages, if any, resulting from the taking of a permanent right to occasionally use and flood Plaintiffs' properties as available reservoir storage capacity.[163] Mr. Deal discussed how his approaches to value utilized, amongst other things, the reasoned and peer-reviewed concept that properties having greater depth, duration, and frequency of recurring "suffer the most."[164] Mr. Deal proceeded to use the site-specific depth, duration, and frequency information for each Test Property to make appropriate reconciliations and adjustments.[165] There is no dispute that Mr. Deal employed generally accepted appraisal methodologies to quantify the retrospective value of the property rights remaining to the Test Properties after the taking of the

---

[160] Tr. 1451:14-24; 1453:01-09; PX-JC 886, 887, 888, 889, 890, & 891 at pages 47-51 (Mr. Deal's appraisals overall discussion of Highest and Best Use Analysis and purpose of appraisal in the after instance).

[161] Tr. 1415:14-1416:13 (Deal); ECF 283, April 30, 2020, Order, at page 5.

[162] Tr. 1500:25-1501:22; 1456:02-1457:08 (Deal); PX-JC 887, page 49, 64-82.

[163] PX-JC 886, 887, 888, 889, 890, & 891 at pages 22-28 (Scope of Work); 68-69 (Paragraph D. Study of issues surrounding the taking of a permanent right to inundate the subject property with impounded flood waters).

[164] Tr. 1478:25-1479:23; 1481:06-17; 1481:19-1482:25 (Deal trial testimony regarding site-specific analyses of depth, duration and frequency, as well as discussion of Fargo Morehead easement acquisition market study).

[165] Tr. 1515:02-1516:08 (Deal trial testimony regarding site-specific analyses of depth, duration and frequency, as well as reconciliation and adjustments).

permanent flowage easement via physical occupation with contaminated floodwaters.[166] And the government does not dispute that Mr. Deal's methodologies and approaches to value strictly conformed to the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.[167] Mr. Deal confirmed that the appraisals meet the credibility, reliability, and accuracy standards promulgated by the Appraisal Institute.[168]

Mr. Deal explained that the overall purpose of conducting separate "before" and "after" appraisals in an easement acquisition scenario is to determine how much less valuable the to-be-imposed easement will make the remainder property.[169] Mr. Deal discussed his extensive analysis, review, and use of land trends, transaction data, and a paired sales analysis providing reliable and quantifiable evidence of market value loss for properties that are subject to the risk of recurring flooding.[170] Mr. Deal provided extensive testimony about how the market's response to properties that remain subject to the risk of recurring flooding is to shorten the economic life of improvements (*i.e.,* structures) on the property.[171] Mr. Deal's appraisals include a lengthy section regarding his study

---

[166] Tr. 1451:14-24; 1453:11-21; 1454:07-23; 1470:03-20; 1470:23-1472:19 (Deal); PX-JC 156, at 170 (Yellow Book quote of *U.S. ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 821 (E.D. Tenn. 1941) (explaining overall rationale under for valuing the market value of the remainder property remaining after imposition of easement).

[167] Tr. 1419:11-18; 1420:02-09; 1420:16-24 (Deal).

[168] Tr. 1420:02-09; 1420:16-1421:24 (Deal).

[169] Tr. 1467:06-1468:17 (Deal); PX-JC 0156, page 170 (Yellow Book discussion of *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 821 (E.D. Tenn. 1941), cited with approval in *United States v. 2,847.58 Acres of Land*, 529 F.2d 682, 686 (6th Cir. 1976)).

[170] Tr. 1483:07-24 (Deal testimony regarding why market's recognition of areas having elevated risk of recurring flooding is germane to analysis of property rights remaining with fee owner); Tr. 1486:10-23 (Deal testimony regarding market reaction to Houston-area properties that are subject to the risk of recurring flooding); 1503:24-1504:15 (Deal testimony regarding how Meyerland submarket has market knowledge of the risk of recurring flooding).

[171] Tr. 1487:05-20 (Deal); PX-JC 887, pages 63-64 "the economic life of the improvement is shortened, and often represents only an interim use having reduced economic utility or value."

of the market's recognition of areas at risk for recurring flooding.[172] That testimony included Mr. Deal's analysis of local government buyout programs, and noted that a Harris County Flood Control District buyout program following Tropical Storm Allison resulted in virtually no market demand in the Arbor Oaks neighborhood located in Northwest Houston, which is now a frisbee golf course.[173] Mr. Deal's appraisals similarly investigated NFIP-based floodplain development regulations associated with the 50% FEMA Rule requiring that newly-built and/or substantially improved or damages properties comply with current floodplain regulations,[174] as well as detailed analyses of the market's response to recurring flooding (*i.e.,* removing the detrimental condition by demolishing the structure or elevating it to get above the recurring flood risk).[175] Finally, Mr. Deal addressed the impacts of the 2019 update to the sellers' disclosure notice and the updated (and highly confidential) FEMA flood insurance rate maps that would for the first time show market participants areas within the Easement Area and "Flood Pool" boundaries (if the selling parties knew how to answer the questions).[176]

     In its brief the government consistently misstates or misrepresents Mr. Deal's methodologies for isolating, identifying, and quantifying the overall reduction in market value in the "after instance."

---

[172] PX-JC 886, Section C, pages 60-68; *see also* PX-JC 887-891.

[173] PX-JC 886, Section C-1, pages 60-61; PX-JC 887-891; Tr. 1483:07-1484:21 (Deal).

[174] PX-JC 886, Section C-3, page 64; PX-JC 887-891; Tr. 517:21-518:16; 531:17-19; 535:14-24; 539:20-24 (Hahn testimony regarding floodplain requirements for properties with substantial improvements and substantial damage; Hahn testimony that he is now the floodplain administrator for Harris County; Hahn testimony that if a property is substantially damaged it must be elevated or demolished; Hahn testimony that substantial damage/improvement determined by comparing reasonable and necessary cost to repair estimates derived from FEMA's Substantial Damage Estimator 2.0 tool versus appraised value).

[175] PX-JC 886, Section C-4, page 64; PX-JC 887-891; Tr. 1486:04-23 (Deal).

[176] PX-JC 886, Section C-6, page 65-69; PX-JC 887-891; PX-JC 457 (Confidential admitted under seal); PX-JC 457 and 458 (demonstratives of updated and highly confidential flood insurance rate maps showing areas behind Addicks and Barker); Tr. 1493:18-1498:07 (Deal).

