**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| In re UPSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | |
| | Sub-Master Docket No. 17-9001L |
| THIS DOCUMENT APPLIES TO: | Judge Charles F. Lettow |
| ALL UPSTREAM CASES | |

## UPSTREAM PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S PROPOSED EASEMENT LANGUAGE (ECF 578)

The government double speak continues unabated. While the government declines the Court's request to articulate fully the rights it has taken, it does so despite the admitted fact that that <u>its own regulations call the clarity it seeks to avoid</u>. *See* JX 1007, at 5-73 (USACE Real Estate Manual mandate that DOJ seek from the Court "a <u>precise</u> description of the interest taken"); *see also* Tr. 144:4-14 (Johnson-Muic). Upstream plaintiffs do not posit that the government will "act unlawfully or contrary to the Court's rulings." ECF 578, at 7. But upstream plaintiffs are saying—and have been saying— that the government has pursued a path of unabashed opportunism in an effort to minimize the compensation due to the upstream plaintiffs while maintaining the government's ability to maximize the easement through post-litigation government interpretation and enforcement against upstream plaintiffs.[1] The government wants to hide in the shadows of uncertainty to avoid the situation: the easement took significant rights and upstream plaintiffs deserve both clarity and compensation.

---

[1] For instance, while the government's witnesses at trial assiduously avoided admitting the easement would be recorded—going so far as to abandon their prior sworn testimony and run from the mandatory language of its Real Estate Manual—in its proposed easement document the government includes a judicial <u>mandate</u> that "this Order shall be recorded by the United States in the Fort Bend County and Harris County land records." *Compare* JX 1007, at 5-71 to 5-73, Tr. 142:21-148:6 *with* ECF 578, at 12. Similarly, the government briefing contends that the amalgamation of prior orders suffices to describe in detail the easement taken. But, in complete contradiction, the top USACE real estate professionals could not answer questions about the easement's scope or effect on the existing record.

**A.**     **The government's assertion that nothing more is needed to delineate the rights it has taken is wrong—and dangerous.**

The government ignores the Court's request and, instead, asserts that any easement language should only "synthesize" the prior rulings in this case. ECF 578, at 1. The government's position (a) is a bad idea, (b) ignores the obvious open issues that exist and remain about the scope of the easement, and (c) fails because of the gratuitous (and counterfactual) commentary in its proposed language. The Court should reject the government's effort (such that it is) because the government restates existing orders but misses the point of the Court's request: to articulate a comprehensive, enforceable, self-contained easement for recordation and notice.

First, the government's proposal makes no sense as a matter of judicial process: if the language of the Court's prior rulings were a complete delineation of the easement's countours, no additional order would be needed. The prior Court rulings—in their entirety and with their context—address the topics on which the Court ruled. Drawing from parts of those orders but not including the broader context invites internal conflict for no benefit. Any additional regurgitation or reformulation of those prior orders would inherently open the door to future argument contrasting those orders with the "synthesized" articulation. *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860 (11th Cir. 2007) (vacating district court order as presenting rulings "internally inconsistent"). If the prior orders control, they should control in their full context—not tactically excerpted by the government.

But, despite the government's empty assertions in its brief (which contradict its own witnesses under oath) the language of the Court's prior rulings does <u>not</u> provide a complete, detailed picture of the scope of the rights taken. The government's own witnesses—including the top civilian real estate authority for the U.S. Army Corps of Engineers who testified on behalf of the United States on the scope of the easement—repeatedly deferred to future, final language and ongoing interpretation when asked about the scope of the easement. Over and over, Ms. Johnson-Muic deferred answers about the

easement and cited the need to have more language and more interpretation before the owner of the easement might know exactly what it has:

- "The corps does not have a position on that today. It would have to be analyzed based on the facts and the law at the time." Trial Transcript 211:18-20.

- "We would need a set of facts and a team come together to make a determination of the policy for this easement." Trial Transcript 214:8-10.

- "The trouble I'm having is that there are lots of decisions our policies allow for. And so when you say 'will apply,' it's not blindly. There's an analysis that has to happen." Trial Transcript 219:13-16.

- "[P]olicies are written generally and have to be specifically applied to facts, and so very frequently we have fact scenarios in the field where an exception is needed or a clarification of does this policy apply, and those are the sorts of things that would be generated in the field and then sent up to the headquarters for decision." Trial Transcript 267:18-25.

- "Well, I think the point here is that it's not a one-size-fits-all, that there are many factors to be applied and considering what – the goals of the policy." Trial Transcript 278:19-22.

- "Well, I think application of all of these policies does require some critical thinking and application to the facts. So there are a lot of factors like value of the property and what the local practices are, and is it one of a kind or is it precedent-setting where we might have hundreds of a similar type of encroachment. So there's a lot of factors that go into what kind of action we might take." Trial Transcript 281:5-16.