For instance, the government repeatedly claims that Mr. Deal "rejected the use of a comparable sales approach using actual sales to determine the 'after' value."[177] This is, at best, misleading. While everyone agrees that there are no sales of properties burdened by a flowage easement (which necessarily excludes using the direct sales comparison approach Lucco purported to employ), Mr. Deal did compare sales of flooded properties in a paired sales analysis to quantify the "immediate impact" on market value resulting from the physical occupation of a residential property by floodwaters, which is a commonly accepted methodology to isolate the effect of a single variable on market value. *See Childers v. United States*, 116 Fed. Cl. 486, 509 (2013) (noting that, "[i]n a paired sales analysis, an appraiser compares two properties that are alike except for one characteristic. Any difference in the price is attributed to the characteristic that differs, which allows the appraiser to isolate the effect of that variable); *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 626 (2013) (same); *Rogers v. United States*, 96 Fed. Cl. 472, 478 (2011) (denying government's motion to strike after confirming that plaintiff's appraiser used a paired sales analysis to appraise the property in the "after" condition).

Mr. Deal directly addressed the "different submarket" issues raised by the government at trial and confirmed that his use of paired sales provided reliable and quantifiable market data regarding the market's pricing response to properties that face recurring flooding.[178] Mr. Deal conducted a robust market study for Meyerland, which included an "on the ground" inspection of homes to evaluate whether the market's response varied based on depth, duration, and frequency of the flood risk.[179] Mr. Deal and his team also interviewed local realtors,[180] and attended to the deposition

---

[177] ECF 570, at 41.

[178] Tr. 1488:02-16 (Deal).

[179] Tr. 1498:18-1499:09; 1508:01-1509:18 (Deal); PX-JC 1162 (Meyerland Market Study map).

[180] Tr. 1509:05-18,

testimony of Stephen Atchison (associate chief residential appraiser for the Harris County Appraisal District), who also testified regarding the market's response to Meyerland's recurring flood risk.[181]

And it is significant that the government makes no attempt to attack the accuracy of the paired sales analysis or its finding that market awareness of recurring flood risk is "devastating to values,"[182] which, leaving aside the other aspects of a flowage easement, Mr. Deal said resulted in a value discount of up to 54% for a residential property.[183] Using his analysis of valuing the part taken plus damages to the remainder, a combination of the diminution in value to the remaining fee from the perceived risk of recurring flooding, added to the reasonable and necessary repair costs each homeowner would face to bring the property back to functionality as its highest and best use, Mr. Deal's testimony and reports provided a firm foundation for the significant compensation owed to each Plaintiff.

### 4.   The testimony and opinions of Tim Archibald.

Timothy Archibald, a member of the Appraisal Institute ("MAI") and a state certified general appraiser with decades of experience appraising Texas properties, testified to the extensive work he did in preparing his reports and reaching his opinions in this case.[184] Mr. Archibald applied the before and after methodology and precepts as set forth in the YELLOW BOOK to appraise the single-family residences, condominiums, leasehold, and market rental rates for the Test Property Plaintiffs.[185] He has appraised hundreds of easements including those for takings of pipelines, road rights-of-way, avigation needs, transmission lines; he's even appraised a property with a flowage easement on it (the only expert to have done so).[186] He has done appraisals for condemnation matters hundreds of times

---

[181] Tr. 1504:20-1505:12; PX-JC 887, page 76, note 98.

[182] Tr. 1486:10-23 (Deal).

[183] PX-JC 886, page 77 (Archibald).

[184] Tr. 1906:2-22 (Archibald).

[185] Tr. 1906:23-1907:23 (Archibald).

[186] Tr. 1907:24-1908:11 (Archibald).

as well, in both state and federal court; although he has been challenged, he has never been excluded from providing testimony.[187]

Mr. Archibald used a classic sales comparable approach to reach his Before Scenario values: numbers the government does not challenge.[188] Mr. Archibald also used a sales comparable approach when selecting properties for the market rental rates for each property.[189]

In the After Scenario, the lack of comparable sales—that is, sales involving a transfer of properties burdened by a flowage easement or lacking the property rights being valued—precluded the use of a sales comparison approach.[190] Instead, Archibald used what he termed a "modified sales comparison" approach to reach his After Scenario percentage valuations of the properties in an uncured—waterlogged—condition, as directed by the YELLOW BOOK.[191] As Mr. Archibald testified, the "uncured" After Scenario condition means, Mr. Archibald explained, that the appraiser should assume a "willing buyer" was walking up to the property "literally after the rain stops in waders."[192]

For his After Scenario value ranges, Archibald drew on his prior experience as an appraiser of various easement interests, as a developer of properties burdened by a flowage easement, interviews with fee owners whose properties were burdened by a flowage easement, independent research seeking studies that concern the impact of flowage easements on improved properties, the previously discussed IRWA article by Donnie Sherwood (as well as direct discussions with Mr. Sherwood), and

---

[187] Tr. 1908:17-1909:9 (Archibald).

[188] Tr. 1950:14-18, 1962:20-1966:13 (Archibald).

[189] Tr. 1966:14-20 (Archibald).

[190] Tr. 1953:16-24, 1916:25-1917:2 (Archibald).

[191] Tr. 1917:3-14, 1949:21-1950:13 (Archibald).

[192] Tr. 1956:7-13. "Q. And let me be clear. You're, again, appraising in the after scenario a wet house, right? A. Yes. Unrepaired." Tr. 1964:21-24 (Archibald).

a series of interviews of market professionals.[193] Those interviews included individuals active in the title, insurance, and mortgage industries as well as brokers, buyers, and sellers of properties in the Houston market.[194] At the end of the process, Mr. Archibald testified to a range of 85-95% for the diminution in value caused by the government's permanent flowage easement based on the rights that left to the remainder property owners based on the imposition of the easement.[195]

The government claims that Mr. Archibald's opinions should be rejected because he did not make findings to justify his use of a qualitative rather than quantitative approach; that his use of that approach is not supported by the fact that buyers of residential properties use a qualitative approach; and that his description of his appraisals as "restricted reports" is not allowed under the YELLOW BOOK.[196] None of the government's arguments hits their mark. First, even though he followed and applied the precepts of the YELLOW BOOK, even if he did not perform an appraisal in accordance with every standard presented in the YELLOW BOOK would not serve as a basis for rejecting his work. Only the government's expert—Lucco—was <u>required</u> the follow and apply the YELLOW BOOK. *See Hardy v. United States*, 141 Fed. Cl. 1, 32 (2018) ("The Yellow Book applies only to appraisers hired by the federal government for condemnation purposes; it is not mandatory with respect to appraisers not hired by the government."). Not only did Lucco fail to follow the YELLOW BOOK standards, but <u>the government</u> actually instructed him to prepare reports that were <u>not</u> in conformity with those standards. Moreover, the government ignores Mr. Archibald's testimony that he labeled his reports as

---

[193] Tr. 1918:8-1936:24. As the Court may recall, Mr. Archibald's discussion of the work done to reach his opinions was the subject of a lengthy (but unsuccessful) voir dire by the government.