*See also* Trial Transcript 146:1-4, 147:9-15, 153:21-155:8, 157:3-158:4, 159:20-160:19, 165:5-18, 168:7-169:5, 172:6-173:9, 178:13-179:11, 187:5-12, 188:9-19, 191:5-20, 198:8-200:12, 206:6-16, 207:6-16, 209:2-6, 210:25-211:20, 218:2-24, 220:18-25, 223:17-224:7, 225:2-15, 232:13-23, 233:17-18, 235:2-236:3, 239:3-7, 241:22-242:9, 242:10-23, 246:22-247:8, 250:22-251:6, 258:3-17, 262:17-23, 267:14-16, 275:3-16, 279:19-282:15, 284:4-22, 302:5-25, 305:11-23 (Johnson-Muic).

Despite the hedging, the government made two points clear. First, the language of the easement document is critical because that language will determine how the Corps enforces the specific rights which this Court announces it has taken. *See* Trial Transcript 284:15-17 ("[T]here would be a legal analysis of the easement rights that we own versus what that property owner owns."); *see also id.* 162:7 ("[I]t would depend on the rights between the parties."); 165:15-18 ("[T]here has to be some

kind of analysis on what they're doing and whether it conflicts with the rights that they own. But if it does, then we would pursue our rights under our easement."); 199:9-12 ("Well, there's an analysis that goes on, and I don't know what kind of property rights we're talking about in this question, but there would be an analysis of our rights versus the other owner's rights.").

And, second, that usage of the easement to fulfill the project's purpose will cause inundation of upstream plaintiffs' properties as often, and for as long, as the Corps deems necessary—so long as the properties are not kept permanently under water. Trial Transcript 166:18-24 (Johnson-Muic); *see also id.* 184:11-15 (project design concept is to detain floodwaters on private property as to which the government owns a flowage easement whenever necessary); 186:24-187:4 (lynchpin for enforcement of property rights by the Corps is the project purpose); 188:20-189:12 (Corps intends to store water on upstream properties in accordance with its project purpose); 193:9-11 ("[T]he authorized purpose as applied to this project is the storage of water upstream to protect downstream.").

The importance of the precise language of the easement is clear—as is, regrettably for the public, the government's ambition to maintain opacity—because whatever the easement language, the Court must assess the compensation owed based on an assumption that the United States will utilize the rights it has taken to their fullest extent and more certainty about the rights conveyed ensures a proper value of the compensation due. *See City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972) (a condemnee "is entitled to consideration of the damage which the condemnor has a right to inflict"). Without clear language, upstream plaintiffs face the very real prospect of being under compensated followed by post-compensation government enforcement.

Finally, the government's articulation fails because that proposed language includes irrelevant *dicta* from the Court's prior orders which the government incorrectly deploys as spin. For example, the proffered language that Tropical Storm Harvey "was the first time that a flood pool detained behind those dams resulted in structure flooding of private properties located between the land owned

by the United States" is wholly immaterial to the rights taken by that inundation. Moreover, the government continues to cling to the statement that future flooding "is not expected to be regular or occurring on a frequent basis." But that statement offers nothing more than a qualitative observation about the expectation of significant weather in future. And as the Court itself noted, the government's efforts to show the government's argument about the remoteness of similar storms <u>was disproven at trial</u>. *See* Transcript of Closing Argument at 131:21-24 (Sept. 29, 2022) (noting Harvey was an event with a less than 100-year expected recurrence). More importantly for the easement, <u>the Court's statement cannot control the weather</u>. Whenever sufficient rainfall occurs over the Addicks and Barker watersheds, the government will adhere to its Congressional mandate to protect the downstream areas and, in turn, will inundate the upstream areas—as often and for so long as operations require.

Harvey was neither a singular nor extraordinary event. Indeed, as data from the National Hurricane Center shows, over the past six seasons, six hurricanes at Category 4 or higher have hit the Gulf of Mexico: Harvey and Irma (2017), Michael (2018), Laura (2020), Ida (2021) and Ian (2022).



**B.** **The government's attacks on upstream plaintiffs' proposals fail.**

Unlike the government, upstream plaintiffs undertook to provide the Court with easement language that married the rights taken with the compensation due. As the trial made clear, the government's expert's "After Damaged" approach only valued the loss of value due to the damage caused by the induced flooding—in effect reflecting the value of a single flood. But Lucco's ~50% decrease in valuation expressly did not include any amount to compensate upstream plaintiffs for the actual rights taken by the government. Should the Court assess compensation at the minimal 50% quantum reflected by Lucco's work, it should enter an easement that leaves with the landowner those uncompensated rights. An example of that—a single-use easement which calls for future government reimbursement for future usage—is in the record and available to the Court. ECF 279 & Exs. 1-2.