[194] Tr. 1957:18-1958:8. The participants uniformly reported that even hearing the term "flowage easement" was associated with a property meant they would pay less for it. Tr.1959:23-1960:2.

[195] Tr. 1914:24-1916:18, 1939:23-1940:19, 1964:1-10 (Archibald).

[196] ECF 570, at 18-19.

"restricted" at the direction of an Appraisal Institute official.[197] At the end of the day, the government's "restricted appraisal" argument is an ill-conceived tempest in a silly teapot.

Similarly flawed is the government's bald assertion that Archibald appraised these properties as if they were subject to a permanent flowage easement that does not permit habitation. The government offers no record support for this charge; it is a government invention. And it is wrong. Mr. Archibald expressly noted in his reports (and repeated from the stand) that he followed and applied the Court's order, one element of which was that the properties could be inhabited after the imposition of the flowage easement.[198] Without doubt, Mr. Archibald appraised the correct easement—one that allows someone to live in a home subject to intermittent flooding. But Mr. Archibald only noted (consistent with Dr. Bell's case studies) that, in his opinion, very few people would take the risk to house their families in a flowage easement-burdened home when virtually identical homes were available in the nearby vicinity. As a result, he explained, the issues of periodicity were not particularly relevant to his analysis. Ultimately, Mr. Archibald testified he was valuing the impact of "the implementation of a flowage easement across these properties," that is, its impact on the bundle of rights taken on the value of the remainder.[199] As Mr. Archibald summed up his assessment: "[T]he valuation of the impact of the flowage easement on the property is not the rain."[200]

---

[197] Tr. 2010:6-20. Knowing that Mr. Archibald sought and received confirmation directly from an Appraisal Institute official that use of restricted reports in litigation for non-government appraisers is appropriate and still attempting to have Mr. Archibald's reports excluded on this basis is just another example of the disingenuous arguments to which the government has chosen to resort.

[198] Tr.1940:20-25 (Archibald). And as noted, the record proof in this case shows that even properties burdened by the "standard" Corps easement can be inhabited if conditions as exist here are present. Tr. 1940:15-19 (Archibald), 1853:18-1856:2 (Bell), JX 1007, at 5-238 n.4.

[199] Tr. 1970:4-25 (Archibald).

[200] Tr. 1971:3-4 (Archibald).

"It's going to boil down to whether they want to buy a house with an easement or not."[201] Mr. Archibald, in his professional opinion, believed that was unlikely and estimated the price effect.

### 5.    The testimony and opinions of Dr. Philip Bedient.

The "extreme nature of the Harvey rainfall and the rarity of the storm"[202] was not contested by the Plaintiffs in the liability trial because the specific frequency of this event was not a relevant issue in determining whether the government was liable for a taking. And Plaintiffs' appraisal experts opined that the establishment, and eventual public awareness, of the existence of the permanent flowage easement will dominate a buyer's consideration regarding the diminution in value in the After Scenario, as compared to the frequency of occurrence of another Harvey-level flood. Nevertheless, while asserting that Dr. Bedient's flood pool frequency analysis is irrelevant to determining just compensation,[203] the government called a host of experts to attempt—but wholly fail—to discredit Dr. Bedient's work. Similarly, the government contends that the Plaintiffs failed to connect Dr. Bedient's opinions to the Plaintiffs' appraisal experts, so the opinions are irrelevant to the question of market value and the Court's determination of just compensation.[204] But, just as contradictorily, the government extols its appraisal expert, Lucco, for basing his "after" market value/damage estimates on diminution in value due to the future risk of flooding from the Addicks and Barker Dams/Project.[205] The government also cites numerous statements and information about the "extreme rarity" of the Harvey storm event in an effort to assuage the Court (and the public) "that Harvey was a thousand-year flood and, therefore, like, everyone can chill out, it's not going to happen

---

[201] Tr. 1969:23-24 (Archibald).

[202] ECF 570, at 14.

[203] ECF 570, at 63.

[204] ECF 570, at 64.

[205] ECF 570, at 26.

again."[206] Given the misinformation the government cites (and has put into the public realm), to the extent that this Court finds that the future risk of flooding of the Plaintiffs' properties, or the use of the government's permanent flowage easement, is relevant to the finding of just compensation, then the Plaintiffs have provided expert testimony of same. Notably, Dr. Bedient focused on actual, observed pool stages, not rainfall alone, because of the ratcheting effect of successive rain events and dam operations.

Dr. Bedient performed his flood pool frequency analysis using a standard methodology, the graphical method, which had been used by the U.S. Army Corps of Engineers in its past flood pool frequency analysis for these two reservoirs. He then also used an analytical method to check the results of the graphical method and determined it would be reasonable to use an approximate average of the two sets of results. Doing so resulted in Dr. Bedient estimating the upper limit of the government's permanent flowage easement at about a 70-year event, with the lower limit having a frequency of about 15-20 years; estimates that make sense given what the Houston region has recently experienced. They also are consistent with the NOAA Atlas 14 upper confidence limit values as shown above.

The government contends that Dr. Bedient's "precipitation frequency estimates" are "outliers," and notes that its witness, Dr. Keim, questioned Dr. Bedient's methods in reaching his estimates.[207] But at trial, Dr. Keim admitted that Dr. Bedient did not conduct a precipitation frequency analysis, but rather used historic storm events as a "reasonableness check" on his flood pool frequency estimates, rendering all of Dr. Keim's complaints about Dr. Bedient's "precipitation frequency analyses or estimates" incorrect as well as irrelevant. Dr. Keim agreed that the six large storm events, noted by Dr. Bedient in his report, could have easily been centered over the Addicks and Barker watersheds, providing further evidence that the Houston region (including the Addicks and Barker

---

[206] ECF 570, at 33-35, 65-68; Tr. 2322:06-09 (Lucco).

[207] ECF 570, at 66-67.

watersheds), has experienced major rainfalls that would have resulted in these reservoirs' pool levels impacting private properties, and will most likely see more of the same in the future.

The government complains that Dr. Bedient used "only" 35 years of stage data to estimate the reservoirs' flood pool frequency.[208] The government contends "that using a graphical method curve on a short data set that has an outlier or extraordinary event could skew the frequency curve toward the more infrequent event, and make the outlier event appear more frequent."[209] But that is exactly why Dr. Bedient ultimately estimated the Harvey pool at a 70-year frequency, rather than the 35-year result from his graphical method. And Dr. Bedient applied the Corps' pre-litigation methods faithfully to estimate pool frequency.