The other proposed easements, the "moderate" and "maximum" options, bring together the scope of rights taken with an appropriate measure of compensation. The government criticizes upstream plaintiffs' experts for providing a range of possible valuation based on various iterations of the easement specifics. But that criticism only reflects the government's refusal to apply controlling legal principles: "The law presumes the condemnor will exercise its rights and will use and enjoy the property taken to the extent of its acquisition." *Horton v. Mills Cty.*, 468 S.W.2d 876, 878 (Tex. Civ. App.—Austin 1971, no writ); *see also Columbia Gas Transmission, LLC v. An Easement To Construct, Operate, & Maintain a 20 Inch Gas Transmission Pipeline*, 745 Fed. Appx. 446, 451 (3d Cir. 2018) (when determining just compensation a court "must assume the use of the easement will be in a manner as injurious to the landowners' remaining rights in the property as the easement rights taken will lawfully permit"). Try as it might, the government cannot escape this reality.

Finally, as to the government's *sub silentio* assurance that its use of the easement will be undertaken in good faith and, therefore, the "maximum" rights taken scenario should be ignored, the record (both factual and historical) tell a different story. In real-world practice, after acquiring property

interests (through whatever means), the government assiduously protects its property rights. The USACE regulations leave no doubt. *See* Tr. 153:21-154:2, 158:10-12, 197:10-11, 225:21-226:3, 256:17-259:24 (Johnson-Muic describing the various steps which Corps policy requires be taken to prevent encroachments on its easement); Tr. 361:14-25 (Nelson confirming Corps will guard against actions by upstream plaintiffs to exclude floodwaters as inconsistent with the purpose of the Buffalo Bayou and Tributaries Project). And the government's litigation track record confirms its practice—successfully employed—of suing to preserve storage capacity in flowage easements even when the capacity impingement was immaterial to the project. *See United States v. Austin Two Tracts, Ltd. P'ship*, 239 F. Supp. 2d 640, 643 (E.D. Tex. 2002) (enjoining even *de minimis* fill material on a portion of the flowage easement); *Hart v. United States*, 945 F. Supp. 1009, 1012 (E.D. Tex. 1996), *aff'd* 137 F.3d 1349 (finding that concrete pilings would interfere with easement rights); *United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1152 (10th Cir. 1974) ("use of landfill to raise the elevation of property [ ], thereby removing it from the flowage easement area, is a material interference with the Government's rights under the flowage easement deed").

\*       \*       \*       \*       \*

The time has come for the government to stop pretending. To stop hiding from the truth. To stop contradicting its own regulations. Having recognized the detail required to fully articulate the easement and value the taking, the Court asked the parties to submit language that addressed the unexpressed details of the easement. Upstream plaintiffs answered the call and proposed an array of options to the Court and correlated the language options to the expert work done in the case. By contrast, the government avoided its responsibility, ignored its own regulations, and ran for the shadows. But the government's efforts cannot stand.

The Court should foreclose the ambiguity and post-judgment interpretation/enforcement process the government prefers. The Court should adopt the language offered by upstream plaintiffs and should award the corresponding just compensation for those taken rights. Neither the rights taken nor the resulting compensation should be left to doubt and subsequent litigation.

Date: October 24, 2022

Respectfully submitted,

*/s/ Daniel H. Charest*

Daniel H. Charest
E. Lawrence "Larry" Vincent
Burns Charest LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
469-904-4550
dcharest@burnscharest.com
lvincent@burnscharest.com

> *Co-Lead Counsel, Upstream Pre-Trial Discovery and Dispositive Motions*

> *Co-Lead Counsel for Upstream Plaintiffs as to Jurisdictional Discovery, Motion to Dismiss, and Scheduling*

Charles Irvine
Irvine & Conner PLLC
4709 Austin Street
Houston, Texas 77004
713-533-1704
charles@irvineconner.com

> *Co-Lead Counsel, Upstream Pre-Trial Discovery and Dispositive Motions*

Edwin Armistead "Armi" Easterby
THE EASTERBY LAW FIRM, P.C.
1502 Glourie Dr.
Houston, Texas 77055
713-230-2200
armi@easterbylaw.com

> *Co-Lead Counsel, Upstream Pre-Trial Discovery and Dispositive Motions*

Vuk S. Vujasinovic
VB ATTORNEYS, PLLC
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713-224-7800
vuk@vbattorneys.com

> *Of Counsel for Upstream Plaintiffs as to Jurisdictional Discovery, Motion to Dismiss, and Scheduling*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the foregoing instrument was served on all counsel of record in this Sub-Master Cause by filing it via the Court's ECF system on October 24, 2022.

/s/ *Daniel H. Charest*
Daniel H. Charest