The government further state that "graphical methods are not used at the Corps to estimate the frequency of extraordinary or rare floods because the period of recorded data is usually too short to reliably estimate such events, and such events require additional analytical methods to help estimate those frequencies."[210] But again that criticism misses the mark since Dr. Bedient created frequency curves that closely follow the observed data—as opposed to the Government's witnesses who created frequency curves using a "new method" that failed to follow the observed data.[211] The government tries to justify the work of its experts by stating that "[o]bserved data points are plotted on top of the curve separately as a comparison only, not for use in fitting the line and not to be confused with the line."[212] However, the government's own witnesses admitted that the graphical method creates a frequency curve that follows the data and is the recommended method for determining pool

---

[208] ECF 570, at 70.

[209] ECF 570, at 70.

[210] ECF 570, at 71.

[211] *See* Tr. 1051:21-1052:7, 1054:3-15 (Beddingfield); Tr. 2549:24-2550:9 (England).

[212] ECF 570, at 71

frequencies of 100-years and less.[213] That is what Dr. Bedient did. And his results reflect a reality-based assessment of the frequency risks faced by Plaintiff and the entire upstream community.

### C.   The Compensation Due for the Temporary Loss of Use Each Plaintiff Suffered.

Just compensation for the temporary dispossession of Plaintiffs' property rights caused by the taking here is measured by the fair rental value of each property for the reasonable period plaintiffs were deprived of its use. *In re Upstream*, 159 Fed. Cl. at 531-32 (citing ECF 466, Plaintiffs' Memorandum of Contentions of Fact and Law, at 26); *see also Yuba Nat. Resources, Inc. v. United States*, 904 F.2d 1577, 1580-81 (Fed. Cir. 1990). The United States cannot dodge its constitutional duty. *Narramore v. United States*, 960 F.2d 1048, 1051 (Fed. Cir. 1992) ("The Fifth Amendment guarantees a property owner the right to seek damages for the full extent of a taking.") (citing *United States v. Clarke*, 445 U.S. 253, 257 (1980)).

Equally unavailing is the government's sole challenge to the evidence Plaintiffs presented at trial: that a ten-month period is an "unreasonable" span for the repair of their properties (and, hence, the period it was temporarily taken by the government).[214] The record supports this length of time to obtain the necessary labor and materials to repair the damage caused by the government's flooding—especially given the fact there were, literally, millions of people vying for the same scarce resources.[215]

---

[213] Tr. 913:24-914:24 (Beddingfield); 2573:1-8, 2558:3-2559:23 (England).

[214] ECF 570, at 101-02.

[215] Tr. 1726:10-24 (Mr. Sidhu required eleven months to repair Unit. 603. "There were many properties that got flooded, so there was many people in search of the same things I was in search of."); Tr. 42:14-43:15, Tr. 53:25-54:17 (Ms. Burnham's property flooded shortly after she had completed remediations relating to the Tax Day Flood—which themselves took one year to complete. She was forced to sell her property "as is" in Feb. 2018. "I did not have the funds available to but it back to habitable conditions. And it was not safe for me or my children. It had been broken into. It just wasn't possible for me to do it.); Tr. 105:17-107:6, (Ms. Micu's remediation efforts lasted about a year. "[F]inding good quality contractors, not some fly-by-night company to come and…fix the house, it took a lot of time and – and labor was – was scarce."); Tr. 762:24-763:24 (It took the Bankers approximately eight months to remediate their home to the point where they could move back in. However, Mr. Banker testified he believed his property has never been put back into the condition it was pre-Harvey; Tr. 827:18-831:9 (Ms. Popovici, whose lot was flooded, remediated projects as her

And the challenges to the recoveries of Popovici and Burnham ignore the facts that (a) Popovici was required to remediate her property and replace the landscaping destroyed by the toxic water the government stored on it, and she did have some damage to her garage structure that required repair; and (b) Burnham's sale of her property does not decrease the time period that it would not be available for use, regardless of who was using it.[216] *Eyheraide v. United States*, 170 Fed. Cl. 598, 607 (1965) (compensation for temporary taking "allows not only for use and occupancy of the property but also for the loss of improvements and the cost of placing the property in its pre-taking condition").

Finally, as discussed above, federal payments, such as the FEMA assistance payments which undergird the government's argument, may not be offset against an award of just compensation as a matter of law. The government never clears the requisite hurdles on that issue.

### D. The Compensation Due for the Personal Property Taken.

"[T]he taking also encompassed—as a consequential result of the flowage easement taken—plaintiffs' personal property, fixtures, and improvements damaged or destroyed by the flood event that climaxed on August 30, 2017." *See In re Upstream*, 148 Fed. Cl. at 278; *see also Horne v. Dep't of Ag.*, 576 U.S. 350, 135 S. Ct. 2419, 2426 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."); *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) ("the term property as used in the Taking Clause includes all

---

budget allowed, upwards to three years after Harvey); Holland-JC 028 at Question 48-h (Mr. Holland never returned to his home).

[216] Popovici is the only test property to have lot-only flooding. She remediated her property as she noticed damages, and as her budget allowed. Tr. 793:2-8 ("the flowerbeds were trampled and they had been sitting in this brackish water for a while…the driveway had kind of a dark film on it"), Tr. 794:3-20 ("our ceiling air vents that [were] covered in mold and mildew), Tr. 819:24-821:20 (Popovici's garage door opener needed repairs post-Harvey. The Court intuited that the sensor at the base of the garage may have been the cause of the mechanical failure since the engine that opens the door is mounted overhead), Tr. 827:18-831:9 ("So keep in mind, I do not do this scope of landscaping every year because this is a very expensive piece of work. So there was some time that elapsed after Harvey before I decided to budget to do this kind – this level of landscaping.").

rights inhering in ownership, including the right to possess, use, and dispose of the property"); *Innovair Aviation, Ltd. v. United States*, 72 Fed. Cl. 415, 423 (2006), *rev'd on other grounds*, 632 F.3d 1336 (Fed. Cir. 2011) (applying *per se* rules in case involving "total destruction" of plaintiff's personal property).

The compensation due is measured by the value of the property taken. And the government is not relieved of its obligation in the absence of market from which to determine a value of the property. *See Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697 (1933) ("But the absence of market value does not mean that the offender shall go quit of liability altogether. The law will make the best appraisal that it can, summoning to its service whatever aids it can command."); *see also id.* at 699 ("Value for exchange is not the only value known to the law of damages. There are times when heed must be given to value for use, if reparation is to be adequate. . .. The market test failing, there must be reference to the values inherent in the thing itself, whether for use or for exchange.").[217] Nor

---

[217] The Court should follow Texas law when valuing the loss of property rights in their personalty. As the Texas Supreme Court has held, the "value inherent" in the property destroyed by the government in the act of taking its easement by inundation includes that for "the loss or destruction of items which have their primary value in sentiment." *Brown v. Frontier Theatres, Inc.*, 369 S.W.2d 299, 305 (Tex. 1963). The Texas Supreme Court explained the valuation of personal property:

> The law recognizes that articles of small market value of which their owner is despoiled may have a special value to him as heirlooms, and there is evidence in the record that with the exception of the coin collection and the land patent the primary value of these items to Mrs. Brown was their sentimental value. For example: the wedding veil, one of the [sic] emerald rings, the shoes and the point lace collar belonged to her grandmother; the pistol belonged to her grandfather; the watch belonged to her great grandmother; and the two slumber spreads were made by hand by her great, great, great grandmothers. . .. It is a matter of common knowledge that items such as these generally have no market value which would adequately compensate their owner for their loss or destruction. Such property is not susceptible of supply and reproduction in kind, and their greater value is in sentiment and not in the marketplace. In such cases the most fundamental rule of damages that every wrongful injury or loss to persons or property should be adequately and reasonably compensated requires the allowance of damages in compensation for the reasonable special value of such articles to their owner taking into consideration the feelings of the owner for such property. Where such special value is greater than the market value, it becomes the only criterion for the assessment of damages.

*Brown*, 369 S.W.2d at 304-05 (citations omitted).

should the government grouse about the quality of Plaintiffs' proof as to the valuation of their property when it was the government that caused the circumstances hindering (and in some cases preventing) better documentation or precise valuation of their losses. *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 698 (5th Cir. 1975) ("In a case such as this, where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of the damages as a matter of just and reasonable inference, although the result may be only an approximation. The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury.") (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931), and *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 379 (1927)). The record supports the compensation requested by each Plaintiff.

### 1.    Kulwant Sidhu has made no claim for lost profits or any other "consequential damages."

Kulwant Sidhu seeks compensation for items of personal property lost in the flooded downstairs unit (Unit 603). That he personally owned the items is supported by the record and unchallenged by the government.[218] And the protests that have been raised lack merit.

The government argues that Mr. Sidhu is not entitled to compensation for the utility and leasing costs he incurred in Unit 603 because they were consequential damages and "normal business expenses incurred anytime a unit is vacant."[219] However, the court made clear in its liability order both that losses that were a consequential <u>result</u> of the taking of the permanent flowage easement do <u>not</u> constitute consequential damages and that the government is liable to compensate each Plaintiff for their loss. *In re Upstream*, 148 Fed. Cl. at 278. The only reason Mr. Sidhu had to pay utility costs and

---

[218] *See* Tr. 1719:4-1720:2 (Sidhu); JX-1172; Sidhu-JC 052; Sidhu-JC 089; Tr. 1725:3-1726:7 (Sidhu); JX 1181.

[219] ECF 570, at 75.

costs associated with re-leasing Unit 603 was because the taking of the permanent flowage easement rendered Unit 603 uninhabitable, forcing Mr. Sidhu's renter to vacate the premises (and not pay those bills). In contrast, the upstairs Unit 604 did not flood, Mr. Sidhu did not have to pay those same utility and leasing costs and has made no claim for them here.[220]

Similarly, Mr. Sidhu is entitled to compensation for the funds he spent traveling to and from Houston after Harvey to manage and repair his damaged properties; that too is money he would not have spent but for the government's taking of the permanent flowage easement.[221] Finally, Mr. Sidhu is entitled to compensation for the HOA special assessments he paid for Units 603 and 604 because those amounts represent amounts he was required to pay to repair damage to the common areas of the condominium complex.

### 2. Scott Holland lost personal property and a leasehold—real property that the government perversely argues is not compensable.

The government's assertion that Mr. Holland's loss was of "contractual" rights that the Court has not found were taken ignores basic property concepts and basic decency. The taking by inundation of the government's easement displaced Mr. Holland from the home he was renting for the remaining period of his lease and destroyed virtually all of his personal effects in the process:

> I was evacuated by rescue boat on August 28, 2017. Because I was still recovering from major surgery, the paramedics helped me. Water was coming into the front of the house, which is on a slope. When I left, there was approximately two feet of water already in my house. The water between my front door and the curb was chest-deep. Based on the high-water line, I think the flood waters reached three to four feet inside.[222] The house was completely destroyed, along with nearly all our belongings. We were never able to move back in. We lost our home and nearly all of our belongings.[223]

---

[220] Tr. 1714:9-24.

[221] Tr. 1731:14-1732:1.

[222] Holland-JC 028, response to deposition question 33.

[223] Holland-JC 028, response to deposition question 34.

The government's taking destroyed the use and enjoyment of his leasehold estate just as if the government had condemned and acquired that leasehold interest "incident to an eminent domain taking of the underlying fee." *Coconut Grove Ent., Inc. v. United States*, 46 Fed. Cl. 249, 254 (2000). There is no difference. And the government ignores fundamental property law to suggest one exists.

The government further argues that Mr. Holland should not receive compensation for the antiques, specialty items, collectibles, art, and hobby-related items he lost during Harvey because he has allegedly not provided sufficient evidence of the value of those items.[224] Mr. Holland testified in his written deposition responses that he and his wife "estimated the cost of our property to the best of our recollection."[225] Notably, the numbers provided by Mr. Holland reflect the cost of those items, that is, the amount he paid to obtain them—not an estimate of their resale value today.[226] Never before trial did the government raise any concern about the accuracy of Mr. Holland's cost estimates for his lost property or seek additional, clarifying discovery on the issue. Nor have any of the government's experts countered with alternative cost estimates for the items at issue.[227] The only evidence about the value of Mr. Holland's property is Mr. Holland's sworn testimony. While the government contends the values are wrong, it offered no proof to that effect.

---

[224] ECF 570, at 83.

[225] Holland-JC 028 response to deposition question 61(d).

[226] The government misses this distinction when it notes Mr. Lozos' observation that the value of antiques and collectibles is "not always high." ECF 570, at 80. Mr. Holland was not estimating what he thought someone else would pay for his antiques and collectibles today, but rather the cost he paid to obtain them.

[227] The government faults plaintiffs' expert Mr. Timothy Lozos for not "verifying" the information provided by Mr. Holland about the cost of his antiques and collectibles—but of course, Mr. Lozos could not examine or assess the cost of those items himself because they were lost in the flood. *Story Parchment*, 282 U.S. at 563 ("The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.").

Beyond that, the government invokes the opinion by its expert Dan Leistra-Jones seeking to "offset" amounts received from private insurance sources against the compensation it owes. That ploy has been repeatedly rejected in Fifth Amendment cases:

> The Fifth Amendment is clear that "it is the duty of the <u>government</u> to make just compensation as of the time when the owners are deprived of their property." *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 305, 43 S. Ct. 354, 67 L. Ed. 664 (1923). Yet, what the City is asking the Court to do is reduce Baker's just compensation not based on funds she has received from the government, but on funds she has received from private citizens and her private insurance. This would set a dangerous precedent, and at worst, would allow a workaround of the Fifth Amendment. The government could completely forego paying any compensation by taking private property then waiting for a collateral third party to cover the landowner's losses. Further, this, in turn, would allow the government to push the burden of paying compensation onto private individuals. But as stated, the obligation to provide just compensation belongs to the government—no one else.

*Baker v. City of McKinney*, No. 4:21-CV-00176, 2022 WL 2298974, at *6 (E.D. Tex. June 21, 2022) (emphasis in original, cleaned up). The Court should reject this similar effort.

### 3.    The government's opposition to the amounts sought by Catherine Popovici are without merit.

Catherine Popovici's unrefuted testimony establishes that her car, garage door, and HVAC/air ducts were damaged by Harvey. The government offered no evidence to refute Ms. Popovici's testimony. She is entitled to just compensation for that damage.

Contrary to the government's representations, Ms. Popovici and her family did not recklessly drive their car through flooded waters for no reason. Ms. Popovici testified that they were trapped in their house and did not leave at all for "about a week."[228] After waiting about a week for the water level to recede, Ms. Popovici's husband needed to leave the house to get food for the family: "Yes, to

---

[228] Tr. 790:17-791:14 (Popovici).

get food. I mean, this is after we were able to get off the property, we did drive it more than once."[229]

As a result, the starter stopped working:

> Q. And why did you have work done on your Toyota Sequoia?
>
> A. The starter stopped working. And this is--happened right after Hurricane Harvey, and we think it happened because of the water. The first time we had to drive through to get some food, it rose up under the truck and impacted the starter.[230]

The government has the temerity to assert that the "decision" to obtain food for her family after a week of being trapped in their house during a flood caused by the government constitutes some kind of an intervening proximate cause.[231] The Popovicis could only obtain food by driving on flooded streets. Rather than serve to disrupt liability through some unproven intervening cause, the event underscores the loss access rights Ms. Popovici and her family suffered.

Similarly, Ms. Popovici's garage door worked before Harvey, her wooden garage door frame was not rotted, and her air filtration system did not have mold. After Harvey, her garage door stopped working correctly, she observed rot on the frame, and there was mold in her air filtration system.[232] She testified that her automatic garage door has an electric eye at the bottom, and that she believed water got into the garage at the base during the storm damaging both the electric mechanism that operated the garage door and the wooden frame.[233] The government assumes that none of this damage was caused by the Harvey because it was not repaired until more than one year later. But Ms. Popovici explained the reason for the timing: "it does always take a while in our household to get around to doing a repair, so you're not going to see it happening immediately after the event for a couple of reasons. Sometimes it takes a while for things to break down or for you to notice them. And then,

---

[229] Tr. 824:22-24 (Popovici).

[230] Tr. 804-3-9 (Popovici).

[231] ECF 570, at 83.

[232] *See* Popovici-JC 019 and Popovici-JC 020.

[233] Tr. 791:19-24, 820:4-6, 821:10-22 (Popovici).

also, when we are budgeting expenses, we don't always fix things immediately."[234] Ms. Popovici's testimony establishes that the damage for which she seeks compensation was caused by the government's flooding. And the government has no evidence to the contrary.

Finally, Ms. Popovici establishes that the damage to her landscaping was caused by Harvey. Indeed, it was some of the first and most obvious damage she noticed at the property immediately after Harvey.[235] Over time the impact of the flood water on Ms. Popovici's property became more manifest and additional work was required.[236] And the fact that the landscaping repair work was done over time in the years following Harvey does not prove that the damage was not caused by Harvey; rather, it reflects the fact (as is supported by her unrebutted testimony) that the repair work was expensive and that Ms. Popovici undertook the work when she was financially able to do so.[237]

### 4.    The government's objections to the personal property recovery sought by Christina Micu are unsupported and, frankly, offensive.

The government argues that Ms. Micu failed to establish which of personal property items "were actually damaged by floodwaters" and which items she "simply chose to discard."[238] Setting aside the government's insulting insinuation that Ms. Micu lost nearly all of her personal possessions because she couldn't be bothered to sort through them, the government is wrong when it argues that she failed to establish a causal link between Harvey and her losses. The record is abundantly clear that Ms. Micu's house had to be emptied and completely renovated after Harvey:

---

[234] Tr. 820:12-19 (Popovici).

[235] Tr. 793:2-6 (Popovici).

[236] Tr. 800:18-22 (Popovici); Tr. 829:22-830:4 ("We had some plants that were not doing well, but we -- they had previously – previously done well. The azaleas were there when we bought the house, and they had flowered every year. And then after Harvey, they were not doing well. And so the landscaper lady said, well, why don't we just try moving them to the backyard, maybe they will do better there.").

[237] Tr. 830:11-15 (Popovici).

[238] ECF 570, at 85.

When we first got back inside, there was mud on the wood floors, the wood floors were warped, the carp- -- the rug was full of mud, furniture moved. Water, you know, still on the carpet -- I mean the rug. Mold growing up the walls.[239]

Well, first you had to throw all your stuff out on the curb. And then after that, you know, you had to demo down the walls, take everything out that was within the walls, insulation, the sheetrock, and then you had to — I had to let the house dry out. We let it dry out for several months. I mean, from the wood frames, the foundation, everything got really dry. And then we started to remediate the mold. That was a long process. And then after that, it was like, okay, now we were ready to start to repair the house.[240]

Photographs of Ms. Micu's home after the flood demonstrate the severity of the damage.[241] She explained that while she would have liked to salvage some of her personal belongings, she could not:

Q.  Ms. Micu, did you keep track of every item that you threw away after Harvey?

A.  No. It was impossible to keep track of everything that we threw away.

Q.  Why?

A.  Well, you're trying to get everything out of the house as soon as possible because it's mold and damaged and -- and nasty… I had piles that I was thinking maybe I could save. I really didn't know. And as the piles were getting taller and taller, it got to a point where I was like, Oh, my God, like, how am I going to save all this stuff? I don't -- I don't even think I can.[242]

The failure to catalog every item can also be attributed to the sheer volume of destroyed items and enhanced by the emotional impact of losing nearly all of her possessions.

Well, a lot of things were taken from me when we were flooded. A lot of them are irreplaceable. I'll never have them back. I mean, from heirloom items to baby pictures.[243]

Finally, the government's asserts that Ms. Micu should not be compensated for some cash she lost as a result of the storm because she "could have turned the cash in for full value" to the Bureau

---

[239] Tr. 103:3-8 (Micu).

[240] Tr. 103:18-104:2 (Micu).

[241] *See* Micu-JC 143; Micu-JC 055; Micu-JC 189; Micu-JC 192.

[242] Tr. 112:17-113:6 (Micu).

[243] Tr. 119:13-16 (Micu).

of Engraving and Printing.[244] But Ms. Micu testified that she unknowingly discarded the cash when she was emptying the house of nearly all of her possessions.

> Q.  I just want to confirm that you discarded $1,000 in cash.
>
> A.  It wasn't knowingly. It was in my bedside drawer. And like I said in other pictures, that we had to throw everything out. So afterwards when I'm filling out the spreadsheet and had to go line item by line item, I remembered, oh, yeah, there was cash in my bedside drawer. Oh, there -- and I threw that out. It wasn't knowingly.[245]

Ms. Micu lost her cash for one reason—the government's taking of a permanent flowage easement at her property. But for the flooding, her cash would not have been accidentally thrown away along with waterlogged furniture. She should receive compensation for money she lost solely due to the flooding.

### 5.    Conclusion re personal property lost: The government's disingenuous ploys to evade responsibility must be rejected.

None of the government's attempts to limit the compensation owed to any Plaintiff for their personal property losses hold water. Indeed, the government's proposed deductions for Ms. Popovici's and Mr. Sidhu's losses <u>exceed the value</u> of their claims for compensation. This is an absurd result not grounded in the law, the record, or reality.

"The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, as it does from technical concepts of property law." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 478 (1973). The facts have proven the government knew that one day it would cause – and be liable for – all the property destroyed when it <u>chose</u> to let mother nature control the triggering of a need for additional property to store detained storm water. *See In re Upstream*, 146 Fed. Cl. at 250 ("[T]he government's actions have subjected plaintiffs' private properties to the possibility, rather probability, of government-induced flooding ever

---

[244] ECF 570, at 85.

[245] Tr. 130:9-18 (Micu).

since the construction of these dams, throughout subsequent changes to the dams and reservoirs, and for at least the foreseeable future."). The record also shows that the government chose <u>at every turn</u> to do <u>nothing</u> to ameliorate the losses it <u>knew</u> it would cause. *Id.* at 259 ("Comparing the cost attributable to flooding rural land to what it would cost to purchase rights to the then-undeveloped land, the Corps determined that the cost of flooding was less. That the calculus reached the conclusion it did indicates that the Corps regarded such overflow as possible but that it was willing to take the ensuing risk. That calculus did not withstand the test of time.").[246]

The government's tactics are nothing short of reprehensible. Particularly obnoxious are the government's throwaway comments such as that in footnote 108 of its brief that the losses Plaintiffs suffered were ameliorated because "[t]he single family residential properties at issue in this case all have a second floor. And, unlike a flash-flooding event, the rise of the flood pool behind the Addicks and Barker dams happened over a period of days before flood waters reached the subject neighborhoods."[247] In other words: "It wasn't that bad. And they should have gathered everything they own and left."

The government <u>knows</u> that <u>it</u> made the decision to use these properties as part of its flood control project – and for 40 years exposed millions of people to the risks inherent in a major flooding event without ever advising them of their peril. *In re Upstream*, 146 Fed. Cl. at 238 (noting that it was not until the mid-1980s that the Corps began public outreach programs regarding the dams and their potential to flood upstream properties). It also <u>knows</u> that <u>it</u> never adopted a flood warning and evacuation plan for the people in the upstream reservoirs.[248]

---

[246] *See also* Tr. 377:7-15 (Thomas) (discussing JX-52 and the Corps' 1995 decision to "Accept existing conditions and risk through no action." during May 7, 2019, liability trial testimony).

[247] ECF 570, at 78 n.108.

[248] Tr. 377:7-15 (Thomas) (May 7, 2019, liability trial testimony).

Indeed, as this Court has recognized, even if it <u>had</u> broadcast to the world (rather than keeping mum) the dangerous conditions <u>it</u> created and continued to maintain, "the government gains no immunity for an uncompensated taking by giving advance notice that it will take property. When the taking actually occurs, it still must provide compensation." *In re Upstream*, 146 Fed. Cl. at 261; *see also id.* at 260 ("To accomplish its purpose of downstream protection, the Corps planned all along to impound water to the maximum extent of the available storage—a determination that never altered even when the Corps came to understand that rainfall events reaching the design storm magnitude were probable rather than merely possible.").

Plaintiffs do not seek to relitigate a liability finding they won. Rather, the point is that in the assessment of just compensation required to put each Plaintiff in as good a position pecuniarily as if his property had not been taken, the equitable facet of that determination shines in favor of Plaintiffs and <u>not</u> the United States.

### E.       There is no such thing as an incremental taking.

With absolutely no legal support, the government asserts that "[c]areful tailoring of just compensation requires the Court to account for the incremental difference in flooding the Burnham and Micu properties experienced during Harvey, and the flooding they would have experienced but for the Corp's actions in constructing and operating the Project."[249] This is a variant of the argument it lost in *Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1374-75 (Fed. Cir. 2013) (rejecting government argument that no taking occurred because "the increase in flooding was only incremental" since that case, like this one, was "not a case in which the asserted intrusion was within a range that the property owner could have reasonably expected to experience in the natural course of things."); *see also Jacobs v. United States*, 290 U.S. 13, 16 (1933) (finding that the construction of a dam

---

[249] ECF 570, at 107.

that produced an incremental increase in flooding resulted in a taking because the increased flooding "impaired the use of the lands for agricultural purposes") (as cited in *Arkansas Game*). While the question of the severity ("incremental nature") of the flooding is a factor in considering whether the government is *liable* for a taking, it cannot have only "taken" the additional span of three-dimensional airspace on the Burnham and Micu properties that the government argues would not have flooded "but for the Corp's [*sic*] actions in construction and operating the Project."[250]

In addition, the government's postulated "incremental damage" argument is grounded in facts that have already once been rejected by this Court: the alternative flood elevation modeling by Dr. Nairn which was shown to be wholly unreliable at the liability trial. *See In re Upstream*, 146 Fed. Cl. at 257 (rejecting Nairn's *modeling* analysis and testimony as it "suffered from a major flaw—a failure to fully capture what *actually* occurred") (emphasis in original). The Court correctly rejected this argument—indeed refused the government's offer of evidence in support—because the premise on which it rests was demolished in the liability phase.[251] As this was the basis of the "facts" its witness, Mr. McReynolds, was asked to <u>assume</u> when doing his analysis, no admitted evidence supports the notion of an incremental take <u>or</u> Mr. McReynolds' calculations.

### F.    The compensation due for the time value of the unpaid compensation.

Staying true to its inaccurate and disingenuous course to the end, the government cites *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 306 (1923), for the proposition that "an award of just compensation <u>may</u> include compensation for the time between the date of taking and the date on which just compensation is paid."[252] There is <u>nothing</u> discretionary in the award of interest in an

---

[250] ECF 570, at 107.

[251] Tr. 2427:19-2431:03 (argument and ruling by the Court that alternative flooding scenarios suggested by Dr. Nairn are not relevant).

[252] ECF 570, at 99 (emphasis added).

inverse condemnation case. And *Seaboard* says <u>nothing</u> of the sort. The comment that the government relies on in *Seaboard* is pure *dicta* and concerns another statement, also in *dicta*, contained in *United States v. North American Transportation & Trading Co.*, 253 U. S. 330 (1920), a matter which *Seaboard* notes "was a suit in the Court of Claims based on an implied promise of the United States to pay for property appropriated by it. It was not a condemnation case." What *Seaboard* <u>actually</u> says on the subject could not be more different than what the government would lead this Court to believe:

> The requirement that "just compensation" shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation. Where the United States condemns and takes possession of land before ascertaining or paying compensation, the owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking.

261 U.S. at 306; *see also Jackson v. United States*, 155 Fed. Cl. 689, 719 (2021) ("In cases where significant time has elapsed between the date of the taking and payment of just compensation, the Government <u>must</u> apply a sufficient interest rate to put plaintiffs in the same position as though just compensation had been paid contemporaneously with the taking.") (citing, *inter alia*, *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 306 (1923)). For the government to imply the award of interest is somehow discretionary here is odious (but consistent).

Having erroneously suggested the award is not mandatory, the government asks the Court to apply the rate and methodology from the Declarations of Taking Act based on *Waverley View Investors, LLC v. United States*, 136 Fed. Cl. 593 (2018), *aff'd*, 767 F. App'x. 996 (Fed. Cir. 2019), and *Textainer Equip. Mgmt. Ltd. v. United States*, 99 Fed. Cl. 211 (2011). But the Court should follow *Hardy v. United States*, 138 Fed. Cl. 344. (2018), which examines both *Waverley View* and *Textainer*, explains why the absolutist statements regarding the Declarations of Taking Act as the sole source for the rate of interest is <u>not</u> accurate, and affirms that considerations and "special proof" presented in *Hardy* (which are equally applicable here) justify the application of the Prudent Investor Rule. And, following that

authority, the Court should use the Moody's Aaa corporate bond rate—compounded quarterly—to make the Plaintiffs whole. As the government levels no challenge to the analysis and opinions in the testimony and report of Dr. Ray Perryman on these issues, the Court should adopt that analysis and award interest on their awards of just compensation at the rate of 3.62 percent (the Moody's Aaa corporate bond rate on August 30, 2017), compounded quarterly.[253]

## CONCLUSION

Private property upstream was taken to catastrophic effect to save downstream properties, the City of Houston, and the Houston Ship Channel. The government, consistent with its design concept for the Addicks and Barker dams, stored detained storm water on private property without any legal right to do so. These upstream homeowners had their private property occupied and destroyed so that the public would benefit—both in terms of human lives but also in economic terms—from the taking.

Plaintiffs have proven beyond any viable debate that the imposition of the permanent flowage easement associated with the government's flooding of upstream properties in connection with the design, construction, maintenance, and operations of the Addicks and Barker dams under the auspices of the Buffalo Bayou and Tributaries Project has diminished the value of their properties—homes where families reside and in which they live their lives—by 80% and 100% of the pre-taking value. That range is supported by a host of credentialed, tested experts as well as the government's non-litigation work. And it is just.

As it did in the liability phase, the government has resorted to every available argument, assertion, or position—however incredible or unsupported—to avoid its fundamental constitutional obligation: "nor shall private property be taken for public use, without just compensation." U.S.

---

[253] Tr. 1757:8-17, 1759:6-1760:5, 1766:13-1769:1 (Perryman). ECF 568 at 40 identifies the lower and upper tiers of just compensation figures owed to the Test Property Plaintiffs for real property, temporary loss and personal property components. The totals shown are before interest.

CONST. amed. V. But this is no game. This is no intellectual exercise. This is no antiseptic chamber. Real people and real lives are at issue. The government took exactly what it wanted from these property owners, used that taken right to the fullest, and ruined the value of these properties. Plaintiffs ask this Court to force the government to do what it should have done from the beginning: compensate these Plaintiffs to make them whole. It is time to give effect to the simple concept underlying the Fifth Amendment compact between the sovereign and its citizens: "for all that the Government takes it must pay." *United States v. Dickinson*, 331 U.S. 745 (1947).

Date: September 23, 2022

Respectfully submitted,

_/s/ Daniel H. Charest_

Daniel H. Charest
E. Lawrence "Larry" Vincent
Burns Charest LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
469-904-4550
dcharest@burnscharest.com
lvincent@burnscharest.com

> _Co-Lead Counsel, Upstream Pre-Trial Discovery and Dispositive Motions_
>
> _Co-Lead Counsel for Upstream Plaintiffs as to Jurisdictional Discovery, Motion to Dismiss, and Scheduling_

Charles Irvine
Irvine & Conner PLLC
4709 Austin Street
Houston, Texas 77004
713-533-1704
charles@irvineconner.com

> _Co-Lead Counsel, Upstream Pre-Trial Discovery and Dispositive Motions_

Edwin Armistead "Armi" Easterby
THE EASTERBY LAW FIRM, P.C.
1502 Glourie Dr.
Houston, Texas 77055
713-230-2200
armi@easterbylaw.com

> _Co-Lead Counsel, Upstream Pre-Trial Discovery and Dispositive Motions_

Vuk S. Vujasinovic
VB ATTORNEYS, PLLC
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713-224-7800
vuk@vbattorneys.com

> _Of Counsel for Upstream Plaintiffs as to Jurisdictional Discovery, Motion to Dismiss, and Scheduling_

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the foregoing instrument was served on all counsel of record in this Sub-Master Cause by filing it via the Court's ECF system on September 23, 2022.

/s/ Daniel H. Charest

Daniel H. Charest